# EXHIBIT 3

Page 1

```
              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
   Case No. 1:17-cv-02246
   _____

   DOROTHY FORTH, TROY TERMINE, CYNTHIA RUSSO,
   INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
   LOCAL 38 HEALTH AND WELFARE FUND, LISA BULLARD and
   RICARDO GONZALES, On Behalf of Themselves and All
   Others Similarly Situated,

           Plaintiffs,

   vs.

   WALGREEN CO.,

           Defendant.
   _____
              VIDEO DEPOSITION OF CADE ERLUND
                     October 2, 2019
   _____
   APPEARANCES:

   ON BEHALF OF THE PLAINTIFFS:
        CAREY ALEXANDER, ESQ.
        JOSEPH GUGLIELMO, ESQ.
        Scott + Scott, Attorneys at Law, LLP
        230 Park Avenue, 17th Floor
        New York, New York 10169
        Phone:  212-223-6444
        Email:  calexander@scott-scott.com
        Email:  jguglielmo@scott-scott.com

   ON BEHALF OF THE DEFENDANT:
        SELINA P. COLEMAN, ESQ.
        Reed Smith LLP
        1301 K Street, N.W., Suite 1000 - East Tower
        Washington, D.C. 20005
        Phone:  202-414-9220
        Email:  scoleman@reedsmith.com

   Also present:
        Dennis Clayton, Videographer
```

Page 22

1  A. Correct.
2  Q. So if the discount card is used in
3  sufficient volume, they'll make up -- or they'll earn
4  profit from that?
5  A. Correct.
6  Q. And how do discount cards generally
7  provide discounts on the prices of prescription drugs?
8  MS. COLEMAN: Objection to form.
9  Q. (BY MR. ALEXANDER) You can answer.
10 A. They negotiate with the pharmacies, very
11 similar to negotiation for, you know, regular
12 insurance coverage, and the pharmacy and them will
13 agree to a contract that says when this drug is
14 adjudicated, it's priced typically at AWP minus a
15 certain amount plus the fee or potentially a MAC
16 price, where it's, you know, just a standard price, so
17 it's whatever, 50 cents per pill, whatever, something
18 like that. That negotiation happens. There's a
19 contract behind the scenes, and then when it's
20 adjudicated at that pharmacy, that's the price that
21 gets returned.
22 Q. So for all discount cards that
23 Walgreen's would accept, is it your understanding that
24 Walgreen's then has a contract with the entity issuing
25 the discount card?

Page 23

1     A.   Yes.
2     Q.   Okay.  Are you aware of any situations
3 in which a discount card would be accepted at
4 Walgreen's when Walgreen's doesn't have a contract
5 with the issuing entity?
6     A.   I'm not aware of anything, no.
7     Q.   Do you know if that's technically
8 possible?
9     A.   I don't know.  Sorry.
10     Q.   Okay.
11     A.   I didn't do much contracting.
12     Q.   That's fine.  You had mentioned the
13 pharmacies will adjudicate a discount card like any
14 other claim.  Can you walk me through how that process
15 works generally?
16     MS. COLEMAN:  Objection to form.
17     Q.   (BY MR. ALEXANDER)  You can answer.
18     A.   [REDACTED]
19 [REDACTED]
20 [REDACTED]
21 [REDACTED]
22 [REDACTED]
23 [REDACTED]
24 [REDACTED]
25 [REDACTED]

[redacted]

Page 25

1  ██████████████████████████████████████████████
2  ████████████████████████████████
3            MS. COLEMAN:  Objection to form.
4        A.   That was my understanding, yes.
5        Q.   (BY MR. ALEXANDER)  Okay.  Do you recall
6  where that understanding came from?
7        A.   No.  Yeah, no, I'm sorry.  I don't.
8        Q.   And just to make sure I understand
9  again.  So for a discount card, the reduced price is
10 the product of a negotiation between the issuing
11 entity and the pharmacy?
12       A.   Correct.
13       Q.   Okay.  For a cash customer, is there any
14 third party that absorbs any portion of the cost for
15 the purchase of a prescription drug?
16       A.   Not that I can recall.
17       Q.   Okay.  Let's go back to the PSC for a
18 moment.
19       A.   Loud.
20       Q.   Apologies for the background noise.  How
21 many iterations would you say the prescription drug
22 club went through during your time at Walgreen's?
23       A.   Two major ones.  There may have been
24 iterations before I, you know, took over ownership of
25 kind of the pricing, but I'm not aware if there were.

Page 26

1  While I was there, it was two major ones.
2       Q.   And what were they?
3       A.   I think maybe what we consider the
4  original PSC, and I think what was called PSC 2.0 or
5  PSC Refresh.
6       Q.   Okay.  To your knowledge, were there any
7  other further developments of the PSC after the PSC
8  Refresh?
9       A.   That would have been after I left
10 Walgreen's, so I'm not aware of anything.
11      Q.   Okay.  Was there particular name for the
12 original version of the PSC?  Was it PSC 1.0 or just
13 PSC?
14      A.   I think just PSC.
15      Q.   Just PSC.
16      A.   I'm not sure.
17      Q.   Okay.  To your knowledge, did Walgreen's
18 ever report its PSC prices as its usual and customary
19 prices?
20      A.   Not to my knowledge.
21      Q.   Were you involved in the decision not to
22 report PSC prices as U&C prices?
23      A.   I don't think so.
24      Q.   Do you know who would have been involved
25 in that decision?

Page 80

1 Walgreen's usual and customary prices?

2     MS. COLEMAN: Objection to form.

3     Q. (BY MR. ALEXANDER) You can answer.

4     A. Usual and customary and -- we should

5 clarify the definition. We set the cash prices.

6 Usual and customary in some definitions is the same as

7 cash. Usual and customary is really the term that's

8 used to -- in contracting terms, though.

9     Q. What is your understanding of the

10 definition of usual and customary?

11     A. The cash retail price.

12     Q. Where does that understanding come from?

13     A. I guess just my understanding of the

14 industry. Sorry. I just knew it.

15     Q. So in your understanding, the usual and

16 customary price as a reference to the cash retail

17 price is an industrywide definition?

18     MS. COLEMAN: Objection to form.

19     Q. (BY MR. ALEXANDER) You can answer.

20     A. I don't know if it's usual and

21 customary. My understanding is, yes, that was the

22 general way that third-party contracts are written,

23 that usual and customary is the cash retail price, so

24 that's where my understanding comes from.

25     Q. Okay. Are there any documents that

Page 81

1  you'd need to refer to to understand what the usual
2  and customary price meant?
3         A.    Again, since I believe it comes from
4  definitions in third-party contracts, that's probably
5  where you would refer to see the definition, I guess.
6         Q.    If you were talking to an employee at
7  another pharmacy chain and they referred to the usual
8  and customary price, though, would you understand to
9  what they were referring?
10        A.    I would think so, yes.
11        Q.    You wouldn't need to consult any
12 documents?
13        A.    I don't think so.
14        Q.    Okay.  To your knowledge, has Walgreen's
15 ever used a definition of usual and customary other
16 than the cash retail price?
17        A.    I do not know.
18        Q.    Okay.  What role does the usual and
19 customary price play in adjudicating claims for the
20 purchase of prescription drugs?
21              MS. COLEMAN:  Objection to form.
22        Q.    (BY MR. ALEXANDER)  You can answer.
23        A.    ███████████████████████████
24 ████████████████████████████████████████
25 ████████████████████████████████████████





Page 114

1  Q. (BY MR. ALEXANDER) Mr. Erlund, do you
2  recognize this document?
3  A. No, but I recognize some of the stuff in
4  it.

[Lines 5-25 redacted]



Page 116

1. [REDACTED]
2. [REDACTED]
3. [REDACTED]
4. [REDACTED]
5. [REDACTED]
6. [REDACTED]
7. [REDACTED]
8. [REDACTED]
9. [REDACTED]
10. [REDACTED]
11. [REDACTED]
12.     A.   I believe what I had heard is that, yes,
13. the membership fee is one of the things that
14. differentiates the PSC from the cash price, because it
15. provides a barrier to entry.
16.     Q.   Okay. And so in part because of the
17. fee, PSC prices aren't cash prices?
18.     A.   Correct.
19.     Q.   And aren't usual and customary prices?
20.     A.   Correct.
21.     Q.   Okay. Without divulging your
22. conversations with counsel, where did your
23. understanding of the purpose of the fee come from?
24.     A.   I'm trying to remember, and I believe it
25. was in some conversations with counsel.

Page 269

1  THE VIDEOGRAPHER: Going off the record.
2  The time is 4:58.
3           (Recess taken.)
4           THE VIDEOGRAPHER: Back on the record.
5  The time is 5:07.
6           MR. ALEXANDER: Mr. Erlund, thank you
7  for speaking with us today. We have no further
8  questions, and we'll reserve our remaining time for
9  any redirect.
10          THE DEPONENT: Thank you.
11          MS. COLEMAN: And we will reserve all of
12 our questions for trial. We would like an opportunity
13 to read and sign the transcript.
14          THE VIDEOGRAPHER: This is the end of
15 Media Unit 4 of 4 of the deposition of Cade Erlund.
16 Going off the record. The time is 5:08.
17          (WHEREUPON, the foregoing deposition was
18 concluded at the hour of 5:08 p.m. Total time on the
19 record was 6 hours and 6 minutes.)
20
21
22
23
24
25

Page 270

1      REPORTER'S CERTIFICATE

2

3           I, Sandra L. Bray, Registered Diplomate
4   Reporter, Certified Realtime Reporter, and Notary
5   Public within and for the State of Colorado,
6   commissioned to administer oaths, do hereby certify
7   that previous to the commencement of the examination,
8   the witness was duly sworn by me to testify the truth
9   in relation to matters in controversy between the said
10  parties; that the said deposition was taken in
11  stenotype by me at the time and place aforesaid and
12  was thereafter reduced to typewritten form by me; and
13  that the foregoing is a true and correct transcript of
14  my stenotype notes thereof.
15           That I am not an attorney nor counsel
16  nor in any way connected with any attorney or counsel
17  for any of the parties to said action nor otherwise
18  interested in the outcome of this action.
19           My commission expires:  January 16, 2020.

*[Signature: Sandra L Bray]*

            Sandra L. Bray
23          Registered Diplomate Reporter
            Certified Realtime Reporter
24          and Notary Public