# EXHIBIT 10

```
 1                UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION
 3   DOROTHY FORTH, DONNA
     BAILEY, LISA BULLARD,
 4   RICARDO GONZALES, CYNTHIA      Civil No. 1:17-cv-02246
     RUSSO, TROY TERMINE,
 5   INTERNATIONAL BROTHERHOOD
     OF ELECTRICAL WORKERS
 6   LOCAL 38 HEALTH AND
     WELFARE FUND,                  Judge John Z. Lee
 7   INTERNATIONAL UNION OF         Magistrate Judge
     OPERATING ENGINEERS LOCAL      Sheila Finnegan
 8   295-295C WELFARE FUND, AND
     STEAMFITTERS FUND LOCAL
 9   439, on Behalf of
     Themselves and All Others
10   Similarly Situated,
11        Plaintiffs,
12   VS.
13   WALGREEN CO.,
          Defendant.
14
15
16          VIDEOTAPED DEPOSITION OF RICARDO GONZALES
                      February 12, 2019
17                       9:20 a.m.
                    Regus Office Suites
18                  150 Washington Avenue
                  Santa Fe, New Mexico 87501
19
                  PURSUANT TO THE NEW MEXICO RULES OF CIVIL
20   PROCEDURE, this deposition was:
21          TAKEN BY:  MR. MICHAEL LEIB
                ATTORNEY FOR DEFENDANT
22
        REPORTED BY:  ANNE D. WIESE, RPR, NM CCR #301
23          VIDEOGRAPHER:  SCOTT SAIZ
               TRATTEL COURT REPORTING
24               609 12TH STREET NW
              ALBUQUERQUE, NEW MEXICO 87102
25
```

Page 14

1  Q. How did you prepare for this deposition?
2      MS. KEARNS: Object to the form.
3  Q. (By Mr. Leib) Did you prepare for this
4  deposition?
5  A. I did briefly go over, you know, a lot of the
6  different, you know, filings and papers that I
7  had -- that my attorney had submitted to me.
8      MS. KEARNS: Rick, pardon me for a moment.
9      I just want to remind you, please do not
10 disclose any substance of the conversations you had with
11 your attorneys.
12     THE WITNESS: Right.
13 A. So I, you know, briefly reviewed the documents,
14 and that was pretty much it. I mean, you know,
15 the -- that's -- you know, the facts as I know them are
16 fairly straightforward in my mind, so there wasn't
17 really a lot of preparation necessary on my part.
18 Q. (By Mr. Leib) Do you remember what documents
19 you reviewed?
20     MS. KEARNS: And again, Mr. Gonzales, if
21 anything you're about to say comes from the
22 conversations you had with your attorneys, don't include
23 that information.
24 A. No, just, you know, I looked at everything that
25 had been sent to me previously and -- you know, and I

Page 15

1 had an electronic form in my computer. So my copies.
2    Q. (By Mr. Leib) Do you remember what documents
3 those are specifically?
4    A. No.
5    Q. Did you meet with your lawyers to prepare for
6 this deposition?
7    A. We met.
8       MS. KEARNS: Again, just the same reminder,
9 Rick.
10    Q. (By Mr. Leib) All my questions, I'm not asking
11 for the substance of conversations with your lawyers.
12       You understand that, right?
13    A. Yes.
14    Q. Okay. How many times did you meet with your
15 lawyers?
16    A. Once.
17    Q. When was that?
18    A. Yesterday.
19    Q. For about how long did you meet?
20    A. I don't recall. I know we went into the early
21 evening, but -- and we started at -- maybe three hours.
22    Q. Do you remember which lawyers you met with?
23    A. Yes.
24    Q. The two sitting at the table here?
25    A. The two sitting.

Page 58

1  A.  Uh-huh (yes).
2       MR. LEIB:  I asked in the previous
3  question -- or a few previous questions ago, "Could you
4  describe that lawsuit."  That does not offer any
5  attorney-client privilege, it couldn't call for any
6  attorney-client privilege, so I object to the continuous
7  offering of the same instruction to the client.
8       I believe the client -- your client already
9  understands, and I've asked your client not to disclose
10 any communications with your attorneys.
11      MS. KEARNS:  And also I'll say for the
12 record it's my responsibility to remind Mr. Gonzales as
13 appropriate.
14      MR. LEIB:  If he starts to go down that
15 road, I have no problem with you stopping him.
16 Q.  (By Mr. Leib)  Do you know what this particular
17 lawsuit is about?
18 A.  Yes.
19 Q.  What is it about?
20 A.  That a number of individuals across the country
21 have had similar and dissimilar sorts of concerns and
22 complaints about Walgreens' pricing, about, you know,
23 some people are getting different -- you know, are
24 paying different prices than others.
25      And what we're trying to do is to get

Page 59

1  Walgreens to stop doing this, and that all of us
2  should -- or, you know, our -- we have every right to
3  receive the lowest possible price that anyone else may
4  be receiving, that there really hasn't been any -- there
5  hasn't been any fairness.  And we want Walgreens to stop
6  that practice.
7      Q.  What are you claiming that Walgreens did wrong?
8      A.  Well, like I said, is when we came back from
9  New Mexico, they would charge me something, and I said,
10 "Well, that's not what you charged me last month."  And
11 I said, "Was there a price change?  What was the reason
12 for the increase?"  And they wouldn't be able to give me
13 a reason.
14          So I would call my insurance company, and
15 they'd say, "Nothing has changed.  Everything should be
16 exactly the way it was the month before.  We have no
17 answer as to why.  You need to go talk to the
18 pharmacist."
19          So we make another trip and talked to the
20 pharmacist and said, "Here's my receipts to show what
21 I've been charged for these particular prescriptions.
22 The minute I arrive in New Mexico, is there like roller
23 coasters?  What's going on?"
24          My insurance company says this is wrong.
25 This isn't -- you know, that there have been no changes,

Page 60

1 no changes in the formularies, no changes of any kind,
2 so they have no reason as to why the price is
3 fluctuating so -- you know, so greatly.
4     Q. And is that what you're claiming in this
5 lawsuit, is about price fluctuations?
6     A. Price fluctuations that -- you know, if they
7 had a preferred club, you know, pricing club that I was
8 never invited to be part of -- out of the last 46 years,
9 I've been an exclusive Walgreens consumer. 34 of those
10 years, I have never been made known that there was any
11 sort of opportunity for me to sign up for something to
12 receive some -- you know, preferred or lower pricing.
13     You've seen my prescription list. You know
14 that probably the, you know, cash-paying customer, the
15 value of those is significant every month. So what was
16 the criteria for people being offered access to the
17 club? 34 years wasn't enough? The fact that I've got a
18 very extensive prescription list and my wife does as
19 well, we don't qualify -- there wasn't any sort of
20 criteria. There wasn't ever any sort of advertising.
21     This weekend, my wife filled a prescription
22 at Kroger, which is where we switched everything to.
23 And within the bag, when she picked up -- because she
24 gave me the bags that had the receipts so I could keep
25 it for my records for taxes. She does the financials

Page 61

1  but I do the taxes. And inside this bag was a flyer.
2  And it said, "Our Kroger Prescription Club is now
3  available in Los Alamos. Go to this website and see if
4  it makes sense for you to join."
5              And I did. $240 a month -- $240 a year
6  savings for a small investment. Guess what? We're
7  going to join.
8              Walgreens never did that for me. Walgreens
9  never told us anything. And as a consumer, because I
10 always had great insurance, I believe that my insurance
11 company had negotiated the best possible rates for not
12 just me but for everyone else in their programs. But to
13 find out that other people were getting prescriptions
14 similar to ours at smaller rates did not sit well with
15 us.
16              And, you know, I don't know all the class
17 members. I will never know all the class members. But
18 it appears from all of the documents that I have seen is
19 this is a widespread problem, that I wasn't singled out.
20 There are lots of people that were, again, not given the
21 same opportunity as some others. And again, the
22 criteria for selecting those others is completely
23 unknown.
24     Q.  You mentioned class actions. You understand
25 this is a class action case, correct?

Page 62

1      A.   Uh-huh (yes).

2      Q.   Do you know what a class action is?

3      A.   Yeah.

4      Q.   What is it?

5      A.   Well, a number of individuals that have -- you
6  know, believe that they have, you know, actionable, you
7  know, reasons for complaint that could result in legal
8  action.

9           But the benefit is rather than each one of
10 us hiring an attorney and going after Walgreens
11 directly, there is a strength in numbers where we all
12 bind together, we all -- you know, that we all agree
13 what are the basic reasons or basic concerns that we
14 have against, you know, such as Walgreens.

15          It actually simplifies the process, and I
16 believe it actually benefits both sides because, one, we
17 don't have to hire -- I don't have to hire -- excuse
18 me -- an attorney to go after Walgreens -- excuse me --
19 separately.

20          But for Walgreens, it's also beneficial
21 because they can consolidate their legal representation,
22 and I think -- and also probably, you know, minimizing
23 their costs.  So it's actually -- it's a unique
24 mechanism that really creates, you know, I think some
25 fairness and also financial sense by grouping these

Page 63

1 actions the way they do.
2     Q.  Do you know what your role in this litigation
3 is?
4     A.  I'm one of the -- I'm a class representative.
5     Q.  What does that mean to be a class
6 representative?
7     A.  Well, it's -- as a class representative, is my
8 interests, of course, are not just my portion or -- you
9 know, or my losses.  My interest, of course, is to
10 represent the interest of all of those others that
11 believe that -- you know, that they have been wronged by
12 Walgreens.
13         I want to -- you know, I plan to see this
14 to the end, whatever that is, because I want to see that
15 all of us are treated fairly and that Walgreens, you
16 know, stops the practice that they have -- you know,
17 that they have been, you know, doing for many, many
18 years, and it has been hidden and done in secret behind
19 me and everyone else.
20         We want fairness and of course -- you know,
21 and restitution for -- you know, for the fact that we
22 were overcharged for -- you know, for things that should
23 have been sold to us at a cheaper price.
24     Q.  I'm going to hand you what's previously been
25 marked as Deposition -- Defendant's Deposition

Page 64

1  Exhibit 3.  If you could take a look at this document
2  and tell me if you recognize this document?
3      A.  Uh-huh (yes), the first amendment, one of the
4  earlier documents.
5      Q.  I'm sorry, what is it?
6      A.  One of the earlier documents, because it's, you
7  know, First Amended.  I think you're what, on the Second
8  Amended now?
9      Q.  You're talking about the Complaint, correct?
10     A.  Uh-huh (yes).
11     Q.  Have you read the First Amended Complaint
12  before?
13     A.  Briefly, yes.
14     Q.  When did you briefly read it?
15     A.  When I -- as documents are created, they're
16  sent to me.  I review them.  If there's anything that
17  needs to be brought to my attention that I need to focus
18  on, I'm told about it.  Otherwise, you know, I read it
19  as I can.
20          And again, it's -- it -- I don't see it as
21  my role to understand every aspect of every complaint in
22  every state.  I do need to understand, of course -- you
23  know, understand and be able to represent the bigger
24  picture.
25          But no, I did not get down in the weeds to

Page 158

1  health insurance?
2      A.  Yes, sir.
3      Q.  And that included a prescription drug benefit,
4  correct?
5      A.  Yes, sir.
6      Q.  Other than your primary prescription drug plans
7  in South Carolina, Wisconsin and New Mexico that we've
8  discussed today, did you have any other health insurance
9  plans that paid prescription drug benefits?
10         MS. KEARNS:  Object to form.  Are you
11 talking about 2007 to present?
12         MR. LEIB:  Yes, just from 2007 to present.
13     A.  Okay.  Please rephrase it again.
14     Q.  (By Mr. Leib)  Sure.
15         So we've been talking today about your
16 prescription drug benefits under your South Carolina,
17 Wisconsin and New Mexico health insurance, correct?
18     A.  Uh-huh (yes).
19     Q.  Did you have any secondary health insurance at
20 any point between 2007 and the present?
21     A.  No.
22     Q.  Were you asked to collect documents for this
23 case --
24     A.  Yes.
25     Q.  -- and provide them to -- strike that.  Let me

Page 159

1  start over.
2          Were you asked to collect documents for
3  this case and provide them to your lawyer?
4      A.  Yes, sir.
5      Q.  Where did you look for documents?
6          MS. KEARNS:  Object to form.
7          MR. LEIB:  What's the objection to the
8  form?
9          MS. KEARNS:  "Where did you look for
10 documents?"
11     Q.  (By Mr. Leib)  Okay.  Where did you look for
12 documents to turn over to your lawyer for purposes of
13 this case?
14     A.  Computer.
15     Q.  Is that the only place you looked?
16     A.  Well, yeah, computer, because it's -- I have
17 all the correspondence between, you know, Walgreens
18 and -- you know, and I used the search terms that were
19 given by you, your office for me to produce documents.
20 I did all of those searches, found numerous documents.
21 They were not altered, sorted, reviewed.  It was, "You
22 requested this.  I did that.  Here's what they are,"
23 and leave it to the -- our attorneys to, you know,
24 review and sort out.
25          So I did not look at them, they just -- we

Page 160

1  just collected them.
2          As I said earlier, I also contacted
3  Walgreens and asked for a download, and I was given
4  two years' worth.
5      Q.  When you say you contacted Walgreens, you meant
6  you went on the website?
7      A.  Yeah, went on the website.
8          But as I said earlier -- I also said that
9  when I found that I could only do two years, I did call
10 and ask if it was possible to get more, and I was told
11 no.
12     Q.  I believe you said you may have called them.
13     A.  I'm pretty -- no, I think it's reasonably sure
14 that I did.
15     Q.  So now are you sure that you did or you're not
16 sure that you did call Walgreens after finding out that
17 you could only print out two years' of data?
18     A.  It seems like something that I would do.  So I
19 think it's very plausible that I did do it because
20 two years really wasn't much, and not -- to provide to
21 my attorneys.
22     Q.  Do you have a present recollection, as you sit
23 here today, of having had a phone conversation with
24 somebody at Walgreens relating to your only being able
25 to print out two years of data by going to

Page 161

1  walgreens.com?
2      A.  I don't have a specific recollection of the
3  discussion.  But as I said, it was -- you know, it's
4  plausible that I did because I would have been looking
5  for more.
6      Q.  So let me see if I understand the process for
7  how you collected documents.  Could you describe that
8  process.  When I say describe the process -- you said
9  you went to your computer and applied search terms?
10     A.  Uh-huh (yes).
11     Q.  Can you give me more specific details about
12 what you did.
13     A.  I'm not sure I understand.
14     Q.  Well, do you have specific files within your
15 computer that you looked at?
16     A.  Yeah, anything that pertained, whether it was
17 an e-mail, whether it was -- yeah, anything that
18 pertained because I -- because the search that I did was
19 on the entire -- not only the entire hard drive but my
20 entire external.
21         So everything that's on my computer,
22 regardless of location, would have been found by those
23 search terms, and then I, in turn, saved them in large
24 groups and then eventually downloaded them to an upload
25 site created by my attorney.

Page 162

1    Q.  So you searched on the hard drive of your
2    computer; is that correct?
3    A.  And the external.
4    Q.  And you have an external hard drive as well?
5    A.  Yeah.  And the reason the external is important
6    is because, one, the external backs up the original to
7    make sure I have a duplicate copy.
8         But because I only have so much storage on
9    my computer, there are things that I archive.  The
10   archive items will only be on the large backup and not
11   on the main computer.  So if I do a search that includes
12   the external, it's -- and again, I don't know if it did,
13   but if it found something that met your search
14   requirements, it would have pulled it out.
15   Q.  The computer that you searched, is it your
16   computer?
17   A.  My computer.
18   Q.  Does your wife also have a computer?
19   A.  Yes.
20   Q.  Did you search on your wife's computer?
21   A.  No, I didn't do that because she really
22   doesn't -- I don't think we'd find anything on there.
23   But I'd be happy to.
24   Q.  You said earlier that your wife may have gone
25   onto walgreens.com and downloaded prescription

```
                                                          Page 213

 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3       Civil No. 1:17-cv-02246
 4   DOROTHY FORTH, et al.,
         Plaintiffs,
 5
     vs.
 6
     WALGREEN CO.,
 7       Defendant.
 8
                      REPORTER'S CERTIFICATE
 9
10
         I, ANNE WIESE, RPR, NM CCR #301, DO HEREBY CERTIFY
11
     that on February 12, 2019, the deposition of RICARDO
12
     GONZALES was taken before me at the request of, and the
13
     sealed original thereof was retained by:
14
                  Attorney for the Defendant:
15
                  MR. MICHAEL LEIB
16                Reed Smith LLP
                  10 South Wacker Drive
17                40th Floor
                  Chicago, Illinois 60606
18
19       I FURTHER CERTIFY that copies of this Certificate
20   have been mailed or delivered to all counsel, and
21   parties to the proceeding not represented by counsel,
22   appearing at the taking of the deposition.
23       I FURTHER CERTIFY that examination of this
24   transcript and signature of the witness was requested by
25   the witness and/or all parties present.  On _____, a
```

Page 214

1    letter was mailed or delivered to the witness or his/her

2    attorney regarding obtaining signature of the witness;

3    and corrections, if any, will be appended to the

4    original transcript, and copies sent to place in each

5    copy of the deposition.

6        I FURTHER CERTIFY that the recoverable cost of the

7    original and one copy of the deposition, including

8    exhibits, to MR. MICHAEL LEIB is $_____.

9        I FURTHER CERTIFY that I did administer the oath to

10   the witness herein prior to the taking of this

11   deposition; that I did thereafter report in stenographic

12   shorthand the questions and answers set forth herein,

13   and the foregoing is a true and correct transcript of

14   the proceeding had upon the taking of this deposition to

15   the best of my ability.

16       I FURTHER CERTIFY that I am neither employed by nor

17   related to nor contracted with (unless excepted by the

18   rules) any of the parties or attorneys in this case, and

19   that I have no interest whatsoever in the final

20   disposition of this case in any court.

21

22   _____
     Anne Dorothea Wiese, RPR, CCR
23   New Mexico Certified Court Reporter #301
     License Expires: 12/31/19
24

25