# EXHIBIT 14

```
                                                              Page 1
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                     EASTERN DIVISION
 4    DOROTHY FORTH, DONNA
      BAILEY, LISA BULLARD,
 5    RICARDO GONZALES,                    Case No.
      CYNTHIA RUSSO, TROY,                 1:17-cv-02246
 6    INTERNATIONAL
      BROTHERHOOD OF
 7    ELECTRICAL WORKERS LOCAL
      38 HEALTH AND WELFARE
 8    FUND, INTERNATIONAL
      UNION OF OPERATING
 9    ENGINEERS LOCAL 295-295C
      WELFARE FUND, AND
10    STEAMFITTERS FUND LOCAL
      439, on Behalf of
11    Themselves and All
      Others Similarly
12    Situated,
                  Plaintiffs,
13       vs.
      WALGREEN CO.,
14              Defendant.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
15                VIDEO DEPOSITION OF
16           STEAMFITTERS FUND LOCAL 439
17                  by and through
18            CHARLES E. BAILEY JUNIOR
19                  June 11, 2019
20                    9:27 a.m.
21        10 South Wacker Drive, 40th Floor
22                 Chicago, Illinois
23
24    Deanna Amore - CRR, RPR, CSR - 084-003999
```

Page 27

```
 1   Steamfitters 439?
 2        Q.    Yes.
 3        A.    No.
 4        Q.    Did you talk with anyone at the Union,
 5   Steamfitters Fund 439 itself, as opposed to people
 6   that work for the Fund?
 7        A.    About the case or about --
 8        Q.    About the case?
 9        A.    They are aware that I'm involved with it,
10   yes.
11        Q.    Did you have any substantive discussions
12   with them about the case?
13        A.    Not really.  I mean, just -- just talking
14   kind of what the details of the -- of what we're
15   here for basically.
16        Q.    What did you discuss with them?  What --
17        A.    That we believe we were overcharged by
18   Walgreens.
19        Q.    But you did not talk with them to prepare
20   for your deposition at all?
21        A.    No.
22        Q.    Did you talk with anyone formally
23   associated with the Fund to prepare for your
24   deposition?
```

Page 28

1   A.   "Associated"?  Could that mean our
2 consultant from J.W. Terrill?
3   Q.   You already talked about your consultant
4 from J.W. Terrill.
5        Let me ask this question:  Other than your
6 attorneys and J.W. Terrill, Ms. Jaegers, did you
7 talk with anyone else to prepare for your
8 deposition?
9   A.   No.
10  Q.   Did you meet in person with your attorneys
11 to prepare for this deposition?
12  A.   Yes.
13  Q.   How many times?
14  A.   Twice.
15  Q.   And when were those meetings?
16  A.   Yesterday and it was about three weeks
17 ago.  It was when we were supposed to do the last
18 deposition.
19  Q.   Let's talk about the meeting three weeks
20 ago.  Where did that take place?
21  A.   In Chicago.
22  Q.   Do you remember the date of the meeting?
23  A.   I want to say it was, like, May 15, but
24 I'm not sure.  I can't recollect the exact date.

Page 29

1     Q.    And who was present for that meeting?
2     A.    Joe Guglielmo, Charley Schaffer, and
3 C.J. Baricevic and myself.
4     Q.    And about how long did that meeting take
5 place -- take -- strike that.
6     About how long did that meeting take?
7     A.    I believe we were there six hours or so.
8     Q.    And did you look at any documents during
9 that meeting?
10     A.    Yes.
11     Q.    And those were the documents that were in
12 the binders?
13     A.    Yes, sir.
14     Q.    And the meeting yesterday, where did that
15 take place?
16     A.    In Chicago as well.
17     Q.    And who was present for that?
18     A.    Joe Gugliemo, Charley Schaffer,
19 C.J. Baricevic and Dave Cates.
20     Q.    And how long did that meeting take place?
21     A.    About six hours.
22     Q.    And did you look at any documents
23 together?
24     A.    Yes.

Page 30

1  Q. And were those the documents that were in
2  the binders?
3  A. Yes, sir.
4  Q. At that first meeting, did you review any
5  of the contracts with your PBMs?
6  A. Yes.
7  Q. And at yesterday's meeting, did you review
8  any of the contracts with the PBMs?
9  A. Yes.
10 Q. Did you -- in addition to any in-person
11 meetings, did you have any phone conferences with
12 your attorneys to prepare for the deposition?
13 A. Yes, we did.
14 Q. And how many phone conversations?
15 A. We had two.
16 Q. And when were they?
17 A. We had one about a week before we came the
18 first visit to Chicago, and then we had one last
19 Wednesday. I guess it would have been the -- maybe
20 the 6th or 7th.
21 Q. And the first conversation, who was on
22 that call?
23 A. Joe Gugliemo, Charley Schaffer,
24 C.J. Baricevic, and myself.

Page 120

1    A.   I don't believe -- if it's a different
2 price, why were we paying more than a non-insured
3 public?
4    Q.   What do you mean "non-insured public"?
5    A.   I mean you don't have to have insurance to
6 get the generics at a -- the PSC price.  We have
7 insurance.  We pay our bills, and we weren't
8 getting that same savings.
9    Q.   Do you understand the Fund is seeking to
10 bring this case as a class action?
11   A.   Yes.
12   Q.   Do you know what a class action is?
13   A.   It's a collective lawsuit.
14   Q.   Can you give me any additional
15 description?
16   A.   I'm not a lawyer.  I can't describe what a
17 class action lawsuit is.
18   Q.   Do you know what the Fund's role in the
19 litigation is?
20   A.   The Fund and me speaking as the Fund,
21 I have a -- as a trustee, I have a fiduciary
22 responsibility to recoup any money losses since we
23 are self-funded, and money is coming in from
24 membership voluntarily to cover this.  So it's our

Page 121

1  responsibility to try to recover if we've been
2  damaged.
3      Q.  Do you know what the phrase "class
4  representative" means?
5      A.  I've heard it, yes.
6      Q.  What do you understand that to mean?
7      A.  Again, I'm not a lawyer, but I believe it
8  means that you're maybe the lead plaintiff or lead
9  witness against somebody that you're suing.
10     Q.  Do you know what obligations -- well,
11 first of all, do you understand that the Fund is
12 acting as a class representative here?
13     A.  Yes.
14     Q.  Do you know what the Fund's obligations
15 are as a class representative?
16     A.  For our members or for the suit?
17     Q.  As a class representative in a case that
18 the Fund is seeking to be named by the Court as one
19 of the named plaintiffs, one of the class
20 representatives, does the Fund understand what its
21 obligations are if it were named as a class
22 representative in the case?
23     A.  Yes.
24     Q.  And what are those obligations?

Page 122

1  A. You could possibly go to trial.
2  Q. Any case could go to trial. So I'm not
3  sure I know what you mean by that answer.
4  A. You are asking me what obligations. I am
5  here. I'm at deposition. I've prepped. I've
6  looked at information, and if it all said I have to
7  go to trial, then I'd have to go there as well.
8  Q. Do you understand as a named plaintiff,
9  the Fund has an obligation to represent all the
10 members of the class and not just represent the
11 Fund's own interests?
12 A. Yes.
13 Q. Do you know whether the Fund has any
14 financial obligations as a class representative?
15 A. Financial obligations to?
16 Q. To your lawyers.
17 A. Oh, no, no.
18 Q. The Fund isn't paying the lawyers
19 anything?
20 A. No, sir.
21 Q. Do you know whether the Fund is
22 responsible for any of the expenses in the case?
23 A. I mean, they are paying my wages.
24 Q. Who is paying your wages?

Page 289

1  BY MR. LEIB:
2      Q.   I believe we talked about this a little
3  bit.  The Fund was asked to collect documents in
4  this case and provide them to your lawyers;
5  correct?
6      A.   Yes.
7      Q.   Can you describe the process the Fund
8  undertook to find all the documents it was asked to
9  collect?
10      A.   I know we linked up with J.W. Terrill and
11  Kathy Jaegers, and she got information from LDI.
12  J.W. Terrill also gave us any information they had.
13  We looked through the hall for any information that
14  may have been in file cabinets that wasn't found by
15  J.W. Terrill or LDI, which all of our information
16  comes from them.  So we shouldn't have had nothing
17  that they didn't have.  And then also, all
18  communications over the computer were found by a
19  consultant that the attorneys hired to do a scan on
20  the computers to find any emails or documents.
21      Q.   So who participated in the search for
22  paper documents?
23      A.   Dave Cates, Janie Bailey, and the
24  consultant as far as computer records went.

Page 290

1  Q. What -- no -- oh, I'm talking just paper.
2  A. Oh, paper.
3     Kathy Jaegers, probably Dave Schroff from
4  LDI was probably on involved on their end;
5  Janie Bailey; Dave Cates; and C.J. Baricevic.
6  Q. And where -- in the hall are there -- is
7  there a separate area where -- I think we --
8  I asked you this before, but I can't remember the
9  answer.
10    Are the Fund documents separated from the
11 rest of the Union documents?
12 A. Yes.
13 Q. So where are the Fund documents kept in
14 the hall?
15 A. In fireproof cabinets.
16 Q. How many cabinets?
17 A. I think it's in maybe one three-level
18 cabinet.
19 Q. And does the Fund have a destruction
20 policy?
21 A. I don't know the exact policy as far as
22 the Health and Welfare. I know all of their
23 documents, we have to hold for seven years. I'm
24 sure it applies to the same thing. That's all

Page 291

1  under ERISA, document controlled.  So it's five
2  years in a training program.  I think it's seven
3  with everything else.
4      Q.   And were all of the documents in those
5  file cabinets reviewed?
6      A.   I believe so, yes.
7      Q.   Did you have any involvement personally in
8  search?
9      A.   No, I didn't come into office until
10 January 1, 2019.  So I was still in the field
11 before then, and this took place prior to that.
12     Q.   Were there any recent requests for
13 documents?
14     A.   Not that I was involved with, no.
15     Q.   Who else would have been involved?
16     A.   The same names.
17     Q.   So the attorneys could call Janie Bailey
18 and ask her for documents?
19     A.   She would lead them in the direction they
20 needed to go.
21     Q.   Did the attorneys have direct contact with
22 Ms. Bailey?
23     A.   Yes.
24     Q.   And as far as the computer search goes,

Page 292

1    what computer records were searched?
2         And the reason I ask is you have no
3    employees; right?
4    A.   No.
5    Q.   So was it the Union's computer records
6    that were searched, or was it specific custodians
7    within the Union that was searched?
8    A.   It was the Union's computers, and I think
9    it was basically all Janie and my father's emails
10   or all emails sent to them.  Again, I don't know
11   100 percent of what information was gathered in
12   this because when this took place, I wasn't
13   involved at the hall at that time.  I was just a
14   trustee.
15   Q.   Do you understand that the documents are
16   just one of the topics of this deposition?
17   A.   Yes.  And I know they did complete a
18   search in the computers, and as we looked at many
19   emails, I'm sure that's where all of those were
20   derived from.  I don't think we'd have to get this
21   type of information on a computer because this
22   comes from our PBMs.  So we just needed the
23   conversations, it seems like.
24   Q.   Other than Janie and your father, is there

Page 295

1 　　　　　　　　C E R T I F I C A T E

2

3 　　　　I, DEANNA AMORE, a Shorthand Reporter and

4 notary public, within and for the State of

5 Illinois, County of DuPage, do hereby certify:

6 　　　　That CHARLES E. BAILEY JUNIOR, the witness

7 whose examination is hereinbefore set forth, was

8 first duly sworn by me and that this transcript of

9 said testimony is a true record of the testimony

10 given by said witness.

11 　　　　I further certify that I am not related to

12 any of the parties to this action by blood or

13 marriage, and that I am in no way interested in the

14 outcome of this matter.

15

16 　　　　IN WITNESS WHEREOF, I have hereunto set my

17 hand this 15th day of June 2019.

18

19

20 　　　　　　　_____

21 　　　　　　　Deanna M. Amore, CRR, RPR, CSR

22

23

24