**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, <br><br>                    Plaintiffs, <br><br>     v. <br><br> WALGREEN CO., <br><br>                    Defendant. | Civil No. 17-cv-2246 <br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan <br><br> Oral Argument Requested |

**MOTION TO EXCLUDE OPINIONS 3, 6, AND 7 OF SCHAFERMEYER'S EXPERT REPORT AND ANY TESTIMONY REGARDING THE SAME PURSUANT TO FEDERAL RULE OF EVIDENCE 702**

Walgreen Co. ("Walgreens") moves this Court to exclude three of seven opinions from the report of Plaintiffs' proffered expert, Kenneth W. Schafermeyer, Ph.D., and to preclude Plaintiffs from relying on testimony regarding such opinions. Specifically, Walgreens moves to exclude the following opinions:

- By not submitting its Prescription Savings Club ("PSC") prices as usual and customary ("U&C"), Walgreens failed to meet the reasonable expectations of the Plaintiffs (Opinion 7);

- The definition of U&C has been understood by the pharmacy industry for decades to mean the *lowest* price offered, including discounts (Opinion 3); and

- Walgreens should have reported or otherwise included its PSC prices when reporting its U&C prices to payers (Opinion 6).

Walgreens moves on the basis that, under Federal Rule of Evidence 702 ("Rule 702"), Schafermeyer's opinion that Walgreens failed to meet the reasonable expectations of the Plaintiffs is unsupported, speculative, and an improper legal opinion regarding private parties' ability to enter into enforceable contracts. In addition, Schafermeyer provides his opinions that the pharmacy industry has understood U&C to mean the lowest price, which would include PSC prices, without any relevant basis and despite record evidence and industry guidance to the contrary, making these opinions unreliable, unhelpful, and likely to confuse, rather than inform, a jury. As a result, and for the reasons set forth below, the Court should exclude these opinions.

**I.     FACTS**

In the pharmacy industry, health insurers and health plans, including Fund Plaintiffs, are referred to as third-party payers ("TPPs"). *See* **Ex. A** (Expert Report of Michael Jacobs) ("Jacobs Report") ¶ 20. TPPs contract with Pharmacy Benefit Managers ("PBMs") to administer pharmacy benefits to their beneficiaries—the pharmacy's insured customers. *Id.* When a customer uses insurance to purchase a drug, insurance-identifying information is submitted to the PBM through

the pharmacy's computer system. *Id.* ¶ 16. The PBM then, in real time, adjudicates the claim by returning information to the pharmacy regarding whether insurance covers the drug, the amount the customer should pay (through a deductible, copayment, or coinsurance), and the amount the PBM expects to reimburse the pharmacy, which is determined pursuant to a contract between the PBM and the pharmacy. *Id.* These contracts generally include a "lesser-of" reimbursement methodology, meaning that the PBM will reimburse the pharmacy at the lowest of various prices, including U&C. *Id.* ¶ 24. In addition, the contracts also often define the term U&C. *Id.* ¶ 25. The TPPs are not parties to the contracts between the PBMs and the pharmacies. *Id.* ¶¶ 22-23.

In exchange for the PBM administering the prescription benefits for a TPP's beneficiaries, the TPP pays the PBM in accordance with a separate contract between the TPP and PBM. **Ex. A** (Jacobs Report) ¶ 20. These contracts may provide that the TPP pay the PBM according to a lesser-of methodology, with U&C as one of the components (like the contract between the PBM and pharmacy), although not all TPP-PBM contracts contain a lesser-of provision with U&C as a price point. *Id.* ¶ 90. These contracts often, but not always, define U&C, although the U&C definition in the TPP-PBM contract is often different than the U&C definition in the PBM-pharmacy contract. *Compare* Dkt. 556-56 (Expert Report of Kenneth Schafermeyer) ("Schafermeyer Report") ¶ 84 & Table 1 *with* ¶¶ 95-97 & Table 3. A pharmacy is not a party to the contracts between TPPs and PBMs, and because the terms of these contracts are often confidential, Walgreens has no knowledge of the TPP's obligations to the PBM. **Ex. A** (Jacobs Report) ¶ 88.

This case concerns Walgreens' PSC customers who enroll in PSC, agree to terms and conditions, and pay an annual membership fee to obtain access to lower prices on prescription

drugs. **Ex. A** (Jacobs Report) ¶ 29. The Individual Plaintiffs[1] and the Fund Plaintiffs[2] (collectively, the "Plaintiffs") allege that Walgreens overcharged them for generic drugs by submitting Walgreens' retail prices as its U&C prices to PBMs instead of the PSC prices available only to PSC members. Dkt. 477 (Fourth Am. Compl.) ¶¶ 1, 4-6. Plaintiffs claim that, had Walgreens reported its PSC prices as its U&C prices, because of the lesser-of provisions in the various contracts, both the customers and the TPPs would have paid less on some generic drugs than they did. *See* Dkt. 552, Pls.' Mem. in Support of Mot. for Class Cert. ("Mem."), at 1-2.

The PBMs involved in this case all had at least one contract with Walgreens—and often multiple contracts—during the period of this case. **Ex. A** (Jacobs Report) ¶¶ 48-64 & Appendix A. Each of these contracts defined U&C differently, with the exception of one that did not define U&C at all. Some even defined U&C to *exclude* discounts, including PSC prices. *Id.* In addition, many of these contracts stated that, if there is a conflict between a contractual term (e.g., the U&C definition) and a PBM's Provider Manual, the contractual term controls. *Id.* ¶¶ 82-84 & Table 1.

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs have requested that the Court certify a multi-state class of customers and TPPs for which eight PBMs (the "Relevant PBMs") administered prescription benefits to the Plaintiffs in certain states. Mem., at 3. Plaintiffs seek certification of a 12-state class, as well as an eight-state unfairness subclass and a five-state unjust enrichment subclass. *Id.* In support of their class certification motion, Plaintiffs offer Schafermeyer as an expert. Schafermeyer offers seven opinions, three of which are at issue in this motion:

- **Failure To Meet Reasonable Expectations**: Schafermeyer opines that, by not submitting or otherwise reporting its PSC prices as its U&C prices, "Walgreens has failed to meet the reasonable expectations of TPPs and their insured beneficiaries[.]"

---

[1] Cynthia Russo, Lisa Bullard, and Ricardo Gonzales.

[2] International Brotherhood of Electrical Workers Local 83 Health and Welfare Fund ("IBEW"), International Union of Operating Engineers Local 295-295C Welfare Fund ("IUOE"), and Steamfitters Fund Local 439.

Schafermeyer Report ¶ 24 (Opinion 7).

- **U&C Is The "Lowest" Price**: Schafermeyer intends to testify that the industry definition of U&C is "common and has been established for decades" to mean the "***lowest*** price that a pharmacy would offer to a cash customer (*i.e.*, a customer paying without using insurance), including any discounts offered by the pharmacy to the cash customer for a specific drug product on a particular day at a particular pharmacy." *Id.* ¶¶ 20, 28 (emphasis added) (Opinion 3).

- **Walgreens Should Have Reported PSC Prices**: Schafermeyer opines that "Walgreens should have reported or otherwise included its PSC prices when determining the U&C prices to report" to PBMs. *Id.* ¶ 23 (Opinion 6).

## II. WALGREENS' RULE 702 MOTION MUST BE ADDRESSED BEFORE THE COURT ADDRESSES CLASS CERTIFICATION

The "Seventh Circuit has directed district courts to decide the admissibility of expert testimony ***prior to ruling on class certification*** where testimony is important to a class certification decision." *Sgouros v. Trans Union LLC*, No. 14 C 1850, 2022 U.S. Dist. LEXIS 49585, at *2 (N.D. Ill. Mar. 21, 2022) (emphasis added); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (holding that the court erred by ruling on a class certification motion involving important expert testimony before ruling on a Rule 702 motion); *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (requiring a court to rule on any expert challenge before ruling on class certification if the expert's testimony is "critical to class certification"). District courts have broad discretion in determining whether expert testimony is admissible, *see Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809, 818 (7th Cir. 2012), but must "act as the evidentiary gatekeeper, ensuring that Rule 702's requirements . . . are satisfied before allowing the finder of fact to hear the testimony of a proffered expert." *Sgouros*, 2022 U.S. Dist. LEXIS 49585, at *3.

Here, Plaintiffs have shown that they view Schafermeyer's proffered testimony in the three challenged opinions as "critical" to their class certification motion. Indeed, they reference these opinions throughout their class certification memorandum. *See* Mem., at 5, 14, 16 (citing Schafermeyer's report in support of Plaintiffs' argument that the industry definition of U&C is

"the *lowest* price that a pharmacy would offer to a cash customer," that Walgreens' PSC prices fit within this industry understanding, and that Walgreens is required to report its PSC prices as U&C, which Plaintiffs argue is the "common question that will drive resolution of this litigation"). Plaintiffs cite the entire Schafermeyer report generally for the concept that "Plaintiffs will use common, classwide evidence to establish that the PSC price fits within the long-recognized, industry-wide definition of the U&C price." *Id*., at 26. Given that Plaintiffs argue that Schafermeyer's report proves that *common* questions of law and fact exist that *predominate* over individualized issues—two of the required elements to certify a class, *see* Fed. R. Civ. P. 23—the Court should rule on the admissibility of the opinions challenged here, and the ability of Plaintiffs to rely on testimony regarding same, before ruling on Plaintiffs' class certification motion.

### III.   LEGAL STANDARD

"The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's seminal decision in *Daubert*." *Sgouros*, 2022 U.S. Dist. LEXIS 49585, at *3 (citations omitted). Rule 702 allows for opinion testimony by an expert—that is, someone with the requisite "'knowledge, skill, experience, training, or education'—to help the trier of fact 'understand the evidence or [] determine a fact in issue.'" *Id.* Specifically, "[t]he proponent of an expert witness bears the burden of demonstrating that the expert's testimony is admissible by a preponderance of the evidence." *Id.* (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)). Expert testimony is admissible only when (1) it is "based on sufficient facts or data," (2) it is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Sgouros*, 2022 U.S. Dist. LEXIS 49585, at *3.

The Supreme Court made clear in *Daubert* that district courts reviewing Rule 702 motions must perform the "critical gatekeeping function" concerning the admissibility of such evidence.

*United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018). "Because expert testimony can be both highly persuasive and difficult for a lay jury to evaluate, the importance of this gatekeeping function cannot be overstated." *Id.* (citations omitted). Judicial gatekeeping is thus "indispensable." *See Sardis v. Overhead Door Corp*, 10 F.4th 268, 284 (4th Cir. 2021). Indeed, the Advisory Committee on Evidence Rules recently accepted Amendments to Rule 702 to take effect in December 2023 that further emphasize this gate-keeping function.

IV. **ARGUMENT**

    A. **Schafermeyer's Opinion About The Reasonable Expectations Of TPPs Is Based On Speculation And Is An Improper Legal Opinion That PBMs And Pharmacies Are Not Free To Contract**

In Opinion 7, Schafermeyer opines that, by not reporting PSC prices as U&C, "Walgreens has failed to meet the reasonable expectations of TPPs and their insured beneficiaries[.]" Schafermeyer Report ¶ 24. The Court should exclude Opinion 7 because Schafermeyer has provided no basis for this opinion other than his own speculation, making it unreliable and unhelpful. In addition, Opinion 7 is an improper legal conclusion, unsuitable for expert testimony.

    1. **Schafermeyer's opinion is speculative and unreliable**

To be reliable under Rule 702, an expert's testimony must be "based on sufficient facts or data," be "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. A court must exclude expert testimony when it is "based upon speculation, unsupported assumptions, or conclusory allegations." *Chen v. Yellen*, 2021 U.S. Dist. LEXIS 175372, at *8 (N.D. Ill. Sept. 15, 2021) (quoting *Buscaglia v. United States*, 25 F.3d 530, 533 (7th Cir. 1994)).

The only support Schafermeyer provides for Opinion 7 regarding what TPPs reasonably expected is his reliance on the allegations in Plaintiffs' complaint. *See e.g.*, **Ex. B:** Schafermeyer Dep. 151:8-11 ("I read the complaint and I think the complaint lays out what [the TPPs']

expectations were[.]").) He never spoke with any of the TPPs to understand the TPPs' reasonable expectations. *Id.* 151:3-151:23; 152:11-22; 160:10-161:1. He never spoke to any of the Plaintiffs in this case to determine "what it is that they actually expected to be charged under their insurance plans[.]" *Id.* 152:23-153:3; 170:11-16 ("Q. [] Without having talked to a single one of the plaintiffs in this case you're offering [an] opinion on what their reasonable expectations were, is that correct? [Objection] A. I think my report stands for itself."). Nor did he discuss with the TPPs whether they were aware of the terms in the contracts between the PBMs and pharmacies (*id.* 163:4-11), or whether the TPPs reviewed any of the PBMs' Provider Manuals. *See generally id.* 144:3-145:5; *see, e.g., id.* 144:25-145:2 ("Whether [the TPPs] actually read [the Provider Manuals], I didn't get in their mind and figure out, and I don't think somebody's actually told me they did").

"[E]xpert opinions that rely primarily upon allegations in a complaint are not based on sufficient facts and data, as required by Rule 702, and are otherwise unreliable." *Chen*, 2021 U.S. Dist. LEXIS 175372, at *8 (internal quotes omitted). Opinion 7 is thus speculative testimony that the Court should exclude.

### 2. Schafermeyer's opinion is an improper legal conclusion as to contracts

Schafermeyer also offers an improper opinion that Walgreens and the Relevant PBMs—all private parties—are not allowed to enter into enforceable contracts that defy what Schafermeyer believes are the TPPs' reasonable expectations. In other words, Schafermeyer opines that any language in contracts between Walgreens and the Relevant PBMs that excludes discounts from the definition of U&C should not be enforced because such language is inconsistent with the reasonable (not the actual) expectations of the TPP who engaged the PBMs. This opinion is a legal conclusion that is not the proper subject of expert testimony. *See Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. Feb. 9, 2010) (striking expert's opinions that offered conclusions about a contractual party's duties under the law because an expert "may not

testify as to the legal implications of conduct"); *Dolmage v. Combined Ins. Co. of Am.*, No. 14 C 3809, 2017 U.S. Dist. LEXIS 67555, at *14 (N.D. Ill. May 3, 2017) (court did not consider expert's opinion that a document was unenforceable because it was not specifically incorporated by reference into a policy because it was "a legal conclusion").

"Legal conclusions are not admissible because they are not helpful to the trier of fact." *Clintec Nutrition Co. v. Baxa Corp.*, 1998 U.S. Dist. LEXIS 13541, at *26 (N.D. Ill. Aug. 26, 1998). There is a "difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts. . . . The former is prohibited; the latter is not." *Dolmage*, 2017 U.S. Dist. LEXIS 67555, at *14 (citations omitted). Expert testimony regarding "the legal duties imposed on the parties under the terms of the contract . . . would stray into forbidden argument about the meaning of contracts[.]" *Burbach Aquatics, Inc.*, 2011 U.S. Dist. LEXIS 4573, at *18. Because this is "a question of law[,] . . . expert testimony is inappropriate." *Id.*

The Court should exclude Schafermeyer from giving Opinion 7 because it is an improper legal opinion regarding whether private parties can enter into a contractual agreement and if so, whether that contract is enforceable. In discussing this opinion, Schafermeyer indicates that:

- PBMs and TPPs enter into contracts that often define the U&C price term. *See* Schafermeyer Report ¶ 84 & Table 1.

- Walgreens is not a party to the contract between the PBM and TPP. *See* **Ex. B** Schafermeyer Dep. 157:18-158:15.

- the contracts between the PBMs and TPPs are often confidential. *Id.* 157:18-158:1.

- PBMs enter into contracts with Walgreens that define U&C. Schafermeyer Report ¶ 95 & Table 3.

- the contracts between the PBMs and Walgreens are confidential. *Id.* ¶ 88.

- PBMs issue Provider Manuals (some of which may be publicly available) that may define U&C in a manner differently than in the contracts between the PBMs and pharmacies

like Walgreens. *Id.* ¶¶ 88-89 and at Table 2.

Taking these facts together, Schafermeyer opines that it was inappropriate for ***Walgreens*** and the non-defendant PBMs to "[get] together and agree[] to circumvent usual and customary" by defining the term in a manner that was ***different*** from how the PBM defined the term in its contract with the TPP. **Ex. B**: Schafermeyer Dep. 162:1-6. He claims that this is because the TPPs had a "reasonable expectation" that Walgreens would include its PSC prices when determining the U&C price to report to the PBMs, and that the TPPs would not pay more to receive PSC drugs than the amounts paid by customers who did not use insurance. *See* Schafermeyer Report ¶ 31. Schafermeyer claims that the TPPs had this reasonable expectation, despite contracts that stated the ***exact opposite,*** because (1) everyone in the pharmacy industry knew U&C to be defined as the lowest price; (2) Walgreens and the PBMs could not contract around the industry understanding of U&C; and (3) allegedly publicly available PBM Provider Manuals defined U&C to require Walgreens to submit its lower PSC prices as U&C and the Provider Manual definitions ***superseded*** the U&C definition in Walgreens' contracts with the PBMs. *See id.* ¶¶ 50-101. Schafermeyer, however, failed to take into account language in Walgreens' contracts with the PBMs stating that, in the event of a conflict between the contract and the Provider Manual, the contract controls.

An example is illustrative:

| Walgreens / Express Scripts Contract Language | Express Scripts' Provider Manual Language | Express Scripts-TPP Contract Language |
|---|---|---|
| 2017 Amendment to contract amended the definition of U&C in § 1.26 to add ▓▓▓ | Non-public, confidential, and unilaterally drafted 2017 Provider Manual update sought to include ▓▓▓ in the definition of U&C.[3] *See* Dkt. | 2016 contract between TPP Plaintiff IUOE and Express Scripts defined U&C as ▓▓▓ |

---

[3] Many Provider Manuals, including ones produced by Express Scripts, are not made available to the public and, in fact, state on their face that they are "confidential." *See* Walgreens' Opposition to Mot. for Class Certification ("Walgreens' Opp'n."), at 22 n.16. In fact, the 2017 Express Scripts Provider Manual to which Plaintiffs cite, has not been produced in discovery, and does not appear to be publicly available. In addition,

| | | |
|---|---|---|
| ▮▮▮▮ *See* Schafermeyer Report ¶ 98 at Table 3 (emphasis added). Section 1.26 also provided that ▮▮▮▮ **Ex. A** (Jacobs Report) ¶ 84 at Table 1 (emphasis added). | 556, Ex. 46. | ▮▮▮▮ *See* Schafermeyer Report ¶ 84 at Table 1. |

Here, Schafermeyer argues that the contract between Walgreens and ESI should not control the relationship between the parties—and is thus unenforceable—because the industry understanding of U&C is the "lowest price," *including* discounts. He provides this opinion despite the fact that Walgreens' contract with Express Scripts ▮▮▮▮, and the contract between Express Scripts and the TPP has a ▮▮▮▮. Schafermeyer testified as to the basis for this opinion during his deposition:

> A. So my basis for this is that there is an agreement between the payer and the PBM, in this case Express Scripts, and there's also an industry definition of usual and customary which was in effect before Walgreens contrived this scam. So the fact that Walgreens convinced Express Scripts to look the other way and they both benefit financially from it, the question is does that relieve them of their duty to provide the true usual and customary. *I see they have this agreement, but this agreement doesn't meet the reasonable expectations of the payer who contracted with Express Scripts and the payer expects to receive the true usual and customary in an accurate and truthful claim.* The fact that Walgreens and Express Scripts get together and make a change doesn't change the first contract between the payer and Express Scripts, that contract's still in effect. And so the reasonable expectations of the payer is they would receive accurate claims in the true usual and customary.

---

Express Scripts testified, ▮▮▮▮ *See* **Ex. C:** Barnes Dep. 117:3-119:9. Corporate representatives for many of the other Relevant PBMs provided ▮▮▮▮. *See* **Ex. A** (Jacobs Report) ¶ 85, n.97.

**Ex. B**: Schafermeyer Dep. 150:7-151:2 (emphasis added).[4] Although couched as an opinion regarding the Plaintiffs' "reasonable expectations," Opinion 7 is nothing more than expert testimony stating that two private parties (Walgreens and any Relevant PBM) cannot enter into legally enforceable contracts or that these contracts are not valid, which is also incorrect as a legal proposition. *See Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 733 (7th Cir. 2021) (stating that under Illinois law, "courts should not interfere with the right of two parties to contract with one another if they freely and knowingly enter into the agreement."). As a result, the Court should strike Opinion 7 from Schafermeyer's expert report and bar any testimony with respect to that opinion.

    **B.**    **Schafermeyer's Opinions As To The Industry Definition Of U&C And As To Walgreens' Practices Are Unreliable In Violation Of Rule 702**

In Opinion 3, Schafermeyer opines that "the industry definition of U&C is common and has been established for decades" to mean the "***lowest*** price offered by a pharmacy to uninsured customers, including all discounts." Schafermeyer Report ¶¶ 20, 50-101 (emphasis added). In Opinion 6, Schafermeyer opines that Walgreens should have reported or otherwise included the lower prices available to PSC members when determining the U&C price to submit. *Id.* ¶¶ 23, 127. Schafermeyer provides no relevant support for these Opinions other than his own say-so, and ignores all record evidence and industry guidance to the contrary.[5]

---

[4] If the TPPs had a reasonable expectation that they would receive Walgreens' PSC prices as U&C based on their contracts with the PBMs, the TPPs should raise the issue with the PBMs with which they contracted instead of Walgreens, which was not a party to the TPPs' contracts.

[5] Schafermeyer attempts to rely upon statements from the National Council for Prescription Drug Programs ("NCPDP"), Medicare Part D, and state Medicaid programs regarding U&C to support his opinion that U&C is the ***lowest*** price offered to customers. Schafermeyer Report ¶¶ 54-75. As set forth in Jacobs's expert report, the NCPDP standard contemplates that there may be an agreed-upon definition of U&C in a contract that differs from the NCPDP format. **Ex. A** (Jacobs Report) ¶¶ 68-71. Further, there is nothing in the Medicare Part D program that would override a contractual definition of U&C agreed upon by a PBM and retail pharmacy (*see id.* ¶ 77), and state Medicaid definitions of U&C not only vary, but they also have no impact here because this dispute does not involve Medicaid claims. *Id.* ¶¶ 78-79. In contrast, Jacobs cites not only industry publications, but also extensive PBM testimony and contemporaneous documents from those PBMs that confirm that the lower prices of pharmacy membership clubs did not affect U&C prices.

Because Opinions 3 and 6 ignore and contradict the record, and are speculative, they should be excluded.

### 1. Schafermeyer ignores the contractual definitions of U&C

In claiming that the industry definition of U&C has been commonly defined for decades to mean the lowest price offered to cash customers, Schafermeyer points to no relevant authorities that agree with him (as set forth in the next section, industry authorities are to the contrary), and instead ignores the *language* defining U&C found in the *contracts* between Walgreens and the PBMs and testimony from the PBMs in this case, which are directly contradictory to Opinions 3 and 6. As a result, Schafermeyer's so-called expert testimony that the industry understanding of U&C is the *lowest* price will not only be unhelpful, but it will also actually confuse a jury because the contracts say something different, as evidenced below:

- January 1, 2017 contract between Optum and Walgreens ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ See Schafermeyer Report ¶ 98 at Table 3.

- October 1, 2010 contract between MedImpact and Walgreens ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*

- June 1, 2011 contract between MedTrak and Walgreens ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇. *Id.*

- August 1, 2010 contract between Sav-Rx and Walgreens ▇▇▇▇▇▇

---

*See, e.g.*, Jacobs Report ¶ 43 n.32 (citing AMCP GUIDE TO PHARMACEUTICAL PAYMENT METHODS (VERSION 3.0) (2013), Walg_Forth_00359354; Adam Fein, Pharmacy Profits and Wal-Mart (Jan. 15, 2009), https://www.drugchannels.net/2009/01/pharmacy-profits-and-wal-mart.html#disqus_thread); ¶ 44 nn.33-35 (citing Barnes (Express Scripts) Dep.); ¶ 45 nn.36-37 (citing Correia (Caremark) Dep.); ¶ 45 n.38 (Caremark, Troubleshooting Set Price Generic Programs (Oct. 1, 2008), Caremark_Forth-000249); ¶ 46 nn.39-40 (citing Johnson (Optum) Dep.); ¶ 51 nn.48-49 (citing Hatler (MedImpact) Dep.); ¶ 55 nn.55-57 (Piti (Sav-Rx) Dep.); ¶ 64 n.78 (citing Schroff (LDI) Dep.); ¶ 76 n.88 (citing OIG, A Comparison of Medicaid Federal Upper Limit Amounts to Acquisition Costs Medicare Payment Amounts, and Retail Prices (Aug. 2009), https://oig.hhs.gov/oei/reports/oei-03-08-00490.pdf); ¶ 76 n.89 (citing 66 Fed. Reg. 37564, 37567 (July 18, 2001); 67 Fed. Reg. 56618, 56636 (Sept. 4, 2002); 68 Fed. Reg. 69840, 69918 (Dec. 15, 2003)); ¶ 76 n.92 (citing CMS Memorandum to Part D Sponsors from Cynthia Tudor, HPMS Q&A-Lower Cash Price Policy (Oct. 11, 2006), Schafermeyer_0000395 to Schafermeyer_0000396).

- ▮▮▮▮▮▮. *Id.*

- October 1, 2017 contract between Express Scripts and Walgreens ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

- January 1, 2018 contract between Caremark and Walgreens ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

- Caremark's corporate representative testified that the PBM did not believe the contract Caremark had with Walgreens in 2011, which defined U&C to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ required Walgreens to report its PSC prices as U&C. **Ex. B**: Schafermeyer Dep. 112:6-16.

- Agreement between Paid Prescriptions (Medco) and Walgreens ▮▮▮▮▮▮▮▮▮▮. **Ex. A** (Jacobs Report) ¶ 57.

At bottom, Schafermeyer would effectively be telling a jury to ignore what the contracts say, which is inappropriate expert testimony.

Schafermeyer also ignores the fact that the ***contracts*** between some of the ***TPP Plaintiffs and the PBMs*** do not require the PBMs to submit the lowest price as the U&C price:[6]

- Contracts between IUOE and Express Scripts defined U&C as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Schafermeyer Report ¶ 84 at Table 1.

- Contracts between IBEW and Caremark defined U&C as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*

- Contract between Steamfitters and LDI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Walgreens' Opp'n., at 28.

For Schafermeyer, however, none of this matters because "he says so." But an expert's report that "relie[s] only on what appears to be plaintiff-curated records . . . casts significant doubt on the soundness of [his] opinion[s]." *Chen*, 2021 U.S. Dist. LEXIS 175372, at *10 (excluding expert's

---

[6] Walgreens does not concede that TPP-PBM contracts impose any requirements on Walgreens. As Schafermeyer admits, Walgreens is not a party to the TPP-PBM contracts, and because the terms of these contracts are generally confidential, Walgreens was unaware of any of the terms, and these terms would not apply to Walgreens. **Ex. A** (Jacobs Report) ¶ 23.

opinion relying only on the plaintiff's allegations when discovery showed the opposite) (quoting *Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 558-59 (7th Cir. 2019) (finding that the expert's "reliance on an anemic and one-sided set of facts casts significant doubt on the soundness of her opinion, and the court did not abuse its discretion by excluding it.")). Schafermeyer's word is not enough to withstand Rule 702 scrutiny, particularly in light of this contradictory evidence. As a result, the Court should exclude Schafermeyer's Opinions 3 and 6.

> 2. **Schafermeyer's opinions as to the industry definition of U&C and as to Walgreens' practices are unreliable because they ignore industry materials that support the opposite view**

Further, Schafermeyer did not consult any other publications, articles, or literature in the pharmacy industry to support his opinions that the industry has had a universal understanding for decades that U&C means the *lowest* price offered. *See* **Ex. B**: Schafermeyer Dep. 72:18-74:4 (indicating he was unaware of any trade literature discussing the definition of U&C prior to 2006 because there was no dispute about it); 75:12-77:18 (stating, among other things, that he is "not aware of any articles that said [U&C] was a matter of controversy"); 115:14-116:4 (admitting that he had not seen any articles or publications discussing why states amended their U&C definitions to capture pharmacy discount club prices). In fact, Schafermeyer conducted no research at all to verify that pharmacies, PBMs, and TPPs—the ***entire pharmacy industry***—knew that U&C meant the *lowest* price offered, including discounts, since the 1970s. *See id.* 70:4-22 (opining that there had been no dispute about the definition of U&C for decades without providing any basis); 72:12-13 ("I don't think [the definition of U&C] was in dispute, I never heard anybody dispute that."); 180:23-182:18 (indicating that the basis for his opinion was that he has "lived in this industry" and the absence of public debate over the definition of U&C). Rule 702 does not allow Schafermeyer to opine that the industry has, for *decades*, understood U&C to mean the *lowest* price when he did no research to confirm his opinion and industry materials contradict his opinion.

Indeed, although Schafermeyer claims to rely on a 2012 article to support the first opinion in Schafermeyer's expert report,[7] he then disavows the same article because it defines U&C as the "*average* cash price," directly contradicting his opinion that U&C has been defined as the "lowest price" for decades. *See* Schafermeyer Report ¶ 141(b), n.133; **Ex. B:** Schafermeyer Dep. 191:13-194:3 (describing the article and testifying: "[M]y point was to point out these are cash prices. I'm not agreeing that it's average."). Similarly, in a 2009 book chapter that ***Schafermeyer authored***, Schafermeyer wrote that U&C "has different definitions but basically it is translated as the cash price *normally* charged" to uninsured customers. **Ex. D:** Schafermeyer_0000564, at Schafermeyer_0000570 (emphasis added); **Ex. B**: Schafermeyer Dep. 185:19-187:14. Although Schafermeyer tries to distance himself from the fact that he did not define U&C as the *lowest* price in 2009, he cannot escape his own words, which appeared, according to him, in the "definitive textbook on managed care pharmacy."[8] **Ex. B**: Schafermeyer Dep. 186:6-10.

## V. CONCLUSION

For the reasons set forth above, Schafermeyer's Opinions 7, 3, and 6 do not satisfy Rule 702's requirements. As a result, the Court should exclude these opinions from Schafermeyer's expert report, and Plaintiffs should be precluded from relying on any testimony from Schafermeyer about those opinions in this matter.

---

[7] Schafermeyer's Opinion 1 is that the prescription drug claims adjudication process is common and standardized throughout the industry and consists of only two types of transactions: (1) insured transactions; and (2) uninsured transactions. *See* Schafermeyer Report ¶¶ 18, 25.

[8] As Jacobs discusses, Schafermeyer's opinion is further undermined by the fact that it is widely understood in the pharmacy industry and by the public that consumers may find lower prescription-drug prices through membership in pharmacy clubs (like PSC) or by presenting third-party discount cards. *See* **Ex. A** (Jacobs Report) ¶ 37 (discussing how third-party discount card websites explain that insured customers may find a lower price available for their drugs by using a discount card); *see also id.* ¶ 38 (citing to language in the 2016 Annual Notice of Change from the Centers of Medicare and Medicaid Services ("CMS") sent to customers stating that they "may have a discount card that is outside our benefit that offers a lower price.").

DATED: March 17, 2023

            *s/ Michael S. Leib*
            Michael Scott Leib
            Anthony Robert Todd
            **REED SMITH LLP**
            10 S Wacker Dr # 4000
            Chicago, IL 60606
            Telephone: 312/207-1000
            *mleib@reedsmith.com*
            *atodd@reedsmith.com*

            Frederick Robinson (*pro hac vice*)
            Selina Coleman (*pro hac vice*)
            Megan Engel (*pro hac vice*)
            Jessica Christensen (*pro hac vice*)
            **REED SMITH LLP**
            1301 K Street, N.W.
            Suite 1100 East Tower
            Washington, DC 20005
            Telephone: 202-414-9200
            *frobinson@reedsmith.com*
            *scoleman@reedsmith.com*
            *mengel@reedsmith.com*
            *jchristensen@reedsmith.com*

            ***Attorneys for Defendant Walgreen Co.***

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of March, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

                                         *s/ Michael S. Leib*
                                         Michael S. Leib