# EXHIBIT A

## *REDACTED*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 17-cv-2246 <br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan |
| Plaintiffs, | |
| v. | |
| WALGREEN CO., | |
| Defendant. | |

**EXPERT REPORT OF MICHAEL S. JACOBS**
**March 16, 2023**

# TABLE OF CONTENTS

**Page**

I.    Introduction ............................................................................................................... 1

II.   Qualifications ........................................................................................................... 2

III.  Summary Of Opinions ............................................................................................. 3

IV.  Background ............................................................................................................... 4

     A.     Prescription Claim Adjudication ................................................................... 4

     B.     The Role Of Pharmacy Benefit Managers ..................................................... 7

     C.     The Relationship Between A PBM And A Retail Pharmacy Is Governed By The Agreement Between The PBM And That Retail Pharmacy ..................................... 8

     D.     PBMs And Retail Pharmacies Often Negotiate And Define In Their Agreements The Meaning Of The Term "U&C" ................................................. 9

     E.     U&C Is Understood In The Industry To Mean The Pharmacy's Retail Price ........... 9

     F.     Walgreens' Prescription Savings Club .......................................................... 10

V.   Opinions ................................................................................................................. 13

     A.     Insurance Serves To Limit Risk, Not To Guarantee The Lowest Price .................... 13

     B.     As Understood In The PBM And Retail Pharmacy Industries, A Pharmacy's "Retail" Or "Cash" Price Is Separate From Membership Club Prices ..................... 15

     C.     The U&C Definitions In Walgreens' Agreements With PBMs Would Not Be Understood In The PBM Or Pharmacy Industries As Encompassing Membership Club Prices ................................................................................. 19

     D.     PBMs And Pharmacies May Agree To "U&C" Definitions That May Differ From Other Guidance ......................................................................... 31

           1.     The National Council For Prescription Drug Programs Does Not Provide A Controlling Definition Of U&C .................................. 32

           2.     Medicare Part D Does Not Restrict The Freedom Of PBMs And Retail Pharmacies To Contract For A U&C Definition That Governs The Pharmacy's U&C Obligations Under A Pharmacy-PBM Agreement ......... 33

           3.     State Medicaid Definitions Of U&C Vary And Have No Effect Here Because This Dispute Does Not Involve Medicaid Claims ........................... 36

           4.     *United States ex rel. Garbe v. Kmart Corp.* Recognizes That U&C Definitions In Payer Agreements Control The Pharmacy's U&C Reporting Obligations ............................................................................. 36

i

E.      In The Event Of A Conflict Between A Provision Of A Pharmacy-PBM Agreement
        And A Provision Of A PBM Manual, The Provision Of The Pharmacy-PBM
        Agreement Is Generally Understood To Prevail........................................................ 37

F.      Plaintiffs' Third-Party Payer Agreements With PBMs Do Not Control Walgreens'
        U&C Reporting Obligations, Which Are Governed Under Walgreens' PBM
        Agreements .......................................................................................................... 42

G.      Schafermeyer's Claim That PBMs Are Biased Does Not Change Their Sworn
        Testimony, Nor Their Incentives To Obtain Competitive Prices For Their TPP
        Clients ................................................................................................................ 46

VI.     Conclusion ...................................................................................................................... 47

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## I.     Introduction

1.     My name is Michael S. Jacobs. This report summarizes my opinions in the matter of *Russo et al. v. Walgreen Co.*

2.     I have been retained by Reed Smith LLP on behalf of its client, Walgreen Co. ("Walgreens") to provide independent review and expert testimony with regard to this case and the Report of Kenneth W. Schafermeyer, Ph.D., dated November 16, 2022, submitted by Plaintiffs.

3.     I have been asked to provide an opinion on the following:

A.     The understanding of usual and customary ("U&C") pricing in the pharmacy benefit management industry and pharmacy retail industry.

B.     How insurance plans and employer-sponsored health-benefit plans contract with Pharmacy Benefit Managers ("PBMs") to deliver pharmacy benefits.

C.     Whether, based on my experience, Walgreens complied with the U&C provisions of its agreements with the PBMs at issue in this case ("Relevant PBMs"), or, in the absence of a U&C definition in those agreements, the industry understanding of the term U&C, by reporting its retail prices, as opposed to its membership-club prices, as its U&C prices to the Relevant PBMs.

D.     Whether the opinions in the expert report of Plaintiffs' expert, Kenneth Schafermeyer Ph.D. are, based on my experience, accurate and consistent with my understanding of and experience with the pharmacy benefit management industry and pharmacy retail industry.

4.     I have based my opinions on documents and data provided to me in this case, publicly available information, and my personal knowledge, experience, and education. The materials I considered in preparation of this expert report are listed in Exhibit A (attached).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## II.    Qualifications

5.      I graduated as a pharmacist, in 1978 from Wayne State University, in Detroit, Michigan with a Bachelor of Science in pharmacy degree. I was first licensed in the State of Michigan as a Pharmacist on August 9, 1978 (License #23471, Permanent License #5302023471).

6.      During my career, I have owned and operated retail pharmacies; worked for a pharmaceutical manufacturer (Ciba-Geigy); been an executive in the PBM industry (Vice-President level); and been a consultant for payers of pharmacy benefits at three national consulting firms: Mercer Human Resource Consulting (Regional Practice Leader in the Southeast United States), Buck Consultants, LLC (National Practice Leader, Pharmacy and Specialty Consulting), and A. J. Gallagher, Inc., as a pharmacy consultant to Managed Care Organizations. I am currently the National Pharmacy Practice Leader at a smaller firm (Foster & Foster Actuaries and Consultants). My consulting work has included creating, managing, and evaluating Prescription Drug Plans, for clients, including self-funded employer groups, Taft-Hartley client groups (group insurance programs for union members working for employers in certain industries), municipalities, and others. I have had the opportunity to negotiate PBM-payer relationships many times with nearly a dozen different PBMs in my career.

7.      I am a speaker and author on the topics of managing pharmacy benefits, value-based contracting strategies, and contracting for PBM services. Since the time I became a licensed pharmacist, my professional memberships have included: the American Pharmacy Association, the Academy of Managed Care Pharmacy ("AMCP"), and the National Council for Prescription Drug Programs ("NCPDP"), among others. I have been an editorial board member of the peer reviewed journal *American Health & Drug Benefits* since 2010, and on the Board of the Center for Value Health Innovation for over four years.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8.      From 2014-2017, I was Senior Director, Priority Accounts, Government at Walmart Stores, Inc., where my responsibilities included negotiating and contracting for preferred pharmacy network relationships with Medicare Part D plan sponsors and other plans, such as large carriers and PBMs.

9.      Currently, I consult with a variety of plan sponsors and payers as I serve as the National Pharmacy Practice Leader at Foster & Foster Actuaries and Consultants. My curriculum vitae, which more fully describes my educational credentials and my professional experience, is attached as Exhibit B. My fees are based on the number of hours I work on this case and are not contingent on the outcome of this case. My hourly rate is $500.

## III.    Summary Of Opinions

10.     I understand Plaintiffs contend that Walgreens should have reported its Prescription Savings Club ("PSC") prices instead of its retail prices as its U&C prices when submitting prescription drug claims to Relevant PBMs. Based on my review of the agreements between Walgreens and the Relevant PBMs, additional documents, deposition transcripts, and publicly available information, as well as my decades of experience in the pharmacy industry, it is my opinion that the terms in the agreements required Walgreens to report its retail prices, not its PSC prices, as its U&C prices to the Relevant PBMs.

11.     I disagree with Schafermeyer's opinion that Walgreens' U&C reporting practices deprived insured beneficiaries of the benefits of their insurance coverage, as it misconstrues the purpose of insurance. The purpose of health insurance is to limit risk and cover healthcare costs over time for insured beneficiaries; it is not, as Schafermeyer suggests, to ensure that TPPs and customers paying with insurance always receive the lowest price on a prescription drug. It is widely understood across the PBM and pharmacy industries that insured consumers may, in certain instances, find

3

lower prices on prescription drugs than their deductible, copay, or coinsurance, such as through membership in pharmacy clubs or by presenting third-party discount cards.

12.    With respect to Walgreens' U&C reporting obligations, the relationships between PBMs and retail pharmacies are governed by their individual and negotiated contracts. This is true whether the PBM is adjudicating commercial or government claims as part of a pharmacy benefit. The U&C price is often defined by the agreement between the PBM and the retail pharmacy. Here, Walgreens appropriately did not consider its PSC prices in reporting U&C prices. That is because the U&C definitions set forth in Walgreens' agreements with the Relevant PBMs do not require Walgreens to report prices available through membership clubs like PSC to the Relevant PBMs when submitting claims. These U&C definitions contain terms, such as "cash" and "retail" price, that are consistently understood in the industry to refer to a price that a customer pays for a prescription without using any benefits, including insurance, a pharmacy membership club, or a third-party discount card.

13.    It is consistent with my experience that to the extent that U&C is not defined in a contract, which is the case for one of the Walgreens-Relevant PBM agreements at issue here, the industry understanding of U&C would prevail. In my experience, the industry understanding is that U&C refers to a pharmacy's retail price, not its membership club prices. Thus, Walgreens properly reported its retail prices, not PSC prices, as its U&C prices under the one Walgreens-PBM agreement that does not include a U&C definition.

## IV.    Background

### A.    Prescription Claim Adjudication

14.    A customer who walks into a pharmacy with no prescription benefit (e.g., those who do not pay with insurance, a third-party discount card, or a club membership) who fills a prescription

pays the "cash" or "retail" price for that prescription drug. Such customers are referred to as "cash"[1] customers in the pharmacy industry. These cash customers pay the price for a prescription drug that is housed on the pharmacy's internal computer system. In contrast, pharmacy customers who do have a prescription benefit pay an adjudicated amount, based on their benefit design, typically returned to the pharmacy by a PBM.

15.      The prescription claim adjudication process is well-established within the industry and involves a transfer of data between the pharmacy provider and the PBM adjudicating the claim, utilizing the data transfer formats and protocols set forth in the NCPDP Telecommunications Standard, described below.

16.      At a high level, the process for adjudicating a prescription claim under a consumer's prescription drug benefit (i.e., insurance) is as follows. The pharmacy provider begins by collecting information from the patient, as required for prescription claims payment submission, which is submitted to the PBM for eligibility determination. The information submitted commonly includes a Member ID to verify the member is eligible under the applicable program benefit, a BIN ("bank identification number") and PCN ("processor control number"), which facilitate the routing of the prescription claim to the correct PBM, and a Group Number, which allows the PBM to access the appropriate pharmacy benefit design and payment information for the customer.[2] All of this information typically appears on the face of a customer's plan membership card.[3] The transfer of

---

[1] "Cash" in this context means only that a customer is paying without a prescription benefit; it does not mean that a "cash" customer necessarily uses only cash to pay for a prescription drug, as opposed to a check, credit card, or debit card.

[2] *See* AMCP Guide to Pharmaceutical Payment Methods (Version 3.0) 11, Ex. 1 (2013), Walg_Forth_00359354 at Walg_Forth_00359365.

[3] *See, e.g.*, CIGNA, QUICK GUIDE TO CIGNA ID CARDS 12 (Dec. 2021), https://www.cigna.com/static/www-cigna-com/docs/member_id_cards.pdf; NCPDP, HEALTH CARE IDENTIFICATION CARD FACT SHEET 1-3 (June 2022), https://www.ncpdp.org/NCPDP/media/pdf/NCPDP_pharmacy_id_card_fact_sheet.pdf.

this information from the pharmacy to the PBM allows for the PBM to adjudicate the claim based on the benefit design.

17.     For a cash prescription, where the pharmacy customer has no benefit (or the customer declines to share information about an available benefit), the pharmacy provider has no information on where to send the claim for pricing and adjudication. The prescription claim is not being routed to any PBM or third-party program. In contrast, when a member pays a premium to access lower prices, or accesses an unfunded benefit, the prescription claim is routed to a PBM or third-party program. For example, when a member presents a third-party discount card to access a lower price for their prescription, this claim is adjudicated. But for a patient without insurance, a third-party discount card, or a club membership like PSC, the only pricing accessible to the retail pharmacy for this prescription is the retail price established by the pharmacy provider—i.e., its cash price. Accordingly, for cash prescriptions, the pharmacy provider will process the prescription claim within the internal claim system, perform Drug Utilization Review ("DUR") for patient safety,[4] and charge the retail price to the customer.

18.     The process for adjudicating a prescription when a customer joins a membership club or presents a third-party discount card is similar to the process for adjudicating a prescription claim pursuant to a customer's insurance. Membership clubs (e.g., Walgreens' PSC) and third-party discount cards (e.g., GoodRx, SingleCare, and RxSaver) are programs where a customer presents a card (physical or virtual) at the pharmacy. Membership club cards and third-party discount cards

---

[4] Walgreens' DUR is run on a screening software for all prescription purchases, regardless of whether the customer is a cash customer or uses a benefit such as insurance or PSC. Declaration of Henry Thompson of Walgreen Co. ¶ 5 (Mar. 15, 2023) (hereinafter "Thompson Decl."). This DUR checks all prescriptions purchased by that customer at any pharmacy, not just Walgreens. *Id.* ¶ 6. Thus, I see no basis for Schafermeyer's safety concerns with respect to DUR. *See* Report of Kenneth W. Schafermeyer, Ph.D. ¶¶ 183-86 (Nov. 16, 2022) (hereinafter "Schafermeyer Report").

also contain information such as BIN, PCN, and Group Numbers.[5]  The membership card or third-party discount card's claims processor or PBM adjudicates the claim, and if the PBM or claims processor determines the customer is eligible for the program (and the drug is covered in the program), returns the appropriate price for that prescription to the pharmacy. That amount is the price available through the membership club or third-party discount card, not the pharmacy's retail (or "cash") price. For the customer to obtain the price, the pharmacy must first submit the claim to the PBM adjudicating the membership club or third-party discount card, which identifies the appropriate price for the pharmacy to charge the customer for that prescription at that store on that day.

### B.      The Role Of Pharmacy Benefit Managers

19.     Over the decades, insurance and other third-party programs that provide coverage for prescription medications have grown exponentially, including after the implementation of Medicare Part D in 2006, which created a prescription-drug benefit for Medicare.

20.     This growth has, in turn, contributed to the growth of the PBM industry. PBMs act as administrators of prescription drug benefit programs. One of their primary roles is to provide a data exchange that takes information from the pharmacy customers, such as BIN, PCN, Member ID and Group Numbers, and incorporates it into the pharmacy's computer system so that it can be sent to the PBM and third-party payers ("TPPs"). TPPs include private health insurance plans, self-funded health plans, and other health benefit providers, which are commonly referred to as third-party payers. These processes are designed to support the efficient and cost-effective delivery of prescription drug benefits to plan members. PBMs also typically perform a variety of

---

[5]     *See, e.g., Get your Free GoodRx Prescription Savings Card*, GOODRX, https://www.goodrx.com/discount-card (last visited Mar. 16, 2023); PSC Consumer Membership Card (Aug. 14, 2015), WAGDCO_Forth_00006980 to WAGDCO_Forth_00006981.

administrative functions for TPPs, such as managing retail pharmacy provider networks, ensuring benefit designs are administered correctly and adhered to, and ensuring that the PBM bill TPPs accurately according to contract terms and definitions specific to each PBM-TPP relationship. PBMs also provide claims processing, formulary development and administration, utilization management and analysis, reporting, billing, and payment processing functions to their TPP clients. PBMs contract with TPPs to provide these services and then separately contract with pharmacies in order to provide some of these services.

21.     PBMs provide these services not only to commercial insurance clients and employers, but also to government-sponsored health-benefit programs such as Medicare Part D.

>        **C.      The Relationship Between A PBM And A Retail Pharmacy Is Governed By The Agreement Between The PBM And That Retail Pharmacy**

22.     The agreement between a PBM and a retail pharmacy is the cornerstone of the pharmacy-PBM relationship. These agreements are the product of extensive negotiations and contain a variety of terms and conditions that identify the parties' respective duties and obligations that govern their relationship. While some terms and conditions tend to be common across PBM agreements, such as those that identify the parties' respective compliance obligations under state and federal laws, others are often the subject of negotiation and can vary significantly from contract to contract, such as defined terms (particularly as they relate to reimbursement), reimbursement rates, due-diligence obligations, and data rights.

23.     Although PBMs also have separate agreements with their TPP clients, those agreements are separately negotiated between the PBMs and TPPs. Retail pharmacies typically play no role in those negotiations, and the PBM-TPP agreements usually have no bearing on a retail pharmacy's obligations under separate pharmacy-PBM agreements. Pharmacies generally are not privy to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PBM-TPP agreements because the terms of those agreements are generally confidential to the parties that negotiated them.

### D. PBMs And Retail Pharmacies Often Negotiate And Define In Their Agreements The Meaning Of The Term "U&C"

24. PBMs pay retail pharmacies for the pharmacy's provision of prescription drugs to the TPPs' beneficiaries contracted with the PBM. Often included in the contractual reimbursement formula is a "lesser of logic" (or "lower of logic") formula component agreed upon by the PBM and retail pharmacy provider. Under a "lesser of" prescription drug reimbursement model, a PBM pays the pharmacy the lower of certain agreed-upon price points, one of which is often the pharmacy's U&C price.

25. PBMs and pharmacies often negotiate and define in their agreements the meaning of U&C. They do so because the U&C price often plays a role in the lesser-of formula by which PBMs may pay pharmacies for dispensing prescription drugs to beneficiaries, although the lesser-of formula may not apply to all drugs.

26. In my experience, if a PBM and pharmacy define U&C in their agreement, then the PBM and pharmacy understand that the U&C definition in the agreement governs the price the pharmacy is required to report as its U&C when submitting prescription drug claims to the PBM.

### E. U&C Is Understood In The Industry To Mean The Pharmacy's Retail Price

27. Although the U&C price is typically a defined term in pharmacy-PBM agreements, if it is not defined, the PBM and pharmacy providers understand U&C to mean the pharmacy's retail price, which is the price that a retail pharmacy would charge a customer who was paying without a prescription benefit (e.g., a prescription drug insurance plan, a pharmacy membership club, or third-party discount card program) for the filling and dispensing of a given prescription medication, including same drug and strength, for a specific quantity, on a specific date, at a

specific location. In other words, U&C is understood to be the retail price, often referred to as the "cash" price. In my experience, U&C generally is not understood to include club prices available to customers who, for example, complete the requirements to join a membership club, or third-party discount card prices.[6]

### F. Walgreens' Prescription Savings Club

28.     Walgreens' PSC is a fee-based membership club that Walgreens designed to assist the uninsured and underinsured, such as individuals who have limited drug coverage. Starting in April 2006, Walgreens piloted the program in several United States markets and fully launched PSC nationwide in August 2008.[7]

29.     PSC is a membership club with lower prices for members. To enroll and gain access to PSC prices, customers must provide Walgreens with certain information, agree to abide by the PSC's terms and conditions,[8] pay an annual membership fee of $20 for an individual or $35 for a family, and meet certain criteria (i.e., beneficiaries of government-funded programs such as Medicare and Medicaid could not enroll until January 2020, and PSC is currently not available in

---

[6] *See* AMCP GUIDE TO PHARMACEUTICAL PAYMENT METHODS (VERSION 3.0) 44 (2013), Walg_Forth_00359354 at Walg_Forth_00359398 ("However 'lower of' provisions would not apply in the case of a community pharmacy generic program available only to those subscribed to the pharmacy's "generics club", a common requirement, because prices available to specified groups are not the pharmacy's 'usual and customary' prices.").

[7] *See* Prescription Savings Club: FY09 Interim Marketing Strategy (Jan. 2008), Walg_Forth_00005266 at Walg_Forth_00005268.

[8] *Prescription Savings Club Terms and Conditions*, WALGREENS, https://www.walgreens.com/topic/psc/prescription-savings-club/psc-terms-and-conditions.jsp?o=acs (last visited Mar. 12, 2023) ("The PSC discounts apply solely to items or services paid for entirely by the Member using cash or credit card at the time of purchase.") ("Subject to any required state agency approvals, Walgreens reserves the right to modify any aspect of the PSC program and its terms and conditions, including but not limited to: (i) modifying the Formulary by adding or deleting drugs, moving drugs to another tier in the Formulary, adding or deleting Formulary tiers, and/or modifying Formulary tier pricing . . .").

certain states).[9] PSC members then become eligible to obtain prescription prices that are usually lower than the retail price by using their membership credentials and paying for the prescriptions out of pocket (i.e., without the use of any insurance benefit).[10]

30.      A current description of PSC is available on Walgreens' website, including the membership fee that customers must pay to join and the lower prices of certain Value Priced Medications available only to PSC members.[11] Value Priced Medications are certain drugs (mostly generic) that are split into three different pricing tiers; currently a 30-day supply of a drug under Tier 1 is $7.50, under Tier 2 it is $10, and under Tier 3 it is $15.[12]

31.      ███████████████████████████████████████████████████

████████████████████, and I understand that a PBM has adjudicated PSC claims throughout the existence of PSC.[13] By adjudication, I mean that when a PSC member purchases a prescription drug with the PSC benefit, ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ As described further below, customers who have not become PSC members by enrolling and paying the membership fee cannot access PSC prices.



---

[9] Thompson Decl. ¶¶ 7-8.

[10] Thompson Decl. ¶¶ 3-4.

[11] *Prescription Savings Club*, WALGREENS, https://www.walgreens.com/psc/prescription-savings-club (last visited Mar. 12, 2023).

[12] *Value Priced Medication List*, WALGREENS (Rev. July 25, 2022), https://www.walgreens.com/images/adaptive/pdf/psc/Value-Priced-Medication-List-English.pdf.

[13] Amiet Dep. at 55:5-17.





34.

## V.    Opinions

### A.    Insurance Serves To Limit Risk, Not To Guarantee The Lowest Price

35.    The purpose of health insurance is to limit risk and cover healthcare costs over time for the insured beneficiaries. The insurance marketplace offers a variety of plans—each with their own unique characteristics and plan designs. For example, some plans may require the beneficiary to pay higher premiums or higher deductibles, in exchange for more generous benefits, including lower cost-sharing responsibilities for the beneficiary, i.e., copayments or coinsurance.[24] Conversely, other plans may charge lower premiums or carry lower deductibles, in exchange for offering more limited benefits, including higher cost-sharing responsibilities.[25] Insurance is about



[24] *See, e.g., The health plan categories: Bronze, Silver, Gold & Platinum*, HEALTHCARE.GOV, https://www.healthcare.gov/choose-a-plan/plans-categories/ (last visited Mar. 12, 2023).

[25] *See, e.g., id.*

limiting risk among a pool of beneficiaries. The cost of services provided for an insured member is determined through provider negotiations and market conditions.[26]

36.     The purpose of insurance is not, however, as Schafermeyer contends, to ensure that TPPs and customers paying with insurance always receive the lowest price on a prescription drug simply because they are using an insurance benefit.[27] It is widely understood across the PBM and pharmacy industries that consumers may find lower prices on prescription drugs through membership in pharmacy clubs or by presenting third-party discount cards.

37.     For example, in the FAQ section on the website for third-party discount card SingleCare, one question and answer states: "Q: Can the SingleCare price beat my insurance copay? A: Yes, we often beat the price of an insurance copay. It's always worth checking."[28] RxSaver, another third-party discount card, explains on its website that, "[i]f you do have health insurance, RxSaver may offer a lower prescription discount than your insurance co-pay."[29] Further, GoodRx's website states "GoodRx may be able to find you a lower price than your insurance co-pay."[30]

---

[26] *See* Pranammya Dey & Peter B. Bach, *The 6 Functions of Health Insurance*, 321 JAMA 1242, 1242-43 (2019), Walg_Forth_00359029 at Walg_Forth_00359029-30.

[27] *See* Schafermeyer Report ¶¶ 26-27, 180-86 (Nov. 16, 2022).

[28] *Got more questions? We've got answers.*, SINGLECARE, https://www.singlecare.com/how-it-works (last visited Mar. 12, 2023).

[29] *RxSaver Helps You Save with Prescription Coupons*, RXSAVER, https://www.rxsaver.com/?gclid=EAIaIQobChMIjK7z2vzP_QIVVJBoCR2hFQQFEAAYAiAAEgJiVvD_BwE (last visited Mar. 12, 2023).

[30] *How to Use GoodRx*, GOODRX, https://www.goodrx.com/how-goodrx-works (last visited Mar. 12, 2023); *see also How to use ScriptSave WellRx*, SCRIPTSAVE WELLRX, https://www.wellrx.com/faq/ (last visited Mar. 12, 2023) ("THOSE WITH HEALTH INSURANCE, MEDICARE, OR HIGH DEDUCTIBLE HEALTH PLANS – . . . can possibly find a lower price than their insurance copay."); *Frequently asked questions*, ArrayRx, https://arrayrxcard.com/ (last visited Mar. 12, 2023) ("You can also use it when the digital ArrayRx Discount Card gets you a better price than your insurance or Medicare plan.").

38.     Indeed, it is common knowledge that an insured beneficiary may be able to save money on prescription drugs by not using insurance. In the 2016 Annual Notice of Change, a document CMS requires Part D Sponsors to send to all of their beneficiaries, the following language was included:

> Sometimes when you are in the [*insert if applicable*: Deductible Stage *OR* Coverage Gap Stage *OR* Deductible Stage and Coverage Gap Stage] you can buy your drug **at a network pharmacy** for a price that is lower than our price.
>
> > For example, a pharmacy might offer a special price on the drug. Or you may have a discount card that is outside our benefit that offers a lower price.[31]

39.     Accordingly, Schafermeyer's claim that Walgreens failed to meet the expectations of consumers and TPPs by not reporting its PSC prices as U&C misconstrues the function and purpose of insurance. His opinions also suffer from additional flaws that I address below.

**B.     As Understood In The PBM And Retail Pharmacy Industries, A Pharmacy's "Retail" Or "Cash" Price Is Separate From Membership Club Prices**

40.     When a customer does not use insurance or some other benefit to pay for a prescription (such as a third-party discount card like GoodRx or a membership club), that customer pays the pharmacy's retail price: a price the pharmacy establishes, which can change from day to day or store to store. This customer is known as a "cash customer."

41.     Based upon my years of experience in the PBM and retail pharmacy industries, the terms "cash price" and "retail price" have the same meaning, and are the prices paid by "cash customers" and "cash-paying customers." Those terms are not, however, understood to encompass pricing available to customers who have joined a membership club like PSC. That is, because joining a membership club (e.g., enrolling, agreeing to abide by the terms and conditions of the club, and for many programs, paying a membership fee) that provides access to a separate price list, the

---

[31] CMS, 2016 Annual Notice of Change Model Evidence of Coverage for PDPs 93 (2016), Walg_Forth_0035884 at Walg_Forth_00358954 (emphases in original).

membership club member who uses the membership benefits is not considered a customer paying the cash price. The club member is entitled to club pricing for prescriptions that are identified as included in the club. These prices are different from the pharmacy's retail cash prices that are available to customers who walk in off the street without any benefits, such as a third-party discount card or a PSC membership.

42.     That a pharmacy's "cash" or "retail" prices are distinct from its membership club prices also finds support in the differences between how the two types of claims are processed. As described more fully above, when adjudicating a prescription claim for a customer who has no prescription benefit (or the customer does not seek to apply that benefit), the pharmacy provider has no information regarding where to send the claim for adjudication. Since the prescription claim is not being routed to any PBM, claims processor, or TPP, the only pricing accessible to the retail pharmacy for this prescription is the "retail" or "cash" price established by the pharmacy provider. In contrast, where a customer uses membership club benefits, the pharmacy submits an array of customer, pharmacy, and drug-specific information to a PBM that processes claims under the program and, if the PBM validates eligibility both for the individual and for the drug being purchased, returns information to the pharmacy detailing what amount is to be collected from the patient (i.e., the club price available for that drug). That club price, which derives from the formulary associated with the membership club (in this case, Walgreens' PSC), is separate and distinct from the pharmacy's "retail" or "cash" price.

43.     In my decades of experience in the PBM and retail pharmacy industries, the understanding of the terms U&C and cash price, are the prices a cash customer, or cash-paying customer pays the pharmacy for the prescription as these are the retail prices. These cash customers, or cash-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

paying customers do not receive the benefit of membership club prices,[32] which is supported by evidence in the record of this case.

44. 

45.

---

[32] *See* AMCP Guide to Pharmaceutical Payment Methods (Version 3.0) 44 (2013), Walg_Forth_00359354 at Walg_Forth_00359398; Adam Fein, *Pharmacy Profits and Wal-Mart* (Jan. 15, 2009), https://www.drugchannels.net/2009/01/pharmacy-profits-and-wal-mart.html#disqus_thread ("[T]he [pharmacy] chains require some sort of membership fee to get discount generics, which means that the price charged to 'club members' is not U or C [sic].") (comment by Adam Fein).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



46.

47.    Although Schafermeyer makes the claim that the industry views membership club prices as cash prices,[41] this is the opposite of my understanding, and I am not aware of any testimony from the PBM representatives deposed in this case that conflicts with my understanding that a pharmacy's "cash price" is separate from its membership club prices.



[41] *See* Schafermeyer Report ¶¶ 137-50.

      **C.**     **The U&C Definitions In Walgreens' Agreements With PBMs Would Not Be Understood In The PBM Or Pharmacy Industries As Encompassing Membership Club Prices**

48.     The U&C provisions in pharmacy-PBM agreements govern the pharmacy's U&C reporting obligations. Consistent with the prevailing understanding in the PBM and retail pharmacy industries of the terms "cash" price and "retail" price, the U&C definitions in Walgreens' PBM agreements at issue in this case did not seek to capture membership club prices, and instead sought Walgreens' retail prices as U&C prices. For ease of reference, included in **Appendix A** is a table with the U&C definitions from Walgreens' agreements with the Relevant PBMs. I address each definition below:

49.



50.



51.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



52.

53.

54.



55.



56.



57.

58.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



59.

60.

61.



62.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



63.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



65.     Although Schafermeyer claims that the industry views membership club prices as U&C prices, this opinion is the opposite of my understanding, and I am not aware of any testimony from the PBM representatives deposed in this case that conflicts with my understanding that a pharmacy's membership club prices (like PSC) are not its U&C prices.

### D.     PBMs And Pharmacies May Agree To "U&C" Definitions That May Differ From Other Guidance

66.     In my experience, PBMs and pharmacies negotiate U&C definitions, among other terms and obligations, in their agreements.

---



67.    Although the U&C term may also appear in industry materials, in my experience, PBMs and pharmacies agree to be mutually bound by their contracts. For that reason, many of the sources cited by Schafermeyer to support his opinions as to the meaning of U&C (e.g., the National Council for Prescription Drug Programs, Medicare Part D, state Medicaid programs, and *United States ex rel. Garbe v. Kmart Corp.*), have no bearing on any of the agreements in this dispute that specifically define the term U&C. Nevertheless, because Schafermeyer included them in his report, I briefly address them below and explain why they are inapplicable here.

### 1.    The National Council For Prescription Drug Programs Does Not Provide A Controlling Definition Of U&C

68.    The National Council for Prescription Drug Programs ("NCPDP") is the American National Standards Institute accredited, not-for-profit organization designed to standardize how electronic data is transferred between pharmacies, PBMs, and payer clients.[79] The NCPDP Telecommunications Standard provides data field specification for submission of claims data, as NCPDP is a standards-development organization.[80] It does not, however, override contractual U&C definitions. Rather, with respect to U&C, NCPDP simply clarifies—for purposes of claims transmission between the PBM and pharmacy—what information to populate in field 426-DQ ("Usual and Customary Charge"), one of the NCPDP's claim submission fields. For that purpose alone, NCPDP defines the 426-DQ data field explanation as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."[81] NCPDP does not, however, mandate that a pharmacy use a specific U&C definition.

---

[79] *See FAQs,* NCPDP, https://www.ncpdp.org/FAQs.aspx (last visited Mar. 12, 2023).

[80] *See* NCPDP, *Telecommunication Version 5 Questions, Answers and Editorial Updates* (Nov. 2010), https://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf (hereinafter "NCPDP Q&A").

[81] *See id.* Notably, "sales tax" and "other amounts claimed" are not reported in this field because they are reported in other fields. *See id.*

69.     Notably, in addressing a question about whether different values may be submitted in field 426-DQ, NCPDP acknowledged that the amounts submitted in that field may vary by payer, explaining that "[t]hird party payer specifications [like pharmacy-PBM agreements] may require specific values for adjudication."[82] That is, apart from not defining U&C for purposes of pharmacy-PBM agreements, NCPDP's claims submission standards contemplates that parties may agree to define U&C by contract to provide for different values that populate in field 426-DQ.

70.     In addition, NCPDP has also acknowledged a difference between cash customers and, for example, customers who pay for a prescription drug with a third-party discount card. That is, in its May 2017 Recommendations for the Use of the NCPDP Telecommunications Standard to Prevent the Use of Copayment Coupons for Medicare Part D Beneficiaries and Applicability to other Federal Programs, NCPDP also distinguished between "Self-Pay: Cash" and "Self-Pay: Discount Program" transactions, confirming that it views "cash" transactions as distinct from discount-card transactions.[83]

71.     Accordingly, the NCPDP's Telecommunications Standard contemplate that there may be a contractually agreed upon definition of U&C, and has issued guidance consistent with the distinction between retail cash prices and other self-pay prices, such as third-party discount cards and membership clubs.

> **2.**     **Medicare Part D Does Not Restrict The Freedom Of PBMs And Retail Pharmacies To Contract For A U&C Definition That Governs The Pharmacy's U&C Obligations Under A Pharmacy-PBM Agreement**

---

[82] NCPDP Q&A at 224.

[83] NCPDP, *Recommendations for Use of the NCPDP Telecommunication Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs* 23-24 (Version 1.1, May 2017), https://www.ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf.

72.     Medicare Part D Prescription Drug Plans ("PDPs") or Medicare Advantage Plans that include a Part D prescription drug benefit ("MA-PDs") are managed and administered by private contractors ("Medicare Part D Plan Sponsors") to the Centers for Medicaid and Medicare Services ("CMS"), according to the Medicare Modernization Act of 2003.[84]

73.     Medicare Part D Plan Sponsors are authorized by CMS as either stand-alone PDPs or MA-PDs. These authorized plans are entities that have contracted with CMS and are held directly accountable for compliance with CMS rules and regulations. Although these entities contract directly with CMS, the prescription drug benefits themselves are managed and administered by either: (a) health insurers (which could include a Medicare Part D Sponsor that (i) contracts directly with CMS and (ii) manages the drug benefit itself, including health insurers that also own a PBM); or (b) PBMs that have contracted with the Part D plan sponsor and the retail pharmacies, respectively.

74.     Importantly, CMS is statutorily prohibited from interfering with PBM contract negotiations on drug pricing. Under the "noninterference" clause of the Medicare Modernization Act of 2003, Congress explained that the federal government generally "may not interfere with the negotiations between drug manufacturers and pharmacies and PDP sponsors . . . [and] may not require a particular formulary . . . [and] may not institute a price structure for the reimbursement of covered part D drugs."[85] Moreover, CMS has explained that:

> Part D sponsors will negotiate prices with pharmacies and manufacturers, and we assume based on current market practices that negotiated prices will vary within a retail pharmacy network . . . . How a Part D sponsor nets out negotiated price concessions in the negotiated prices is at the discretion of the Part D sponsor, but we expect that competition will create incentives for Part D sponsors to offer

---

[84] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 121 Stat. 2492, https://www.congress.gov/bill/108th-congress/house-bill/1/text.

[85] 42 U.S.C. § 1395w-111(i).

reasonable negotiated prices. Ultimately, however, these pricing issues are between a Part D sponsor and the network pharmacies and manufacturers with whom the Part D plan negotiates price concessions.[86]

75.     In other words, in the case of Medicare Part D, CMS does not restrict the freedom to contract between PBMs (that contract with Part D sponsors to administer the program) and retail pharmacies to define U&C pricing in their agreements as they desire; to the contrary, CMS encourages it.[87]

76.     CMS has never taken a position on whether it would consider prices charged under a pharmacy's membership program to be the pharmacy's U&C price for purposes of Medicare Part D. Indeed, in August 2009, the Office of Inspector General stated: "If the pharmacy charges a fee to join their discount generic program, CMS does not have a stated policy as to whether the prices charged under that program would meet the definition of a usual and customary charge to the public."[88] Moreover, CMS has repeatedly made distinctions between U&C and club-like prices, consistent with pharmacy membership clubs not affecting U&C prices.[89] And despite Schafermeyer's discussion of a CMS memorandum from Cynthia Tudor, then-Director of the Medicare Drug Benefit Group, dated October 11, 2006,[90] regarding CMS's view that Walmart's $4 pricing on generics constituted its U&C prices, that memorandum is largely irrelevant here because, whereas Walmart gave $4 prices on select prescription medications to *all* customers *without* enrollment in a club and agreeing to terms and conditions and/or payment of a membership

---

[86] 70 Fed. Reg. 4194 at 4245 (Jan. 28, 2005).

[87] *See* 42 U.S.C. § 1395w-111(i); 70 Fed. Reg. 4194, at 4236 (Jan. 28, 2005).

[88] OIG, *A Comparison of Medicaid Federal Upper Limit Amounts to Acquisition Costs Medicare Payment Amounts, and Retail Prices* 7 n.26 (Aug. 2009), https://oig.hhs.gov/oei/reports/oei-03-08-00490.pdf.

[89] *See, e.g.*, 66 Fed. Reg. 37564, 37567 (July 18, 2001); 67 Fed. Reg. 56618, 56636 (Sept. 4, 2002); 68 Fed. Reg. 69840, 69918 (Dec. 15, 2003).

[90] *See* Schafermeyer Report ¶ 56.

fee, Walgreens' PSC made its PSC prices available only to customers who enrolled, agreed to abide by its terms and conditions, and paid to join the club.[91] Indeed, the memorandum goes on to explain that "special" prices are not a pharmacy's U&C prices.[92]

77.     The bottom line is that there is nothing in the Medicare Part D program that would override a contractual definition of U&C agreed upon by a PBM and retail pharmacy.

### 3.     State Medicaid Definitions Of U&C Vary And Have No Effect Here Because This Dispute Does Not Involve Medicaid Claims

78.     Despite Schafermeyer's references to U&C definitions set forth in state laws related to state Medicaid programs,[93] those definitions have no bearing on this dispute because this case does not involve state Medicaid claims.

79.     States define their own requirements for calculating and submitting U&C for purposes of their Medicaid programs, just as PBMs and retail pharmacies define U&C in their agreements that govern prescription drug reimbursement.

### 4.     *United States ex rel. Garbe v. Kmart Corp.* Recognizes That U&C Definitions In Payer Agreements Control The Pharmacy's U&C Reporting Obligations

---

[91] *See* CMS Memorandum to Part D Sponsors from Cynthia Tudor, HPMS Q&A-Lower Cash Price Policy 1-2 (Oct. 11, 2006), Schafermeyer_0000395 to Schafermeyer_0000396 ("2006 CMS Tudor Memorandum"). Further, when addressing scienter under the False Claims Act, the Seventh Circuit "decline[d] to treat [this CMS memorandum] as authoritative guidance for two reasons. First, the memorandum was addressed to plan sponsors, not pharmacies . . . Second . . . an informal communication is insufficiently authoritative even if it originates from the relevant agency." *United States ex rel. Proctor v. Safeway, Inc.*, 30 F.4th 649, 661 n.14 (7th Cir. 2022), *writ of certiorari granted*, 143 S. Ct. 643 (Jan. 13, 2023).

[92]  *See* 2006 CMS Tudor Memorandum at 1-2 ("Although we expect it to happen rarely, an individual may be able to obtain a lower price at a network pharmacy than that which his or her plan charges (the plan's negotiated price) in any applicable coverage gap or deductible. This may be possible if the pharmacy is offering a 'special' price or other discount . . .") (emphasis in original).

[93] *See* Schafermeyer Report ¶¶ 59-75.

80.     My opinion that it is the pharmacy-PBM agreement that governs the pharmacy's U&C reporting obligations to the PBM also finds support in *United States ex rel. Garbe v. Kmart Corp.*, a case which examined Kmart's U&C submission practices,[94] which Schafermeyer references in his report.[95]

81.     Although *Garbe* involved materially different facts than those at issue here, the district court in *Garbe* recognized that the U&C definitions contained in payer agreements with pharmacies control the relationship, observing that "[i]t would be nonsensical to find that these definitions would not control the specific contracts or agreements with these specific payers."[96] Accordingly, as here, it is the U&C provision agreed upon by the PBM and pharmacy, and reflected in their agreement, that controls the pharmacy's U&C reporting obligations.

**E.     In The Event Of A Conflict Between A Provision Of A Pharmacy-PBM Agreement And A Provision Of A PBM Manual, The Provision Of The Pharmacy-PBM Agreement Is Generally Understood To Prevail**

82.     Based on my experience, it is generally understood in the PBM and retail pharmacy industries that, in the event of a conflict between a provision of a pharmacy-PBM agreement and a provision of a PBM manual, the provision of the pharmacy-PBM agreement takes precedence.

83.     PBM provider manuals are documents that provide generalized guidance to pharmacies regarding how, operationally, a PBM commonly communicates business and benefit information with a retail pharmacy in addition to other considerations. The intended audience is pharmacies that interact with the PBM, and these manuals are not intended to provide insight or information

---

[94] *United States ex rel. Garbe v. Kmart Corp.*,73 F. Supp. 3d 1002 (S.D. Ill. 2014), *as amended* 2015 U.S. Dist. LEXIS 73520 (Jan. 12, 2015), *aff'd in part, rev'd in part*, 824 F.3d 632 (7th Cir. 2016).

[95] *See e.g.,* Schafermeyer Report ¶ 81.

[96] *Garbe,* 73 F. Supp. at 1016. This part of the opinion was not overturned by the Seventh Circuit on appeal, and, in fact, the Seventh Circuit stated, "*[u]nless state regulations provide otherwise*, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" 824 F.3d at 643 (emphasis added).

to TPPs or consumers. It is commonly understood in the PBM and retail pharmacies industries that, unless the parties contract otherwise, the pharmacy-PBM agreement, which the parties negotiate and agree upon, governs the parties' respective obligations in their business relationship and prevails over any PBM pharmacy provider manual. This industry understanding makes good sense because, whereas pharmacy-PBM agreements are the result of extensive negotiations and tailored to address the unique needs of the contracting parties, provider manuals are unilaterally drafted and issued by the PBM to all network pharmacy providers.

84.     Underscoring this point, many of the Walgreens-PBM agreements at issue in this case specifically state ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████

**Table 1: Conflict Provisions From Walgreens-Relevant PBM Agreements**

| Date | PBM | Bates No. | Conflict Provision |
|------|-----|-----------|--------------------|



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER





85. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ In other words, consistent with the prevailing understanding of the PBM

and retail pharmacy industries that, unless the parties contract otherwise, the terms of pharmacy-PBM agreements take precedence over any conflicting provisions in PBM manuals; ███████

██████████████████████████████████

86.     Schafermeyer's reliance on PBM manuals in forming his opinion on the definition of U&C[98] does not align with the industry understanding of the role of manuals. The purpose of a manual is to provide operational guidance to support the successful submission of prescription claims to the PBM. Schafermeyer is not relying on materials that are relevant to this case that an expert in the field would be expected to rely upon.

### F.     Plaintiffs' Third-Party Payer Agreements With PBMs Do Not Control Walgreens' U&C Reporting Obligations, Which Are Governed Under Walgreens' PBM Agreements

87.     Schafermeyer concludes that Walgreens was obligated to include its PSC prices in its determination of the U&C prices it reported to PBMs, but his reliance on Plaintiffs' PBM-TPP agreements as support for that conclusion is inappropriate and not something experts in the field would ever do.[99] The U&C provisions in Plaintiffs' TPP agreements with PBMs do not control Walgreens' U&C reporting obligations, which are set forth in Walgreens' PBM agreements.

88.     It is well understood in the pharmacy benefit industry that Plaintiffs' PBM-TPP agreements govern only the PBM-TPP relationships, just as pharmacy-PBM agreements exclusively govern the pharmacy-PBM relationships. In my experience, PBM-TPP agreements are separately negotiated directly between the TPP and PBM, without the involvement of the any retail pharmacies. Moreover, PBM-TPP agreements are typically confidential—as they often contain

██████████████████████████████

[98] See Schafermeyer Report ¶¶ 87-95, Table 2.

[99] See Schafermeyer Report ¶¶ 84-86, Table 1.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

pricing and other sensitive business information—and pharmacies often have no insight into those agreements. Given that pharmacies are not party to PBM-TPP agreements and often have no knowledge of their specific terms, those agreements are not understood to control the pharmacy's obligations under its separate PBM agreements.

89.     Further, many PBM-TPP agreements, including many of the agreements in evidence in this case, provide: ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████. These types of provisions undercut Schafermeyer's claim that Walgreens' U&C reporting practices under its agreements with the Relevant PBMs have failed to meet the reasonable expectations of TPPs by Walgreens.[100] In other words, as explained above, Walgreens has complied with its U&C reporting obligations under its agreements with the Relevant PBMs, and based on the aforementioned provisions in the PBM-TPP agreements, TPPs generally understand that they and their beneficiaries may not always receive the lowest price for a prescription drug. These provisions from certain PBM-TPP agreements, in evidence in this case, are listed in the below chart.

**Table 2: Financial Disclosure Provisions in the Plaintiffs-PBM Agreements**

| Plaintiff | PBM | Date | Bates No. | Financial Disclosure Provisions |
|-----------|-----|------|-----------|--------------------------------|



---

[100] *See* Schafermeyer Report ¶¶ 180-86.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER





90.     But even if a U&C definition in a PBM-TPP agreement had any relevance to a pharmacy's

U&C reporting obligations under the pharmacy's separate PBM agreements—which it does not—

a pharmacy would need to obtain a vast number of agreements that exist between its PBMs and each of those PBMs' TPP clients to determine the U&C definitions in those agreements. That exercise, in and of itself, would be particularly burdensome, given that, in my experience, PBMs often have agreements with hundreds, if not thousands, of TPPs. The next step would then be to review the PBM-TPP agreements to determine whether reimbursement was based on a lesser-of formula with U&C as a price point. And even if that were the case, the pharmacy would then need to review the U&C definitions in the PBM-TPP agreements in order to determine whether membership club prices were included in those definitions.

> **G. Schafermeyer's Claim That PBMs Are Biased Does Not Change Their Sworn Testimony, Nor Their Incentives To Obtain Competitive Prices For Their TPP Clients**

91.     Although Schafermeyer theorizes that PBMs have incentives to allow Walgreens to manipulate U&C Prices,[101] the testimony in this case shows that the Relevant PBMs believed Walgreens' PSC prices did not be need to be reported as its U&C prices under their agreements.

92.     Moreover, the PBM industry is highly competitive, with PBMs working hard to negotiate competitive contracts with pharmacies, which benefit their TPP clients.[102] That is, PBMs endeavor to bring value and efficiency to their TPP clients and aim to provide TPP beneficiaries with the best possible value for prescription drugs.[103]

---

[101] *See* Schafermeyer Report ¶¶ 118-26.

[102] *See* VISANTE (PREPARED ON BEHALF OF PCMA), THE RETURN ON INVESTMENT (ROI) ON PBM SERVICES (Jan. 2023), https://www.pcmanet.org/wp-content/uploads/2023/01/The-Return-on-Investment-ROI-on-PBM-Services-January-2023.pdf.

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████

93.     In order to remain competitive in the marketplace and secure the business of additional TPPs, PBMs are motivated to secure the lowest prices possible in their contract negotiations with pharmacies.[104] Those negotiations are rigorous and extensive, as PBMs and pharmacies each try to drive a bargain that benefits their competing interests of obtaining the best possible reimbursement terms.

94.     My opinion is based upon my years of experience in this space, including my assistance to TPPs in negotiating their agreements with PBMs, assisting pharmaceutical manufacturers in negotiating pharmaceutical product access (formulary positioning) and rebate agreements, and other consulting endeavors. In my experience, PBMs that do not offer competitive pricing generally do not win business relative to their competitors in the market.

**VI.     Conclusion**

95.     Based on my experience in the industry, insurance serves to limit risk and does not, as Schafermeyer contends, guarantee that customers paying with insurance will receive the lowest price. Further, a pharmacy's "retail" or "cash" price is not understood in the industry to include a pharmacy's membership club price. Moreover, the U&C definitions in Walgreens' agreements with the Relevant PBMs do not encompass membership club prices, such as PSC prices. Additionally, PBMs and pharmacies are free to negotiate for and agree to different U&C definitions than that which appear in various guidance documents, such as documents from NCPDP and CMS. In the event of a conflict between a pharmacy-PBM agreement and the PBM manual, the agreement is generally understood to take precedence. What is more, PBM-TPP

agreements have no relevance to Walgreens' U&C reporting obligations under Walgreens' agreements with the Relevant PBMs. Finally, Schafermeyer's claim that PBMs have "incentives" to allow Walgreens to "manipulate" its U&C prices disregards their incentives to obtain competitive prices for their TPP clients.

Respectfully submitted,

DATE:     3.16. 2023

48

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Appendix A: U&C Definitions for Walgreens-PBM Agreements

| Date | PBM | Bates No. | Definition of U&C |
|------|-----|-----------|-------------------|

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

