# EXHIBIT B

## *REDACTED*

Page 1

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5         CYNTHIA RUSSO, LISA BULLARD,

6         RICARDO GONZALES, INTERNATIONAL

7         BROTHERHOOD OF ELECTRICAL

8         WORKERS LOCAL 38 HEALTH AND

9         WELFARE FUND, INTERNATIONAL UNION OF

10        OPERATING ENGINEERS LOCAL 295-295C

11        WELFARE FUND, AND STEAMFITTERS FUND

12        LOCAL 439, on Behalf of Themselves and

13        All Others Similarly Situated,

14             Plaintiffs,

15             vs.         Case No.  17-CV-2246

16        WALGREEN CO,

17             Defendant.

18

19              VIDEO DEPOSITION OF

20            DR. KENNETH SCHAFERMEYER

21         Taken on behalf of the Defendant

22               January 13, 2023

23

24

25

Page 70

```
1           Q.      Paragraph.

2           A.      Paragraph 50, sure.

3                   Okay.

4           Q.      In paragraph 50 you say, for decades

5      there was no dispute about the definition of U&C,

6      it was universally understood to be the lowest

7      price offered by a pharmacy to customers paying for

8      a prescription drug without insurance, including

9      all discounts.

10                  Did I read that correctly?

11          A.      I wasn't reading with you but I can

12     read it myself.  I understand what it says.

13          Q.      Okay.  And in this paragraph of your

14     report there's no citation to any source materials

15     for the opinions stated in paragraph 50, is that

16     correct?

17                  MR. DWOSKIN:  Form.

18          A.      Well, this particular issue is really

19     not in dispute and nobody argued over the position

20     of usual and customary for decades until some

21     people started contriving these scams to manipulate

22     usual and customary.

23          Q.      (BY MR. ROBINSON)  How many decades

24     are we talking about in paragraph 50, or are you

25     talking about in paragraph 50?  How far back was
```

Page 72

1    definition was.

2         Q.    But have you seen any -- what was the

3    basis for your understanding in 1976 when you first

4    became a listened pharmacist as to the definition

5    of usual and customary?

6              MR. DWOSKIN:   Form.  I had to process

7    insurance claims and I know Missouri Medicaid would

8    not pay more than usual and customary, and we all

9    knew what that meant.

10        Q.    (BY MR. ROBINSON) How did you all,

11   who is it that all knew what was meant?

12        A.    Well, I don't think it was in

13   dispute, I never heard anybody dispute that.  I

14   mean I can't speak for everyone in the world but I

15   never heard anyone dispute it.  I never heard of

16   any controversy surrounding the definition of usual

17   and customary until relatively recently.

18        Q.    I'm not asking you about customary.

19   I want to know how you know that it was universally

20   understood that U&C was defined to be the lowest

21   price offered by a pharmacy to customers paying for

22   take prescription drug without insurance including

23   all discounts?

24        A.    Well, let's say this:  If there was

25   some dispute about it, there was controversy over

Page 73

1    what that definition was, there would be public
2    debate with it, there would be articles about it,
3    there should be some news stories about it and
4    there would be discussions at meetings, and I would
5    have certainly heard about that and been aware of
6    it.  I can tell you that there is no such
7    discussion, no such dispute, until after these
8    plans popped up around 2006.  So you're not going
9    to find something in the literature to document
10   something that's universally agreed upon because
11   it's not a matter of controversy and it's not even
12   worth talking about.  There's no dispute about this
13   issue.  If there was we would find those arguments
14   in the literature.
15           Q.    So you're saying that -- let me make
16   sure I understand this.  You're not aware of any
17   literature, scholarly literature or trade
18   literature in the pharmaceutical industry which
19   talks one way or the other back in '70s, '80s,
20   '90s, about the universal understanding of the
21   definition of usual and customary price.
22                 MR. DWOSKIN:  Form.
23           A.    Pharmacies had their cash price and
24   that's what they were supposed to submit as usual
25   and customary, and that's what pharmacies did, and

Page 74

1    there wasn't debate about that.  So that was the

2    industry practice at the time and I'd say that this

3    controversy was created by companies that wanted to

4    circumvent usual and customary.

5              MR. ROBINSON:  Move to strike the

6    entire answer as nonresponsive?

7         Q.    (BY MR. ROBINSON)  My question to you

8    Dr. Schafermeyer was whether you were aware of any

9    scholarly literature or trade publications in the

10   pharmaceutical industry one way or the other that

11   describe a universal understanding of the

12   definition of usual and customary price.

13             MR. DWOSKIN:  Form.

14        A.    I'll explain it a different way.  All

15   pharmacists had to process claims, they had to

16   understand what their contract terms were so they

17   had to understand what the term was.  In all my

18   experience I have not seen literature or heard any

19   controversy about what that definition was until

20   after around 2006, 2008, somewhere in that range.

21             MR. ROBINSON:  Move to strike as not

22   responsive.

23        Q.    (BY MR. ROBINSON)  Again Dr.

24   Schafermeyer, my question to you is are you aware

25   of whether there is any scholarly literature or

Page 75

1    trade publication prior to the 2006 time period
2    which describes a universal understanding of the
3    definition of the phrase usual and customary price,
4    yes or no?
5              MR. DWOSKIN:  Form.  Asked and
6    answered.
7              MR. ROBINSON:  It's been asked but it
8    hasn't been answered.
9         A.   Well Mr. Robinson, you don't like the
10   answer but I answered it and I'm staying with my
11   answer.  I think I answered it perfectly.
12        Q.   (BY MR. ROBINSON)  Are there
13   articles, either scholarly publications or in trade
14   journals prior to 2006 that you're aware of that
15   describe a universally understood definition of the
16   phrase usual and customary price?
17             MR. DWOSKIN:  Form.  Asked and
18   answered.
19        A.   I'm not aware of any articles that
20   said it was a matter of controversy that people
21   didn't understand it.
22        Q.   (BY MR. ROBINSON)  And at the same
23   time you're not aware of any articles that said
24   people did understand it, are you?
25        A.   Well, look.  If they all understood

Page 76

1    it why would they debate it?

2                    MR. ROBINSON:  Object, move to strike

3    the answer as nonresponsive.

4          Q.    (BY MR. ROBINSON)  And I repeat Dr.

5    Schafermeyer, are you aware of any articles in

6    either trade publications or scholarly literature

7    where people, where a universal definition of the

8    phrase usual and customary was described?

9                    MR. DWOSKIN:  Form, asked and

10   answered.

11         A.    I know you're looking for something

12   but you're not going to get it, but I'm standing on

13   my answer.

14         Q.    (BY MR. ROBINSON)  We'll be back

15   after we go to the judge on this Dr.

16   Schafermeyer --

17         A.    I'm fine with that.  Go ahead.

18         Q.    You can continue not answering my

19   questions but we'll be back.

20         A.    You don't like my answer, sorry.  I

21   answered it.

22         Q.    No, you're not answering the

23   question, it's a very simple yes or no question.

24                    Are you aware of any articles in a

25   trade publication or in an academic journal that

Page 77

```
 1    says that there is a universally understood
 2    definition of usual and customary price one way or
 3    the other, regardless of what the definition is, is
 4    there any article that you can tell me that you
 5    know of that discusses the fact that there was a
 6    universally understood definition of usual and
 7    customary price prior to 2006?
 8                    MR. DWOSKIN:  Form.  Asked and
 9    answered.
10                    Mr. Robinson, you know you've asked
11    this question many times, I understand that you may
12    not be satisfied with the answer Dr. Schafermeyer's
13    provided but that is his answer.  He does not have
14    to answer it again.  Let's just move on.
15              Q.    (BY MR. ROBINSON)  Dr. Schafermeyer,
16    are you refusing to answer my last question?
17              A.    Oh, no, I answered your question.
18    You're refusing to accept it.
19              Q.    Have you at any point reviewed any,
20    as part of your report, have you reviewed any
21    contracts either between third party payers and
22    PBMs or third party, or PBMs and pharmacies that
23    contain a definition of the term usual and
24    customary prior to the year 2000?
25              A.    Part of this report.
```

Page 112

1    their contract provider manual says, and I'm also

2    aware of Caremark's financial incentives to say

3    that.

4                    MR. ROBINSON:  Move to strike that

5    answer as nonresponsive.

20                   MR. ROBINSON:  I'm going to move to

21   strike everything after I was aware of what he

22   said.

23         A.     I'll stand on my answer, so I'm sorry

24   you don't like it.

25         Q.     (BY MR. ROBINSON)  The judge will

Page 115

1    discounts should be considered in usual and

2    customary.

3             Q.      Have you talked to any state, in

4    those states that have recently changed their U&C

5    definition, have you talked to any state regulators

6    about the reason why they made those changes?

7                     MR. DWOSKIN:  Form.

8             A.      No.  I wouldn't say they changed

9    their requirements, I think they clarified their

10   requirements.  And have I talked to them personally

11   about that?  No.  But I see the sequence of events

12   and understand the reasoning for what they're

13   doing.

14            Q.      (BY MR. ROBINSON)  And have you read

15   any newspaper articles or government publications

16   that discuss the reason why those states made

17   changes in their U&C definitions?

18                    MR. DWOSKIN:  Form.

19            A.      I don't think I have seen newspaper

20   articles about that.

21            Q.      (BY MR. ROBINSON)  Have you seen any

22   other government publications that discuss the

23   reasons why those states clarified their usual and

24   customary definitions?

25                    MR. DWOSKIN:  Form.

Page 116

1    A.    Well, I'm aware of the sequence of

2  events and why they would need to do that, sitting

3  here right now I can't recall a publication but I

4  think I'm aware of their rationale.

5              MR. ROBINSON:  I'm going to move to

6  strike as nonresponsive other than sitting here

7  right now I can't recall a publication.

8    Q.    (BY MR. ROBINSON)  Let me ask you Dr.

9  Schafermeyer to turn to paragraph 84 of your

10  opinion.  It's Exhibit 500.

11              And I think paragraph 84 may be on

12  page 23 of the pdf for those who are looking at the

13  pdf.

14    A.    Okay.

Page 144

1    manual and assume that's what they're doing.  That
2    would be reasonable expectation on their part.
3            Q.    Have you ever talked with a third
4    party payer to see if they actually read the
5    provider manuals issued by the PBMs with whom they
6    contract?
7                    MR. DWOSKIN:  Form.
8            A.    Are you talking about the third party
9    payer, about whether the pharmacy, I'm sorry, about
10   whether PBM -- I'm sorry.  You're asking whether
11   the third party payers have ever told me that they
12   read the provider manuals?
13           Q.    Yes.
14           A.    I don't recall a specific instance
15   but they would be available.  I have seen instances
16   with the provider manuals were attached as an
17   exhibit and that's pretty common, so the payers
18   would have access to those provider manual before
19   they ever sign a contract.
20           Q.    But you're not aware of any of these
21   third payer payers who have told you that they have
22   read that third party provider Form.
23           A.    I've seen that they were requested
24   and provided in RFPs, so they're available.
25   Whether they actually read it, I didn't get in

Page 145

1    their mind and figure out, and I don't think

2    somebody's actually told me they did, but if

3    they're requested and provided I would think that,

4    you know, this publicly available information would

5    give them some idea of what to expect.

6           Q.    The contracts between the third party

7    payers and the PBMs, they're often confidential as

8    well, isn't that correct?

9                 MR. DWOSKIN:  Form.

10          A.    Well, I assume that they would be.

11   Yeah, I mean there's a lot of contracts and a lot

12   of contracts are confidential, I wouldn't be

13   surprised if they were.

14          Q.    (BY MR. ROBINSON)  And if the

15   contract between a third party payer and the PBM

16   was confidential when Walgreens was contracting

17   with the same PBM it would not have access to the

18   terms of that PBM's contract with the third party

19   payer, isn't that true?

20                MR. DWOSKIN:  Form.

21          A.    Well, so Walgreens might not know

22   that but I think they know the industry definition

23   of usual and customary.

24          Q.    (BY MR. ROBINSON)  They wouldn't

25   know, Walgreens wouldn't know the definition that

Page 150

1    not sure it's responsive to your question.  Ask me

2    your question again.

3           Q.    Do you have any basis for saying that

4    Walgreens and Express Scripts were legally

5    prohibited from agreeing to the language that they

6    put into section 1.26?

7           A.    So my basis for this is that there is

8    an agreement between the payer and the PBM, in this

9    case Express Scripts, and there's also an industry

10   definition of usual and customary which was in

11   effect before Walgreens contrived this scam.  So

12   the fact that Walgreens convinced Express Scripts

13   to look the other way and they both benefit

14   financially from it, the question is does that

15   relieve them of their duty to provide the true

16   usual and customary.  I see they have this

17   agreement, but this agreement doesn't meet the

18   reasonable expectations of the payer who contracted

19   with Express Scripts and the payer expects to

20   receive the true usual and customary in an accurate

21   and truthful claim.  The fact that Walgreens and

22   Express Scripts get together and make a change

23   doesn't change the first contract between the payer

24   and Express Scripts, that contract's still in

25   effect.  And so the reasonable expectations of the

Page 151

1    payer is they would receive accurate claims in the

2    true usual and customary.

3           Q.    Have you talked to any of the payers

4    who contracted with Express Scripts in this case to

5    determine what they expected Express Scripts to

6    charge them for prescriptions?

7                  MR. DWOSKIN:  Form.

8           A.    Well, I read the complaint and I

9    think the complaint lays out what their

10   expectations were and I understand with a, what

11   they would reasonably expect.

12          Q.    (BY MR. ROBINSON)  Did you -- let me

13   ask again.

14                 Have you talked to any of the payers

15   who contracted with Express Scripts in this case to

16   determine what they expected Express Scripts to

17   charge them for prescriptions covered by their

18   plans?

19                 MR. DWOSKIN:  Form.

20          A.    I didn't talk with them because

21   there's other information available and I already

22   had an understanding what that expectation should

23   be.

24          Q.    (BY MR. ROBINSON)  Besides the

25   complaint that was drafted by the lawyers for the

Page 152

1    plans do you have any document that you are relying

2    upon to tell you what the expectations of the plans

3    actually were with respect to how much they would

4    be charged by Express Scripts?

5                    MR. DWOSKIN:  Form.

6            A.    I think that's in my report in which

7    I talked about the understanding of what a cash

8    prescription is, understanding what usual and

9    customary is, what the NCPDP standards are and I

10   think that is related throughout my report.

11           Q.    (BY MR. ROBINSON)  But you haven't

12   talked to any, you haven't interviewed any of the

13   plans to find out what in fact they expected

14   Express Scripts to do under the contract, isn't

15   that right?

16                   MR. DWOSKIN:  Form.

17           A.    That wasn't necessary to understand

18   what's going on.

19           Q.    (BY MR. ROBINSON)  So the answer is

20   you did not talk to any of the pans, correct?

21           A.    I didn't feel it was necessary to

22   talk to the other plans and no, I didn't.

23           Q.    And have you talked to any of the

24   individual plaintiffs in this case to find out what

25   it is that they actually expected to be charged

                                           Page 153

1      under their insurance plans?
2                  MR. DWOSKIN:  Form.
3            A.     That wasn't necessary.
4            Q.     (BY MR. ROBINSON)  And you recall,
5      you recall that in, when you testified recently in
6      the Humana arbitration you testified that
7      pharmacies and PBMs are free to change the
8      definition of usual and customary price in their
9      contracts.
10                 Do you remember saying that?
11                 MR. DWOSKIN:  Form.
12                 Mr. Schafermeyer, excuse me, Dr.
13     Schafermeyer, with respect to testimony or evidence
14     that was offered in the Humana v Walgreens
15     arbitration, which I understand is based by its own
16     protective order, I would caution you against
17     sharing any information which you believe is
18     subject to that protective order.
19                 MR. ROBINSON:  And Counsel that's a
20     misstatement of the protective order.  The
21     arbitration itself was not confidential, there was
22     specific information that was produced in the
23     arbitration that was confidential, that does not
24     include Dr. Schafermeyer's opinion about the
25     freedom of contract enjoyed by pharmacies and PBMs.

Page 157

1    qualify my answer that I don't know that there's
2    not more to this particular answer.
3            Q.    Is it your testimony in this matter
4    that a PBM and a pharmacy are not free to have a
5    definition of usual and customary that is different
6    than the NCPDP definition?
7            A.    Well, it's my testimony, my
8    understanding, that the definition applies as
9    determined by the payer in a PBM and the PBM
10   shouldn't be working with pharmacies to circumvent
11   that.  And so if they're free to define the
12   contract it should be in compliance with what the
13   payer expects.  And so the suit is about the
14   reasonable expectations of the plaintiffs, those
15   reasonable expectations aren't being met if there's
16   a secret contract to circumvent that PBM agreement
17   between a payer and a PBM.
18           Q.    Do you agree with me from Walgreens'
19   perspective the contract between the PBM and the
20   third party payer is also secret, isn't that true?
21               MR. DWOSKIN:  Form.
22           A.    Well, these contracts are often
23   confidential, I don't know if this one in
24   particular is or not but I wouldn't be surprised if
25   it was.  I can see where they might want to make it

Page 158

1    confidential.

2          Q.     (BY MR. ROBINSON)  If Walgreens

3    doesn't know the definition in the contract between

4    the PBM and the third party payer but the PBM does,

5    isn't it the PBM's responsibility to do, to make

6    sure it's done whatever it's required to do by the

7    third party payer?

8               MR. DWOSKIN:  Form.

9          A.     I see what you're saying.  The PBM

10   certainly would be parties to both contracts and

11   should be consistent.  But they, you know, if these

12   contracts were all confidential and Walgreens gets

13   them to go along with this ploy, the other parties,

14   and that's the part of my report, the other party,

15   the payer, wouldn't be aware of that.  Now

16   Walgreens knows or should know the industry

17   definition of usual and customary, and they know

18   that they're sneaking around and trying to disguise

19   these cash prescriptions as something other than a

20   cash prescription.  Why are they doing that?  So

21   answering your question here is the contracts are

22   usually confidential and the PBM would know what

23   they're doing, I agree with that, but I think

24   Walgreens should also know because they're a party

25   to this ploy and they know what the industry

```
                                              Page 160

 1    right?

 2                   MR. DWOSKIN:  Form.  Misstates

 3    testimony.

 4         A.     Yeah.  I didn't say that and I have

 5    to look through my entire report for such a

 6    reference, so.  But we know why we're here and we

 7    know what's happening in this industry, we know

 8    what's happening in this case, that's why we're

 9    here.

10         Q.     (BY MR. ROBINSON)  You haven't spoken

11    to any fund plaintiffs in this case, other than the

12    complaint you haven't looked at any written

13    statements from any of the fund plaintiffs about

14    what they expected their PBMs to do, isn't that

15    right?

16                   MR. DWOSKIN:  Form.

17         A.     I wouldn't need to and I generally

18    don't want to be influenced by the plaintiff, I

19    want to give a reasonable answer based on my

20    expertise and talking to the plaintiff and having

21    them tell me what they would like me to say, I

22    don't do that.  I look at the evidence, I look at

23    the complaint, I look at the evidence and I draw a

24    conclusion based on my knowledge and experience and

25    looking at the record.  That's what I did.  I
```

Page 161

1    didn't need to talk with the plaintiffs.

2            Q.      And you're not aware, you haven't,

3    you're not aware of any -- strike that.

4            A.      Would this be a good time for a

5    break?

6            Q.      Yeah.  Let's take a break.

7            A.      I was reading your mind wasn't I?

8            Q.      Apparently.

9            VIDEOGRAPHER:  Going off the record,

10   the time is 1:11 p.m.

11                  Excuse me, the time is 1:58 p.m.

12          (A RECESS WAS TAKEN BY THE PARTIES)

13          VIDEOGRAPHER:  Going back on the

14   record.  The time is 2:07 p.m.

Page 162

7        Q.      So for example if we look at your

8    chart that's in table 3 on page 27 of your report.

9    You need to go back a page from what's on the

10   screen.

11               MR. ROBINSON:  Let's go back to the

12   beginning of table 3 please.

13               This is page 32 of the pdf, John.

14   Page after this.  There we go.

Page 163

4      Q.     Have you ever discussed with any of

5  the payers in this case whether in fact they knew

6  what the terms in the contracts between their PBMs

7  and the pharmacies were?

8                 MR. DWOSKIN:  Form.

9      A.     Have I ever talked with the payers?

10     Q.     (BY MR. ROBINSON)  Right.

11     A.     No.  Didn't need to.

Page 170

```
1                    I just want to make it clear, you're

2       not providing a legal opinion on the effect that

3       the fund plaintiff's contracts the with PBMs had on

4       Walgreens' contracts with those same PBMs, is that

5       correct?

6                         MR. DWOSKIN:  Form.

7            A.    I'm not a lawyer, I'm not providing a

8       legal opinion, I'm providing expert opinion on what

9       the reasonable expectations of the plaintiffs

10      should have been or were.

11           Q.    (BY MR. ROBINSON)  Without having

12      talked to a single one of the plaintiffs in this

13      case you're offering opinion on what their

14      reasonable expectations were, is that correct?

15                        MR. DWOSKIN:  Form.

16           A.    I think my report stands for itself.

17           Q.    (BY MR. ROBINSON)  As part of your

18      report did you conduct any sort of research to look

19      for any contemporaneous statements by third party

20      payers as to what they expected to be charged under

21      their contracting with PBMs?

22                        MR. DWOSKIN:  Form.

23           A.    Well, I did note that there was a lot

24      of litigation over this issue which I reported in

25      my report, so obviously a lot of payers must have
```

```
                                            Page 180
 1    say when the Garvey appellate decision came out,

 2    did you say 2016?  I'm sorry.

 3          A.     No, I don't think that's what I said.

 4    I don't think I said 2016.  But it is what it is,

 5    right?

 6                 MR. DWOSKIN:  Right.

 7                 I think you said 2014.

 8          Q.     (BY MR. ROBINSON)  I want to turn to

 9    paragraph 109 please in your report.

10                 Now, in paragraph 109 you're talking

11    about the pharmacy industry in the 1970s.  Is that,

12    correct?

13          A.     Well, starting in the 1970s and

14    after.

15          Q.     Okay.  And you didn't become a

16    pharmacist yourself until 1976, is that right?

17          A.     Well, I was an intern before that and

18    so practiced as an intern for what, three years.

19          Q.     When did you get your license?

20          A.     As an intern or as a pharmacist?

21          Q.     As a pharmacist.

22          A.     1976.

23          Q.     And so what is the basis, what

24    research have you done to conclude that pharmacies,

25    PBMs and third party payers all knew that such
```

Page 181

1   prices at the lowest price offered to cash paying

2   customers would be the pharmacy's U&C price?  So my

3   question is what research have you done to verify

4   the understanding of the pharmacies, PBMs and third

5   party payers in the 1970s?

6          A.    Well, you know, we had a long series

7   of questions about this same issue which I

8   answered, and I'm not sure how this is different

9   from your previous line of questions that we spent

10  a lot of time on.  Can you explain how this is

11  different from your previous line of questions?

12         Q.    I don't have to answer questions that

13  you pose Dr. Schafermeyer.  I'm asking you about a

14  new statement in your paragraph.  You disagree with

15  me there's nothing that's footnoted here, you

16  haven't cited to anything in paragraph 109 to

17  support your conclusion, so it I want to know

18  what's the basis for, upon which you made the

19  statement about what the pharmacies, PBMs and third

20  party payers all understood in the 1970s.

21         A.    This is exactly what we talked about

22  before and I've lived in this industry and I've, my

23  area of study and expertise has been reimbursement

24  for prescription drugs through insurance programs,

25  both public and private, and so if there had been

Page 182

1    some controversy, you remember the discussion now,

2    right?  If there had been some controversy over

3    this issue it would have appeared in the

4    literature, but if everybody agrees to it this is

5    not something you find in the literature.  There

6    was no argument about what usual and customary was.

7    It was, if you want to find when the controversy

8    starts it's not coincidental that it started about

9    the same time or shortly after companies started

10   creating these membership clubs to circumvent usual

11   and customary.

12          Q.    So, what you're relying on to make

13   the statement in the last sentence of paragraph 109

14   is your experience in the industry and the fact

15   that there was no public debate over the definition

16   of usual and customary price, is that a fair

17   summary?

18          A.    Before 2006 that would be true.  Keep

19   in mind too that as third party prescriptions grew

20   there were fewer and fewer cash prescriptions and

21   pharmacies knew that they had to report their cash

22   prices and that there weren't that many cash

23   customers, so that just created a very high cash

24   price and very few, very few claims for a while

25   were adjudicated by insurance programs at usual and

```
                                            Page 185
 1    book chapter was 2009 and that you wrote it in
 2    2007?
 3                   MR. DWOSKIN:  Form.
 4          A.     There's two editions of this book,
 5    which one are you talking about?
 6          Q.     (BY MR. ROBINSON)  I'll show you what
 7    I'm talking about.  I'm talking about the edition
 8    that you produced through your lawyers in this
 9    case.
10                   MR. ROBINSON:  Let's put up Exhibit
11    TT and mark that as, formally as Exhibit 510
12    please.
13                   MR. WOROBIJ:  Exhibit 510 is marked.
14          Q.     (BY MR. ROBINSON)  So if you pull
15    Exhibit 510 from the Exhibit Share you'll see it
16    has the Bates numbers that say Schafermeyer_0000564
17    through 591.
18          A.     Okay.
19          Q.     You'll see there's a copyright date
20    of 2009 on page 2 of the document?
21          A.     Yeah.  Uh-huh.
22          Q.     Okay.  And do you remember telling me
23    in the Humana case that you believe you wrote this
24    in 2007?
25          A.     At least by then.  That may be when I
```

Page 186

1    finished it, I may have, or when I submitted the

2    last copy edits.  I probably started before that.

3    I remember this book took a long time and I was

4    finished with my chapter well before the book got

5    published.  So I would say 2007, maybe even before.

6         Q.    And you see, and you called this the

7    definitive, this textbook as in your words the

8    definitive textbook on managed care pharmacy, is

9    that correct?

10        A.    At that time it was, yeah.

11        Q.    And let's turn to page 391.  Do you

12   see at the top of the page it says usual and

13   customary prices?

14        A.    Okay.  Yeah.

15        Q.    Okay.  Says PBM says will not

16   reimburse pharmacies more than their usual and

17   customary price, i.e., the amount charged to cash

18   customers for prescriptions, pharmacy computers

19   should transmit the correct usual and customary

20   price when required by the PBM.  Usual and

21   customary has different definitions but basically

22   it is translated as the cash price normally charged

23   to patients who do not have prescription insurance

24   coverage, this is an attempt by the PBM to assure

25   that they are not getting charged more than the

                                                    Page 187

1    current quote, market, end of quote, prices for

2    medications.

3              Did I read that correctly?

4         A.    Yes.

5         Q.    And in this description that you

6    wrote the usual and customary price the phrase

7    quote, lowest price, unquote, doesn't appear in the

8    text you wrote, isn't that right?

9         A.    Well, let's look at the historical

10   perspective here.

11        Q.    No.  Answer my question first before

12   you go talking about history.

13        A.    I'd be glad to explain why.  It

14   doesn't and there's good reason why it doesn't.

15        Q.    Have there been subsequent editions

16   of this book, this chapter, in the managed care

17   pharmacy practice textbook?

18        A.    Is this the second edition?

19        Q.    Yes.

20        A.    That's the last one I know about.

21        Q.    Okay.  So this, as far as, if anybody

22   went and looked for this book, Managed Care

23   Pharmacy Practice, in their local library what they

24   would find, or their university library, they'd

25   find the same definition that you wrote on page 391

Page 191

1    while.

2                  All right.  Let's see the context.

3    And I should have commented about the context in my

4    report where I quoted the book in Navarro's chapter

5    too, because the context was an important point.

6                  133 you said?

7          Q.     (BY MR. ROBINSON)  I didn't say it

8    but somebody on the line said it.

9                  MR. DWOSKIN:  Yeah, that's the

10   footnote number.  Just trying to move it along.

11   Let's see what the record says.

12         A.     Okay.  I see that.

13         Q.     (BY MR. ROBINSON)  So you quoted,

14   this is on page 42 of your report, you cite to the

15   article by Dr. Mattingly and state a U.S.

16   Pharmacist article quoting the GAO definition

17   indicates that quote, the U&C rate is often

18   referred to as the cash price for patients, and

19   then you cited to the Mattingly article, correct?

20         A.     That's what it says.

21         Q.     Okay.  And then if we look at the

22   Mattingly article, the article is called

23   Understanding Drug Pricing.  See that?

24         A.     I see that.

25         Q.     Okay.  Do you know Professor

1    Mattingly?

2              MR. DWOSKIN:  Form.

3         A.     University of Maryland?  No.  No, I

4    wouldn't say I know him personally.

5         Q.     (BY MR. ROBINSON)  Do you know Dr.

6    Mattingly by reputation?

7              MR. DWOSKIN:  Form.

8         A.     I really don't recall.  No.

9         Q.     (BY MR. ROBINSON)  Okay.  And on the

10   second page of his article, see there's a table?

11        A.     Uh-huh.

12        Q.     That's entitled Common Terms and

13   Acronyms Used In Drug Pricing?

14        A.     Uh-huh.

15        Q.     And then for usual and customary

16   price it says that the definition is the average

17   cash price paid at a retail pharmacy.

18              Is that right?

19        A.     That's what it says but that's not

20   the portion I was quoting, and he also says later

21   on that, my point was to point out these are cash

22   prices.  I'm not agreeing that it's average.  You

23   put this in context to the article and this is

24   where Navarro fit in too is he was saying that

25   usual and customary is based on cash prices.  In

Page 193

1      other words, prices not paid by patients using

2      insurance benefit and that illustrates my point.

3      I'm not agreeing with this statement about average

4      cash price, I'm just saying look, he understands

5      the cash price, and so did the GAO, right?

6           Q.     So he was, Dr. Mattingly was

7      authoritative enough for you to quote as supporting

8      your opinion but you would agree with me that he

9      provides a different definition of usual and

10     customary in 2012 than either the definition that

11     you provided in the book chapter in 2009 or the

12     definition in your expert report that you produced

13     in this case.

14                 MR. DWOSKIN:   Form.

15          A.     Okay.  So I think you're

16     misrepresenting my report.  If you look at

17     paragraph 141 (b) I talked about the GAO definition

18     and this whole discussion has to do with the fact

19     that PSC customers are cash customers and I'm

20     illustrating that point.  GAO defined usual and

21     customary as the price that a person without

22     insurance would pay.  This author then refers to

23     that GAO definition, right, and he agrees that it's

24     the cash price.  That's my point.  I am not

25     endorsing his definition that it's average price or

Page 194

1    saying that he's even expert in this.  I'm just say
2    that he quoted GAO and agreed with the cash price
3    and that was my point.
4          Q.    (BY MR. ROBINSON)  Look, I understand
5    how you used Dr. Mattingly's article to support
6    what you were saying about the GAO report, but
7    isn't it true that Dr. Mattingly in his article
8    which you thought was authoritative to cite for the
9    quote you wanted, he says that the usual and
10   customary price means the average cash price paid
11   at a retail pharmacy, that's what he says.
12                MR. DWOSKIN:  Form.
13         A.    Well, again, from a historical
14   perspective, I'm not sure how aware he was of what
15   was going on in 2011, but historically average cash
16   price was the cash price because there was only one
17   cash price and so before 2007 for example or 2006
18   that statement would have been entirely correct.
19   I'm not sure that he was aware at that time when he
20   wrote this that things, that people were trying to
21   manipulate definitions.  Maybe he would have been
22   more careful, but at one point the average price
23   was the price because there weren't multiple
24   different prices, not until we started playing
25   games with usual and customary.

Page 256

1                     REPORTER CERTIFICATE

2

3          I, SUZANNE BENOIST, Certified Shorthand

4     Reporter, do hereby certify that there came before

5     me via Zoom, the above-referenced parties, that the

6     proceeding was translated and proofread using

7     computer-aided transcription, and the above

8     transcript of proceedings is a true and accurate

9     transcript of my notes as taken at the time of said

10    event.

11         I further certify that I am neither attorney

12    nor counsel for nor related nor employed by any of

13    the parties to the action in which this examination

14    is taken; further, that I am not a relative or

15    employee of any attorney or counsel employed by the

16    parties hereto or financially interested in this

17    action.

18         Dated this 25th day of January, 2023.

19

20

21                    Ms. Suzanne Benoist, RPR,

22                    CCR-MO, CCR-KS, CSR-IL, CSR-IA

23    Notary Public No. 07541281

24    State of Missouri - Jefferson County

25    My commission expires:  5/10/2024