# EXHIBIT D

# Managed Care Pharmacy Practice

## Second Edition

### ROBERT P. NAVARRO, PharmD
Navarro Pharma, LLC



**JONES AND BARTLETT PUBLISHERS**

*Sudbury, Massachusetts*

BOSTON    TORONTO    LONDON    SINGAPORE

SCHAFERMEYER_0000564

*World Headquarters*

Jones and Bartlett Publishers
40 Tall Pine Drive
Sudbury, MA 01776
978-443-5000
info@jbpub.com
www.jbpub.com

Jones and Bartlett Publishers
Canada
6339 Ormindale Way
Mississauga, Ontario L5V 1J2
Canada

Jones and Bartlett Publishers
International
Barb House, Barb Mews
London W6 7PA
United Kingdom

Jones and Bartlett's books and products are available through most bookstores and online booksellers. To contact Jones and Bartlett Publishers directly, call 800-832-0034, fax 978-443-8000, or visit our website www.jbpub.com.

Substantial discounts on bulk quantities of Jones and Bartlett's publications are available to corporations, professional associations, and other qualified organizations. For details and specific discount information, contact the special sales department at Jones and Bartlett via the above contact information or send an email to specialsales@jbpub.com.

Copyright © 2009 by Jones and Bartlett Publishers, LLC

All rights reserved. No part of the material protected by this copyright may be reproduced or utilized in any form, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without written permission from the copyright owner.

The authors, editor, and publisher have made every effort to provide accurate information. However, they are not responsible for errors, omissions, or for any outcomes related to the use of the contents of this book and take no responsibility for the use of the products and procedures described. Treatments and side effects described in this book may not be applicable to all people; likewise, some people may require a dose or experience a side effect that is not described herein. Drugs and medical devices are discussed that may have limited availability controlled by the Food and Drug Administration (FDA) for use only in a research study or clinical trial. Research, clinical practice, and government regulations often change the accepted standard in this field. When consideration is being given to use of any drug in the clinical setting, the health care provider or reader is responsible for determining FDA status of the drug, reading the package insert, and reviewing prescribing information for the most up-to-date recommendations on dose, precautions, and contraindications, and determining the appropriate usage for the product. This is especially important in the case of drugs that are new or seldom used.

**Production Credits**

Publisher: David Cella
Editorial Assistant: Maro Asadoorian
Production Director: Amy Rose
Production Assistant: Julia Waugaman
Associate Marketing Manager: Lisa Gordon
Manufacturing and Inventory Control Supervisor: Amy Bacus

Composition: Arlene Apone
Cover Design: Brian Moore
Cover Image: © Aura Castro/ShutterStock, Inc.
Printing and Binding: Malloy Incorporated
Cover Printing: Malloy Incorporated

**Library of Congress Cataloging-in-Publication Data**

Managed care pharmacy practice / [edited] by Robert P. Navarro. — 2nd ed.
    p. ; cm.
 Includes bibliographical references and index.
 ISBN-13: 978-0-7637-3240-0
 ISBN-10: 0-7637-3240-0
 1. Pharmacy—Practice—United States. 2. Managed care plans (Medical care)—United States. 3. Insurance, Pharmaceutical services—United States. I. Navarro, Robert.
 [DNLM: 1. Pharmaceutical Services—organization & administration. 2. Insurance, Pharmaceutical Services. 3. Managed Care Programs—organization & administration. QV 737 M2648 2009]
 RS100.3.M356 2009
 615'.1068—dc22
                                            2008035267
6048

Printed in the United States of America
12  11  10  09  08    10  9  8  7  6  5  4  3  2  1

SCHAFERMEYER_0000565

# chapter
# 16

# IMPACT OF MANAGED CARE ON PHARMACY PRACTICE

## KENNETH W. SCHAFERMEYER

## INTRODUCTION

One of the greatest challenges facing managed care organizations (MCOs) today is the rapid increase in expenditures for prescription drugs. From 2003 to 2004, the average annual expenditure per member increased by 8.4% (from $336.26 to $364.65).[1, p48] Although drug costs comprise less than 15% of total healthcare expenditures, they are increasing more rapidly than other healthcare expenditures and are a major concern of employer groups and health insurers. Consequently, MCOs and pharmacy benefit managers (PBMs) are intensifying their efforts to control prescription drug utilization and expenditures, which, in turn, are having a significant influence on the way pharmacies are providing and being reimbursed for services.

Changes in managed care prescription programs present both threats and opportunities to pharmacy practice today. While managed care prescription plans have contributed to declining pharmacy margins, they also have influenced pharmacy managers to become more efficient and to explore new services and opportunities.

While most chapters in this book address topics from the perspective of the MCO or PBM, this chapter presents the perspective of community pharmacies that participate in managed care prescription programs. It is important for managed care pharmacists to understand this perspective in order to effectively collaborate with their network pharmacies for the benefit of all parties concerned. Specifically, this chapter describes the impact of managed health care on pharmacy practice today and outlines measures that pharmacies and MCOs have applied to constrain increases in prescription expenditures without compromising quality.

This material may be protected by Copyright law (Title 17 U.S. Code)

387

SCHAFERMEYER_0000566

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 5 of 29 PageID #:9112

# ADMINISTRATION OF MANAGED CARE PRESCRIPTION CONTRACTS

## NETWORKS

Because the administration of managed care pharmacy programs is complex and requires a large prescription volume to be conducted efficiently, MCOs often carve out prescription benefits and arrange to have them managed by PBMs. In 2004, 96.3% of health maintenance organizations (HMOs) used PBMs to administer pharmacy services, an increase from 93.7% in 2003.[1, p38] Using PBMs helps MCOs to isolate cost centers and concentrate a workforce of prescription benefit experts to manage the prescription program. PBMs provide two basic functions: 1) they serve as brokers for prescription benefits by arranging services between payers and providers, and 2) they use databases and various tools to influence the cost and quality of healthcare services. As brokers and managers of data, costs and quality, the administrative services provided by PBMs include:

* Combining existing pharmacies into large networks
* Communicating with both patients and providers to explain and update administrative policies
* Providing reports to plan sponsors
* Identifying eligible beneficiaries
* Processing claims submitted by pharmacies
* Reimbursing network pharmacies
* Creating and maintaining formulary systems
* Performing disease-management programs
* Conducting drug utilization review
* Educating providers
* Auditing pharmacies

Many of these functions are defined and described in a participating pharmacy agreement, which is a contract that stipulates the pharmacy services that will be provided in exchange for a specified, discounted reimbursement. Typically, PBMs contract with existing community pharmacies to create a large network of pharmacies from which patients can receive prescriptions. The network may be an *open panel* in which all community pharmacies are invited to sign participating pharmacy agreements, or it may be a *closed panel* in which only selected or "preferred" pharmacies may participate. In selecting a network, PBMs consider such factors as the pharmacy's:

* location
* willingness to accept the PBM's reimbursement terms, and
* ability to perform services specified in the participating provider agreement.

Carried to an extreme, the closed network could contract with a very limited number of pharmacies (sometimes only one chain) and become what is known as an *exclusive provider organization (EPO)*. Being excluded from participating in a PBM's network can average

SCHAFERMEYER_0000567

affect a pharmacy. When faced with the possibility of losing a major portion of their clientele, many pharmacies see no option but to agree to a contract and accept low reimbursement.

Some HMOs develop a network of pharmacies that they own and operate. Twenty-nine percent of HMO prescriptions were dispensed through on-site pharmacies in 2004, down from 32.5% in 2003. This strategy is employed more commonly by staff model HMOs; 77% of them had an in-house pharmacy in 2004.[1] p37

## MAIL ORDER

Participation of community pharmacies in managed care plans also can be limited by the use of mail-order pharmacies. Due to large prescription volumes, most PBMs offer mail-service pharmacies as part of their service and negotiate discounts on product costs in an effort to reduce dispensing costs. PBMs may require members to use only a mail-service pharmacy for certain prescriptions—usually maintenance medications for chronic conditions—or they may give incentives, such as discounted copayments, to encourage members to use the mail-service pharmacy. Even when made mandatory, utilization of the mail service benefit by enrollees, however, was modest; HMO plans dispensed an average of only 36% of their prescriptions through mandatory mail service, and 12% when use was voluntary.[2] p25 When a prescription benefit plan makes the mail-service program optional, community pharmacies are wise to make their patients aware of their advantages regarding accessibility and the value of face-to-face interaction between pharmacist and patient.

## REIMBURSEMENT FOR MANAGED CARE PRESCRIPTIONS

As illustrated in **Figure 16-1**, three factors influence the costs incurred in fee-for-service prescription plans: 1) unit costs, 2) utilization rate, and 3) program administration costs. Each of these components is described below.

## UNIT COSTS

Unit costs, the average amount paid by the MCO to the pharmacy for each prescription, consist of two components: 1) the cost of drug ingredients, plus 2) a professional dispensing fee. This sum is reduced by any amount that the patient is required to pay out-of-pocket (i.e., patient cost sharing). The first component, drug ingredient costs, represents



**FIGURE 16-1 Components of Fee-for-Service Prescription Costs.**
Source: Copyright © Foundation for Managed Care Pharmacy.

SCHAFERMEYER_0000568

between 75% and 80% of the prescription price. **Figure 16-2** illustrates the unit cost for a fee-for-service prescription program in more detail.

*Drug Ingredient Costs*   Traditionally, pharmacy reimbursement for drug ingredient costs has been based on the average wholesale price (AWP), which is a list price established by the manufacturer. Because AWP does not closely represent actual acquisition cost (AAC), it is being replaced by a new metric known as average manufacturer's price (AMP). The difference between the pharmacy's AAC and the amount paid by the PBM is known as the *earned discount*. These discounts are very important because they decrease the pharmacy's acquisition cost, resulting in a higher *gross margin (GM)* (i.e., the difference between the selling price and the cost to the pharmacy for the product that was sold). By supplementing low dispensing fees, earned discounts have allowed pharmacies to participate in managed care plans that would otherwise have been unprofitable.

Managed care plans usually limit reimbursement for multiple-source drugs to the price for a selected generic equivalent, referred to as the *maximum allowable cost (MAC)*. Each managed care plan creates its own MAC list. On those occasions when a physician requires the brand-name product, some managed care plans allow full reimbursement for the higher-cost product if the pharmacist indicates that the prescription was a *dispense as written (DAW)* order.

*Dispensing Fee*   The second component of unit costs illustrated in Figure 16-2, the professional dispensing fee, is designed to cover the pharmacy's overhead expenses (also known as the cost of dispensing) plus a reasonable net profit. The easiest and most common way to lower costs has been to restrict pharmacy dispensing fees, which decreased from \$2.05 in 2003 to \$1.95 in 2004.[2][p4] However, dispensing fees represent a very small percentage of prescription costs and the potential savings to be achieved by controlling drug ingredient costs and prescription drug utilization rates are much greater.



FIGURE 16-2   **Unit Cost Components for a Fee-for-Service Prescription.**
Source: Copyright © Foundation for Managed Care Pharmacy.

SCHAFERMEYER_0000569

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 8 of 29 PageID #:9115

*Usual and Customary Prices* PBMs will not reimburse pharmacies more than their usual and customary price (i.e., the amount charged to cash customers for prescriptions). Pharmacy computers should transmit the correct usual and customary price when required by the PBM. *Usual and customary* has different definitions, but basically it is translated as the cash price normally charged to patients who do not have prescription insurance coverage. This is an attempt by the PBM to assure that they are not getting charged more than the current "market" prices for medications.

*Patient Cost Sharing* Managed care organizations commonly require beneficiaries to pay a portion of the cost of their prescriptions. This patient cost sharing is designed to control utilization of health services by discouraging patients from seeking care for insignificant problems, while not impeding them from obtaining care for problems that are significant.[3 p54]

Plans without any patient cost sharing have "first-dollar coverage." Although first-dollar coverage was once common, most plans use patient cost sharing as a financial incentive to avoid using unnecessary healthcare services. To be effective, however, patient cost-sharing provisions should not be so high as to discourage use of necessary health services.

Patient cost sharing takes one of three forms: copayments, deductibles, and coinsurance. Copayment, the most common form of patient cost sharing for prescription benefits, requires patients to pay a specified dollar amount for every prescription received (e.g., $10.00 per prescription).

Deductibles require patients to pay for all of their prescription expenses until a specified dollar amount has been paid out-of-pocket during a given period of time, usually a year. For example, the prescription plan may cover prescriptions only after the patient has paid the first $1000 of prescription expenses. With the expansion of online computerized claims processing, more programs are including deductibles because the pharmacist is informed by the computer of the amount of cost-sharing the patient must pay. The use of deductibles as a way to manage costs has increased by approximately 50% since 2000. Almost 16% of employers reported deductible use in 2004 compared with 8% in 2000. Deductible amounts increased by two-thirds since 2000.[2 p20]

Coinsurance requires patients to pay a specified percentage (usually 20%) of the prescription cost while the payer covers the remainder. The percentage of employers using coinsurance increased from 22% in 2001 to 32% in 2004.[2 p19] Although most employers who use coinsurance generally use it for all drug categories, some employers use coinsurance only for certain non-preferred drug categories. This approach allows plans more flexibility to ensure that patients pay a consistent portion of the benefit cost, while providing an additional incentive to use generic drugs.[2 p19]

The pharmacy is supposed to collect the patient's share of the prescription cost at the time the prescription is dispensed; this amount is then deducted from the PBM's reimbursement. Patient cost sharing, therefore, serves multiple functions: it decreases the PBM's unit cost, helps control utilization, and channels patients and providers toward using less expensive products.

SCHAFERMEYER_0000570

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 9 of 29 PageID #:9116

## UTILIZATION

The second component of managed care prescription costs is utilization. As shown in Figure 16-1, *utilization* is the product of intensity (i.e., the average number of prescriptions per patient) multiplied by the population (i.e., the total number of patients enrolled in the program). The utilization rate multiplied by the average unit cost is the total program reimbursement for prescription drugs. Program intensity is an important benchmark used to compare managed care prescription plans. Prescription intensity was 8.5 prescriptions per person per year in 2004, up from 8.2 prescriptions in 2003.[1 p34] Prescription utilization rates have grown because of the aging of the population, an increase in the number of members enrolled in managed care that now have a more affordable prescription drug benefit, the growing availability of unique drug products, and the influence of direct-to-consumer advertising of prescription drugs.

*Administrative Costs*   The third component of managed care prescription costs is the administrative costs incurred in managing the prescription benefit. MCOs incur costs in contracting with pharmacies, communicating with patients and providers, maintaining pricing files, processing claims, making payments, maintaining formularies, operating drug utilization review (DUR) programs, and performing other functions. To reduce costs, PBMs can look at any of the three components listed in Figure 16-1. Because dispensing fees are less than one-fourth of total costs, the additional amount of savings that can be achieved by further decreasing fees is limited. Greater savings can be earned by increasing patient cost sharing or by decreasing drug ingredient costs through the use of generics and formularies.

## IMPACT OF MANAGED CARE PROGRAMS ON PHARMACY

The growth of managed care prescriptions has changed the economics of the retail pharmacy marketplace. For private-pay prescriptions, retail prices have traditionally been set by the pharmacy in response to the competitive market. Managed care prescription plans, however, are able to demand significant discounts from regular retail prescription prices through their contractual arrangements with pharmacies. While decreasing reimbursement, managed care prescriptions also can increase the work required for prior authorization, online prospective DUR, formulary compliance, and answering patients' questions about their prescription benefit plan.

During the last decade, usual and customary prescription charges have increased significantly while dispensing fees for managed care prescriptions have decreased. This, along with other competitive forces, has contributed to a shrinkage of the average pharmacy's gross margin from 26.3% of sales in 1996 to 23.6% of sales in 2005, a drop of 2.7% (**Table 16-1**).[4 p8] For those pharmacies that have survived, the average net profit has consistently remained at 3.0% of sales or higher. Pharmacies that have remained in business have succeeded at least in part by decreasing expenses and becoming more efficient.

SCHAFERMEYER_0000571

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 16 of 29 PageID #:9117

**TABLE 16-1    Changes in Pharmacy Operations, 1996–2005\***

|  | 1996 (%) | 2005 (%) | Change (%) |
|---|---|---|---|
| Sales | 100 | 100 | 0 |
| Cost of goods sold | 73.7 | 76.4 | +2.7 |
| Gross margin | 26.3 | 23.6 | -2.7 |
| Expenses | 23.3 | 19.9 | -3.4 |
| Net profit | 3.0 | 3.7 | +0.7 |

\* Expressed as a percentage of sales.

Source: Adapted from West D. (ed.), *2006 NCPA-Pfizer Digest*. Alexandria, VA: National Community Pharmacists Association; 2006: 8.

primarily through computerization and the use of pharmacy technicians. It also appears that pharmacies need to maintain a net profit above 3% percent in order to stay in business, otherwise the business' resources could be put to more profitable use elsewhere.

There is evidence that pharmacies with high managed care prescription volumes (greater than 75% of their total) have significantly lower gross margins, lower proprietors' incomes and lower net profits as a percentage of sales than do pharmacies with low managed care prescription volumes (less than 50%). (**Table 16-2**).[4, p54] Although the number of pharmacies is increasing (from 51,579 in 1996 to 58,665 in 2005),[4, p6] the average number of hours of operation per pharmacy has increased as well. This suggests that pharmacists may work longer hours to compensate for declining gross margins.

Although many community pharmacy managers may believe that dispensing fees are too low, there is little pressure on PBMs to increase fees as long as there is an adequate network of participating pharmacies. It is often assumed that if fees were inadequate, pharmacies would not accept them. In fact, MCOs could interpret some pharmacies' willingness to accept fees from other PBMs that are even lower than theirs as evidence that fees may actually be higher than necessary.

**TABLE 16-2    Effect of Managed Care Prescriptions on Pharmacy Operations, 2005\***

|  | Pharmacies with Low Managed Care Activity (%)\*\* | Pharmacies with High Managed Care Activity (%)\*\*\* |
|---|---|---|
| Sales | 100 | 100 |
| Cost of goods sold | 76.1 | 78.1 |
| Gross margin | 23.9 | 21.9 |
| Expenses | 19.2 | 19.7 |
| Net profit | 4.6 | 2.2 |

\* Expressed as a percentage of sales.

\*\* Low managed care activity defined as less than 50% of prescriptions paid by managed care programs.

\*\*\* High managed care activity defined as at least 75% of prescriptions paid by managed care programs.

Source: Adapted from West D. (ed.), *2006 NCPA-Pfizer Digest*. Alexandria, VA: National Community Pharmacists Association; 2006: 54.

SCHAFERMEYER_0000572

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 11 of 29 PageID #:9118

Why then do pharmacies participate in managed care plans while claiming that reimbursement is inadequate? The answer is not simple and varies from pharmacy to pharmacy.

1. Pharmacists do not want to lose long-term customers and want to do what they can to continue providing services to these patients.

2. Many pharmacy managers have not quantified the effect that managed care plans have on their profitability and, consequently, do not have adequate information to make an informed business decision.

3. Even if pharmacy managers know that some plans are unprofitable, they may be willing to accept these losses provided that the plans are relatively small.

4. Businesspeople know they can take small losses on certain lines of business and still meet overall financial objectives as long as they can earn sufficient above-average profits from other lines of business. Therefore, some managers may claim that losses from low managed care reimbursement can be absorbed by pharmacies that can make additional profits from either: 1) non-prescription sales or 2) prescription sales to cash customers. These "cost-shifting" strategies worked for some pharmacies when managed care prescriptions represented a relatively small percentage of prescriptions. Because the majority of prescriptions are now covered by managed care plans, cost shifting is no longer a viable strategy for most pharmacies.

5. Pharmacies have fixed costs (i.e., rent, utilities, insurance, payroll, etc.) that will be incurred whether or not they participate in a given managed care plan. Pharmacy owners and managers know that any revenue received in excess of their variable costs (i.e., those costs that increase with each unit sold, such as ingredient costs and prescription vials and labels) will help cover these fixed costs. Without this additional revenue to help defray the fixed costs, pharmacies may lose even more by not participating. As difficult as it may seem, deciding upon whether or not to sign some managed care contracts may present a choice between losing a little money or a lot of money.

Pharmacy owners or chain pharmacies' managed care departments must evaluate whether they can afford to participate in each program. To do so, they must know the impact of accepting or rejecting any given contract. Pharmacy owners and managers must understand that low reimbursement rates require that the pharmacy department be run efficiently and economically in order for the pharmacy to prosper.

The following sections of this chapter describe some strategies that pharmacy owners and managers can use to work effectively with managed care prescription programs.

## STRATEGIES FOR WORKING WITH MANAGED CARE PLANS

To succeed in the current managed care environment, it is essential that pharmacy personnel are able to:

- properly identify and control overhead costs,
- document services that enhance patient outcomes, and
- understand the needs of payers.

SCHAFERMEYER_0000573

## IDENTIFYING AND CONTROLLING COSTS

To remain profitable, pharmacies must earn revenues that exceed expenses. Because prescription reimbursement rates are fixed by managed care plans, it is cost—not retail price—that is the primary target for control.

Two types of costs can be controlled. The first is the cost of drug ingredients, also known as the *cost of goods sold (COGS)*.

Pharmacy managers must reduce cost of goods sold by purchasing inventory as efficiently as possible, usually by earning discounts and using generics as much as possible. Community pharmacies often participate in buying groups to obtain volume discounts. Other discounts available to pharmacies from manufacturers are cash discounts (for paying early) and trade discounts (special deals and promotions). These discounts are very important because they decrease the pharmacies' acquisition costs, which will increase gross margins. By supplementing low dispensing fees, earned discounts have allowed pharmacies to participate in managed care plans that would otherwise have been unprofitable.

Pharmacies also can decrease their COGS by:

* Purchasing efficiently and earning volume discounts from suppliers
* Increasing the inventory turnover rate
* Returning out-dated merchandise in a timely manner

If pharmacies can purchase efficiently by earning discounts from suppliers, then they may be able to purchase inventory at prices slightly less than the cost that is estimated by the MCO. Therefore, purchasing the right products from the right suppliers at the right price is a critical function for pharmacy departments.

One of the most important measures of pharmacy department efficiency is the *inventory turnover rate*. This is measured by dividing COGS for a period of time by the average inventory on hand during the same period. This calculation shows how many times the inventory has been sold and replaced during the year and is a key indicator of efficiency.

$$\text{Inventory Turnover Rate} = \frac{\text{Cost of Goods Sold}}{\text{Average Inventory}}$$

In general, a higher inventory turnover rate indicates greater efficiency. According to the *NCPA-Pfizer Digest*, the average pharmacy turns its inventory over 10.4 times per year.[4 p14]

The second is overhead costs for dispensing prescriptions, also known as the *cost of dispensing (COD)*.

The economic viability of an effective pharmacy depends upon its revenues exceeding associated expenses. Developing an understanding of a firm's cost of doing business is among the most basic and vital business functions. The cost of doing business should be assessed and used for pricing prescriptions as well as in contract negotiations, cost management, and other decisions.

In order to price prescriptions competitively and yet realize a fair profit, prescription pricing decisions and decisions regarding participation in managed care contracts must be

SCHAFERMEYER_0000574

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 13 of 29 PageID #:9120

based on accurate measurements of costs. Because pharmacies make thousands of transactions, each having a relatively small dollar value, minor miscalculations in deciding price relative to cost is multiplied thousands of times in the course of a year.

Restating a concept explained previously, the components of a retail prescription drug price include the cost of drugs, COD prescriptions, and a reasonable return on investment. The COD is calculated by totaling all prescription department expenses over a given period and dividing by the number of prescriptions dispensed during that time. The average COD in 2005 was $10.53.[4] p48

$$\text{Cost of Dispensing} = \frac{\text{Total Rx Dep't Costs}}{\text{Number of Prescriptions}}$$

A COD analysis can be as simple or detailed as needed. The simplest approach would be to classify all expenses into two categories: 1) direct costs, and 2) indirect costs. *Direct costs* are those incurred only by the prescription department and include:

* Licenses required for the pharmacy to operate
* Pharmacy computer expenses
* Salaries for pharmacists, technicians and clerks
* Employee benefit expenses (medical, dental, etc.)
* Prescription vials and labels

*Indirect costs* are those shared with the rest of the store or other departments and include:

* Rent
* Utilities
* Advertising

Direct costs would be applied 100% to the prescription department while indirect costs could be allocated in proportion to the percentage of total store sales generated from the prescription department. Further refinements may be made to satisfy the internal management needs of the firm conducting a COD analysis. (Two examples are allocating *fixed costs*—those costs that do not increase because of increases in sales—in proportion to the amount of store area occupied by the prescription department and allocating personnel costs in proportion to the percentage of each employee's time spent working in the prescription department.)

Although it may be important to apply the same cost-accounting procedures to all pharmacies participating in industry-wide COD surveys, this uniformity is not necessary or even desirable for individual companies that are interested in analyzing their own costs. Because it is possible that expenses that are variable in one pharmacy may be fixed in another, it would be best if costs could be assigned by someone familiar with each particular pharmacy's operation.

The potential profitability of a particular managed care contract depends in part on the proportion of beneficiaries that are new customers versus the proportion who were

SCHAFERMEYER_0000575

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 14 of 29 PageID #:9121

private-pay customers but converted to the plan. A well-known accounting text states that "present business should be charged with all present costs [in other words the cost of dispensing], and additional business should be charged only with incremental or differential costs [in other words, only variable costs—those costs that will increase with an increase sales]."[5 p899] Therefore, for current patients who are converted from private pay to the managed care plan, the pharmacy will make a profit only if the gross margin from the plan exceeds the pharmacy's cost of dispensing. For new patients, the gross margin earned from the plan must exceed only the variable costs of dispensing the new prescriptions, of course, provided there are a sufficient number of other prescriptions with reimbursement sufficient to cover the pharmacy's fixed costs.

Pharmacies face the difficult task of trying to reduce overhead costs as much as possible, while at the same time maintaining good quality services. Two ways to help accomplish these tasks are: 1) minimizing the pharmacists' role in drug distribution by delegating non-clinical functions to technicians, and 2) using automation and technology to create additional efficiencies.

In many cases today, delegating dispensing functions to technicians requires that pharmacies alter their workflow. Sometimes this will require remodeling and restructuring the pharmacy department to allow technicians to:

* Receive prescriptions
* Facilitate data entry to produce labels
* Count, pour, and package medications
* Set-up prescriptions for final pharmacist check

An efficient workflow enables pharmacists to work closer to the "out window" and be free to:

* Check the final prescription before dispensing
* Counsel patients
* Monitor drug therapy and interact with patients

## MODIFYING PHARMACY WORKFLOW

Pharmacies in today's healthcare marketplace face the difficult task of trying to reduce overhead costs to the extent possible while at the same time increasing their level of pharmaceutical care services. To accomplish these seemingly opposing objectives, pharmacies must: 1) minimize pharmacists' roles in drug distribution by delegating these functions to technicians, and 2) use automation and technology to create additional efficiencies.

Delegating dispensing functions to technicians requires that pharmacies alter their workflow so that pharmacists are free to counsel patients, monitor drug therapy, and intervene with patients when necessary. In turn, this modified workflow may require some remodeling of the pharmacy so that technicians receive prescriptions, type labels, and count or pour medications while pharmacists work closer to the "out window" to

SCHAFERMEYER_0000576

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 15 of 29 PageID #:9122

check prescriptions processed by the technicians, review computerized patient records, and interact with patients. A counseling area that offers patients privacy should be close to the pharmacist's workstation.

Increasing productivity, that is, the effectiveness of workers' efforts, is another way to decrease overhead costs. Optimum productivity is the result of efficiently controlling payroll expenses while maximizing results, or sales. Employee productivity is sometimes measured by "sales per employee." However, sales per employee have remained relatively stable from $398,449 in 2004 to $393,560 in 2005 despite increasing use of technology.[4 p12] Increased costs to administer complex managed care prescription programs and preparation for the implementation of Medicare Part D are possible explanations for the stagnation.[4 p12] Pharmacies have been relatively successful decreasing overhead costs, but increasing financial pressures requires a continuing commitment to creating additional efficiencies.

## DOCUMENTING PATIENT OUTCOMES

Pharmacists must demonstrate that pharmaceutical care services have value. For example, patient counseling can improve patient compliance, which hopefully will result in more favorable patient outcomes: cure, alleviation of symptoms, or decreased use and expense for other healthcare services such as physician office visits, lab tests, hospitalization, and nursing home admissions.

Pharmacists' future survival and prosperity depends in part on the ability to demonstrate value of their services and to get reimbursed accordingly. The steps involved in developing a reimbursement strategy for cognitive services include: 1) identifying key participants in the reimbursement decision, 2) demonstrating patient need for the service, 3) marketing to establish payer demand, 4) documenting the link between services provided and patient outcomes, and 5) setting prices to reflect value to the payer.[6] Reimbursement will not be easy to achieve as MCOs will pay for these services only if they are convinced that doing so is in their best interest. Several pharmacy organizations, computer companies, and managed care programs have been working for over a decade to develop standardized methods to pay for pharmacy interventions.

Providing cognitive services requires that pharmacists excel at counseling patients, monitoring therapy, conducting utilization review, assuring compliance, and maximizing therapeutic outcomes. The most commonly offered services are blood pressure monitoring, comprehensive medication reviews, diabetes training/management, anticoagulation therapy monitoring, dyslipidemia monitoring/management, and influenza immunizations.

The number of pharmacists billing for their services increased in 2005,[4 pp28,29] including cash fees charged directly to the patient as well as those billed to managed care plans for services provided. Future opportunities may include mental health, nutrition, oncology, geriatrics, pediatrics, hypertension, depression, gastric disorders, digestive diseases, and respiratory, cardiac and circulatory problems. It is evident that community pharmacists are providing a range of patient care services and are setting up structure and processes in their pharmacies to offer high-quality care.[4 p29]

SCHAFERMEYER_0000577

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 16 of 29 PageID #:9123

# PROCEDURES FOR WORKING WITH MANAGED CARE ORGANIZATIONS

The previous discussion on pharmacy workflow and medication therapy management (MTM) services underscores the need for pharmacists to delegate many managed care functions to well-trained pharmacy technicians. This section discusses procedures that can be employed to optimize the use of pharmacy personnel, reduce costs, reduce the number of rejected or delayed claims payments, and maximize opportunities provided by managed care plans.

## ELIGIBILITY

The participating pharmacy agreement specifies how covered employees and dependents will be identified. Some plans' identification cards list the names of the cardholder and all dependents eligible to receive prescriptions. Other plans do not list eligible family members; instead, they define eligibility coverage. For example, dependent children may be covered up to age 18 or, in other cases, they may be covered up to age 23 or 24 (depending on the specific plan) if they are full-time students, etc. Even though PBMs issue identification cards, pharmacy personnel should still verify patient eligibility through an online point-of-service (POS) verification system that also indicates the portion of the cost of the prescription the patient must pay (i.e., the amount of patient cost sharing).

By linking pharmacies to PBMs at the time a prescription is dispensed, POS claims' adjudication systems help pharmacies to:

- Verify that the patient is eligible for coverage
- Determine whether the prescribed medication is covered
- Determine the maximum quantity that may be dispensed
- Conduct online prospective drug utilization review
- Confirm the amount the pharmacy will be paid
- Determine the patient's copayment
- Submit the claim for payment

Pharmacies can reduce the possibility of rejected claims by making sure that all patient information submitted is accurate. Patient birth date is a required element relating to eligibility, benefit design, and DUR messaging, so it must be recorded accurately. The patient's relationship to the cardholder has a code that will determine coverage limits. Pharmacy personnel need to be familiar with each PBM's use of dependent codes. In some cases, college students are covered and in other cases they are not. Although the primary card holder (the person in whose name the prescription coverage is listed) is designated by the person code "00" by some PBMs, others use the code "01."

## CLAIMS

*Data Collection and Documentation*    The participating pharmacy agreement specifies how claims will be submitted and paid. Many of these requirements can be met by ensuring

SCHAFERMEYER_0000578

that all necessary information is gathered accurately and documented in the correct place either in the pharmacy's computer system or on the hard copy of the prescription.

Information that must be collected from the patient to process a claim includes, but is not limited to:

* Name
* Date of birth
* Gender
* Address
* Phone number
* Medication allergies
* Chronic medical conditions
* Insurance identification numbers

It is also helpful to obtain the prescriber's name, address, phone number, and identification number.

This information generally is collected and maintained in the pharmacy's computer system and is transmitted to the PBM to adjudicate a prescription claim. Although most participating pharmacy agreements do not mandate that this information be documented in either the computer or on the hard copy prescription itself, it is beneficial to document this information in the event that it is needed for a possible future audit.

*Package Size and NDC Number*    To avoid lost revenue and possible audit problems, pharmacy personnel must be careful when entering claims data to ensure that the proper patient codes and national drug codes (NDC) are used.

The pharmacy must make sure that the actual drug dispensed matches with what was billed. Purchasing a drug in 500 size or 1000 size and billing under the NDC for the 100 size will lead to audit problems. Many federal and state regulations place responsibility on pharmacists to bill correct NDC numbers. The best solution is to record the NDC numbers for the prescription claim directly off of the manufacturer's package. This is important not only on the original fill, but also on prescription refills. Audit problems caused by using the wrong NDC numbers on claims can be quite substantial, especially if the pharmacy's computer software doesn't actually accommodate and historically track NDC changes on refills.

*Quantity Billed versus Quantity Dispensed*    When entering a prescription, special attention is necessary to correctly record the quantity that is billed to the PBM. Each insurance plan will have specific quantity limits that are allowed for the members covered under the plan. If a higher quantity is entered than the allowable amount, a rejection message will be returned to the pharmacy's computer.

Dispensing and billing the prescription for the quantity prescribed by the physician averts many problems. Some pharmacies get into trouble by dispensing quantities other

SCHAFERMEYER_0000579

than what is written on the prescription, even if the number of refills and maximum days supply under health plan coverage permits it. This can be especially tough as some patients are well educated about their plan maximums and sometimes insist on receiving a larger quantity. In those cases, the physician should be contacted to write a new prescription for the quantity actually dispensed.

The quantity that is actually dispensed to the patient must also match the quantity of the medication that is billed to the PBM. This may seem obvious, but there are some cases where there is a gray area that must be interpreted. The most common of these is dealing with partially filled prescriptions. There are times when the pharmacy does not have the entire amount of medication that a prescription is written for. In this case, if the patient decides to take the amount of medication on hand and return for the remainder later, it is important that the pharmacy does not overcharge for the prescription.

PBMs will want to assure that if the remainder of the medication is not picked up by the patient, the PBM is charged only for the amount dispensed. The PBM also wants to ensure that only one dispensing fee is paid for the full prescription. Many pharmacies sign a Corporate Integrity Agreement (CIA) in which they agree that they will only bill for medication that is actually received by patients.

Each pharmacy will have a slightly different method for handling partially filled prescriptions. It is important that the amount of medication dispensed to a patient is the same as the amount that is billed to the PBM. Partial filling may be viewed by the plan as fraud or abuse. The best method is to only bill the claim when the completed prescription is dispensed.

*Days Supply*    The maximum allowable quantity that a PBM will allow is based upon the number of days that the prescription will last. The allowable quantity that each PBM will pay for varies by the individual plan. Many will pay for a one-month supply (usually 30 to 34 days). Accurate calculation of days supply can be difficult for certain types of medications such as topical creams/ointments, inhalants, and injectables. Days supply for inhalants, like albuterol and nasal steroids, can be determined because each of these will contain a set number of doses (sprays/puffs) that can be divided by the number of doses per day. For example, an albuterol inhaler prescription (total doses per inhaler = 200) written with directions of two puffs four times daily will have a 25-day supply (200 ÷ 8). Injectable medications, like insulin, can be handled much the same way with the total amount per vial divided by the total dose per day. Days supply is more difficult to determine for topical medications and may require some judgment.

There are instances that require information be written directly on the prescription itself regardless of the documentation entered into the pharmacy computer system. One case where this is appropriate is when a prescription is written with directions of "use as directed." Because there is a quantity written but no directions for use, it is impossible for the pharmacy to accurately determine the number of days supply to dispense as required by the PBM. The pharmacist may have to call the prescriber's office to determine either

SCHAFERMEYER_0000580

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 19 of 29 PageID #:9126

the correct directions for use or how long the prescriber anticipates the quantity written will last. In the latter case, the days supply must be documented on the hard copy in case of a future audit. It is also a good idea to document any information needed to justify a prior authorization.

*Claims Rejections*   When a claim is submitted, a PBM will either accept the claim as submitted or send back a response indicating why the claim was not accepted. These responses are often in the form of a uniform set of "reject codes" established by National Council for Prescription Drug Programs (NCPDP). Depending on the computer software the pharmacy uses, it may either see the code or it will be translated into an explanation. Not all codes are uniformly adopted by all payers and various pharmacy computer systems translate the codes differently. If a resubmitted claim is still rejected, the pharmacy may need to contact the PBM's help desk for information needed to resolve the rejection and obtain payment for the claim.

## FORMULARIES

*Restrictions*   Formulary systems not only provide a list of preferred drug products but also may create other types of restrictions such as: 1) limits on the number of refills; 2) limits on the number of dosage units dispensed (e.g., a maximum of a one-month supply); 3) restrictions on use according to age and gender; and 4) limits on prescribing specialized medications to physicians practicing in certain specialties. The latter are usually very expensive medications that require a high level of expertise. For example, the use of growth hormone may be restricted to endocrinologists and prescribing intravenous chemotherapy may be limited to oncologists.

*NDC blocks* are sometimes used to prevent non-formulary drugs from being covered but more often are used to exclude entire therapeutic categories. For example, PBMs may exclude drug categories such as fertility agents, appetite suppressants, and over-the-counter medications. They also may establish a lifetime limit for some drug products such as one course of nicotine patches.

*Generic Preference*   Each managed care plan creates its own MAC list. On those occasions when a physician requires a brand-name product, some managed care plans allow full reimbursement for the higher-cost product if the pharmacist indicates that the prescription was a dispense as written (DAW) order.

The NCPDP has developed nine DAW codes designed to communicate the circumstances for which a certain multiple-source drug product was used or not used (Exhibit **16-1**). Most plans recognize only a few of these codes and strictly limit their use. The inappropriate use of DAW codes can result in inaccurate payments to the pharmacy and trigger an audit.

DAW codes reflect the preference of the physician or patient regarding substituting equivalent generic products for more expensive brand-name medications. Because DAW

SCHAFERMEYER_0000581

# EXHIBIT 16-1   DAW CODE VALUES.

**0 = No Product Selection Indicated**
This is the field default value that is appropriately used for prescriptions where product selection is not an issue. Examples include prescriptions written for single source brand products and prescriptions written using the generic name and a generic product is dispensed.

**1 = Substitution Not Allowed by Prescriber**
This value is used when the prescriber indicates, in a manner specified by prevailing law, that the product is to be Dispensed As Written.

**2 = Substitution Allowed - Patient Requested Product Dispensed**
This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the patient requests the brand product. This situation can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.

**3 = Substitution Allowed - Pharmacist Selected Product Dispensed**
This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist determines that the brand product should be dispensed. This can occur when the prescriber writes the prescription using either the brand or generic name and the product is available from multiple sources.

**4 = Substitution Allowed - Generic Drug Not in Stock**
This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since a currently marketed generic is not stocked in the pharmacy. This situation exists due to the buying habits of the pharmacist, not because of the unavailability of the generic product in the marketplace.

**5 = Substitution Allowed - Brand Drug Dispensed as a Generic**
This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the pharmacist is utilizing the brand product as the generic entity.

**6 = Override**
This value is used by various claims processors in very specific instances as defined by that claims processor and/or its client(s).

**7 = Substitution Not Allowed - Brand Drug Mandated by Law**
This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted, but prevailing law or regulation prohibits the substitution of a brand product even though generic versions of the product may be available in the marketplace.

**8 = Substitution Allowed - Generic Drug Not Available in Marketplace**
This value is used when the prescriber has indicated, in a manner specified by prevailing law, that generic substitution is permitted and the brand product is dispensed since the generic is not currently manufactured, distributed, or is temporarily unavailable.

**9 = Other**
This value is reserved and currently not in use. NCPDP does not recommend use of this value at the present time. Please contact NCPDP if you intend to use this value and document how it will be utilized by your organization.

Source: Materials reproduced with the consent of © National Council for Prescription Drug Programs, Inc. 2008 NCPDP.

SCHAFERMEYER_0000582

codes can affect the amounts of payments and patient copayments, it is important that the pharmacy uses the correct code for each claim. The particular reason for using the DAW code should be recorded also.

The need for documentation is important to justify the use of DAW codes. For example, to transmit a DAW-1 code, a written prescription must have the prescriber's signature on the DAW line or there must be a check mark in the DAW box (depending on state requirements). In the event of a telephoned prescription, the pharmacist must record the nature of the DAW request on the hard copy of the prescription along with the name of prescriber's agent who authorized the DAW. If the patient has stated that the brand-name version is preferred to a generic version (by authorizing "substitution permitted"), this request must be documented on the hard copy of the prescription by pharmacy staff. The pharmacy could lose a large sum of money if an audit cannot find the documentation supporting the use of these codes.

## PREFERRED DRUGS AND TIERED COPAYMENTS

Formularies can be categorized as being *open* (i.e., most prescription products are covered), *incented* (i.e., patients pay lower copayments for preferred products), or *closed* (i.e., reimbursement is limited to selected drug products within each therapeutic class). Most PBMs have migrated from open to incented formularies to the use of tiered copayments. In a three-tier copayment plan, generics will require a relatively low copayment (e.g., $10) from the patient; preferred brand-name drugs will have a higher copayment (e.g., $25), and non-preferred brand-name drugs will have the highest copayment (e.g., $50). Some plans have a fourth tier for so-called *lifestyle drugs* such as those for erectile dysfunction.

Retail copayments increased across all tiers from 2003 to 2004; they increased by 6% for the first tier; increased by 8% for the second tier; and increased by 7% for the third tier.[p15] Tiered copayments are sometimes confusing to patients, so pharmacy personnel must be prepared to explain why copayments vary from one prescription to another. To sensitize patients to actual drug therapy costs, some plans utilize coinsurance in which the patient pays a percentage of the total cost (e.g., 20%, 30%, or 50%) in lieu of copayments.

*Prior Authorization*    Formulary guidelines specify policies that determine the specific situations in which certain high-cost drugs may be used. Usually the prescriber must explain why a particular drug product is considered superior to a preferred formulary product and obtain authorization from the PBM before the pharmacy may dispense the drug and obtain reimbursement. Pharmacies receiving a prescription for a drug restricted by a prior authorization (PA) program may have to contact the physician and/or the PBM to make sure the proper authorization is obtained before the drug can be dispensed. Although this may be inconvenient for the patient, pharmacist, and physician, it does reduce expenditures without unnecessarily denying access to medications when they are needed. Although 92% of HMOs use prior authorization,[1][p35] the administrative expenses associated

SCHAFERMEYER_0000583

ated with operating PA programs usually requires that PBMs apply this restriction to relatively few drug products.

Prior authorizations are often required for specific products such as high-cost injectables.

Some plans require that certain low-cost or low-risk alternatives be tried first before a non-formulary drug will be approved. Some examples of drugs or situations requiring prior approval are:

- Certain injectable medications, such as Lupron® or growth hormone.
- The use of a drug for a purpose other than what was approved by the FDA. For example, prescribing Viagra® for a female patient, or prescribing oral contraceptives for a male.
- Drugs in a therapeutic class that has been excluded, such as drugs used for cosmetic purposes. For example, some plans will not pay for Retin-A® for use by patients over the age of 25 unless the prescriber obtains prior approval.
- Brand-name multi-source drugs that are deemed to be medically necessary. These products can sometimes be approved with a PA even though the PBM does not allow routine DAW overrides for the product.
- Non-formulary brand-name products.

In some cases, a prescriber will contact the PBM or health plan medical director to explain the reason for prescribing a non-formulary product. In most cases, a prescriber does not know when a PA is needed for a particular product. The pharmacy submitting a claim will receive a rejection notice and will need to call the PBM help desk to determine the reason for the rejection. The help desk will tell the pharmacy the process that the PBM requires for prior approval. The pharmacy ultimately informs the prescriber of the need for obtaining a PA and the process to follow for approval.

Some plans specify that pharmacies must telephone the PBM to receive approval before they are allowed to dispense certain prescriptions. If the plan authorizes the prescription, the pharmacy is given a code that is used to document the approval. Authorization may be given for one prescription, several refills, or a year's worth of refills for a patient. In any case, the pharmacy must follow the PBM's specific procedures for obtaining authorization.

The PA process will vary from one PBM to another. Some PBMs will accept prior authorization requests through their Web sites; in most cases, though, the pharmacy needs to contact the PBM help desk, and follow the plan's procedures.

Some PBMs, after approving a prior authorization request, will adjust their processing computers to accept the prescription the pharmacy submits. Some PBMs may require the prescriber to include a prior approval number on the prescription, and require the pharmacy to submit that number along with the claim. Other PBMs may require the pharmacy to call the PBM help desk to obtain the authorization number to submit with the claim. There are other methods a PBM may use for approving a prior authorization. Whatever the process, once approval is obtained, the prescription can then be submitted for online adjudication.

SCHAFERMEYER_0000584

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 23 of 29 PageID #:9130

Some plans require that *Treatment Authorization Requests (TAR)* be filed to receive a prior authorization for a medication. This request is usually a form for which the pharmacy will input various data regarding the patient, pharmacy, physician, medication, and justification, and fax in to the PBM for review and authorization.

There may be instances where a plan will not approve a PA request. If this is the case, the patient needs to be advised that the prior authorization request was denied by the plan. The pharmacy can call the prescriber to obtain a different prescription or explain to the patient that he or she has the option of paying cash for the prescription as originally written.

## DISEASE STATE MANAGEMENT

Disease management programs are designed to promote rational drug utilization, especially for patients with certain common, high-cost diseases. For pharmacists, this means not only dispensing drugs but also educating patients, encouraging compliance, monitoring patient progress, and intervening when necessary to assure positive outcomes.

These types of services generally require specialty training in a particular area, as well as the use of diagnostic devices and supplies. The number of pharmacists billing for their services increased in 2005,[4] [p28] indicating that managed care is becoming more comfortable with providing a separate "cognitive" skills fee reimbursement to pharmacists for their involvement.

With the recognition of MTM services through Medicare Part D, it is expected there will be more opportunities for pharmacists to become more involved as pharmacotherapy managers and get reimbursed for these services.

## DRUG UTILIZATION REVIEW

One of the primary tools used by PBMs to control utilization is DUR. DUR is a very important tool that has a significant impact on community pharmacy practice. Traditional DUR programs have attempted to control unnecessary utilization by avoiding duplication of therapy and reducing drug abuse and misuse. All reporting HMOs had DUR programs in 2004.[1] [p33]

Controlling program utilization can save more money than restricting expenditures for drug ingredients or dispensing fees. For example, patients who continue taking a proton pump inhibitor beyond the time recommended for acute treatment of ulcers cause significant and unnecessary costs for the program. By limiting medication use to the recommended dosage and duration, the MCO can save hundreds of dollars for just one patient.

DUR may be prospective or retrospective. Retrospective DUR involves the review of prescription claims databases well after the prescriptions have been dispensed. Because these programs are primarily educational, the focus is on alerting physicians and pharmacists to prescribing habits with the hope that they will be able to improve patients' outcomes using less costly medications.

Prospective DUR, on the other hand, occurs before the prescription is dispensed and results in alert messages being sent to the pharmacy's computer when problems are

SCHAFERMEYER_0000585

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 24 of 29 PageID #:9131

detected. When this occurs, pharmacists must review the alert message and take appropriate action that may require a phone call to the physician, a discussion with the patient, or a call to the PBM to resolve the problem. These alerts also may result in a prescription being changed or not filled, if that is determined to be in the patient's best interests.

There are two types of information that are reviewed in the DUR process:

1. *Non-clinical (administrative):* Messages involve evaluating the prescription claim for compliance with the insurance plan for each patient's prescription. Administrative messages focus on issues such as patient and dependent eligibility, drug exclusions and limitations, and formulary requirements.
2. *Clinical:* Messages that focus on issues relating to patient safety and enhancing the appropriate use of medications with the patient. Examples include review for potential:

   - Drug interactions
   - Duplication of therapy
   - Inappropriate dosage
   - Inappropriate duration of therapy
   - Contraindications

While prospective DUR messages about clinical issues (i.e., drug interactions) often duplicate information generated by the pharmacy's own computer system, sometimes they can provide information that wouldn't otherwise be available for patients who use more than one pharmacy.

## CLAIMS RECONCILIATION

When PBMs reimburse pharmacies for prescription claims, the check is usually accompanied by a "remittance advice," "claims detail," or other document that shows the amount paid for each claim, the copayment amount, and other messages that help explain how each claim is paid. This remittance advice is used to reconcile prescription claims with payments.

Because of the difficulty in determining the accuracy of a payment response at the time of filling, many pharmacies have developed systems that allow them to properly handle claims and collect payments. Claims management systems record claims transactions, create receivables files (what the pharmacy expects to be paid), and reconcile payments against claims. This helps to identify differences between expected payments and actual payments. A claims management system will also help pharmacy personnel to determine:

- *Was the adjudicated claim paid at all?* During prescription processing, the PBM sends a response indicating what they will pay for a particular claim. Once the information has been processed by the PBM and the pharmacy dispenses the prescription, the claim is then labeled as *adjudicated*. Sometimes an adjudicated claim does not make it onto a payment voucher. Pharmacy personnel need to check each claim against payment registers to be sure the claim was paid.

SCHAFERMEYER_0000586

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 25 of 29 PageID #:9132

* *Was the claim paid at the rate indicated by the adjudication response?* The adjudicated response is what the PBM says it will pay. Payments may sometimes be adjusted by the PBM through its internal claim review process. If payment does not agree with the adjudicated response, pharmacy personnel should check to find the reason and, if necessary, contact the PBM's help desk to determine the reason for the discrepancy.

* *Was the claim paid at the correct contract rate?* This is very difficult to determine unless the pharmacy can determine the plan in which the patient was enrolled. Some PBMs provide information on their remittance advice. In these cases, pharmacy personnel can compare the payment with the contracted rate.

* *Was the claim paid in full?* If the claim was paid in an amount other than the amount anticipated, the pharmacy should determine the payment differential and determine why the claim payment varied from the anticipated payment. Payment variances can occur from MAC pricing, incorrect NDC numbers, incorrect quantities, or incorrect copayments.

When payment is delayed, the pharmacy should attempt first to determine the cause of the unresolved claim. If the problem claim resulted from an incorrect billing entry at the store, it may be possible to correct and re-bill the claim. If the pharmacy dispensed a brand-name drug in place of a generic product and was paid at MAC, there may be no way to recover the outstanding payment. If this problem occurs, it would be a good idea to establish a procedure for dispensing generics and make sure all pharmacy personnel know the importance of following this procedure.

## CLAIM ADJUSTMENTS

Even though a claim is paid, it may not have been paid in accordance with the plan schedule. It also may not have been paid in accordance with the amount returned by the PBM's adjudication response. Most PBMs have the ability to audit adjudicated claims for reasonableness prior to sending payment. If a claim seems to be unreasonable, such as 100 vials of insulin (rather than 100 units of insulin), and this was not adjusted during the dispensing process, the PBM may review and adjust the claim.

Among the most frequent reasons for claims adjustments are:

* *Error in package size.* If the NDC submitted for an asthma inhaler refers to a package size of 22.5 mL and the pharmacy submitted a quantity of 2.25 mL, a payment reduction will occur.

* *Error in metric quantity.* Some PBMs require the billing of injectable products as number of vials while others may require the number of milliliters or the number of packages. For example, a drug with a package size of 7.5 mL may need to be entered as 7.5 mL rather than as "1" unit. The incorrect billing unit will result in a payment different than is anticipated.

* *Invalid DAW code.* DAW codes help the payer to understand why a generic product was or was not dispensed. If the pharmacist dispensed a brand-name product instead

SCHAFERMEYER_0000587

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 26 of 29 PageID #:9133

of a generic, because the physician instructed the prescription to be DAW and did not indicate the proper DAW code, the claim amount billed will be adjusted down as if the generic product had been dispensed.

- *Paid from MAC list.* This is the maximum allowable cost for a multiple-source drug. This indicates that the plan pays only for generics even if a brand-name drug was dispensed. If a brand-name drug was dispensed, that is money lost that cannot be recovered.
- *Change in drug acquisition cost.* Because payers and pharmacies may use different data sources and update their files at different times, the cost information used by the pharmacy to calculate reimbursement may differ from that used by the payer.
- *Incorrect fee.* Dispensing fees vary by plan and are subject to change. The pharmacy may anticipate reimbursement at one rate and be paid another.
- *Claim subject to usual and customary pricing.* Some plans require the pharmacy to submit its usual and customary price along with the prescription claim. These plans will pay the contract price or the usual and customary price, whichever is lower.

Pharmacies should have an individual—perhaps a technician—who has the responsibility for researching and resolving those claims that are paid incorrectly. When payments differ from the expected payments, the person responsible for reconciling billings with payments should create reports comparing anticipated payments with the actual payment and include all of the claim and payment data elements.

Whatever the reason for a variance, it is important to document the findings. The more documentation the pharmacy has, the greater the likelihood of determining the cause of the variance and recovering any under-payments by following the specific procedures. If, for example, a product that had been multi-source no longer has a generic counterpart but the PBM continues to pay at the generic rate, the pharmacy's documentation will help in resolving the payment.

Not all variances are recoverable. If the pharmacy is unable to recover further payment from the PBM, it will need to account for the loss by decreasing the amount of sales recorded in its financial records or show the loss as an expense (i.e., "bad debts"). Each pharmacy has its own procedures for handling these adjustments.

## CHARGEBACKS

Occasionally, a PBM may assert that it has overpaid a claim in error, or paid a claim incorrectly and will charge back to the pharmacy the amount in question. Whenever receiving a chargeback, the pharmacy should review the original claim, the adjudication response, and the payment response to determine the facts involved in the chargeback request. If the chargeback is appropriate, the pharmacy will need to make appropriate financial adjustments in accordance with its financial procedures. If the chargeback is determined to be inappropriate, the pharmacy should gather all appropriate documentation and call the PBM's help desk.

SCHAFERMEYER_0000588

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 27 of 29 PageID #:9134

## CLAIM REVERSALS

Because pharmacy systems record a billing upon dispensing a prescription, there may be circumstances where an adjudicated prescription needs to be reversed or "unbilled." This happens when a patient does not pick up their prescription within a reasonable period of time.

Prescriptions may not be picked up by patients for a variety of reasons: the patient no longer needs the medication, the physician has changed the medication, the patient decides to get the prescription at another pharmacy, the patient forgot to pick it up, or the patient no longer wants the prescription. Each pharmacy should have appropriate procedures to address prescriptions that are not picked up.

## AUDITS

Because of the increasing cost of health care, managed care plans want assurances that all steps outlined within the participating pharmacy agreement are being followed. This holds true for all sectors of health care from hospitals, physicians, and pharmacies. As a way to address this concern, most PBMs audit prescription claims. Audits come in many different forms that range from automated reviews of electronic claims (desk audits) to on-site audits in a community pharmacy (*field audits*).

Audit programs have three primary goals:

1. *Identify overpayments.* Insurance companies are legally bound to do this by a fiduciary responsibility to their clients.
2. *Provide a significant deterrent to abuse.* It is perceived that people who are aware of audit activity are more likely to follow plan guidelines.
3. *Encourage compliance.* Audits can help healthcare providers learn (sometimes the hard way) to understand and follow program guidelines.

The best way to prepare for an audit is to develop day-to-day policies that will address many of the areas that will trigger an audit and stick to them. By being proactive and employing effective procedures, a pharmacy can avert expensive problems later.

## EFFECT OF MANAGED CARE ON HOSPITAL PHARMACIES

### BACKGROUND

The rapid rise in hospital costs during the last several decades has been fueled by an oversupply of hospital beds, lack of price competition among hospitals, and generous reimbursement methods. With the passage of the Hill-Burton Act in 1946, the federal government provided money to build new hospitals in many communities throughout the country. The number of hospital beds, admissions, and average length of stay increased significantly. Hospitals also were reimbursed on a "cost plus" basis that created few incentives to contain costs. As a result of this generous fee-for-service reimbursement, it was not necessary for hospitals to compete on price. Instead, hospitals competed with

SCHAFERMEYER_0000589

Case: 1:17-cv-02246 Document #: 581-4 Filed: 03/17/23 Page 28 of 29 PageID #:9135

each other to attract physicians who could fill the beds. The most effective way of attract-ing physicians was to provide the latest medical technology, which is a very costly but effective strategy.

Effective restraints on hospital costs were finally introduced in 1983 with prospec-tive reimbursement methods known as *diagnosis-related groups (DRGs)* and capitation. Under DRGs, hospitals were paid a specified amount for each admission based on patient diagnosis. This new reimbursement method encouraged hospitals to become more efficient and to improve effectiveness of treatment to reduce patient length of stay. In 2004, 10.7% of contracted hospitals were reimbursed using DRGs, continuing an annual increase since 2001.[1] p86

While DRGs are still used by some MCOs, many MCOs continue to negotiate with hospitals to establish *per diem* or capitation, rates. Although 76.3% of contracted hospi-tals accepted *per-diem* payments in 2004, the popularity of this method has also been declining.[1] p86 One reason may be that hospital pharmacies can control their own pro-duction efficiency but have little control over the prescribing habits of the physicians. Therefore, a pharmacy can provide services and prescriptions very efficiently but still may lose financially if physicians prescribe many and/or expensive products.[7]

## IMPLICATIONS FOR HOSPITAL PHARMACIES

Through prospective reimbursement systems, MCOs have profoundly changed the way hospitals operate. Hospitals now have strong incentives to eliminate unnecessary services and to promote efficiency. Some hospitals have closed, and others have eliminated some of their licensed beds. Most hospitals have either consolidated into large hospital corpora-tions or developed affiliations with other hospitals to benefit from economies of scale in their purchasing, advertising, and central administration.

The advent of prospective reimbursement transformed hospital pharmacies from profit centers into cost centers and created incentives to eliminate unnecessary services and promote efficiency. The primary cost-cutting targets for hospital pharmacies have been the two areas that contribute the most to costs: 1) inventory and 2) personnel. Almost all hospital pharmacies have reduced inventory costs by working with the medical staff to adopt extensive formulary systems. They also reduced the cost of goods by joining with other hospitals to form volume purchasing groups that solicit competitive bids from pharmaceutical manufacturers.

Personnel costs have been reduced by delegating routine functions to pharmacy tech-nicians and by automating dispensing procedures. Automated dispensing machines and robots reduce personnel time and enhance accountability by delivering medications to the nursing staff on demand. Many hospital pharmacy departments have increased the extent of their on-the-job training programs, and some have encouraged or required pharmacy technicians to enhance their knowledge and skills by passing a certification exam. Automation and extended use of pharmacy technicians, however, have not always reduced pharmacy staff. In many cases, these efficiencies have allowed pharmacists to become

SCHAFERMEYER_0000590

more involved with patient-focused care, dosage recommendations, discharge counseling, and case management. By working with the medical staff to achieve positive patient outcomes, hospital pharmacists can help reduce patients' length of stay and, consequently, minimize overall hospital costs.

## CONCLUSION

The impact of managed care prescriptions on pharmacy margins and workload is readily recognized by pharmacists. These changes, though, are a natural progression of a medical industry that is in the advanced stages of evolving from a cottage industry to a post-industrial revolution industry with a focus on efficiencies, economies of scale, consolidation, and continuous quality improvement.

Until recently, healthcare services were *financed* but not *managed*. Historically, government and private employers sponsoring health insurance programs demanded cost controls but showed relatively little interest in improving quality or ensuring positive outcomes, which are ordinary management functions for most businesses. More attention is now being devoted to analyzing claims databases to assess and improve the quality of healthcare services in an effort to control costs and enhance patient outcomes.

Pharmacy practice and pharmacy education have no choice but to adapt and change in order to fit into the evolving managed care environment. Successful pharmacists now need to be more than good practitioners; they need to understand business, technology, marketing, and how to improve patient outcomes.

Pharmacists will continue to play a greater role in managed care. All pharmacists—staff or management, community or institutional—are affected by the problems and opportunities presented by managed care prescription programs. The extent to which pharmacists use their skills to minimize problems and take advantage of opportunities will determine to a large extent the profession's future success.

## REFERENCES

1. *Managed Care Digest Series: 2005.* Bridgewater, NJ: Aventis Pharmaceuticals Corporation; 2005.

2. *The Prescription Drug Benefit Cost and Plan Design Survey Report: 2005 Edition.* Lincolnshire, IL: Takeda Pharmaceuticals North America, Inc.; 2005.

3. Brian E.W. and Gibbens S.F., California's Medi-Cal co-payment experiment. *Med Care.* 1974; 12(Suppl 12): 1–303.

4. West D., (ed.), *2006 NCPA-Pfizer Digest.* Alexandria, VA: National Community Pharmacists Association; 2006.

5. Pyle W.W. and Larson K.D., *Fundamental Accounting Principles.* 9th Ed. Homewood, IL: Richard D. Irwin, Inc.; 1981.

6. Rupp M.D., Strategies for reimbursement. *Am Pharm.* 1992; NS32: 79-85.

7. Larson L.N., Financing Health Care in the United States, Chapt 2, in Smith M.I., et al. (eds.): *Pharmacy and the U.S. Health Care System,* 3rd Ed. Binghamton, NY: The Haworth Press, Inc.; 2005.

SCHAFERMEYER_0000591