**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> WALGREEN CO., <br><br> Defendant. | Civil No. 17-cv-2246 <br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan <br><br> Oral Argument Requested |

**MOTION TO EXCLUDE HILTON'S EXPERT REPORT AND TESTIMONY
UNDER FEDERAL RULE OF EVIDENCE 702**

Walgreen Co. ("Walgreens") moves the Court to exclude the report of Plaintiffs' expert Lynette Hilton, Ph.D. and preclude Plaintiffs from relying on her testimony. Under Federal Rule of Evidence 702 ("Rule 702"), Hilton is not qualified to provide the opinions she proffers, which propose using an unreliable methodology for calculating damages that will not be helpful to the jury because it ignores all relevant facts about pharmacy reimbursement.

## I. INTRODUCTION

In the pharmacy industry, health insurers and health plans, including the Fund Plaintiffs,[1] are referred to as third-party payers ("TPPs"). *See* **Ex. A:** (Expert Report of Michael Jacobs) ("Jacobs Report") ¶ 20. TPPs contract with Pharmacy Benefit Managers ("PBMs") to administer pharmacy benefits to their beneficiaries—the pharmacy's consumers who pay with insurance. *Id.* In turn, PBMs contract with pharmacies to include them in the network of pharmacies that the PBMs make available to the TPPs' beneficiaries. When a consumer uses insurance to purchase a drug, the pharmacy submits insurance-identifying information to the PBM through the pharmacy's computer system. *Id.* ¶ 16. The PBM then, in real time, adjudicates the claim by returning information to the pharmacy regarding whether the consumer's insurance covers the drug, the amount the consumer should pay (through a deductible, copayment or coinsurance), and the amount the PBM expects to reimburse the pharmacy, which is determined pursuant to the pharmacy-PBM contract. *Id.* These contracts generally include a "lesser-of" reimbursement methodology, meaning that the PBM will reimburse the pharmacy at the lowest of various prices, including the usual and customary ("U&C") price. *Id.* ¶ 24. In addition, the contracts also often define the term U&C. *Id.* ¶ 24-25. The TPPs are not parties to the contracts between the PBMs and the pharmacies. *Id.* ¶ 22-23.

---

[1] International Brotherhood of Electrical Workers Local 83 Health and Welfare Fund, International Union of Operating Engineers Local 295-295C Welfare Fund, and Steamfitters Fund Local 439 ("Steamfitters").

In exchange for the PBM administering the prescription benefits for a TPP's beneficiaries, the TPP pays the PBM in accordance with a separate contract between the TPP and PBM. **Ex. A:** Jacobs Report ¶ 20. These contracts may provide that the TPP pay the PBM according to a lesser-of methodology, with the U&C price as one of the components (like the contract between the PBM and pharmacy), although not all TPP-PBM contracts contain a lesser-of provision. *Id.* ¶ 90. These contracts often, but not always, define U&C, although the U&C definition in the TPP-PBM contract is often different than the U&C definition in the PBM-pharmacy contract. *Compare* Dkt. 556-56, (Expert Report of Kenneth Schafermeyer) ¶ 84 & Table 1 with ¶¶ 95-97 & Table 3. A pharmacy like Walgreens is not a party to the contracts between TPPs and PBMs, and because the terms of these contracts are often confidential, Walgreens has no knowledge of the TPP's obligations to the PBM. **Ex. A:** Jacobs Report ¶ 88.

This case involves Walgreens' Prescription Savings Club ("PSC"). Consumers who enroll in PSC agree to terms and conditions and pay an annual membership fee to obtain access to lower prices on prescription drugs. *See* **Ex. A:** Jacobs Report ¶ 29. The Individual Plaintiffs[2] and the Fund Plaintiffs (collectively, the "Plaintiffs") allege that Walgreens overcharged them for generic drugs by submitting Walgreens' retail prices as its U&C prices to PBMs instead of the PSC prices available only to PSC members. Dkt. 477 (Fourth Am. Compl.) ¶¶ 1, 4-6. Plaintiffs claim that, had Walgreens reported its PSC prices to PBMs as its U&C prices, both consumers and TPPs would have paid less on some generic drugs than they did. *See* Dkt. 552, Pls.' Mem. of Law ("Mem.") at 1.

Plaintiffs have moved pursuant to Federal Rule of Civil Procedure 23 to certify a class and two subclasses. In support, Plaintiffs proffer Hilton as a proposed expert. She claims to have

---

[2] Cynthia Russo, Lisa Bullard, and Ricardo Gonzales.

2

developed a formulaic methodology that identifies class members, namely those consumers and TPPs who paid more than the PSC price on generic prescription drug transactions, and calculates both the amount of their alleged damages and the amount by which Walgreens was allegedly unjustly enriched. Dkt. 556-55 (Expert Report of Lynette Hilton) ("Hilton Report"). Hilton, however, is not qualified to develop such a methodology, as she is unable to read or write the code for the data queries[3] that form the basis of her opinions. Instead, her staff wrote the queries. Plaintiffs did not disclose those staff members as experts, and Hilton was unable to explain important details of the work they performed.

Even if Hilton could read or explain the data queries, her methodology is not reliable and would not be helpful to the jury because her methodology has no rational connection to how pharmacy reimbursement actually works. In identifying whether there is an alleged overpayment, Hilton proposes looking at each individual drug transaction from 2007 on in which one of eight PBMs (the "Relevant PBMs") adjudicated the transaction and determine whether the combined amount the consumer paid the pharmacy plus the amount the TPP paid the Relevant PBM is greater than the PSC price. In other words, Hilton, as instructed by Plaintiffs' counsel, calculates overpayments on each transaction individually instead of in relation to other transactions for the same consumer in the same benefit year. Fatal to Hilton's methodology, however, is that it does not account for how pharmacy reimbursement operates in the real world.

As discussed below, to accurately assess damages, each consumer transaction must be reviewed in the context of all the transactions the consumer had in an entire benefit year to account for the impact of deductibles, out-of-pocket maximums, and other benefit design features. **Ex. B:**

---

[3] Queries are a set of steps using a predefined code (the query language) that allows a person to retrieve data from a database or ask for additional actions to be performed on the data. *See, e.g.,* TechTarget, "query" definition, available at (https://www.techtarget.com/searchdatamanagement/definition/query).

(Expert Report of James Hughes) ("Hughes Report") ¶ 75. Because Hilton's methodology calculates classwide damages without taking these key features of how insurance benefits work into account, it lacks a rational connection between what potential class members (consumers and TPPs) *would have paid* if Walgreens had reported PSC prices as U&C prices and what Hilton *calculates their damages* to be.

Moreover, Hilton did not test her methodology on a larger data set available to see if it could accurately identify damages, or to assess any problems with her methodology. Instead, she cherry-picked example transactions that were "cleaner," and ignored the "messy" transactions that would require individual investigation. In other words, Hilton does not even know if her methodology would work when applied to classwide data.

Because Hilton lacks the qualifications to offer her opinions, and because she sets forth a methodology that is not based on sufficient facts, is unreliable and untested, has no basis in real-world principles, and will not be helpful to the trier of fact, her opinions do not meet the requirements set forth in Rule 702. The Court should exclude her testimony.

**II.     THIS MOTION MUST BE ADDRESSED BEFORE CLASS CERTIFICATION**

The "Seventh Circuit has directed district courts to decide the admissibility of expert testimony *prior to ruling on class certification* where testimony is important to a class certification decision." *Sgouros v. Trans Union LLC*, No. 14 C 1850, 2022 U.S. Dist. LEXIS 49585, at *2 (N.D. Ill. Mar. 21, 2022) (citations omitted) (emphasis added); *see also American Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (holding that a district court must rule on any challenge to an expert before ruling on class certification if the expert's report or testimony is "critical to

4

class certification").[4]

Here, Plaintiffs have shown that they view Hilton's proffered testimony as "critical" to the question to their class certification motion. They reference Hilton's report throughout their class certification memorandum. *See* Pls.' Mem. of Law ("Mem.") at 17, 22-23, 27 (citing Hilton's report for the proposition that the proposed class representatives' claims are typical, that "damages and restitution can be calculated on a classwide, formulaic basis that will not require individualized inquiries regarding members of the Class," that "common, classwide evidence" predominates and will be used to demonstrate Plaintiffs' claims of deception, and that Plaintiffs have damages). Given that Plaintiffs argue that Hilton's report helps prove typicality and commonality— two of the required elements to certify a class, *see* Fed. R. Civ. P. 23— the Court should rule on the admissibility of Hilton's report, and Plaintiffs' ability to rely on Hilton's testimony, before ruling on Plaintiffs' class certification motion.

### III. LEGAL STANDARD

"The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's seminal decision in *Daubert*." *Sgouros v. Trans Union LLC*, No. 14 C 1850, 2022 U.S. Dist. LEXIS 49585, at *2 (N.D. Ill. Mar. 21, 2022) (citations omitted)). Rule 702 allows for opinion testimony by an expert—that is, someone with the requisite "'knowledge, skill, experience, training, or education'—to help the trier of fact 'understand the evidence or [] determine a fact in issue.'" *Id.* (quoting Rule 702). Specifically, "[t]he proponent of an expert witness bears the burden of demonstrating that the expert's testimony is admissible by a preponderance of the evidence." *Id.* (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)). Expert testimony

---

[4] This issue is also discussed at pages 4-5 of Walgreens' Motion To Exclude Opinions 3, 6, And 7 Of Schafermeyer's Expert Report And Any Testimony Regarding The Same ("Schafermeyer Motion"), filed concurrently with this motion and incorporated here by reference.

is admissible only when it (1) consists of "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) is "based on sufficient facts or data"; (3) is "the product of reliable principles and methods"; and (4) is the product of a "reliabl[e] appli[cation] of th[ose] principles and methods to the facts of the case." *United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2016) (quoting Rule 702).[5]

## IV. ARGUMENT

### A. Hilton's Opinions Fail To Satisfy The Requirements Of Rule 702

#### 1. Hilton's Opinions Regarding Her Proposed Damages Methodology Should Be Excluded Because She Is Not Qualified

To determine whether an expert is qualified, "we ask not whether an expert 'is qualified in general' but whether [s]he is qualified 'to answer a specific question.'" *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). A court "must look at each of the conclusions [the expert witness] draws individually to see if [s]he has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617. Courts have excluded expert reports and testimony where the experts were qualified in the relevant industry generally but were not qualified to opine on the ***specific issues*** in the case. *See Sgouros*, 2022 U.S. Dist. LEXIS 49585, at *5-6 (excluding consumer finance industry expert opinions where the expert did not have expertise on how consumers view one credit report services).

Here, Hilton is not qualified to answer the specific questions at issue: whether class members can be identified and classwide damages determined via a formula using only data instead of individualized review. She lacks the qualifications because she did not write ***and cannot read or explain the data queries that form the basis of her opinions***. *See, e.g.,* **Ex. C:** Hilton Dep.

---

[5] Additional discussion regarding the Rule 702 standard, including its "critical gatekeeping function" is in the Schafermeyer Motion at pages 5-6, which Walgreens incorporates by reference herein.

6

at 234:4-235:13; 301:20-24. In fact, Hilton had not even reviewed the queries to ensure their accuracy before production, nor could she do so because she was unable to read the code that formed the queries.

> Q: Do you have experience with code yourself?
>
> A: I do, but it's very old.
>
> Q: So it wouldn't translate. Like, Fortran isn't used anymore. So you wouldn't be able to create this code; is that correct? . . .
>
> THE WITNESS: Yea, I did Fortran back – for my dissertation back 20-something years ago. And I also used to code in SAS, but it's been a long time. . . .
>
> Q: Did you review the query before it was produced to us?
>
> A: No. it's not my practice to review the code. . . . I wouldn't say I've never reviewed [the queries]. I've looked briefly at some code. The rest, I asked my staff [to] explain to me what this code is doing. They'll walk me through it. Or we just talk about it in words rather than – I don't look at the code. . . .
>
> Q: Are you able to read this code?
>
> A: This particular code, no.

**Ex. C:** Hilton Dep. at 234:4-7; 234:16-235:12.

As a purported damages expert, Hilton should have been able to answer questions about the meaning of the data queries used and what steps she took to calculate her damages or alleged overpayment analysis. But she could not do so because her staff wrote and ran these queries.

> Q: And what about cleaning the data for duplicates?
>
> A: Sitting here today, I'm not sure if that was something that was checked for, but that's something that's obviously very easy to check for.
>
> Q: Your staff knows, but you don't know, correct?
>
> A: Well, given that I was using examples, I didn't really need to because I wouldn't pick the same example twice. So it wasn't something at this stage that needed to be done, but it's very easy to do.

> Q: That wasn't my question. My question was, your staff did and knows; you don't know, correct? . . .
>
> A: Yeah, my answer is that it's kind of irrelevant, but they would know.

**Ex. C:** Hilton Dep. at 234: 4-7, 16-21; 235:10-12.

Hilton's staff wrote and executed the data queries, and Hilton could not explain them. Thus, she lacks the essential qualifications to serve as an expert in this case. Accordingly, Hilton's opinions as to her damages methodology should be excluded. *See, e.g., Nutall v. Reserve Marine Terminals*, 2016 U.S. Dist. LEXIS 83541, at *5-6 n.7 (N.D. Ill. Oct. 31, 2017) (granting motion to exclude testimony by any additional, undisclosed, unnamed expert witness).

### 2. Hilton's Opinions Should Be Excluded Because Her Methodology Is Not Reliable and Will Not Be Helpful to the Trier of Fact

Even if a proffered expert is qualified, a court cannot admit expert testimony unless the opinions are reliable. *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021). "Even '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Kirk*, 991 F.3d at 873 (quoting *Smith v. Ford*, 215 F.3d 713, 718 (7th Cir. 2000)).

A court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 809 (7th Cir. 2022) (internal citations and quotation marks omitted). A proposed expert must "bridge the analytical gap by showing a rational connection between the data and the expert's contested conclusion." *Id.* (internal citations and quotation marks omitted). To assess reliability, a court may consider multiple factors, including (1) whether the particular scientific theory has been, or could be, tested; (2) whether the theory has been the subject of peer review or publication; (3) the potential or known rate of error; and (4) whether the relevant expert community has generally accepted the theory. *Kirk*, 991 F.3d at 873. Further, "the correct inquiry focuses not on

'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Id.* (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)).

Hilton's methodology does not satisfy these factors. Hilton failed to align her methodology to the facts relevant here, and she did not even test her entire methodology to see if it would work on any data sets besides the Named Plaintiffs' data. As a result, Hilton does not know whether her methodology will work across larger data sets and what complexities may arise. **Ex. D: (**Expert Report of Jed Smith) ("Smith Report") ¶¶ 15, 110; **Ex. C:** Hilton Dep. at 109:2-19 (stating that she did not run her whole methodology over the larger data set produced in this matter).

### a. Hilton Fails To Account For Industry Reimbursement Practices

Hilton's simplified methodology ignores the complex set of payment steps that actually occurs with each pharmacy transaction between TPPs, PBMs, pharmacies, and individual consumers. **Ex. B:** Hughes Report ¶¶ 22-71 and Figure 1. She reviews each transaction individually, without reference to any of a consumer's other transactions, when, in fact, as Walgreens' expert, James Hughes, Ph.D., explains, the amount a *consumer* pays for each transaction depends on a comprehensive review of *all of an individual consumer's prior transactions*—including at other pharmacies—not just the individual transaction at issue. **Ex. B:** Hughes Report ¶¶ 93-106. This is because the amount a consumer pays at the register is based on various factors, such as the individual's deductible, how the PBM calculates the individual's copayment or coinsurance amount, and any out-of-pocket maximums that may apply. *Id.* ¶¶ 38-47. For example, if a consumer overpays for a prescription in one month, that overpayment could result in the consumer meeting his deductible sooner, and paying nothing for prescriptions sooner. *Id.* ¶¶ 45, 93-106. Similarly, someone with an out-of-pocket maximum who paid more than they would have on a few transactions may still have met their out-of-pocket maximum and paid the

9

same overall amount in the plan year, thus leaving them with no damages. *Id.* ¶¶ 45-46, 93-106. By failing to recognize the complicated nature of pharmacy reimbursement with respect to the calculations underlying a consumer's payment, Hilton's methodology is not reliable. Moreover, her methodology does not bear a rational connection to the facts that will be before the jury.

Similarly, the amount a TPP pays its PBM for a beneficiary's drug purchase is governed by that TPP's contracts with its PBM and is not necessarily the same amount the PBM would pay the pharmacy. The contracts between a TPP and a PBM generally (1) define the reimbursement methodology the TPP uses to compensate the PBM for managing prescription-drug benefits for the TPP's beneficiaries (which may or may not be based on U&C), (**Ex. B:** Hughes Report ¶¶ 13, 31, 50-55, 147, 149; **Ex. A:** Jacobs Report ¶¶ 20, 87-88); (2) provide information regarding the TPP's plan design; and (3) provide information regarding back-end reconciliation provisions (e.g., generic effective rate guarantees). **Ex. B:** Hughes Report ¶ 57. Other documents, which would need to be obtained through additional discovery will contain information about whether a TPP has other back-end payment sources, such as stop-loss insurance (which protects the TPP against high medical/prescription drug costs). *See* **Ex. B:** Hughes Report ¶¶ 60-62. Not only does Hilton fail to consider any of this information, but she is also largely unfamiliar with these concepts. Indeed, Hilton admitted that she does not understand how a TPP pays a PBM.[6] Yet this information is necessary to determine what the TPP would have paid—and whether there has been an

---

[6] **Ex. C:** Hilton Dep. at 70:24-71:2 ("Q: Do you know . . . the difference between a self-funded plan and a wholly insured plan? A: I have a vague understanding."); 74:20-22, 75:2-21 (Q: Do you know the terms "spread pricing" and "pass-through pricing"? A: I have heard those terms, yes. . . . Q: The TPP . . . pays the PBM according to the contract the TPP has with the PBM , correct? . . . THE WITNESS: It's my understanding that the TPP pays the PBM based on whatever the PBM says that the TPP owes. . . . A: and how does the PBM know how much to charge the TPP? . . . THE WITNESS: So that's not something I have formed an opinion about. It's not something that's in my report. . . . . Q: I'm asking if it's something you know. A: If it's something I know? I don't know.").

overpayment—in a single drug transaction. *Id.* ¶¶ 28, 51-55, 101-109, 139-167. Hilton's failure to account for all of the components of pharmacy reimbursement, something more fully described in the expert reports of Walgreens' experts Hughes and Smith, (**Ex. B:** Hughes Report ¶¶ 91-178; **Ex. D:** Smith Report ¶¶ 28-39, 70-109), results in a methodology that does not provide a "rational connection" between what potential class members (consumers and TPPs) *would have paid if Walgreens had reported its PSC prices as U&C* and what Hilton *calculates their damages* to be, leading to an unreliable methodology. *See Downing*, 48 F.4th at 809.

### b. Hilton's Methodology Has Not Been Tested As Workable

Hilton's proposed methodology is also unreliable because she did not test it to determine if it is actually workable on a classwide basis. Although Hilton provided examples of transactions from the Named Plaintiffs as support for her damages methodology, (Dkt. 556-55, Ex. A; **Ex. D:** Smith Report ¶¶ 58, 113-114), she did not test her methodology over the available, larger data set produced by Walgreens that includes complexities absent from her hand-selected examples.[7] **Ex. D:** Smith Report ¶¶ 15, 110; **Ex. C:** Hilton Dep. at 109:14-19. For example, larger data sets typically will present issues with identifying the correct TPP that was allegedly damaged and the amount of the consumer share of the transaction, including whether the consumer paid a deductible, copay, or coinsurance. **Ex. D:** Smith Report at ¶¶ 15, 78-98, 110. Hilton has not addressed these issues.

---

[7] Plaintiffs asked for and the parties negotiated the production of a data sample consisting of all transactions in calendar year 2015 in Connecticut, Illinois, New York, Ohio, Pennsylvania, and Wisconsin for all persons who purchased at least one generic drug during 2015. Hilton used this data only to see the types of information and fields that might be in that data, and did not test her entire methodology on it. *See* **Ex. C:** Hilton Dep. at 107:9-12 ("Q: What queries did you run on the 2015 data? A: . . . [S]itting here today, I cannot give you a list of all the queries I ran on the 2015 data.); 109:2-10 (Q: Dr. Hilton, using the 2015 sample data, did you attempt to identify any transactions that would be considered in the class, according to the proposed definition? A: I guess, are you asking if I ran my whole methodology to determine class members? Q: Let's start there. Did you run your whole methodology over the 2015 sample data? A: No.")

### c. Hilton's Vague Methodology Will Not Help The Trier Of Fact

Hilton readily admitted that her methodology is imprecise. When asked if Defendants could use her methodology as "a road map" for potential damages, Hilton responded, "I don't know if I would call it a road map, but I do list that as a possible way to do it." **Ex. C:** Hilton Dep. at 329:15-21 (referring to how to identify a PBM for a particular transaction); *see also* **Ex. C:** Hilton Dep. at 99:6-18 (giving only an example of options one could use to identify class members because she "didn't think [she] needed to really list every single option"). But because of the omissions described above, Hilton's methodology would not help a trier of fact.

For example, instead of showing the actual basis for how her methodology can be used to determine *classwide* damages, Hilton included in her report only illustrative examples from the Named Plaintiffs that she hand-selected by "determin[ing] which ones were the best examples of the methodology . . . [the] cleaner data[.]" **Ex. C:** Hilton Dep. at 317:1-320:8. Hilton did not want to show the "messy data," the data that was non-standard, the data that was less "populated." *Id.* at 320:6-321:4. But Plaintiffs have offered Hilton as an expert for the sole purpose of showing the Court that there is a formulaic methodology Plaintiffs can use to identify class members and calculate *classwide* damages. Developing a sound methodology to calculate damages on a classwide basis necessitates testing that methodology on a data set that would approximate the same types of unknowns that will be found within the classwide data.

By ignoring the "messy" parts of the data, which would require individualized inquiry, and not testing her methodology on a larger data set, Hilton's opinion is unreliable and would not be helpful to the trier of fact.

          **d.**      **Hilton Relies On Unsupportable Assumptions, With No Rational Connection Between The Data And Her Conclusions**

In addition, Hilton's damages methodology is unreliable because she does not provide a basis for two main assumptions that are necessary to form her expert opinions: (1) how to identify whether a TPP reimbursed a PBM based on a lesser-of logic that includes the U&C price; and (2) how to determine whether individual consumers pay a copayment or co-insurance. Indeed, the assumptions Hilton makes do not have a rational connection between the data and her conclusions. *See Downing*, 48 F.4th at 809 (holding an expert's "opinions were properly excluded" because they were not connected to the data in her report).

First, Hilton assumes—without any support—that all TPPs reimburse the Relevant PBMs using a lesser-of reimbursement methodology that included U&C as a price point. *See* **Ex. C:** Hilton Dep. at 128:17-129:18; 134:13-136:3; 139:23-141:4 (assuming that the data field on which she relies means that all parties in all phases of a transaction paid according to lesser-of logic). She makes this assumption by looking at ***Walgreens'*** produced data to see if there was at least one transaction in Walgreens' produced data indicating that a Relevant PBM reimbursed Walgreens in that manner. What Hilton does not recognize—and in fact, gets wrong—is that the data field on which she relies for this assumption does not indicate how the ***TPP reimburses the PBM***, but instead indicates ***how the PBM reimburses Walgreens***. *See* **Ex. D:** Smith Report ¶¶ 18-19 ("The Walgreens [data] relates to payments between the PBM and Walgreens and does not reflect the payment terms between the PBM and the TPP."). Further, Hilton's methodology, which relies on the assumption that how one PBM for one TPP reimburses Walgreens must apply to all TPPs for which the particular PBM adjudicates claims, has no basis. *See* **Ex. C:** Hilton Dep. at 146:17-148:12 (assuming that, if data shows that one transaction for a PBM indicates U&C was part of its reimbursement determination, all TPPs for which that PBM administers claims pay based on

13

lesser-of logic that includes U&C); *see* **Ex. D:** Smith Report ¶¶ 18-19 ("I have not seen any information in the data produced in this matter that indicates for any given transaction whether that drug was reimbursed by the TPP on a basis of the U&C price. Even within a single plan, certain drugs can be adjudicated using lesser-of logic while others are not[.]").

Hilton's methodology would never be accepted in the general pharmacy industry because it ignores the fact that, between 2007 and the present, a PBM would have had contracts with hundreds or thousands of TPPs, and each of those contracts can set forth different reimbursement methodologies and/or definitions of U&C, if U&C is a part of the reimbursement methodology at all. **Ex. A:** Jacobs Report ¶ 87-88; **Ex. B:** Hughes Report ¶ 149. In fact, the contracts at issue here disprove the assumption that a PBM charges every TPP with which it contracts according to lesser-of logic. For example, ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ *See* Walgreens' Opp'n to Mem. at 28; *see also* **Ex. B:** Hughes Report ¶ 148. Hilton's methodology to identify TPP class members who have transactions "where the [U&C] price was a basis for the amount paid" is unsupported by the record and by industry understanding, and is thus unreliable.

Second, Hilton's assumption that she can determine whether a consumer's payment responsibility takes the form of a copay or coinsurance solely by reference to the data is unsupported and unsupportable. This is a critical part of Hilton's methodology. She knows she needs to be able to tell the difference between a transaction where a consumer pays a copay and one where a consumer pays coinsurance. *See* **Ex. B:** Hughes Report ¶ 44 (explaining coinsurance). In fact, she uses different formulas to calculate damages where a consumer is required to pay a copay and where a consumer is required to pay coinsurance. **Ex. C:** Hilton Report ¶¶ 24-25. But Hilton's proposed methodology would yield numerous errors in making this determination. **Ex. B:**

Hughes Report ¶ 116-121, 123 (stating that Hilton's 90% threshold for determining whether a consumer's payment was based on a copayment or coinsurance is arbitrary, and that consumer payments are based on factors other than just coinsurance and copay, and can instead reflect a mix of payment terms); **Ex. D:** Smith Report ¶¶ 72-75 (demonstrating lack of basis in data for Hilton's 90% threshold). Whether a consumer's plan has a copay or coinsurance cannot accurately be determined from looking at the data by itself. This information can only be determined by reviewing a consumer's plan design, which Hilton did not do. **Ex. B:** Hughes Report ¶¶ 16, 119.

And these are not the only two areas where Hilton's methodology is unworkable. She also fails to account for (1) other patient responsibility metrics, including deductibles, out-of-pocket-maximums, and coverage stages for Medicare Part D; (2) differences in the metrics a TPP uses to reimburse a PBM and those a PBM uses to reimburse a pharmacy; (3) post-adjudication true-ups in applicable contracts; and (4) third-party insurance to cover TPP's losses. *See* **Ex. B:** Hughes Report ¶¶ 14-15, 38-55, 57-61, 63, 92-106, 122, 124-138, 157-167; **Ex. D:** Smith Report ¶¶ 28-31, 40-41, 78-98, 101-109, App'x B ¶¶ 5-8. Because Hilton's methodology does not have a rational connection between the data and her conclusions, her opinion should be excluded.

V.   **CONCLUSION**

Because Hilton's report does not satisfy Rule 702's requirements, the Court should exclude Hilton's report in its entirety, and Plaintiffs should be precluded from relying on her testimony.

DATED: March 17, 2023

          *s/ Michael S. Leib*
          Michael Scott Leib
          Anthony Robert Todd
          **REED SMITH LLP**
          10 S Wacker Dr # 4000
          Chicago, IL 60606
          Telephone: 312/207-1000
          mleib@reedsmith.com
          atodd@reedsmith.com

        Frederick Robinson (*pro hac vice*)
        Selina Coleman (*pro hac vice*)
        Megan Engel (*pro hac vice*)
        Jessica Christensen (*pro hac vice*)
        **REED SMITH LLP**
        1301 K Street, N.W.
        Suite 1100 East Tower
        Washington, DC 20005
        Telephone: 202-414-9200
        *frobinson@reedsmith.com*
        *scoleman@reedsmith.com*
        *mengel@reedsmith.com*
        *jchristensen@reedsmith.com*

        ***Attorneys for Defendant Walgreen Co.***

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of March, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*s/ Michael S. Leib*
Michael S. Leib