# EXHIBIT C

# *REDACTED*

Page 1

1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4
5    CYNTHIA RUSSO, LISA BULLARD,        )
     RICARDO GONZALES, INTERNATIONAL     )
6    BROTHERHOOD OF ELECTRICAL WORKERS   )
     LOCAL 38 HEALTH AND WELFARE FUND,   )
7    INTERNATIONAL UNION OF OPERATING    )
     ENGINEERS LOCAL 295-295C WELFARE    )
8    FUND, AND STEAMFITTERS FUND LOCAL   )
     439, on Behalf of Themselves and    )
9    All Others Similarly Situated,      )
                                         )
10                  Plaintiffs,          )
                                         )
11                    vs.                )Case No.
                                         )17-cv-2246
12   WALGREEN CO.,                       )
                                         )
13                  Defendant.           )
     _____)
14
15
16         VIDEO-RECORDED REMOTE DEPOSITION OF
17                LYNETTE HILTON, Ph.D.
18              Tuesday, January 17, 2023
19                     Volume I
20
21     *** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***
22   Reported by:
     CARLA SOARES
23   CSR No. 5908
24   Job No. 5645367
25   Pages 1 - 347

Page 2

1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF ILLINOIS
3                EASTERN DIVISION
4

5   CYNTHIA RUSSO, LISA BULLARD,        )
    RICARDO GONZALES, INTERNATIONAL     )
6   BROTHERHOOD OF ELECTRICAL WORKERS   )
    LOCAL 38 HEALTH AND WELFARE FUND,   )
7   INTERNATIONAL UNION OF OPERATING    )
    ENGINEERS LOCAL 295-295C WELFARE    )
8   FUND, AND STEAMFITTERS FUND LOCAL   )
    439, on Behalf of Themselves and    )
9   All Others Similarly Situated,      )
                                        )
10                 Plaintiffs,          )
                                        )
11                  vs.                 )Case No.
                                        )17-cv-2246
12  WALGREEN CO.,                       )
                                        )
13                 Defendant.           )
    _____)
14

15

16          VIDEO-RECORDED REMOTE DEPOSITION OF
17  LYNETTE HILTON, Ph.D., Volume I, taken on behalf of
18  Defendants, beginning at 9:07 a.m., and ending at
19  7:29 p.m., on Tuesday, January 17, 2023, before
20  CARLA SOARES, Certified Shorthand Reporter No. 5908.
21

22

23

24

25

Page 70

```
 1    provided through these relevant PBMs?              17:20:59

 2           I think you said employers were one,

 3    correct?

 4           MR. ALEXANDER:  Objection to form.

 5           THE WITNESS:  I said if they weren't       17:21:02

 6    specifically excluded, then they would be included.

 7    But unions would be another entity, or -- for

 8    example, the fund plaintiffs.

 9    BY MR. LEIB:

10       Q   Union funds, correct?                      17:21:06

11       A   Exactly.

12       Q   Third-party administrators, would they be

13    included?

14       A   As long as they're not excluded below.

15           MR. ALEXANDER:  Objection to form.         17:21:09

16           THE WITNESS:  Sorry, Carey.

17           MR. ALEXANDER:  That's okay.

18    BY MR. LEIB:

19       Q   And HMOs?

20           MR. ALEXANDER:  Same objection.            17:21:11

21           THE WITNESS:  As long as they're not

22    excluded below.

23    BY MR. LEIB:

24       Q   Do you know -- do you know the difference

25    between a self-funded plan and a wholly insured    17:21:13
```

```
                                                    Page 71
 1   plan?                                        17:21:15

 2        A   I have a vague understanding.

 3        Q   Do you have an understanding whether

 4   wholly insured plans would be included within the

 5   definition?                                  17:21:17

 6           MR. ALEXANDER:  Objection to form.

 7           THE WITNESS:  It's my understanding, as

 8   long as they're not excluded in the exclusions

 9   below, that they would be included.

10           MR. LEIB:  Let's look at            17:21:20

11   Dr. Schafermeyer's report.  Have we put that into

12   evidence yet?  I don't believe so.  So Tab K, 519.

13   Exhibit 519.

14           (Exhibit 519 was marked for identification

15        and is attached hereto.)               17:21:24

16           MR. WOROBIJ:  Exhibit 519 marked.

17   BY MR. LEIB:

18        Q   I want to point you to page 2 -- and we

19   can put that on the screen -- of the report.

20           Can we share that on the screen, John?  17:21:27

21   There we go.

22           Do you see that Footnote 2 on page 2?  At

23   the bottom of the page, Footnote 2?  Tell me when

24   you're there.

25        A   I'm there.                          17:21:31
```

Page 74

```
 1   generic prescription drugs from Walgreens?          17:22:12

 2          MR. ALEXANDER:  Objection to form.

 3          THE WITNESS:  For example, the PBM could

 4   pay Walgreens for a prescription, and the TPP would

 5   reimburse the PBM for that amount.                   17:22:15

 6   BY MR. LEIB:

 7      Q   Is that a real-world situation that

 8   occurs?

 9          MR. ALEXANDER:  Objection to form.

10          THE WITNESS:  It is my understanding that    17:22:18

11   that can occur, yes.

12   BY MR. LEIB:

13      Q   In what situations can that occur?

14          MR. ALEXANDER:  Objection to form.

15   Objection to scope.                                  17:22:21

16          THE WITNESS:  The example that I just gave

17   where a PBM would be paying the pharmacy, and then

18   the TPP would be paying the PBM.

19   BY MR. LEIB:

20      Q   Do you know the terms "spread pricing" and   17:22:24

21   "pass-through pricing"?

22      A   I have heard those terms, yes.

23      Q   Are you referring -- in your example, are

24   you referring to one of those situations?

25      A   I wasn't intending to.  I suppose that       17:22:28
```

Page 75

```
 1    that could arise in that situation.                  17:22:29

 2        Q    The TPP -- and we'll get to this a little

 3    bit later, I think, in more detail -- but the TPP

 4    pays the PBM according to the contract the TPP has

 5    with the PBM, correct?                               17:22:34

 6             MR. ALEXANDER:  Objection to form.

 7    Objection to scope.

 8             THE WITNESS:  It's my understanding that

 9    the TPP pays the PBM based on whatever the PBM says

10    that the TPP owes.                                   17:22:37

11    BY MR. LEIB:

12        Q    And how does the PBM know how much to

13    charge the TPP?

14             MR. ALEXANDER:  Objection to form.

15    Objection to scope.                                  17:22:40

16             THE WITNESS:  So that's not something I

17    have formed an opinion about.  It's not something

18    that's in my report.

19    BY MR. LEIB:

20        Q    I'm asking if it's something you know.      17:22:42

21        A    If it's something I know?  I don't know.

22        Q    Do you know how the PBM -- well, we'll get

23    to that in a second.

24             Are there any other examples you can think

25    of of a person or entity who reimbursed, in whole or 17:22:46
```

Page 99

1    you say "For example, restricting the plan type to          17:30:48

2    'Commercial,'" the other two types that you -- it is

3    really an example, because you also rely on union

4    and Medicare Part D, correct?

5         A    Correct.                                           17:30:53

6         Q    But you don't put in your report that

7    you're relying on union and Medicare Part D values,

8    correct?

9         A    No, that -- yeah.  That sentence is not in

10   here.                                                        17:30:57

11        Q    Why didn't you include that in the report?

12        A    I guess I was just providing an example

13   that that particular variable is pretty

14   straightforward.  And as the Dymon declaration

15   states, the values that are in the data are kind of         17:31:00

16   the common, everyday understanding of what the --

17   what those words mean.  So I didn't think I needed

18   to really list every single option.

19        Q    But based on looking at your report alone

20   and the Dymon -- strike that.                                17:31:06

21             Based on looking at your report and the

22   Dymon declaration, I could not know what you used as

23   values in the field "plan type" to figure out what

24   transactions to include, correct?

25        A    I'm sorry.  Based on my report and the             17:31:11

Page 107

```
 1        Q    We're unaware of any queries having been        17:33:29
 2   produced relating to the 2015 data.  And you
 3   produced those?
 4             MR. ALEXANDER:  Counsel, it's something we
 5   can take under advisement.  I don't believe the        17:33:32
 6   witness is in a position to respond to that
 7   otherwise.
 8   BY MR. LEIB:
 9        Q    What queries did you run on the 2015 data?
10        A    That's -- sitting here today, I cannot        17:33:35
11   give you a list of all the queries I ran on the 2015
12   data.
13             As we go through the report, I might be
14   able to tell you certain things that I've looked at
15   using the 2015 data.  But sitting here right now --        17:33:40
16   I've been working on this case for a while.  I ran
17   quite a few tests.
18        Q    You said you -- you ran queries -- you ran
19   queries on it.  You said you used it to test certain
20   queries.        17:33:46
21             What do you mean by "test certain
22   queries"?
23        A    I used it to look at the variables that
24   would be available in Walgreens' data.
25             For example, we were just talking about        17:33:50
```

```
                                                    Page 109
 1        A   No, I'm finished now.  Thank you.        17:34:15

 2        Q   Dr. Hilton, using the 2015 sample data,

 3   did you attempt to identify any transactions that

 4   would be considered in the class, according to the

 5   proposed definition?                              17:34:19

 6        A   I guess, are you asking if I ran my whole

 7   methodology to determine class members?

 8        Q   Let's start there.  Did you run your whole

 9   methodology over the 2015 sample data?

10        A   No.                                      17:34:23

11            MR. ALEXANDER:  Objection to form.

12            THE WITNESS:  Sorry.

13   BY MR. LEIB:

14        Q   Did you run your whole -- did you run your

15   whole methodology over the -- in a query over the  17:34:25

16   2015 sample data to determine who would be in the

17   class under the proposed definition?

18            MR. ALEXANDER:  Objection to form.

19            THE WITNESS:  No.

20   BY MR. LEIB:                                       17:34:29

21        Q   Did you run any part of your methodology

22   in a query over the 2015 sample data to identify

23   transactions that would be considered in the class?

24            MR. ALEXANDER:  Objection to form.

25            THE WITNESS:  I guess I'm not sure how to  17:34:32
```

Page 128

```
 1    transaction in the Walgreens data and what the TPP      17:40:40

 2    paid.

 3         Q    What the TPP paid to whom?

 4         A    To the PBM.

 5         Q    And to make sure a Medicare Part D            17:40:43

 6    beneficiary is included, do you know what fields you

 7    would need in the data that was produced by the

 8    relevant PBMs?

 9         A    If the -- yeah.  I don't know what --

10    again, what the field would be called.                 17:40:47

11         But if they have fields that identify

12    whether it was federally funded, whether it was

13    Medicaid, Medicare, Medicare Part D, so that sort of

14    information would -- the PBMs would have.

15         Also, that's in Walgreens' data.  But the         17:40:52

16    PBMs should have that data as well.

17         Q    Paragraph 63, you refer to the data field

18    ███████████████████████████████████████

19         Do you see that?

20         A    Yes.                                          17:40:56

21         Q    And that field that you're referring to is

22    a field in Walgreens' data.

23         Do you see that?

24         A    Yes.

25         Q    And you say that it's a way to determine,     17:40:58
```

Page 129

1    quote, "whether the adjudicating PBM used U&C prices    17:40:59

2    in the adjudication process."

3              Do you see that?

4         A    Yes.

5         Q    Do you agree that the value in the ██████    17:41:02

6    ████████████████████████████████ field in the

7    Walgreens data is the value returned by the PBM

8    adjudicating the transaction?

9         A    I believe that's right.  Yes.  Yes.

10        Q    That is not a value determined by          17:41:06

11   Walgreens, correct?

12        A    Yes.

13        Q    Do you agree that all this field indicates

14   is ███████████████████████████████████████████

15   ████████████████████████████████?                 17:41:09

16             MR. ALEXANDER:  Objection to form.

17             THE WITNESS:  It indicates that the U&C

18   was used to adjudicate that particular transaction.

19   BY MR. LEIB:

20        Q    Well, "used to adjudicate that particular    17:41:13

21   transaction" could mean many things.  It could mean

22   it was used to tell how much the consumer should pay

23   Walgreens, correct?  That's one thing adjudication

24   is.

25             MR. ALEXANDER:  Objection to form.          17:41:18

Page 134

```
 1    Objection to scope.                                17:42:25

 2           THE WITNESS:  Yes.  I don't know what goes

 3    into determining what those ultimate prices will be.

 4    BY MR. LEIB:

 5       Q   And you don't know how the pharmacy         17:42:27

 6    benefit manager determines how much to charge the

 7    TPP for that transaction, correct?

 8           MR. ALEXANDER:  Same objection.

 9           THE WITNESS:  That's right.  I don't know

10    all the factors that go into determining what the   17:42:30

11    ultimate --

12    BY MR. LEIB:

13       Q   So getting back to the question, in

14    paragraph 63, you talk about ████████████████

15    ████████████████████████████████████████            17:42:34

16    ██████

17           What is your understanding that ████████

18    ████████████████████████ field reflects?  And

19    feel free to refer to Figure 1.

20       A   My understanding is that it reflects        17:42:38

21    transactions -- ████████████████████ it's the

22    transaction ██████████████████████████████████

23    ████████████████████  ██████████████████████

24    ██████

25       Q   That's "lower of" logic, sometimes called   17:42:42
```

                                                      Page 135

 1    "lesser of" logic, correct?                       17:42:43

 2        A    That's right.

 3        Q    And "lower of" logic is just, if there's

 4    multiple different variables for how a drug might be

 5    priced, it's priced by the lowest of those         17:42:47

 6    variables, correct?

 7        A    Correct.

 8        Q    Do you know who "lower of" logic is

 9    applied to in the adjudication process?

10             In other words, going back to Figure 1, is  17:42:51

11    it applied to how much the TPP pays the PBM, how

12    much the PBM pays Walgreens, or how much the

13    consumers pays Walgreens, or all three?  What is

14    your understanding?

15             MR. ALEXANDER:  Objection to form.        17:42:56

16    Objection to scope.

17             THE WITNESS:  I don't have an

18    understanding of that.

19    BY MR. LEIB:

20        Q    Do you have an understanding of, when     17:42:57

21    ██████████████████████████████████████████████

22    ██████████████████████████████████████  whether

23    that means that the consumer paid Walgreens, with

24    U&C being a consideration in that payment?

25        A    I guess I would say that a transaction    17:43:02

Page 136

```
 1    being adjudicated with U&C, my assumption is it          17:43:02

 2    would apply to the whole transaction.  But that's

 3    really a liability question or issue.

 4        Q   Is it a liability issue?  If it's in your

 5    report and it's a basis for how you -- your              17:43:07

 6    methodology was created, isn't it more than just a

 7    liability issue?  Isn't it an issue for class

 8    determination, who's in the class, and damages?

 9            MR. ALEXANDER:  Objection to form.

10    Argumentative.                                           17:43:11

11            MR. LEIB:  I'm not arguing with the

12    witness.  I'm just asking the witness her

13    understanding.

14            MR. ALEXANDER:  Same objection.

15            THE WITNESS:  My understanding is that           17:43:14

16    that field, as I said earlier, indicates that U&C

17    was used to adjudicate that claim using the "lesser

18    of" logic.

19            The assumption is that would apply, you

20    know, to the whole claim.  Like I said, I think         17:43:18

21    that's a liability issue.  I was asked to assume

22    liability.

23    BY MR. LEIB:

24        Q   Well, if it's a liability issue, why did

25    you include it in your report?                           17:43:22
```

Page 139

```
 1    report, is "where the usual and customary price was        17:43:53

 2    a basis for the amount paid or reimbursed in

 3    connection with the purchase of such drug," correct?

 4          A   Yes.

 5          Q   And that's the part of the definition that       17:43:56

 6    you are attempting to discuss here in paragraph 63,

 7    correct?

 8          A   Yes.

 9          Q   And this is in a section that's

10    Appendix B, identifying class members, correct?           17:43:59

11          A   I believe so.  Yes.

12          Q   So if there's a ███████   is it your

13    understanding that that means that the consumer paid

14    according to "lower of" logic, with U&C being one of

15    the considerations in the "lower of" logic?              17:44:04

16              MR. ALEXANDER:  Objection to form.  The

17    witness has now answered this question at least

18    twice.

19    BY MR. LEIB:

20          Q   You can answer.                                 17:44:07

21          A   Can you either restate it, or I can read

22    it off of the realtime?

23          Q   So assuming there's ██████████████

24    ██████████████████████ field in the

25    Walgreens data for a particular transaction, is it        17:44:11
```

```
                                                    Page 140
 1    your understanding that that means that the consumer    17:44:11

 2    paid according to "lower of" logic, with U&C being

 3    one of the considerations in the "lower of" logic?

 4            MR. ALEXANDER:  Same objection.

 5            THE WITNESS:  I would say yes, that's my    17:44:16

 6    assumption.

 7    BY MR. LEIB:

 8        Q    And assuming that there's a███████████

 9    ████████████████████████████████ field in the

10    Walgreens data for a particular transaction, is it    17:44:19

11    your understanding that that means that the PBM paid

12    Walgreens according to "lower of" logic, with U&C

13    being one of the considerations in the "lower of"

14    logic?

15            MR. ALEXANDER:  Same objections.    17:44:23

16            THE WITNESS:  Again, that's -- that's my

17    assumption based on the fact that I was asked to

18    assume liability.

19    BY MR. LEIB:

20        Q    And assuming there's ███████████    17:44:26

21    ████████████████████████████████ field in the

22    Walgreens data for a particular transaction, is it

23    your understanding that that means that the TPP paid

24    the PBM according to "lower of" logic, with U&C

25    being one of the considerations in the "lower of"    17:44:31
```

```
                                              Page 141
 1    logic?                                   17:44:31

 2            MR. ALEXANDER:  Same objection.

 3            THE WITNESS:  That's my assumption based

 4    on assuming liability.

 5            MR. LEIB:  We can take the lunch break.    17:44:33

 6            How long would you like for lunch,

 7    Dr. Hilton?

 8            MR. ALEXANDER:  I'll defer to Dr. Hilton.

 9            Do you need 30, 45 minutes?

10            MR. LEIB:  That's what I'm asking.      17:44:36

11            MR. ALEXANDER:  Which one would you

12    prefer?

13            THE WITNESS:  I'm sorry.  What were the

14    options?  30 or 45?

15            MR. LEIB:  30 or 45 would be normal      17:44:39

16    options.  Anything in between is also fine.

17    Whatever you want.

18            THE WITNESS:  Why don't we say -- I don't

19    know -- 45.  Is that --

20            MR. LEIB:  45.  We'll come back on the    17:44:42

21    record at 12:25 [sic] p.m.

22            THE WITNESS:  Okay.

23            THE VIDEO OPERATOR:  Off the record,

24    12:41 p.m.

25            (Recess, 12:41 p.m. - 1:28 p.m.)        17:44:45
```

Page 146

1    you're saying all you need is the Walgreens data.        17:46:02

2    And for the TPPs, you're saying you need both the

3    Walgreens and the -- and the fund -- and the PBM

4    data, correct?

5         A    Yes.                                           17:46:06

6         Q    And so in both cases, you need Walgreens'

7    data?

8         A    Yes.

9         Q    And if that transaction doesn't have ██

10   ███████████████████████████████████████████           17:46:08

11   field in the Walgreens data, do you exclude that

12   transaction?

13             MR. ALEXANDER:  Objection to form.

14             THE WITNESS:  No.

15   BY MR. LEIB:                                             17:46:11

16        Q    Why not?

17        A    What I have done is I have determined,

18   using the 2015 sample, whether -- based on the bin

19   number, whether a particular PBM has ever

20   adjudicated the claim using a -- ███████████ has       17:46:15

21   adjudicated a claim based on U&C in the 2015 sample.

22             If they have, then I include all of that

23   PBM's information in my -- or transaction in my

24   analysis.

25        Q    The ██████ is in Walgreens' data, correct?   17:46:20

Page 147

```
 1       A    Yes.                                  17:46:21

 2       Q    It's returned by the PBM, but it's found

 3   in the Walgreens data?

 4       A    This particular variable we're talking

 5   about, yes.                                    17:46:24

 6            PBMs will also have an indicator for

 7   whether they adjudicated the claim based on U&C.

 8   But this particular variable we're talking about,

 9   yes, it's in the Walgreens data.

10       Q    So which data do you look at to determine   17:46:28

11   if a transaction -- let's just take consumers.

12            For consumers, I thought you just said you

13   only look at the Walgreens data.

14       A    That's right.

15       Q    So if there's not ███████ in the         17:46:32

16   transaction, would you exclude it?

17       A    No.

18            MR. ALEXANDER:  Objection to form.

19   BY MR. LEIB:

20       Q    Why not?                               17:46:34

21       A    So as I explained a minute ago, what I'm

22   doing is, if a given bin is associated -- bin number

23   is associated with ███████ any time in the

24   2015 sample in the Walgreens data, then the

25   assumption is that all of its plans use U&C to       17:46:40
```

Page 148

```
 1    adjudicate claims as one of the potential in the      17:46:41
 2    "lower of" logic.
 3         Q   If you find -- let me see if I understand
 4    this correctly, Dr. Hilton.
 5             If you find ██████████████████             17:46:44
 6    transaction for a consumer, you're assuming all
 7    ████████ transactions use "lower of" logic, with U&C
 8    as a consideration in the "lower of" logic
 9    determination?
10         A   Your question was if I find it in one        17:46:49
11    transaction?
12         Q   Yeah.
13         A   Yeah.  That's the assumption, although
14    it's a mischaracterization of the data given that
15    there are thousands of observations with ██████      17:46:52
16             But yes, that's the basic idea.
17         Q   I'm just trying to understand because of
18    what you said.
19             So how do you -- you make a determination
20    based on looking at the data whether to apply --      17:46:57
21    whether ████████ applies "lesser of" logic for all
22    of the plans that they contract with, correct?
23         A   I'm sorry.  I lost you on part of that
24    question.  Do you mind repeating it?
25         Q   Sure.                                        17:47:02
```

```
                                                      Page 233

 1   BY MR. LEIB:                              18:14:15

 2       Q   Do you recognize this query?

 3           MR. ALEXANDER:  I'm sorry, Counsel.  I

 4   don't have it up yet.  If you could just wait one

 5   moment.                                   18:14:18

 6           Okay.  Please proceed.

 7           MR. LEIB:  Just to be clear for the

 8   record, the highlighting is ours.

 9           THE WITNESS:  Okay.  I'm sorry.  Yes, I've

10   reviewed it.                             18:14:22

11   BY MR. LEIB:

12       Q   What does this query reflect?

13       A   Are you referring to a specific line in

14   the code or just generally what this code is doing?

15       Q   Generally, what is this code doing?     18:14:26

16       A   I'm not familiar with the ████████

17   coding, but basically this is -- it looks like it's

18   combining ████████████████████████████████████████

19   ██████████████████  into an index.  But other than that,

20   I can't tell you what the exact code is doing.    18:14:31

21       Q   Did you work on this query?

22       A   What do you mean by "work on"?

23       Q   Well, your staff worked on the query,

24   correct?

25       A   That's right.                    18:14:36
```

Page 234

1      Q    Did you -- and they did so at your          18:14:36

2   instruction, correct?

3      A    Yes.

4      Q    Did you review the query before it was

5   produced to us?                                     18:14:38

6      A    No.  It's not my practice to review the

7   code.

8      Q    So do you understand that this code

9   relates to finding a PSC price?

10      A    No, other than I see it's reading in PSC   18:14:41

11   data.

12      Q    So the queries that you produced to us or

13   that we received from counsel, you've never reviewed

14   those before?

15          MR. ALEXANDER:  Objection to form.          18:14:45

16          THE WITNESS:  I wouldn't say I've never

17   reviewed them.  I've looked briefly at some code.

18          The rest, I asked my staff explain to me

19   what this code is doing.  They'll walk me through

20   it.  Or we just talk about it in words rather       18:14:49

21   than -- I don't look at the code.

22   BY MR. LEIB:

23      Q    Do you have any experience with code

24   yourself?

25      A    I do, but it's very old.                    18:14:52

Page 235

```
 1          Q    So it wouldn't translate.  Like, Fortran      18:14:53

 2     isn't used anymore.  So you wouldn't be able to

 3     create this code; is that correct?

 4               MR. ALEXANDER:  Objection to form.

 5               THE WITNESS:  Yeah.  I did Fortran back --     18:14:57

 6     for my dissertation, back 20-something years ago.

 7     And I also used to code in Saas, but it's been a

 8     long time.

 9     BY MR. LEIB:

10          Q    Are you able to read this code?              18:15:01

11          A    This particular code, no.  Generally I can

12     read code, but like I said, I don't know what the

13     ████████     means here.

14               MR. LEIB:  We can take a break.

15               MR. ALEXANDER:  Okay.  If I can just          18:15:05

16     ask -- this is about a 15-minute break, please.

17               MR. LEIB:  You want a 15-minute break?

18               MR. ALEXANDER:  Yes.  Thank you, Counsel.

19               MR. LEIB:  You want to keep me here late,

20     huh?  You want to make me tired?  No worries.          18:15:09

21               MR. ALEXANDER:  It's already pretty late.

22     We're already down that road, unfortunately.

23               MR. LEIB:  15 minutes.

24               MR. ALEXANDER:  Thank you.

25               THE VIDEO OPERATOR:  Off the                  18:15:13
```

Page 317

```
 1    in paragraph 7 of my report, states that "I was      18:41:57

 2    asked to develop a formulaic methodology that can

 3    identify and calculate overpayments by plaintiffs

 4    and class members as a result of Walgreens' failure

 5    to report or otherwise include PSC prices when        18:42:01

 6    determining the U&C price to report for PSC

 7    generics."

 8            And then there's a second part to that

 9    involving the unjust enrichment.

10            And then I state in my report, "I have        18:42:06

11    developed and present below illustrative

12    calculations."  I state that in paragraph 9.

13    BY MR. LEIB:

14        Q    Why only illustrative?

15            Let me ask you a different question.          18:42:10

16            You have all the data you need to figure

17    out all of the alleged overpayments for the

18    individual named consumer plaintiffs, correct?

19        A    No.

20        Q    According to your methodology, you need       18:42:13

21    Walgreens' data, correct?

22        A    Yes.

23        Q    You need the PSC transactional claims

24    data, correct?

25        A    Yes.                                          18:42:16
```

Page 318

```
 1        Q    You need the ESI formularies, correct?        18:42:17

 2        A    Yes.

 3        Q    You need the Connecticut reconciliation

 4   data, correct?

 5        A    Yes.                                           18:42:19

 6        Q    And those four pieces of information, you

 7   have complete sets of those, correct?

 8        A    No.

 9        Q    You only have it up to 2019, correct?

10        A    That's correct.                               18:42:23

11        Q    Did you figure out all individual consumer

12   plaintiff alleged overpayments up through 2019 -- up

13   until -- I'm sorry -- through 2019?

14             MR. ALEXANDER:  Objection to form.

15             THE WITNESS:  Sorry.  I'm just rereading       18:42:28

16   the question.

17             Did I figure out all -- no.  No.  That

18   wasn't something I was asked to do.  I was just

19   asked to develop a methodology, and I was showing

20   that the methodology worked by providing an           18:42:32

21   illustrative example.

22   BY MR. LEIB:

23        Q    So it looks like you provided at least one

24   example for every state that the person might be a

25   class representative of; is that correct?             18:42:36
```

Page 319

1          A    I believe that was the intent.                18:42:36

2          Q    That was the instruction from counsel,

3    correct?

4          A    Yes.

5          Q    And you believe you have more transactions    18:42:39

6    than these, in which there are overpayments up until

7    and through 2019, that you've identified?

8               MR. ALEXANDER:  Objection to form.

9               THE WITNESS:  Yes, I believe that to be

10   the case.                                                18:42:42

11   BY MR. LEIB:

12         Q    And you don't know whether it was for

13   Ms. Bullard, Mr. Gonzales, or Ms. Russo?

14         A    Sitting here today, I don't know.  I

15   obviously have that information.  I just don't have      18:42:46

16   it memorized.

17         Q    Did you provide that information, all of

18   the alleged overpayments that you know with regard

19   to the individual named consumer plaintiffs, to

20   counsel?                                                 18:42:50

21         A    I believe I did.

22         Q    And who decided which examples would go in

23   your report, you or counsel?

24         A    I believe there was back-and-forth on

25   that.                                                    18:42:54

Page 320

```
 1        Q    Who ultimately made the decision?          18:42:54

 2        A    I believe based on the data that I would

 3   have (inaudible).

 4             THE REPORTER:  I'm sorry.  I didn't hear

 5   you.  "Based on the data that I would have..."?      18:42:56

 6             THE WITNESS:  I would have determined

 7   which ones were the best examples of the

 8   methodology.

 9   BY MR. LEIB:

10        Q    What makes something a good example or a   18:42:57

11   best example?  Because those are the two words you

12   used.

13        A    I would say the data are populated, you

14   know, in the Walgreens data less -- for lack of a

15   better word -- messy, cleaner data, more populated  18:43:02

16   data, that sort of thing.

17        Q    What is messy data?

18        A    Messy data, they are data that -- some of

19   these data are hand-entered, and so there might be a

20   typo.  For example, the NDCs had leading zeros where 18:43:07

21   normally they wouldn't have leading zeroes.  Those

22   sorts of things.

23             It's very common in data of this sort, and

24   it's a common thing to have to go through and

25   standardize those things.                            18:43:12
```

Page 321

```
 1        Q    Clean the data?                        18:43:12

 2        A    Clean the data.

 3        Q    And, in fact, you did that, right?

 4        A    Yes.

 5        Q    Tell me how you cleaned the data.      18:43:15

 6        A    Do you have a particular field in mind or

 7   data in mind that you're asking specifically about?

 8        Q    Let's use the NDC data field.

 9        A    Okay.  So NDCs are generally an 11-digit

10   number.  Very common.  All the pharmaceutical data     18:43:20

11   that I've worked with, manufacturers will leave off

12   certain leading zeros, or sometimes they'll include

13   zeros when there shouldn't be zeros.  Those sorts of

14   things.

15           So that was the basic cleaning that I did     18:43:37

16   on NDC, was to just make those uniform, 11 digits

17   long.

18        Q    How did you do that?

19        A    There are various lines in the code that

20   look for zeros and take them out.  That sort of --     18:43:55

21   it's basically looking at the string of numbers and

22   taking out the first X number of zeros.  That sort

23   of thing.

24        Q    And that's something you accomplished with

25   your queries?                                          18:44:11
```

Page 329

```
 1    is the relevant PBM for this transaction?              18:56:02

 2             MR. ALEXANDER:  Objection to form.  Asked

 3    and answered.  And especially in light of counsel's

 4    tone, argumentative as well.

 5    BY MR. LEIB:                                            18:56:17

 6         Q   You can answer.

 7         A   So again, as I stated, I give several

 8    options for how the data can be used to identify the

 9    PBM.

10             Like I said, there's -- relevant PBMs can     18:56:38

11    turn over data.  I think this is a special case of a

12    relevant PBM turning over data.  That's the

13    Walgreens data that matches the PBM data.  So I

14    believe that that falls under that sentence.

15         Q   You think I can use your report as a road     18:56:55

16    map to figure out how you determined that CastiaRx

17    is the relevant PBM for the Russo transaction?

18             MR. ALEXANDER:  Same objections.

19             THE WITNESS:  I don't know if I would call

20    it a road map, but I do list that as a possible way    18:57:11

21    to do it.

22    BY MR. LEIB:

23         Q   Where do you list it?  What do you say in

24    paragraph 62 that tells me this?

25             MR. ALEXANDER:  Same objections.              18:57:19
```

Page 347

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [x] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: January 23, 2023

23                    *Carla Soares*

24

25                    CARLA SOARES

                      CSR No. 5908