# EXHIBIT D

# *REDACTED*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295c WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, *Plaintiffs,* <br><br> -v.- <br><br> WALGREEN CO., *Defendant.* | Civil No. 1:17-cv-02246 <br><br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan |

---

## Expert Report of Jed Smith

### March 17, 2023

Signed: _____

---

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION AND QUALIFICATIONS | 1 |
| II. | SUMMARY OF SCOPE | 1 |
| III. | SUMMARY OF OPINIONS | 2 |
| IV. | DATA RELIED UPON | 5 |
| V. | BASIS OF OPINIONS | 6 |
| VI. | ADDITIONAL ANALYSES REQUESTED BY COUNSEL | 55 |
| VII. | CONCLUSION | 57 |
| | APPENDIX A – DATA APPENDIX | 58 |
| | APPENDIX B – GLOSSARY OF KEY TERMS FROM HUGHES REPORT | 77 |

## LIST OF ATTACHMENTS

**Attachment 1** – Curriculum Vitae Of Jed Smith

**Attachment 2** – Documents Relied Upon

**Attachment 3** – PSC Membership Fee Data Analysis

**Attachment 4** – Summary of Transactions on HILTON_0000133 With An Incorrect PSC Price

**Attachment 5** – Hilton Exhibit 3A and HILTON_0000132: Revised To Include PSC Membership Fee

**Attachment 6** – Hilton Exhibit 3C: Revised To Include PSC Membership Fee

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I.    INTRODUCTION AND QUALIFICATIONS

1.      My name is Jed Smith. I am a Senior Managing Director with Ankura Consulting, Inc. ("Ankura") and lead the Pharmacy sector of the Healthcare Disputes Forensics Practice. I am a licensed CPA in the State of California, and I have over 15 years of experience calculating damages in healthcare disputes involving pharmacies, Pharmacy Benefit Managers ("PBMs"), payers, and providers. For many of the nation's largest pharmacies, commercial health insurance companies, government contractors for Medicare and TRICARE programs, third party administrators, PBMs, and physician practices, I have managed projects and performed analysis to calculate damages relative to provider agreements, statutory requirements, and/or industry standards. As part of this work, I have analyzed over a billion pharmacy claims records and contributed to dozens of expert reports and privileged damage analyses.

2.      Ankura is a consulting firm with offices located throughout the world. Ankura's work in this matter was performed by me or by those under my supervision. Ankura is being compensated at a rate of $625 per hour for my work on this matter, and at hourly rates ranging from $275 to $550 for my colleagues' work. The compensation to Ankura for my services as well as for those under my supervision is not dependent on the outcome of this matter.

3.      A copy of my curriculum vitae is attached to this report as **Attachment 1.**

## II.    SUMMARY OF SCOPE

4.      Counsel for Walgreen Co. ("Walgreens") has asked me to:

   a.   Evaluate whether class members, under Plaintiffs' proposed class definition, can be identified from data alone;

   b.   Evaluate whether damages can be determined on a class-wide basis or, alternatively, whether individualized inquiry would be required to determine whether any particular member(s) of the proposed class suffered damages;

   c.   Evaluate and respond to the November 16, 2022 Report of Lynette Hilton, Ph.D. ("Hilton Report")[1]; and

   d.   Prepare certain additional analyses related to data Walgreens produced in this litigation.

5.      In this matter, Plaintiffs define their proposed class as follows: (the "Class")

   All persons, or entities, for whom prescription drug insurance benefits were provided through the Relevant PBMs (a.k.a., A&A Services, LLC d/b/a SAV-RX Prescription Services; Caremark, LLC; Castia Rx (f/k/a Leehar Distributors Missouri, LLC); Express Scripts, Inc.; Medco Health Solutions, Inc.; MedImpact Healthcare Systems, Inc.; MedTrak Services, LLC; and/or OptumRx, Inc.), and who paid or reimbursed in whole, or in part, for generic prescription drugs from Walgreen Co. at any point in time from the period January 1, 2007 through the present, in Arizona, California, Connecticut, Delaware, Florida, Illinois, Massachusetts, New York, North Carolina, Ohio, Pennsylvania, and Wisconsin, where the usual and customary price was a basis for the amount paid or reimbursed in connection with the purchase of such drug, and the amount paid or reimbursed was inflated because the Prescription Savings Club price was not reported or otherwise included when determining the usual and customary price to report.

---

[1] Dkt. 556-55 (Expert Report of Lynette Hilton, Ph.D. ("Hilton Report")).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Excluded from the Class are:

a.   Walgreens and its management, employees, subsidiaries, and affiliates;

b.   The Court, members of their immediate families, and judicial staff;

c.   All government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries;

d.   All government-funded entities, and their beneficiaries;

e.   All PBMs and entities that have or had a parent or subsidiary relationship with any PBM at any time since January 1, 2007; and

f.   All individuals and entities, except for the named Plaintiffs, that have sued or initiated formal dispute resolution proceedings against Walgreens relating to its determination of usual and customary prices in connection with the Prescription Savings Club.[2]

6.   Plaintiffs allege harm to potential class members because Walgreens submitted Usual and Customary ("U&C") prices that did not factor in Walgreens' Prescription Savings Club ("PSC") prices.[3,4]

7.   My opinions are based on data, documents, and other information available to me as of the date of this report, including transaction data produced by both Plaintiffs and Walgreens in connection with this matter.[5] A list of the transaction data and documents relied on in developing my opinions is included in **Attachment 2.**[6]

8.   I understand that Walgreens contests as a matter of law and fact whether it was required to submit PSC prices as its U&C prices for all or some prescription drug claims. However, for the purposes of my report, I was not asked to address Plaintiffs' allegation that Walgreens was required to submit its PSC prices as the U&C amount, or at least consider PSC prices as one factor when determining U&C prices.

9.   My analyses are based on the information now available to me. If additional information, data, or documents becomes available, I may evaluate and consider that information. Therefore, I reserve the right to modify or supplement my opinions and conclusions.

### III.   SUMMARY OF OPINIONS

10.   **Identification of the class members is not possible based on the data alone:** Consistent with the Hughes Report, Plaintiffs' proposed consumer and fund classes would require review of information that is not in the data alone including documents for each potential class member including but not limited to contracts between each Third-Party Payer ("TPP") and PBM, TPP funding data, and TPP parent/subsidiary information.[7] This information is not in the Walgreens or PBM transaction data,

---

[2] Hilton Report ¶ 5.

[3] Fourth Amended Consolidated Class Action Complaint and Jury Demand, dated June 16, 2021, ECF No. 477 ("Fourth Amended Complaint") ¶¶ 1, 4.

[4] Expert Report of Michael Jacobs ("Jacobs Report") ¶ 27 for the industry understanding of "Usual and Customary" in the absence of a defined contractual term.

[5] Refer to Appendix A for additional information about data relied upon in this report.

[6] Throughout this report and as part of my analysis, I rely on a number of key terms and definitions regarding the payment and reimbursement of pharmacy claims by health plans, pharmacy benefit managers and consumers. The definitions of these terms are found in the Hughes Report. In addition, I have attached as Appendix B a list of the terms I rely upon from the Hughes Report and Jacobs Report along with the definition of that term.

[7] Hughes Report ¶ 147.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and it would need to be collected and reviewed to determine which TPPs and consumers are members of the class, including which are subject to one of the class exclusions.

11. **Consistent with Hughes's opinion, a formulaic damages calculation for class members is not possible; it requires individualized review and information not available in the data**: Hughes states in his report that "the data Dr. Hilton proposes using and her formulaic calculations cannot determine injury to proposed consumer class members on a class-wide basis "[8] and "injury to third-party payer members of the proposed class cannot be assessed on a class-wide basis."[9] Because of the complex nature of pharmacy reimbursement, including how changes in payments on one claim can have downstream impacts on payments on other claims, any damages calculation in this matter would require the re-adjudication of each transaction (including brand-name drug transactions), taking into account all transactions in a benefit year (including at other non-Walgreens pharmacies), a consumer's plan design, and contract requirements such as Generic Effective Rates ("GER") and the application of lesser-of logic for the specific transaction.[10,11] It is also my opinion that sufficient information required to perform such a re-adjudication is not in the Walgreens or PBM transaction data produced in this matter.

12. **Consistent with Nordby's opinion, any damages calculation must factor in PSC membership fees in determining PSC prices**: Consistent with Nordby's opinion,[12] I have adjusted Hilton's damages calculation by allocating a portion of the PSC membership fee when determining the PSC price for a given drug and quantity on a specific day. I determine the correct allocation using the PSC transaction data and then apply that allocation to the PSC price to be used in Hilton's damages calculation.

13. **Hilton's overall methodology is flawed:** Hilton's analysis is flawed because (1) she fails to properly identify class members based on the proposed class definition and exclusions and provides no valid methodology to programmatically identify class members; (2) as stated in Paragraph 11, above, her damages calculation fails to take into account the actual process of prescription drug reimbursement (including out-of-pocket maximums, deductibles, GERs, and copay/coinsurance),[13] and this information is not available in the data and would require expert analysis of the data and documents for each class member to determine damages. I point out specific errors and give examples of the erroneous portions of Hilton's methodology, including erroneous outcomes.

14. **Hilton fails to properly execute her own methodology:** Even assuming Hilton's methodology is workable to determine damages on a class-wide basis (it is not), Hilton does not always accurately apply her own methodology, further demonstrating she has not established a reliable methodology for calculating class-wide damages and that experts would need to be involved in every damages proceeding.

---

[8] Hughes Report, IV.B.
[9] Hughes Report, IV.C.
[10] Hughes Report, IV (including explanations and definitions of consumers' plan design elements and factors related to TPP reimbursement paid to PBMs).
[11] Expert Report of Michael Jacobs ("Jacobs Report"), ¶ 25, 87-90.
[12] Expert Report of Kelly Nordby ("Nordby Report"), ¶ 10.
[13] Hughes Report ¶¶ 44-47, 57.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

15.     **Hilton's flaws appear in the limited data analyzed to date and would be magnified when applied to the larger data sets needed for class-wide analysis:** Hilton's damages calculations to date have been on the limited population of Named Plaintiff[14] data (approximately 73,000 transactions). The consequences of her flaws would be exacerbated in a larger data set of hundreds of millions of transactions where Hilton would be required to identify class members, match data from PBMs to data from Walgreens, and calculate alleged overpayments, but would not already know certain information that she does about the Named Plaintiffs, such as the TPP name, the PBM, and the methodology used for determining the consumer share of the transaction. Additionally, Hilton presents the task of matching data from the PBMs to data from Walgreens as a simple exercise when it is far from simple and will require expert analysis, especially when dealing with the larger class-wide data, which involves PBMs that have not yet produced data. Furthermore, Hilton's analysis of limited examples in her Exhibits 3A and 3C and HILTON_0000132 and HILTON_0000133 show that she renders inconsistent conclusions for the same transaction regarding what the PSC price should be and whether there is an overpayment on that transaction, and she relies on PSC prices that do not always reconcile to her stated methodology. All of these errors will likely be magnified when hundreds of millions of insured transactions are reviewed instead of approximately 73,000 transactions.

16.     In addition to providing support regarding these opinions, my report contains the following additional analyses that were requested by Counsel for Walgreens:

   a.   I assessed the Walgreens 2015 Sample Data[15] to determine the frequency of retail cash transactions[16] versus PSC transactions. The data shows that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

   b.   I assessed the Walgreens 2015 Sample Data to determine the number of consumers who would require individual analysis under Hilton's damages approach;

   c.   I determined the number of consumers with an insured transaction in the Walgreens 2015 Sample Data who also had a PSC transaction prior to their insured transactions;

   d.   I determined the number of individuals in the Walgreens 2015 Sample Data who would save money overall if they used PSC on all their prescription drug purchases;

   e.   I determined the number of transactions in the Walgreens 2015 Sample Data where the consumer payment is less than the PSC price.

   f.   I determined that the Named Consumer Plaintiffs continued to purchase drugs at Walgreens after they met with Plaintiffs' counsel in this matter.

---

[14] Cynthia Russo, Lisa Bullard, and Ricardo Gonzales ("Named Consumer Plaintiffs") and International Brotherhood of Electrical Workers Local 83 Health and Welfare Fund, International Union of Operating Engineers Local 295-295C Welfare Fund, and Steamfitters Fund Local 439 ("Named Fund Plaintiffs") are known collectively as "Named Plaintiffs."

[15] Refer to Appendix A for additional detail about this data set.

[16] Jacobs Report ¶ 12. ("Cash and Retail price…are consistently understood in the industry to refer to a price that a customer pays for a prescription without using any benefits, including insurance, a pharmacy club, or a third-party discount card.")

ankura.com



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### IV. DATA RELIED UPON

17.   Brief descriptions of the data sets used in my analysis and referenced in this report are below. Please refer to **Appendix A** for a more detailed description of the data sets I rely upon and how they were prepared for analysis.

a.   **The Walgreens PSC Transaction Data:** Prescription Savings Club transaction level data from Walgreens.

b.   **The Walgreens PSC Formularies:** Walgreens' post-1/1/2018 PSC pricing lists for VPG and Non-VPG drugs.

c.   **The Walgreens ████████████████████:** Walgreens produced data related to ████████████████████████████ that provides information on ████████████████████████████████████████████████████████ ████████████████.

d.   **The Walgreens 2015 Sample Data:** Data from Walgreens produced in connection with the December 2, 2020 Stipulation as to Sample Data[18] containing all generic drug transactions from January 1, 2015 – December 31, 2015 in the following six states: Connecticut, Illinois, New York, Ohio, Pennsylvania, and Wisconsin.

e.   **The Walgreens 12K Sample Data:** Data from Walgreens produced in connection with the December 2, 2020 Stipulation as to Sample Data[19] containing all pharmaceutical transactions from January 1, 2008 – December 31, 2019 for a random selection of 12,000 patients who purchased at least one generic drug at a Walgreens store within one of the following six states: Connecticut, Illinois, New York, Ohio, Pennsylvania, and Wisconsin.

f.   **The Walgreens Transaction Data:** Transaction level data from Walgreens containing prescription drug transactions related to the Named Fund Plaintiffs.

g.   **The Walgreens Named Consumer Transaction Data:** Transaction level data from Walgreens containing prescription drug transactions related to the Named Consumer Plaintiffs.

h.   **The Walgreens PSC Enrollment Data:** Data from Walgreens regarding PSC membership activity including enrollments, upgrades, renewals, and cancellations.

i.   **The PBM Transaction Data:** Data from the PBMs Express Scripts, Sav-Rx, CVS Caremark, MedTrak,[20] and CastiaRx[21] containing purported transaction level data

---

[17] Declaration of Christopher Dymon ("Dymon Declaration"), *Russo, et al. v. Walgreen Co.*,Civil No. 1:17-CV-02246 (Nov. 9, 2022) ¶ 11.
[18] Stipulation as To Sample Data, Russo v. Walgreens, December 2, 2020.
[19] Stipulation as To Sample Data, Russo v. Walgreens, December 2, 2020.
[20] Now Elixir. *See Elixir CRAFTED Rx SOLUTIONS*, Frequently Asked Questions (Sept. 01, 2020), available at https://ess.springfield.il.us/Documents/HR/Prescription/2020/MedtrakNameChangeElixirFAQ09012020.pdf.
[21] Now owned by OptumRx. *See John Santilli, OptumRx is Aggressively Growing its Business through Acquisitions*, Access Market Intelligence (Dec. 11, 2019), available at https://accessmarketintell.com/2019/12/11/optumrx-is-aggressively-growing-its-business-through-acquisitions/.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

related to the Named Fund Plaintiffs.

## V.    BASIS OF OPINIONS

### A.    Identification Of Class Members Is Not Possible To Perform Based On The Data Alone

18.    **The Data Does Not Show Whether U&C Was A Basis For The Amount Paid Or Reimbursed:** The Plaintiffs' proposed class definition states that for a consumer or TPP to be in the class, they must pay for a drug "where the usual and customary price was a basis for the amount paid or reimbursed."[22] As stated in the Hughes Report, "[t]o determine if the U&C price is a basis for the price paid by the TPP, it would be necessary to review the contracts between each TPP and PBM to see if the U&C price is a factor in setting the TPPs reimbursement to the PBM."[23] The Jacobs Report also supports the fact that not all plans use lesser-of logic to price transactions and one must review the contracts between the TPP and the PBM to determine whether the TPP was reimbursing transactions based on the U&C price.[24] Furthermore, I have not seen any information in the data produced in this matter that indicates for every given transaction whether that drug was reimbursed by the TPP on a basis of the U&C price. Even within a single plan, certain drugs can be adjudicated using lesser-of logic while others are not, and this could only be determined from a contract review.[25]

19.    According to her deposition testimony, Hilton assumes that if a PBM has one transaction in the Walgreens 2015 Sample Data where it paid Walgreens based on the U&C price, then all transactions adjudicated by that PBM also use U&C as a basis or reimbursement.[26] The Walgreens 2015 Sample Data relates to payments between the PBM and Walgreens and does not reflect the payment terms between the PBM and the TPP. As both Jacobs and Hughes explain, the payment methodologies between the PBM and TPP can differ from the payment methodologies between the PBM and Walgreens.[27] For example, Hilton's analysis determined that ▇▇▇▇▇▇ reimbursed based on U&C pricing; however, counsel has informed me that the ▇▇▇▇▇▇▇▇▇▇▇.[28] Furthermore, when we review the data produced by ▇▇▇▇▇▇ for the ▇▇▇▇▇ we can find example transactions where ▇▇▇▇ did not appear to reimburse ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[30]

---

[22] Hilton Report ¶ 5.
[23] Hughes Report ¶ 147.
[24] Jacobs Report ¶¶ 87-90.
[25] Jacobs Report ¶¶ 25, 87-90.
[26] Deposition of Lynette Hilton, Ph.D. ("Hilton Dep."), *Russo et al. v. Walgreen Co.,* Civil No. 17-CV-2246 (N.D. Ill. Jan. 17, 2023) 149:1-8.
[27] Hughes Report ¶ 52; Jacobs Report ¶¶ 87-90.
[28] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
[29] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Russo et al. v. Walgreen Co.,* Civil No. 17-CV-2246 (N.D. Ill. June 15, 2020) at 224-225.
[30] Data in this table is from ▇▇▇▇▇▇▇▇▇▇▇▇▇.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



20.     **The Data Does Not Show The Specific TPP Entity That Paid In Whole Or In Part For A Transaction:** The class definition proposed by Plaintiffs purports to include in the class all "entities, for whom prescription drug insurance benefits were provided through the Relevant PBMs … and who paid or reimbursed in whole, or in part, for generic prescription drugs from [Walgreens] at any point in time from the period January 1, 2007 through the present."[32] Under this definition, it is important to determine which TPP paid in whole or in part for the transaction. As stated in the Hughes Report, "for self-insured plans, the amount a health plan pays depends on the actual health care costs incurred by their beneficiaries" while fully insured plans pay "the same amount regardless of what the pharmacy reports as the U&C price."[33] The determination of self-insured or fully insured is necessary to determine which TPP is a member of the class. For example, for fully insured plans, the TPP class member would be the health insurance company. The Walgreens Transaction Data and the PBM Transaction Data do not contain any information regarding the funding status of plans.

21.     The Hughes Report also states that self-insured plans sometimes do not pay the cost of member's prescriptions, because they often purchase stop-loss insurance, which covers expenditures over a certain amount. [34] Because information about the funding status of plans could be different for each TPP for each year, determining this information would require reviewing potentially hundreds of thousands of contracts. Based on my review of the Walgreens 2015 Sample Data alone, Walgreens submitted claims to over ███████ different health plans who had claims adjudicated by the Relevant PBMs.[35] For 2015 alone, these ██████ health plans would need to be individually reviewed to determine if the groups are self-insured or fully insured (i.e., the plans funding status), whether U&C was a basis for how much they paid the Relevant PBMs, and whether they paid more than the PSC price for any generic drug purchased by one of their beneficiaries. Further, because the time period at issue in this matter is from January 1, 2007 through the present and because a plan's funding status could be different in different years, those ██████ plans would likely have multiple contracts that would need to be reviewed separately for each year for these factors.[36] In addition, the other years of data

---

[31] Data from ███████.
[32] Hilton Report ¶ 5.
[33] Hughes Report ¶¶ 58-59.
[34] Hughes Report ¶¶ 18, 60-61.
[35] For the purposes of this analysis, I have identified a health plan as the unique combination of ████████████
████████████████████████████████████
[36] Hughes Report ¶ 137.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

may have claims associated with different health plans that do not appear in the 2015 data, and those plans will also need to be reviewed to determine if they are class members.

22.     **The Data Does Not Show Whether Any Potential Class Members Have Relationships With PBMs:** Plaintiffs' proposed class definition excludes all "entities that have or had a parent or subsidiary relationship with any pharmacy benefit manager."[37] Hilton testified that she did not consider these exclusions in her analysis.[38] According to the Hughes Report, these exclusions must be considered.[39] But based on my review of the PBM Transaction Data and the Walgreens Transaction Data, there is no field in the data produced in this matter that can be used to determine whether a TPP entity is excluded for being affiliated with a PBM.[40]

23.     This exclusion of TPPs with a current or prior parent or subsidiary relationship with a PBM is impacted by the assessment of which TPP is the potential class member based on being self-insured or fully insured. For example, Aetna, which, based on internet research, is affiliated with the PBM Caremark,[41] can fully insure an employer group.[42] In this scenario, Aetna would pay for prescription drug purchases and would be the only TPP class member with potential damages. Since Aetna is PBM-affiliated, the plan damages would be excluded from the class. However, if, instead, the employer group is self-insured and the employer group is the only TPP class member for a transaction, that TPP would not be excluded from the class under Plaintiffs' criteria. There are many health insurers that have current or former affiliations with PBMs including most of the largest insurers in the country such as, United Healthcare (OptumRx), Wellpoint/Anthem (NextRx), Aetna (CVS Caremark), and Cigna (Express Scripts).[43] For any other health insurers and subsidiaries, it would require review of documents regarding business structures.

24.     Even once the parent/subsidiary relationships between PBMs and health plans are known, it is not always possible to identify the health plan name in the Walgreens data to know which TPP to exclude from the class. Although the Walgreens Transaction Data can contain information in the ██████████████"[44] field on the specific health plan to which the claim was submitted when known to Walgreens, based on my review of the Walgreens 2015 Sample Data, Walgreens submitted many claims to health plans with nondescript values in the ████████████████ field indicating a potential affiliation with a PBM (either by having an insured name from the group above in Paragraph

---

[37] Hilton Report ¶ 5.
[38] Hilton Dep. at 91:8-21. ("[Discussing the exclusion of entities with a parent or subsidiary relationship with a PBM:] Q: So is the answer that at this point, you have not considered this exclusion in your methodology? A: Yes.")
[39] Hughes Report ¶ 170.
[40] Hilton Report ¶ 5(e).
[41] https://www.cvshealth.com/news/company-news/cvs-health-completes-acquisition-of-aetna-marking-start-of.html.
[42] https://www.aetna.com/health-insurance-plans/pharmacy.html
[43] For the purposes of this analysis, I limited the 2015 Sample Data to commercial claims for the PBMs at issue and defined a group as the unique combination of BIN, PCN and Plan Group Number in Walgreens data and identified the largest plan sponsor names that may be affiliated with a PBM. Plan sponsors that may be PBM affiliated include: Aetna (https://www.cvshealth.com/news/company-news/cvs-health-completes-acquisition-of-aetna-marking-start-of.html.), United Healthcare / Oxford Healthplan: (https://www.uhc.com/content/dam/uhcdotcom/en/Employers/communication-resources/PDFs/GST_OptumRx_Quick%20Start%20Guide%20_%2063250C-062017.pdf and https://www.nytimes.com/2004/04/27/business/unitedhealth-agrees-to-deal-for-oxford.html.), Wellpoint/Anthem: (https://www.fiercehealthcare.com/healthcare/express-scripts-buys-wellpoint-pbm-4-7b-transaction). Furthermore, Express Scripts, Caremark, EnvisionRx and Sav-Rx are all PBMs.
[44] The field ████████████████ contains the ████████████████ on a transaction according to Walgreen's data dictionary. EDW_Pharmacy_Metadata_20171020.xlsx,Walg_Forth_0000041.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

23 or a name of a PBM). ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. In those circumstances, the data would not indicate the TPP that should be excluded from the class as PBM-affiliated entities because the data does not tell us who the plan sponsor[45] is, whether the plan sponsor is self-insured or fully insured, and who the insurer is. In the Walgreens 2015 Sample Data alone, the nondescript ████████████████████████████ was assigned to ██████ different health plans. For these ██████ health plans, all we know is ████████████████████████████; we do not know the name of the health plan, who the plan sponsor is, if that plan sponsor is self-insured or fully insured, or who the insurer is. All this information would need to be collected through additional data files and document review.[46] The table below contains **10 example** generic ███████████████████ that appear in the Walgreens 2015 Sample Data that may be PBM affiliated. Therefore, one would need to analyze data not currently produced in the matter and documents for each of the health plans associated with the generic names to determine who the plan sponsor is; then obtain documents to determine whether the health plan is self-insured or fully insured; based on that information, then determine the potential TPP class members; and then conduct research into whether each TPP would be excluded. In just the Walgreens 2015 Sample Data, which represents only one year of data in six states, there are **over** ██████ **health plans** associated with these nondescript names and each would need to be reviewed to determine if they are eligible for the class.[47]

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

25.     **The Data Does Not Accurately Show Whether Potential Class Members Are Government Entities Or Government-Funded Entities:** The proposed class definition also excludes "all government entities . . . and their beneficiaries" and "all government funded entities, and their beneficiaries."[49] Hilton incorrectly asserts that she can account for this exclusion by limiting the

---

[45] The plan sponsor is a type of TPP that sponsors a health insurance plan (i.e. contributes to the payment for the coverage, benefit or insurance product). A sponsor can be a corporation, union, state or government entity, or other type of organization. Refer to Appendix B and Hughes Report ¶¶ 33-34 for additional detail.
[46] Hughes Report ¶¶ 58-59.
[47] For the purposes of this analysis, I have identified a health plan as the unique combination of ████████████ ███████████████████████████████████████
[48] Data summarized from Walgreens 2015 Sample Data.
[49] Hilton Report ¶ 5.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Walgreens Transaction Data to records with a ████████████████████████[51]

Based on my review of the Walgreens Transaction Data, this is not the case. Based on my review of the data, whether a TPP with a ████████████████████" is a government entity or a government-funded entity is not information available in the Walgreens Transaction Data or the PBM Transaction Data produced in this matter. Rather, it would require research into the different entities identified in the Walgreens Transaction Data in the Plan Name and Employer or Plan Sponsor Name fields (as well as the research discussed above to determine the TPP class members based on the funding status of the health plans).[52] These fields provide only limited detail regarding the plan sponsor name, when available to Walgreens (which, as shown in Table 2 with generic values in the ████████ ███████████ field, is not always the case). As a result, further research would be necessary to determine when this class exclusion applies.

26.      For example, in the Walgreens 2015 Sample Data, there are ██████████ transactions with a ████████████████████████████████████████████████████████████████████ ████████████████.[53] One can research the ██████ and determine that the government pays a portion of the member's monthly premium,[54] which may indicate that ██████ and its beneficiaries should be excluded from the class under the government-funded exclusion. In addition to ██████, there are many other potentially government-funded health plans like state and local government plans for employees, public schools, and court systems with a ████████████████████ in Walgreens' data. For some entities, it is not obvious whether the entity is a government or government-funded entity, and it would require additional research to determine if the entity received any government funding. For example, utility corporations, hospitals affiliated with public universities, or student health plans may or may not be government funded. Examples of entities that are categorized in Walgreens' data as ████████████████ ██████████ field that appear to be government-funded entities, include:

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

[50] The field ████████████████████████████████████████████████████
EDW_Pharmacy_Metadata_20171020.xlsx, Walg_Forth_0000041.

[51] Hilton Dep. at 88:15-90:11.

[52] Both fields are contained in the ████████████████████  Refer to the Walgreens data dictionary for additional information. EDW_Pharmacy_Metadata_20171020.xlsx, Walg_Forth_0000041.

[53] In the 2015 Sample Data, ████████████████████████████████████████████

[54] https://www.opm.gov/healthcare-insurance/healthcare/plan-information/premiums.

[55] Letter from L. Hoff, Physicians Ins. Corp., to Dep. Comm'ner D. Schwartzer, (July 3, 2013), available at bloximages.chicago2.vip.townnews.com/wiscnews.com/content/tncms/assets/v3/editorial/5/76/576ed7c5-1e62-56e2-9327-8a325a6103c2/535e5f6f57549.pdf.pdf

[56] ███████████████████████████████████████████████████████ █ █
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

27.     Accordingly, Hilton's proposal to limit the entities to only those with a ████████ ████████████████ will result in overinclusive class-member identification. Only through additional research into each TPP, and potentially requiring information directly from the TPP itself, could it be determined if the TPP received any government funding and should be excluded from the class. Based on my review of the Walgreens 2015 Sample Data alone there are over ██████ entities[58] with a ████████████████ that would need to be reviewed to determine whether they are government-funded entities. Further, as discussed above, there are over ██████ health plans in the Walgreens 2015 Sample Data where the employer or plan sponsor is unknown because the Walgreens data contains only nondescript name values in the ████████████████████ field such as ████████████████████████ Further research and information, potentially from each of the TPPs and health insurers, is needed on these health plans to determine the actual TPP on the transaction and whether that TPP is a government entity or a government-funded entity.

**B.  <u>A Damages Calculation Requires An Individualized Review That Is Not Possible To Perform On A Class-Wide Basis</u>**

28.     As stated in the Hughes Report, "identifying and assessing potential injury, if any, to proposed class members requires individualized inquiry."[59] Hughes further states that is necessary to incorporate plan details into a damages calculation, such as knowing whether the consumer met their deductible, whether they paid a copayment, coinsurance, or some hybrid of the two, and whether they met their out-of-pocket maximum.[60] Hughes further states that the TPP class also requires individualized review because consumer damages impact TPP damages, and to account for stop-loss insurance, GERs, and Medicare Part D plans.[61]

29.     Due to the complex nature of pharmacy reimbursement, any damages calculation in this matter would require re-adjudication of each transaction at issue, but in the context of all transactions in a benefit year (including transactions at other pharmacies and transactions for brand-name drugs) for each consumer, which will require several steps, discussed in the following paragraphs, and could not be done on a class-wide basis using only the data.

30.     Hilton's proposed methodology for calculating damages is incorrect because it does not account for the necessary individualized review outlined by Hughes. Further, Hilton only looks at each transaction in isolation, not accounting for the fact that each transaction impacts what a consumer will pay on each subsequent transaction.[62] If an alternate U&C considering the PSC price is determined, all transactions (including those without potential damages) would need to be re-adjudicated[63] to determine what each party would have to pay on that transaction and each subsequent transaction in a benefit year, in light of the revised U&C price, including the change in:

---

[58] Here I count an "entity" as the unique combination of values in the Plan Name, PBM Name, and Employer or Plan Sponsor fields in the Plan Category Table. Refer to Appendix A for additional information about the Walgreens 2015 Sample Data.
[59] Hughes Report, IV.
[60] Hughes Report ¶ 89.
[61] Hughes Report, IV.C.
[62] Hughes Report ¶¶ 14-15.
[63] Hughes Report ¶ 75.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

    a.   The TPP's payment to the PBM;

    b.   The patient responsibility amount (either deductible, copay, or coinsurance), which would depend on the patients plan design including deductible amounts, out-of-pocket maximum amounts and copayments vs. coinsurance and where the patient was at in meeting their deductible and reaching their out-of-pocket maximum;[64]

    c.   Amounts to be paid or reimbursed on all other claims for the patient in the year, including both brand-name and generic drugs and claims for the patient at non-Walgreens pharmacies, to determine the downstream changes in the patients' deductibles, out-of-pocket maximums, Medicare Part D benefit stages, etc.[65]

    d.   Recalculating post adjudication true-ups, including GERs, between the PBM and the TPP as well as between the TPP and PBM to determine the total change in payments to Walgreens and total change in payments by the TPP;[66]

    e.   The PBM's payment to Walgreens.

31.      It is not possible to perform these steps using only the information available in the Walgreens Transaction Data and the PBM Transaction Data. The re-adjudication of claims requires contract and document review to determine specific information not in the Walgreens or PBM Transaction Data, such as information on the applicable U&C definition and when lesser-of logic with U&C as a consideration applies for payments between the TPP and the PBM. Furthermore, it requires individualized review of plan designs to understand member benefits including copays, coinsurance, deductible amounts, out-of-pocket maximum levels, and the collection and analysis of claims data from other pharmacies as well as on medical expenses to evaluate the impact payment changes on one transaction will have on other payments in the year due to deductibles and out-of-pocket maximums. Additionally, information regarding post adjudication true-ups requires the individualized review of contracts between the TPPs and PBMs, as well as other documents, to understand the terms of the true-ups, collection of information not in the data regarding any payments regarding these true-ups, and the collection of sufficient data to recalculate and true-ups after adjusting the adjudication of claims.

    **C.**    **Any Damages Calculation Must Factor In The PSC Membership Fee In Determining PSC Prices**

32.      In order for a Walgreens consumer to access PSC prices, they must enroll in PSC and pay an annual membership fee of $20 per person or $35 per family.[67] Walgreens' economics expert, Kelly Nordby, Ph.D., states that the PSC membership fees are part of PSC prices from an economic perspective.[68] That is, "Walgreens' PSC price structure is known in economics as a two-part tariff or two-part pricing because it consists of two parts: a fixed price. *i.e.*, the membership fee, plus a price per unit for each unit purchased, *i.e.*, the PSC formulary price. Accordingly, the total price paid for a drug purchased through Walgreens' PSC is not simply the PSC formulary price. Instead, the true PSC prices

---

[64] Hughes Report ¶¶ 14-15.
[65] Hughes Report ¶ 106.
[66] Hughes Report ¶¶ 157-158.
[67] Deposition of Michael Amiet ("Amiet Dep."), *Forth et al. v. Walgreen Co.*, Civil No. 17-CV-2246 (N.D. Ill. Nov. 20, 2019), at 79:14-80:1; Jacobs Report ¶ 29.
[68] Nordby Report ¶¶ 10-11.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

incorporate a portion of the annual membership fee. A two-part pricing structure and thus, Walgreens' PSC, is a type of 'conditional' pricing arrangement that provides members with the right to access lower PSC formulary prices for one year as long as members pay the applicable annual membership fee and meet certain other requirements."[69] Therefore, any analysis that assesses the PSC price must also incorporate the cost of the annual membership fee.[70,71] I was asked to determine the percentage of PSC members in the Walgreens PSC Enrollment Data with a recorded membership fee payment, which must be calculated from the Walgreens PSC Transaction Data to determine the portion of the membership fee applicable to each transaction to determine the actual amount that a consumer paid on a PSC transaction.

33.     When asked about the PSC membership fee in her deposition, Hilton stated that her understanding was that "an enrollment fee is required at certain times over the years" but that the membership fee "wasn't something that was relevant for [her] analysis."[72] Nordby contradicts this in her report, stating that "the total price paid for a drug purchased through Walgreens' PSC is not simply the PSC formulary price. Instead, the PSC price includes a portion of the annual membership fee."[73]

34.     Based on my review of the Walgreens PSC Enrollment Data for the period 1/1/2007 – 12/31/2019, I found that █████ of PSC card holders in the Walgreens PSC Enrollment Data with a PSC transaction have a recorded PSC membership fee payment.

35.     As discussed in more detail in Appendix A to this report, Walgreens produced PSC Enrollment Data in this matter that contains information on the ████████████████████████████ ███████████████████████████████.[74] ████████████████████████.[75] For the primary account holder, the ███████████████ Other family members on a PSC membership will have ████████████████████████ ████ The same Card ███████████████████████████████████ ██████ field in the Walgreens PSC Transaction Data. I refer to the ██████████████████████ ████████████████████████.

36.     I assessed the PSC Enrollment Data by counting the number of ██████████████ with a populated date in the ████████████ field, indicating that the ██████████████ paid for the PSC membership.[76] For ██████████████████████████████████████████ ███████ was used to complete any PSC transactions in the Walgreens PSC Transaction Data.

37.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[69] Nordby Report ¶¶ 10-11.
[70] *United States ex rel. Garbe v. Kmart Corp.,* 824 F.3d 632, 643-44 (7th Cir. 2016).
[71] Nordby Report ¶ 10.
[72] Hilton Dep. at 201:6-25.
[73] Nordby Report ¶ 10.
[74] See ████████████████████████████████████
[75] See ██████████
[76] Prior to preparing this analysis, I removed records from the ██████████████████████████████████ ████████████████████████████████████████████████████

ankura.com



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████. Refer to **Attachment 3** for detail. Furthermore, the Walgreens PSC Transaction Data also supports that ███████████████████████████████████████████████████. The Walgreens ████████████████████████████████████████████████, as reflected by the value ██████████████████████[77]████████████████████, there can be a comment in the ████████████████████"[78] field indicating that ████████████████████████████████████████. Based on my review of the Walgreens PSC data productions, there are ████████████████████████████████████████████████. The table below shows █████████████████████████████████████.

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

38.     In addition to determining the percentage of PSC members who paid the membership fee, I performed an analysis to calculate the amount of membership fees to allocate to each PSC transaction. I accounted for membership fees in PSC transactions by allocating the membership fee for a PSC member across their PSC transactions within the same enrollment year (e.g., I calculated the average share of the membership fee per transaction).[79] Based on my review, I found that PSC members who paid a membership fee between 2010 and 2019,[80] on average paid ██████ in membership fees per PSC transaction (e.g., the average individual membership with a membership fee of $20 would have ████

---

[77] ████████████████████████████████████████████████████████████████████
EDW_Pharmacy_Metadata_20171020.xlsx, Walg_Forth_0000041.

[78] ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ EDW_Pharmacy_Metadata_20171020.xlsx, Walg_Forth_0000041.

[79] For this analysis, I used a membership fee of $20 per individual or $35 for a family if there was more than one PSC Member enrolled under a plan. For any individual member enrollment between January 1, 2012 and March 31, 2012 I used a membership fee of $5, as there was a promotion for this time period (Amiet Dep. at. 80:6-12;). As noted in the table, the overall average calculation excludes 2012. Furthermore, for the time period of March 2012 – November 2017, Walgreens had a Limited Guarantee Program in place where a member could request a credit for the difference between their membership fee and the amount of savings they obtained from PSC prices (Amiet Dep. at 81:18-82:14). Though I do not have any data on members requesting refunds under the program, to account for the guarantee, I conservatively set the membership fee to the lesser of the actual membership fee or the member's savings in the year.

[80] Member information ████████████████████████████████████████████████████████
███████████████████████████████████████████

14

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transactions for an allocation of ▓▓▓ per PSC transaction and a family membership with a membership fee of $35 would have on average ▓▓▓ transactions for an allocation of ▓▓▓ per PSC transaction).

39.　　In any analysis that compares the U&C price that Walgreens originally submitted on a transaction to the PSC price for that drug to calculate damages, I would add the allocated portion of the membership fee in the corresponding enrollment year for each individual consumer to the PSC prices applicable to each transaction (e.g., listed on the Walgreens PSC Formularies or contained in the Walgreens PSC Transaction Data. Refer to Appendix A for more information about these sources.) to create the "True PSC Price." This True PSC Price, which includes the allocation of the membership fee, is the amount that should be used to calculate damages under a theory that Walgreens should have submitted the PSC price as its U&C price.

### D.　Hilton's Overall Methodology Is Flawed And Hilton Fails To Properly Execute Her Own Methodology

40.　　In her analysis, Hilton erroneously ignores or oversimplifies many of the key steps of a damages analysis. Hilton's proposed methodology for identifying class members and calculating damages is not contained in the text of her report. Instead, in order to fully understand the assumptions and methodology she relied upon, it is necessary to read her deposition and have an expert review the computer scripts she produced,[81] which she could not describe herself at her deposition.[82]

41.　　Hilton's analysis is flawed because: (1) she fails to properly identify class members based on the proposed definition and provides no methodology to accurately identify class members; (2) in her proposed calculation of damages she fails to take into account the actual process of prescription drug reimbursement (including out-of-pocket maximums, deductibles, GERs, and copay/coinsurance),[83] and (3) all the information necessary to account for the actual process of prescription drug reimbursement is not available in the Walgreens Transaction Data or the PBM Transaction Data produced in this matter. For example, the Walgreens Transaction Data and PBM Transaction Data produced in this matter do

---

[81] HILTON_0000001 – HILTON_0000045; HILTON_0000079 – HILTON_0000130.
[82] "Q: Are you able to read this code? A: This particular code, no." Hilton Dep. at 235:10-11.
[83] Hughes Report ¶¶ 44-47, 57.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

not contain complete information on plan design, such as deductible amounts, out-of-pocket maximum amounts, whether copayments, coinsurance, or a mix of the two are used in the plan, or GER terms and payments.[84]

42.     In the following section, for each step of Hilton's damages analysis, I will (1) summarize Hilton's methodology completing that step; (2) discuss my criticisms of her approach including (a) the flaws in her methodology as well as (b) her failures to follow her own methodology in her execution.

       **I.**    **Data Collection From Walgreens And PBMs And The Flaws In Hilton's Method For Matching Transactions In PBM Data To Transactions In Walgreens' Data**

43.     Although I agree that transactions from the PBM Transaction Data should be matched to transactions in the Walgreens Transaction Data, Hilton has not provided an accurate and formulaic methodology for matching the Walgreens Transaction Data to the PBM Transaction Data, and, in fact, oversimplifies her discussion of the process to match the Walgreens Transaction Data to the PBM Transaction Data during the data collection phase. Based on my review of the available PBM Transaction Data produced in this case, this process is complicated and requires individualized review for each PBM source file due to variations in the data formats provided by PBMs and because there is conflicting information about which TPP is on a specific transaction between the Walgreens Transaction Data and the PBM Transaction Data or information about the TPP is not included in the Walgreens Transaction Data.

***Hilton's Approach:*** Hilton states that, were she asked to calculate class-wide damages, the Relevant PBMs would need to provide transaction data for generic drug claims submitted by Walgreens pharmacies in the Relevant States to the Relevant PBMs; similarly, she states Walgreens would produce transaction data for generic drug claims submitted by Walgreens pharmacies in the Relevant States to the Relevant PBMs based on information in the ███████████████████████████ ██████.[86, 87, 88] Hilton will then identify for analysis those transactions that match between the PBM-produced data and the Walgreens-produced data.[89] Transactions that do not match, or that match to multiple transactions, are excluded from the class.[90] Hilton's method requires matching of the Walgreens and PBM Transaction Data because she uses certain fields available only in the PBM Transaction Data (such as the amounts the TPP paid the PBM) and certain other fields only available in the Walgreens Transaction Data (such as whether the plan type on the transaction is ██████████ ████████████████████████. Hilton's report provides very little detail on the actual mechanics required to "match" data provided by the PBMs to the Walgreens Transaction Data and how Hilton proposes to

---

[84] Hughes Report ¶ 89.

[85] ████████████████████████████████████████████ Dymon Declaration ¶ 5.

[86] ██████████████████████████████████████████████████████████████████. Dymon Declaration, ¶ 59a.

[87] Hilton Report ¶¶ 55 – 59.

[88] Hilton Report ¶ 35. ██████████████████████████

[89] Hilton Dep. at 153:10-15.

[90] Hilton Dep. at 145:17-20.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

accomplish this task using class-wide data. Instead, computer scripts she produced had to be reviewed to deduce her methodology.[91]

44.     ***Hilton's Methodological Flaws:* Hilton's Matching Methodology Is Overly Simplistic.** Hilton's method of matching the PBM Transaction Data to the Walgreens Transaction Data is too simplistic and fails to take into account the differences in even just the limited PBM Transaction Data produced thus far in this litigation. Based on my review of the PBM Transaction Data received to date, this process is very complicated and required individualized review for each PBM source file.

45.     Hilton uses the following files produced by the PBMs for her analysis.[92]



46.     The data files provided by each PBM contain field structures and sets of information that are different from the other PBMs and different from the Walgreens Transaction Data. As a result, individual assessment of each file is necessary. The table below shows whether certain fields that would be important for a matching analysis or damages calculations were provided by the PBMs. As shown, the PBMs did not provide all necessary fields, nor did each PBM provide the same fields in their data extracts. Table 7 illustrates the disparity in the necessary information across the different PBM files:



47.     Based on my review of the scripts that Hilton produced to show her application of her methodology, she has not created a uniform method for matching the PBM Transaction Data and the Walgreens Transaction Data[93,94], but instead, Hilton employed a different method for each PBM to match each file to the Walgreens Transaction Data, and made adjustments to individual records to account for duplication or other matching issues.[95] For example, when assessing ███ data, she

---

[91] HILTON_0000112.
[92] Hilton Report ¶ 65.
[93] HILTON_0000128.
[94] HILTON_0000112.
[95] HILTON_0000039.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

matched the Walgreens Transaction Data to the PBM Transaction Data on ███████████ ██████ ██████ ████████████.[98] When assessing the ███████████ data, however, she did not consider the ███████ field, even though she had access to that field.[99] When assessing the ████████ data, Hilton allowed matches where the ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████.[101] The table below summarizes how, depending on the PBM, Hilton used different matching criteria.

48.    **Hilton's Matching Methodology Does Not Identify Unique Transactions In The Walgreens Transaction Data.** Not only does Hilton use different methods for each PBM data set, the fields she uses to match the PBM Transaction Data to the Walgreens Transaction Data do not establish a unique transaction. As discussed in more detail in the following paragraph, while Hilton's approach may be sufficient to identify a handful of example transactions that meet the criteria for damages under Plaintiffs' theories using the limited volume of approximately 73,000 Named Plaintiff transactions, she has not proposed a workable methodology for matching hundreds of millions of class-wide records of PBM data to hundreds of millions of transactions in Walgreens data on a class-wide basis.

49.    Hilton's matching criteria is imprecise, which will result in incorrect matches when applied at a large scale. A unique transaction is identified in Walgreens' data based on the combination of ████████ ████████████████████████████████████████████.[102] It is important to understand that, in Walgreens' data, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[96] Dymon Declaration ¶ 21. ████████████████████████████████████████████

[97] Dymon Declaration ¶ 42. █████████████████████████████████████████████████████

[98] Dymon Declaration ¶ 36. ██████████████████████████████████

[99] HILTON_0000128.

[100] Dymon Declaration ¶ 51. ████████████████████████████████████████

[101] HILTON_0000128.

[102] Dymon Declaration ¶ 21.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████ ███████████████████████████

███████████████████████████████████████████, it will result in erroneous matches

when applied to the large class-wide data.

50.     **Hilton's Matching Methodology Yields Discrepancies Between The TPP Identified In The PBM Transaction Data And The Walgreens Transaction Data.** Even though Hilton proposes limiting transactions in the class to ones that can be matched between the PBM Transaction Data and the Walgreens Transaction Data, additional investigation is necessary to confirm the accuracy of the data provided by the PBMs, specifically related to the TPP identified on the transaction. In the available data produced by the PBMs related to the Named Fund Plaintiffs, the TPP name information from the PBMs does not always match the name of the plan in Walgreens' data or Walgreens' data does not contain a TPP name on the transaction.

51.     Detail regarding my attempts to reconcile data discrepancies between data provided by the PBMs and the Walgreens Transaction Data is described below.

a.     ███████████████████████████████████ provided this file and Hilton asserts that it contains transactions related to ███████████████ But the ███████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ – none of which have been identified by Plaintiffs as being associated with ████████████ ████[105] Counsel has informed me that Walgreens produced data potentially associated with these transactions by producing all transactions in the Walgreens Transaction Data with ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████. Nothing in the Walgreens Transaction Data associated with these fills contains any indication that the transactions are related to ███████████████. The records in the Walgreens Transaction Data that share ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████. Hilton has done nothing to confirm that these are actually ███████████████ transactions and not transactions related to some other entity ███████████████████████ Despite not having this confirmation, Hilton proceeds to "match" the two data sets for her analysis. This issue illustrates the need for individualized analysis to determine what TPP is responsible for each transaction provided by the PBMs.

b.     ███████████████████████████████████ provided this file and Hilton asserts it contains ███████████████ transactions.[106] Counsel has informed me that Walgreens produced records where the transaction in Walgreens' data contained the same ████████████

_____

[103] Dymon Declaration ¶ 21.
[104] Hilton Report ¶ 65.
[105] Dymon Declaration ¶ 13c.
[106] Hilton Report ¶ 65.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████████████████████ .
Hilton's methodology for matching the ████████████ data to the Walgreens Transaction
Data is to match on ████████████████████████████████ .[107] However, as
shown in Table 9 below, in doing this, ████ of the transactions in this file match to a record
in the Walgreens Transaction Data with a PBM other than ████████████ . According to
the Walgreens Transaction Data, █████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████ . Additionally, when I recreated Hilton's matching criteria, ████
records in the file provided by ████████████ are not able to be located in the Walgreens
Transaction Data using the methodology provided by Hilton. Finally, when matching using
Hilton's methodology, ████ of the transactions in the ████████████ data match to a
record in Walgreens' data where the plan name on the transaction is ████████████████
███████████████████████████████████ . This issue again illustrates
the need for individualized analysis to determine what TPP is responsible for each
transaction provided by the PBMs.

c.   ███████████████████   Hilton's proposed methodology to match ████ data to the
Walgreens Transaction Data is to identify records in Walgreens' data that have the same
████████████████████████████████████ s the record in the ████████ data.[108] As
discussed above, however, because ████████ is not a unique identifier and the same ███
████████ can be used by multiple stores on the same day, Hilton's matching approach is
not viable on a large scale because her criteria does not identify a unique transaction in the
data. In addition, when I recreated Hilton's matching criteria, I found ████ records in the
████████ data were not able to be located in the Walgreens Transaction Data using Hilton's
methodology. Additional investigation and research would need to be conducted on these
transactions to determine if they should be part of the class under Plaintiffs' definitions.

d.   ████████████████████████   Hilton's proposed approach for matching the
███████ transaction data received from ████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████ . As stated above, not including
a store-level identifier in the matching algorithm is not a viable matching methodology to
perform on the millions or billions of transactions that would meet Plaintiffs' proposed class
definition. When I recreated Hilton's matching methodology for this data set, it results in
records in ████████ data matching to nine records in the Walgreens Transaction Data
that are identified as ████████████ transactions. In addition, I was unable to match 933
records in the ████████ file to transactions in the Walgreens Transaction Data using the
methodology proposed by Hilton. As a result, additional investigation and research would

---

[107] Hilton matches the ████████████ field in the PBM data to the ████████████ field in the Walgreens Transaction
Data (HILTON_0000128).
[108] Hilton matches the ████████████ field in the PBM data to the ████████████ field in the Walgreens Transaction
Data (HILTON_0000128).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

need to be conducted on these transactions to determine if they are transactions associated with a class member under Plaintiffs' definitions.

e. ████████████████: Unlike the other PBMs, the ██████ data does not contain a field for ████████. Hilton's proposed approach is to match to Walgreens' data by joining the ████████████████████████████████████████████████████. When I recreated this methodology, I was unable to match ███ transactions in the PBM Transaction Data to the Walgreens Transaction Data. As a result, additional investigation and research would need to be conducted on these transactions to determine if they should be part of the class under Plaintiffs' definitions.

f. ████████████████ The ████████ data includes a field labeled ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████. Hilton's proposed matching methodology is to join the PBM Transaction Data to the Walgreens Transaction Data on ████████████████.[109] However, she does not use the ██ ████████████████████████████████████████████████ ████████████████████.[110] In other files provided by ████████████████ ████████████████████████████████████████████████ ████████████████████████ The fact that multiple potentially incomplete ████████ are needed to identify the potentially relevant transactions shows how individual and iterative analysis will be needed to identify any set of transactions associated with a specific TPP or consumer. When I recreate Hilton's matching methodology, it results in ██ records from the ██████ data files matching to transactions in Walgreens' data associated with ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. Additionally, ███ transactions from the original ████████████ file are unable to be located in the Walgreens Transaction Data using Hilton's methodology.

52. The table below illustrates the transactions matched using Hilton's methodology where the Plan Name or PBM name from the Walgreens Transaction Data does not align with the information provided by the PBMs and where additional investigation would be necessary to determine if the transaction should be included in the class.

---

[109] Hilton matches the ████████████ field in the PBM data to the ████████████ field in the Walgreens Transaction Data (HILTON_0000128).
[110] It is possible that Hilton ████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



53.     As described above, although Hilton claims it is a simple exercise to match the PBM Transaction Data to the Walgreens Transaction Data, it is anything but simple. Even with the relatively small volume of PBM Transaction Data produced this far, Hilton has not developed a consistent methodology that yields accurate results for matching unique transactions to both the PBM and Walgreens data. Because she has not received data from all Relevant PBMs or all potentially relevant TPPs,[112] she has not offered an opinion about how she would match data from all PBMs to Walgreens' data, and in my experience, a single PBM may use multiple adjudication systems such that, when the class-wide data is received, each PBM may produce multiple formats of data, further complicating the analysis.

54.     Given that the methodologies Hilton does propose do not work with 100% accuracy on the small populations of data she attempted to match, they would certainly not work on the hundreds of millions of transactions in the proposed class because all fields necessary to create a unique identifier in the Walgreens Transaction Data are not present in the PBM Transaction Data provided. As a result, any attempt to match data sets would result in incorrect results on certain transactions that would need to be investigated and resolved individually by experts and by receiving additional data from third parties to determine which transactions are associated with class members.

## II.     Hilton's Method For Filtering Data Would Yield Overinclusive Results

55.     While I agree with Hilton that the data would need to be filtered to include only transactions that would identify class members, Hilton's proposed filtering steps would yield results that are overinclusive,

---

[111] Values in this field come from the following fields in the PBM Transaction Data: ███████████

[112] Hilton has not received data from ███████████

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

as not all information relevant to the identification of class members and calculation of damages is contained within the Walgreens Transaction Data and the PBM Transaction Data

56.     **Hilton's Approach:** After collecting and matching the responsive transaction data from Walgreens and the PBMs, Hilton then proposes to limit the data to at-issue transactions by filtering the matched data to include only transactions that qualify for class members. She does this by limiting the data to where the ███████████████████████████████████████████████████████████

███████████████████████ ██ ████████████████████████████████████████████

█████████████████████████████████████████████

57.     **Hilton's Methodological Flaws:** Hilton's methodology for isolating plans and beneficiaries that meet the definition of the class will yield overinclusive results. As discussed previously in Paragraphs 25-27, Hilton's methodology cannot accurately determine whether a health plan is a government entity, a government-funded entity, or a PBM-affiliated entity—████████████████████████████████████

█████████████████████████—nor can her methodology determine whether a plan is fully insured or self-insured. Not all of the information that is necessary for this analysis is in the data, a fact that Hilton ignores.

58.     For example, in her report, Hilton provides damages calculations for claims for the Named Plaintiff ████████████ █ ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████ █ █████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

---

[113] Hilton Dep. at 89:19-90:11.
[114] Hilton Report at Exhibit 3A.
[115] ████████████████████████████████████████████████████████

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

59.     Additionally, the data file HILTON_0000133 responds to an interrogatory asking that for each Fund Plaintiff, Plaintiffs identify each purchase of a generic drug made at Walgreens during the Relevant Time Period by one of the fund's beneficiaries in which Plaintiffs contend the fund was overcharged for that generic drug. The table below shows example records that appear in HILTON_0000133, that when properly matched to the data Walgreens produced, are not related to the named Fund Plaintiffs, but instead are related to ███████████████████████████████████ The fact that these non-union fund related transactions appear in HILTON_0000133 and are characterized by Hilton as Fund Plaintiff transactions where the fund was overcharged is further evidence that Hilton's methodology for identifying relevant transactions is flawed.



### III.     Hilton's Method Of Determining PSC Prices For Use As Alternate U&C Submission Is Flawed

60.     While I agree that the PSC Transaction Data and the Walgreens PSC Formularies can be leveraged to determine the PSC price applicable to an insured transaction, Hilton's method for doing so contains several errors and inconsistencies that result in her selecting incorrect PSC prices or selecting different PSC prices for the same class member transaction in different exhibits and data files she has provided along with her report. Furthermore, Hilton fails to account for the PSC membership fee in her price determination.

61.     *Hilton's Approach:* To assign a PSC price to a potential class member transaction, Hilton applies the following hierarchy for each combination of drug, quantity, and day as the transactions in the matched Walgreens and PBM Transaction Data.[116] If no PSC price is found using the steps below, the transaction is excluded from the class.[117]

---

[116] Hilton Dep. at 250:11-17.
[117] Hilton Dep. at 219:8-18.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a. **The Walgreens PSC Transaction Data:** First, Hilton determines if the matched at-issue transactions are for PSC drugs by determining if there are records in the Walgreens PSC Transaction Data[118] with the same ██████████████████████ ██████████████████.[119] Hilton determines the PSC price to apply by adding the amounts in the ██████████████████████ on the PSC transaction in Walgreens' data.[120] If those fields are null, Hilton uses the amount in the ████████████ ██████ field as the PSC price.[121] If that field is also null, Hilton uses the amount in the ██ ████████ field as the PSC price.[122] If there are multiple PSC transactions at different prices for the same ██████████████████████, Hilton uses the most common price as the PSC price.[123] If there is an exact tie, Hilton uses the higher of the two prices.[124]

b. **The Walgreens PSC Formularies:** If Hilton cannot identify a PSC price for a certain day in the Walgreens PSC Transaction Data, she uses the Walgreens PSC Formularies, as defined in Hilton's report, to determine the PSC price.[125]

c. **The Walgreens** ██████████████████████**:** If there is no match to the Walgreens PSC Formulary on the date of the transaction, Hilton uses the Walgreens ████████ ██████████████, as defined in Hilton's report.[126] For Non-VPG drugs,[127] she finds ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████.[128]

62. *Hilton's Methodological Flaws:* Hilton's determination of PSC prices for damages suffers from a number of flaws including: (1) failing to account for the PSC membership fee; (2) not correctly accounting for sales taxes in the PSC price, (3) erroneously using ████████████ as the PSC price, and (4) erroneously relying on the Walgreens ██████████████████ as a source for VPG and Non-VPG PSC prices (See Appendix A for a discussion of VPG vs. Non-VPG drugs).

a. **Hilton Fails To Account For The PSC Membership Fee:** As stated in Nordby's report, and as described in Paragraphs 32-39 of this report, the price that PSC members pay for prescription drugs must include both the amount paid at the register and the PSC membership fee, as the membership fee is required before members have "the right to

---

[118] Refer to Appendix A for additional detail on this table.
[119] Hilton accomplishes this by the replicating PSC transactions in the PSC data for up to seven days into the past if no other transaction for the same NDC and quantity exists. Hilton Dep. at 251:1.
[120] Hilton Dep. at 222:5-9.
[121] Hilton Dep. at 222:16-19.
[122] Hilton Dep. at 222:20-21.
[123] Hilton Dep. at 241:5-13.
[124] Hilton Dep. at 243:13-14 (errata sheet).
[125] Hilton Report ¶ 47.
[126] Hilton Report ¶ 48.
[127] ████████████████████████████████████████ ████████████████ Refer to the Dymon Declaration, ¶ 36 for additional detail.
[128] Hilton Dep. at 257:5-9.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

access lower PSC formulary prices" as part of PSC's "conditional" pricing arrangement.[129] As explained in Paragraph 38 of this report, the average portion of the PSC membership fee per PSC transaction ranges between ███████████, depending on the year. Therefore, under Plaintiffs' damages theory, according to Nordby, this allocated share of the PSC membership fee should be added to any PSC price derived from the various sources of PSC pricing.[130] Adding the allocated membership fee to the PSC price reduces damages on all transactions and completely eliminates damages on many of the Named Consumer Plaintiff and Named Fund Plaintiff transactions where Hilton alleges damages. The table below contains transactions from the data file HILTON_0000132, which was produced in response to an interrogatory asking Hilton to identify, for each Named Consumer Plaintiff, each purchase of a generic drug made at Walgreens during the Relevant Time Period which Plaintiffs contend Walgreens overcharged the Named Consumer Plaintiff for that generic drug. The examples in the table below are transactions included on HILTON_0000132 where damages would be eliminated with the allocation of the PSC membership fee. The same issue arises in relation to Hilton's alleged Fund Plaintiffs damages.

███████████████████████████████████████████████████

b.  **Hilton Does Not Correctly Account For Sales Taxes In The PSC Price:** ████████

███████████████████████████████████████████████████

---

[129] Nordby Report ¶¶ 10-11.
[130] Nordby Report ¶¶ 10-11.
[131] ████████████████████████████████████

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

c. **Hilton Erroneously Uses** ███████████ **as the PSC Price:** In her deposition testimony, Hilton stated that if no data was populated in the ████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ as the PSC price.[132] This methodology for determining the PSC price is incorrect. According to the Dymon Declaration, ███████████ ██████████████████████████████████████████ █████████████████████████████████.[133] ███████ ████████████████████████████████████.[134] ████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████[135] An actual example of Hilton erroneously using the ███████████ ██████ ███████ appears in the HILTON_0000133 data file, shown in the tables below. On the listed transaction, Hilton selects ███████ as the PSC price, but that price only appears in the Walgreens PSC Transaction Data on one record for this ███████████████████████████ █████████ field. Hilton makes two mistakes in selecting ███████ as the PSC price. First, the ██████████████████████████████████████ on the PSC transaction she selected equal ████████. Second, there are other PSC transactions closer in time to the disputed transaction with a higher PSC price of ████████ (before the allocation of the membership fee).

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

[132] Hilton Dep. at 223:18-23.
[133] Dymon Declaration ¶ 34.
[134] Dymon Declaration ¶ 34.
[135] Dymon Declaration ¶ 34.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

d.  **The Walgreens** ████████████████████ **Is Not An Accurate Source For VPG PSC Prices.**

---

[136] Hilton Dep. at 257:13-20.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



e.  **Walgreens** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Is Not An Accurate Source For Non-VPG PSC Prices.** Hilton uses the Walgreens ▮▮▮▮▮▮▮▮▮▮▮ as a source for Non-VPG PSC prices, when the data does not contain that information.[137] As stated in Appendix A to this report and the Dymon Declaration, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[138] The Non-VPG Walgreens ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ The table below provides an example of the deficiency created by using the Non-VPG Walgreens ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as a PSC price source. In the example below ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[137] Hilton Report ¶ 48.
[138] Dymon Declaration ¶ 37.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████ Due to the vast quantity of data that would be analyzed in a class-wide analysis, differences of only a few cents in the determined PSC price can impact the damages by significant amounts. As a result, the Walgreens ████████████████ ██ cannot be used as a reliable source for Non-VPG pricing.

███████████████████████████████████████████████████

63. **_Hilton's Failure To Execute Her Own Methodology:_** A key aspect of Hilton's damages calculation is the determination of the PSC price, because her assessment of damages is based on amounts paid in excess of the PSC price. However, Hilton fails to reliably execute her own methodology for selecting PSC prices to calculate damages as follows: (1) Hilton calculates PSC prices not supported by the data; and (2) Hilton's PSC prices for the same transaction are inconsistent within her own data files. As a result, the determination of PSC prices requires expert analysis. This is further illustrated because the PSC prices Hilton assigns to Named Consumer Plaintiff and Named Fund Plaintiff transactions in her analysis are different from the PSC prices listed on the same Named Consumer Plaintiff and Named Fund Plaintiff transactions in the Fourth Amended Complaint.

64. **Hilton Calculates PSC Prices Not Supported By The Data:** Hilton's executed methodology for determining the PSC price available at Walgreens for a given drug, quantity, and date, is flawed because it results in her concluding that PSC prices were available to consumers that were not, in fact, available. Out of the ██████ Named Fund Plaintiff transactions appearing in HILTON_0000133 on which Hilton calculated damages, when applying the methodology of selecting PSC prices described by Hilton, I cannot replicate the selected PSC prices on at least ██ transactions, prior to the allocation of the membership fee discussed above.[139] An investigation of the differences reveals that Hilton's executed methodology results in selecting prices that were not available at the time of the transaction at issue. As an example, the table below shows a Named Fund Plaintiff transaction from December 5, 2016 that appears on HILTON_0000133 as an ████████████ transaction with damages. Hilton's methodology results in concluding that the PSC price available for this drug, quantity, and day ███

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

[139] Refer to **Attachment 4** for a list of these transactions.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

65.

66.     As another example where Hilton selects an incorrect PSC price under her own stated methodology,

---

[140] Hilton Dep. at 218:2-4.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

67.     Hilton does not clearly explain the methodology she used to identify [REDACTED] [REDACTED] . The fact that experts need to analyze voluminous data to determine the PSC price, and that Hilton has not shown that her methodology is capable of accurately assessing that data to determine the PSC prices being offered, means that an individual review of alleged PSC prices for each

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

transaction where Plaintiffs allege damages will be necessary to confirm or rebut Plaintiffs' PSC price allegations. As stated above, these PSC price differences are not isolated to a few transactions, but exist in at least ▮ transactions in the limited Named Fund Plaintiff data that was produced. If Hilton were to execute her methodology for identifying PSC prices on the proposed class-wide data there would likely be millions of incorrectly selected PSC prices, meaning each of the prices she picks would need to be individually investigated.

68.     **Hilton's PSC Prices Are Inconsistent Within Her Own Data Files**: Exhibit 3C to Hilton's report contains illustrative examples of Named Fund Plaintiff overpayments. Hilton also produced HILTON_0000133, which is a data file that purportedly contains all potential Named Fund Plaintiff overpayments her executed computer scripts identified. Notably, there are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ that appear on Exhibit 3C of Hilton's expert report as an overpayment that do not appear in HILTON_0000133. This inconsistency indicates that it is possible that Hilton is not using the computer scripts she produced to identify the Named Fund Plaintiff transactions with overpayments she included in her expert report, but is using some other, possibly manual, methodology to review transactions. The fact that there are transactions that Hilton specifically selected as illustrative examples in her report that do not appear on HILTON_0000133, which purportedly contains all possible Named Fund Plaintiff overpayments identified by Hilton's calculations, demonstrates that Hilton has not established an accurate, consistent and repeatable methodology for calculating damages without individualized analysis and review. The table below lists the ▮▮▮▮▮▮▮▮▮ that appear on Hilton's Exhibit 3C in her expert report, but were not generated by her executed computer scripts, because they do not appear on HILTON_0000133.



69.     In addition, ▮▮▮▮▮▮▮▮ appears on both Hilton's Exhibit 3C and HILTON_0000133, but ▮▮▮▮▮▮ is assigned a different PSC price in each file. On Exhibit 3C, Hilton identifies the PSC price on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. This further illustrates the complexity of identifying a PSC price and Hilton's inability to present a reliable, consistent, and accurate class-wide analysis. The fact that Hilton's executed methodology results in the same Named Fund Plaintiff transaction appearing twice in Hilton's work product (Exhibit 3C and the data file HILTON_0000133) with different PSC prices shows she has not

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

established a formulaic basis to calculate damages without individualized inquiries. The table below provides detail on this transaction and the conflicting PSC prices in Hilton's analysis.



70.      **Hilton's Analysis Shows The Complexity Of Determining PSC Prices As Her Own Analysis Contradicts PSC Prices In The Fourth Amended Complaint**: Further evidence that determining PSC prices require expert analysis and that Hilton's PSC prices will need to be individually investigated comes from the fact that Hilton disagrees that there are damages on ▮▮▮▮▮ Named Consumer Plaintiff transactions ▮▮▮ that appear on the Fourth Amended Complaint and ▮▮▮▮▮ Named Fund Plaintiff transactions ▮▮▮ that appear on the Fourth Amended Complaint because those transactions do not appear on either of Hilton's exhibits to her report nor her data files listing all transactions where she calculated damages.[141] Based on Hilton's deposition testimony, her staff, who was responsible for writing and executing the computer scripts used to identify the transactions with damages in Hilton's report, also assisted Plaintiffs' counsel in identifying the transactions with alleged damages to include in the Fourth Amended Complaint.[142]

71.      The fact that the methodology for identifying relevant transactions and available PSC prices for a ▮▮▮▮▮▮▮▮▮ could change so significantly in the time between the Fourth Amended Complaint and Hilton's report shows that selecting a PSC price from the available data is not a straightforward exercise. Given the complexity of determining a PSC price, individual review and expert testimony will be needed to assess every PSC price selected by Plaintiffs. Refer to the table below for a list of transactions that appear on the Fourth Amended Complaint with alleged damages, but not in the Exhibits to Hilton's report or Hilton's data files that contain all Named Consumer Plaintiff and Named Fund Plaintiff transactions where she calculated damages under her methodology.[143]

---

[141] Fourth Amended Complaint, at 7, 9, 10, 12, 13, and 15; Hilton Report, Exhibits 3A and 3C; HILTON_0000132 and HILTON_0000133.
[142] Hilton Dep. at 268:1-6.
[143] HILTON_0000132 and HILTON_0000133.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### IV.    Claims Re-Adjudication

72.    As stated in the Hughes Report, "to accurately assess what a consumer would have paid for their drugs if Walgreens had reported its PSC prices as its U&C prices as plaintiffs allege it was required to do, would require a re-adjudication of all of the consumer's relevant prescription drug spending at both Walgreens and all other pharmacies. This assessment would also include the consumer's medical spending during a given year for some consumers and would require knowledge of their health plan's terms for determining the consumer's drug payments."[144] In order to re-adjudicate consumer claims, it is necessary to know if the consumer's payment is based on coinsurance, copayment, some other methodology, or if out-of-pocket maximums apply.[145] Additionally, "TPPs receive payments after the prescription is filled that reduce their prescription drug costs. Because these payments occur after the prescription transaction, they are generally not recorded in the prescription claims data Dr. Hilton proposes using in her transaction-by-transaction analysis."[146]

73.    Hilton's report proposes that overpayments on claims can be calculated using only the information in the Walgreens Transaction Data and PBM Transaction Data. According to the Hughes Report and as discussed above in Paragraphs 30-31, this is incorrect. The information necessary to properly re-adjudicate the claims is not contained in the Walgreens Transaction Data or PBM Transaction Data produced in this matter. As stated in the Hughes Report, re-adjudication is necessary and will require individualized review of plan documents, PBM contracts, collection of non-Walgreens pharmacy transactions, and collection of medical transactions because those documents and data contain information necessary to properly re-adjudicate a transaction.[147]

74.    ***Hilton's Approach:*** Hilton's methodology proposes that she would determine whether PBMs adjudicated claims using coinsurance or copayment benefits by assuming that, for a given calendar month, all transactions adjudicated by a specific PBM were adjudicated using coinsurance if 90% of the at-issue transactions have the same consumer share percentage (consumer payment as a % of the total consumer and plan payment).[148] If less than 90% of the transactions for the PBM in the month have the same consumer share percentage, Hilton assumes that the consumer payment on all transactions for that PBM and month are copayments.[149] She would use the coinsurance and copayment determination to calculate alleged overpayments on claims using the alternate U&C based on the PSC price and allocate damages between the TPP and the TPP's beneficiary. For example, assume that for a given month, there were 100 transactions associated with a PBM and 50 of the transactions were adjudicated using 25% coinsurance and 50 were adjudicated using a $15 copay. Hilton would calculate overpayments assuming the consumer share was based on copay for all 100 claims, even the coinsurance transactions, because less than 90% of the transactions have the same consumer share percentage. On the coinsurance transactions where Hilton misidentifies the methodology used to re-adjudicate the claim as copay, her calculation would understate consumer damages and overstate plan damages because she assigns an incorrect share of the PSC price to

---

[144] Hughes Report ¶ 15.
[145] Hughes Report ¶ 16.
[146] Hughes Report ¶ 18.
[147] Hughes Report ¶¶ 14-15.
[148] Hilton Dep. at 275:4-11.
[149] Hilton Dep. at 272:15-17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the consumer. On coinsurance transactions, damages are split between the TPP and consumer based on the coinsurance percentage; whereas, for copay transactions, the consumer will not have damages until the PSC price falls below the consumer's copay. However, in this example of Hilton's approach, the consumers with coinsurance will be treated as a copay transaction and assigned $0 damages, even though their coinsurance payments would have changed.

**Table 25: Hypothetical Example Of Impact When Hilton Incorrectly Categorizes Coinsurance Transactions as Copay**

| Consumer Share Methodology | Count of Transactions For PBM and Month | % | Hilton Methodology Used to Re-adjudicate Claim | Portion of Payment Decrease Assigned to Consumer by Hilton | Portion that Should be Assigned to Consumer |
|---|---|---|---|---|---|
| 25% Coinsurance | 50 | 50% | Copay | $0 Until PSC Price Falls Below Copay Amount | 25% of any decrease |
| $15 Copay | 50 | 50% | Copay | | $0 Until PSC Price Falls Below Copay Amount |
| **Total** | **100** | **100%** | | | |

75.    Alternatively, assume that for a given month, there were 100 transactions associated with a PBM and 91 of the transactions were adjudicated using 25% coinsurance and nine were adjudicated using a $15 copay. Hilton would calculate alleged overpayments on all 100 claims as if the consumer share was based on coinsurance, even the copay transactions, because greater than 90% of the transactions have the same consumer share percentage. On copay transactions where Hilton misidentifies the methodology used to re-adjudicate the claim as coinsurance, her methodology understates plan damages and overstates consumer damages because she assigns an incorrect share of the PSC price to the consumer. On copay transactions, damages are assigned entirely to the TPP until the TPP's payments are reduced to $0 and the PSC price falls below the consumer's copay, at which time the consumer would start being allocated damages. However, under Hilton's approach, the consumer would be assigned a percentage of the damages, even if their copayment would not have changed.

**Table 26: Hypothetical Example Of Impact When Hilton Incorrectly Categorizes Copay Transactions as Coinsurance**

| Consumer Share Methodology | Count of Transactions For PBM and Month | % | Hilton Methodology Used to Re-Adjudicate Claim | Portion of Payment Decrease Assigned to Consumer by Hilton | Portion that Should be Assigned to Consumer |
|---|---|---|---|---|---|
| 25% Coinsurance | 91 | 91% | Coinsurance | 25% of any decrease | 25% of any decrease |
| $15 Copay | 9 | 9% | Coinsurance | | $0 Until PSC Price Falls Below Copay Amount |
| **Total** | **100** | **100%** | | | |

76.    **Hilton's Methodology To Calculate Consumer And Plan Damages:** Hilton used the amount in the ▮▮▮▮▮▮▮ field on each transaction as the amount the consumer paid on the transaction.[150] Hilton identifies the amount paid by each TPP by looking at the amounts in the fields in the PBM

---

[150] Hilton Report ¶ 64.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Transaction Data that appear to report TPP payment amounts, named differently in each PBM data set.[151] Hilton provided the following formulas in her report to calculate consumer and TPP overpayments.[152]

Consumer Copayment Overpayment = █████████ – PSC Price

Consumer Coinsurance Overpayment = █████████ – (PSC Price x Coinsurance %)

Total Overpayment = (TPP Payment from PBM Data + █████████) – PSC Price

TPP Overpayment = Total Overpayment – Consumer Overpayment

77.     Hilton also proposes a methodology to calculate unjust enrichment damages. Hilton calculates unjust enrichment on transactions in the proposed consumer class as equal to the amount paid by the PBM to Walgreens plus the amount paid by the consumer to Walgreens minus the alternative U&C based on the PSC price.[153] Hilton uses the same formula to calculate unjust enrichment in the proposed TPP class.[154]

Consumer Class Unjust Enrichment = █████████ + PBM Payment to Walgreens – PSC Price

TPP Class Unjust Enrichment = █████████ + PBM Payment to Walgreens – PSC Price

78.     **_Hilton's Methodological Flaws:_** Hilton's transaction-by-transaction approach ignores key components of claims adjudication in the determination of damages, especially related to consumer shares, where changes in a consumer's share on one claim can have down-stream impacts on their payments on other claims (e.g. decreasing a deductible payment on one claim will increase future deductible payments). As stated in the Hughes Report, Hilton's "approach fails to recognize that each transaction in a benefit year can impact the amount a consumer must pay for a transaction later in that benefit year."[155]

79.     To re-adjudicate claims and determine the change in consumer and plan payments requires the correct determination of the consumer benefits. As stated in the Hughes Report, in order to determine injury to a proposed consumer class member "it is necessary to know whether the consumer met their deductible, whether they paid a copayment, coinsurance, or some hybrid of the two, and whether they met their out-of-pocket maximum."[156] The information needed to re-adjudicate consumer benefits under these provisions is not available in the Walgreens or PBM Transaction Data produced in this matter.

80.     Hilton oversimplifies her analysis by assuming that only copay and coinsurance apply to consumer benefits, when, in fact, consumers have numerous other key consumer responsibility items including deductibles, out-of-pocket maximums, and combined medical and pharmacy deductibles and out-of-pocket maximums.[157] Items such as these affect multiple prescription drug claims for a consumer

---

[151] ████████████████████████████████████████████████████

[152] Hilton Report ¶¶ 22-26.
[153] Hilton Report, Exhibit 3B.
[154] Hilton Report, Exhibit 3D.
[155] Hughes Report ¶ 88.
[156] Hughes Report ¶ 89.
[157] Hughes Report ¶ 89.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and their families throughout the plan year. For example, decreases in deductible payments on one claim would result in increased deductible payments on future claims until the consumer meets the full deductible. By failing to account for these items, Hilton fails to correctly re-adjudicate claims and calculate damages. To correctly assess the impact of these items requires the individualized review of benefit plans to determine deductible amounts, out-of-pocket maximums, copay parameters, and coinsurance parameters. It also requires the review of significant volumes of transaction data that has not been collected for this matter (e.g. brand-name drug claims, claims from other pharmacies, and, for some consumers/TPPs, medical claims).[158]

81.      **Consideration of Deductibles**: Even though it is common for consumers to have deductibles on their health plans,[159] Hilton proposes no methodology to account for deductibles in her calculation of consumer overpayments.[160] Nor does Hilton propose a methodology for even determining which consumers have deductibles on their plans and the amounts of their deducible. The information needed to determine a consumer's deductible is not available in the Walgreens Transaction Data or the PBM Transaction Data produced in this matter. Deductibles have a significant impact on consumer damages for several reasons, as set forth in the Hughes Report.

82.      Deductibles are a fixed amount that must be paid by the consumer before the plan makes any payment.[161] Therefore, if a consumer allegedly overpaid a claim in the deductible phase and their payment was reduced, that amount would be reduced from the consumer's accumulated deductible payments and would need to be paid on a later claim before the TPP begins making payments. Therefore, any reduction in what a consumer pays on a transaction in the deductible phase will increase what the consumer pays on a later transaction until the consumer exhausts their deductible. This recalculation of deductibles could reduce or eliminate a consumer's damages. For example, consider a hypothetical consumer with a $100 deductible, after which they owed a $5 copay per transaction. If, as shown in the table below, the amount the consumer paid on their first two transactions were reduced to the PSC price, then the consumer would have to pay more on later transactions, that were previously copay transactions, to satisfy their deductible. Hilton's methodology does not account for this and only identifies the transactions where the PSC price is less than what the consumer paid. She does not identify the follow-on impact from a change in the pricing on one transaction that could cause the consumer to pay more than they originally paid on later transactions. In order for her to do that analysis she would need to know each consumer's deductible, their total brand and generic drug spend at Walgreens, their total brand and generic drug spend at other non-Walgreens pharmacies, and potentially their total spend on other medical or hospital services.

---

[158] Hughes Report ¶¶ 14-15.
[159] Hughes Report ¶ 45.
[160] Hilton Dep. at 291:21-292:4.
[161] Hughes Report ¶ 45.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**Table 27: Hypothetical Example Of Hilton's Failure To Consider Deductibles**

Original Prescription Price: $40

PSC Price: $20

Deductible: $100

Copayment: $5

| Trxn. No. | Original Consumer Payment | | Hilton Method: Consumer Payment | | Corrected Method: Re-Adjudicated Consumer Payment | | Alleged Overpayment | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Rx Payment | Cumulative Aggregate | Rx Payment | Cumulative Aggregate | Rx Payment | Cumulative Aggregate | Hilton Method. | Method. Considering Deds. |
| | A | B= ΣA | C | D= ΣC | E | F= ΣE | G=A-C | H=A-E |
| 1 | $40 | $40 | $20 | $20 | $20 | $20 | $20 | $20 |
| 2 | $40 | $80 | $20 | $40 | $20 | $40 | $20 | $20 |
| 3 | $20 | $100 [1] | $20 | $60 | $20 | $60 | $0 | $0 |
| 4 | $5 | $105 | $5 | $65 | $20 | $80 | $0 | ($15) |
| 5 | $5 | $110 | $5 | $70 | $20 | $100 [1] | $0 | ($15) |
| 6 | $5 | $115 | $5 | $75 | $5 | $105 | $0 | $0 |
| Total | $115 | | $75 | | $105 | | $40 | $10 |

[1] Consumer exhausts their deductible on transaction 3 under their original payments and transaction 5 under the re-adjudicated payments.

83.    **Application Of Deductible For Patient With Copay Benefits:** Hilton's proposed methodology for assessing damages looks at each Walgreens transaction in isolation, even though it is common for the amount paid by a consumer or TPP on one transaction to impact the amount that will be paid on later transactions. The table below shows *an actual example* from the Walgreens Transaction Data of how Hilton's proposed damages approach fails to generate accurate results when applied to a consumer with a plan with a deductible.[162] In this example, ██████████████████████████████

█████████████████████████████████████████████████████████████████████████████████.

Note, however, that there is ████████████████████████████████████████████████████

██████████████████████████████████████. For this example, I identified a consumer who appears to have a deductible based on reviewing the pattern of consumer and plan payments on the transactions over time; however, there is ████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████). Based on the pattern of payments, by June 2013, ████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████.

Under Hilton's proposed methodology, consumer damages would be calculated on five of the first six transactions because the PSC price was lower than what the consumer paid. No consumer damages would be calculated on the copay transactions because the PSC price was greater than the consumer's copay. However, because under Hilton's damages scenario, the consumer is paying less on their

---

[162] For this illustration, it is assumed, but not confirmed, that this example member has a deductible based only on the amounts paid on the transactions. In order to fully assess deductible limits, plan documents would need to be reviewed and additional data collected, including brand name transactions and any transactions for purchases the member made at other pharmacies and potentially medical claims.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

deductible transactions, they would no longer have exhausted their deductible in 2013 and would therefore have to pay the full PSC price on the post June 2013 transactions ██████████ ████████████████. Hilton's incorrect methodology would result in consumer damages ████████████████ when reviewed in isolation. If, however, Hilton were to account for the deductible, as she should, consumer damages would equal ████████████████ The damages would be even less if Hilton were to take into account an allocation of the membership fee (discussed above) and other relevant information about a consumer's benefit plan, which I will discuss later in this report.

84. **Application Of Deductible For Patient With Coinsurance Benefits:** A second flaw in Hilton's methodology is that she fails to account for the fact that deductibles can also be combined with an alternate mechanism for determining the consumer portion of a transaction, such as coinsurance.

85. The table below shows *an actual example* from Walgreens' produced data of how Hilton's methodology incorrectly calculates damages for consumers with plans that have a deductible followed by coinsurance. In this example, the ████████████████████████████ ████████████████████████████████████████.[163] By May 2013, it appears as if the deductible of ████████████████████████████████████. Under Hilton's proposed methodology, ████████ ████████████████████████████████████████████████████████ ████████████████████████ Hilton's methodology would attribute higher damages to the consumer than the consumer actually could have incurred, assuming liability, ████████████████

---

[163] For this illustration, it is assumed, but not confirmed, ████████████████████████████████ ████████████████████████. In order to fully assess deductible limits, plan documents would need to be reviewed and additional data collected, including brand name transactions and any transactions for purchases the member made at other pharmacies and potentially medical claims.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

██████████████████████████████████████████████

████████████████████████████████████████ . Because of the ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████ . Hilton's

incorrect methodology would result in consumer damages █████████████████████

██████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

86. **Application Of Deductible For Patients That Use Non-Walgreens Pharmacies In The Plan Year:** A third flaw in Hilton's methodology is that she fails to account for the fact that deductible payments are not isolated to services received by the consumer from Walgreens pharmacies. Consumers can have prescription drugs filled from multiple pharmacies including non-Walgreens pharmacies within the same calendar year, and data for the transactions at non-Walgreens pharmacies would need to be collected in order to properly assess deductible accumulation under Plaintiffs' alternative pricing theory using PSC prices. Hilton has proposed no mechanism for obtaining this data or how she would be able to accurately calculate damages without this data. The table below shows a hypothetical example where a consumer has a $100 deductible and fills their first four prescriptions at Walgreens while they are within their deductible, then fills the next three prescriptions at a non-Walgreens pharmacy after the deductible has exhausted. If the Walgreens transactions were adjudicated at a lower PSC price, the consumer would pay less on the Walgreens transactions, but more on the non-Walgreens pharmacy transactions because the consumer's deductible would no longer be exhausted.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**Table 30: Hypothetical Example Of Deductible For Consumer With Non-Walgreens Transactions**

Original Prescription Price: $30

PSC Price: $12

Deductible: $100

Copayment: $5

| Trxn. No. | Pharmacy | Original Consumer Payment | | Hilton Method: Consumer Payment | | Corrected Method: Re-Adjudicated Consumer Payment | | Alleged Overpayment | |
|---|---|---|---|---|---|---|---|---|---|
| | | Rx Payment | Cumulative Aggregate | Rx Payment | Cumulative Aggregate | Rx Payment | Cumulative Aggregate | Hilton Method. | Method. Considering Deds. |
| | | A | B= ΣA | C | D= ΣC | E | F= ΣE | G=A-C | H=A-E |
| 1 | Walgreens | $30 | $30 | $12 | $12 | $12 | $12 | $18 | $18 |
| 2 | Walgreens | $30 | $60 | $12 | $24 | $12 | $24 | $18 | $18 |
| 3 | Walgreens | $30 | $90 | $12 | $36 | $12 | $36 | $18 | $18 |
| 4 | Walgreens | $10 | $100 | $10 | $46 | $12 | $48 | $0 | ($2) |
| 5 | Non-Walgreens | $5 | $105 | $5 | $51 | $30 | $78 | $0 | ($25) |
| 6 | Non-Walgreens | $5 | $110 | $5 | $56 | $22 | $100 | $0 | ($17) |
| 7 | Non-Walgreens | $5 | $115 | $5 | $61 | $5 | $105 | $0 | $0 |
| Total | | $110 | | $56 | | $100 | | $54 | $10 |

87.     An actual example showing a consumer using multiple pharmacies to fill prescriptions comes from ▬▬▬▬ produced pharmacy transaction data[164] for Named Consumer Plaintiff ▬▬▬ that show that she filled prescriptions at multiple pharmacies in 2014. The table below shows examples of transactions that ▬▬▬▬▬▬▬▬▬▬



88.     Furthermore, other data produced in this matter shows that it is common for consumers to use multiple pharmacies. ▬▬▬▬ produced a file ▬▬▬▬▬▬▬▬▬ with both Walgreens and non-Walgreens transactions. Within that file there are ▬▬▬▬▬▬ that had at least one claim from a

---

164 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Walgreens pharmacy in 2017, ███████████████████████ also had at least one claim from a non-Walgreens pharmacy in 2017.

89.    Since consumers can use multiple pharmacies within a year, to properly conduct a damages analysis that accounts for the impact of payment changes on deductibles, one would need to collect and analyze data from non-Walgreens pharmacies.

90.    **Application Of Deductible For Patients That Purchase Brand-Name Prescriptions:** Hilton's methodology is also flawed for a fourth reason, she fails to account for the fact that health plan deductibles can commonly be satisfied both by generic and brand-named drugs.[165] In order to properly assess deductible accumulation under Plaintiffs' alternative pricing theory using PSC prices, transaction data for both brand-name and generic drugs would need to be collected. Hilton has not proposed a mechanism for obtaining this data or how she would be able to accurately calculate damages without this data.

91.    Refer to the table below for *an actual example* from the Walgreens 12K Sample Data of the impact of brand-name transactions on Plaintiffs' proposed damages calculations. In this example, the consumer's first six transactions in 2017 appear to be ████████████████████████████ ██████████████████████████████████████ By September 2017, it appears as if the deductible ███ ██████████████████████████████████████████████████ ██████████████████████████████████ Under Hilton's proposed methodology, ██████████ ██████████████████████████████████████████████ ████████████████████████████████. Hilton's methodology would attribute higher damages to the consumer than the consumer actually could have incurred, assuming liability, because Hilton's methodology ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. Hilton's damages methodology is flawed ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Furthermore, for this patient, ████████████████████████████████ ██████████. To do this on a class-wide basis requires collecting additional data regarding each potential class member's brand-name drug transactions in addition to generic drug transactions.

---

[165] Hughes Report, ¶¶ 14-15, 106.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



92.     **Application Of Deductible For Patients That Have Combined Medical And Pharmacy Deductibles:** A fifth reason Hilton's methodology is flawed is her failure to account for the fact that health plan deductibles can be satisfied both by pharmacy and medical transactions.[166] In order to properly assess deductible accumulation under Plaintiffs' alternative pricing theory using PSC prices, transaction data from all health care providers where consumers incurred costs would need to be obtained. Hilton has not proposed a mechanism for obtaining this data or how she would be able to accurately calculate damages without this data. Refer to the table below for an illustration of the impact of medical transactions on Plaintiffs' proposed damages calculations. The table below shows a hypothetical example because data from medical providers has not been produced in this litigation. In this example, a consumer has a $100 deductible and fills four prescriptions at Walgreens exhausting their deductible. They then receive medical services where their plan allows $1,000, assigning the consumer a 10% coinsurance. If the Walgreens transactions were adjudicated at a lower PSC price, the consumer would pay less on the Walgreens transactions, but not have exhausted their deductible at the time of their medical services, causing them to owe a greater share of the $1,000 charge than the 10% they originally paid.

**Table 33: Hypothetical Example Of Consumer With Combined Medical And Pharmacy Deductible**

| Original Prescription Price: $30<br>PSC Price: $12<br>Deductible: $100<br>Coinsurance: 10% | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Original Consumer Payment** | | | **Hilton Method: Consumer Payment** | | | **Corrected Method: Re-Adjudicated Consumer Payment** | | | **Alleged Overpayment** | |
| Trxn. No. | Location | Consumer Payment | Plan Payment | Cumulative Consumer Aggregate | Consumer Payment | Plan Payment | Cumulative Consumer Aggregate | Consumer Payment | Plan Payment | Cumulative Consumer Aggregate | Hilton Medod. | Method. Considering Deds. |
| | | A | B | C= ΣA | C | D | E= ΣC | F | G | H= ΣE | I=A-C | J=A-F |
| 1 | Walgreens | $30 | $0 | $30 | $12 | $0 | $12 | $12 | $0 | $12 | $18 | $18 |
| 2 | Walgreens | $30 | $0 | $60 | $12 | $0 | $24 | $12 | $0 | $24 | $18 | $18 |
| 3 | Walgreens | $30 | $0 | $90 | $12 | $0 | $36 | $12 | $0 | $36 | $18 | $18 |
| 4 | Walgreens | $10 | $20 | $100 | $10 | $20 | $46 | $12 | $0 | $48 | $0 | ($2) |
| 5 | Medical | $100 | $900 | $200 | $100 | $900 | $146 | $147 [1] | $853 | $195 | $0 | ($47) |
| | Total | $200 | | | $146 | | | $195 | | | $54 | $5 |

[1] The consumer payment is comprised of $52 in remaining deductible + 10% of $948. ($52.00 + $94.80 = $146.80)

---

[166] Hughes Report ¶ 62.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

93.     **Consideration Of Out-of-Pocket Maximums:** When a consumer's plan has an out-of-pocket maximum, there is a maximum amount the consumer can pay over the course of the plan term, typically one year.[167] For consumers that reach their out-of-pocket maximum, they pay $0 on subsequent prescription drug purchases during the plan term.[168] As a result, if a consumer reaches their out-of-pocket maximum, there generally would be no impact if their payment on a particular pharmacy transaction was decreased, because that would only increase the amount the consumer owed on later transactions until the person hit their maximum amount. In these cases, the person would have paid the same amount over the benefit year even if Walgreens had reported the PSC price as its U&C price. Hilton's methodology provides no mechanism to determine which consumers have out-of-pocket maximums on their plans, the amount of those out-of-pocket maximums, and how to account for the impact of out-of-pocket maximums. This information is not contained in the Walgreens Transaction Data or the PBM Transaction Data produced in this matter.

94.     Named Plaintiff ████████ is an example of a consumer who had an out-of-pocket maximum.[169] In 2012, ████████ made payments on all pharmacy transactions through June 2012. After June 2012, ████████ share of the costs on pharmacy transactions were ████████████████. In January 2013, ████████ began paying a share of pharmacy transactions again. If ████████ paid less on transactions between January and June 2012 because Walgreens submitted its PSC prices as its U&C prices, he would pay more on the post-June 2012 transactions where he previously ████████ ████████████████████████. Hilton's methodology erroneously assesses each transaction in isolation, when, in fact, the amount a consumer pays on one transaction can impact the amount they owe on following transactions.

95.     The table below illustrates Hilton's failure to properly account for out-of-pocket maximums in her damages calculations for a different consumer. In this **actual example**, ████████████████ ████████████████████████. Note that it is not possible to determine the consumer's out-of-pocket maximum obligation from the Walgreens Transaction Data. To determine out-of-pocket maximums, plan documents would need to be reviewed. For purposes of this example, I assumed based ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████. Accordingly, when properly analyzed, Hilton's calculated damages of ████████████████████████████████████.

---

[167] Hughes Report ¶ 46.
[168] Hughes Report ¶ 46.
[169] *See* ████████ benefit plan design documents: ████████████████ █ ████████. s Plaintiffs are not claiming damages for ████████ █ ████ an out-of-pocket maximum, I use this merely as illustration of how out-of-pocket maximums should be accounted for.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



96.     Similar to the discussion regarding evaluating deductibles in Paragraphs 81-92 of this report, out-of-pocket maximums are impacted by information beyond generic drug claims at Walgreens pharmacies. In order to fully evaluate out-of-pocket maximums, I would need to review brand-name drug transactions, transactions from other pharmacies, and when an out-of-pocket maximum is based on combined medical and prescriptions charges, I would need medical claims data as well.[170]

97.     **Hilton Fails To Account For Copay Reimbursement Eligibility:** Hilton's methodology does not account for unique plan payment terms ███████████████████████████████████.[171] According to the ██████ declaration, during 2011, ████████████████████████████████

---

[170] Hughes Report ¶¶ 14-15.
[171] Refer to the Hughes Report, ¶ 121 for another example of a consumer payment being determined by a mix of payment factors.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



."[172] As a result, neither the Walgreens Transaction Data nor the PBM Transaction Data reflects what the consumer and the TPP ultimately paid on the transaction. In order to know the consumer payment, accounting for the reimbursement they received from the third-party medical administrator, additional data from the third-party administrator, the TPP, or the consumer would need to be collected. Additionally, individual plan reviews would need to be undertaken in order to identify which of the hundreds of thousands of plans at issue have unique plan terms like this example.

98. **Limits On Coinsurance, Mix Of Copay And Coinsurance, Coinsurance Maximums:** Even assuming Hilton's flawed methodology for determining whether the consumer share of a transaction is based on coinsurance or a copay is correct (it is not), Hilton's assumption that the same consumer payment methodology would be used if the transaction were re-adjudicated at a lower price is incorrect. As discussed in the Hughes Report, there can be limits on coinsurance, where a consumer pays a certain percentage up to a set dollar amount, after which they pay a flat maximum.[173] Plans can require copayments on certain drugs and coinsurance or other drugs. See for example the benefit overview for a ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████.[174] These plan design terms are not contained in the Walgreens or PBM Transaction Data produced in this matter. Hilton does not account for any of these plan design terms, nor does she propose a methodology for collecting this information and accounting for it on a class-wide basis. In fact, in order to know the specific consumer payment terms, an individualized review of plan documents would be necessary. This information is not included in the data, and once the plan design is determined based on review of plan documents, it would require expert analysis of each purported consumer class member to which these special terms apply to calculate any purported overpayment.

99. **Hilton Fails To Account For Medicare Part D Stages:** Hilton includes Medicare Part D plans in her analysis, but, as discussed in the Hughes Report, provides no mechanism for properly adjudicating the consumer portion of Medicare Part D plan transactions.[175] Hilton's methodology assumes that all transactions over the course of a month for the same PBM use only one of two consumer responsibility options – that is, they are either copay transactions or coinsurance transactions.[176] However, as Hughes states, a single Part D plan has various stages of consumer payments that can vary from deductibles, to copayments and coinsurance.[177] To properly address the benefit stages requires analyzing a consumer's full benefit-year of transactions (including brand and

---

[172] ████████████████████████████████████████████████████████████████
[173] Hughes Report ¶ 121.
[174] ███████████████████████████████████████.
[175] Hughes Report ¶ 124.
[176] Hilton Dep. at 272:7-17.
[177] Hughes Report ¶¶ 124-138.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

generics as well as any transactions at other pharmacies) and their benefit plans to understand their thresholds for each benefit stage to recalculate the consumer payment.

100.     **Hilton's Unjust Enrichment Damages Calculation Is Flawed:** Hilton's methodology of calculating unjust enrichment damages would result in double-counting damages if both a consumer class and a TPP class existed. For her overpayment analysis, Hilton calculates the total overpayment on a transaction as the difference between the TPP payment plus the consumer payment and the PSC price.[178] She then apportions that overpayment between the consumer and the TPP to calculate consumer overpayments and TPP overpayment. The sum of the calculated consumer overpayment and TPP overpayment reflects the total difference between the PSC price and what the consumer and the TPP paid on the transaction. Therefore, when Hilton calculates further unjust enrichment damages based on the difference between the total amount received by Walgreens and the PSC price, she is double-counting damages because what Walgreens received is a subset of the consumer payment and the TPP payment.[179] Therefore, if the class is certified as Plaintiffs' propose, there cannot be unjust enrichment damages in the manner that Hilton calculates, because the dollars she assigns to unjust enrichment damages have already been assigned as overpayments. In the example below, which appears on Hilton's Exhibits 3C and 3D,

---

[178] Hilton Report ¶ 22.
[179] Hilton Report, Exhibit 3B and 3D.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### V.  Recalculating Post-Adjudication True-Ups

101.     As stated in the Hughes Report, TPP contracts with PBMs may specify guaranteed discounts such as GERs, that "result in retroactive payments from the PBM to the TPP to meet price discount guarantees."[180] Hughes also states that "To account for potential reconciliation payments related to GER, it would be necessary to obtain and review the contracts between the PBMs and the TPPs to see what GER provisions are included and how any reconciliation payments would be determined under a lower U&C price."[181] Information on GER provisions are not available in the Walgreens or PBM Transaction Data produced in this matter.

102.     In calculating plan damages, Hilton ignores the key contract terms of GER, which specifically impact the amount of money paid by PBMs to Walgreens and paid by TPPs to PBMs. When claims are re-adjudicated at PSC prices, it will change the components of GER calculations and can impact damages. Collecting the data and performing revised GER calculations involves creating separate GER models for each specific GER which can vary by PBM, plan, and year.

103.     ***Hilton's Approach:*** Hilton fails to refer to adjusting damages for changes in post-adjudication true-ups, such as GERs, or guaranteed contract payments.[182]

104.     ***Hilton's Methodological Flaws:*** In calculating plan damages, Hilton ignores the key contract terms of GER that specifically affect the amount of money paid by TPPs to PBMs and paid by PBMs to Walgreens. If claims were re-adjudicated with PSC prices as U&C prices, it would change the components of GER calculations and could affect damages. Collecting the data and performing revised GER calculations would involve creating separate GER models for each specific GER, which can vary by PBM, TPP, and year.

105.     As stated in the Hughes Report, "TPPs receive payments after the prescription is filled that reduce their prescription drug costs."[183] Payments between a TPP and a PBM and between a PBM and a pharmacy do not end and are not final at the point of sale. GERs and other provisions, such as quality incentive programs, in contracts between PBMs and TPPs on one hand and between PBMs and pharmacies on the other hand result in periodic "true-ups" where the total payments across classes of prescription drugs can be altered.[184] These are not simple calculations, nor is the data required to do these calculations contained in the Walgreens Transaction Data. Instead, plan documents, past GER payment reports, cancelled checks, and other documentation would be needed to recalculate these payments after re-adjudicating the at-issue transactions.[185] Hilton's proposed methodology for calculating damages looks only at the transaction at the point of sale and incorrectly ignores all post-claim adjudication. Hilton has proposed no methodology for collecting and implementing the complex data elements required to recalculate GER payments after re-adjudicating transactions using PSC prices as the U&C.

---

[180] Hughes Report ¶ 19.
[181] Hughes Report ¶ 165.
[182] See Appendix B: Glossary of Key Terms for additional detail on GER provision.
[183] Hughes Report ¶ 18.
[184] Hughes Report ¶ 57.
[185] Hughes Report, Figure 15.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

106.     To assess the impact of these GER payments, multiple steps would be required for both the GER between the TPP and the PBM to determine the change in plan payments and for the GER between the PBM and Walgreens to determine the change in payments to Walgreens. These steps include:

    a.   Reviewing contracts to determine all applicable GER terms for the relevant time period;

    b.   Determining the universe of claims included in the GER reconciliation;

    c.   Collecting the original GER reconciliations;

    d.   Collecting all relevant data for the GER reconciliation so they can be recalculated, including claims from non-Walgreens pharmacies and potential proprietary PBM algorithms for including and excluding claims from the GER reconciliation;

    e.   Adjusting the GER calculation based on the change in adjudication.

107.     Because of GER payments, certain transactions, where Hilton's methodology appears to calculate damages, would actually result in no damages, because they would reduce GER payments due from the PBM to the TPP. In order to account for GER, stop-loss insurance (through which a TPP may receive money back for pharmaceutical expenditures over a certain amount),[186] and other post-claim reconciliations, an individual review of plan and PBM contracts and communications would be necessary.[187] Additionally, sometimes there are other guarantees where the excess in one guarantee can offset the GER in a separate contract. Therefore, to do a complete analysis, one would need information on all reconciliation payments under any contract for a PBM and a TPP.[188] Furthermore, under Hilton's unjust enrichment damages methodology, the calculation of damages would also be impacted by GER payments from the Relevant PBMs to Walgreens pursuant to their contracts.

108.     The following are just some examples of documents produced in this matter that detail GER provisions and payments.



    a.

        [189]

    b.

        .[190].

    c.

---

[186] Hughes Report ¶¶60-61.
[187] Hughes Report ¶¶ 18, 60-61.
[188] See, e.g.,

[189]
[190]

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



[191]

109.     The complexity of analyzing GER payments can be observed in the various plan language examples below that show the variation in GER provisions amongst the Named Plaintiff plans and PBMs. Differences in the GER provisions include the specific GER formula, the types of drugs included in the GER calculation, and the types of transactions included in the GER calculation. For example, some contracts include coordination-of-benefit claims in the GER calculation, while others do not. Additionally, some contracts include claims paid at U&C in the GER calculation, while others do not. Because the GER provisions impact the total amount TPPs pay to their PBM and PBMs pay to Walgreens, the GER calculations would need to be recalculated for each plan and year to accurately account for the plan's payments to Walgreens under Plaintiffs' damages theories.

i.

[192]

ii.

[193]

iii.

[*194]

iv.

---

[191] ███████████.
[192] ███████████.
[193] Walg_Forth_00193198.
[194] Walg_Forth_00051381_R.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[195]

### E. Hilton's Flaws Appear In The Limited Data Analyzed To Date And Would Be Magnified When Applied To The Larger Data Sets Needed For Class-Wide Analysis

110.     As described above, Hilton's errors cause her to calculate damages incorrectly on the limited number of examples in the attachments to her report and in the data files she produced after her report was filed.[196] Indeed, she cannot replicate the exhibits to her report through programmatic output as illustrated by the numerous discrepancies identified between Hilton's Exhibit 3C to her expert report and her HILTON_0000133 data file showing her programmatic output of all calculated Named Fund Plaintiff transactions. She cannot accurately calculate damages without performing the adjustments and individualized review discussed throughout this report. In fact, as illustrated in Table 36 below,

[197]

111.     **Damages For PBMs Not At Issue:** According to the class definition, the class is limited to transactions adjudicated by the Relevant PBMs. However, Hilton's computer scripts and proposed methodology do not appropriately limit the transactions on which she calculates damages to those PBMs. In Walgreens' data, the PBM for a transaction can be determined by using the information in the PBM Name field in the Plan Category table.[198] Hilton's executed methodology does not appear to limit the Named Consumer Plaintiffs to only the PBMs at issue, and as a result, she erroneously includes transactions on Exhibit 3A and HILTON_0000132 that should be excluded.

112.     For Named Consumer

a PBM not at issue in this matter. First,

[200] Second, the Walgreens Named Consumer Transaction Data identifies the

. This can be confirmed, not only through the information

---

[195] Walg_Forth_00142498.
[196] HILTON_0000132 and HILTON_0000133.
[197] Hilton Report ¶ 5.
[198] Dymon Declaration ¶ 18c.
[199] Hilton Report, Exhibit 3A.
[200]

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in Walgreens' ████████████, but also through publicly available information regarding the PBM ████████████████.[201] Hilton's error-filled matching algorithms where she assumed that ██████ numbers in a Walgreens' data production related to transactions produced by ██████ were exclusively used by ██████ at all points in time[202] result in these plainly incorrect conclusions regarding the PBM associated with a transaction appearing in her report.[203] Additionally, for Named Consumer Plaintiff ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ This shows that individualized expert testimony would be needed for each class member to confirm the consumer's or TPP's PBM.

113.    **Preliminary Impact Of Flawed Methodology On Named Consumer Plaintiffs**: Without accounting for the necessary individualized review of documents including but not limited to plan contracts, consumer's plan designs, GER reconciliations, and additional transactions, including but not limited to data from other pharmacies, medical claims, and brand-name drug claims—none of which has been made completely available in this matter—and only accounting for the allocation of the membership fee and the exclusions listed in the class definition itself, I can eliminate many of the Named Consumer Plaintiffs' transactions that Hilton determined had overpayments. In fact, accounting for these few factors eliminates all transactions with damages for ████████████ that appear either on Hilton's Exhibit 3A or the HILTON_0000132 data file. Only ████████████████ appearing on Hilton's Exhibit 3A and the HILTON_0000132 data file still result in damages after accounting for allocating for the membership fee and excluding PBMs and TPPs that are correctly excluded from the class. **Attachment 5** and the table below shows all transactions that appear on Exhibit 3A to the Hilton Report and the HILTON_0000132 data file, adjusted for the allocated membership fee, and corrected to exclude TPPs and PBMs not at issue. This is not to say that ██████ ████████████ if her claims were re-adjudicated properly, as described in this report.

---



[201] ████████████████████████████████████████████████████████████████████████████████████████████████

[202] Hilton Dep. at 121:13–122:1.

[203] I understand that when Walgreens produced transaction data related to the transactions in the ██████████s file produced by the PBMs, they provided all transactions with the same ████████████████████████

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

114.    **Preliminary Impact Of Flawed Methodology On Named Fund Plaintiffs:** Further, even without accounting for the necessary individualized review of documents including but not limited to plan contracts, consumer's plan designs, GER reconciliations, and additional transactions, including but not limited to data from other pharmacies, medical claims, and brand-name drug claims, and only adjusting Hilton's analysis for the flawed methodologies related to the allocated PSC membership fee, excluded PBMs and excluded TPPs, I can eliminate at least ███████████████ Named Fund Plaintiff transactions with damages identified by Hilton in her Exhibit 3C. Additionally, ███████████████ Named Fund Plaintiff transactions on Exhibit 3C do not also appear on Hilton's damages data file

---

204 ██████████████████████ also were able to be eliminated through the allocation of the PSC membership fee.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

(HILTON_0000133) showing that even she cannot replicate the damages analysis that appears on Exhibit 3C in a programmatic way. Refer to **Attachment 6** for an updated version of Hilton's Exhibit 3C with these adjustments.

115. ████████████████ **Transactions Were Mail-Order Transactions**: Even assuming the ████ ████████████████████████ were not an excluded government-funded entity, which it appears to be based on my analysis in Paragraph 58 of this report, ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████[05]

## VI.  ADDITIONAL ANALYSES REQUESTED BY COUNSEL

116. Counsel asked that I prepare certain additional analyses using the data produced by Walgreens in this matter.

117. **The Data Shows That** ████████████████████████████████████████████ ████████████████████████**:** As discussed in  Appendix A, the Walgreens 2015 Sample Data contains information on all generic drugs dispensed in six states in 2015 including prescription drug transactions for consumers who used PSC, insurance, or any other third-party benefit, as well as information on uninsured transactions where consumers did not use any benefit or programs and paid the retail cash price on the transaction ("Retail Cash Transactions").[206]

118. In the Walgreens 2015 Sample Data, there were ████████████████████████████ ████████████████████s. In other words, in 2015, consumers paying without insurance at Walgreens purchased prescriptions at Walgreens and ████████████████████████████████ ████████████████████████.

**Table 37: Relative Frequency Of PSC Transactions And Retail Cash Transactions In 2015 Sample Data**

| Transaction Category | 2015 Transaction Count | % |
|---|---|---|
| Retail Cash Transactions | | |
| PSC Transactions | | |
| Total | | |

119. Even though PSC prices are generally lower than retail cash prices, ████████████████ ████████████████████████████████████████████████████████████.

120. **Number Of Consumers Who Would Require Individualized Analysis Under Hilton's Damages Approach:** Once limited to the Relevant PBMs, states, plan types, and generic drugs, the Walgreens 2015 Sample Data contains sold transactions associated with ████████████████ ████████████████████. My recreation of Hilton's proposed approach with none of the required

---

[205] Declaration of Henry Thompson, *Russo, et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (March 15, 2023).
[206] ████████████████████████████████ I do not count these transactions as retail cash transactions.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

adjustments discussed in this report results in ████████████ with potential damages.[207] As a result, when other years beyond 2015 are considered, there will be millions of individual consumers where individual plan review and non-Walgreens data collection would be necessary to calculate damages correctly under Plaintiffs' theories. As discussed throughout this report, the individualized review would be necessary to (1) determine benefit structure, (2) evaluate transaction history or deductibles, out-of-pocket maximums, varying benefit stages, and (3) calculate changes in any GER or true-up provisions.

121.    **Number Of Insured Consumers With A Past PSC Membership:** Many of the proposed class members are individuals who at one point in time had a PSC membership prior to transactions where Hilton calculates an overpayment. Once limited to the Relevant PBMs, states, plan types, and generic drugs, the Walgreens 2015 Sample Data contains sold transactions associated with ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.

122.    **Number Of Individuals In 2015 Sample Data Who Would Save If They Used PSC On All Transactions:** Once limited to the Relevant PBMs, states, plan types, and generic drugs, the Walgreens 2015 Sample Data contains sold transactions associated with ████████████████ ████████████████. If these consumers paid the PSC price[208] on all transactions for PSC drugs instead of the consumer share of their insured benefit, ████████████████████████████ would pay the same or more to Walgreens in total for all transactions in 2015. Only ████████████ ████████████████ would pay less to Walgreens in total for all transactions in 2015 had they paid the PSC price on all transactions rather than their insured benefit. These consumers typically have very few transactions and are responsible for only ████████████████████████████ of the total.

123.    **Number Of Transactions In 2015 Sample Data Where Consumer Payment Is Less Than The PSC Price:** Once limited to the Relevant PBMs, states, plan types, and generic drugs, the Walgreens 2015 Sample Data contains ████████████████████. On ████████ of those transactions, a PSC price can be determined using Hilton's proposed seven-day look-forward methodology. On ████████████████████ the amount the consumer paid on the transaction as reflected in the ████████████ field is less than the PSC price, incorporating the allocated membership fee. On ████████████████████████████ the amount the consumer paid on the transaction as reflected in the ████████████ field is less than the PSC price, not incorporating the allocated membership fee.

124.    **The Named Consumer Plaintiffs Continued To Purchase Drugs At Walgreens After They Met With Counsel In This Matter:** After each of the Named Consumer Plaintiffs and Named Fund Plaintiffs met with Plaintiffs' counsel in this litigation, they continued to purchase prescription drugs from

---

[207] When the PSC membership fee is included in the PSC price, this number of consumers with potential damages drops to ██████.
[208] For this analysis the PSC price was determined using Hilton's proposed "Seven Day Look Forward" methodology, discussed previously in this report, plus adding the allocated PSC membership fee.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Walgreens or allowed their beneficiaries to do so. The table below summarizes for each Plaintiff the date they met with counsel, the date ranges they continued to purchase drugs at Walgreens, and the number of transactions each Plaintiff made after the meeting with Plaintiffs' counsel, according to the produced transaction data.



## VII.    CONCLUSION

125.    These opinions are performed based on the information now available to me. Accordingly, in addition to my other opinions as set forth above, it is my view that Plaintiffs' proposed class would require individualized review of each class member's information and documents, including information that is not in the produced transaction data. In addition, Hilton's proposed methodology suffers from numerous flaws, discussed throughout this report, that render it inaccurate and unreliable.

126.    As additional information becomes available, I may evaluate and consider that information. Therefore, I reserve the right to modify or supplement my opinions and conclusions. In the event any class is certified, I will offer additional analysis and opinions regarding the class.

---

[209]  Pre meeting transaction counts are based on data from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and Walgreens Named Consumer Transaction Data.
[210] Post meeting transaction counts are based on data from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and Walgreens Named Consumer Transaction Data.

ankura.com