# EXHIBIT 7

## *REDACTED*

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
 3   EASTERN DIVISION
     Civil No. 1:17-cv-02246
 4   - - - - - - - - - - - - - - - - - - - - -x
 5   DOROTHY FORTH, LISA BULLARD, RICARDO
     GONZALES, CYNTHIA RUSSO, INTERNATIONAL
 6   BROTHERHOOD OF ELECTRICAL WORKERS
     LOCAL 38 HEALTH AND WELFARE FUND,
 7   INTERNATIONAL UNION OF OPERATING
     ENGINEERS LOCAL 295-295C WELFARE
 8   FUND, AND STEAMFITTERS FUND LOCAL 439,
     On Behalf of Themselves and All
 9   Others Similarly Situated,
10                    Plaintiffs,
11          -against-
12   WALGREEN CO.,
13                    Defendant.
14   - - - - - - - - - - - - - - - - - - - - -x
15                    September 17, 2020
                      11:36 a.m.
16
17          *** HIGHLY CONFIDENTIAL ***
18          *** ATTORNEYS' EYES ONLY ***
19
20                    Virtual Videotaped 30(b)(6)
     Deposition of BRIAN CORREIA, taken by
21   Plaintiffs, pursuant to Notice, before
     Sharon Pearce, RMR, CRR, CRC, NYRCR, a
22   Registered Merit Reporter, Certified
     Realtime Reporter, and Notary Public of
23   the State of New York.
24
25
```

Page 88



Page 89

16    Q.    Are you familiar with Walgreens'

17    Prescription Savings Club?

18    A.    From a general perspective, yes.

19    Q.    If I refer to the PCS, will you

20    understand that I'm referring to

21    Walgreens' Prescription Savings Club?

22    A.    I will now.

23    Q.    Thank you.

24          I'll represent that the PSC was

25    rolled out nationally in 2008.  This

Page 90

1    CORREIA - HIGHLY CONFIDENTIAL - AEO

2   contract was executed in 2015.  And so the

3   PSC had been in existence at that point

4   for approximately seven years.

Page 91

[REDACTED]

12      Q.      Are you familiar with the term

13  "provider manual"?

14      A.      Yes.

15      Q.      To what does that refer?

16      A.      We publish and provide a

17  provider manual.  So it is a set of terms

18  and conditions that's a part of our

19  pharmacy contract.

20      Q.      Did Caremark ever define certain

21  terms in its provider manual?

22      A.      Yes.

23      Q.      What is the purpose of defining

24  terms in a provider manual?

25              MR. GEYERMAN:  Objection to

```
 3              Switching gears.
 4              When did Caremark first learn
 5    about the PSC?
 6         A.    I don't recall the exact date.
 7    I'm sure it was shortly before or shortly
 8    after launch.
 9         Q.    So is it correct that
10    approximately in 2008, Caremark first
11    learned about the PSC?
12              MR. LEIB:  Objection.
13         A.    Yes.
14         Q.    What did Caremark do upon
15    learning about the PSC?
16              MR. GEYERMAN:  Objection to
17         form.
18         Q.    You can answer.
19         A.    As with any new program that
20    came out into the market, as I recall, you
21    know, they had a press release announcing
22    it.  And we had a meeting with Walgreens
23    to make sure that we understood what they
24    were doing with their program.
25         Q.    And what was your understanding
```

```
                                              Page 100
 1      CORREIA - HIGHLY CONFIDENTIAL - AEO
 2   of what Walgreens was doing with their
 3   program?
 4      A.    As I recall, members had to
 5   enroll into a program, and upon
 6   enrollment, they, you know -- they would
 7   receive discounts on a variety of
 8   products.  I don't recall how many drugs.
 9   I don't recall the price points.  This is
10   going back, you know, 12 years.
11      Q.    Did Caremark know whether
12   Walgreens was reporting its PSC prices as
13   its usual and customary prices?
14      A.    They weren't required to.
15      Q.    And so Caremark understood that
16   Walgreens was not -- excuse me.
17            So Caremark understood that
18   Walgreens was not reporting its PSC prices
19   as its usual and customary prices.
20      A.    Correct.  They were not required
21   to.
22      Q.    And at what point did Caremark
23   first learn of that?
24      A.    Learned that they weren't
25   required to report?  I don't understand
```

```
 1    CORREIA - HIGHLY CONFIDENTIAL - AEO
 2   the question.
 3       Q.    Did Caremark do anything upon
 4   learning that Walgreens was not reporting
 5   its PSC prices as its usual and customary
 6   prices?
 7            MR. GEYERMAN:   Objection to
 8       form.
 9       A.    Yeah.  I mean, as we -- as we
10   understood the terms of the program, we
11   weren't expecting them to report the usual
12   and customary -- as usual and customary,
13   because it wasn't a usual and customary
14   price.
15       Q.    And so it's correct that
16   Caremark then took no action in response
17   to learning that Walgreens was not
18   reporting its PSC prices as its usual and
19   customary prices?
20       A.    Correct.
```

Page 102

10    Q.    While this document loads, in

11  order to understand whether Walgreens was

12  required to report its PSC prices as its

13  usual and customary prices, did Caremark

14  need to evaluate the PSC?

15          MR. GEYERMAN:   Objection to

16      form.

17      A.    So first of all, what's the

18  document number?

19      Q.    I'm asking a separate question.

20      A.    Oh, I'm sorry.  I'm sorry.  I

21  was just trying to get the document

22  loaded.  So can you repeat the question?

23      Q.    So in order to understand

24  whether Walgreens was required to report

25  its PSC prices as its usual and customary

1    CORREIA - HIGHLY CONFIDENTIAL - AEO

2   prices, did Caremark need to evaluate the

3   PSC in any way?

4        A.    Yes.

5        Q.    And how did it do that?

6        A.    We had conversations with the

7   managed care team that we deal with at

8   Walgreens.  They explained the program to

9   us.  And the decision was made that this

10  was not a program that fell into the

11  definition of usual and customary.

12       Q.    Why did Caremark need to

13  evaluate the PSC?

14       A.    We evaluate all programs that we

15  become aware of that our providers

16  implement to make sure they're in

17  compliance.  We want to make sure we

18  understand them so that when our clients

19  ask questions about them, we can

20  articulate the program correctly.

21       Q.    So it's your understanding that

22  Walgreens might have been required to

23  report its PSC prices as its usual and

24  customary prices; correct?

25            MR. LEIB:  Objection.

```
                                            Page 104
 1      CORREIA - HIGHLY CONFIDENTIAL - AEO
 2              MR. GEYERMAN:  Objection.
 3      Q.    Prior to evaluating the program.
 4              MR. LEIB:  Objection.
 5      A.    I guess when we -- you know,
 6   when Walgreens announced the program,
 7   there was enough information in the press
 8   release, as I recall, that, you know, we
 9   didn't think it would be required to.  We
10   set up meetings with Walgreens to get all
11   the details so that we knew that our
12   understanding of the program was the same
13   as their understanding of the program.
14      Q.    Do you know who on Walgreens'
15   managed care team Caremark met with?
16      A.    I'm sure it was Scott Schuler
17   and his team or one of his team members at
18   the time.  We don't keep a log when this
19   happens.  I just don't recall who was
20   there at the time.
21      Q.    So I've introduced Exhibit 355
22   as I had described it earlier.  It should
23   be available.
24              Can you access it?
25      A.    355?  Yes.
```



Page 105

1      CORREIA - HIGHLY CONFIDENTIAL - AEO

Page 106

17      Q.      Let's unpack that a little bit.

18              So you referred to receiving

19  dozens of inquiries from plan sponsors.

20              Who would be included as a plan

21  sponsor?  What does that describe?

22      A.      That describes people that we

23  contract with that are clients that we

24  administer benefits for.

25      Q.      Does that include third-party

```
1      CORREIA - HIGHLY CONFIDENTIAL - AEO
2   payers?
3       A.     In a broad definition, yes.
4       Q.     And so you had described how --
5              MR. LEIB:  I'm sorry, Carey.
6       When you asked him that question, you
7       meant does it describe third-party
8       payers as you had defined it
9       previously; correct?
10             MR. ALEXANDER:  Yes.
11             MR. LEIB:  And that's how the
12      witness answered the question;
13      correct?
14             THE WITNESS:  Correct.
15      Q.     So you had described how Walmart
16  had introduced its program and caused a
17  splash and that there were several others
18  that followed suit.
19             Would you agree that Walgreens
20  as PSC was one of the programs that
21  followed suit?
22             MR. GEYERMAN:  Objection to
23      form.
24      A.     I mean, you would have to ask
25  Walgreens why they developed the program.
```

Page 108

1    CORREIA - HIGHLY CONFIDENTIAL - AEO

2    I know it came after the Walmart

3    introduction of the $4 generic program,

4    the set price program that they came out

5    with.  As to why they developed it, you'd

6    have to ask Walgreens.

18    Q.    What does it mean for a price to

19    be set?

20         MR. GEYERMAN:  Objection to

21    form.

22    Q.    You can answer.

23    A.    Yeah.  The trend that we were

24    seeing was -- and again, it wasn't really

25    even Walmart that started it.  It was

1    CORREIA - HIGHLY CONFIDENTIAL - AEO

2    Kmart.  But Kmart got no credit for it.

3    But Walmart took I believe it was about

4    400 low-price generics and put a set price

5    on it for a 30-day supply.  Now, it was $4

6    in most states.  There were some states

7    that it was $9 for a 30-day supply.  And

8    if it was a quantity of 60, it was 18, 27,

9    it was in multiples of 9 versus multiples

10   of 4.  So it was commonly referred to as a

11   set price program.

12       Q.    So is it correct that set price

13   refers to a certain day's supply of drugs

14   offered at a set price?

15            MR. GEYERMAN:  Objection to

16       form.

17       A.    Yes.  That's what I meant by

18   that.  Correct.





Page 111



Page 112



Page 113



```
10        Q.      So if you needed to join a
11   program, could the program still have been
12   considered a standard set price generic
13   program?
14        A.      No.
15        Q.      If you needed to pay a fee to
16   join the program, could the program still
17   have been considered a standard set price
18   generic program?
19        A.      I guess you're kind of mixing
20   the words.  It wouldn't be considered
21   usual and customary.
22        Q.      You're saying if you needed to
23   join a program, if you needed to pay a
24   fee, then Caremark wouldn't consider the
25   prices that were then offered to be the
```

1    CORREIA - HIGHLY CONFIDENTIAL - AEO
2   usual and customary prices; correct?
3        A.    Correct.  Correct.
4        Q.    What about the act of joining a
5   program is significant?  Why does that
6   make a difference for purposes of whether
7   a price is usual and customary or not?
8        A.    When a member makes a conscious
9   decision to join a program, they're
10  joining for any number of reasons.  It
11  could be for the other benefits other than
12  the prescription drug discounts that they
13  may be receiving.  And once they join and
14  a claim adjudicates, and it has a
15  different, you know -- it has management.
16  There is a formulary.  There's day supply.
17  All the different characteristics -- it
18  doesn't -- it's not a usual and customary
19  price.  It's not available for everybody.
20       Q.    So when we talked -- we had
21  talked earlier about senior citizens
22  discounts; correct?
23       A.    We did.
24       Q.    Senior citizens discounts aren't
25  available to everybody; right?

```
 1      CORREIA - HIGHLY CONFIDENTIAL - AEO
 2        not able to access the document?
 3              MR. LEIB:  I'm not able to
 4        access the entire folder, for some
 5        reason.
 6              MR. ALEXANDER:  Let's go off the
 7        record.
 8              THE VIDEOGRAPHER:  Going off the
 9        record.  The time is 2:52.
10              (Recess)
11              THE VIDEOGRAPHER:  We're back on
12        the record.  The time is 2:55 p.m.
13   BY MR. ALEXANDER:
14        Q.    Mr. Correia, you understand
15   you're still under oath; correct?
16        A.    Yes, I do.
17        Q.    Thank you.
```

Page 136



Page 137



```
                                    Page 189
 1     CORREIA - HIGHLY CONFIDENTIAL - AEO
 2       form.
 3             MR. GEYERMAN:  Objection.  Join.
 4     Q.    Okay.  I'll re-ask the question.
 5   I'm not sure what the objection was, but
 6   I'll re-ask the question.
 7             Does Caremark understand the
 8   meaning of usual and customary used
 9   outside of any contract?
10             MR. ALEXANDER:  Objection to
11       form.
12     A.    Yes.  I believe we have our
13   definition of usual and customary, which,
14   you know, we believe is a very reasonable
15   definition of usual and customary.  I
16   talked about it earlier today, and it is,
17   you know the amount that a person without
18   a funded or unfunded benefit walking into
19   a pharmacy would pay, and it is the
20   pharmacy's usual and customary price.  So
21   if I called up a Walgreens and wanted to
22   do a price check on a prescription, that
23   would be the price that you would -- that
24   Walgreens would convey.  It's a usual and
25   customary price.  I don't have any type of
```

1    CORREIA - HIGHLY CONFIDENTIAL - AEO

2    benefit, whether funded or unfunded, and

3    that would be the price that you would

4    quote.

5        Q.    Is that also known as the retail

6    price?

7        A.    That would -- in my definitions,

8    and in our eyes, it would be the retail

9    price, your usual and customary retail

10   price.

Page 193

1      CORREIA - HIGHLY CONFIDENTIAL - AEO

2    2001 and the present?

3      A.    Yes.



Page 194

14    Q.    Is it correct that Caremark sets

15    the MAC price for any particular drug?

16         MR. ALEXANDER:  Objection to

17    form.

18         MR. LEIB:  What's your

19    objection?

20         MR. ALEXANDER:  It's vague.

21         MR. LEIB:  What's vague?

22         MR. ALEXANDER:  "Sets."

23    Q.    Is it correct that Caremark

24    determines the MAC price for any

25    particular drug?

Page 195

1    CORREIA - HIGHLY CONFIDENTIAL - AEO

2        A.    Yes.



Page 205



Page 206



Page 228



Page 229





Page 230

Page 234



Veritext Legal Solutions
212-279-9424    www.veritext.com    212-490-3430

Page 235





Page 236

Page 237





Page 261

Page 262



Page 263

21    Q.    So if Walgreens' retail price

22  for a drug was $15, and its PSC price was

23  $10, it would still report its U&C as the

24  $15, but it would let you know that its

25  PSC price was $10, and then you could

```
 1      CORREIA - HIGHLY CONFIDENTIAL - AEO
 2   change your MAC price to be $10; is that
 3   correct?
 4        A.    Yeah.  What we found out was
 5   that the FEP MAC prices were already lower
 6   than the clear majority of any of the club
 7   price programs that were out there.  So
 8   the incremental value for this endeavor
 9   was very minimal.  There might have been
10   some leaders that some of the club
11   programs had.  But it didn't amount to
12   anything in the aggregate.
13        Q.    But my hypothetical was correct,
14   though.
15        A.    Yes.  That's correct.
16        Q.    And in fact, the whole point of
17   this provision, this -- under the generic
18   drug section, the whole point of this
19   provision was because you knew that
20   Walgreens was not reporting its PSC prices
21   as its U&C prices; correct?
22        A.    Correct.
23        Q.    And if we can look at Tab T now,
24   which we'll mark as Exhibit 364.
25              MR. PERKINS:  Tab T or Tab S?
```

Page 318

1

2                    CERTIFICATION

3

4       I, SHARON PEARCE, RMR, CRR, CRC,

5    NYRCR, a Notary Public for and within the

6    State of New York, do hereby certify:

7       That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17      IN WITNESS WHEREOF, I have hereunto

18   set my hand this 30th day of September,

19   2020.

20          *Sharon Pearce*

21   _____

22              SHARON PEARCE

23         RMR, CRR, CRC, NYRCR

24

25