# EXHIBIT 21

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4
 5   DOROTHY FORTH, DONNA BAILEY,       )
     LISA BULLARD, RICARDO GONZALES,    )
 6   CYNTHIA RUSSO, TROY TERMINE,       )
     INTERNATIONAL BROTHERHOOD OF       )
 7   ELECTRICAL WORKERS LOCAL 38        )
     HEALTH AND WELFARE FUND,           )
 8   INTERNATIONAL UNION OF OPERATING   )
     ENGINEERS LOCAL 295-295C WELFARE   )
 9   FUND, AND STEAMFITTERS FUND        )
     LOCAL 439, on Behalf of            )
10   Themselves and All Others          )
     similarly Situated,                )
11                                      )
            Plaintiffs,                 )
12                                      ) Case No.
        vs.                             ) 1:17-cv-02246
13                                      )
     WALGREEN CO.,                      )
14                                      )
            Defendant.                  )
15
16
17      The videotaped deposition of EDWARD FOX,
18   taken before Maria S. Winn, CSR, RPR and CRR,
19   pursuant to the Federal Rules of Civil Procedure
20   for the United States District Courts pertaining
21   to the taking of depositions, at Reed Smith,
22   10 South Wacker Drive, Suite 4000, Chicago,
23   Illinois, commencing at 9:22 a.m. on May 7, 2019.
24
```

Page 72

1  And if you look on page 4, do you see
2  there's a reference to Sav-Rx?
3      A    Yes.
4      Q    And Sav-Rx was your PBM prior to
5  Caremark; is that correct?
6      A    Yes.
7      Q    Can I call them Sav-Rx?
8      A    Yes.
9      Q    And is it fair to say they provided the
10 same services to the Fund that Caremark did?
11     A    Correct.
12     Q    Or that Caremark does, correct?
13     A    Correct.
14     Q    And it looks like the -- that Sav-Rx was
15 the Fund's PBM from 2007 to 2014; is that correct?
16     A    Correct.
17     Q    Now again, this does not list anyone by
18 name at Sav-Rx.
19          Are you aware of anyone at Sav-Rx who
20 interfaced with the fund on a regular basis?
21     A    Christy Piti.
22     Q    Can you spell her last name?
23     A    P-i-t-i.
24     Q    Anyone else?

Page 154

1  that your participants can go to, correct?
2      A   Correct.
3      Q   And that allows CVS Caremark to manage
4  its costs, correct?
5          MR. GUGLIELMO:  Objection, form.
6      A   Not necessarily.  They would be managing
7  our costs for us by getting the best discounts
8  available based on the networks.
9  BY MR. LEIB:
10     Q   But you chose to have the largest network
11 option, which is an entire national network,
12 correct?
13     A   Correct.
14     Q   And that, you're saying, is more
15 expensive pricing than Option 2, 3 or 4, correct?
16     A   It would be, but I wouldn't -- not know
17 what the differential would be, if it would be
18 material or not.
19     Q   And would you agree that the exclusion,
20 that parentheses that's there, excludes Walmart,
21 Sam's Club, and Rite Aid participating pharmacies
22 for this participating group only, is an
23 adjustment to the national network that's
24 available under the base contract?

Page 155

1     A    It is.

2     Q    And if --

3     A    But I wouldn't -- I wouldn't -- I'm not
4 aware if they adjusted the discounts to reflect
5 that or not.

6     Q    And to know that, we'd have to ask the
7 Segal Group; is that correct?

8     A    Yes.

9     Q    Do you recall any discussion, when
10 negotiating the contract, over whether to include
11 or exclude Walmart, Sam's Club, and Rite Aid?

12     A    The board instructed Segal to exclude
13 those pharmacies from the network.

14     Q    Do you remember any discussions that the
15 board was having about whether to do that or not?

16     A    Because those pharmacies were excluded
17 previously, they wanted to continue that policy.

18     Q    And they were excluded because of
19 concerns about them not having labor -- them not
20 having union employees, correct?

21     MR. GUGLIELMO:  Objection, form.

22     A    No.  It's union-built facilities.  It's
23 not union employees.

24

Page 174

1            From the time period 2011 to the present.
2       A    Correct.
3            MR. LEIB:  I'm going to -- I'm going to
4       mark an exhibit that we'll mark as Exhibit 74.
5                (Document marked as Defendant's
6                Exhibit No. 74 for identification.)
7    BY MR. LEIB:
8       Q    This is a document that was produced to
9    us by your lawyers in this case, and it has a
10   Bates stamp in the bottom right.  You can see it
11   says IBEW in the bottom right.
12           Do you see that?
13      A    Um-hm.
14      Q    Which means it came out of IBEW's files.
15           Do you recognize this document?
16      A    I mean, I knew the program existed.
17   But...
18      Q    So you don't recognize the document, but
19   you know about the program --
20      A    Correct.
21      Q    -- that is referred to in the document?
22           So it talks about a Sav-Rx advantage
23   card.  And it says, in the second sentence:
24           "A program has been created to assist our

Page 175

1  members who have run out of pharmacy benefits."
2         Under what circumstance could one of your
3  participants run out of pharmacy benefits?
4     A   Well, I mean, it says "run out of
5  healthcare."
6         So that would mean that the participant
7  had lost their eligibility in order to be able to
8  participate in the program, or the Health and
9  Welfare Fund.
10        So that would be caused by a reduction in
11 hours, there not being enough work, and not
12 meeting the hours eligibility rules.
13    Q   Let -- that's not actually what this
14 says.
15        What the second sentence says -- it
16 doesn't talk about health benefits, it talks about
17 pharmacy benefits.  And in fact, it's a
18 prescription advantage card, so specifically
19 referring to pharmacy benefits.
20        And it says:  "Run out of pharmacy
21 benefits."
22        It doesn't say no longer eligible for
23 pharmacy benefits, correct?
24        MR. GUGLIELMO:  Objection, form.

Page 176

1              (Reporter clarification.)
2     BY MR. LEIB:
3         Q    So does that -- are you saying the second
4     sentence is just incorrect in its description of
5     the program?
6         A    But the second sentence is to go along
7     with the first sentence, which means that the
8     member has run out of healthcare, so they've run
9     out of their eligibility.
10             So during the downturn of 2008, when work
11    went bad and work was not good, members lost
12    eligibility.
13             And so when they lose their eligibility,
14    they ultimately lose the entire medical, drug,
15    dental, vision, everything.
16             And so what they were putting this out
17    there for was to make members aware that this
18    Sav-Rx advantage card is out there.  Since they
19    don't have coverage through our -- the IBEW Health
20    and Welfare Plan, that this program is out there
21    for them free of charge, to provide them discounts
22    on their prescription drugs.
23        Q    So this says that if somebody uses this
24    card, they would get up to a 32 percent discount

Page 197

1  that it says -- it means the pharmacy's usual
2  selling price for a prescription drug if the
3  product was not eligible for coverage under the
4  Plan.
5              I don't know what that means.
6     Q    Well, I'm not asking if you understand
7  what the definition of usual and customary means
8  right now.
9              I'm asking if the Fund knows what the
10 definition of usual and customary is in the
11 current contract between Walgreens and Caremark.
12    A    We wouldn't have that contract available
13 to us.
14    Q    So you would not know what the definition
15 of usual and customary is in that contract,
16 correct?
17    A    No.
18    Q    And does the Fund know what the
19 definition of usual and customary is in any prior
20 contracts between Walgreens and Caremark?
21    A    No.
22    Q    Does the Fund know if the definition of
23 usual and customary has remained the same in all
24 contracts that were in existence between Walgreens

Page 198

1    and Caremark between 2014 and the present?
2         A    No.
3         Q    Does the Fund know what the definition of
4    usual and customary was in the contract between
5    Walgreens and Sav-Rx at any point between 2007 and
6    2014?
7              And I know you're looking at your
8    contract, but I'm now referring to the contract
9    between Sav-Rx and Walgreens.
10        A    Right.  But I'm just -- we would not have
11   knowledge of the particular contract between
12   Sav-Rx and Walgreens.
13        Q    So the Fund has no knowledge of what the
14   definition of usual and customary is in any
15   contract between Walgreens and Sav-Rx at any point
16   between 2007 and 2014, correct?
17        A    Correct.
18        Q    Does the Fund have a contract with
19   Walgreens?
20        A    No.
21        Q    So isn't it the case that if you paid
22   more than the U&C price that is required by your
23   contracts with Sav-Rx and Caremark, that your
24   grievance is with Caremark and Sav-Rx and

Page 199

1    not Walgreens?
2            MR. GUGLIELMO:  Objection, calls for a
3        legal conclusion.
4            To the extent you know.
5        A   Repeat the question.
6    BY MR. LEIB:
7        Q   Sure.  Isn't it the case that if you paid
8    more than the usual and customary price that is
9    required by your contracts with Sav-Rx and
10   Caremark, that your grievance is with Caremark and
11   Sav-Rx and not with Walgreens?
12           MR. GUGLIELMO:  Objection, calls for a
13       legal conclusion.
14       A   I mean, it would be -- I'm really not
15   sure.
16           I mean -- I mean, I would think both
17   would be as liable as the other because...
18   BY MR. LEIB:
19       Q   Your contract is with the PBM, correct?
20       A   Yes.
21       Q   And you contract and expect to get the
22   price required by the contract with the PBM,
23   right?
24       A   Yes.

Page 200

1  Q   You haven't sued Caremark -- CVS
2  Caremark, have you?
3  A   No.
4  Q   You haven't sued Sav-Rx, have you?
5  A   No.
6  Q   But those are the two companies that,
7  between 2007 and the present, the Fund had a
8  contract with regarding pharmaceutical benefits,
9  correct?
10  A   Yes.
11  Q   Would you agree that PBMs pay close
12  attention to what is happening in the
13  pharmaceutical marketplace?
14       MR. GUGLIELMO:  Objection, calls for
15    speculation.  Also outside the scope of the
16    notice.
17  BY MR. LEIB:
18  Q   Do you know --
19       MR. GUGLIELMO:  Same objection.
20  BY MR. LEIB:
21  Q   Do you know if PBMs pay close attention
22  to what is happening in the pharmaceutical
23  marketplace?
24       MR. GUGLIELMO:  Same objection.  Outside

1   The undersigned is not interested in the
2   within case, nor of kin or counsel to any of the
3   parties.
4   In witness whereof, I have hereunto set
5   my hand and seal of office this day, May 8, 2019.
6
7
8   *Maria S. Wu* (signature)
9
10  CSR No. 084-003784 - Expiration Date: May 31, 2019
11
12
13
14
15
16
17
18
19
20
21
22
23
24