EXHIBIT 23

```
                                          Page 1

 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4    DOROTHY FORTH, DONNA
      BAILEY, LISA BULLARD,
 5    RICARDO GONZALES,              Case No.
      CYNTHIA RUSSO, TROY,           1:17-cv-02246
 6    INTERNATIONAL
      BROTHERHOOD OF
 7    ELECTRICAL WORKERS LOCAL
      38 HEALTH AND WELFARE
 8    FUND, INTERNATIONAL
      UNION OF OPERATING
 9    ENGINEERS LOCAL 295-295C
      WELFARE FUND, AND
10    STEAMFITTERS FUND LOCAL
      439, on Behalf of
11    Themselves and All
      Others Similarly
12    Situated,
                  Plaintiffs,
13       vs.
      WALGREEN CO.,
14               Defendant.
      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
15              VIDEO DEPOSITION OF
16          STEAMFITTERS FUND LOCAL 439
17               by and through
18          CHARLES E. BAILEY JUNIOR
19               June 11, 2019
20                 9:27 a.m.
21        10 South Wacker Drive, 40th Floor
22               Chicago, Illinois
23
24    Deanna Amore - CRR, RPR, CSR - 084-003999
```

Page 90

1   Medtrak Services?

2        A.   Uh-huh.

3        Q.   Is it okay if I call them Medtrak for

4   short?

5        A.   Uh-huh.

6        Q.   Medtrak is your former PBM; correct?

7        A.   Yes.

8        Q.   Now, we've seen documents that show they

9   were your PBM -- and when I say "your," I mean the

10  Fund's -- since 2008.  Do you know if Medtrak was

11  the Fund's PBM prior to 2008?

12       A.   The timeline I have is 2007 to 2014.

13       Q.   So starting January 14, 2007, they became

14  the Fund's PBM?

15       A.   Yes.

16       Q.   So the contract we'll look at later starts

17  January 1, 2008.  Do you believe that there is a

18  one-year contract that they signed in January 2007?

19       A.   Being that I wasn't a trustee or really

20  involved with the Health and Welfare at that time,

21  I don't know exactly what document that was, but

22  I did see that same document you're talking about.

23       Q.   So who was the Fund's PBM in 2007?

24       MR. GUGLIELMO:  Objection.  Asked and answered.

Page 91

1    BY MR. LEIB:

2        Q.   You can answer.

3        A.   The timeline I was given by Kathy Jaegers

4    was 2007 to 2014 that we used Medtrak, and I can

5    only go by her expertise since she's been around

6    since 1995.

7        Q.   So that was one of the questions you asked

8    Ms. Jaegers?

9        A.   Yes.

10       Q.   But nobody was able to find a contract; is

11   that correct?

12       A.   Obviously, there is only one from 2008,

13   yes.

14       Q.   Did you request from J.W. Terrill to

15   locate any contracts that existed starting in 2007?

16       A.   I believe the lawyers asked J.W. Terrill

17   for all information regarding this case.  I did not

18   personally, no, nor did the Fund.

19       Q.   Did anyone at the Fund, or its attorneys,

20   contract Medtrak to find out if they had a copy of

21   a contract from 2007?

22       A.   That, I don't know.

23       Q.   Did anyone at the Fund contract -- contact

24   anyone at Medtrak to find out if anyone at Medtrak

Page 149

1    anything.  This is the split of the amount that the
2    PBM charges, the split that the Fund pays versus
3    the member pays, and my question has been who
4    determines what that split is.  You had said the
5    PBM, but now I'm not sure you believe it's the PBM.
6        A.   Yeah, I misspoke.  This would be under the
7    guidance of J.W. Terrill on what our Fund needs to
8    recoup money for the amount of money it's putting
9    in per week, year.  So she's -- they've determined
10   that we have to ask a minimum at this point to pay
11   25 percent out-of-pocket if we are going to cover
12   75 percent.
13       Q.   So the Fund has to make sure it doesn't
14   run out of money; correct?
15       A.   Yes.
16       Q.   And it asked J.W. Terrill to advise it on
17   how much the members should pay versus the Fund
18   paying; correct?
19       A.   Yes.
20       Q.   Ultimately, am I correct that it's the
21   trustees who make that determination?
22       A.   Yes.
23       Q.   Do you know what "retail price" means?
24       A.   Yes.

Page 150

1      Q.   What does retail price mean?

2      A.   The price sold at a retailer for a

3  product.

4      Q.   Do you have an understanding that retail

5  price means the full price and does not include any

6  coupons or discounts?

7      A.   Yes.

8      Q.   Do you know what is meant by "usual and

9  customary price" also known as U&C price?

10     A.   Yes.

11     Q.   What is your understanding of what usual

12  and customary price is?

13     A.   It's the price of a medical service or

14  pharmaceutical in a geographic area and what

15  similar cost is in that area including incentives

16  or rebates.

17     Q.   Who determines what the geographic area

18  is?

19     A.   Are you talking about me or the Fund?

20     Q.   Well, you just said that the usual and

21  customary price is, in your understanding, a

22  medical service or pharmaceutical in a geographic

23  area and what similar cost is in that area

24  including incentives or rebates.  I am trying to

Page 181

1    correct?

2         A.    Yes.

3         Q.    And I think we've already established

4    before the Fund never told its members that in the

5    Fund's opinions the members were being overcharged

6    by Walgreens; correct?

7         A.    Yes.

8         Q.    Yes, you're agreeing with my statement;

9    correct?

10        A.    What was your statement again?  Repeat it,

11   please.

12        Q.    I'll ask it as an open-ended.

13             Has the Fund ever told its members that,

14   in the Fund's opinion, the members are being

15   overcharged by Walgreens for certain drugs?

16        A.    No, we have not.

17        Q.    In fact, rather than precluding its

18   members from using Walgreens, or even encouraging

19   its members not to use Walgreens, after it filed

20   this lawsuit, the Fund changed its plans to require

21   that its beneficiaries either use LDI mail order or

22   Walgreens to fill 90-day supplies of maintenance

23   medication; correct?

24        A.    For three months from January 1 to

Page 182

1   March 1 of 2019, Walgreens was the exclusive

2   maintenance drug retailer because we were having

3   issues with the mail order through LDI.

4       Q.   I'm actually not talking about 2019.  I am

5   talking starting in 2018.

6       A.   Uh-huh.  I'm just saying there has been an

7   instance where they were the strict pharmacy but --

8       Q.   And the reason that for the three-month

9   period, January 1 to March -- what did you say?

10  What time period in March?

11      A.   March 1.

12      Q.   March 1.

13           So for those two months --

14      A.   Three months.

15      Q.   January 1 to March 1?

16      A.   Okay.  Yeah.

17      Q.   So for those two months in the beginning

18  of 2019, Walgreens was the exclusive maintenance

19  drug retailer, and the reason for that is because

20  the Fund actually changed its plan, after filing a

21  lawsuit, to require that the only retail pharmacy

22  in which a 90-day supply of maintenance medication

23  could be purchased by its members is Walgreens;

24  correct?

```
                                      Page 183

 1        A.   Yes.

 2        Q.   And then for those two months, it

 3   eliminated the mail order option, the LDI mail

 4   order option, because it was having problems with

 5   LDI; correct?

 6        A.   Yes.

 7        MR. LEIB:  We'll mark 108.

 8                    (Whereupon, Exhibit 108 was

 9                    marked for identification.)

10   BY MR. LEIB:

11        Q.   Have you seen this document before?

12        A.   Yes, I have.

13        Q.   Have you seen the email or just the

14   attachment?

15        A.   Yeah, I've seen the email.

16        Q.   And what is this document, including the

17   attachment?

18        A.   This is a summary of material

19   modifications.

20        Q.   And its modifications to your welfare

21   plan; correct?

22        A.   Yes.

23        Q.   And in this email cover page,

24   Lisa Suemnicht, S-u-e-m-n-i-c-h-t, from
```

Page 184

1   J.W. Terrill wrote to Janie Bailey, "Here is the
2   full copy of the mailing that went out today for
3   your records."  Do you see that?
4        A.   Uh-huh.
5        Q.   Who did the mailing go to?
6        A.   It looks like Janie Bailey.
7        Q.   But Janie is saying -- I'm sorry.  The
8   email is telling Janie that J.W. Terrill sent out
9   this attachment.  Do you see that?
10       A.   Uh-huh.
11       Q.   Who did the attachment go to?
12       A.   I'd be speculating on who this went to.
13  I'm not sure.
14       Q.   Do you know -- you said you recognize the
15  attachment; correct?
16       A.   Yes, I've seen this in the data.
17       Q.   Prior to preparing for this deposition,
18  had you seen this before?
19       A.   No.
20       Q.   Do you know if this went to the members
21  and participants in the plan?
22       A.   Yes.  This document, 385, would have went
23  to the membership.
24       Q.   And that's 385 through 387; correct?

Page 185

1      A.   I would say so.  I wouldn't see why they'd

2    have this copied on the back if that wasn't

3    included but...

4      Q.   And there is a whole list of addresses in

5    the back, people with these addresses.  Do you know

6    who those people are?

7      A.   Yes.

8      Q.   Who are those people?

9      A.   Members of Steamfitters Local 439.

10     Q.   So then that makes sense that this went to

11   those people; correct?

12     A.   Yes.

13     Q.   And this, in fact, if we look at page 385,

14   this reflects a change in the welfare plan;

15   correct?

16     A.   Yes.

17     Q.   And it says "As of May 1, 2018, the Plan

18   has added Walgreens retail locations as an option

19   for obtaining a 90-day supply of maintenance

20   medications.  The Plan's prescription drug supply

21   limitation (Section X.C. on page 59 of your SPD)

22   has been updated to read as follows."

23          And then the change in the plan is "Drugs

24   are limited to a 34-day supply per prescription or

Page 186

1   refill, except maintenance drugs (prescriptions to

2   treat chronic or long-term conditions), which are

3   limited to a 90-day supply for each prescription

4   refill.  Maintenance drug must" -- and it

5   underlines must -- "be obtained through Walgreens

6   or through the LDI Home Advantage Select mail order

7   program (although new prescriptions for a 30-day

8   supply may be filled up to two times at any retail

9   pharmacy)." Do you see that?

10      A.   Yes.

11      Q.   And this change occurred, would you agree,

12  well after November 2017?

13      A.   Yes.

14      Q.   So when this change was made, you were

15  already -- strike that.

16          So when this change was made, the Fund had

17  already voted, the trustees had already voted to

18  file a lawsuit against Walgreens; correct?

19      A.   Yes.

20      Q.   And, in fact, the date of this email is

21  6-20-2018 or June 20, 2018, and that's after the

22  May 1, 2018, filing of the Second Amended

23  Complaint; correct?

24      A.   Yes, I believe so.

Page 187

1      Q.   And in the lawsuit you're alleging that
2   Walgreens is overcharging the Fund and its members
3   for certain generic drugs; correct?
4      A.   Yes.
5      Q.   But if the Fund believes Walgreens is
6   overcharging it for PSC generics, why, after
7   becoming aware of Walgreens' practice of how
8   Walgreens charges the Fund and its members for PSC
9   generics, did the Fund amend its plan to make
10   Walgreens the exclusive retail pharmacy where its
11   members are permitted to fill out 90-day
12   prescriptions for maintenance medications?
13      MR. GUGLIELMO:   Objection.   Form.
14      You can answer.
15      THE WITNESS:   As I stated before, I mean,
16   people are used to going to certain pharmacies.
17   These pharmacies, such as Walgreens, is available
18   to a lot more people than the mom and pop shops
19   that aren't open anymore.   So we can't limit our
20   people to not use pharmacies, and Walgreens,
21   obviously, can handle the demand that our
22   membership needed.
23   BY MR. LEIB:
24      Q.   This provision makes Walgreens the

Page 188

1    exclusive retail pharmacy for 90-day supplies of

2    maintenance medications; correct?

3        MR. GUGLIELMO:  Objection.  Form.

4    BY MR. LEIB:

5        Q.   The amendment, as reflected on page 385,

6    makes Walgreens the exclusive retail pharmacy for

7    90-day supplies of maintenance medication; correct?

8        MR. GUGLIELMO:  Objection.  Form.

9        You can answer.

10       THE WITNESS:  Yes.  Besides LDI, though.  So

11   they're not totally exclusive.

12   BY MR. LEIB:

13       Q.   I said the "exclusive retail pharmacy";

14   right?

15       A.   Yes.

16       Q.   Previously, the Fund -- and we can look at

17   documents if you don't know -- but previously, am

18   I right that the Fund required all 90-day supplies

19   of maintenance medication to be filled by mail

20   order?

21       A.   No, that's not correct.

22       Q.   Okay.

23       A.   The first two maintenance drugs can be

24   filled at a retail.  After that they were -- it was

1    mandatory up until the January 1 meeting where they

2    decided to get rid of the LDI mandatory mail order,

3    but you had to do two retail -- you could do two

4    retail purchases for maintenance drugs before you

5    had to go on the mail order side of it.

6         Q.   So prior to this change, after you filled

7    your first two 30-day prescriptions of maintenance

8    medication, you were required to do a 90-day

9    supply; correct?

10        A.   Yes.

11        Q.   And were you required to do a 90-day

12   supply through mail order?

13        A.   After you used the two up at a retail,

14   yes.

15        Q.   And let's look at the 2013 plan, which is

16   Exhibit 106, and look at page 59.  Do you see under

17   (B) it says "Participating Pharmacies"?

18        A.   Yes.

19        Q.   "Only prescription drugs obtained from

20   pharmacies participating in the Medtrak network" --

21   because at that time Medtrak was your PBM; correct?

22        A.   Yes.

23        Q.   -- "are covered under the plan.  It is

24   very important that you choose a Medtrak pharmacy,

Page 190

1  as prescription drugs purchased from non-Medtrak

2  pharmacies are not covered.  Directories of Medtrak

3  pharmacies (including Performance 90) locations are

4  available in the Fund office."

5        Do you know what the Performance 90

6  locations were?

7     A.   No, I do not.

8     Q.   It wasn't exclusively Walgreens; correct?

9     A.   No, there was plenty of in-network

10  pharmacies that they could go to.

11     Q.   And then under "(C) Supply Limitations.

12  Drugs are limited to a 34-day supply for

13  prescription and refill, except maintenance drugs

14  who are limited to a 90-day supply for each

15  prescription or refill.  Maintenance drugs may be

16  obtained through the mail order program or at a

17  'Performance 90' retail pharmacy."

18        Do you see that?

19     A.   Yes.

20     Q.   Did that change at some point where the

21  requirement was that it be done only through mail

22  order?

23     A.   From 2016 to 2019 is when they were trying

24  to utilize the LDI mail order situation, and then,

Page 191

1   like I said before, that's where they were having
2   issues with getting the maintenance drugs on a
3   timely manner.  So it kind of got tweaked
4   throughout the years until the final point where,
5   you know, they just told them if you want to do the
6   mail order, you could do the mail order.  If not,
7   there was no mandatory on it then.
8       Q.   Are you saying that the 2013 plan was
9   amended to provide that instead of being able to
10  use a retail pharmacy, it was an exclusive
11  requirement that for a 90-day maintenance supply,
12  it be mail order?
13      A.   Yeah, from 2016.
14      Q.   I have not been -- I do not believe we've
15  been provided that amendment.
16      A.   This is in conversation that I've had with
17  Kathy Jaegers, just talking about different parts
18  of our plan.
19      Q.   So what this shows then, this full
20  discussion, is that sometime -- at some times
21  during the period 2007 to the present, you've
22  allowed your members to fill 90-day supplies of
23  maintenance medications either by mail order or
24  through some Performance 90 retail pharmacy

Page 192

1    network, while at other times you've required them

2    to do mail order only; correct?

3        A.    Yes.

4        Q.    And then as of May 1, 2018, you allow your

5    members to get 90-day prescriptions filled for

6    maintenance medication at either LDI, mail order,

7    or Walgreens except for the two months between

8    January 1 and March of this year in which it was

9    just Walgreens exclusively; correct?

10       A.    Yes.

11       Q.    The Fund didn't have to make Walgreens the

12   exclusive retail pharmacy; correct?

13       A.    No, we did not.

14       Q.    But it chose to do that; correct?

15       A.    Because of their locations.

16       Q.    Well, if you make more locations

17   available -- strike that.

18            If you make more pharmacy chains

19   available, you would make more locations available;

20   correct?

21       MR. GUGLIELMO:  Objection.  Form.

22       THE WITNESS:  I mean, it just depends on where

23   you are at.

24   BY MR. LEIB:

Page 193

1      Q.   Well, by definition, instead of including

2  only Walgreens as the exclusive retail pharmacy for

3  90-day supply maintenance medication fills and

4  refills, you allowed it to be Walgreens and CVS,

5  you would have more locations; correct?

6      A.   Yes.

7      Q.   But you chose to make Walgreens the

8  exclusive retail pharmacy for 90-day fills and

9  refills of 90-day maintenance medication supplies;

10 correct?

11     MR. GUGLIELMO:  Objection.  Asked and answered.

12     You can answer.

13     THE WITNESS:  Like I said before, it's

14 continuity of care, people being used to going to

15 certain pharmacies.  We didn't want to limit

16 people.  We know they have three times the

17 locations as their biggest competitors.  I mean, it

18 just seemed like regardless if we have issues with

19 them right now, we couldn't eliminate them from our

20 pool of pharmacies just because we have a

21 disagreement at this point.

22 BY MR. LEIB:

23     Q.   But you did limit people; correct?  You

24 limited anybody who was using a pharmacy other than

Page 194

1   Walgreens, you limited them to change to using

2   Walgreens if they didn't want to use the mail

3   order; correct?

4       A.   Yes.

5       Q.   So when you say "We didn't want to limit

6   people," it's actually not a true statement;

7   correct?

8       MR. GUGLIELMO:  Objection.  Mischaracterizes

9   testimony.

10      THE WITNESS:  I mean, we were looking for the

11  majority.  We can't -- we were trying to appease

12  the majority of our membership.

13  BY MR. LEIB:

14      Q.   So if you were trying to appease the

15  majority of your membership, wouldn't the best

16  thing to have done is to allow them to go to

17  multiple different retail chains so they could

18  choose the pharmacy of their choice?

19      MR. GUGLIELMO:  Objection.

20      We're still talking about the mail order;

21  correct?

22      MR. LEIB:  Yeah, for the 90-day prescription

23  supplies of maintenance medication.

24      THE WITNESS:  Again, I don't know.  With the

Page 195

```
 1   guidance of J.W. Terrill and Kathy, there was
 2   reasons behind why we did all of this stuff.  So if
 3   they thought Walgreens was the best provider for a
 4   pharmacy, that's why we did it.  We did a lot of
 5   stuff when it comes to medical issues through her
 6   guidance because she is the professional; we are
 7   not.
 8   BY MR. LEIB:
 9        Q.   Did the Fund tell J.W. Terrill that it
10   didn't want to use Walgreens as the exclusive
11   pharmacy because it was in a litigation with it?
12        A.   No, we didn't.
13        Q.   If you look back at Exhibit 108, which is
14   the amendment to the plan -- before you look at
15   that, let me ask you this question:  For retail
16   pharmacies, your network is broader than just
17   Walgreens; correct?
18        A.   Yes.
19        Q.   And your members do utilize pharmacies
20   other than Walgreens; correct?
21        A.   Yes, I suppose so.
22        Q.   If you look at page 386, under -- in the
23   middle of the page, it says "Exclusive Walgreens
24   90-Day Maintenance Program & LDI Home Advantage
```

Page 196

1    Mail Order."  Do you see that?

2        A.    Yes.

3        Q.    And this is basically a communication to

4    your members, and on the next page there is

5    questions and answers; correct?

6        A.    Yes.

7        Q.    And it says under "Exclusive Walgreens" --

8    what we just read, it says there "Do you have

9    medications you take every day?  Your plan allows

10   two convenient options to fill your maintenance

11   medications.  You are allowed two 30-day fills at

12   your retail pharmacy and then subsequent fills must

13   be obtained through a Walgreens retail pharmacy or

14   LDI Home Advantage (mail order)."

15           Do you see that?

16       A.    Yes.

17       Q.    If you look at the next page, the third

18   question, "If I," and it's a question that a member

19   would ask; right?

20       A.    Uh-huh.

21       Q.    "If I use Walgreens for refills, will I be

22   able to receive a 90-day supply immediately"?

23           The answer is "No.  Regardless of the

24   retail pharmacy you use, your first two fills will

Page 197

1   only be a 30-day supply.  Although we encourage

2   using Walgreens for seamless service, the first two

3   fills may be obtained through any network retail

4   pharmacy.  Subsequent 90-day fills must be obtained

5   through a Walgreens retail pharmacy or LDI Home

6   Advantage (mail order)."

7           If the Fund believes Walgreens is

8   overcharging it for PSC generics, why would it

9   encourage its members to use Walgreens for the

10  first two fills that it could fill at any retail

11  pharmacy?

12      A.  I just think because they are -- there is

13  more locations, and like I said, I don't know if

14  there was problems with other pharmacies in the

15  area, if that's why Walgreens became a major

16  choice.  I mean, I would say generally it's just

17  because of their locations.  They have many

18  locations, and people could get there a lot sooner.

19  And if they are older and they can't drive, it's

20  not a burden to them to try to get their

21  medications when needed.

22      Q.  Are you aware of any problems with other

23  pharmacies in the area?

24      A.  No, I'm not.

1      Q.   If somebody was using, let's say, CVS,

2   maybe because it's the closest one to their home,

3   and they received this, they received a

4   communication from the Fund encouraging them to use

5   a different pharmacy for their first two 30-day

6   fills of maintenance medication; correct?

7      A.   I mean, it's also asking that any network

8   retail pharmacies available.

9      Q.   Well, it's telling them that any network

10   pharmacy is available?

11      A.   Yeah.

12      Q.   But it's encouraging them to use

13   Walgreens, even if their regular pharmacy is a

14   different pharmacy; correct?

15      A.   But it's not telling them they have to use

16   Walgreens.

17      Q.   I didn't ask you if it was telling them

18   they have to use Walgreens.  I am asking if it's

19   telling them even if their pharmacy, their regular

20   retail pharmacy is different than Walgreens, it's

21   encouraging them to use Walgreens for their first

22   two fills of maintenance medication; correct?

23      MR. GUGLIELMO:  Objection.  Form.

24      THE WITNESS:  Yeah, I mean, it's wording that

Page 199

```
 1   it's encouraging them to use Walgreens.
 2   BY MR. LEIB:
 3       Q.   And it didn't have to do that; right?
 4           It could have just said, "You can use any
 5   network retail pharmacy for doing these two fills";
 6   correct?
 7       MR. GUGLIELMO:  Objection.  Misstates the
 8   statement.  And it's taking this document out of
 9   context.
10       THE WITNESS:  Yeah, it's saying you can refill
11   at any network pharmacy, retail pharmacy.
12   BY MR. LEIB:
13       Q.   But it could have -- I'm sorry.
14           It could have left off that first part
15   about encouraging using Walgreens; correct?
16       A.   Sure.
17       Q.   Do you know who authorized this to go out,
18   this document?
19       A.   I would say LDI.  LDI created it.  So they
20   are in pharmaceuticals so --
21       Q.   Did the Fund review it?
22       A.   I did not review it, no.  I'm sure
23   somebody from the Fund is aware of it, but I don't
24   know who.
```

Page 202

1   BY MR. LEIB:

2       Q.   What do you mean by directly -- "not

3   directly"?

4       A.   Our money gets to them somehow or they

5   wouldn't give us the product.

6       Q.   Well, the Fund does not have a contract

7   with Walgreens; correct?

8       A.   No, we do not.

9       Q.   Do you understand that the PBM has a

10  contract with Walgreens?

11      A.   Yes.

12      Q.   And the PBM pays Walgreens according to

13  the terms of its contract with Walgreens; correct?

14      A.   Yes.

15      Q.   And the Fund doesn't know what the terms

16  of the contract are between, in this case, Medtrak

17  and Walgreens; correct?

18      A.   That, I'm not aware of.

19      Q.   Right.

20           The Fund doesn't know; correct?

21      A.   Yes.

22      Q.   Because the Fund's never seen the contract

23  between Medtrak and Walgreens; correct?

24      A.   I haven't, no.

Page 203

1       Q.   Has anyone at the Fund?

2       A.   I don't believe so, no.

3       Q.   In fact, the Fund is required to pay

4  Medtrak whatever is stated in its agreement with

5  Medtrak; correct?

6       A.   Yes.

7       Q.   That's regardless of whatever the contract

8  between Medtrak and Walgreens states; correct?

9       A.   Yes.

10      Q.   The obligations that the Fund has to

11 Medtrak are only those obligations that are in the

12 contract; correct?

13      A.   75 percent of what we pay for the

14 pharmaceuticals.

15      Q.   The obligation that the Fund has to

16 Medtrak are only those obligations that are in the

17 contract; correct?

18      A.   Yes.

19      Q.   If we look at -- again, that sentence says

20 that the paid claim charges are "defined and

21 described in Exhibit B."  You see that; right?

22      A.   Yes.

23      Q.   So let's look at Exhibit B on page 10.

24           It says "Exhibit B, Financial Terms."  Are

Page 229

1   and customary?

2       A.   Again, I don't know that answer.

3       Q.   This definition of usual and customary is

4   in your contract with Medtrak; correct?

5       A.   Yes.

6       Q.   So isn't it true that if you paid more

7   than the usual and customary price that's required

8   by your contract with Medtrak, that your complaint

9   is with Medtrak, not Walgreens?

10      A.   Well, Medtrak, at this time, they weren't

11  filling the prescriptions.  I mean, we were getting

12  them from Walgreens.  So...

13      Q.   Do you understand when a prescription gets

14  filled, that Walgreens interfaces with the PBM so

15  the PBM can tell it how much to charge the member?

16      MR. GUGLIELMO:  Objection.  Form.

17      THE WITNESS:  Yes.

18  BY MR. LEIB:

19      Q.   So now going back to my other question,

20  isn't it true that if the Fund paid more than the

21  usual and customary price as required by the Fund's

22  contract with Medtrak, that the Fund's complaint is

23  with Medtrak, not Walgreens?

24      MR. GUGLIELMO:  Objection.  Form.

Page 230

1     You can answer.

2     THE WITNESS:  I don't -- I don't know what the

3 relationship Medtrak has with Walgreens.  I can't

4 speak for them.  I don't know their contracts with

5 each other.  All I know is Walgreens offered a

6 certain price, and we didn't get that price.

7 BY MR. LEIB:

8     Q.   You contracted with Medtrak; correct?

9     A.   Yes.

10     Q.   You expected Medtrak -- Medtrak to charge

11 you the price required by the contract; right?

12     A.   Yes.

13     Q.   If you don't get a price required by the

14 contract, then Medtrak would be in breach of your

15 contract; correct?

16     MR. GUGLIELMO:  Objection.  Calls for a legal

17 conclusion.

18     You can answer.

19     THE WITNESS:  Again, I don't know what their

20 relationship is and what information they can get

21 from Walgreens.  I don't --

22 BY MR. LEIB:

23     Q.   I'm not asking about information they can

24 get from Walgreens.  I am asking you if Medtrak

Page 231

1    does not charge you what they are allowed -- strike

2    that.

3          I'm asking you if Medtrak charges you

4    something other than what they are allowed to

5    charge you under your contract with Medtrak, then

6    it would be Medtrak that would owe you money;

7    correct?

8       MR. GUGLIELMO:  Objection.  Form.

9       THE WITNESS:  Medtrak needs to follow the rules

10   that we have set up in here.

11   BY MR. LEIB:

12      Q.   And if they don't, you would have a

13   complaint with Medtrak; correct?

14      A.   Yes.

15      Q.   If you can look at the Second Amended

16   Complaint, paragraph 42.

17      MR. LEIB:  You know what, I'm going to skip

18   that question, and I think now would be a good time

19   to take a break.

20      MR. GUGLIELMO:  Perfect.

21      THE VIDEOGRAPHER:  We are going off the record

22   at 4:08 p.m.  This is the end of Media Set 5.

23                  (A short break was taken.)

24      THE VIDEOGRAPHER:  Back on the record at

Page 249

1      A.   They are in this.   I just seen them

2   recently.   They're in these binders.

3      MR. GUGLIELMO:   They have been produced.

4   BY MR. LEIB:

5      Q.   Okay.   We'll take a look for those, but

6   I'm asking you where in the contract it provides

7   for a specific -- now, let me say this:   At the end

8   of the year, they do a reconciliation; correct?

9      A.   Reconciliation is on brand name drugs

10   only.

11      Q.   Well, that's -- let's take a look.   Let's

12   go back to Exhibit E.   Let's go to the bullet

13   points on page 64.

14         The first sentence "LDI will separately

15   reconcile the guarantees for each pricing component

16   on an annual basis."   Do you see that?

17      A.   Yes.

18      Q.   Now, have you received any money back from

19   LDI as a result of such a reconciliation?

20      A.   Yes.

21      Q.   Now, I'm talking not as part of a

22   reconciliation process at the end of the year where

23   it determines average overall the purchases for the

24   entire year.   I am talking about for an individual

Page 273

1  Price or," and then it lists other things.  Do you

2  see that?

3      A.   Yes.

4      Q.   So it has same type of "lesser of" logic

5  that your Medtrak contract has; right?  It may not

6  be the same exact provisions, but it has "lesser

7  of" logic.  Do you see that?

8      A.   Yes.

9      Q.   And one of the "lesser of" is provider's

10  usual and customary retail price.  Do you see that?

11      A.   Yes.

12      Q.   Let's look at Section 1.24 on page 5.

13          Do you see that it defines "Usual and

14  Customary Retail Price" as "the retail price of a

15  Covered Medication in a cash transaction at the

16  Pharmacy dispensing the Covered Medication (in the

17  quantity dispersed) on that date that it is

18  dispensed."

19      A.   Yes.

20      Q.   And I said dispersed.  I meant dispensed.

21  I'll reread it.

22          It says "The retail price of Covered

23  Medication in a cash transaction at the Pharmacy

24  dispensing the Covered Medication (in the quantity

Page 274

1  dispensed closed) on the date it is dispensed."

2        Do you see that?

3     A.   Yes.

4     Q.   There is no discussion of the discounts;

5  correct?

6     A.   No, just the retail price of the

7  medication.

8     Q.   So based on that, if Walgreens reported

9  the U&C to LDI as the retail price, then it

10 reported the statistic LDI needs to know in order

11 for LDI to know what it's required to pay

12 Walgreens; right?

13    MR. GUGLIELMO:  Objection to form.

14    THE WITNESS:  Yes.

15 BY MR. LEIB:

16    Q.   Even if the PSC price were $10 and the

17 retail price was $50, under this contract,

18 Walgreens had to report to LDI the retail price of

19 $50; correct?

20    MR. GUGLIELMO:  Objection to form.

21    THE WITNESS:  Yes.

22 BY MR. LEIB:

23    Q.   If LDI needed any additional information

24 from Walgreens to know how much LDI is required to

Page 295

1                     C E R T I F I C A T E

2

3           I, DEANNA AMORE, a Shorthand Reporter and

4    notary public, within and for the State of

5    Illinois, County of DuPage, do hereby certify:

6           That CHARLES E. BAILEY JUNIOR, the witness

7    whose examination is hereinbefore set forth, was

8    first duly sworn by me and that this transcript of

9    said testimony is a true record of the testimony

10   given by said witness.

11          I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage, and that I am in no way interested in the

14   outcome of this matter.

15

16          IN WITNESS WHEREOF, I have hereunto set my

17   hand this 15th day of June 2019.

18

19

20

21          Deanna M. Amore, CRR, RPR, CSR

22

23

24