# EXHIBIT 61

## *REDACTED*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Cynthia Russo, Lisa Bullard, Ricardo Gonzales, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, International Union of Operating Engineers Local 295-295c Welfare Fund, and Steamfitters Fund Local 439, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WALGREEN CO.,<br>Defendant. | Civil No. 1:17-cv-02246 |

## EXPERT REPORT OF
## KELLY LEAR NORDBY, PH.D.

**Ankura Consulting Group, LLC**

**March 17, 2023**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Table of Contents

**I. Introduction** ..................................................................................................................1

    A. Qualifications ....................................................................................................1

    B. Assignment ......................................................................................................1

**II. Summary of Opinions** ....................................................................................................4

**III. Background** ...................................................................................................................5

    A. Nature Of The Dispute .....................................................................................5

    B. Overview Of Walgreens' PSC ...........................................................................6

    C. Administration Of Walgreens' PSC ...................................................................9

**IV. Walgreens' PSC Is A Two-Part, Conditional Pricing Arrangement That Necessitates Allocating The Membership Fee To Accurately Reflect PSC Prices** ................................. 10

    A. Walgreens' PSC Is A Two-Part Pricing Structure ..............................................10

        1. Access to Walgreens' PSC Formulary Prices Is Conditioned On Paying The Membership Fee ..............................................................................................................10

        2. Within The PSC, The Two-Part Price Provides A Quantity Discount That Should Be Factored Into The Total PSC Price ....................................................................13

    B. An Economically Sound Approach To Calculating "PSC Prices" Per Unit Allocates The Membership Fee Ratably Across Customers' Drug Purchases .....................................16

**V. The Hilton Report's Proposed Methodologies For Calculating Classwide Overpayment And Unjust Enrichment Damages Are Flawed And Unreliable Because They Fail To Account For The Membership Fee And Therefore Would Understate PSC Prices And Overstate Damages** ................................................................................................... 17

    A. The Hilton Report's Proposed Methodologies Require A Determination Of PSC Prices .........17

    B. The Hilton Report's Proposed Methodology For Calculating The PSC Price Is Flawed And Unreliable Because It Fails To Account For The Membership Fee ...............................18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**VI. The Schafermeyer Report's Assertions About The** ███████████████ **Are Flawed,**
   **Misleading, and Inconsistent With The Economics Of Two-Part Pricing ..................... 19**

   A. The Schafermeyer Report's Assertion That ███████████████ PSC
      Customers From Other Cash Customers Overlooks The Economics Of Two-Part Pricing....19

   B. The Schafermeyer Report's Claims That Walgreens ███████████
      ████████████████ Are Misleading And Do Not Support Ignoring The Fee When
      Calculating PSC Prices...................................................................................................25

      1. Instances Of The Membership Fee Being ██████████████ Are Limited ..........25
      2. Claims Of The Fee Being ████████████ Mischaracterize The Evidence ............27

   C. The Schafermeyer Report's Assertion That Insured Beneficiaries Should Not Have To Pay
      Membership Fees To Access PSC Prices Is Logically Flawed.......................................30

**VII. Conclusion ..................................................................................................30**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# I. INTRODUCTION

## A. Qualifications

1. My name is Kelly Lear Nordby. I am an economist and a Managing Director at Ankura Consulting Group, LLC ("Ankura"), a global advisory and expert services firm headquartered in Washington, D.C.

2. I hold a Master of Business and a Ph.D. in Business Economics and Public Policy from Indiana University's Kelley School of Business, Bloomington, Indiana, where I specialized in industrial organization, applied microeconomics and environmental economics. I also hold a Bachelor of Science in Finance from Lehigh University, Bethlehem, Pennsylvania. My curriculum vitae is attached as Exhibit 1.

3. Before joining Ankura, I held positions at global consulting firms, including Berkeley Research Group, LLC (BRG) and LECG, LLC. My consulting work over the last 25 years has focused on applying economics, econometrics, statistics, and finance to complex litigation issues related to class certification, liability and damages in matters spanning a wide range of industries. In the pharmaceutical industry, I have examined issues of class certification and damages in matters involving alleged anticompetitive bundling and breach of contract. I have also examined issues related to two-part pricing and usual and customary pricing and provided testimony on these topics at an arbitration.

4. In addition to economic consulting, I conduct research and have taught undergraduate and graduate level courses in managerial economics, money and banking, data analysis, and business statistics at Indiana University's Kelley School of Business, Indiana University-Purdue University Indianapolis, the University of San Francisco, and Northeastern University, respectively. I have published articles that examine economic issues related to class certification and firm incentives in regulated industries, including the pharmaceutical industry.

## B. Assignment

5. I have been retained by Reed Smith, counsel for Walgreen Co. ("Walgreens"), to offer economic opinions in the class action matter brought by Cynthia Russo, Lisa Bullard, and Ricardo

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Gonzales (collectively, "Named Consumer Plaintiffs"),[1] and third-party payers ("TPPs")[2] International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, International Union of Operating Engineers Local 295-295C Welfare Fund, and Steamfitters Fund Local 439 (collectively, "Named TPP Plaintiffs"), on behalf of themselves (collectively, "Plaintiffs") and all other similarly situated persons or entities, defined as set forth in Plaintiffs' memorandum in support of their motion for class certification (collectively, the "Proposed Class").[3] Specifically, I was asked to review and assess the opinions put forward in the expert reports submitted by Lynette Hilton, Ph.D.[4] and Kenneth W. Schafermeyer, Ph.D.[5] as they relate to the prices paid by members of Walgreens' Prescription Savings Club ("PSC") for prescription drugs and for the PSC membership fee. In addition, I was asked to consider the pricing structure of Walgreens' PSC and offer independent expert opinions as an economist regarding the following topics:

> (a) whether the price paid for a prescription drug by a PSC member using their PSC benefits (the "PSC price") is the PSC formulary[6] price paid at the cash register (the

---

[1]  The Complaint defines a "consumer" as "a person who is a participant or beneficiary under a public or private health insurance plan that provides prescription drug benefits pursuant to such plan." Fourth Amended Consolidated Class Action Complaint and Jury Demand, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, June 16, 2021, pp. 1-103 ("Complaint"), ¶ 1, fn. 1.

[2]  The Complaint defines TPP as "private health insurance companies, third-party administrators, health maintenance organizations, health and welfare plans that make payments from their own funds, and other health benefit providers and entities with self-funded plans that contract with a health insurer or administrator to administer their prescription drug benefits." Complaint, ¶ 1, fn. 2.

[3]  Complaint, ¶ 1; and Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 17, 2022, pp. 1-32, at 1 and 3 (defining the Proposed Class to include, with certain exclusions, "[a]ll persons, or entities, for whom prescription drug insurance benefits were provided through the Relevant PBMs [Pharmacy Benefit Managers]…, and who paid or reimbursed, in whole or in part, for generic prescription drugs from Walgreen Co. at any point in time from the period January 1, 2007 through the present, in Arizona, California, Connecticut, Delaware, Florida, Illinois, Massachusetts, New York, North Carolina, Ohio, Pennsylvania, and Wisconsin, where the usual and customary price was a basis for the amount paid or reimbursed in connection with the purchase of such drug, and the amount paid or reimbursed was inflated because the Prescription Savings Club price was not reported or otherwise included when determining the usual and customary price to report.").

[4]  Report of Lynette Hilton, Ph.D., *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 16, 2022, pp. 1-22, and exhibits ("Hilton Report").

[5]  Report of Kenneth W. Schafermeyer, Ph.D., *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 16, 2022, pp. 1-53, and exhibits ("Schafermeyer Report").

[6]  "A formulary is the list of prescription drugs that a health insurer will cover; it assigns particular products to one of several tiers (typically two to four in commercial formularies) with different member cost sharing."

"PSC formulary price"),[7] or whether the PSC price also includes some or all of the annual membership fee; and,

(b) if the latter, to provide an economically sound approach to calculating the PSC price that accounts for the PSC membership fee.

6.    This report summarizes my analysis and findings. The materials I considered in forming my opinions are cited herein and listed in Exhibit 2 to this report. These materials include legal filings, deposition transcripts, expert reports, declarations, documents produced through discovery in this matter, economic literature, and publicly available documents.

7.    My analysis is ongoing, and I reserve the right to modify and/or supplement my opinions should other relevant information become available after the submission of this report.

8.    I have no financial interest in the outcome of this litigation. Ankura is being compensated for my time spent working on this matter at my hourly rate for expert consulting services of $630. I have been supported in my work by Ankura staff, who are being billed at their respective customary billing rates, which vary between $200 and $735 per hour based on each individual's qualifications and experience. The compensation to Ankura for my services and for the services of Ankura staff is not dependent on my opinion or the outcome of this matter.

9.    The remainder of this report is organized as follows:

- Part II summarizes my opinions;
- Part III provides background regarding the nature of the dispute and Walgreens' PSC;

---

*See, e.g.,* Gabriela Dieguez, Maggie Alston, and Samantha Tomicki, "A primer on prescription drug rebates: Insights into why rebates are a target for reducing prices," Milliman White Paper, May 2018, at 2, available at https://www.milliman.com/-/media/Milliman/importedfiles/uploadedFiles/insight/2018/prescription -drug-rebates.ashx.

[7]    Herein, the "PSC formulary price" refers to the PSC price(s) per unit returned by the Pharmacy Benefit Manager ("PBM") administering the PSC at the time of the transaction. I understand from counsel that the price returned by the PBM should reflect the PSC formulary price in effect at the time of the transaction. Furthermore, ████████████████████████████████████████████████████████████████████

████████████████ *See* Declaration of Christopher Dymon, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 9, 2022, pp. 1-58 ("Dymon Declaration"), ¶ 34.

3

- Part IV presents the economic analysis that supports my opinions regarding Walgreens' PSC price structure on which I rely in responding to the reports submitted by Plaintiffs' experts;

- Part V and Part VI address the reports submitted by Plaintiffs' experts in this matter, Drs. Hilton and Schafermeyer, respectively; and

- Part VII summarizes my conclusions.

## II. SUMMARY OF OPINIONS

10. As a matter of economics, the PSC membership fee is part of the PSC price. Walgreens' PSC price structure is known in economics as a two-part tariff or two-part pricing because it consists of two parts: a fixed price, i.e., the membership fee, plus a price per unit for each unit purchased, i.e., the PSC formulary price. Accordingly, the total price paid for a drug[8] purchased through Walgreens' PSC is not simply the PSC formulary price. Instead, the PSC price includes a portion of the annual membership fee.

11. A two-part pricing structure and thus, Walgreens' PSC, is a type of "conditional" pricing arrangement that provides its members with the right to access lower PSC formulary prices for one year as long as members pay the applicable annual membership fee and meet certain other requirements.[9]

12. Additionally, within the PSC, the two-part pricing structure (i.e., the fixed annual fee and the price per-prescription drug) provides a *de facto* quantity discount for members, conditional on additional purchases; the price per-drug purchase decreases as the annual fee is spread across more units (i.e., prescription drug purchases). Therefore, an economically sound approach to calculating the prices actually paid by PSC members is to allocate the membership fee on a per-drug purchase basis. The average membership fee per-PSC drug purchase needs to be added to each drug's PSC formulary price to obtain the total price per unit (the "Effective Price") paid by PSC members. Ignoring the membership fee per-drug purchase and treating only the PSC formulary price as the Effective Price results in a downward biased estimate of the PSC price.

---

[8] Herein I use "prescription drug" and "drug" interchangeably; therefore, all references to "drug(s)" refer to "prescription drug(s)." As discussed in Section III.A of my report, this matter involves prices paid for generic prescription drugs.

[9] *See, e.g.*, Walgreen Co., "Prescription Savings Club, Terms and Conditions," available at https://www.walgreens.com/topic/psc/prescription-savings-club/psc-terms-and-conditions.jsp?o=acs.

13. The Hilton Report's proposed methodologies for calculating overpayment and unjust enrichment damages on a classwide basis are flawed and unreliable because they fail to consider the two-part pricing structure of the PSC and do not account for the PSC membership fee. Consequently, the Hilton Report's proposed methodologies would understate PSC prices and overstate damages.

14. The Schafermeyer Report's assertions that Walgreens ███████████████████████[10] are misleading and inconsistent with the economics of two-part pricing; the evidence does not support ignoring the membership fee when determining the PSC price paid. Additionally, the assertion that insured beneficiaries should not pay the membership fee is logically flawed.

## III. BACKGROUND

### A. Nature Of The Dispute

15. This matter concerns prices Walgreens reported as its "Usual and Customary" ("U&C") prices[11] on claims submitted for reimbursement to third-party payers for certain generic prescription drugs, specifically, generic prescription drugs that are available for purchase by members of Walgreens' PSC ("PSC Generics").

16. The Complaint alleges that:

> (a) "for years, Walgreens has knowingly and intentionally reported artificially inflated U&C prices for PSC Generics on claims for reimbursement submitted to third-party payors. Because the reported U&C price is used to calculate the amount a consumer must pay, Walgreens also overcharged consumers and beneficiaries of

---

[10] Schafermeyer Report, ¶ 127(e). *See also* Schafermeyer Report, ¶¶ 151 and 157.

[11] I understand that Walgreens disputes how Plaintiffs define U&C price. Plaintiffs claim "[t]he U&C price submitted in the adjudication process is generally defined as the cash price to the general public, exclusive of sales tax or other amounts claimed." *See* Complaint, ¶ 58. According to Walgreens, the U&C price is "defined by applicable state law or contract." *See* Walgreens Third Amended Objections and Responses to Plaintiffs' Second Set of Requests for Admission, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, October 28, 2021, pp. 1-63, ¶ 4. *See also* Walgreens' Response to Plaintiffs' First Request for Admissions to Defendant, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, February 28, 2020, pp. 1-25, Response to Request for Admission No. 21.

third-party payors for PSC Generics by improperly collecting inflated copayments, coinsurance, or deductible amounts."[12]

(b) "Walgreens' misconduct has caused Plaintiffs and the other members of the Class to suffer significant damages from 2007 to the present."[13]

17. According to the Complaint, Plaintiffs seek to recover monetary damages, injunctive relief, and other remedies.[14]

### B. Overview Of Walgreens' PSC

18. Walgreens' PSC is "a program that helps reduce prescription costs for patients who are uninsured and underinsured."[15] According to Walgreens, the PSC "offers Members the right to purchase specified healthcare items or services"[16] from participating stores at lower prices as long as they enroll, pay the required annual membership fee of $20 per individual or $35 per family, meet certain eligibility requirements (e.g., until early 2020, Medicare and Medicaid beneficiaries could not join),[17] and agree to abide by the terms and conditions of participation, including agreeing to purchase PSC drugs without the use of insurance.[18] Uninsured or

---

[12] Complaint, ¶ 12.

[13] Complaint, ¶ 13.

[14] Complaint, ¶ 13.

[15] *See* "Prescription Savings Club Talking Points and Frequently Asked Questions (FAQs)," Walg_Forth_00040901-Walg_Forth_00040907 ("PSC Talking Points and FAQs"), at Walg_Forth_00040901. *See also* "Prescription Savings Club FY10 Creative Brief," Walg_Forth_00184588-Walg_Forth_00184590 ("PSC FY10 Creative Brief"), at Walg_Forth_00184588.

[16] Walgreen Co., "Prescription Savings Club program details," available at https://www.walgreens.com/psc/prescription-savings-club.

[17] *See* Declaration of Henry Thompson, Senior Director and General Manager of Consumer-Paid Prescriptions for Walgreens, *Cynthia Russo, et al v. Walgreen Co.*, Case No. 1:17-cv-02246, March 15, 2023, pp. 1-2 ("Thompson Declaration"), ¶ 7. *See also* Walgreens' Third Amended Objections and Responses to Plaintiffs' Second Set of Requests for Admission, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, October 28, 2021, pp. 1-63, Response to Request for Admission No. 71.

[18] Walgreen Co., "Prescription Savings Club program details," available at https://www.walgreens.com/psc/prescription-savings-club. *See also* PSC Talking Points and FAQs, at Walg_Forth_00040901-902. Deposition of Jay Bernstein, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, September 14, 2019, pp. 1-158 ("Bernstein Deposition"), at 18 and 83-84; Walgreens' 30(b)(6) Deposition of Michael Amiet, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 20, 2019, pp. 1-288 ("Amiet Deposition"), at 13, 72, and 77-80; and Thompson Declaration, ¶ 3.

underinsured[19] customers who are not PSC members, or who do not utilize an insurance benefit, third-party discount card or manufacturer's coupon, pay Walgreens' retail prices.[20] One Walgreens-produced document estimates that "over 30% [of PSC members] have some other form of insurance, implying that PSC is being used to supplement their current prescription coverage."[21]

19.     Walgreens piloted its PSC in April 2006 "as a supplement to prescription insurance."[22] According to a PSC "[Fiscal Year 2009] Interim Marketing Strategy" document, the pilot program ███████████████████████████████████████████████████████ ███████████████████████████████████████████████[23] By 2007, Walgreens added a $35 membership fee for families and "changed the formulary" to cover "over 5000 brand name and generics, including 300 value-priced generics ($12.99 for a 90-day supply)."[24]

20.     When it launched nationally in August 2008, [25] Walgreens' PSC, known as "PSC Base 1.0," included discounts for "400 VPGs [Value Priced Generics]" priced at 1 tier -- $9.99/$12 for a 30- / 90-day supply and covered "all 4,500 generics and 3,500 S/S [Single Source] Brands."[26]

---

[19]  "Underinsured" customers are customers with limited prescription-drug coverage, *i.e.*, a high out-of-pocket obligation. *See, e.g.*, Amiet Deposition, at 73-74; "Prescription Savings Club (PSC) Transition Document," Version 1.2, April 3, 2014, Walg_Forth_00347934-Walg_Forth_00347936 ("PSC Transition Document"), at Walg_Forth_00347934 ("The target customers for all of these programs are the uninsured and underinsured (those that do have insurance but their insurance doesn't cover their medication).").

[20]  *See* Amiet Deposition, at 51 and 78-79.

[21]  PSC FY10 Creative Brief, at Walg_Forth_00184589. Other Walgreens-produced documents indicate the percentage of PSC members that also have prescription drug insurance is as high as 60%. *See, e.g.*, "Prescription Savings Club," January 28 and 29, 2014, Walg_Forth_00347272-Walg_Forth_00347329, at Walg_Forth_00347273.

[22]  "Prescription Savings Club, FY09 Interim Marketing Strategy, January 2009," Walg_Forth_00005266-Walg_Forth_00005277 ("PSC FY09 Interim Marketing Strategy"), at Walg_Forth_00005268; Amiet Deposition, at 70, 74-75.

[23]  PSC FY09 Interim Marketing Strategy, at Walg_Forth_00005268.

[24]  PSC FY09 Interim Marketing Strategy, at Walg_Forth_00005268.

[25]  Amiet Deposition, at 70, 74-75.

[26]  "Prescription Savings Club 'White Paper,'" Walg_Forth_00062179-Walg_Forth_00062206 ("PSC White Paper"), at Walg_Forth_00062187, Walg_Forth_00062197 and Walg_Forth_00062198. *See also* PSC FY10 Creative Brief, at Walg_Forth_00184588; Amiet Deposition, at 94-95.

21.  In May 2012, Walgreens launched PSC 2.0 to expand the set of Value Priced Generics ("VPGs").[27] In PSC 2.0, VPGs were priced at three tiers. PSC "Value-Priced Medication List" documents and other documents in the record indicate that Walgreens' PSC formulary prices for 30- and 90-day supplies for certain generic drugs were $5/$10 for Tier 1, $10/$20 for Tier 2, and $15/$30 for Tier 3, respectively, in 2012 and 2013.[28] Medications included in the PSC covered conditions including diabetes, high cholesterol, high blood pressure, heart disease, allergy/asthma, and anxiety/depression.[29]

22.  By April 2013, Walgreens' PSC had ▮▮▮▮▮ memberships.[30] According to a PSC "Transition Document," as of April 2014, there were ▮▮▮▮▮ memberships in PSC" and "[s]ince inception of the program[,] over ▮▮▮▮▮ memberships have been issued."[31] A January 2014 Walgreens-produced document reports that "PSC generates in excess of $29 [Million] annually for enrollment fees."[32]

23.  Today, the PSC covers over 8,000 medications.[33] A Walgreens' PSC "Value-Priced Medication List" indicates Walgreens' PSC formulary prices for 30- and 90-day supplies for certain generics are the same for Tier 2 and Tier 3 drugs as in 2013 and are now $7.50/$15 for 30- and 90-day supplies of Tier 1 VPGs, respectively.[34]

---

[27]  Amiet Deposition, at 94. *See also* Amiet Deposition, at 95 ("[W]e got to 700 to 800 drugs instead of that 300. And so it really -- that was the primary motivating factor, was just to put more products on the VPG in a way that it would create great visibility for those individuals and attract them to our store.").

[28]  "Prescription Savings Club Value-Priced Medication List," Revised 5/9/2012, Walg_Forth_00300646-Walg_Forth_00300650 ("PSC Value-Priced Medication List 2012"), at Walg_Forth_00300646; "Prescription Savings Club Value-Priced Medication List," Revised 8/23/2013, Walg_Forth_00013205-Walg_Forth_00013209 ("PSC Value-Priced Medication List 2013"), at Walg_Forth_00013205. *See also* PSC White Paper, at Walg_Forth_00062187 and Walg_Forth_00062197.

[29]  PSC Value-Priced Medication List 2012, at Walg_Forth_00300646-Walg_Forth_00300648. *See also* PSC White Paper, at Walg_Forth_0062193, Walg_Forth_00062203.

[30]  "Prescription Savings Club (PSC), Cash and Third Party Discount Cards," 5/23/13, Walg_Forth_00077013-Walg_Forth_00077016, at Walg_Forth_00077014.

[31]  PSC Transition Document, at Walg_Forth_00347934.

[32]  "Prescription Savings Club," January 28 and 29, 2014, Walg_Forth_00347272-Walg_Forth_00347329, at Walg_Forth_00347273.

[33]  Walgreen Co., "Prescriptions Savings Club, Prescription Savings Club can lower the price of keeping you well," available at https://www.walgreens.com/psc/prescription-savings-club.

[34]  PSC Value-Priced Medication List 2013, at Walg_Forth_00013205; and Walgreen Co., "Prescription Savings Club Value-Priced Medication List," Revised 7/25/22 ("PSC Value-Priced Medication List 2022"), available at https://www.walgreens.com/images/adaptive/pdf/psc/Value-Priced-Medication-List-English.pdf.

## C. Administration Of Walgreens' PSC

24. Walgreens' PSC is administered by a PBM, who, among other responsibilities, verifies a patient's membership and eligibility for PSC pricing.

25. 

26.

## IV. WALGREENS' PSC IS A TWO-PART, CONDITIONAL PRICING ARRANGEMENT THAT NECESSITATES ALLOCATING THE MEMBERSHIP FEE TO ACCURATELY REFLECT PSC PRICES

### A. Walgreens' PSC Is A Two-Part Pricing Structure

27.  Within Walgreens' PSC, members pay a fixed annual membership fee plus the PSC formulary price for each eligible prescription they purchase within the membership year. Such pricing structures are commonly known in economics as a "two-part tariff" or "two-part pricing."[42] Thus, the fixed fee is one part of the two-part price.

28.  Walgreens' two-part pricing structure provides for lower prices in two ways. First, payment of the membership fee provides PSC members the right to access per-unit PSC formulary prices that are *lower* than prices available to non-members (i.e., lower PSC formulary prices are conditioned on paying the membership fee). Second, the PSC provides a quantity-based discount because the per-purchase membership fee decreases as it is spread across a higher number of purchases (i.e., conditional on purchasing more units). In this section of my report, I discuss both aspects of this two-part pricing structure. In addition, I provide an economically sound approach to calculating the total PSC price per unit that accounts for the membership fee, i.e., the "Effective Price."

### 1. Access to Walgreens' PSC Formulary Prices Is Conditioned On Paying The Membership Fee

29.  Access to PSC formulary prices paid by PSC members is conditioned upon paying the membership fee and therefore, the total price PSC members actually pay for any particular prescription drug using their PSC benefits is the PSC formulary price plus a portion of the membership fee. As discussed above, customers who purchase prescription drugs from Walgreens' participating pharmacies "out-of-pocket" and without an insurance benefit may, among other options, purchase at the "retail price" (a/k/a the "cash price")[43] or join Walgreens' PSC, pursuant to which they are charged lower PSC formulary prices for eligible drugs, provided

---

[42] *See, e.g.*, Michael R. Baye, Managerial Economics and Business Strategy, 2d ed., Irwin, 1997, at 418 ("With *two-part* pricing, a firm charges a fixed fee for the right to purchase its goods, plus a per-unit charge for each unit purchased.").

[43] *See* Expert Report of Michael S. Jacobs, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, March 16, 2023, pp. 1-48, ¶ 14.

10

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

they pay an annual membership fee and meet certain other conditions.[44] Importantly, PSC formulary prices are not available to **all** customers who purchase without an insurance benefit. Rather, PSC formulary prices are available conditional upon the customer enrolling, satisfying the eligibility requirements, agreeing to the terms and conditions, and paying the membership fee on an annual basis.[45] From an economic perspective, this pricing strategy allows customers to self-select into Walgreens' PSC, depending on their demand (expected usage) and price sensitivity.[46]

30.   Walgreens' PSC is a type of pricing strategy known in economics as a "conditional" pricing arrangement because it conditions access to lower PSC formulary prices on members fulfilling certain requirements and provides a quantity discount as the member purchases more units (discussed in greater detail below).[47] Conditional pricing strategies are common within the pharmaceutical industry.[48] For example, such strategies may condition discounts or rebate payments – that reduce the total price paid – on certain performance requirements, such as

---

[44] *See, e.g.*, Walgreen Co., "Prescription Savings Club, Terms and Conditions," available at https://www.walgreens.com/topic/psc/prescription-savings-club/psc-terms-and-conditions.jsp?o=acs. *See also* "Terms and Conditions," Walg_Forth_00059855-Walg_Forth_00059857 ("WCard Terms and Conditions"); Amiet Deposition, at 78.

[45] *See, e.g.*, Walgreen Co., "Prescription Savings Club, Terms and Conditions," available at https://www.walgreens.com/topic/psc/prescription-savings-club/psc-terms-and-conditions.jsp?o=acs. *See also* WCard Terms and Conditions, at Walg_Forth_00059855; PSC Talking Points and FAQs, at Walg_Forth_00040902.

[46] *See, e.g.*, Kathleen Carroll and Dennis Coates, "Teaching Price Discrimination: Some Clarification," *Southern Economic Journal*, 1999, 66(2), 466-480, at 475 ("The first example is similar to memberships in warehouse shopping clubs. The consumer can join with one of two different types of membership. Under the less expensive membership, posted prices are not discounted, whereas under the more expensive membership, posted prices are discounted 10%. By selecting a membership, consumers reveal information about their demand—information that the firm would not have had otherwise.").

[47] *See, e.g.*, Patrick DeGraba, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," September 2017, pp. 1-14, at 1, 5-7 ("Conditional pricing practices (CPPs) include a broad range of pricing strategies employed by many firms in the economy, including firms with large market shares and those with small shares. This broad range of practices includes, among others: all-units and other quantity-based discounts, bundling, and market-share discounts.") (citations omitted), available at https://www.ftc.gov/system/files/documents/reports/conditional-pricing-practices-short-primer/conditional_pricing_practices_-_a_short_primer_-_sept_2017.pdf.

[48] *See, e.g.*, Avalere Health, "Follow the Pill: Understanding the Prescription Drug Supply Chain," May 20, 2020, pp. 1-4, at 3 ("PBM-Manufacturer rebates are often negotiated as a percentage of the drug's list price; however, rebates can also take other forms. For instance, they may include value- or volume-based rebates that are paid if certain predetermined thresholds are met."), available at https://avalere.com/insights/follow-the-pill-understanding-the-prescription-drug-supply-chain.

meeting minimum volume purchase requirements, purchasing a specified share of a customer's total requirement from the seller, or purchasing a specific set of products.[49] Bundled and volume discounts or rebates are examples of conditional pricing practices.[50] With bundled products, a customer pays a lower price for purchasing a set of products than if the customer purchased each product individually.[51] The lower bundled package price is conditioned on the customer purchasing all products in the bundle. Similarly, volume or "loyalty" discounts and rebates provide lower prices to customers who meet predetermined purchase commitments. Under these arrangements, customers do not receive the rebates or discounts without satisfying the specific requirements.

31. The conditional price arrangement in Walgreens' PSC is made clear in Walgreens' marketing documents. For example, Walgreens' PSC brochure states, "[m]embership fee required."[52] "Value-Priced Medication List" documents also state "[m]embership fee required ($20 individual or $35 family per year)."[53] A Walgreens-produced document discussing frequently asked questions about the PSC states:

> "Why do I have to pay $20 or $35 to join the Prescription Savings Club?

---

[49] *See, e.g.*, Einer Elhauge and Abraham L. Wickelgren, "Robust exclusion and market division through loyalty discounts," *International Journal of Industrial Organization*, 43, 2015, 111-121, fn. 1 ("[S]eller commitments are common in the health care industry, where dominant suppliers typically contract with hospitals through Group Purchasing Organizations (GPOs). In the typical contract, the supplier agrees with the GPO to offer contracts to GPO members with price tiers based on whether the hospital is loyal (buys a high percentage) from the supplier, with hospitals who agree to disloyal tiers getting a nominal 'discount' from supplier-set list prices and those who agree to loyal tiers guaranteed a higher discount.").

[50] *See, e.g.*, Patrick DeGraba, Patrick Greenlee, and Daniel P. O'Brien, "Conditional Pricing Practices – A Short Primer," September 2017, pp. 1-13, at 1, 5 ("Similarly, linking the units of a single product through a volume, all-units, or market share discount can be seen as bundling units of the same product and may facilitate price discrimination."), and 7 ("[U]nder a volume discount, the price of a bundle of units that aggregate to a specific volume is less than the sum of the prices that would be paid if each unit were purchased separately." (citing a two-part tariff example where "[t]he price of purchasing a bundle of two units" under the two-part tariff is less than "the price of purchasing two units separately....")).

[51] *See, e.g.*, Thomas A. Lambert, "Evaluating Bundled Discounts," *Minnesota Law Review*, 89, 2005, 1688-1757, at 1689 ("A 'bundled discount' occurs when a seller offers collection of different goods for a lower price than the aggregate price for which it would sell the constituent products individually.") (footnote omitted).

[52] Walgreen Co., "Walgreens Prescription Savings Club Plus Brochure," at 1, available at https://www.walgreens.com/images/adaptive/pdf/psc/PSCBrochure-English.pdf.

[53] PSC Value-Priced Medication List 2012, at Walg_Forth_00300650; PSC Value-Priced Medication List 2013, at Walg_Forth_00013209; PSC Value-Priced Medication List 2022, at 3.

> This fee enrolls you in an exclusive Club that provides special discounts on prescriptions to members only."[54]

32. The documentary evidence and testimony indicate that the membership fee was an important part of Walgreens' PSC. Jay Bernstein, developer and project manager of Walgreens' PSC,[55] testified that Walgreens' computer systems did not allow people to enroll without paying the membership fee.[56] In addition, I understand that Walgreens' PSC membership data show Walgreens required that customers using the PSC pay their annual membership fees.[57] According to Michael Amiet, Walgreens' corporate representative, the membership fee "has been an important component of the PSC since the initial pilot all the way through to the present day."[58]

### 2. Within The PSC, The Two-Part Price Provides A Quantity Discount That Should Be Factored Into The Total PSC Price

33. As discussed above, within Walgreens' PSC, members pay a fixed annual membership fee, plus the PSC formulary price for each eligible prescription they purchase within the membership year using their PSC benefits. Such two-part pricing structures are described by economists as a "two-part tariff" or "two-part pricing,"[59] and are widely recognized as a form of a quantity discount. For example, Nobel laureate Jean Tirole stated:

---

[54] "Prescription Savings Club Marketing Best Practices," "FAQs," Walg_Forth_00337741-Walg_Forth_00337754, at Walg_Forth_00337747.

[55] Bernstein Deposition, at 19-20. *See also* Amiet Deposition, at 83-84.

[56] Bernstein Deposition, at 23, 44, 46.

[57] Expert Report of Jed Smith, *Cynthia Russo, et al. v. Walgreen Co.,* Case No. 1:17-cv-02246, March 17, 2023, pp. 1-80 ("Smith Report"), ¶¶ 34 and 37.

[58] Amiet Deposition, at 77.

[59] Two-part tariffs are commonly discussed in the economics literature as a price discrimination practice used by a monopolist selling a single product. Two-part pricing programs are also employed in competitive markets. *See, e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, 8th ed., Prentice Hall, 2013, at 414 ("The **two-part tariff** is related to price discrimination and provides another means of extracting consumer surplus. It requires consumers to pay a fee up front for the right to buy a product. Consumers then pay an additional fee for each unit of the product they wish to consume. The classic example is an amusement park. You pay an admission fee to enter, and you also pay a certain amount for each ride."); Michael R. Baye, Managerial Economics and Business Strategy, 2d ed., Irwin, 1997, at 418 ("With *two-part* pricing, a firm charges a fixed fee for the right to purchase its goods, plus a per-unit charge for each unit purchased."); Kathleen Carroll and Dennis Coates, "Teaching Price Discrimination: Some Clarification," *Southern Economic Journal*, 1999, 66(2), 466-480, at 477 ("[s]ituations of multiple pricing may reflect any number of economic situations other than price discrimination, such as problems in market definition, the existence of opportunity costs not accounted for explicitly by the firm, a situation of competitive behavior

"[T]wo-part tariffs correspond, *de facto*, to a quantity discount scheme: The average price of the good decreases with the number of units bought."[60]

34. Equation (1) below presents the simple case of a two-part tariff for one product, where $q$ is the quantity of units purchased, $p$ is the per-unit price, and $A$ is the fixed fee. The total amount paid ($T$) by the consumer is:

$$T = A + pq. \qquad (1)$$

35. The total amount paid per unit can be found by dividing Equation (1) by $q$, as shown in Equation (2). I refer to the total amount paid per unit as the "Effective Price" (or "EP").

$$EP = \frac{A}{q} + p. \qquad (2)$$

36. As the formula above illustrates, the Effective Price **decreases** as the customer purchases a *greater* number of units, thereby providing a quantity discount. Consider the two extremes. If the quantity purchased is very large, the fixed fee per unit ($A/q$) approaches zero and the **minimum** Effective Price approaches the unit price ($p$). Alternatively, if the quantity purchased is very small, the fixed fee per unit ($A/q$) approaches the fixed fee ($A$) and the **maximum** Effective Price paid approaches the fixed fee plus the unit price ($A+p$), as illustrated in Figure 1.

---

indicating the absence of market power, or the presence of an alternative market imperfection, such as asymmetric information.").

[60] Jean Tirole, The Theory of Industrial Organization, The MIT Press, 1988, at 143.

**Figure 1: Effective Price (Per Unit)**



Note: Assumes a fixed fee of $20 and a price of $5 per unit.

37. The same is true in Walgreens' PSC. At one extreme, if a PSC member pays the annual membership fee and makes only one purchase in the membership year at the PSC formulary price for one drug, then the Effective Price the member actually pays for the one drug is the PSC formulary price plus the annual membership fee ($25 = $5 + $20, in Figure 1). However, if the member purchases more than one drug (or purchases more of the same drug), then the number of purchases increases and the Effective Price paid for the first drug decreases to a portion of the fixed membership fee plus the PSC formulary price, as the membership fee is spread across a greater number of purchases. Ignoring the membership fee and treating only the PSC formulary price ($5 in Figure 1) as the total PSC price per unit, i.e., the Effective Price, results in a downward biased estimate of the actual PSC price paid by PSC members.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

38.     This example demonstrates why the price paid for a drug purchased through Walgreens' PSC is not simply the PSC formulary price. Rather, the price actually paid for any given drug is the PSC formulary price, **plus** a portion of the annual membership fee, i.e., the Effective Price.[61]

39.     In sum, PSC membership fees are a key component of the total amount charged to Walgreens' PSC members who pay for their prescriptions without using insurance. Thus, the Effective Price includes the PSC formulary price plus a portion of the membership fee that is (i) a prerequisite to accessing the lower PSC formulary prices and (ii) was actually paid by members.

40.     In a similar matter concerning Kmart's prescription savings club and the prices Kmart reported as its U&C prices for generic drugs for the purposes of Medicare reimbursement, the Court of Appeals for the Seventh Circuit recognized that the price paid for a drug purchased through Kmart's program is not simply the formulary price. The Court stated, "if the fee was $10 and the program drug price was $15, the customer paid $25 for her first prescription."[62] The Court further stated, "for people who fill more than one prescription, the [annual membership] fee **would need to be allocated** in some sensible way."[63] In the next section, I discuss one possible method that I view as an economically sound approach for allocating the annual membership fee to calculate the Effective Price.

### B. An Economically Sound Approach To Calculating "PSC Prices" Per Unit Allocates The Membership Fee Ratably Across Customers' Drug Purchases

41.     As the formula in Equation (2) in Section IV.A.2. reflects, prices paid by PSC members include the annual membership fee. Equation (2) allocates the membership fee based on the customer's **total number of units** to calculate the PSC member's average **membership fee per unit**. Here, the number of units is equivalent to the number of PSC drugs purchased (i.e., PSC transactions)

---

[61]  My approach is consistent with the peer-reviewed literature that examines warehouse club pricing. For example, Kim and Choi (2007) allocate a portion of the membership fee to an individual product purchase. *See* Sang-Hoon Kim and S. Chan Choi, "The role of warehouse club membership fee in retail competition," *Journal of Retailing*, 2007, 171-181, at 171 and 173, fn. 6 ("In reality, **the annual membership fee [F] is spread across all product purchases** from the warehouse club. In our simplified version which considers only one product, *F* can be thought of as **a prorated portion of the annual fee** that can be attributed towards the expected purchase of the focal product.") (emphasis added).

[62]  *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, at *643 (7th Cir. 2016).

[63]  *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, at *643-644 (7th Cir. 2016) (emphasis added).

by a PSC member during a membership year. Thus, for each PSC member, the Effective Price paid for each drug purchased is the **per-purchase** membership fee plus the PSC formulary price.

42. The discussion thus far is at an individual PSC member level. Generally speaking, to determine an estimate of PSC prices actually paid per drug by all PSC members, the customer level per-purchase membership fees could be averaged across PSC members or PSC transactions to obtain an average per-purchase membership fee. This average per-purchase membership fee could then be added to the PSC formulary price for each drug to obtain an estimate of the Effective Price paid per-drug purchase by PSC members.

## V. THE HILTON REPORT'S PROPOSED METHODOLOGIES FOR CALCULATING CLASSWIDE OVERPAYMENT AND UNJUST ENRICHMENT DAMAGES ARE FLAWED AND UNRELIABLE BECAUSE THEY FAIL TO ACCOUNT FOR THE MEMBERSHIP FEE AND THEREFORE WOULD UNDERSTATE PSC PRICES AND OVERSTATE DAMAGES

### A. The Hilton Report's Proposed Methodologies Require A Determination Of PSC Prices

43. Dr. Hilton was retained by Plaintiffs' counsel to "develop a formulaic methodology" to "identify and calculate" (i) overpayments allegedly paid by Plaintiffs and the Proposed Class members and (ii) Walgreens' unjust enrichment in connection with Plaintiffs' contention that "Walgreens was required to report or otherwise include" PSC prices when determining its U&C.[64] The Hilton Report's proposed methodologies for calculating overpayments and unjust enrichment damages on a classwide basis require the determination of PSC prices.

44. Assuming liability, the Hilton Report maintains that "[a] formulaic approach can be applied here to estimate classwide damages"[65] and that "[i]ndividualized analysis for specific Class members will not be necessary."[66] More specifically, the Hilton Report proposes calculating the alleged "[c]lasswide [o]verpayment" as the "difference between what Class members actually paid for a

---

[64]  Hilton Report, ¶¶ 6-7.
[65]  Hilton Report, ¶ 21.
[66]  Hilton Report, ¶ 21.

generic drug and the PSC price for the same generic drug."[67] In addition, the Hilton Report proposes a methodology for calculating the alleged unjust enrichment as "the difference between Walgreens' revenue and its PSC prices,"[68] where an alleged overpayment occurred.[69] The proposed methodologies therefore require a determination of PSC prices, i.e., actual prices paid by PSC members using their PSC benefit.

## B. The Hilton Report's Proposed Methodology For Calculating The PSC Price Is Flawed And Unreliable Because It Fails To Account For The Membership Fee

45. Dr. Hilton failed to consider the membership fee and testified at deposition that, instead, she followed counsel's instructions to not consider the membership fee.[70] Dr. Hilton further testified that she does not have an opinion about whether the membership fee should be considered in determining PSC prices.[71] Nevertheless, she testified that the membership fee "wasn't something that was relevant for [her] analysis."[72]

46. The Hilton Report notes that, among other information, the PSC Claims Data "contain…the PSC price returned by the adjudicating PBM."[73] The Hilton Report states: "PSC prices can be

---

[67] Hilton Report, ¶ 22. The formula presented is: "Total Overpayment = (TPP Payment + Consumer Payment) – PSC Price," where an "overpayment" is identified by a "Total Overpayment" greater than zero. Hilton Report, ¶ 22, fn. 14. In addition, the Hilton Report provides general formulas for determining the alleged overpayment for the Consumer and TPP Proposed Class members. All formulas depend on the PSC price. Hilton Report, ¶¶ 22-26. *See also* Hilton Report, ¶¶ 29-36.

[68] Hilton Report, ¶ 37.

[69] Hilton Report, ¶ 37.

[70] Deposition of Lynette Hilton, Ph.D., *Cynthia Russo, et al. v. Walgreen Co.,* Case No. 1:17-cv-02246, January 17, 2023, pp. 1-347 ("Hilton Deposition"), at 205-206 ("Q. You don't mention the enrollment fee anywhere in your report, do you? A. No. Q Is there anywhere in your damages methodology where you account for the enrollment fee as part of the PSC prices? A. No. Q. Did you consider accounting for the fee in determining what the PSC price is? A. I guess I don't understand what you mean by 'consider,' but it wasn't something that I was asked to look at. Q. Were you told by counsel not to consider it? A. I was told not to consider it. Q. By counsel? You were told by counsel not to consider the enrollment fee in your analysis? A. It was something I was not asked to look at."; "Q. Were you told by counsel not to consider the enrollment fee? A. I'm trying -- yeah, I'm trying to figure out if it was just not my assignment. Yes, that was my understanding, that I should not consider it.").

[71] Hilton Deposition, at 206 ("Q. As an economist, do you have an opinion on whether or not the enrollment fee should be considered in determining what the PSC prices are? A. I don't have an opinion on that.").

[72] Hilton Deposition, at 201.

[73] Hilton Report, ¶ 44 and fn. 21 (stating "the PSC price returned by the adjudicating PBM is contained in ███████████████████████ citing the Dymon Declaration, ¶ 18(b).

formulaically derived from Walgreens' records for all Class members."[74] At deposition, Dr. Hilton testified that she calculated the PSC price as the sum of two data fields: [75,76] The ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[77]

47. Based on Dr. Hilton's testimony, I conclude that the methodology proposed in the Hilton Report is flawed because it fails to account for the membership fee. As discussed in Section III.B, Walgreens had over ██████ memberships in 2013 and 2014 and estimated that "PSC generates in excess of ████████ annually for enrollment fees."[78] As explained in Section IV.A.2. above, the failure to account for the membership fee results in a downward biased estimate of the total PSC price paid per unit, which would result in an incorrect and, therefore, unreliable estimate that overstates classwide damages.

## VI. The Schafermeyer Report's Assertions About The "Sham 'Membership Fee'" Are Flawed, Misleading, and Inconsistent With The Economics Of Two-Part Pricing

### A. The Schafermeyer Report's Assertion That "No Meaningful Selectivity…Separated" PSC Customers From Other Cash Customers Overlooks The Economics Of Two-Part Pricing

48. The Schafermeyer Report asserts that "[t]here is no meaningful selectivity that separated Walgreens' 'membership club' customers from any other cash customers purchasing prescriptions without insurance,"[79] and "no restrictions based on any type of demographic

---

[74] Hilton Report, ¶ 41.

[75] Hilton Deposition, at 221-222. *See also* Dymon Declaration, ¶ 18(e). Dr. Hilton further testified that if "one of those or both are blank, then I use plan return co-pay dollars…. And then if that's also blank, I use fill sold dollars…." Hilton Deposition, at 222.

[76] Dr. Hilton testified that footnote 21 to the Hilton Report, which states that, "the PSC price returned by the adjudicating PBM is contained in plan_return_copay_dlrs" is "incomplete" because it doesn't mention the additional fields she used (plan return cost dollars, plan return fee dollars and fill sold dollars). *Id.*, at 222-224.

[77] Dymon Declaration, ¶ 18(e).

[78] "Prescription Savings Club," January 28 and 29, 2014, Walg_Forth_00347272-Walg_Forth_00347329, at Walg_Forth_00347273.

[79] Schafermeyer Report, ¶ 132.

variable."[80] These assertions are incorrect from an economic perspective and are not consistent with the factual record I have reviewed.

49. The Schafermeyer Report's assertions overlook two important factors related to the economics of two-part pricing structures. First, under the PSC's two-part pricing structure, the right to PSC formulary prices is only available to club members who are eligible, enroll, agree to the terms and conditions, and pay the membership fee. Second, the two-part pricing structure enables Walgreens to separate high-demand, price-sensitive cash customers from low-demand, less price-sensitive cash customers.

50. The inability to observe *ex ante* a customer's "type," in this case whether a consumer is high-demand and/or price sensitive, is precisely one reason firms choose to employ a two-part pricing structure. As discussed in Section IV.A above, the two-part pricing structure induces customers to reveal their type by "self-selecting" into Walgreens' PSC based on their level of expected demand and price sensitivity.

51. More specifically, economists view two-part pricing structures as a form of price discrimination. Price discrimination refers generally to a firm charging *different* customers *different* prices for the *same* good.[81] A common form of price discrimination is when firms offer discounted prices to students or senior citizens. These segments of the population are typically more price sensitive than the rest of the population. In this example, different prices are offered to different customers based on a demographic variable, i.e., age, which is readily observable when the customer presents a form of identification showing their date of birth. This type of price discrimination is known as "third-degree price discrimination."[82]

---

[80] Schafermeyer Report, ¶ 132.

[81] *See, e.g.,* Robert S. Pindyck and Daniel L. Rubinfeld, <u>Microeconomics</u>, 8th ed., Prentice Hall, 2013, at 401 ("price discrimination: charging different prices to different customers" and defining price description as the "practice of charging different prices to different consumers for similar goods."). As these definitions demonstrate, such discussions generally treat "consumers" and "customers" synonymously. Some definitions of price discrimination add the condition that the differences in prices are not attributed to differences in costs. *See, e.g.,* Kathleen Carroll and Dennis Coates, "Teaching Price Discrimination: Some Clarification," *Southern Economic Journal,* 66(2), 1999, 466-480, at 467-468.

[82] Kathleen Carroll and Dennis Coates, "Teaching Price Discrimination: Some Clarification," *Southern Economic Journal,* 66(2), 1999, 466-480, at 469-470 ("Third-degree price discrimination is based on characteristics of the consumer or group of consumers. Firms recognize that some consumers are more sensitive to price than

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52. However, when a firm is unable to observe a consumer's type, a two-part pricing structure can help it separate consumers into groups. Two-part pricing is considered "second-degree price discrimination." For example, an article by two economists states,

> "Second-degree price discrimination encompasses a variety of pricing schemes through which the firm is able to induce consumers with high valuations to pay higher prices than consumers with low valuations. Second-degree price discrimination schemes induce consumers to self-select into groups based on their willingness to pay. Firms do not have the consumers' valuation information in this case…, nor do they have information that would enable them to identify high- versus low-demand individuals…. For example, the firm might know that there are two groups of buyers of its product. The first group will buy a great deal of the good if the price for the marginal unit is low enough; the second group will buy only a small amount of the good no matter what the price. Unfortunately for the seller, he or she does not know which group any specific buyer is in. One form of second-degree price discrimination is the offer of quantity or volume discounts: the price per unit falls after the purchase of some preset number of units. Another form of second-degree price discrimination is the two-part tariff. Under a two-part tariff, consumers pay a lump sum fee and a per-unit charge. In each of these cases, buyers 'self-select' into the pricing arrangement best for them and best for the seller, besides."[83]

53. Consumers with "high valuations" are those customers that are "less price sensitive," while consumers with "low valuations" are "more price sensitive."

54. Thus, while there is no "demographic variable" that allows Walgreens to restrict membership, as the Schafermeyer Report observes, the two-part pricing structure and, in particular, the membership fee can differentiate, *ex-ante,* a customer who is more price sensitive and expects to purchase a large number of drugs from one that is less price sensitive and plans to purchase only a few drugs over the membership year. Customers who choose to join Walgreens' PSC pay the

---

are others. Moreover, firms can separate consumers into either group through some easily or costlessly identifiable trait of the consumer. For example, students may be identified by asking for a student identification card; senior citizens by presentation of an American Association of Retired Persons card or a driver's license…. Prices…may differ for different consumers even after accounting for cost differences."). *See also, e.g.,* Robert S. Pindyck and Daniel L. Rubinfeld, Microeconomics, 8th ed., Prentice Hall, 2013, at 404.

[83] Kathleen Carroll and Dennis Coates, "Teaching Price Discrimination: Some Clarification," *Southern Economic Journal*, 66(2), 1999, 466-480, at 469.

annual membership fee plus lower PSC formulary prices, and those who choose not to join the PSC pay no membership fee and higher retail prices for prescription drugs.[84]

55. Contemporaneous documents, empirical evidence, and testimony in the record are consistent with the two-part structure of Walgreens' PSC enabling Walgreens to identify price-sensitive cash customers who purchase a large number of prescription drugs, and who therefore may be more interested in joining Walgreens' PSC. For instance, Mr. Amiet testified that the purpose of the PSC since the national launch was "to offer a membership program for the uninsured and underinsured customers who were, for the most part, price sensitive customers."[85] A 2012 Walgreens-produced document states that PSC drugs were "[p]rice[d] to drive maximum retention of price sensitive customers."[86] The same document shows that, at the time, PSC customers averaged 12 prescriptions per year and spent $310, while cash customers averaged 8 prescriptions per year and spent $235.[87]

56. Other evidence indicates the level of the fee was a "barrier" that dissuaded some members of the public from joining Walgreens' PSC. For instance, a Walgreens-produced document indicates that, when the membership fee was reduced in January 2012 from $20 per individual to $5 per individual, new PSC enrollments increased from under ██████████████, as shown in Figure 2 below.[88,89]

---

[84] *See, e.g.*, Robert S. Pindyck and Daniel L. Rubinfeld, <u>Microeconomics</u>, 8th ed., Prentice Hall, 2013, at 417, Example 11.4 (discussing an example where cell phone providers offer different plans "so that consumers sort themselves into groups based on their plan choices. A different two-part tariff is then applied to each group." In the example, a provider offers three plans for consumers to choose from: an access charge of $39.99/month for 450 "anytime minutes," plus 45 cents/minute thereafter; $59.99/month for 900 "anytime" minutes and 40 cents/minute thereafter; or $69.99/month for unlimited "anytime" minutes).

[85] Amiet Deposition, at 72. *See also* 98-101 (discussing how price sensitivity was a factor Walgreens considered when setting the PSC 2.0 pricing tiers).

[86] PSC White Paper, at Walg_Forth_00062187.

[87] PSC White Paper, at Walg_Forth_00062189 ("Rx figures are 90 day adjusted.").

[88] PSC White Paper, at Walg_Forth_00062192. According to Walgreens, the fee per family was reduced to $10. *See* Walgreens' Second Amended Objections and Responses to Plaintiff's Third Set of Interrogatories, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 20, 2020, pp. 1-11, Response to Interrogatory No. 17.

[89] In the next section of my report, I address the Schafermeyer Report's assertion that Walgreens "eliminated the net cost" of the membership fee through this promotion and "other means."



57. Another document in the record indicates that PSC enrollments and renewals increased from approximately ███████████████████████████████████████████████[91] When the membership fee returned to $20 (for individuals), the number of monthly enrollments and renewals decreased to ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████

58. Discussing this promotion, Mr. Amiet testified, "the promotion was intended…to drive additional enrollment, and so they wanted to lower it because we understood…$20 to be a pretty significant barrier to entry."[94] Another Walgreens employee also testified that the $20

[90] PSC White Paper, at Walg_Forth_00062192.
[91] "PSC + Cash – Highlights – FY12," Walg_Forth_00058481-Walg_Forth_00058496, at Walg_Forth_00058484.
[92] "PSC + Cash – Highlights – FY12," Walg_Forth_00058481-Walg_Forth_00058496, at Walg_Forth_00058484.
[93] Amiet Deposition, at 80-81. *See also* Walgreen Co., U.S. SEC Form 10-K, for the fiscal year ended August 31, 2014 at 33 (stating that "[f]rom January 1, 2012, until September 14, 2012, however, Express Scripts' network did not include Walgreens pharmacies.").
[94] Amiet Deposition, at 80.

23

membership fee was a "significant" amount for consumers to spend. Specifically, Mr. Bernstein testified that, "for some folks that were in our pharmacy, $20 is a lot of money, even if they had to have these drugs for their health, that was still a significant dollar amount."[95]

59. The fee was also not "nominal" from Walgreens' perspective. As discussed in Section III.B, Walgreens had over ███████ memberships in 2013 and 2014 and estimated that "PSC generates in excess of ███████ annually for enrollment fees."[96] Mr. Amiet also testified that the PSC membership fee represented "additional revenue for the company[.]"[97]

60. Therefore, the evidence indicates the $20 fee for individuals / $35 fee for families was not a "nominal 'membership fee,'" as the Schafermeyer Report claims,[98] and, for some customers, presented a "barrier" to joining Walgreens' PSC. From an economic perspective, the fee is part of the PSC price.

61. I note that, in *United States ex rel. Garbe v. Kmart Corp.*, the Seventh Circuit found that the program fee of $10 -- 50% less than Walgreens' PSC membership fee for individual members -- was "nominal" and that "barriers to joining" were "almost nonexistent."[99] While I understand from counsel that there were significant differences between Kmart's program and Walgreens' PSC, even with this finding, the court still ruled that, "if the fee was $10 and the program drug price was $15, the customer paid $25 for her first prescription" and "[f]or people who fill more than one prescription, the [annual membership] fee **would need to be allocated in some sensible way**."[100]

---

[95] Bernstein Deposition, at 120.

[96] "Prescription Savings Club," January 28 and 29, 2014, Walg_Forth_00347272-Walg_Forth_00347329, at Walg_Forth_00347273.

[97] Amiet Deposition, at 77.

[98] Schafermeyer Report, ¶ 151.

[99] *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, at *643 (7th Cir. 2016).

[100] *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, at *643-644 (7th Cir. 2016) (emphasis added).

**B. The Schafermeyer Report's Claims That Walgreens** ███████████ **Are Misleading And Do Not Support Ignoring The Fee When Calculating PSC Prices**

62. The Schafermeyer Report claims ████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████.[101] To support this assertion, the Schafermeyer Report refers to five instances of the ████████████████████████████████.[102] Based on my review of the cited evidence, the Schafermeyer Report's characterization is misleading. As discussed below, the referenced examples of the fee being ████████████ ████████ are isolated instances that occurred over very short periods during the life of the PSC. The examples of the fee being ████████████████ mischaracterize the evidence. Additionally, Dr. Schafermeyer testified at deposition that he did not have or recall seeing data that show the fee ████████████.[103] He has not quantified the extent to which the membership fees were ████████████.[104] And, in fact, Walgreens' PSC membership data confirms payment of the annual membership fee by █████ of PSC members in the PSC membership data who purchased drugs at PSC prices.[105] Thus, the evidence does not support ignoring the PSC membership fee when determining PSC prices.

### 1. Instances Of The Membership Fee Being Discounted Or Not Collected Are Limited

63. The Schafermeyer Report claims Walgreens discounted or did not collect the PSC membership fee.[106] However, the evidence provided regarding these assertions indicates these are isolated

---

[101] Schafermeyer Report, ¶¶ 127(e) and 158 (citations omitted).

[102] Schafermeyer Report, ¶ 158.

[103] Deposition of Dr. Kenneth Schafermeyer, *Cynthia Russo, et al. v. Walgreen Co.,* Case No. 1:17-cv-02246, January 13, 2023, pp. 1-255 and Errata ("Schafermeyer Deposition"), at 231 ("Q. What data are you relying on to show that the fee was actually not collected? A. I didn't say that I had data. I said that's a damages issue. It's not something that I remember seeing and it wouldn't really affect my opinion.").

[104] Schafermeyer Deposition, at 230 ("Q. Are you aware that Walgreens produced data in this case that shows that over 98 percent of the customers who received PSC prices paid the membership fee? A. You know, I'm not calculating the damages so I can't quantify that. I don't recall that.").

[105] Smith Report, ¶¶ 34 and 37.

[106] Schafermeyer Report, ¶¶ 158(a) and (c).

instances that occurred over very short periods during the life of the PSC and does not support ignoring the PSC membership fee when determining PSC prices.

64.    For example, as support for the assertion that Walgreens ██████████████████, the Schafermeyer Report refers to a couple of months in 2012 when ████████████████████ ████████████████████[107] The cited document, dated October, 2012, refers to a ████████████████████████[108] According to Walgreens, at all times since the PSC launched nationally, the annual PSC membership fee has been $20 for individuals and $35 for families, except from approximately January to March 2012 when Walgreens ████████████████████████████████.[109] This limited period of ██████████ over the life of the PSC is an exception and does not negate the need to account for the membership fee when determining the PSC price.

65.    In addition, the Schafermeyer Report states that the membership fee ████████████████ ████████████ citing deposition testimony of Mr. Bernstein.[110] Mr. Bernstein explained that, when the PSC ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████.[111] By 2008, Walgreens automated the processing of the PSC membership fee.[112] Thus, the time period during which this occurred was limited. In addition, Mr. Bernstein testified that he did not recall Walgreens ever ████ ████████████████ and that Walgreens' computer systems did not allow people to enroll without paying the membership fee.[113] The Schafermeyer Report ignores this evidence.



---

[107] Schafermeyer Report, ¶ 158(a).

[108] The Schafermeyer Report states this occurred "during 2010," however the supporting Bernstein Deposition Exhibit 46 refers to a $5 promotion that occurred in January 2012. *See* Schafermeyer Report, ¶ 158(a) and fn. 169.

[109] Amiet Deposition, at 80. *See also*, Walgreens' Second Amended Objections and Responses to Plaintiff's Third Set of Interrogatories, *Cynthia Russo, et al. v. Walgreen Co.,* Case No. 1:17-cv-02246, November 20, 2020, pp. 1-11, Response to Interrogatory No. 17.

[110] Schafermeyer Report, ¶ 158(c).

[111] Bernstein Deposition, at 54 ████████████████████████████████████████████. ████████████████████████

[112] Bernstein Deposition, at 54 ████████████████████████████████████

[113] Bernstein Deposition, at 23, 44, 45-46.

Furthermore, Henry Thompson, a Walgreens employee currently responsible for PSC, confirmed the accuracy of this statement, testifying that "[p]ayment of the annual membership fee is a requirement to access PSC prices" and "Walgreens' systems do not allow an individual to purchase prescription drugs at PSC prices without validation of an active membership, which requires payment of the annual fee."[114]

### 2. Claims Of The Fee Being ████████ █ ████████ Mischaracterize The Evidence

66. The Schafermeyer Report's purported examples of the membership fee being ████████ ████ mischaracterize the evidence and do not support ignoring the PSC membership fee when determining PSC prices.

67. The Schafermeyer Report claims ███████████████████████████████████ ████"[115] Walgreens indicated in its interrogatory responses that it "made the PSC program available as an employee benefit" and employees who elected to participate were required "to pay the tax on the membership fee."[116] In addition, these employees still had to enroll in the PSC and abide by its terms and conditions.[117] This employee benefit does not negate the need to include the membership fee in the total price paid for a given prescription drug.

68. In addition, the Schafermeyer Report claims that ██████████████████████ ███████████████████████████████████████ ███████[118] As support for ███████████████, the Schafermeyer Report points to a single, undated letter addressed ████████████████████ ███████████████████████████████



---

[114] Thompson Declaration, ¶ 4.
[115] Schafermeyer Report, ¶ 158(b).
[116] Walgreens' Second Amended Objections and Responses to Plaintiff's Third Set of Interrogatories, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 20, 2020, pp. 1-11, Response to Interrogatory No. 17. *See also* Bernstein Deposition, at 51.
[117] Walgreens' Second Amended Objections and Responses to Plaintiff's Third Set of Interrogatories, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 20, 2020, pp. 1-11, Response to Interrogatory No. 17; Bernstein Deposition, at 51. *See also,* Schafermeyer Deposition, at 205-206. ("Q. The fact is you deleted from footnote 113 the statement that the employees who got the membership fee paid for them had to treat it as a taxable benefit on their taxes. You deleted that, right? A. So what? That's not my point.")
[118] Schafermeyer Report, ¶ 158(d) and (e).

███████████████████████████████████████████.[119] The Schafermeyer Report does not acknowledge that Mr. Bernstein did not recall this "actually happening."[120] Dr. Schafermeyer testified at deposition that he did not recall who wrote the letter, when it was written, whether it was sent, who it was sent to, and ████████████████████████████ ████████████.[121]

69. Regarding the savings guarantee, the Schafermeyer Report states that, ███████████ ██████████████████████████████████████████████████████████████ ████████."[122] Specifically, the savings guarantee states,



[123]

70. The savings guarantee had specific requirements, ████████████████████████ ████████████████████████████████████████████████████████.[124] The Schafermeyer Report cites to no evidence indicating how many PSC members requested ██████████████████████ under the savings guarantee over the Class Period. At his deposition, Dr. Schafermeyer could not quantify the number of customers that received these

[119] Schafermeyer Report, ¶ 158(d), citing "Bernstein Dep. Ex. 43 (Undated letter to PSC members)."
[120] Bernstein Deposition, at 86-88.
[121] Schafermeyer Deposition, at 235-237.
[122] Schafermeyer Report, ¶ 158(e).
[123] "Prescription Savings Club Value-Priced Medication List," As of 2/12, Walg_Forth_00112531-Walg_Forth_00112535, at Walg_Forth_00112535. *See also* Amiet Deposition, at 82 ("Over the course of that next 12 months, if they didn't save at least $20, meaning the difference between the retail price and the PSC price for everything that they filled over that 12 months wasn't $20, then they could actually come back into the pharmacy and say to the pharmacist, 'I didn't get my $20.' And that pharmacist would then work with corporate to pull that individual's prescriptions and verify they saved $16, therefore, they're owed a $4 credit, and that was provided in the form of store credit.").
[124] *See, e.g.,* WCard Terms and Conditions, Walg_Forth_00059856 ("The member must request the store credit within 60 days after the end of the one year membership period to be eligible for the store credit. Guaranteed savings request received after the 60-day submission period will not be valid or eligible for store credit."). *See also* Deposition of Cade Erlund, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, October 2, 2019, pp. 1-272 ("Erlund Deposition"), at 151 ("Q. In your personal opinion, if savings are being guaranteed, is there really any risk to joining the PSC? A. I don't know. I haven't thought about it. It probably does lessen the risk, but you know, I guess similar to rebates, how many people send the rebates in, you know, when you buy something and you get a rebate. So there is definitely still risk on the consumer because they still have to do the work, I think.").

███████████████████████████████████████████.[125] Cade Erlund, a former Walgreens employee, however, testified that the savings guarantee was "something that not many customers would take advantage of."[126] In addition, according to Walgreens, the savings guarantee was initiated in March 2012 and discontinued by November 2017.[127] Thus, the savings guarantee was in place for only part of the Class Period.

71. Importantly, under the "savings guarantee," ██████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████.

72. In addition, customers who ████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[125] Schafermeyer Deposition, at 229-230. ("Q. But you've not seen any data that would show you how many people actually got ████████████████████ because of the guarantee. A. ████████████
████████████████████████████████

[126] Erlund Deposition, at 153.

[127] Walgreens' Second Amended Objections and Responses to Plaintiff's Third Set of Interrogatories, *Cynthia Russo, et al. v. Walgreen Co.*, Case No. 1:17-cv-02246, November 20, 2020, pp. 1-11, Response to Interrogatory No. 19. *See also* Amiet Deposition, at 81 ("There was a savings guarantee that was implemented in March of 2012 as part of the PSC 2.0 refresh, as you may have seen it referenced in some of the documents. That guarantee was in place until October or November of 2017.").

[128] *See, e.g.*, RxList, "Glucophage," available at https://www.rxlist.com/glucophage-drug.htm#description.

[129] "Prescription Savings Club Value-Priced Medication List," As of 2/12, Walg_Forth_00112531-Walg_Forth_00112535, at Walg_Forth_00112535 (emphasis added).

73. This hypothetical example illustrates two important points. If the member requests a credit under the savings guarantee, (i) the credit given is not for the full amount of the membership fee, as Dr. Schafermeyer claims, and (ii) the member effectively does not pay the PSC formulary price. Instead, if the member requests a credit for the membership fee, they no longer receive the benefit of the lower PSC formulary price. Thus, the savings guarantee provides additional evidence that customers cannot access PSC formulary prices without paying the PSC membership fee.

### C. The Schafermeyer Report's Assertion That Insured Beneficiaries Should Not Have To Pay Membership Fees To Access PSC Prices Is Logically Flawed

74. The Schafermeyer Report states that, "[i]nsured beneficiaries, such as the Individual" and TPP Plaintiffs, "were entitled by their insurance membership to assurance that copayments would not exceed the PSC price" and "should not have been required to pay a fee to get the lower [PSC] prices."[130] This assertion is logically flawed.

75. Accounting for the PSC membership fee in the PSC price is not based on an assumption that **Plaintiffs** would have paid PSC membership fees to access PSC prices in the counterfactual world where Walgreens considered PSC prices when reporting its U&C. Rather, if the court finds Walgreens liable, such that Walgreens should have considered prices paid by PSC members when reporting its U&C, then the relevant analysis is to determine **PSC prices** actually paid by **PSC members**. For the reasons outlined in Section IV above, the price paid for a prescription drug purchased through Walgreens' PSC is not simply the PSC formulary price, but also a portion of the annual membership fee.

## VII. CONCLUSION

76. In conclusion, as a matter of economics, the PSC membership fee is part of the PSC price. Walgreens' PSC is a two-part pricing structure that conditions access to lower prices on paying

---

[130] Schafermeyer Report, ¶ 180.

the membership fee and purchasing more prescription drugs. An economically sound approach to calculating PSC prices adds the average per-purchase membership fee to the PSC formulary price for each drug.

77. The Hilton Report's proposed methodology for calculating classwide damages is flawed and unreliable because it fails to account for the membership fee and therefore, would understate PSC prices and overstate damages.

78. The Schafermeyer Report's assertions regarding the availability of PSC prices and the "sham 'membership fee'" are factually incorrect and inconsistent with the economics of two-part pricing. The claims that Walgreens "reduced or eliminated the net cost" of the PSC membership fee do not support ignoring the fee when calculating PSC prices and the assertion that insured beneficiaries should not pay the membership fee is logically flawed.


Respectfully submitted on March 17, 2023,


Kelly Lear Nordby, Ph.D.