**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 17-cv-2246 <br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan <br><br> Oral Argument Requested |
| Plaintiffs, | |
| v. | |
| WALGREEN CO., | |
| Defendant. | |

**OPPOSITION OF DEFENDANT WALGREEN CO. TO**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

### TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTS RELEVANT TO RULE 23 ANALYSIS ............................................. 3

    A. Who Pays For Prescription Drugs.......................................................... 3

    B. The Term "Usual And Customary" ......................................................... 5

    C. Walgreens' Prescription Savings Club ................................................... 6

    D. Walgreens And The Relevant PBMs Agree That Walgreens Is Not Required To Report Its PSC Prices As Its U&C Prices ........................................... 6

III. LEGAL STANDARD ........................................................................................ 7

IV. ARGUMENT ...................................................................................................... 7

    A. Several Named Plaintiffs Lack Standing To Maintain This Action ...................... 7

        1. IUOE does not have standing to represent a class under the Connecticut Unfair Trade Practices Act ("CUTPA")................................. 8

        2. IBEW does not have standing under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") ................................................ 8

        3. Because there is no evidence IBEW suffered injury to a commercial interest in reputation or sales, it does not have standing under the Ohio Deceptive Trade Practices Act ("ODTPA") ...................................... 9

    B. There Are No Common Questions Capable Of Classwide Resolution, Individual Issues Predominate, And Class Treatment Is Not Superior ... 10

        1. Plaintiffs cannot show commonality, predominance, or superiority in light of the differences in various states' laws..................................... 11

            a. The Seventh Circuit does not allow multi-state classes unless all litigants are governed by the same legal rules ........................ 11

            b. Courts have found that multi-state consumer fraud classes may not be certified due to differences in consumer fraud statutes...................................................................................... 13

            c. Although the proposed unjust enrichment states follow the Restatement, courts have found differences in states' approaches to the Restatement defeat class certification ... 17

        2. Because the relevant contracts differ materially, whether Walgreens misrepresented the U&C price has no common answer .......................... 19

            a. Where a contract defines U&C, the contract controls, not industry understanding or PBM manuals..................................... 19

            b. The Pharmacy-PBM Contracts differ in material ways ............... 23

c.    The PBM-TPP Contracts differ in material ways ........................ 27

3.    Because millions of individualized damages proceedings would be required, individual issues predominate .................................... 30

C.    Typicality And Adequacy .................................................................. 35

1.    The Named Plaintiffs are not typical because their claims relate only to the contracts that apply to their specific PBM ..................................... 36

2.    Fund Plaintiffs' claims are not typical of consumer claims and vice versa; Fund Plaintiffs' claims are not typical of all TPPs; and Fund Plaintiffs and consumers are antagonistic to each other ......................... 37

3.    The Fund Plaintiffs are not typical of class members in states outside their home jurisdictions .................................................................. 38

4.    The fact that each Named Plaintiff continued to purchase prescription drugs from Walgreens even after first meeting with counsel presents unique defenses that makes them not typical or adequate .......................................................................................... 39

5.    IBEW is also subject to unique defenses because it knew it was not receiving the PSC prices as early as 2008 ................................ 42

6.    Russo has not made any purchases at Walgreens for more than the PSC price where one of the Relevant PBMs provided her benefits ......... 43

7.    Because he is subject to a class exclusion and has no qualifying purchase in Arizona or Wisconsin, Gonzales is not typical of the class .............................................................................................. 44

a.    Because Gonzales is a beneficiary of a government-funded entity, he is excluded from the class ............................... 44

b.    Because Gonzales did not purchase a drug in Arizona, he cannot represent an Arizona Consumer Fraud Act class ............. 45

c.    Gonzales did not purchase a drug in Wisconsin using a Relevant PBM for which he paid more than the PSC price.......... 46

8.    Bullard had no damages in Massachusetts before filing this action ......... 47

D.    Plaintiffs' Proposed Class Is Not Ascertainable .................................... 47

E.    Plaintiffs Cannot Meet The Required Standard Under Rule 23(b)(2) For Certification Of A Declaratory And Injunctive Class............................... 48

1.    Because the putative classes primarily seek damages, Supreme Court precedent does not authorize certification under Rule 23(b)(2) .................................................................................................. 49

2.    The Named Plaintiffs lack standing to seek certification over a declaratory or injunctive relief claim ........................................ 49

V.    CONCLUSION................................................................................ 50

ii

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Al Haj v. Pfizer Inc.*,
    338 F. Supp. 3d 741 (N.D. Ill. 2018) .............................................................................12, 18

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997).................................................................................................................38

*In re Aqua Dots Prod. Liab. Litig.*,
    270 F.R.D. 377 (N.D. Ill. 2010).......................................................................................12, 17

*In re Aqua Dots Prods. Liab. Litig.*,
    654 F.3d 748 (7th Cir. 2011) ..................................................................................................15

*Armada PTE Ltd. v. Amcol Int'l Corp.*,
    244 F. Supp. 3d 750 (N.D. Ill. 2017) .......................................................................................8

*Balderrama-Baca v. Clarence Davids and Co.*,
    318 F.R.D. 603 (N.D. Ill. 2017)..............................................................................................10

*Baldwin v. Star Sci., Inc.*,
    78 F. Supp. 3d 724 (N.D. Ill. 2015) .......................................................................................44

*Barnes v. Air Line Pilots Ass'n, Int'l*,
    310 F.R.D. 551 (N.D. Ill 2015)...............................................................................................18

*Beardsall v. CVS Pharmacy, Inc.*,
    953 F.3d 969 (7th Cir. 2020) ..................................................................................................16

*Bell v. Bimbo Foods Bakeries Distrib.*,
    No. 11 C 003343, 2013 U.S. Dist. LEXIS 170063 (N.D. Ill. Dec. 3, 2013) ...............10, 25, 30

*Bell v. Publix Super Mkts., Inc.*,
    982 F.3d 468 (7th Cir. 2020) ..................................................................................................16

*Block v. Abbott Labs.*,
    No. 99 C 7457, 2002 U.S. Dist. LEXIS 5453 (N.D. Ill. Mar. 28, 2002) ................................36

*CE Design Ltd. v. King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011) ........................................................................................36, 39, 43

*Chapman v. Priceline Grp., Inc.*,
    No. 3:15-CV-1519, 2017 U.S. Dist. LEXIS 162137 (D. Conn. Sept. 30, 2017)......................8

*Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co.)*,
    Nos. MDL-1703, 05 C 4742, 05 C 2623, 2006 U.S. Dist. LEXIS 92169 (N.D.
    Ill. Dec. 18, 2006) ........................................................................................................17, 46

*Coleman v. Commw. Land Title Ins. Co.*,
    318 F.R.D. 275 (E.D. Pa. Aug. 17, 2016) ............................................................................14

*Corcoran v. CVS Health Corp.*,
    779 F. App'x 431 (9th Cir. 2019) ........................................................................................21

*Corcoran v. CVS Health*,
    No. 15-cv-03504-YGR, 2017 U.S. Dist. LEXIS 143327 (N.D. Cal. Sept. 5,
    2017) .....................................................................................................................................27

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
    662 F.3d 913 (7th Cir. 2011) .................................................................................................7

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    No. 09 CR 3690, 2013 U.S. Dist. LEXIS 119962 (N.D. Ill. Aug. 23, 2013) .....................8, 44

*Dawson v. Blockbuster, Inc.*,
    No. 86451, 2006 Ohio App. LEXIS 1138 (Ohio App. Ct. Mar. 16, 2006) .............................9

*Dolmage v. Combined Ins. Co. of Am.*,
    No. 14 C 3809, 2017 U.S. Dist. LEXIS 67555 (N.D. Ill. May 3, 2017)................................11

*Enduring Wellness, L.L.C. v. Roizen*,
    No. 108681, 2020 Ohio App. LEXIS 2129 ( June 4, 2020) ...................................................9

*Espenscheid v. DirectSat USA, LLC*,
    705 F.3d 770 (7th Cir. 2013) ...............................................................................................30

*Ewalt v. GateHouse Media Ohio Holdings II, Inc.*,
    No. 2:19-cv-4262, 2021 U.S. Dist. LEXIS 40258 (S.D. Ohio Mar. 4, 2021)..........................9

*Foster v. Ctr. Twp. of La Porte Cty.*,
    798 F.2d 237 (7th Cir. 1986) ...............................................................................................45

*Frasier v. Stanley Black & Decker, Inc.*,
    109 F. Supp. 3d 498 (D. Conn. 2015)....................................................................................8

*United States ex rel. Garbe v. Kmart Corp.*,
    73 F. Supp. 3d 1002 (S.D. Ill. 2014)....................................................................................21

*United States ex rel. Garbe v. Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016) ...........................................................................................20, 44

*Hunt v. U.S. Tobacco Co.*,
    538 F.3d 217 (3d Cir. 2008)................................................................14

*Hyderi v. Washington Mut. Bank*,
    235 F.R.D. 390 (N.D. Ill. 2006)........................................................41

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ............................................................36

*Kent Literary Club v. Wesleyan Univ.*,
    257 A.3d 874 (Conn. 2021) ..............................................................14

*Kern v. Lehigh Valley Hosp.*,
    108 A.3d 1281 (Pa. Super. Jan. 28, 2015) ........................................14

*Kremers v. Coca-Cola*,
    712 F. Supp. 2d 759 (S.D. Ill. 2010)................................................41

*Leshin v. St. Charles Pontiac*,
    No. 96 C 5326, 1997 U.S. Dist. LEXIS 14379 (N.D. Ill. Sept. 17, 1997)..............................40

*Lewis v. Casey*,
    518 U.S. 343 (1996).....................................................................7, 50

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...........................................................................9

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
    271 F.R.D. 402 (D. Me. 2010) ..........................................................19

*Lilly v. Ford Motor Co.*,
    No. 00 C 7372, 2002 U.S. Dist. LEXIS 5698 (N.D. Ill. Apr. 2, 2002)....................................17

*Marshall v. H & R Block Tax Servs., Inc.*,
    270 F.R.D. 400 (S.D. Ill. 2010) ..................................................11, 13

*Marshall v. Miller*,
    276 S.E.2d 397 (N.C. 1981)...............................................................9

*McCleese v. Natorp's, Inc.*,
    No. 1:20-cv-118, 2021 U.S. Dist. LEXIS 104619 (S.D. Ohio June 3, 2021)..........................9

*Med. Mut. of Ohio v. AbbVie Inc. (In re Testosterone Replacement Therapy Prods. Liab. Litig.)*, MDL No. 2545, 2018 U.S. Dist. LEXIS 125041 (N.D. Ill. July 26, 2018)...............................39

*Monaco v. Bear Stearns Cos.*,
  No. 09-05438 SJO (JCx), 2012 U.S. Dist. LEXIS 189628 (C.D. Cal Dec. 10,
  2012) ..........................................................................................................................41

*Motorola, Inc. v. Lemko Corp.*,
  No. 08 C 5427, 2010 U.S. Dist. LEXIS 25778 (N.D. Ill. Mar. 15, 2010) ..............................29

*Muehlbauer v. General Motors Corp.*,
  No. 05-2676, 2009 U.S. Dist. LEXIS 26971 (N.D. Ill. Mar. 31, 2009)..................................13

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ........................................................................................16, 47

*Murray v. New Cingular Wireless Servs., Inc.*,
  232 F.R.D. 295 (N.D. Ill. 2005)..........................................................................................36

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) ................................................................................................7

*Philips v. Ford Motor Co.*,
  No. 14-CV-02989-LHK, 2015 U.S. Dist. LEXIS 88937 (N.D. Cal. July 7,
  2015) ..........................................................................................................................14

*Phillips v. Sears Roebuck & Co.*,
  No. 06-412-GPM, 2008 U.S. Dist. LEXIS 37689 (S.D. Ill. May 8, 2008)..............................13

*In re Prempro Prods. Liab. Litig.*,
  230 F.R.D. 555 (E.D. Ark. 2005)..........................................................................................15

*Prohias v. Pfizer, Inc.*,
  485 F. Supp. 2d 1329 (S.D.N.Y. 2007)..................................................................................41

*Quality Mgmt. & Consulting Servs. v. SAR Orland Food Inc.*,
  No. 11 C 06791, 2013 U.S. Dist. LEXIS 155727 (N.D. Ill. Oct. 30, 2013) ...........................36

*Randall v. Rolls-Royce Corp.*,
  637 F.3d 818 (7th Cir. 2011) ....................................................................................39, 41, 43

*Red v. Kraft Foods, Inc.*
  No 10-1028-GW, 2011 U.S. Dist. LEXIS 116965 (C.D. Cal. Sept. 29, 2011) .......................41

*Ret. Bd. Of the Policemen's Annuity & Ben. Fund of Chi. v. Bank of N.Y. Mellon*,
  775 F.3d 154 (2d Cir. 2014)..................................................................................................25

*Retired Chi. Police Ass'n v. City of Chi.*,
  7 F.3d 584 (7th Cir. 1993) ....................................................................................................38

*Riffey v. Rauner*,
    910 F.3d 314 (7th Cir. 2018) ................................................................30

*Santangelo v. Comcast Corp.*,
    No. 15-cv-0293, 2017 U.S. Dist. LEXIS 200935 (N.D. Ill. Dec. 6, 2017)................7

*Schwarz v. Rockey*,
    932 A.2d 885 (Pa. 2007) .....................................................................14

*Sheet Metal Workers Local 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*,
    540 F. Supp. 3d 182 (D.R.I. 2021)...........................................................27

*Siegel v. Shell Oil Co.*,
    256 F.R.D. 580 (N.D. Ill. 2008)................................................12, 17, 38, 46

*Simic v. City of Chicago*,
    851 F.3d 734 (7th Cir. 2017) ...........................................................49, 50

*Stitt v. Citibank, Nat'l Ass'n*,
    No. 12-cv-03892- YGR, 2015 U.S. Dist. LEXIS 169070 (N.D. Cal. Dec. 17,
    2015) .........................................................................................25

*Strait v. Belcan Eng'g Grp., Inc.*,
    911 F. Supp. 2d 709 (N.D. Ill. 2012) ......................................................49

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. Aug. 22, 2014).....................................................16

*Suchanek v. Sturm Foods, Inc.*,
    311 F.R.D. 239 (S.D. Ill. 2015) ............................................................18

*Teamsters Local 237 v. Astrazeneca Pharmaceuticals LP*,
    136 A.3d 688 (Del. 2016) ...................................................................41

*Thomas v. UBS AG*,
    706 F.3d 846 (7th Cir. 2013) ...............................................................29

*Thorogood v. Sears, Roebuck & Co.*,
    547 F.3d 742 (7th Cir. 2008) .................................................................7

*Van v. Ford Motor Co.*,
    332 F.R.D. 249 (N.D. Ill. 2019)............................................................49

*Vulcan Golf, LLC v. Google Inc.*,
    254 F.R.D. 521 (N.D. Ill. 2008) ...........................................................17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...........................................................7, 10, 25, 49

*Warth v. Seldin*,
    422 U.S. 490 (1975)...................................................................................................8

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation*,
    No. 09-MDL-2074-PSG, 2014 U.S. Dist. LEXIS (C.D. Cal. Sept. 3, 2014) ...................25, 26

**Statutes**

Conn. Gen. Stat. Ann. § 42-110g(b) ...........................................................................8

**Rules**

Fed. R. Civ. P. 23 ...................................................................................7, 10, 36, 48

**Other Authorities**

66 Am. Jur. 2d *Restitution and Implied Contracts* § 92 (West 2016) ...........................................40

K. Pollitz, The Henry J. Kaiser Family Foundation, *Issue Brief: High-Risk Pools
    for Uninsurable Individuals* (Feb. 2017), http://files.kff.org/attachment/Issue-
    Brief-High-Risk-Pools-For-Uninsurable-Individuals .............................................................48

The Marketplace in Your State, HealtCare.gov,
    https://www.healthcare.gov/marketplace-in-your-state/.......................................................48

Restat. 2d of Conflict of Laws, § 148, comment J (2nd 1988). ...................................................12

## I.  INTRODUCTION

Plaintiffs fail to meet their burden of establishing the Rule 23 requirements for class certification, and instead largely argue the merits of their claims. Setting aside Plaintiffs' repeated mischaracterization of the record, which Walgreens will address on summary judgment, trying this case as a class action would involve at least 12 different states' laws, hundreds of thousands of contracts, and, if liability is established, millions of individual damage hearings that would each require discovery and expert testimony. In other words, the case would be entirely unmanageable.

This case is about Walgreens' Prescription Savings Club ("PSC"). To join PSC, customers are required to enroll, agree to terms and conditions, and pay an annual membership fee. In return, members can elect to purchase thousands of drugs at prices lower than Walgreens' retail prices.

Plaintiffs Cynthia Russo, Lisa Bullard, and Ricardo Gonzales (the "Individual Plaintiffs") and union funds International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund ("IBEW"), International Union of Operating Engineers Local 295-295C Welfare Fund ("IUOE"), and Steamfitters Fund Local 439 ("Steamfitters") (the "Fund Plaintiffs" and together with the Individual Plaintiffs, the "Plaintiffs" or "Named Plaintiffs") contend that Walgreens should have reported its PSC prices, rather than its retail prices, as its "usual and customary" prices on claims Walgreens submitted to pharmacy benefit managers ("PBMs") for prescription drug reimbursement. If Walgreens had done so, because of certain contract terms, it would have resulted in some insured customers and their health insurers, union funds, and/or employers ("third-party payers" or "TPPs") paying lower prices on a small percentage of generic drug purchases.[1]

---

[1] As Walgreens' expert Jed Smith points out, approximately ▮▮▮▮▮ of the time, insured customers paid less than the PSC price. *See* Ex. 1 (Smith Rpt.) ¶ 12. All references to "Ex." are to exhibits attached to the Declaration of Michael S. Leib in support of Walgreens' opposition to Plaintiffs' motion for class certification ("Decl."), submitted contemporaneously with this filing.

Plaintiffs seek a 12-state consumer fraud class, an eight-state unfairness subclass, and a five-state unjust enrichment subclass. But courts in this district routinely deny certification of multi-state consumer fraud and unjust enrichment classes. The Seventh Circuit has made it clear that a class action is not proper unless the same legal rules apply to all litigants, and many courts have found that the consumer fraud and unjust enrichment laws of different states differ materially. In fact, Plaintiffs cite only one multi-state consumer fraud case in this district in which a class was certified, which is distinguishable, and do not cite *any* multi-state unjust enrichment cases in which a court certified a class.

To add to the complexity of a proposed class governed by 12 different states' laws, there are 16 different contracts between Walgreens and the eight PBMs identified in the proposed class definition (the "Relevant PBMs"), most of which have different definitions of U&C price. If one of the U&C definitions were found to require Walgreens to report its PSC price as its U&C price (none actually do), that would not answer whether the other 15 contracts require the same, and the determination on each contract would need to be measured: (i) against each of the 12 states' laws; and (ii) separately for consumer class members and TPP class members, as the laws apply differently to each. As a result, there are no common questions with common answers, individual issues would predominate, and a class would be unmanageable. Further, to assess who is even in the class, each and every TPP contract with a Relevant PBM and/or health insurer, non-parties in this case, from 2007 to the present, would need to be produced, likely tallying hundreds of thousands of contracts, each of which would have to be analyzed to determine if those TPPs could have been affected by how Walgreens reported its U&C price.

Class treatment is also inappropriate because, if liability were found, millions of individualized damages hearings would have to be held. Plaintiffs have entirely failed to account

2

for the features of prescription drug benefits. A damages calculation for consumers would require discovery into each one of their health plan's design and a re-adjudication of every one of their claims. Given, for example, deductibles and out-of-pocket maximums, a change in the price on one transaction might affect how much a consumer paid on other transactions. Individual damage hearings would also be required for TPPs, many of which receive money back from PBMs and insurers at the end of a plan year, which would affect damages. This would require discovery of class members and third parties, as well as expert testimony, *for each of the millions of consumer damage proceedings and likely tens, if not hundreds, of thousands of TPP damage proceedings*. Moreover, the two types of class members, consumers and TPPs, would be vying for the same pot of money on each transaction and, therefore, are antagonistic and cannot be in the same class.

Further, IBEW and IUOE lack standing to bring a class action under Connecticut, North Carolina, and Ohio's consumer fraud statutes, and the Named Plaintiffs are not typical or adequate. As only one of many examples, each Plaintiff continued to purchase at Walgreens, or allowed their beneficiaries to do so, after they met with lawyers and learned about Walgreens' allegedly improper practice, providing unique defenses against each of them. And because Plaintiffs are seeking damages, under Supreme Court precedent, an injunctive class cannot be certified.

For these reasons, and those discussed below and in Walgreens' experts' reports, the Court should deny Plaintiffs motion for class certification.

## II.      FACTS RELEVANT TO RULE 23 ANALYSIS

### A.      Who Pays For Prescription Drugs

The price the pharmacy charges to a customer purchasing a prescription depends on whether the customer uses insurance or any other benefit (such as a third-party discount card like

GoodRx or a membership club benefit).[2] An uninsured customer who does not use any benefit is referred to as a "cash customer" and pays the pharmacy's retail or "cash" price for the drug. *See* Ex. 2 (Jacobs Rpt.) ¶ 14.

In contrast, the amount an insured customer pays is complicated. It depends on a chain of relationships involving various players in the pharmacy industry, starting with TPPs, such as health insurers (e.g., Aetna) and health plans (e.g., union funds and employers). Ex. 2 (Jacobs Rpt.) ¶¶ 19-21. TPPs usually contract with PBMs to administer prescription drug benefits for the TPP's beneficiaries (e.g., union members/employees and their dependents). *Id.* ¶ 22. Pharmacies are not parties to the contracts between TPPs and PBMs, which often have confidential terms. *Id.* ¶ 23. PBMs, in turn, contract with pharmacies, thus creating pharmacy networks that the TPPs' beneficiaries can access to fill their prescriptions.[3] *Id.* ¶ 24.

An insured customer seeking to fill a prescription typically presents to the pharmacy an insurance card with identifying information. *See* Ex. 2 (Jacobs Rpt.) ¶ 16. Using that information, the pharmacy routes the claim to the PBM administering the claim. *Id.* Based on information known to the PBM about the beneficiary's individual prescription drug plan and the beneficiary's prior purchase history, the PBM reports back to the pharmacy, in real-time, whether the insured customer's plan covers the particular drug, and if so, how much the pharmacy should charge the customer, which may be a deductible, copay (a flat amount), or coinsurance (a percentage of the amount the PBM will charge the TPP).[4] *See id.* This process is known as adjudication. *Id.*

---

[2] To the extent the term "consumer" is used, rather than "customer," it is not a concession that the customer is a "consumer" as defined or interpreted under any particular state consumer fraud statute.

[3] Health plans may contract directly with PBMs for their beneficiaries' drug benefits, as in the case of the Fund Plaintiffs. But some health plans, like those of many employers, contract with insurers for all of their beneficiaries' health needs, including drug benefits, and the insurers then contract with PBMs.

[4] Sometimes the PBM tells the pharmacy not to charge the customer anything, such as when a customer has hit their annual out-of-pocket maximum under the health plan's design (e.g., a $1,000 maximum on all drug

In addition to the amount the pharmacy collects from the customer, the pharmacy's contract with the relevant PBM will typically require the PBM to pay for part of the prescription, which the PBM also determines at the time of adjudication. *See* Ex. 2 (Jacobs Rpt.) ¶ 21. Often contracts between a PBM and pharmacy use "lesser-of logic" to pay the pharmacy the lowest of different price points for a particular drug, such as (i) the parties' negotiated rate as stated in their contract; (ii) the pharmacy's U&C price; or (iii) a Maximum Allowable Cost ("MAC"), which the PBM sets unilaterally. *Id.* ¶ 24. During adjudication, the PBM determines the reimbursement it expects to pay the pharmacy by comparing these different price points and returning the lowest amount. *Id.* The PBM then charges the TPP according to the PBM's separate contract with the TPP. *Id.* ¶ 23. Some, but not all, of these separate contracts have a similar lesser-of logic provision stating that the TPP will pay the PBM the lowest of the listed price points, including U&C.

## B. The Term "Usual And Customary"

Contracts between pharmacies and PBMs that use the U&C price in the lesser-of logic require the pharmacy to submit its U&C price on a claim for adjudication. *See* Ex. 2 (Jacobs Rpt.) ¶¶ 24-26. Contracts between a pharmacy and a PBM usually, but not always, define the term U&C. *Id.* ¶ 25. The PBM and pharmacy industry generally understand U&C to refer to the pharmacy's retail price. *Id.* ¶¶ 13, 27. But where a U&C definition exists in the contract, that definition controls, not the industry understanding. *Id.* ¶ 26. The U&C definitions in the relevant contracts vary considerably. *See, e.g.*, *id.* ¶ 49-64; Dkt. 556-56 (Schafermeyer Rpt.), at 27-29, Table 3.

Contracts between PBMs and TPPs may similarly include U&C definitions. *See* Ex. 2 (Jacobs Rpt.) ¶¶ 87; Dkt. 556-56 (Schafermeyer Rpt.), at 17-18, Table 1. The definitions in these

---

purchases or a $2,500 maximum on all health and drug spending). Other times the plan provides for the customer to pay $0, such as for generic drugs. *See, e.g.*, Ex. 3 ¶¶ 11-12.

contracts often differ from those in the pharmacy-PBM contract. If the PBM-TPP contract has a different U&C definition, the PBM must charge the TPP according to the PBM-TPP contract. *See* Ex. 2 (Jacobs Rpt.) ¶ 87. That is, the U&C definition in the PBM-pharmacy contract has no bearing on the separate, independent term in the PBM's contract with the TPP. *Id.* ¶¶ 87-89 & Table 2.

### C. Walgreens' Prescription Savings Club

In 2006, Walmart launched a $4 generic program, which provided low prices for certain generic drugs to all customers, whether or not they had insurance. *See* Ex. 4, at SCHAFERMEYER_0000395, n. 1. Before Walmart's launch, Walgreens had piloted PSC, which provided access to prescription drug prices lower than retail to customers who enrolled, agreed to certain terms and conditions, and paid an annual membership fee ($20 for an individual, and, since November 2007, $20 for an individual and $35 for a family). *See* Ex. 5, at Walg_Forth_00005268. Originally, Walgreens excluded federal beneficiaries (e.g., Medicare and Medicaid) from joining PSC, although Walgreens eliminated that exclusion in early 2020. *See* Ex. 6 ¶ 7.

### D. Walgreens And The Relevant PBMs Agree That Walgreens Is Not Required To Report Its PSC Prices As Its U&C Prices

Following Walgreens' launch of PSC, other retailers, including CVS and Rite Aid, introduced similar membership clubs. *See* Ex. 5, at Walg_Forth_00005268, Walg_Forth_00005274. Industry players, including PBMs, were well aware of the launch of these clubs. *See* Ex. 2 (Jacobs Rpt.) ¶¶ 48-65. Because Walmart gives its $4 prices to all customers, without requiring customers to take any action, that price is its retail price. *See id.* ¶ 76. Thus, Walmart reports its $4 prices as its U&C prices when submitting claims to PBMs. *Id.* But Walgreens does not provide the PSC price to all customers; only to club members who agreed to the terms and conditions and paid the annual membership fee. *Id.*; Ex. 1 (Smith Rpt.) ¶ 37 & Table 4. Walgreens and ***every Relevant PBM*** that testified on the issue in this case testified that the

6

contracts between Walgreens and the Relevant PBMs required Walgreens to report , which Walgreens did.[5] In fact, in 2008 (the year PSC launched nationally), Caremark, one of the Relevant PBMs, issued an ████████████████ ████████████████████████████████████████████████ ████████████████. *See* Ex. 14, at Caremark-0002103; Ex. 7, at 205:8-206:19.

## III. LEGAL STANDARD

The Court knows well the requirements for class certification. *See* Fed. R. Civ. P. 23(a), (b); *Santangelo v. Comcast Corp.*, No. 15-cv-0293, 2017 U.S. Dist. LEXIS 200935, at *4 (N.D. Ill. Dec. 6, 2017) (citing *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012)); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC,* 662 F.3d 913, 916 (7th Cir. 2011) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, 2551 (2011)). The party seeking class certification has the burden of establishing it is proper. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Courts "'may not simply assume the truth of the matters asserted by the plaintiff[s],' but instead must receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate." *Santangelo* 2017 U.S. Dist. LEXIS 200935, at *5 (quoting *Messner*, 669 F.3d at 811). The Seventh Circuit has instructed district courts to exercise "caution" before certifying a class. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008).

## IV. ARGUMENT

### A. Several Named Plaintiffs Lack Standing To Maintain This Action

Standing requires named plaintiffs attempting to represent a class to "allege and show that they personally have been injured." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (citations omitted).

---

[5] *See* Ex. 7, at 99:9-101:20, 88:3:91:11, 228:8-230:18, 135:18-137:22, 234:11-237:7 (Caremark); Ex. 8, at 165:17-166:7, 174:15-19, 192:15-192:10, 193:25-194:16 (MedImpact); Ex. 9, at 93:21-95:18, 97:7-99:10, 113:5-119:14 (Sav-Rx); Ex. 10, at 199:8-200:9 (Optum); Ex. 11, at 78:9-82:12; 109:10-114:7, 119:10-121:19, (Express Scripts; Medco); Ex. 12, at 111:8-112:9 (LDI/CastiaRx); Ex. 13, at 52:8-17 (Walgreens).

To have standing, "the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig*., No. 09 CR 3690, 2013 U.S. Dist. LEXIS 119962, at \*27-28 (N.D. Ill. Aug. 23, 2013). For a claim based on a statute, "the standing question . . . is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

1.  **IUOE does not have standing to represent a class under the Connecticut Unfair Trade Practices Act ("CUTPA")**

Under CUTPA, a class action for damages may be brought only by persons "who are residents of this state or injured in this state." Conn. Gen. Stat. Ann. § 42-110g(b); *see Frasier v. Stanley Black & Decker, Inc.*, 109 F. Supp. 3d 498, 501-02, 505-06 (D. Conn. 2015) (citation omitted); *Chapman v. Priceline Grp., Inc.*, No. 3:15-CV-1519, 2017 U.S. Dist. LEXIS 162137, at \*17-21 (D. Conn. Sept. 30, 2017). IUOE is the only Named Plaintiff asserting a CUTPA claim. *See* Dkt. 477 (Fourth Am. Complaint ("Complaint" or "Compl.") ¶¶ 199-207); Pls.' Mem. in Support of Mot. for Class Cert. ("Mem."), at 3 n.2. But IUOE did not make a purchase of a drug in Connecticut (its beneficiaries did) (Dkt. 477 (Compl.) ¶ 31), and it is a New York resident (Dkt. 477 (Compl.) ¶ 30) for which any alleged injury could only have occurred in New York. *See Armada PTE Ltd. v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 755 (N.D. Ill. 2017) (stating that a "corporate entity generally suffers economic harm in its principal place of business"). Thus, IUOE does not have standing to bring a class action under CUTPA. Because no Named Plaintiff has CUTPA standing, neither a class nor subclass can be certified that includes a CUTPA claim.

2.  **IBEW does not have standing under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA")**

The North Carolina Supreme Court has held that, in enacting UDTPA, the "Legislature intended to establish an effective private cause of action ***for aggrieved consumers in this State***."

*Marshall v. Miller*, 276 S.E.2d 397, 404 (N.C. 1981) (emphasis added). IBEW did not purchase any relevant products in North Carolina (its beneficiaries did) (*see* Dkt. 477 (Compl.) ¶ 27), nor is it a North Carolina resident. Thus, it is not a North Carolina consumer and does not have UDTPA standing. Without a class representative for North Carolina, neither a multi-state class nor an unfairness subclass can be certified that includes a UDTPA claim.

      **3.**      **Because there is no evidence IBEW suffered injury to a commercial interest in reputation or sales, it does not have standing under the Ohio Deceptive Trade Practices Act ("ODTPA")**

Ohio courts look to the Lanham Act when analyzing ODTPA claims. *See Enduring Wellness, L.L.C. v. Roizen*, No. 108681, 2020 Ohio App. LEXIS 2129, at *P46 (Ohio App. Ct. June 4, 2020). In 2014, the Supreme Court in *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ruled that a Lanham Act claim requires a showing of "injury to a commercial interest in reputation or sales." *Id.* at 131-137. Thus, in *McCleese v. Natorp's, Inc.*, No. 1:20-cv-118, 2021 U.S. Dist. LEXIS 104619 (S.D. Ohio June 3, 2021), the court ruled that, because the plaintiff "fail[ed] to plead any facts demonstrating an injury to a commercial or sales interest," or showing that plaintiffs' "position in the marketplace was harmed," it had failed to state a claim under the Lanham Act and would not be allowed to amend the complaint to add an ODTPA claim as that claim would fail for the same reason. *Id.* at *10-12 and *12 n.1. IBEW has presented no evidence that, as a result of Walgreens' actions, IBEW lost sales or suffered reputational harm. It, therefore, has not presented evidence of statutory injury and has no standing under ODTPA. Given that there is no other Plaintiff being put forth as an Ohio class representative, no class can be certified that includes an ODTPA claim.[6]

---

[6] In addition, a consumer cannot bring a claim under ODTPA and, thus, no individual consumer class (as opposed to a TPP class) could be brought under ODTPA. *See Dawson v. Blockbuster, Inc.*, No. 86451, 2006 Ohio App. LEXIS 1138, at *P24 1240, ¶ 24 (Ohio App. Ct. Mar. 16, 2006); *Ewalt v. GateHouse Media Ohio Holdings II, Inc.*, No. 2:19-cv-4262, 2021 U.S. Dist. LEXIS 40258, at *57 (S.D. Ohio Mar. 4,

## B. There Are No Common Questions Capable Of Classwide Resolution, Individual Issues Predominate, And Class Treatment Is Not Superior

"For class certification to be proper, the class members' claims must present common questions of law or fact." *Balderrama-Baca v. Clarence Davids and Co.*, 318 F.R.D. 603, 609 (N.D. Ill. 2017) (citing Fed. R. Civ. P. 23(a)(2)). To be common, the question "must be capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality depends not on whether there are common questions, but rather on "the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation." *Id*. (emphasis added).

"While similar to commonality, the predominance criterion [of Fed. R. Civ. P. 23(b)(3)] is far more demanding," requiring plaintiffs seeking a damages class to show that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Bell v. Bimbo Foods Bakeries Distrib.*, No. 11 C 003343, 2013 U.S. Dist. LEXIS 170063, at *34-35 (N.D. Ill. Dec. 3, 2013) (J. Chang) (citations and quotations omitted). Moreover, the "superiority" criterion requires a class action to be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Among the issues a court should consider is "the likely difficulties in managing a class action." *Id*.

According to Plaintiffs, "[t]he common question that will drive the resolution of this litigation is whether Walgreens should have reported or otherwise included its PSC prices when determining the U&C price to report for PSC Generics." Mem., at 16. But this cannot be answered on a classwide basis. As discussed below, the laws of each of the states in the proposed class and

---

2021).

subclasses vary widely. Thus, whether Walgreens violated a consumer fraud statute or was unjustly enriched cannot be answered in one stroke. And because the Pharmacy-PBM contracts and the PBM-TPP contracts have different terms, including different U&C definitions, there are no common answers as to whether the contracts required Walgreens to report PSC prices as U&C prices, or whether U&C prices affected the PBMs' charges to TPPs. Further, while Plaintiffs claim that they can measure damages with a rote methodology, calculating any damages here would require individualized considerations, including discovery from each class member and third parties and expert testimony, such that individual issues would overwhelm any common issues. As a result, trying this case as a class would be unmanageable. Indeed, Plaintiffs did not submit a trial plan with their motion, further undercutting their argument that a class can be certified.[7]

1.      **Plaintiffs cannot show commonality, predominance, or superiority in light of the differences in various states' laws**

a.      **The Seventh Circuit does not allow multi-state classes unless all litigants are governed by the same legal rules**

Plaintiffs seek certification over a 12-state class. Courts in this district, however, routinely deny certification over multi-state consumer fraud and unjust enrichment cases. *See, e.g.*, *Bridgestone/Firestone Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir. 2002) (because "[s]tate consumer-protection laws vary considerably . . . a single nationwide class is not manageable"); *Marshall v. H & R Block Tax Servs., Inc.*, 270 F.R.D. 400, 407 (S.D. Ill. 2010) (denying certification over a proposed 11-state consumer fraud class because "[w]here class claims

---

[7] Although trial plans are not required in this Circuit, a plaintiff's failure to submit one can be taken into consideration when evaluating class certification. *See, e.g.*, *Dolmage v. Combined Ins. Co. of Am.*, No. 14 C 3809, 2017 U.S. Dist. LEXIS 67555, at *32 n.6 (N.D. Ill. May 3, 2017) (citation omitted) ("[T]he lack of a tangible plan from Plaintiff outlining exactly how liability and damages could be decided on a class-wide basis at trial further undercuts her arguments that the Rule 23 requirements are satisfied.").

are governed by varying laws of multiple jurisdictions, class certification is not appropriate."); *In re Aqua Dots Prod. Liab. Litig.*, 270 F.R.D. 377, 386 (N.D. Ill. 2010) ("the law of unjust enrichment varies too much from state to state to be amendable . . . even to multistate class treatment"). In *Siegel v. Shell Oil Co.*, then-District Court Judge Amy St. Eve rejected certification over a nationwide consumer fraud and unjust enrichment class, as well as a 21-state "unfairness class" and an 11-state "unconscionable conduct" class, because of material variations in the consumer fraud statutes and unjust enrichment laws. 256 F.R.D. 580, 583-84 (N.D. Ill. 2008) (citing *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995)) (noting that, according to the Seventh Circuit, every "nuance in the law is important and must be respected"); *see also Bridgestone/Firestone*, 288 F.3d at 1015 ("No class action is proper unless all litigants are governed by the same legal rules. Otherwise the class cannot satisfy the commonality and superiority requirements."). The court also found that, under Illinois choice-of-law principles, the law of each state where the representation was made and received applies to that consumer (*i.e.*, the place of purchase). *Siegel*, 256 F.R.D. at 583-585. Using a similar analysis, the law of the Funds' (and TPPs') home states apply.[8] Because of the differences in consumer fraud and unjust enrichment laws, the court held that "[p]laintiffs have failed in their burden of establishing . . . commonality, superiority, and predominance." *Id*. at 584-586. Plaintiffs have failed here too.

---

[8] The "most significant relationship" test has the Court consider "(a) the state where plaintiff acted in reliance upon defendant's representations, (b) the state where plaintiff received the representations, (c) the state where defendant made the representations, (d) the domicile, residence, place of incorporation, and place of business of the parties, and (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time." *Al Haj v. Pfizer Inc.*, 338 F. Supp. 3d 741, 753 (N.D. Ill. 2018). Comment j to the Restatement (Second) of Conflicts § 148 provides that, if any two of the above, except the defendant's domicile, counsel for one state, that is the state whose law will usually apply. Restat. 2d of Conflict of Laws, § 148, comment J (2nd 1988). Here, the Fund Plaintiffs received the representations and made payment *from their home states*. Thus, two prongs support the application of the laws of the home states of the Fund Plaintiffs and putative TPP class members.

>   **b.**    **Courts have found that multi-state consumer fraud classes may not be certified due to differences in consumer fraud statutes**

Courts routinely decline to certify multi-state consumer fraud classes because "[w]here class claims are governed by varying laws of multiple jurisdictions, class certification is not appropriate." *Marshall*, 270 F.R.D. at 407 (citation omitted). In fact, "*[t]he Seventh Circuit has put an end to most multistate consumer class cases*." *Phillips v. Sears Roebuck & Co.*, No. 06-412-GPM, 2008 U.S. Dist. LEXIS 37689, at *25 (S.D. Ill. May 8, 2008) (emphasis added). In *Marshall*, for example, the court denied certification over a proposed 11-state consumer fraud class that included eight of the 12 states proposed in the main class in this case and seven of the eight states proposed in the unfairness subclass. *See Marshall*, 270 F.R.D. at 407-08.

Although Plaintiffs attach a chart purporting to show similarities between the 12 states' laws (Dkt. 556-57), in their brief they state only that these laws are "essentially uniform." Mem., at 25. Plaintiffs' dearth of analysis is fatal to their motion. *See, e.g.*, *Muehlbauer v. General Motors Corp.*, No. 05-2676, 2009 U.S. Dist. LEXIS 26971, at *17 n.4 (N.D. Ill. Mar. 31, 2009) ("plaintiffs' entire examination of the legal similarities among different jurisdictions is done in such a cursory fashion" that the "analysis is woefully inadequate"). Moreover, Plaintiffs' chart actually reveals a number of material differences. According to the chart:

- **Different Deception Standards**: In Arizona, a "deceptive" statement has the "tendency and capacity to convey misleading impressions to consumers" from the perspective of the "least sophisticated reader" in light of "all that is reasonably implied." California requires showing that members of the public are likely to be deceived. Delaware requires that the conduct "creates a likelihood of public deception." In Wisconsin, a statement "is deceptive or misleading if it causes a reader or listener to believe something other than what is in fact true or leads to a wrong belief." The other states have their own variations.

- **Different Scienter Standards**: One state requires an intent to do the act involved, but not a specific intent to deceive (Arizona), others have no intent requirement (California, Connecticut, Florida, Massachusetts, New York, North Carolina, and Ohio), others require an intent for the recipient to rely on the statement (Delaware and Illinois), and another requires at least negligence (Wisconsin).

13

- **Different Approaches To Damages**: Some states allow punitive damages and/or a damages multiplier (under different standards), while others provide only for actual damages. Arizona allows punitive damages on a finding that the "conduct is wanton or reckless, shows spite or ill will or where the conduct demonstrates a reckless indifference to the interests of others." Massachusetts provides $25 minimum damages and requires double to treble damages "if willful or knowing." Pennsylvania provides $100 minimum damages and allows a court discretion to treble damages. Plaintiffs' chart omits that the discretion in Pennsylvania "is not limitless" and the court must consider "the presence of intentional or reckless, wrongful conduct." *Schwarz v. Rockey*, 932 A.2d 885, 889 (Pa. 2007). Unlike the other states, California allows only restitution, not damages. Moreover, because this relief is equitable, a plaintiff bringing a claim must "establish that there is no adequate remedy at law available." *Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015 U.S. Dist. LEXIS 88937, at *52 (N.D. Cal. July 7, 2015) (citation omitted).

- **Different Reliance Standards**: The states also have different reliance standards. In Arizona, reliance need not be reasonable. California requires only that the named plaintiffs establish reliance (i.e., by showing that the misrepresentation was a substantial factor in the purchasing decision). North Carolina requires reasonable reliance, but reliance can be shown on a classwide basis. Pennsylvania requires justifiable reliance.[9] Other states do not require any reliance (Connecticut, Delaware, Florida, Illinois, Massachusetts, New York, Ohio, and Wisconsin).

- **Different "Unfairness Standards"**: As for Plaintiffs' proposed "unfairness subclass," the eight relevant states do not have "the same legal rules."

  o Some states look to interpretations from the Federal Trade Commission ("FTC") to determine what is "unfair." Arizona provides "courts ***may use*** ***as a guide*** interpretations given by the [FTC]" to Section 5(a) of the FTCA, but are not required to accept those interpretations. Connecticut provides that "the courts . . . ***shall be guided*** by interpretations given by the [FTC] and the federal courts" but continue to apply a test for finding "unfairness" the FTC abandoned decades ago (the "Cigarette Rule"). *See Kent Literary Club v. Wesleyan Univ.*, 257 A.3d 874, 899-900 (Conn. 2021). Florida gives "***great weight***" to the interpretations of the FTC and federal courts. Illinois gives "***consideration***" to these interpretations. Other states do not refer to the FTC or federal courts as a source of interpretation.

---

[9] Although in Plaintiffs' Exhibit 57, Plaintiffs claim that "the Pennsylvania Supreme Court has held that ***'reliance' can be presumed when a party makes material misrepresentations*****,**" (emphasis in original), Plaintiffs base this statement on a 2002 case that is not good law. Pennsylvania state courts, including the Pennsylvania Supreme Court, and federal courts, have overwhelmingly concluded there is no presumption of justifiable reliance in UTPCPL claims. *See, e.g., Kern v. Lehigh Valley Hosp.*, 108 A.3d 1281, 1289-90 (Pa. Super. Jan. 28, 2015); *Coleman v. Commw. Land Title Ins. Co.*, 318 F.R.D. 275 (E.D. Pa. Aug. 17, 2016); *see also Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 221, 227 n.17 (3d Cir. 2008) (citing *Schwartz v. Rockey*, 932 A.2d 885 (Pa. 2007) and rejecting notion that reliance can be presumed in class actions). The only exception is when the parties have entered into a fiduciary relationship, which is not the situation here. *See Hunt*, 538 F.3d at 227 (citation omitted).

    o   States also differ as to what is an "unfair" business practice. In California, an "unfair" business practice "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." In Delaware, "unfair" is "any act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, violations of public policy as established by law, regulation, or judicial decision applicable in this State may be considered as evidence of substantial injury." Other states have different formulations, each with its own case law interpreting what is "unfair."

Dkt. 556-57.[10] These material differences render class certification inappropriate.

Perhaps recognizing the weakness of their argument for a multi-state class, in the alternative, Plaintiffs seek the certification of 12 subclasses, one for each state. Mem., at 3. Given the differences in state law, however, 12 subclasses would be unmanageable. *See, e.g.*, *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011) (recognizing "serious problems of management apart from the variability of state law" in a case with four proposed subclasses where the court expressed that differentiating between subclasses across different states would be difficult); *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 565 (E.D. Ark. 2005) (noting "a multitude of subgroups . . . would lead to monumental case management problems"); Manual for Complex Litigation (4th ed.) ("MCL") § 21.23 ("The necessity of a large number of subclasses may indicate that common questions do not predominate").[11]

---

[10] Other differences absent from Plaintiffs' chart are included in Appendix A to this brief (chart re: consumer fraud statutes), such as: (i) differences in statutes of limitations, ranging from one to six years; (ii) Ohio does not require proximate causation; it is enough to show that defendant's conduct "has the tendency to deceive"; (iii) a plaintiff continuing to purchase after knowing the facts prevents a finding of causation in Illinois, as well as Delaware, but only as to sophisticated entities (such as the TPPs), while in Florida, a plaintiff needs to show a "plausible reason" for continuing to purchase, and in California and Ohio, continuing purchases by a named plaintiff does not invalidate class claims; in Arizona, continuing to purchase does not invalidate any claim; (iv) in some states (Arizona, Delaware, and Wisconsin) materiality is required; it is not in others (Connecticut and Florida).

[11] Moreover, these 12 states are not the only states with laws at issue here. Walgreens asked Plaintiffs if they intended to voluntarily dismiss all claims not included in their brief. *See* Ex. 15. Plaintiffs agreed to dismiss four claims (the Minnesota and New Mexico consumer fraud claims, Counts 16-18 and 20), but none of the other claims. *See* Dkt. 570. Thus, there are still individual claims for (i) common law fraud on

The cases Plaintiffs cite do not help them. First, *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 72 (7th Cir. 2020) was an appeal from a grant of summary judgment, and *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 475 (7th Cir. 2020) was an appeal from the dismissal of certain claims; neither case concerned class certification. Second, while *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) did involve class certification, the court did not discuss differences (or similarities) in various state statutes and, contrary to Plaintiff's description of the case, the court did not say which consumer statutes were at issue. Finally, Plaintiffs rely heavily on opinions in *Suchanek v. Sturm Foods, Inc.*, but while the Seventh Circuit opinion reversed the original denial of certification, it did not discuss in detail the similarities or differences between the consumer fraud statutes, and did not address whether a class should be certified. 764 F.3d 750, 763 (7th Cir. 2014). Importantly, the *Suchanek* court found that "[t]he same legal standards govern every class member's claim" because the **defendant inexplicably admitted** this in its brief. *Id*. at 756. The district court's later opinion certifying the class was based on that admission, a fact not present here. 311 F.R.D. 239, 264 (S.D. Ill. 2015). As for their proposed "unfairness subclass," Plaintiffs **do not cite any case** supporting that the same legal standards govern these states' laws.

As a result, the Court should reject Plaintiffs' motion for certification of a 12-state consumer fraud class (or 12 subclasses) and an eight-state unfairness subclass.

---

behalf of each Plaintiff (Count I), which will involve the laws of six different states, (ii) unjust enrichment for Gonzales and Russo (Count II), which will involve the laws of New Mexico, Wisconsin, and Florida; (iii) the Colorado Consumer Protection Act (Count VIII); (iv) the Georgia Uniform Deceptive Trade Practices Act (Count XII); (v) the Georgia Fair Business Practices Act (Count XIII); (vi) the Louisiana Unfair Trade Practices and Consumer Protection Law (Count XIV); (vii) the Nevada Deceptive Trade Practices Act (Counts XIX); and (viii) the South Carolina Unfair Trade Practices Act (Count XXV). Each of these laws has unique standards and case law interpretations, and Plaintiffs have not indicated (through a trial plan or otherwise) how these individual claims will be tried with the class claims. This failure adds to the commonality, predominance, and superiority/manageability issues that defeat class certification.

          **c.**    **Although the proposed unjust enrichment states follow the Restatement, courts have found differences in states' approaches to the Restatement defeat class certification**

Plaintiffs argue that the five states for which they are seeking certification of an unjust enrichment class—California, Connecticut, Illinois, Massachusetts, and New York—"follow the elements set forth in the Restatement," which provides that "a 'person who has been unjustly enriched at the expense of another is required to make restitution to the other[,]'" making their claims "common." Mem., at 29 (quoting Restatement (First) of Restitution § 1 & cmt. A (AM. L. INST. 2022)). But each state's court interprets the Restatement elements differently. *See Siegel*, 256 F.R.D. at 584 ("several courts have recognized that, while many unjust enrichment claims are based on common law principles identified in the Restatement . . . they nonetheless vary to some extent") (citations omitted). Thus, "*multi-state* class actions for unjust enrichment are inappropriate because the individual states' laws regarding unjust enrichment are too nuanced to lend themselves to class treatment." *In re Aqua Dots*, 270 F.R.D. at 386 (denying certification of four grouped subclasses, holding that "the law of unjust enrichment varies too much from state to state to be amendable . . . even to multistate class treatment"; notably, in *Aqua Dots*, Connecticut, Illinois, and Massachusetts were all in different proposed subclasses, meaning that the plaintiffs there recognized differences in the unjust enrichment laws of those states).[12]

Further, Plaintiffs do not conduct any analysis as to the unjust enrichment laws of the five states, falling well short of their burden of proof. *See, e.g.*, *Vulcan Golf, LLC v. Google Inc.*, 254

---

[12] *See also Siegel*, 256 F.R.D. at 584 (recognizing that California and Connecticut have different unjust enrichment elements); *Chatham v. Sears, Roebuck & Co. (In re Sears, Roebuck & Co.)*, Nos. MDL-1703, 05 C 4742, 05 C 2623, 2006 U.S. Dist. LEXIS 92169, at *4 n.3 (N.D. Ill. Dec. 18, 2006) (denying certification over a multi-state unjust enrichment class, stating that "unjust enrichment is a tricky type of claim that can have varying interpretations even by courts within the same state, let alone amongst the fifty states"); *Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 U.S. Dist. LEXIS 5698, at *6 (N.D. Ill. Apr. 2, 2002) ("[T]he variations in state common laws of unjust enrichment demonstrate that class certification of such a claim would be unmanageable.").

F.R.D. 521, 532-33 (N.D. Ill. 2008) (finding that, even though the plaintiffs attached a chart comparing unjust enrichment laws (which Plaintiffs here did not do), "the plaintiffs notably fail[ed] to discuss the states' laws in the detail or address the concerns raised by numerous other courts that have found significant differences in the [unjust enrichment] laws" of different states).[13]

And, as with consumer fraud, the cases Plaintiffs cite do not help their argument. In *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551 (N.D. Ill 2015), the unjust enrichment claim was **brought only under Illinois law**. *See id.* at 555. Although Plaintiffs claim that the court in *Al Haj v. Pfizer Inc.* certified an unjust enrichment class (Mem., at 29-30), the court actually denied class certification not once, but twice. *See Al Haj*, No. 17 C 6730, 2019 U.S. Dist. LEXIS 117930, at *29; Dkt. 230 (Memo. Op. and Order), at 9. In fact, **Plaintiffs have not cited a single case in which a court certified a multi-state unjust enrichment class**.

Moreover, even if Plaintiffs had sought certification of a single state class, **under the facts of this case** they would still fail the commonality and predominance prongs. Unjust enrichment requires a consideration of the entire facts surrounding a class member before determining whether, in that person's **specific** situation, there was unjust enrichment. Here, there is not sufficient uniformity among even the Named Plaintiffs, let alone putative class members, to reach a common answer to this question. For example, Russo suspected she was not receiving PSC prices for her prescriptions, but did nothing to check if that was true, and, by Plaintiffs' own admission, has less than $20 in damages (the amount of the membership fee). *See* Ex. 16, at 63:10-64:10; Ex. 17; Ex. 18, at 11-12; Ex. 19 (Plaintiffs' damages claims for the Individual Plaintiffs); Ex. 1 (Smith

---

[13] *See also Suchanek*, 311 F.R.D. 239, 253 (S.D. Ill. 2015) (in a case cited by Plaintiffs, the court denied certification because the plaintiffs did not "set out the elements of unjust enrichment under the common law of each of the eight states at issue or comparatively analyze those laws to show that the laws are substantially similar and/or that the variances are manageable").

Rpt.) ¶¶ 62, 71 & Tables 12, 24, and 36. Under those circumstances, it would be a jury question as to whether it would be unjust for Walgreens to retain a benefit. The same is the case for someone who knew about Walgreens' practice but kept purchasing, including:

- The Named Plaintiffs, all of whom continued to purchase at Walgreens or allowed their beneficiaries to keep purchasing at Walgreens after meeting with counsel. *See* Section IV(C)(4), below.

- IBEW, which, as discussed in Section IV(C)(5) below, knew it was not receiving discount card prices as early as 2008.

- Those TPPs that Caremark told ███████████████████████████████ ████████████████████████. *See* Ex. 7, at 102:23-114:20; 205:8-206:19; Ex. 14, at Caremark-0002103.

- Consumers who learned about the allegations in this case but continued to purchase at Walgreens without joining PSC.

*See In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 418 (D. Me. 2010) (noting that the plaintiffs "do not explain why it is unjust for the Defendants to retain the money from someone who did not believe their misrepresentations when purchasing, did not purchase because of their misrepresentations, or received the benefit promised."). All of these issues would require discovery, including oral testimony, of each class member and individual trials, meaning individual considerations would predominate.

Plaintiffs have not met, and cannot meet, their burden to show that a multistate unjust enrichment subclass would meet the requirements of commonality, predominance, and superiority, and the Court should reject Plaintiffs' motion to certify an unjust enrichment subclass.

  2. **Because the relevant contracts differ materially, whether Walgreens misrepresented the U&C price has no common answer**

    a. **Where a contract defines U&C, the contract controls, not industry understanding or PBM manuals**

Plaintiffs' motion for class certification rests on the faulty premise that the contracts

19

between Walgreens and the Relevant PBMs (the "Pharmacy-PBM Contracts") do not matter. Plaintiffs argue instead that the industry standard controls over the U&C definitions in the Pharmacy-PBM Contracts, even if those contracts expressly ***exclude*** membership club prices. This argument is based on the opinion of their proffered expert, Kenneth Schafermeyer, Ph.D. *See* Dkt. 556-56 (Schafermeyer Rpt.) ¶¶ 97, 148. But as Walgreens shows in its Rule 702 motion filed contemporaneously, Schafermeyer has presented an improper legal opinion regarding the inability of private parties to contract as they see fit. Plaintiffs' position also contradicts their own statement in open court, where Plaintiffs expressly told the Court that their theory of the case is that Walgreens has a "***contractual obligation***—to report usual and customary prices for its drugs." Dkt. 260, at 23:3-11 (emphasis added). Plaintiffs presumably make this argument because, as discussed below, of the 15 contracts that contain U&C definitions, the definitions vary, and without uniformity in the proposed class, individual issues predominate and class certification fails. Plaintiffs are wrong, of course, as Walgreens and PBMs are free to define U&C by contract.

In *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), the Seventh Circuit interpreted "U&C" as used in governmental programs, with the important caveat "[u]nless state regulations provide otherwise." *Id*. at 643. The same rationale applies to contracts between private parties.[14] In fact, the *Garbe* district court, which Schafermeyer cites, expressly found that Pharmacy-PBM Contracts may define U&C differently, and the Seventh Circuit did not disturb that finding on appeal. The district court explained that the National Counsel for Prescription Drug Programs' ("NCPDP") U&C standard, which Schafermeyer argues provides the industry understanding of U&C (*see* Dkt. 556-56 (Schafermeyer Rpt.) ¶¶ 36-37), "is not meant to be

---

[14] Walgreens believes the evidence shows that the industry understanding of U&C is the retail price, but the Court need not resolve this issue for the purpose of the class certification motion.

'mandatory,' but to instead explain the format for how a pharmacy claim should be submitted," and that "individual payers [such as PBMs and TPPs] may further define U&C price specifically in their . . . contracts." *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1014-15 (S.D. Ill. 2014). The Ninth Circuit in *Corcoran v. CVS Health Corp.*, a consumer class action brought against CVS with similar claims (in which CVS prevailed), likewise recognized that the contract terms between a PBM and a pharmacy determine the pharmacy's reporting obligations. 779 F. App'x 431, 433 (9th Cir. 2019) ("It is enough for plaintiffs to show that CVS failed to report the [CVS club] prices as U&C prices contrary to the PBM contracts, and that, as a result, plaintiffs were charged higher copayments."). Indeed, this Court, in ruling on Walgreens' motion to dismiss, recognized that, if Walgreens complied with a contract's U&C definition, "this would undercut Plaintiffs' claims" that Walgreens had violated the industry understanding of U&C. Dkt. 91, at 11 & n.7. Even Schafermeyer testified in another matter "that parties to contracts between a PBM and a pharmacy are free to have a definition of usual and customary that is different than the NCPDP definition if they choose to." Ex. 20, at 1235:18-1236:1.

Although Schafermeyer argues that Walgreens and PBMs should not be permitted to contract for a U&C definition that differs from the PBMs' contracts with their TPPs (*see* Dkt. 556-56 (Schafermeyer Rpt.) ¶ 97), that argument has no merit, and Plaintiffs cite no case law in support. Walgreens and PBMs can contract however they want; nothing in the Pharmacy-PBM Contracts binds Walgreens to the potentially tens, if not hundreds, of thousands of PBM-TPP Contracts to which Walgreens is not even privy. *See* Ex. 21, at 197:9-198:17; Ex. 22, at 191:16-192:9; Ex. 23, at 202:9-203:2; Ex. 24 (Hughes Rpt.) ¶¶ 141-47. Moreover, if a PBM-TPP Contract requires the PBM to price prescription drugs based on a U&C definition in that contract and the PBM does not do so, ***that is an issue between the Fund and the Relevant PBM***, not with Walgreens. *See* Ex. 21,

at 199:7-200:10; Ex. 22, at 213:11-21; 215:23-216:4; Ex. 23, at 229:13-231:14.[15]

Plaintiffs also cannot avoid this fact by focusing on the PBM-issued provider manuals ("Provider Manuals").[16] As a threshold matter, 11 of the 16 Pharmacy-PBM Contracts expressly state that, ███████████████████████████████████████████████████████████ ███████████████████████████. *See* Ex. 2 (Jacobs Rpt.) ¶¶ 82-85 & Table 1. As for the five that remain, first, the 1999 Sav-Rx contract is ████ on the issue (*see* Ex. 28), but Sav-Rx testified that it never had Provider Manuals. *See* Ex. 9, at 103:3-5. The 2000 Optum (Pacificare Pharmacy Centers, Inc.) contract is also ████ on the issue (*see* Ex. 29), but Optum testified that the contract would supersede the Manual. *See* Ex. 10, at 109:13-23. The 1994 Medco (PAID Pharmacies) contract also does not ███████████ (*see* Ex. 30), but it has ████████████ and Medco's corporate representative testified that this means the "industry understanding" would apply, not the Medco Provider Manual's U&C definition. Ex. 11, at 79:7-80:4. As for MedImpact, by 2019, the MedImpact Provider Manual stated expressly that ██████████████████████ ███████████████████████████████████████████████████████████ ███████ (Ex. 31, at 36), something which Schafermeyer omits from his chart (he stops with the 2018 Provider Manual). *See* Dkt. 556-56 (Schafermeyer Rpt.), at 21, Table 2.

[15] Plaintiffs go even further, arguing in a misleading way that "Walgreens admits that there is a common industry understanding as to the meaning of the U&C price." Mem., at 16, 26 (citing Walgreens' Resp. to RFA No. 21 (Dkt. 556-15)). This is true, but in a response to a request for admission, Walgreens stated that, "if the term 'usual and customary' price is found in a contract, the contract controls over the Industry understanding of the meaning of the term 'usual and customary' price." Dkt. 556-15, at 21-22.

[16] Plaintiffs claim Provider Manuals are published by PBMs as "publicly-facing documents." Mem., at 13-14. Provider Manuals, however, are not publicly facing documents; there is no evidence that ***any*** of the Named Plaintiffs ever saw a Provider Manual, let alone relied on a Provider Manual. Moreover, many Provider Manuals are not publicly available. For example, the Express Scripts Provider Manuals are not made available to the public and, in fact, state on their face that they are "confidential." Ex. 25, at 2 ("Proprietary & Confidential Information"); Ex. 26, at 2 (same); Ex. 27, at 2 (same).

Moreover, while Plaintiffs refer to Express Scripts in April 2017 to seek , the Express Scripts-Walgreens contract provided that . *See* Ex. 32 § 2.12(a). Further, while Express Scripts did seek (undercutting Schafermeyer's claim that PBMs had an incentive not to seek these lower prices as U&C), Walgreens rejected that change, and the parties negotiated an amendment with . *See* Ex. 33 § 4; Dkt. 556-46; Ex. 13, at 233:18-237:3.) That is, Walgreens and Express Scripts agreed in October 2017 on a U&C definition that ." Ex. 33 § 4; Dkt. 556-46; Ex. 13, at 233:18-237:3.

Finally, even if the Court, and eventually the jury, had to account for U&C definitions in Provider Manuals, that would just add to the complexity, showing there is no common answer as to whether Walgreens reported the correct U&C price.

**b. The Pharmacy-PBM Contracts differ in material ways**

Whether the Pharmacy-PBM Contracts required Walgreens to report its PSC prices as its U&C prices is not susceptible to a common answer. Plaintiffs' proffered expert, Schafermeyer, identifies 15 contracts between Walgreens and the Relevant PBMs during the relevant time period (he excludes one that does not have a U&C definition). *See* Dkt. 556-56 (Schafermeyer Rpt.) ¶ 98. These contracts have different and varied U&C definitions, which means Plaintiffs cannot establish commonality, predominance, and superiority.[17]

Schafermeyer claims that,

---

[17] While Schafermeyer lists two contracts between Walgreens and PBM Catalyst Health Solutions, Inc. (Dkt. 556-56 (Schafermeyer Rpt.) ¶ 98), Catalyst is not a Relevant PBM and, therefore, Walgreens does not discuss these contracts.



██████████████████████████████████████████████████

████████████████████. Dkt. 556-56 (Schafermeyer Rpt.) ¶ 96; *see also* Mem., at 13-14.[18] While

Walgreens—and the PBMs—disagree that any of the Pharmacy-PBM Contracts required

Walgreens to report its PSC prices as its U&C prices (*see* footnote 5, above), only four of the 16

Pharmacy-PBM Contracts have this ████████████████ language.[19] According to Schafermeyer

(Dkt. 556-56 (Schafermeyer Rpt.) at ¶ 98) (emphasis added):

- 2010 MedImpact contract: Defines U&C as ████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████

- 1999 MedTrack contract: Provides U&C ████████████████████
  ████████████████████████████████████████████
  ████████████████████

- 1999 Sav-Rx contract: Defines U&C as ████████████████████
  ████████████████████████████████████████████
  ████████████████████████

- 2009 and 2012 Express Scripts contracts: Do not say that U&C is ████████
  ██████████████████, although it calls U&C the ████████████
  ████████████████████████████████████████████
  ████████████████████

- November 2010 LDI contract: Provides ████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████

---

[18] Schafermeyer essentially concedes that, if a U&C definition "***excludes***" discounts or membership clubs, it does not include PSC. Dkt. 556-56 (Schafermeyer Rpt.) ¶ 89 ("None of these provider manual definitions exclude any types of discounts or exclude membership club programs from the definition of U&C."). In addition, Plaintiffs' counsel stated in open court they contend that the Pharmacy-PBM Contracts "do[] not exclude any type of discount programs." Dkt. 129, at 30-31.

[19] *See* Ex. 28, § 1.13; Ex. 29, at Ex. A (Walg_Forth_00051540_R); Ex. 35, at Schedule of Terms (Walg_Forth_00320842); Ex. 36, at Schedule of Terms (Walg_Forth_00102481).

[20] *See* Ex. 7, at 189:7-190:10; Ex. 9, at 55:7-56:11, 86:3-88:10; Ex. 10, at 33:6-20; Ex. 11, at 44:14-45:1; Ex. 22, at 110:6-10; Ex. 23, at 149:23-150:7.

- There is no evidence of a MedImpact contract before October 1, 2010, an Express Scripts contract before January 1, 2009, or an LDI contract before November 2010, meaning no class can be certified relating to these PBMs before these dates.

In addition, Schafermeyer's report does not refer to the Medco contract in effect from 1994-2012, which refers to the ████████████████████████████████████████████████ ████████ Ex. 30, at Walg_Forth_00110250.

Further, the nation's three largest PBMs—Caremark, Express Scripts, and Optum—all ████████████████████████████████████████ in contracts with Walgreens. The October 1, 2017 Express Scripts contract; the January 1, 2018 Caremark contract; and the January 1, 2017 Optum contract ████████████████████████████████ ████████████████████████████████████████████ Dkt. 556-56 (Schafermeyer Rpt.) ¶ 98. Plaintiffs essentially concede that these definitions require Walgreens to report prices **other than PSC prices**. *See* Mem., at 13-14.

These contractual differences mean that **no one set of facts will resolve the question** of whether Walgreens contractually misreported its U&C prices. *See Bell*, 2013 U.S. Dist. LEXIS 170063, at *40-41 (J. Chang) ("the variation in contract language demonstrates that class certification is not appropriate. . . . the dissimilarities in the proposed class's distributor agreements have the potential to impede the generation of common answers. . . . Moreover, individualized analysis of each contract would overwhelm any common questions of law or fact.") (citing *Dukes*, 564 U.S. at 348).[21] Indeed, although Walgreens and the Relevant PBMs interpret their contracts to

---

[21] *See also In re WellPoint, Inc. Out-of-Network "UCR" Rates Litigation*, No. 09-MDL-2074-PSG, 2014 U.S. Dist. LEXIS, at *12, 27-28 (C.D. Cal. Sept. 3, 2014) (finding certification not appropriate because "[usual, customary, and reasonable] obligations are governed by its contracts, and the relevant terms of those contracts vary across the proposed classes" even where a standard, industry definition existed); *Stitt v. Citibank, Nat'l Ass'n*, No. 12-cv-03892- YGR, 2015 U.S. Dist. LEXIS 169070, at *13 (N.D. Cal. Dec. 17, 2015) (finding class certification was inappropriate because liability depended on the terms of different contracts affecting class members and, therefore, "common proof could not be used to determine the validity of property inspection fees"); *Ret. Bd. of the Policemen's Annuity & Ben. Fund of Chi. v. Bank of*

require ███████████████████████████████████████████████████,[22] Plaintiffs will need to prove that the different language in each contract means the exact opposite, contrary to this evidence. *See WellPoint*, 2014 U.S. Dist. LEXIS, at \*27-28 (finding that "WellPoint's obligations must begin with the text of [the contracts]" even if WellPoint treated the plans the same). This cannot be done in one stroke.

Further, to the extent the Court finds any of the contracts are ambiguous, parole evidence becomes admissible. Each of the 16 contracts at issue and their negotiations has a unique story, which would require the Court to consider individualized issues.[23] Moreover, most of the Pharmacy-PBM Contracts have ████████████████████████████████████████

████████████████████████████████████████████████████████████

---

*N.Y. Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) (class treatment not appropriate as it would be necessary to evaluate "which loans, in which trusts, were in breach of the representations and warranties. And whether a loan's documentation was deficient requires looking at individual loans and documents.").

[22] *See* footnote 5, above.

[23] For example, the January 3, 2001 and January 1, 2016 Caremark contracts have the same U&C definition, which state the U&C price ████████████████████████████████ Dkt. 556-56 (Schafermeyer Rpt.) ¶ 98. But Caremark drafted a ████████████████

████████████████████. *See* Ex. 7, at 104:21-114:19, 205:8-206:19; Ex. 14. Thus, the contemporaneous evidence shows that, when Caremark entered into the January 3, 2001 contract, its intention was ████████████████████. Moreover, effective January 1, 2015, Walgreens and Caremark entered into a Federal Employees Program ("FEP") contract that stated that, ███████████████████████████████████████████████████████████ Ex. 37, at Walg_Forth_00101219. Caremark testified that this language addressed ████████████████████████████████████. *See* Ex. 7, at 261:6-264:22. To accomplish this, ██████████████████████████████████████████████████████████████████████████████████. *See id.* at 261:6-264:22, 193:10-195:2.████████████████████████████████████████████████. But this shows Caremark understood that Walgreens was ████████████████████████████████. *See id.* at 261:6-264:22. Thus, the parole evidence shows that, when Caremark entered into the January 1, 2016 contract with Walgreens and continued with the 2001 contract's same U&C definition, Caremark knew that ████████████████████████████████████████████████████████████.

████,[24] which adds more complexity to the application of 16 different contracts to 12 different state laws, highlighting how Plaintiffs have not shown how there is one common answer to the interpretation of these contracts.

To the extent Plaintiffs respond by citing to the certification of a consumer class in *Corcoran v. CVS, Inc.* and *Sheet Metal Workers Local 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, not only are those cases from different jurisdictions, but also they have very different facts. 540 F. Supp. 3d 182, 199 (D.R.I. 2021). The class certified in *Corcoran* involved contracts between CVS and PBMs that all uniformly stated that the U&C price included discounts. *See Corcoran v. CVS Health*, No. 15-cv-03504-YGR, 2017 U.S. Dist. LEXIS 143327, at *44 (N.D. Cal. Sept. 5, 2017).[25] With respect to the certification of a TPP class in the *Sheet Metal* case, CVS argued that the contracts should be interpreted "in light of the uniform industry understanding" of U&C, which is not the argument Walgreens makes here. *Sheet Metal*, 540 F. Supp. 3d at 199. As a result, the *Sheet Metal* court did not analyze differences in the contracts. *See id.*

### c. The PBM-TPP Contracts differ in material ways

Whether **Walgreens** correctly reported its U&C prices depends on the Pharmacy-PBM Contracts. On the other hand, the PBM-TPP Contracts define the basis on which the TPP pays the PBM for drugs dispensed to its beneficiaries. Plaintiffs have defined the proposed class to include only TPPs that paid for generic prescription drugs "where the usual and customary price was a

---

[24] *See* Ex. 30, at 5 § 20 (Walg_Forth_00110249); Ex. 32, at 20 § 8.11 (Walg_Forth_00095290); Ex. 236, at 8 § 9.4 (Walg_Forth_00320840); Ex. 36, at 12 § 9.4 (Walg_Forth_00102478); Ex. 38, at 24 § 41 (Walg_Forth_00074732); Ex. 29, at 6 § 9.4 (Walg_Forth_00051535_R); Ex. 39, at 22 § 11.11 (Walg_Forth_00053025); Ex. 40, at 11 § 10.13 (Walg_Forth_00139957); Ex. 41, at 19 § 23 (Walg_Forth_00142514); Ex. 28, at 10 § 8.8 (Walg_Forth_00148176); Ex. 42, at 17 § 8.9 (Walg_Forth_00144229); Ex. 43, at 17 § XIX (MI-F_00004185); Ex. 44, at 22 § XIX (MI-F_00003064).

[25] In *Corcoran*, one Optum contract excluded "discount card programs" from U&C, but it was effective for only the last six months of the class period (*Corcoran*, 2017 U.S. Dist. LEXIS 143327, at *46), and did not appear to be part of the trial. *See Corcoran*, No. 15-cv-03504, Dkts. 561, 571, 574, 579, 584, 587, 590, 593, 604.

basis for the amount paid or reimbursed in connection with the purchase of such drug." As described in the expert reports of Jacobs and Hughes, determining which TPPs are in the class will require looking at the PBM-TPP Contracts to determine if the contracts contain lesser-of provisions that include U&C as a ceiling on reimbursement, and, if so, to determine if the definition of U&C covered club pricing like PSC. *See* Ex. 2 (Jacobs Rpt.) ¶ 90; Ex. 24 (Hughes Rpt.) ¶¶ 145-49. Even Schafermeyer agrees there is variation in the U&C definitions in the PBM-TPP Contracts. *See* Dkt. 556-56 (Schafermeyer Rpt.) ¶ 84 ███████████████████████████████ ███████████████████████████████ (emphasis added). For example, the contract between IUOE and Express Scripts states that U&C ██████████████████████████ ███████████████████████████████. *Id.* The IBEW contracts with Caremark provide that ████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███. *Id.* Moreover, the January 1, 2014 contract between Steamfitters and PBM LDI ████████ ███████████████████████████████████████. *See* Ex. 46; Ex. 12, at 57:19-59:1. Because the contract did not require LDI ██████████████ ███████████████████████████████████████████ █████████████████████████████.

These are only examples of the complexities that make class certification unmanageable. If the Court grants class certification, the parties will need to conduct discovery as to ***each TPP class member*** and each of the PBMs to discover ***every contract between TPP class members and the Relevant PBMs*** (except those the proposed class definition excludes) to determine if the TPPs were entitled to U&C pricing and what the definition of U&C was in their contracts with the PBMs,

with each definition having to be interpreted under the law required by each contract. Moreover, contracts change over time, meaning that a PBM-TPP Contract may have had U&C pricing at one period of time, but not another period of time. *See, e.g.,* ████████████████████████

*Compare* Ex. 46, *with* Ex. 47. Moreover, many health plans (such as employers) have contracts with health insurers (which then contract with Relevant PBMs) and, while it is unclear if Plaintiffs intend the health plans in this situation to be part of the class, if they do, even more contracts would need to be produced. Here, there would be ***hundreds of thousands, if not millions,*** of PBM-TPP Contracts and health plan-health insurer contracts to review. *See* Ex. 24 (Hughes Rpt.) ¶¶ 141-47.

Ignoring this reality, Plaintiffs proffer Lynette Hilton as an expert who purports to have a methodology through which Plaintiffs can identify class members without having to review any of the contracts. Hilton's methodology, however, is severely flawed and unsupported. For instance, Hilton claims that she could use ***Walgreens'*** own data to determine whether a PBM charged a TPP according to lesser-of logic that included U&C as a price point. But ***Walgreens'*** data does not show this—it reveals only the payments stream from the PBM to ***Walgreens***. Walgreens has no data on what the PBM charged the TPP according to entirely different contracts. *See* Ex. 2 (Jacobs Rpt.) ¶ 88; Ex. 1 (Smith Rpt.) ¶ 18-19; Ex. 24 (Hughes Rpt.) ¶ 145. And to the extent Hilton argues that she could use ***PBM*** data to determine whether the Relevant PBMs charged the TPPs with a lesser-of logic that included U&C as a price point, she has not identified any field in the PBM data produced in this case supporting that claim.[26] She also has not shown how the data alone could

---

[26] Moreover, no data shows, nor could show, if the PBM-TPP's Contract with the PBM required the PBM to price according to U&C, which Plaintiffs must show to prove the TPP was defrauded or unjustly enriched. *See, e.g., Thomas v. UBS AG*, 706 F.3d 846, 853-54 (7th Cir. 2013) (without being deprived of something that one has a right to or a reasonable expectation of payment, there can be no unjust enrichment); *Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 U.S. Dist. LEXIS 25778, at *15 (N.D. Ill. Mar. 15, 2010) (a claim for unjust enrichment requires some expectation of receiving a benefit); footnote 28, below (discussing that the consumer fraud statutes require reliance and/or causation).

show if the TPP is a government payer or is related to a PBM, both of which would exclude the TPP from the proposed class. *See* Ex. 1 (Smith Rpt.) ¶ 22-27 & Tables 2 and 3. Thus, to determine who is in the proposed class, one would need to review all of the contracts between the potential TPP class members and PBMs (and, potentially, all of the contracts between health plans and health insurers that contract with the Relevant PBMs), which would make a class of this size unmanageable and class certification inappropriate.[27] *See Bell*, 2013 U.S. Dist. LEXIS 170063, at *40-41 (J. Chang) ("the dissimilarities in the proposed class's [contract language] have the potential to impede the generation of common answers. . . . Moreover, individualized analysis of each contract would overwhelm any common questions of law or fact.").

### 3. Because millions of individualized damages proceedings would be required, individual issues predominate

Class certification also is improper because damages are not susceptible to classwide measurement, and the Court would have to hold millions of separate evidentiary hearings to determine how much each class member suffered in damages. Typically a class can only be certified when "the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program, so that there is no need for notice." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013) (citation omitted). But where individualized hearings "might swamp" the court, certification is not proper. *Id.* at 773; *Riffey v. Rauner*, 910 F.3d 314, 319-20 (7th Cir. 2018). That is the case here.

As a threshold matter, Plaintiffs have failed to show that, presuming liability, proving classwide damages is even possible. They have ignored the reality that, to properly calculate

---

[27] Indeed, Steamfitters did not produce a PBM-TPP Contract covering 2007, meaning there is no way to know in 2007 whether the applicable contract provided for U&C pricing. *See* Ex. 23, at 90:6-91:22. Nevertheless, Plaintiffs do not exclude 2007 from their proposed class definition.

damages, Plaintiffs must "re-adjudicate" *every claim* for *every class member* in a *plan year*, which requires individualized review for each customer, given that benefit designs of health plans differ widely. *See* Ex. 1 (Smith Rpt.) ¶¶ 29-31, 72-99; Ex. 24 (Hughes Rpt.) ¶¶ 89-123. This re-adjudication process would have to consider prescription purchases by customers at pharmacies *other than Walgreens* and for drugs *other than the generics at issue in this case, including brand-name drugs*, because of health plan features like deductibles, customer cost-sharing amounts, and out-of-pocket maximums. *See* Ex. 1 (Smith Rpt.) ¶ ¶ 78-99; Ex. 24 (Hughes Rpt.) ¶ 106. For instance, Plaintiffs fail to account for the fact that customers who have plans setting an out-of-pocket maximum may not have *any damage* in a benefit year. That is, once the customer hits the out-of-pocket maximum, the customer pays $0 for drugs for the rest of the plan year. So even if Walgreens had reported its PSC prices as U&C, the customer would have paid the *same amount* in the plan year (i.e., the amount of the customer's out-of-pocket maximum), incurring no damages. *See* Ex. 1 (Smith Rpt.) ¶¶ 93-96 & Table 34; Ex. 24 (Hughes Rpt.) ¶¶ 98-106.

Nor do Plaintiffs attempt to account for health plan deductibles. Before meeting a deductible, if a customer would have paid $10 less on the first prescription in a plan year if Walgreens had submitted the PSC price as its U&C price, that customer would then have to spend $10 *more* to meet the deductible (i.e., if the customer had a $500 deductible and spent $10 instead of $20, the person would have $490 left on the deductible, not $480). This means that some or all of the $10 savings may be offset by higher payments on later prescriptions. *See* Ex. 1 (Smith Rpt.) ¶¶ 81-92 & Tables 27-33; Ex. 24 (Hughes Rpt.) ¶¶ 93-97. As a result, determining whether a customer with a deductible suffered *any* damages (and if so, the amount of those damages), would require consideration of every prescription transaction in the plan year, whether at Walgreens or

31

another pharmacy, and whether it was a generic or a brand drug. *See* Ex. 1 (Smith Rpt.) ¶¶ 81-92 & Tables 27-33; Ex. 24 (Hughes Rpt.) ¶¶ 105-06.

Moreover, to "re-adjudicate" each claim to assess potential damage, one needs to know whether a customer would pay a copay (flat fee) or a coinsurance amount (percentage-based), which only plan-design documents, not data, will confirm. *See* Ex. 1 (Smith Rpt.) ¶¶ 79-80; Ex. 24 (Hughes Rpt.) ¶¶ 108-18. This is complicated by the fact that some plans provide for copays in certain situations and coinsurance in other situations, something Hilton does not take into account. Although Hilton claims she can look at the data to determine if a customer paid a copay or coinsurance for a particular transaction, Hughes and Smith have both shown that her methodology is unsupported and unreliable. *See* Dkt. 556-55 ¶¶ 24-25, 33-34; Ex. 1 (Smith Rpt.) ¶ 74-75 & Tables 25-26; Ex. 24 (Hughes Rpt.) ¶¶ 108-23.

Thus, the parties would need discovery of plan-design documents for likely tens, if not hundreds, of thousands of non-party health plans and data for all prescriptions in the 12 states for a time period of over 16 years. Discovery would also be needed from millions of customers and their health insurers as to their medical expenses if their deductible and/or out-of-pocket maximum combine both prescription drug spending and medical expenses, which many plans do. Ex. 24 (Hughes Rpt.) ¶ 106. In addition, if an overpayment caused a person to receive a tax benefit from taking a higher deduction on their tax return for medical expenses, that person would not have been damaged by the full extent of the overpayment. As a result, millions of consumer class members would need to produce their tax returns.

The same issues affect potential TPP damages because Hilton's formula for a TPP overpayment starts from the Consumer Overpayment (TPP Overpayment = Total Overpayment – Consumer Overpayment). *See* Dkt. 556-55 (Hilton Rpt.) ¶ 26. And not all PBM-TPP Contracts

factor U&C into how much the PBM charges the TPP. As noted above, the 2014 Steamfitters/LDI contract did not even mention ███████████████████████████████████████. *See* Ex. 46. Therefore, Steamfitters (from 2014-2019), and any other TPP whose PBM-TPP Contract did not entitle the TPP ███████████████████████.[28] To determine this would require the discovery of potentially hundreds of thousands of PBM-TPP Contracts.

Similarly, a TPP's damages may also be affected by contractual payments it receives from the PBM at the end of a plan term. PBM-TPP Contracts often contain a Generic Effective Rate ("GER") provision, whereby the PBM guarantees that, over a certain amount of time, the TPP will not be charged more than a certain amount, which is not based on U&C. *See* Ex. 1 (Smith Rpt.) ¶¶ 101-109; Ex. 24 (Hughes Rpt.) ¶ 157. For example, a PBM might commit to not charging a TPP more than 80% off of the Average Wholesale Price ("AWP") on average for all generic drugs purchased by members during the plan year at retail pharmacies. If the PBM charges more than the guaranteed amount (i.e., charges, on average, AWP-75%), the PBM is required to make a reconciliation payment to the TPP according to the formula provided for in the contract. *See* Ex. 1 (Smith Rpt.) ¶¶ 101-109; Ex. 24 (Hughes Rpt.) ¶ 157. To determine any TPP damages where a TPP received a reconciliation payment, one would need to understand the contractual guarantee provision and redo the calculation (with the transaction data) based on the "but-for" world where Walgreens reported its PSC prices as U&C prices, and the damages would be reduced. *See* Ex. 1 (Smith Rpt.) ¶¶ 101-109; Ex. 24 (Hughes Rpt.) ¶ 158. This is because, even if the TPP overpaid on a single drug purchase, that overpayment changed the amount by which the PBM failed to meet

---

[28] Plaintiffs may argue that, even if certain TPPs were not contractually entitled to U&C pricing, the PBMs voluntarily charged according to U&C. But if the TPP had no right to U&C pricing, the TPPs could not have relied on any alleged misrepresentation as to U&C for those consumer fraud statutes that require reliance, nor can they show proximate causation for statutes that require it. They certainly could not show unjust enrichment if not entitled to U&C pricing. Also, proving, for each TPP class member, that they were voluntarily charged according to U&C pricing would require individualized discovery and testimony.

the GER, as Hughes and Smith explain. *See* Ex. 1 (Smith Rpt.) ¶¶ 101-107; Ex. 24 (Hughes Rpt.) ¶¶ 159-63. To determine if there is a GER, the applicable formula, and the amount of any reconciliation payments the PBM made to the TPP to do this calculation, individualized discovery would be necessary from the Relevant PBMs and all of the TPP class members. Specifically, the PBM-TPP Contracts would need to be obtained to understand the GER formula. In addition, proof of payment (i.e., checks) and cover letters that describe what that payment is for would be required. *See* Ex. 24 (Hughes Rpt.) ¶¶ 165-66. In fact, GERs are not the only guarantees in PBM-TPP Contracts, and sometimes excesses from one guarantee (i.e., that the PBM exceeded a guarantee) can be used to offset a shortfall in the GER. *See* Ex. 46, at 63-64 (LOCAL439_0001877).

████████████████████████████████████████████████████████

██████████████████████████████████████. Discovery from the Relevant PBMs and very likely tens, if not hundreds, of thousands of TPP class members would be needed to find all information as to reconciliation payments, and then experts would have to apply the information to perform a recalculation in individualized proceedings. *See* Ex. 1 (Smith Rpt.) ¶¶ 106-107; Ex. 24 (Hughes Rpt.) ¶ 167. Moreover, oral testimony may be needed from TPP members where reconciliation information is not produced by the Relevant PBMs and TPP class members. For example, Steamfitters testified that it has received reconciliation payments (*see* Ex. 23, at 249:18-20), yet Walgreens has been unable to locate any evidence of reconciliation payments in the documents produced in the case.[29] All of this further adds to the individualized issues that predominate over any common issues.

---

[29] Although Steamfitters testified that "[r]econciliation is on brand name drugs only" (Ex. 23, at 249:5-10), the contract provides otherwise. *See* Ex. 46, at 64 (LOCAL439_0001877); Ex. 23, at 249:11-17.

In addition, the amount of TPP damages may be affected by stop-loss insurance, which protects a TPP against high prescription-drug costs. *See* Ex. 1 (Smith Rpt.) ¶ 107; Ex. 24 (Hughes Rpt.) ¶ 152. To determine its effect on damages, individualized discovery (including, potentially, oral testimony) would need to be taken from each TPP class member and their stop-loss carrier as to whether the TPP had stop-loss insurance, when it received any payments from the carrier, and what the payments were for. *See* Ex. 1 (Smith Rpt.) ¶ 107; Ex. 24 (Hughes Rpt.) ¶ 155.[30]

Moreover, because consumers and TPPs are vying for the same pot of money, and because Hilton's damages formula for the TPP Overpayment is the Total Overpayment minus the Consumer Overpayment, a TPP will have to be involved in ***every*** consumer's individualized damages hearing to protect its right to claim what the TPP believes is its share of any alleged overpayment. This additional complexity and logistical challenge highlights how Plaintiffs' failure to include a trial plan means they have not proven the Rule 23 requirements.

As the above shows, Hilton is wrong that Plaintiffs can calculate damages with a formulaic methodology. Determining damages for each class member would require discovery from multiple non-party sources, including millions of potential class members, as well as extensive analysis and expert testimony at individual damages hearings. As a result, class certification is inappropriate.

## C.     Typicality And Adequacy[31]

"To certify a class, the Court must determine that 'the claims or defenses of the

---

[30] Similarly, one would need additional discovery in the event the consumer obtains prescription drug coverage through a health plan that subcontracts with another insurer because, in that case, the damages may have to be split between two TPP class members—the health insurer and the health plan. *See* Ex. 24 (Hughes Rpt.) ¶ 142; Ex. 1 (Smith Rpt.) ¶¶ 20-21. To create such a methodology, one would need discovery as to the plan documents and relevant contracts between the health plan and the insurer and the insurer and the PBM. *See* Ex. 1 (Smith Rpt.) ¶¶ 20-21; Ex. 24 (Hughes Rpt.) ¶ 144.

[31] Attached as Appendix B is a chart summarizing, for each Count in the Complaint, which Plaintiffs are proposed as class representatives and whether they have standing and why they are not typical or adequate. Attached as Appendix C is a chart summarizing, for each state in which an unjust enrichment class is being sought, why the proposed class representatives are not typical or adequate.

representative parties are typical of the claims or defenses of the class' and that 'the representative parties will fairly and adequately protect the interests of the class.'" Fed R. Civ. P. 23(a)(3), (a)(4). "In many cases . . . these two requirements merge." *CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721, 724 (7th Cir. 2011) (citations omitted); *Quality Mgmt. & Consulting Servs. v. SAR Orland Food Inc.*, No. 11 C 06791, 2013 U.S. Dist. LEXIS 155727, at * 14 (N.D. Ill. Oct. 30, 2013) (J. Chang). Typicality exists where the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (citation omitted). "If proof of [plaintiff's] claims would not necessarily prove all of the proposed class members' claims," typicality fails. *Block v. Abbott Labs.*, No. 99 C 7457, 2002 U.S. Dist. LEXIS 5453, at *9 (N.D. Ill. Mar. 28, 2002) (quoting *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 586 (N.D. Ill. 2000)). "To determine if the plaintiff has met the adequacy requirement of Rule 23(a)(4), three factors must be present: 1) the proposed representative does not have antagonistic or conflicting claims with other members of the class; 2) the proposed representative has sufficient interest in the outcome of the case to ensure vigorous advocacy; and 3) its counsel is competent, qualified, experienced and able to vigorously conduct the litigation." *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 299 (N.D. Ill. 2005) (citation omitted). For the reasons set forth below, Plaintiffs have failed to prove typicality and adequacy.

### 1. The Named Plaintiffs are not typical because their claims relate only to the contracts that apply to their specific PBM

Each Pharmacy-PBM Contract is unique. Proof that one Pharmacy-PBM Contract required Walgreens to report its PSC prices as its U&C price would not prove that another Pharmacy-PBM Contract between Walgreens and a different Relevant PBM, or between Walgreens and the same PBM but covering a different time period, required Walgreens to report its PSC prices as its U&C

price. Thus, no Named Plaintiff's claims are typical of the entire proposed class. Moreover, even if *one* Named Plaintiff could represent putative class members whose benefits were administered by *different* PBMs, there are no Named Plaintiffs whose PBM was MedImpact (*see* Dkt. 556-55 (Hilton Rpt.), Exs. 4A-4D), and, therefore, no class can include either consumers or TPPs with MedImpact as their PBM.

### 2. Fund Plaintiffs' claims are not typical of consumer claims and vice versa; Fund Plaintiffs' claims are not typical of all TPPs; and Fund Plaintiffs and consumers are antagonistic to each other

In *Corcoran*, consumers brought a U&C class action against CVS, eventually resulting in a jury verdict in CVS's favor. In *Sheet Metal*, TPPs brought a class action against CVS. But here, Plaintiffs are seeking to have *one consolidated class* of all consumers and TPPs. The Individual Plaintiffs, however, cannot represent TPPs and the Fund Plaintiffs cannot represent consumers, as their claims are not typical of each other and their interests are antagonistic.

As an initial matter, the consumers' claims and TPPs' claims are governed by different contracts. Whereas a Pharmacy-PBM Contract may require payment based on lesser-of logic that includes U&C, a PBM-TPP Contract may not. And as stated above, the Pharmacy-PBM Contracts may define U&C differently than the PBM-TPP Contracts. Thus, success of either the consumer claim or the TPP claim does not mean success for the other, *even on the same transaction*.

In addition, consumers and TPPs have conflicting interests. Plaintiffs' damages expert put forth the following methodology for assessing whether a TPP has damage:

### TPP Overpayment = Total Overpayment – Consumer Overpayment

Dkt. 556-55 (Hilton Rpt.) ¶ 26. Because the TPP and consumer are each sharing a portion of the Total Overpayment, "[t]he greater the consumer's share of that overpayment, the lower the TPP's share of that overpayment," and vice versa. Ex. 48, at 307:23-308:1. Hilton even admitted that if she changed her methodology it could "[p]otentially" "affect the division [of the alleged

overpayment] between the consumer and the TPP." *Id.* at 313:6-10. This is the very definition of antagonism between class members, which defeats class certification. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 626 (1997) (affirming denial of class certification where two groups with different and conflicting interests were contained within the same putative class); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993) (internal citations omitted) ("[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims."). Thus, the Individual Plaintiffs cannot represent TPP class members, and the Fund Plaintiffs cannot represent consumer class members.[32, 33]

### 3. The Fund Plaintiffs are not typical of class members in states outside their home jurisdictions

Fund Plaintiffs IBEW, IUOE, and Steamfitters are not typical of all potential TPP class members because they seek to assert claims beyond their home states by asserting claims in states where (i) the Fund Plaintiff's beneficiaries purchased generic drugs from Walgreens, and (ii) with regard to those transactions, the Fund Plaintiff paid its PBM more than the PSC price. Illinois choice-of-law principles support applying the law of the Fund Plaintiff's home state, not the law of the state in which the beneficiary purchased the drug. *See Siegel*, 256 F.R.D. at 585; footnote 8, above. Plaintiffs request making IBEW a class representative over claims in California, Florida, and North Carolina. Mem., at 2 n.2. But IBEW is located in Ohio (*see* Dkt. 477 (Compl.) ¶ 26) and cannot be a class representative over claims based on the laws of other states. The same is true of IUOE, located in New York (*see* Dkt. 477 (Compl.) ¶ 30), which Plaintiffs seek to be a class

---

[32] The Fund Plaintiffs are also inadequate class representatives. Because the Fund Plaintiffs contracted directly with PBMs, they have no incentive to determine a proper division between a health plan and health insurer when both types of TPPs are on a single transaction. *See* Ex. 24 (Hughes Rpt.) ¶ 144.

[33] To the extent the Court certifies any class, there certainly cannot be a consumer class where there is no Individual Plaintiff who can serve as a class representative for a particular Count, and there cannot be a TPP class where there is no Fund Plaintiff that can serve as a class representative for a particular Count.

representative over claims based on the laws of Connecticut, Delaware, Florida, Massachusetts, and Pennsylvania. Mem., at 2 n.2. Similarly, Steamfitters, located in Illinois (*see* Dkt. 477 (Compl.) ¶ 34), cannot be a class representative over claims based on the law of Arizona or Florida. *See* Mem., at 2 n.2.

### 4. The fact that each Named Plaintiff continued to purchase prescription drugs from Walgreens even after first meeting with counsel presents unique defenses that makes them not typical or adequate

"The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *CE Design*, 637 F.3d at 726 (internal quotation marks and citation omitted); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011) (affirming denial of class certification where the named plaintiffs' claims were "significantly weaker than those of some (perhaps many) other class members"); *Med. Mut. of Ohio v. AbbVie Inc. (In re Testosterone Replacement Therapy Prods. Liab. Litig.)*, MDL No. 2545, 2018 U.S. Dist. LEXIS 125041, at *333-36 (N.D. Ill. July 26, 2018). Here, each of the Named Plaintiffs is not typical of the proposed class or adequate because they continued to purchase, or allowed their beneficiaries to purchase, prescription drugs from Walgreens *after* meeting with counsel and learning that Walgreens did not submit its PSC prices as its U&C prices, which creates unique defenses as to these Named Plaintiffs.

According to Plaintiffs, they first met with counsel on: Russo – December 14, 2016; IBEW – December 21, 2016; Gonzales – February 24, 2017; Bullard – May 10, 2017; IUOE – September 2017; and Steamfitters – November 7, 2017. *See* Ex. 49, at 3-4. Each Individual Plaintiff continued purchasing at Walgreens after these dates *even though they did not have to*. *See* Ex. 1 (Smith Report) ¶ 124 & Table 38 (showing that each continued to purchase after meeting with counsel); Ex. 16, at 103:11-105:2; 112:15-113:2 (Russo admitted she could have used her PBM's mail order

service for all of her prescriptions instead of continuing to purchase at Walgreens); Ex. 50, at 122:20-125:16 (Gonzales admitted that he moved prescriptions from Walgreens to two different pharmacies in New Mexico, confirming he did not have to purchase from Walgreens in New Mexico, and admitting that, when he was later in Wisconsin, he could have purchased at a CVS but instead continued to shop at Walgreens); Ex. 51, at 156:13-164:8, 168:20-169:9 (Bullard admitted that she continued to shop at Walgreens despite there being other pharmacies near her home, including one closer than Walgreens, that could have filled her prescriptions).

Similarly, the Fund Plaintiffs took no action to prevent their beneficiaries from purchasing drugs at Walgreens. For example, from January 1, 2008 to December 31, 2015, IBEW excluded

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. *See* Ex. 52; Ex. 53 ¶¶ 5-6; Ex. 21, at 154:19-155:9-23. ███████████████████████████████████████████████

████. IUOE's representative testified the Fund did not even tell its members that it believed Walgreens was overcharging them. *See* Ex. 22, at 254:5-23. And, remarkably, Steamfitters not only allowed Walgreens to remain in its pharmacy network, but ***after*** filing this case, Steamfitters made Walgreens the ***exclusive*** 90-day retail option for its members and ***encouraged*** its members to fill their first two 30-day prescriptions (before they went to 90-day) at Walgreens. *See* Ex. 23, at 181:17-199:16; Ex. 54; Ex. 55 ¶¶ 7-8.

Plaintiffs' actions in continuing to purchase, or continuing to let their members purchase, prescription drugs at Walgreens after learning of Walgreens' alleged fraud raises a failure to mitigate defense, as well as a voluntary payment defense, for both the consumer fraud and unjust enrichment claims.[34] These defenses make Plaintiffs inadequate class representatives. *Leshin v. St.*

---

[34] 66 Am. Jur. 2d *Restitution and Implied Contracts* § 92 (West 2016) ("A person cannot use the courts to recover money voluntarily or consensually paid with full knowledge of all the facts and without fraud,

*Charles Pontiac*, No. 96 C 5326, 1997 U.S. Dist. LEXIS 14379, at *10 (N.D. Ill. Sept. 17, 1997) (plaintiff not "typical" because of her failure to mitigate damages defense); *Hyderi v. Washington Mut. Bank*, 235 F.R.D. 390, 401-02 (N.D. Ill. 2006) (finding class certification inappropriate where "numerous plaintiff-specific individualized hearings will be needed to resolve the class members' claims," including that the named plaintiffs "waited for months to replace the force-placed insurance after they were notified of it" and, thus, were subject to a failure to mitigate damages defense); *Monaco v. Bear Stearns Cos.*, CV 09-05438 SJO (JCx), 2012 U.S. Dist. LEXIS 189628, at *26-27 (C.D. Cal Dec. 10, 2012) (denying certification when there were individualized affirmative defenses, including voluntary payment).

In addition, for consumer fraud statutes that require reliance (*see* Appendix A), and even those that require causation, it will be difficult for Plaintiffs to show that they relied on any alleged misrepresentations, that any alleged misrepresentations were material, or that any alleged misrepresentations caused their injury. Indeed, case law in some states supports that the continued purchase after learning the facts defeats a plaintiff's claim for consumer fraud.[35] And Plaintiffs will have a difficult time showing unjust enrichment when they purchased, or allowed their beneficiaries to purchase, knowing Walgreens' U&C reporting practice. *See Randall*, 637 F.3d at

---

duress, or extortion in some form.").

[35] *See, e.g.*, *Red v. Kraft Foods, Inc.*, No 10-1028-GW, 2011 U.S. Dist. LEXIS 116965, at *33 (C.D. Cal. Sept. 29, 2011) (noting that named plaintiffs' continued purchase of the product at issue would "have almost certainly destroyed the ability of the class to ever establish reliance and/or materiality of the alleged misrepresentations."); *Teamsters Local 237 v. Astrazeneca Pharmaceuticals LP*, 136 A.3d 688, 695-96 (Del. 2016) (citation omitted) ("[W]e rely on the common sense notion that TPPs who claim that false advertising injured them, but continue to cover the allegedly falsely advertised drug on their formularies and reimburse members for prescriptions cannot, as a matter of law, establish that they were injured by reason of or were victims of the false advertising."); *Kremers v. Coca-Cola*, 712 F. Supp. 2d 759, 769 (S.D. Ill. 2010) (because Plaintiff could not prove he was actually deceived by Defendant's alleged misrepresentation, Plaintiff could not show proximate causation); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D.N.Y. 2007) (under the Florida and New York consumer fraud statutes, plaintiffs who continued to pay for a drug knowing it has limitations are not "actually injured or aggrieved").

824 (holding that "named plaintiffs who are subject to a defense that would not defeat unnamed class members are not adequate class representatives") (citing *CE Design*, 637 F.3d at 725-28). Given the above, Plaintiffs are inadequate class representatives.

### 5. IBEW is also subject to unique defenses because it knew it was not receiving the PSC prices as early as 2008

As shown above, IBEW met with counsel on December 21, 2016, yet continued to allow its members to purchase at Walgreens. The evidence further shows that IBEW knew as early as 2008 that the pharmacy and PBM industry considered U&C to be synonymous with "retail price" and that the industry never considered discount program prices, such as PSC prices, to be the U&C price. This too makes IBEW an inadequate class representative subject to a unique defense.

From 2007-2014, Sav-Rx was IBEW's PBM. *See* Ex. 21, at 72:14-16. Sav-Rx created a Sav-Rx Advantage Discount Card Program for, among others, members of union funds. *See id.* at 174:8-175:1; Ex. 56; Ex. 9, at 177:20-180:22, 362:4-364:5; Exs. 57, 58, 59. As early as 2008, IBEW provided the discount card to members not eligible under IBEW's prescription-drug plan. *See* Ex. 21, at 174:8-176:22. This free program required the beneficiary to pay 100% of the drug cost. *See* Ex. 9, at 177:20-178:6; Ex. 56. IBEW's beneficiaries who used the discount card had their claim adjudicated by Sav-Rx, which told the pharmacy to charge the beneficiary the program price negotiated between Sav-Rx and the pharmacy. *See* Ex. 9, at 177:20-178:6. Around February 2010, IBEW and Sav-Rx discussed "how to reach those who have lost the IBEW coverage." *See id.* at 176:21-180:22; Ex. 60. Sav-Rx made it clear to IBEW that Sav-Rx believed that the U&C price is the "retail price" and that the discount card price is ***not*** the U&C price. In a summary created by Sav-Rx and provided to IBEW for an early 2010 newsletter (Ex. 56; Ex. 60; Ex. 21, at 174:8-176:22; Ex. 9, at 178:16-180:9), Sav-Rx summarized the program as follows:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████

Ex. 56 (emphasis added). So, as early as 2008, and no later than early 2010, IBEW knew that Sav-Rx considered U&C prices to be retail prices and did not expect pharmacies to report discount-card prices as U&C prices. *See* Ex. 9, at 181:2-186:20. Further, Sav-Rx never guaranteed IBEW, and IBEW did not ask for a guarantee, that IBEW and its beneficiaries would not be charged more than the program prices. *See id.* at 365:8-366:15.

As a result of the above, IBEW is subject to the unique defenses of voluntary payment, failure to mitigate damages, lack of reliance (in those states that require reliance), lack of causation, and an inability to show unjust enrichment. And those unique defenses, which would not apply to all class members, render IBEW an inadequate class representative. *See CE Design*, 637 F.3d at 726; *Randall*, 637 F.3d at 824. Without IBEW, there are no class representatives for California, North Carolina, Ohio, and no TPP class representative for Arizona. *See* Mem., at 3 n.2.

### 6.    Russo has not made any purchases at Walgreens for more than the PSC price where one of the Relevant PBMs provided her benefits

Plaintiffs' damages expert, Hilton, testified that she has enough data to determine all alleged overpayments for the Individual Plaintiffs through 2019. *See* Ex. 48, 317:16-318:10. But she identified only two allegedly affected purchases by Russo. *See* Ex. 17; Ex. 18, at 11-12; Ex. 19. The first is an April 21, 2010 purchase where, contrary to Hilton's claim that the PBM on the claim was ███████ (Ex. Dkt. 556-55 (Hilton Rpt.), at Ex. 3A), which did not even exist in 2010, the PBM that actually administered Russo's benefits was ██████. *See* Ex. 1 (Smith Rpt.) ¶ 122 & Table 36. Because Argus is not one of the Relevant PBMs, that transaction cannot be included in assessing whether Russo is an adequate class representative. The second is an April 27, 2011 transaction in which Russo paid ████████████████ whose PSC price, according to Hilton, was

██. *See* Ex. 19. But, as Nordby testifies, consistent with the Seventh Circuit's opinion in *Garbe*, some portion of the PSC membership fee must be allocated when determining the PSC price.[36] *See* Ex. 61 (Nordby Rpt.) ¶¶ 10-12, 37-40. For 2011, that amount is ██ (*see* Ex. 1 (Smith Rpt.) ¶¶ 38, 39 & Tables 5 and 35), making the actual PSC price for this purchase ██, meaning Russo has ***no damages***. Further, Russo testified in 2019 that she no longer purchases prescriptions at Walgreens. *See* Ex. 16, at 117:4-118:21.

Having failed to prove a qualifying transaction, Russo is not typical of the proposed class. *See In re Dairy Farmers of Am.,* 2013 U.S. Dist. LEXIS 119962, at *27-28 (to represent a class, "the plaintiff must be part of the class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents."). Because Russo is the only Individual Plaintiff asserting a claim under the Florida Deceptive and Unfair Trade Practices Act, if she cannot be a class representative, there can be no consumer class (as opposed to a TPP class) as to that law. *See Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 735 (N.D. Ill. 2015) (dismissing class complaint for claims under state laws if the named plaintiff has not suffered any injury).

7. **Because he is subject to a class exclusion and has no qualifying purchase in Arizona or Wisconsin, Gonzales is not typical of the class**

a. **Because Gonzales is a beneficiary of a government-funded entity, he is excluded from the class**

One of the class exclusions in the proposed class definition is "all government-funded entities, and their beneficiaries." Mem., at 3, n. 1 Gonzales supposedly paid more than the PSC price for eight transactions through 2019. *See* Ex. 17; Ex. 18, at 11-12; Ex. 19. The first, on February 26, 2015, involved ██, a PBM that is not one of the Relevant PBMs. *See* Ex. 1 (Smith Rpt.) ¶¶ 112-113 & Table 36; Ex. 62 ¶¶ 4, 12; Ex. 63. The remaining seven transactions

---

[36] *See Garbe*, 824 F.3d at 643-44 ("[T]he [annual membership] fee would need to be allocated in some sensible way.").

occurred in 2016-2017 (Ex. 19), when Gonzales received his prescription drug benefits from the New Mexico Public Schools Insurance Authority, a legislatively created body that receives government funds to provide insurance to, among others, public school employees. *See* Ex. 64 ¶¶ 3-4; N.M.S.S. 22-29-1 et seq. (specifically §§ 2-4, 6); Ex. 1 (Smith Rpt.) ¶¶ 58, 115 & Tables 10 and 36. Thus, when he made these seven transactions, Gonzales was a beneficiary of a government-funded entity. Because all of the transactions Hilton identified are not eligible for class treatment, and because Gonzales testified in February 2019 that he does not anticipate purchasing at Walgreens in the future (*see* Ex. 50, at 73:10-75:20; 141:5-146:23), Gonzales is excluded from the class under Plaintiffs' proposed definition and is not eligible to act as a class representative. *See Foster v. Ctr. Twp. of La Porte Cty.*, 798 F.2d 237, 244 (7th Cir. 1986) ("It is, of course, axiomatic that the named representative of a class must be a member of that class"). Because no other Individual Plaintiff can act as an Arizona class representative there can be no consumer fraud class or unfairness subclass (as opposed to a TPP class) under Arizona law, and there can be no class involving Wisconsin law (Gonzales is the only proposed Wisconsin class representative).

**b.      Because Gonzales did not purchase a drug in Arizona, he cannot represent an Arizona Consumer Fraud Act class**

Further, Gonzales cannot be the class representative for Plaintiffs' Arizona Consumer Fraud Act ("ACFA") claim because he did not purchase any drugs in Arizona. Although six of his eight alleged overpayments allegedly occurred in Chandler, Arizona (Ex. 19; Ex. 1 (Smith Rpt.) ¶ 115 & Table 36), Gonzales testified that he never purchased a drug there. *See* Ex. 50, at 115:13-118:2. After his deposition, Gonzales produced documents revealing that these were six mail-order purchases that the Chandler, Arizona, fulfillment center (not a retail pharmacy) shipped to Gonzales's home in New Mexico. *See* Ex. 65; Ex. 6 ¶ 9. Because Gonzales purchased the drugs in New Mexico and received the drugs in New Mexico, under Illinois choice-of-law principles, New

Mexico—not Arizona—has the most significant relationship to these transactions, meaning the ACFA does not apply. *See In re Sears,* 2006 U.S. Dist. LEXIS 92169, at *2-3; *Siegel*, 256 F.R.D. at 585. As a result, Gonzales is not typical of other potential ACFA class members and cannot represent the ACFA class. As no other Individual Plaintiff can act as an Arizona class representative, there can be no consumer class or unfairness subclass (as opposed to a TPP Class) involving the ACFA.

### c. Gonzales did not purchase a drug in Wisconsin using a Relevant PBM for which he paid more than the PSC price

Gonzales also cannot be the class representative under Wisconsin law. The two remaining transactions for which Gonzales supposedly paid more than the PSC price occurred in Wisconsin. *See* Ex. 19; Ex. 1 (Smith Rpt.) ¶ 112 & Table 36. The first, a 2015 transaction, involved Navitus, which is not one of the Relevant PBMs. *See* Ex. 62 ¶¶ 4, 12; Ex. 63; Ex. 16 (Smith Rpt.) ¶¶ 58, 112 & Tables 10 and 36. The second is an October 13, 2016 transaction for which Gonzales paid ███ for a drug with a PSC price of ███, for an alleged ███ damage. *See* Ex. 19; Ex. 1 (Smith Rpt.) Table 36. As discussed previously, however, ███ of the PSC membership fee must be allocated to each purchase, making the actual PSC price ███, meaning Gonzales has ***no damages*** for a Wisconsin transaction. *See* Ex. 61 (Nordby Rpt.) ¶ 42; Ex. 1 (Smith Rpt.) ¶¶ 38-39 & Tables 5 and 36. Moreover, Gonzales now lives in New Mexico, and Plaintiffs have shown no reason to believe he made additional purchases in Wisconsin after 2019.[37] *See* Dkt. 477 (Compl.) ¶ 20.

Because Gonzales has no damages for Wisconsin purchases for any transactions with the Relevant PBMs, his claim is not typical of other potential Wisconsin class members. And because he is the only Named Plaintiff put forth by Plaintiffs to be a Wisconsin class representative (Mem.,

---

[37] Even if Gonzales had purchased at a Walgreens in Wisconsin after 2019, as discussed in Section IV(C)(4) below, he could not show damages given that he knew of Walgreens' practices by then.

at 3 n.2), a class cannot be certified involving the Wisconsin Deceptive Trade Practices Act.

### 8. Bullard had no damages in Massachusetts before filing this action

Plaintiffs' expert has identified only one allegedly affected transaction for Bullard in Massachusetts. *See* Ex. 17; Ex. 18, at 11-12; Ex. 19; Ex. 1 (Smith Rpt.) Table 36. But that transaction occurred in 2019, well after Bullard met with her attorney on May 10, 2017 (Ex. 49, at 3-4), and even after Plaintiffs filed the Second Amended Complaint on May 1, 2018. As Bullard is subject to the voluntary payment doctrine and failure-to-mitigate damages defenses, among others, she is not typical of other potential Massachusetts class members. Because there is no Individual Plaintiff who can act as a Massachusetts class representative, there can be no consumer class or subclass (as opposed to a TPP class or subclass) involving the Massachusetts Consumer Protection Law or unjust enrichment law under Massachusetts law.

### D. Plaintiffs' Proposed Class Is Not Ascertainable

The Seventh Circuit has "long recognized an implicit requirement under Rule 23" that a class must be ascertainable, meaning "the class must be defined clearly and that membership be defined by objective criteria." *Mullins*, 795 F.3d at 657. The question that must be answered is whether, under the class definition the Plaintiffs propose, "it would be difficult to identify particular members of the class." *Id.* at 659. Here, the class and subclass definitions the Plaintiffs propose are unclear.

First, in the class definition, it's unclear what "paid *or reimbursed*" means, and Hilton did not even consider the term "or reimbursed" in coming up with her damage methodology. *See* Ex. 48, at 77:2-4. Second, the term "the amount paid or reimbursed was inflated because the [PSC] price was not reported *or otherwise included*" makes no sense. According to Plaintiffs' theory, there can only be damage if a consumer or TPP paid more than they would have because the PSC price was not reported. The term "or otherwise included" adds nothing as far as Walgreens can tell

and, if it does, it is incapable of ascertainment. Third, PBMs do not provide insurance benefits, so the first part of the class definition makes no sense. Further, in a situation where a health plan contracts with a health insurer who then contracts with a PBM, the health plan did not have anything provided by the PBM. It is unclear if Plaintiffs intend to include such TPPs in their class definition, as previously discussed above. Moreover, the references to "all government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries" and "all government-funded entities, and their beneficiaries" are vague. Do public schools qualify as "government entities"? What about public hospitals? What about health plans that are partly or wholly government funded, such as Medicare Advantage?[38] What about government-subsidized coverage provided through Affordable Care Act exchanges?[39] What about student health insurance plans public colleges and universities provide to students? And what about high-risk insurance pools subsidized by states?[40] These terms of exclusion do not make it clear who Plaintiffs are suggesting be excluded, thus failing the ascertainablity class certification requirement. *See* Ex. 1 (Smith Rpt.) ¶¶ 25-27, 58 & Table 10.

### E. Plaintiffs Cannot Meet The Required Standard Under Rule 23(b)(2) For Certification Of A Declaratory And Injunctive Class

In addition to seeking certification of a Rule 23(b)(3) damages class, all Plaintiffs except Gonzales (who was dismissed from the Declaratory and Injunctive Relief Count (*see* Dkt. 91, at

---

[38] Because Medicare Advantage plans are funded by the government, one would think they are not included in the proposed class. But that leaves the question of whether Medicare Advantage plan beneficiaries are included, as one part of the definition would suggest they are ("Medicare Part D beneficiaries") but another part of the definition would suggest they are not ("All government-funded entities, and their beneficiaries").

[39] *See, e.g.*, The Marketplace in Your State, HealtCare.gov, https://www.healthcare.gov/marketplace-in-your-state/.

[40] High-risk pools were offered in the early part of the class period, before the Affordable Care Act eliminated them. *See* K. Pollitz, The Henry J. Kaiser Family Foundation, *Issue Brief: High-Risk Pools for Uninsurable Individuals* (Feb. 2017), http://files.kff.org/attachment/Issue-Brief-High-Risk-Pools-For-Uninsurable-Individuals.

35)) seek certification over a Rule 23(b)(2) declaratory and injunctive class. Plaintiffs, however, have not proven, and cannot prove, an entitlement to certification of a (b)(2) class.

### 1.    Because the putative classes primarily seek damages, Supreme Court precedent does not authorize certification under Rule 23(b)(2)

The Supreme Court has held that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Dukes*, 564 U.S. at 360-61 (2011). Indeed, claims for monetary relief may not be certified under Rule 23(b)(2) where "the monetary relief is not incidental to the injunctive or declaratory relief." *Id*. at 360. Courts in this district have followed *Dukes*, as they are required to do. *See, e.g.*, *Van v. Ford Motor Co.*, 332 F.R.D. 249, 291 (N.D. Ill. 2019); *Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 735 (N.D. Ill. 2012). Because the monetary relief Plaintiffs seek is not "incidental" to the injunctive relief sought, certification cannot be had under Rule 23(b)(2).

### 2.    The Named Plaintiffs lack standing to seek certification over a declaratory or injunctive relief claim

In ruling on Walgreens' Motion to Dismiss, this Court noted that, "[t]o establish standing to seek injunctive relief, Plaintiffs must plead a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" Dkt. 91, at 32 (quoting *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017)). "Past exposure to illegal conduct," it noted, "that is 'unaccompanied by continuing, present adverse effect' does not establish a present case or controversy." Dkt. 91, at 32 (quoting *Simic*, 851 F.3d at 738). The Court then dismissed Gonzales from the declaratory/injunctive Count because he is now aware of Walgreens' practices and is eligible to join PSC and obtain PSC prices. Dkt. 91, at 33, 35. At the time, however, Russo and Bullard were "ineligible for the PSC program due to their Medicare coverage." *Id*. at 33. As of early 2020, however, Medicare-covered individuals can join the PSC. *See* Ex. 6 ¶ 7. Thus, Russo and Bullard no longer have standing to assert a claim for declaratory/injunctive relief.

The Court also noted that the Individual Plaintiffs pled that, "to maintain continuity of their medical care, they must continue filling their prescriptions at Walgreens" (Dkt. 91, at 33 (citing Compl.)), and, therefore, had overcome the general rule that "consumer plaintiffs cannot seek injunctive relief once they are aware of a deceptive practice." *Id*. at 33-34 (citing various cases, including *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740-41 (7th Cir. 2014)). The Court stated that, "it is certainly plausible that Walgreens may be the only reasonably convenient pharmacy provider to the non-PSC eligible Consumer Plaintiffs." Discovery has shown, however, that Russo and Bullard do not have to continue purchasing at Walgreens to maintain continuity of care. In fact, Russo no longer purchases at Walgreens (Ex. 16, at 117:24-118:21), and, therefore, has no threat of future injury and no standing.[41] Bullard has a CVS, Stop & Shop, and Walmart near her in which she could, but chooses not to, fill her prescriptions. *See* Ex. 51, at 156:13-164:8.

The Fund Plaintiffs also lack standing to claim injunctive relief. IBEW, IUOE, and Steamfitters could remove Walgreens as a network pharmacy, but chose not to, with Steamfitters making Walgreens its ***exclusive*** 90-day option after filing the Complaint. *See* Section IV(C)(4).

Without a class representative with standing, Plaintiffs' request for Rule 12(b)(2) certification fails. *Lewis*, 518 U.S. at 357 (named plaintiffs must have standing to bring a class claim); *Simic*, 851 F.3d at 740 ("Simic's lack of standing to seek injunctive relief also means that she may not seek that relief on behalf of the putative class").

## V.    CONCLUSION

For these reasons, and those discussed in Walgreens' experts' reports, the Court should deny Plaintiffs' motion for class certification.

---

[41] Moreover, as of January 1, 2020, Walgreens no longer offers PSC in Massachusetts. *See* Ex. 6 ¶ 8. Thus, Russo not only could avoid purchasing at Walgreens, but also has no threat of future harm as Russo cannot be entitled to PSC pricing in a state where the program is not being run.

DATED: March 17, 2023

*s/ Michael S. Leib*
Michael Scott Leib
Anthony Robert Todd
**REED SMITH LLP**
10 S Wacker Dr # 4000
Chicago, IL 60606
Telephone: 312/207-1000
*mleib@reedsmith.com*
*atodd@reedsmith.com*

Frederick Robinson (*pro hac vice*)
Selina Coleman (*pro hac vice*)
Megan Engel (*pro hac vice*)
Jessica Christensen (*pro hac vice*)
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 East Tower
Washington, DC 20005
Telephone: 202-414-9200
*frobinson@reedsmith.com*
*scoleman@reedsmith.com*
*mengel@reedsmith.com*
*jchristensen@reedsmith.com*

***Attorneys for Defendant Walgreen Co.***

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically through the Court's Electronic Case Filing System, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

_s/ Michael S. Leib_
Michael Scott Leib