# EXHIBIT 61

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295c WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated,** | Civil No. 1:17-cv-02246 |
| **Plaintiffs,** | Judge Edmond E. Chang |
| **v.** | Magistrate Judge Sheila Finnegan |
| **WALGREEN CO.,** | |
| **Defendant.** | |

**REBUTTAL REPORT OF LYNETTE HILTON, PH.D.**

**Econ ONE Research, Inc.**

**June 19, 2023**

550 South Hope St., Suite 800

Los Angeles, CA 90071

# TABLE OF CONTENTS

I.    Introduction ..................................................................................... 1

II.   Claims Regarding Identification of Class Members .................... 2

   A. Identifying Whether U&C was a Basis for Payment .............................. 3

   B. TPP Identification .......................................................................... 4

   C. Relationship with PBM .................................................................... 6

   D. Identifying Government Entities ....................................................... 6

   E. Identifying Relevant PBMs ............................................................... 8

III.  Claims Regarding Flaws in My Methodology ........................... 10

   A. Copay v. Coinsurance .................................................................... 10

   B. Matching PBM Data to Walgreens' Data ........................................... 11

      1. Claims Matching is Overly Simplistic ........................................... 12

      2. Claims Matching Yields Non-Unique Transactions .......................... 13

      3. Claims Matching Yields Discrepancies in the TPP Identified ............. 14

   C. Claims Regarding PSC Price Selection ............................................. 16

      1. Mr. Smith Incorrectly Replicated My Methodology ......................... 16

      2. Accounting for Sales Tax ........................................................... 17

      3. Use of Walgreens Connecticut Reconciliation Data ........................ 18

      4. Claims Regarding Mr. Smith's Inability to Replicate PSC Prices ........ 21



**IV.  Claims Regarding Injury and the Calculation of Damages** ....... **22**

A. Re-Adjudicating Claims ................................................................. 23

B. Claims Regarding Retroactive Payments .......................................... 24

C. PSC Membership Fees .................................................................... 25

1. Walgreens Did Not Charge Membership Fees to all Members of the General Public Who Received PSC Prices ..................................... 25

2. Walgreens Did Not Include Membership Fees in Other Contexts ....... 26

3. Membership Fees Could be Determined Methodologically, But Mr. Smith's Method is Flawed .......................................................... 27

**V.  Plaintiff Overcharges** ................................................................. **28**

**VI.  Claims Regarding Unjust Enrichment** ...................................... **28**

CONFIDENTIAL – Subject to Protective Order

# I. Introduction

1.  I have been asked by Counsel for the Class in this matter to prepare this Rebuttal Report in response to the criticisms directed at my work in the reports of Defendants' experts, Jed Smith and James Hughes.[1]  I focus herein on what would appear to be the central elements of their criticisms. An updated summary of my training, past experience, and prior testimony is shown in Exhibit 1.

2.  In my Report, I concluded that:

> [O]verpayments made by proposed Class members can be calculated on a classwide, formulaic basis that will not require individualized inquiries regarding members of the Class.  I have developed methodologies that can identify and calculate overpayments paid by Plaintiffs and Class members, and can identify and calculate Walgreens' unjust enrichment as a result of its failing to report or otherwise include PSC prices when determining the U&C price to report for PSC Generics.  These methodologies can be applied to the Class once classwide data is

---

[1] Declaration of Michael S. Leib in Support of Defendant Walgreen Co.'s Opposition to Plaintiffs' Motion for Class Certification, ECF 588 (Mar. 17, 2023), Exs. 1 & 24; Amended Expert Report of Jed Smith, dated April 25, 2023 ("Smith Report"); Amended Expert Report of James W. Hughes, Ph.D., dated April 27, 2023 ("Hughes Report"); Deposition of Jed R. Smith, dated April 28, 2023 ("Smith Dep.") at 32:11-33:9 ("Q. In an April 25, 2023, email transmitting this amended expert report, Walgreens' counsel represented that it contained only those three changes. First, that in paragraphs 64 and 67 the number 85 was amended to 72. Second, that in Attachment 4, 72 transactions were listed instead of 85 transactions. And third, that in the table on page 73 references were added to documents Bates stamped Walg_Forth_00353523 to Walg_Forth_00353723. To your knowledge, is counsel's representation that the amended expert report contains only those three changes accurate? A. I believe those are the substantive changes. We also changed the date and titled it as amended. Q. So other than those three substantive changes, and changing the date and title on the first page, are you aware of any other changes that were made to your amended expert report? A. Those were the changes that we made to my amended expert report.").



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

> provided to me. In that regard, I have developed (and present
> below) illustrative calculations.[2]

3.  Defendants have submitted reports from Mr. Smith and Dr. Hughes in response to
    the opinions I offer in my report. The purpose of this report is to provide my
    response to their central criticisms. To the extent that this report does not address
    every one of their criticisms, it is not to suggest that I accept them. There was
    nothing in the challenges Mr. Smith or Dr. Hughes did offer which leads me to alter
    any of the opinions summarized above.

4.  A list of materials reviewed since my last report was filed is attached as Exhibit 2.

## II. Claims Regarding Identification of Class Members

5.  Both Mr. Smith and Dr. Hughes maintain that it is not possible to identify Class
    members based on "the data alone,"[3] arguing that Class member identification:

> would require review of information that is not in the data alone
> including documents for each potential class member including
> but not limited to contracts between each Third-Party Payer
> ("TPP") and PBM, TPP funding data, and TPP parent/subsidiary
> information.[4]

6.  For the reasons set forth below, I explain why I disagree and establish why the data is
    sufficient to identify class members and to calculate overpayments on a formulaic,
    classwide basis.

---

[2] Declaration of Joseph P. Guglielmo in Support of Plaintiffs' Motion for Class Certification, ECF 556 (Nov. 17, 2022) ("Guglielmo Decl."), Ex. 55 (Report of Lynette Hilton, Ph.D., dated November 16, 2022) ("Hilton Report"), ¶ 9.

[3] Smith Report, ¶¶ 10, 18 – 27; Hughes Report, ¶¶ 13 – 15.

[4] Smith Report, ¶ 10; Hughes Report, ¶ 147.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

### A. Identifying Whether U&C was a Basis for Payment

7.  In my report, I provided a methodology to determine whether the adjudicating pharmacy benefit manger ("PBM") used usual and customary ("U&C") prices in the adjudication process by reference to NCPDP code 522-FM in ███████████.[5]  One of the criticisms Mr. Smith makes is that my methodology mistakenly ████████ ██████████████████████████████████████  In support of his claim, Mr. Smith provides examples in Table 1 that he claims show transactions "████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████[6] ████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████.[7]  *See* Table 1.

---

[5] Hilton Report, ¶ 63.

[6] Smith Report, ¶ 19, Table 1.  Mr. Smith claimed that he determined the ████████████ ██████████████████████████████████████  *Id.*, ¶ 19 n.29.  This appears to be false as he also deducts ████████████.

[7] ████████████████████████████████████████████████████████



CONFIDENTIAL – Subject to Protective Order



8.      Mr. Smith further testified that the ▮▮▮▮▮▮▮▮▮▮▮ can be compared to the U&C price for a given transaction to determine whether, for that transaction, the U&C was used to determine the amounts paid by the consumer and third-party payer ("TPP").[8] This provides an alternative method for determining whether the adjudicating PBM used U&C prices in the adjudication process. Thus, it remains my opinion that the data is sufficient to identify where U&C pricing was the basis of Class members' transactions.

### B.      TPP Identification

9.      Mr. Smith claims that "the data does not show the specific TPP entity that paid in whole or in part for a transaction."[9] In particular, Mr. Smith argues that the determination of whether a plan is self-insured or fully insured "is necessary to determine which TPP is a member of the class."[10] As Dr. Hughes explains, "for self-insured plans, the amount that the health plan pays depends on the actual health care

---

[8] Smith Dep. at 133:18-25 ("Q.  If the amount paid by a health plan, plus the amount paid by a consumer, equals the usual and customary price, is that suggestive that the usual and customary price was the basis for determining the amount paid by the health plan?  A.  For that transaction, yes, that the usual and customary price was the basis of the price.").

[9] Smith Report, ¶ 20.

[10] *Id*, ¶ 20.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

costs incurred by their beneficiaries,"[11] whereas for fully insured plans, "the health plan pays a health insurer a certain amount per beneficiary and the insurer is then responsible for any payments to the PBM related to the beneficiaries' prescription costs."[12]

10.   This fundamentally misconstrues what my methodology accomplishes. My methodology is able to identify the entity that overpaid in connection with a given transaction, regardless of whether the entity is self-insured or fully insured. The TPP listed in the PBM data as paying for prescription drug purchases is the Class member, and to the extent that any other entity or entities were responsible for payments associated with a given claim, I understand that data would be in the PBM's possession to identify that or any other entity or entities.

11.   Mr. Smith also vastly overstates the number of potential TPP Class members. While Mr. Smith claims to have identified ████████████████████████████
████[13] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████[14]
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████.

---

[11] Hughes Report, ¶ 58.

[12] Id., ¶ 59.

[13] Smith Report, ¶ 21.

[14] Id. at 7, n.35 ("For the purposes of this analysis, I have identified a health plan as the unique combination ████████████████████████████████████████
████████████████████████████████████████.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

### C. Relationship with PBM

12. Mr. Smith argues that "the data does not show whether any potential Class members have relationships with PBMs."[15] Mr. Smith conceded that both Walgreens and the Relevant PBMs could provide information sufficient to identify their subsidiaries and affiliates.[16] It is my understanding that the Relevant PBMs will be asked to provide information regarding entities that have or had a parent or subsidiary relationship with the PBM for purposes of excluding such Class members consistent with the Class definition.[17] It would then be straightforward to remove these entities from the Class.

### D. Identifying Government Entities

13. I understand that Plaintiffs propose modifying the proposed Class exclusions to exclude:

    a.    all federal government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries;

    b.    all state government entities and their beneficiaries, except for state political subdivisions, such as, for example, cities, towns, municipalities, counties, and school districts, and their beneficiaries.

14. Mr. Smith claims that the Walgreens data cannot be used to identify government entities or government funded entities.[18] He argues that "[o]nly through additional research into each TPP, and potentially requiring information directly from the TPP

---

[15] *Id.*, ¶¶ 22 – 24.

[16] Smith Dep. at 138:13-139:18 ("Q. In your opinion, is the identity of Walgreens management, employees, subsidiaries, and affiliates knowable? A. I would expect that Walgreens could provide that information.… Q. Sitting here today, do you have any reason to believe that the relevant PBMs are less capable than Walgreens at identifying their subsidiaries or affiliates? A. No.").

[17] Mr. Smith testified that he expected that PBMs would be able to identify their subsidiaries and affiliates. *Id.* at 139:3-18.

[18] Smith Report, ¶¶ 25 – 27; 56 – 59.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

itself, could it be determined if the TPP received any government funding and should be excluded from the class."[19]  He then provides ████████████████████████ ████████████████████████████████████████████████████████████████ ████████████[20]

15.     Mr. Smith fails to take into account that according to Walgreens' testimony, ████████████████████████████████████████████████████ ██████████████████████████████████████████████[21] and ████████████████████████████████████████████████████ ████████████████████████████████████████[22]

16.     The ████████ also contains ████████████████████ which, according to the Dymon Declaration, ████████████████████████.[23]  I have now included this additional restriction in my code to ████████████████████ ████.[24]

17.     By accounting for the data in these fields, according to Walgreens' testimony, I am able to exclude, among others, plans that have ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████

[19] Id., ¶ 27.

[20] Id., ████████████████.

[21] Guglielmo Decl., Ex. 58 (Declaration of Christopher Dymon, dated November 9, 2022) ("Dymon Dec."), ¶ 18.h.

[22] Id., ¶ 18.h (emphasis added).

[23] Id., ¶¶ 18.h., 52.

[24] I restrict transactions to those where ████████████████████████████████████ ████████████████████████████████████████

Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

███████████████████████████████████████████████████
████████████████████████████████████[25]

18.    Moreover, and contrary to claims by Mr. Smith, this is information that PBMs maintain.  According to Walgreens, "████████████████████████████ ███████████████████████"[26] ████████████████████████ ██████████████████████████████[27] It is my understanding that this information will be requested from all of the Relevant PBMs and can be used to confirm the identity of Class members.

19.    Mr. Smith argues that Named Plaintiff ███████████████████████ █████████████████████████████████████████████████████ ████████████████████████████.[28]  As noted above, Plaintiffs have modified this exclusion and I can confirm that Plaintiff Gonzales' claims would be included within the Class, which is consistent with my methodology.

### E.    Identifying Relevant PBMs

20.    Mr. Smith claims that my methodology does not limit the claims to those adjudicated through a Relevant PBM.[29]  In particular he claims that █████████████████ ████████████████████████████████████████████████,[30] █████████████████████████████████████████████████████

---

[25] *Id.*, ¶ 18.h.

[26] *Id.*, n.11; *see also* Smith Dep. at 91:14-16 ("…I would expect the PBM to have better information on its specific client than the pharmacy.").

[27] CAST000081 (wherein the insurance_plan field contains the value "COMMERCIAL" for all transactions).

[28] Smith Report, ¶ 58, Table 10.

[29] *Id.*, ¶¶ 111 – 112.

[30] *Id.*, ¶ 112.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order



21.     Once the Relevant PBMs provide data, I will be able to confirm whether a transaction was adjudicated through a Relevant PBM as that information will be readily apparent.

22.     As an aside, Mr. Smith criticizes me for including a transaction associated with Plaintiff Gonzales[32] in Hilton_0000132 that he claims was not adjudicated by a Relevant PBM.  However, Hilton_0000132 was not filtered by Relevant PBM as the interrogatory did not request that transactions be filtered by Relevant PBM.[33]

---



[33] The following information was requested by Walgreens:  "For each Individual Plaintiff, identify each purchase of a generic drug made at Walgreens during the Relevant Time Period in which Plaintiffs contend Walgreens overcharged the Individual Plaintiff for that generic drug, including the date of purchase, the name of the drug, the amount paid by the Individual Plaintiff, the price Plaintiffs contend was the PSC Price for that drug on the date of purchase, and the amount the Individual Plaintiff believes it should have been charged for that generic drug purchase."  Defendant's Third Set of Interrogatories, dated June 12, 2020, at Interrogatory No. 9.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

## III. Claims Regarding Flaws in My Methodology

### A. Copay v. Coinsurance

23.     Dr. Hughes claims that "[b]ased on the Walgreens and PBM data produced in this
matter, it is not possible to determine the basis for the consumer's payment for every
transaction from the data alone."[34]  He further claims that, in his experience, PBM
data "do not always capture all the relevant components of the consumer's
payment."[35]  Mr. Hughes is incorrect about the availability of such data.  I have
reviewed PBM data produced in other cases that provide information regarding
whether a copay or coinsurance was paid and the amount of the copay or coinsurance
paid.  Additionally, declarations submitted by PBMs in *In Re: Niaspan Antitrust
Litigation* further confirm that such data are available.[36]  For example,

- Caremark testified that it maintains data that includes, among other things:

> the total amount paid by the Client's individual member
> (i.e., the applicable co-pay, and other aspects that are
> dependent on the Client's plan design) as well as the total
> amount paid by the Client for each prescription it
> adjudicates.  Generally, Client plan sponsors have their
> plan/group structure broken out by plan design, allowing
> the data to be sorted to exclude, for example, members
> who have a flat co-pay structure. … data fields available

---

[34] Hughes Report, ¶ 16; *see also* Smith Report, ¶¶ 74 – 75.

[35] Hughes Report, ¶ 118.

[36] *See* Declaration of Non-Party OptumRx submitted in *In re Niaspan Antitrust Litig.*, No. 2:13-md-2460 (E.D.
Pa.); Declaration of Non-Party Express Scripts, Inc. submitted in *In re Niaspan Antitrust Litig.*, No. 2:13-md-
2460 (E.D. Pa.); Declaration of Non-Party Caremark L.L.C. submitted in *In re Niaspan Antitrust Litig.*, No.
2:13-md-2460 (E.D. Pa.).



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

> to a Client would include among others: … [p]lan co-pay structure.[37]

- Express Scripts testified that "[its] data typically includes the total amount paid by the Client's individual member (i.e., the applicable co-pay, and other aspect [sic] that are dependent on the plan design elements) as well as the total amount paid by the Client for each prescription transaction."[38]

- OptumRx testified that "[its] claim database contains certain plan design details, including, but not limited to, information regarding copayment structure (i.e. flat co-payment or percentage coinsurance), to the extent applicable."[39]

24.     Thus, I believe that the Relevant PBMs maintain and can produce data sufficient to determine whether a consumer payment associated with a given transaction was a copay or coinsurance.  Further, I have developed a methodology that can determine whether a given TPP's beneficiaries' payments were associated with coinsurance.  I determine whether a PBM adjudicated claims for a given plan using coinsurance (rather than a copayment) if at least 90 percent of the transactions adjudicated by a specific PBM for a given plan have the same consumer share percentage (consumer payment as a percentage of the total consumer and plan payment).

### B.      Matching PBM Data to Walgreens' Data

25.     Mr. Smith claims that there are flaws in my method for matching transactions in the PBM data to transactions in the Walgreens data.  He argues that "[the matching]

---

[37] Declaration of Non-Party Caremark L.L.C. submitted in *In re Niaspan Antitrust Litig.*, No. 2:13-md-2460 (E.D. Pa.).

[38] Declaration of Non-Party Express Scripts, Inc. submitted in *In re Niaspan Antitrust Litig.*, No. 2:13-md-2460 (E.D. Pa.).

[39] Declaration of Non-Party OptumRx submitted in *In re Niaspan Antitrust Litig.*, No. 2:13-md-2460 (E.D. Pa.).



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

process is complicated and requires individualized review for each PBM source file due to variations in the data formats provided by PBMs."[40]  I disagree with Mr. Smith's assessments.

### 1.    Claims Matching is Overly Simplistic

26.    Mr. Smith first claims my method for matching the PBM transactions with transactions in the Walgreens data is "too simplistic and fails to take into account the differences" in the PBM data produced thus far.[41]  He then goes on to criticize me for not creating a "uniform" methodology for matching, but instead "employing a different method for each PBM."[42]  He argues that such differences make individualized analysis of each PBM dataset necessary.

27.    As Mr. Smith notes, each PBM produced data with a variety of fields that can be used to identify a unique claim.  However, Mr. Smith's claim that the PBMs did not provide all of the "necessary" fields to allow me to match the PBM transactions with the Walgreens' transactions is not correct.[43]  For each PBM, I was able to match over 90 percent of the PBM's transactions with the Walgreens' transactions based on the data provided.[44]  This covers a sufficiently large subset of the total experience so as to support the reliability of the fields used in the matching process.  Once complete data is produced by the Relevant PBMs, I will be able to use the same fields to match these data to the Walgreens data.  Furthermore, the data request can be drafted to include the additional variables ████████████████ that Mr. Smith claims are

---

[40] Smith Report, ¶ 43.

[41] *Id.*, ¶ 44.

[42] *Id.*, ¶ 47.

[43] *Id.*, ¶ 46.  Mr. Smith does not provide a list of fields that he believes are "necessary" for matching PBM transactions with Walgreens' transactions.

[44] I was able to match 92 percent of the transactions produced in ██████████████████████ ███████████████████████████████████████████████████████████████.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

necessary to obtain a match between the PBM data and the Walgreens data.  And as Mr. Smith concedes in his report, where ██████████ is a variable that is provided, it is a variable that I use to match claims.[45]

28.     Mr. Smith claims that the fact that PBM data fields may contain different names from each other precludes classwide analysis.[46]  I disagree.  In my work I often receive data from various sources that need to be compiled into one dataset for analysis.  The fact that each dataset may contain different names associated with certain data fields does not preclude classwide analysis using the compiled dataset.

29.     One advantage of my method is that it is flexible and can be amended as new data become available.

## 2.     Claims Matching Yields Non-Unique Transactions

30.     Second, Mr. Smith claims that my matching methodology will not establish a unique transaction.  In particular, he states that ████████████████████████████ ████████████████████████████████████ ██████████████████████████████ ████████████████████[47]█████████████████ ████████████████████████████████ ██████████████████████████████ ██████████████████████████████████.  As Mr. Smith conceded, this improves the reliability on my

---

[45] *Id.*, ¶ 19, Table 7.

[46] *Id.*, ¶ 43 ("[T]his process is complicated and requires individualized review for each PBM source file due to variations in the data formats provided by PBMs"); ¶ 44 ("this process is very complicated and required individualized review for each PBM source file.").  At deposition, Mr. Smith conceded that "I would expect different PBMs to have different data fields."  Smith Dep. at 66:25-67:2.

[47] Smith Report, ¶ 49.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

claims matching methodology.[48]  . Under my methodology, these transactions would then be dropped from the analysis.[49]  However, my matching methodology is sufficiently flexible that I can add additional matching variables such as ████████████████ .

### 3. Claims Matching Yields Discrepancies in the TPP Identified

31.  A third argument Mr. Smith makes is that my matching methodology yields discrepancies between the TPP identified in the PBM data and the TPP identified in the Walgreens data.[50]  Mr. Smith states that "additional investigation is necessary to confirm the accuracy of the data provided by the PBMs, specifically related to the TPP identified on the transaction" because the TPP name in the PBM data does not always match the TPP name in Walgreens' data.[51]

32.  According to Walgreens' testimony, ███████████████████████████ ████████████████████████ .

_____

[48] Smith Dep. at 64:7-19 ("████████████████████████████████████████████████████████████████████████████████████████████████████")

[49] Mr. Smith argues that there will be ████████████████████████████ (Smith Report, ¶¶ 48 – 49).  However, my matching methodology is flexible and can include additional variables in the matching criteria (e.g., ██████ ).

[50] Smith Report, ¶¶ 50 – 54.

[51] *Id*, ¶ 50.



CONFIDENTIAL – Subject to Protective Order

████████████████████████████████████████████[52]

33.     Mr. Smith presents examples in Tables 9 and 11 where the "████████████
███████████████████████████████████████████████████
█████████████" and he claims "██████████████████████
███████"[53]  However, the PBM data indicate these claims are related to the Fund
Plaintiffs, and as Walgreens' testimony acknowledges, "████████████████████
███████████████████████████████████████████████
█████."[54]  For example, with regard to ESI_0001549, Mr. Smith claims:  "Nothing in
the Walgreens Transaction Data associated with these fills contains any indication
that the transactions are related to IUOE Local 295."  However, Express Scripts, the
PBM that produced ESI_0001549, represented in producing the data that it contains
"transactional data for prescription drug purchases by beneficiaries of IUOE made at
Walgreens Pharmacies before April 2009."[55]

---

[52] Dymon Dec., ¶ 6.c.i.

[53] Smith Report, ¶ 52, Table 9; ¶ 59, Table 11.

[54] Dymon Dec., ¶ 6.c.i.  *See also* Smith Dep. at 91:14-16 ("…I would expect the PBM to have better information on its specific client than the pharmacy.").

[55] Smith Dep., Ex. 537; *see also Id.* at 74:19-75:2 ("Q.   When a PBM affirmatively represents that specific transactions are associated with a specific health plan, in your opinion, is it unreasonable to rely on the PBM's representation? A.   If that's the only data available and there is not contradicting information, then that would seem to be reasonable.").



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

### C.  Claims Regarding PSC Price Selection

#### 1.  Mr. Smith Incorrectly Replicated My Methodology

34.  Mr. Smith testified that he did not develop his own methodology to identify PSC prices,[56] and instead, claims only that he "applied [my] methodology."[57]  Even though Mr. Smith testified that it was his intention to replicate my methodology rather than creating his own, his attempts to replicate my methodology differ from my stated methodology in several ways.  For example,

a.  Mr. Smith applies different filters to identify PSC transactions.  I identified PSC transactions consistent with Walgreens' testimony as outlined in paragraph 32 in the Dymon Declaration.[58]  Smith does not apply this filter; but instead, applies several filters based on ██████████ ███████████████████████████████████, and other fields which I do not use and which ██████████████████████████████████.[59]

b.  Mr. Smith handles taxes differently than I do.  *See supra* § C(2).

---

[56] *Id.* at 183:7-9 ("Q.  You didn't create your own methodology for identifying PSC prices? A.  I did not."); 183:23-184:2 ("I was not asked to calculate a specific PSC price for any given transaction, so I analyzed Dr. Hilton's PSC prices…."); 187:2-4 ("I was not asked to undertake an effort to calculate my own independent determination of PSC prices for this report.").

[57] *Id.* at 182:25-183:17; 183:3-6 ("I applied Dr. Hilton's methodology and I adjusted it for the purposes of applying the PSC enrollment fee, but other than that that's the only methodology I applied."); 185:23-25 ("My review was to determine whether I would get the same PSC price if I applied the methodology that Dr. Hilton applied…."); 187:9-14 ("My analysis was whether Dr. Hilton implemented her own methodology consistently.  I have not put forth an opinion as to what my own independent determination of each PSC price would be, that would require significant more analysis and determination.").

[58] ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████  Dymon Dec., ¶ 32.  Mr. Smith testified that he did not consider these limitations when purportedly replicating my methodology.  Smith Dep. at 295:15-18 ███████████████████████████████████████████████████████████████.



[59] Smith Report, App'x A, ¶ 9.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

    c.    .

    d.    Mr. Smith does not use the same Connecticut Reconciliation data files that I used, and the files that he uses have far less robust pricing information. *See supra* § C(4).

    e.    Mr. Smith uses a different methodology for backfilling PSC prices for dates and quantities where there weren't any PSC transactions. *See supra* § C(3).

    f.    .

35.    Given Mr. Smith's failure to replicate my methodology, it is not surprising that he is unable to replicate my PSC prices.  I address Mr. Smith's criticisms below.

        **2.    Accounting for Sales Tax**

36.    Mr. Smith maintains that I do ""[60]  I believe that my methodology is reasonable. [61] .




CONFIDENTIAL – Subject to Protective Order



[62]

### 3. Use of Walgreens Connecticut Reconciliation Data

37. 

[63]

[64]

[65]

"[66]

---

[62] Smith Dep. at 231:18-232:6 ("

")

[63] Smith Report, ¶ 62.d – 62.e.

[64] *Id.*, ¶ 62.d.

[65] *Id.*, ¶ 62.d, Table 15.

[66] *Id.*, ¶ 62.d, Table 15, Table 16. To the extent this criticism has any merit, it can be addressed by limiting the use of the Connecticut Reconciliation Data to time periods when the ESI formulary data is unavailable.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order



38.  ███████████████████████████████████████████
█████████████████████████████████████████████
████████████████.67 █████████████████████████
███████████████████████████████████████████
████████████████████████.68 █████████████████
█████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████.69

39.  In Table 17, ███████████████████████████████████
███████████████████████████████████████████

---

67 *Id.*, ¶ 62.e.

68 Despite having produced the exact code that I use to determine PSC prices by reference to the Connecticut Reconciliation Data, Mr. Smith testified that he could not identify the applicable queries.  Smith Dep. at 314:11-18 ("Q.   Does Dr. Hilton identify -- strike that. In any of the queries that you've seen from Dr. -- that were produced from Dr. Hilton, does she identify her methodology for determining the PSC prices from the Connecticut data? A.   Not that -- not that I could determine from her.").

69 

████.  Hilton Report, Ex. 2.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

██████.[70]  In Table 17, Mr. Smith provides an example of ███████████████
████████████████████████████████████████████████████████
███████████████████.[71]  However, Mr. Smith's example is based on Connecticut Reconciliation data that I do not use.  An excerpt of the Connecticut Reconciliation data I would use to price this transaction is shown below in Table 3.[72]
████████████████████████████████████████████████████████
████████████████████████████████ (just as Mr. Smith shows in column B of his Table 17) and a ███████████████.

███████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

40.     Table 4 below shows how ████████████████████████████
███████████████████████. I ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████.

---

[70] Smith Report, ¶ 62.e, Table 17.

[71] Id.

[72] Walg_Forth_00353779 (a Connecticut Reconciliation data pscrate file).



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order



41.    I use the Connecticut Reconciliation data only if a given drug and quantity combination cannot be priced using the PSC transaction data or the ESI formulary data. As a result, less than 8 percent of the Consumer Plaintiff transactions and less than 2 percent of the Fund Plaintiff transactions have PSC prices calculated from the Connecticut Reconciliation data.

###### 4.    Claims Regarding Mr. Smith's Inability to Replicate PSC Prices

42.    Mr. Smith claims that the PSC prices I calculate are "████████████████ █████████████████████████████████████████████████████ █████████████████████████████"[73] Mr. Smith transmitted an Amended Report on April 25, 2023, three days before his deposition, in which he considered additional--*but not all*--of the Connecticut Reconciliation Data considered in my report, and amended his statement to say that ███████████████████ ████████████████████████████.[74]

43.    Upon further review I have identified minor coding errors in implementing my methodology that resulted in ██████████████████████████████████ ████████████████████████. The correction does not alter my methodology.

---

[73] Expert Report of Jed Smith, dated March 17, 2023, ¶ 64.

[74] Smith Report, ¶ 64, Attachment 4.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

44.    With respect to the remaining █████████████████████████████████ ████████████████, they result because Mr. Smith either misapplies or misunderstands my methodology.

45.    Lastly, Mr. Smith criticizes my current analysis as being inconsistent with the Plaintiff overpayments identified in the Fourth Amended Complaint.[75]  In Table 24, he presents ██████████████████████████████████████████████████████████ ████████████████████████████████████.  He claims that this discrepancy indicates PSC prices must be individually investigated and shows "selecting a PSC price from the available data is not a straightforward exercise" and that "[g]iven the complexity of determining a PSC price, individual review and expert testimony will be needed to assess every PSC price selected by Plaintiffs."[76]  I disagree.

46.    Mr. Smith ignores the fact that the Fourth Amended Complaint was filed on June 16, 2021, before Walgreens produced new data in August – September 2021.  He also ignores the fact that Walgreens' testimony as reflected in the Dymon Declaration, ████████████████████████████████████████████████████████████████ █████.[77]  Therefore, it is not surprising, and in no way discredits my methodology, that my current analysis differs from analysis provided based on different data productions and earlier versions of Walgreens' testimony ██████████████████ █████████████████.

## IV.    Claims Regarding Injury and the Calculation of Damages

47.    Both Mr. Smith and Dr. Hughes claim that the calculation of damages requires individualized analysis and cannot be done on a classwide basis.  Both Mr. Smith and Dr. Hughes argue that it is necessary to incorporate plan details into a damages calculation, such as knowing whether the consumer met their deductible, whether

---

[75] *Id.*, ¶¶ 70 – 71.

[76] *Id.*, ¶ 71.

[77] Dymon Dec.



CONFIDENTIAL – Subject to Protective Order

they paid a copayment, coinsurance, or some hybrid of the two, and whether they met their out-of-pocket maximum. They further claim that the TPP class also requires individualized review because consumer damages impact TPP damages, and to account for stop-loss insurance, GERs, and Medicare Part D plans. For the reasons set forth below, I disagree.

### A.    Re-Adjudicating Claims

48.    Both Dr. Hughes and Mr. Smith claim that in order to calculate damages, one must account for all transactions in a benefit year rather than focusing on prescription drug transactions on a transaction by transaction basis.[78] They also argue that prescriptions (including both brand and generic prescriptions and prescriptions that were filled at non-Walgreens pharmacies and all medical claims) must be re-adjudicated.[79]

49.    If the court rules that damages must be calculated on a benefit year basis, my methodology is sufficiently flexible to do so. Based on my experience with PBM data in other matters, it is my opinion that the Relevant PBMs possess data that would allow me to do so. For example, on the basis of my experience with data produced in other matters, I believe that the Relevant PBMs create and maintain data that includes information on the deductible amount, the amount paid towards the deductible, the out-of-pocket maximum amount, the amount paid towards the out-of-pocket maximum, the copay/coinsurance structure, and other information that can be used to calculate overpayments on an annual basis if necessary. Moreover, my understanding that such data exists is further supported by statements made by certain of the Relevant PBMs in other litigation.[80]

---

[78] Hughes Report, ¶¶ 14, 88; Smith Report, ¶¶ 28-31, 78 – 80.

[79] Hughes Report, ¶¶ 11 – 15, 91; Smith Report, ¶¶ 29 – 30; Section IV.

[80] *See supra* n.36. Mr. Smith also testified that a PBM considers "Eligibility. Plan design. Drug formularies. Contract terms. Benefit structure, among other things," when it adjudicates a claim and that he expects that



CONFIDENTIAL – Subject to Protective Order

### B.    Claims Regarding Retroactive Payments

50.    Both Mr. Smith and Dr. Hughes argue that my analysis overstates overpayments and injury because I do not account for payments that are not recorded when the prescription is filled.[81]

51.    It is my understanding that payments by stop-loss insurers, GER payments, and federal government Medicare part D payments are not tied to specific drugs, are not paid (or considered) at the time of adjudication, and are not paid by Walgreens.[82]  For example, stop-loss insurance generally operates as a risk mitigation mechanism for health plans.  The plan pays its reimbursement obligations and then turns to the stop-loss insurer to be reimbursed in its own right for payments in excess of the stop-loss limits.  As the Self-Insured Institute of America states:

> Stop-Loss insurance is provided on a reimbursement basis.  The employer is responsible for payment of all losses under a self-funded plan.  With the purchase of Stop-Loss coverage, the employer is still responsible for all losses including those that exceed the deductible.  After the losses have been paid, the employer will be reimbursed for the amount of the loss that exceeds the deductible.[83]

52.    It is my understanding that Walgreens does not make any "back-end" reconciliation payments to potential Class members.  It is my understanding that the stop-loss insurer reimburses the plan sponsor for any expenditures in excess of the deductible.

---

"the PBM has information beyond what the pharmacy has that's used in adjudication."  Smith Dep. at 141:21-143:20.

[81] Smith Report, ¶¶ 101 – 109; Hughes Report, ¶¶ 18 – 20, 152 – 176.

[82] Hughes, ¶ 57 ("The GER ensures that the average amount per prescription paid by the TPP to the PBM during the contract term does not exceed the amount specified in the PBM/TPP contract."); ¶ 61 ("Stop-loss insurance can be designed to guard against extraordinary costs for individual plan members, or for extraordinary *aggregate* costs across all the plan's members.").

[83] "Stop-Loss Excess Insurance," SELF-INSURANCE INSTITUTE OF AMERICA, INC., https://www.siia.org/i4a/pages/index.cfm?pageid=7535 (last visited June 17 2023).



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

Hence, the health plan still pays its normal share of the prescription cost, with the insurer offsetting some of the loss after-the-fact. Accordingly, the health plan still incurs the overpayment.

53.     Regardless, to the extent the Court determines it is necessary to account for payments that are not recorded when the prescription is filled, such as Stop Loss, such payments can be incorporated into my methodology. Class members who received such payments, or PBMs that made such payments, can provide information regarding those payments.

### C.     PSC Membership Fees

54.     Mr. Smith argues that "any damages calculation must factor in PSC membership fees in determining PSC prices."[84] He calculates an average per prescription membership fee and then proposes using a "███████████████████████████████████████
███████████████████████.[85]

### 1.     Walgreens Did Not Charge Membership Fees to all Members of the General Public Who Received PSC Prices

55.     Mr. Smith concedes that in every year from 2008-2019, Walgreens extended PSC prices to individuals who did not pay a membership fee to join the PSC. According to Mr. Smith's own analysis, he identified ████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████.[86]

---

[84] Smith Report, ¶¶ 12, 32 – 39, 62.a.

[85] *Id.*, ¶ 39, Table 5.

[86] *Id.*, ¶ 37, Attachment 3.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

## 2. Walgreens Did Not Include Membership Fees in Other Contexts

56.



57.







Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

### 3. Membership Fees Could be Determined Methodologically, But Mr. Smith's Method is Flawed

58.    Mr. Smith provides a methodology for including PSC membership fees in the overpayment analysis.  Mr. Smith calculates the amount of the membership fee to allocate to each PSC transaction by dividing each PSC member's PSC membership fee by the number of their PSC transactions each year, and calculating the average of such "allocation" over all members for each year.  However, Mr. Smith's methodology is flawed because it could result in Class members paying more than the annual PSC membership fee.  For example, Mr. Smith ███████████

███████████████████████████████████████████

████████████████[90]████████████████████████████████

████████████████████████████████████████████████

████████████████████████████[91]

59.    However, even using Mr. Smith's flawed membership fee analysis, Mr. Smith still identifies valid overcharges for all of the following state/ Plaintiff combinations:[92]

        a.      Arizona: Plaintiff Steamfitters

        b.      California: Plaintiff IBEW

        c.      Connecticut: Plaintiff IUOE

        d.      Delaware: Plaintiff IUOE

        e.      Florida: Plaintiffs Russo, IBEW, IUOE, and Steamfitters

        f.      Illinois: Plaintiff Steamfitters

---

[90] Smith Report, ¶ 38, Table 5; Smith Dep. at 238:3-239:7.

[91] *See also* Smith Dep. at 248:20-249:20.

[92] Smith Report, Attachment 5 (showing the overpayment in Column O), Attachment 6 (showing the overpayment in Column Q).  As set forth in Paragraphs 61, 62, and 65 here, the corrections and updates to my methodology further identify overcharges in Wisconsin associated with Plaintiff IBEW.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

> g.    Massachusetts: Plaintiffs Bullard and IUOE
>
> h.    New York: Plaintiffs Bullard and IUOE
>
> i.    North Carolina: Plaintiff IBEW
>
> j.    Ohio: Plaintiff IBEW
>
> k.    Pennsylvania: Plaintiff IUOE

60.    The key issue here is whether the PSC membership fee would have been included in the U&C price had Walgreens reported the PSC price as its U&C price. This is a legal issue outside the scope of my assignment. However, if the court decides that PSC membership fees should be accounted for, I can easily adjust my analysis to incorporate the PSC membership fees using classwide data and methodologies.

## V.    Plaintiff Overcharges

61.    To account for the corrections and updates that I have made to my code and methodology since submitting my report, I have prepared an updated analysis identifying overpayments for each of the Plaintiffs.

62.    My revised analysis confirms and replicates my previous report's Exhibit 3A, which shows examples of overpayments for each named Consumer Plaintiff. The Revised Exhibit 3C, which provides examples of overpayments for each of the Fund Plaintiffs, contains three revisions: ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ █████████████████████████████████. Otherwise, Exhibits 3A and 3C remain the same.

## VI.    Claims Regarding Unjust Enrichment

63.    Mr. Smith opines that "Hilton's methodology of calculating unjust enrichment damages would result in double-counting damages if both a consumer class and a



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

TPP class existed."[93]  It is my understanding that overpayments and unjust enrichment are alternative methods of calculating damages (not additive), therefore, Mr. Smith's claims regarding double counting are incorrect.

64.    Mr. Smith also claims that I double count unjust enrichment by calculating unjust enrichment for both Consumer Plaintiffs and Fund Plaintiffs.  Mr. Smith is wrong. Unjust enrichment is calculated for each claim where either the consumer overpaid, the TPP overpaid, or both overpaid.  My methodology for calculating unjust enrichment does not calculate unjust enrichment twice on the same claim, rather it may identify that Walgreens was unjustly enriched by both a consumer and fund in a single transaction, not that they would be each separately be entitled to the entire amount that Walgreens was unjustly enriched.

65.    My revised analysis confirms and replicates my previous report's Exhibit 3B, which provides an illustration of the unjust enrichment calculation applied to named Consumer Plaintiff claims using data produced by Walgreens.  The Revised Exhibit 3D provides examples of unjust enrichment for each of the named Fund Plaintiffs; it contains two revisions from my previous report: ████████████████████ ████████████████████████████████████████████ ██████████████████████████.  Otherwise, Exhibits 3B and 3D remain the same.

---

[93] *Id.*, ¶ 100.



Rebuttal Report of Lynette Hilton, Ph.D.

CONFIDENTIAL – Subject to Protective Order

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed on June 19, 2023, in Los Angeles, California.

Lynette Hilton, Ph.D.

Rebuttal Report of Lynette Hilton, Ph.D.

# EXHIBIT 1

Exhibit 1



**LYNETTE HILTON, Ph.D.**
*Senior Economist*
**Los Angeles, California**
**Tel: 213 624 9600**

Dr. Hilton specializes in projects involving economic damage assessment. Dr. Hilton has extensive experience with issues relating to the pharmaceutical industry. Most recently her work has focused on assessing exclusionary conduct in the pharmaceutical industry. She has taken a major role in calculating damages in a number of antitrust cases alleging delayed generic entry resulting from various conduct, such as reverse payments settlements and line extensions. In addition, she has worked on several projects calculating overpayments for Medicaid reimbursements.

Dr. Hilton has served as an expert for plaintiffs in multiple wrongful death cases and several pharmaceutical cases. She has co-authored a number of articles on a wide range of topics, including a study of immigration and the welfare state which appeared in The Quarterly Journal of Economics. Her career also includes studies of the semiconductor, plastics, computer and medical technology industries.

**Education**

Ph.D. in Economics, University of California, San Diego

B.A. in Quantitative Economics and Decision Sciences, University of California, San Diego

**Work Experience**

Econ One Research, Inc.
    Senior Economist, September 2001 - Present
    Economist, 1997 - August 2001

    **Expert Engagements**
    *In re: Zetia (Ezetimibe) Antitrust Litigation*

    *Nostrum Pharmaceuticals, L.L.C., et al. v. Dixit, et al.*

    *United States of America, et al. ex rel. Wetherholt and Drimer v. Pfizer, Inc.*

    *Charles T. Kusuno and Elsie M. Kusuno v. Owens-Illinois, Inc., et al.*
    *Solomon Keawe and Patricia A. Keawe v. Owens Corning, et al.*

    *Gary T. Matsumoto and Tamako S. Matsumotot v. Owens Illinois, Inc., et al.*

    *Edward T. W. Chang et al. v. Owens-Illinois, Inc., et al.*

    *Edna L. M. Johnson v. Owens Corning, et al.*

Lynette Hilton, Ph.D.
Senior Economist
Page 2 of 3

> *Donald James and Eldora K. James v. Owens Corning, et al.*
>
> *Nancy A. De Rego, individually and as Legal Representative of the Estate of James De Rego, deceased v. Owens Corning, et al.*
>
> *Raymondo Rellin and Felisa A. Rellin v. Allied-Signal, Inc., et al.*
>
> *Edward J. Sherry and Theresa M. Sherry v. Owens Corning, et. al.*
>
> *Theodore Y.C. Kam and Alice P.N. Kam v. Owens-Illinois, Inc., et al.*

Micronomics, Inc.
> Economist, 1996 - 1997

KPMG Peat Marwick, Barents Group
> Senior Associate, 1995 - 1996

University of California, San Diego Social Science Computing Services
> Statistical Consultant, 1994 - 1995

California State University San Marcos
> Lecturer, 1993

DeCotiis Erhard Strategic Consulting Group
> Data and Statistical Analysis Consultant, 1991 - 1993

**Papers**

"Lost Profits and Royalties In Intellectual Property Disputes: The Need to Avoid Double Dipping," *The Metropolitan Corporate Counsel*, February 2000, vol. 8, no. 2 (with Charles Mahla).

"A New Approach to Estimating Damages in Mass Torts," *International Journal of the Economics of Business*, Volume 7, Number 1, 2000 (with Atanu Saha).

"Expo-Power: A Flexible Hazard Function for Duration Data Models," *Economic Letters*, 54 (1997) (with Atanu Saha).

"The Role of Failure Time Models in Class-Action Litigation," October 1996 (with Atanu Saha).

"Immigration and the Welfare State: Immigrant Participation in Means-Tested Entitlement Programs," *The Quarterly Journal of Economics*, Vol. CXI, May 1996 (with George Borjas).

"AFDC-UP and Family Structure: Does UP Encourage Two-Parent Families?" September 1994.

Lynette Hilton, Ph.D.
Senior Economist
Page 3 of 3

**Papers (continued)**

"AFDC and Household Formation," February 1994 (with Jean Shelton).

**Presentations**

"Expo-Power: A Flexible Hazard Function for Duration Data Models," presented at the American Agricultural Economic Association's Annual Conference, Toronto, Canada, July 27-30, 1997 (with Atanu Saha).

"A New Duration Model with a Flexible Hazard Function," presented at the 72nd Annual Western Economic Association International Conference, Seattle, July 9-13, 1997 (with Atanu Saha and Arthur Havenner).

# EXHIBIT 2

CONFIDENTIAL - Subject to Protective Order

**Exhibit 2**
**Additional List of Materials Considered**

*Includes all additional documents, studies, and articles cited in the Rebuttal Report.*

**Expert Reports and Work Papers**
    Hughes, James (3/17/2023)
    Hughes, James (4/27/2023)
    Smith, Jed (3/17/2023)
    Smith, Jed (4/25/2023)

**Depositions and/or Exhibits**
    Correia, Brian (9/17/2020)
    Hughes, James (5/3/2023)
    Smith, Jed (4/28/2023)

**Documents**
    WALGREENS
    2020.11.06_Walgreens_Forth_PSC_Null and Multi_NDCs.xlsx

**Publicly Available Materials**
    Declaration of Non-Party OptumRx submitted in In re Niaspan Antitrust Litig., No. 2:13-md-2460 (E.D. Pa.);
    Declaration of Non-Party Express Scripts, Inc. submitted in In re Niaspan Antitrust Litig., No. 2:13-md-2460 (E.D. Pa.);
    Declaration of Non-Party Caremark L.L.C. submitted in In re Niaspan Antitrust Litig., No. 2:13-md-2460 (E.D. Pa.)

# EXHIBIT 3

CONFIDENTIAL - Subject to Protective Order





CONFIDENTIAL - Subject to Protective Order