# EXHIBIT 62

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 1:17-cv-02246 Judge Edmond E. Chang Magistrate Judge Sheila Finnegan |
| Plaintiffs, | |
| v. | |
| WALGREEN CO., | |
| Defendant. | |

**REBUTTAL REPORT OF KENNETH W. SCHAFERMEYER, PH.D.**
**June 20, 2023**

**[REDACTED]**

1

## Glossary of Terms

| | |
|---|---|
| AMCP | Academy of Managed Care Pharmacy |
| BIN | Bank Identification Number |
| CMS | Centers for Medicare and Medicaid Services |
| Complaint | Fourth Amended Consolidated Class Action Complaint and Jury Demand |
| FEP | Federal Employees Health Benefits Program |
| Fund Plaintiffs | Three Third-Party Payers operating as trusts that provide healthcare benefits to their beneficiaries, specifically: IBEW, IUOE and Steamfitters (each defined below) |
| Hanifin Report | Expert Report of John W. Hanifin, dated March 17, 2023 |
| Humana | Humana Health Plan, Inc. |
| IBEW | International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund |
| Individual Plaintiffs | Lisa Bullard, Ricardo Gonzales, and Cynthia Russo |
| IUOE | International Union of Operating Engineers Local 295-295c Welfare Fund |
| Jacobs Report | Expert Report of Michael S. Jacobs, dated March 16, 2023 |
| NCPDP | National Council for Prescription Drug Programs |
| Nordby Report | Expert Report of Kelly Lear Nordby, Ph.D., Ankura Consulting Group, LLC, dated March 17, 2023 |
| Opening Report | Report of Kenneth W. Schafermeyer, Ph.D, dated November 16, 2022 |
| PCN | Processor Control Number |
| PPA | Participating Pharmacy Agreement |
| PSC | Prescription Savings Club |
| Smith Report | Expert Report of Jed Smith (Mar. 17, 2023) ("Smith Report") |
| Steamfitters | Steamfitters Fund Local 439 |

| | |
|---|---|
| TPP | Third-Party Payer |
| Tudor Memo | Memorandum from Cynthia Tudor, Director of the CMS Medicare Drug Benefit Group and CMS (Oct. 11, 2006), https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/QADiscountsandTrOOP_100606.pdf |
| U&C | Usual and Customary |
| Walgreens | Defendant Walgreen Co. |

# Table of Contents

I.   Introduction and background ...................................................................................... 6

II.  Mr. Jacob's limited view of U&C is incomplete and inaccurate and, therefore, unreliable ............... 7

   A.   Mr. Jacobs' view of pharmacies' understandings is unreliable ..................................... 7

   B.   Mr. Jacobs gives testimony and declarations by certain PBM representatives undue weight and ignores declarations, testimony, and evidence to the contrary ........................................ 8

   (1)  Mr. Jacobs fails to consider declarations and testimony that are contrary to his view .......... 8

   (2)  The Caremark declaration referenced by Mr. Jacobs is contradicted by Caremark's selective enforcement of its own contracts ...................................................................... 10

   (3)  Mr. Jacobs failed to consider PBM provider manuals that help explain PBMs' understanding of "usual and customary price" ........................................................................ 10

   (4)  Despite Mr. Jacobs reliance on them, declarations and testimony of PBM representatives with a financial interest in this matter should not be afforded weight ................................... 11

   C.   Summary ................................................................................... 12

III. Mr. Jacobs' opinion that PSC transactions were not cash transactions by cash customers is wrong and not supported by reliable evidence .................................................................. 13

   A.   The Academy of Managed Care Pharmacy's definition of "usual and customary price" does not support Mr. Jacobs' view .......................................................................... 14

   B.   Mr. Jacobs incorrectly assigns insurance terminology to PSC ..................................... 14

IV.  Mr. Jacobs' ignores, disregards or fails to consider evidence supporting the fact that "cash customers" are, indeed, customers who do not use a prescription *insurance* benefit ................. 16

   A.   Walgreens' own documents confirm that Walgreens understood that PSC prescriptions were cash prescriptions and PSC customers were cash customers ........................................ 16

   B.   Mr. Jacobs did not consider relevant court/arbitration decisions that support my long-held the industry understanding of U&C price ................................................................ 17

V.   Mr. Jacobs correctly opines that contract terms referring to U&C are uniform .................... 18

VI.  The industry definition of "usual and customary price" does not change if contractual partners decide to exclude specific discounts .......................................................................... 19

VII. Mr. Jacobs' misconstruction of the adjudication process is incorrect and misleading ............. 20

   A.   PSC transactions are not actually adjudicated ................................................... 21

   B.   Whether or not a prescription is adjudicated is irrelevant to whether a membership club (or pharmacy discount program) price should be considered a U&C price .............................. 24

VIII. Mr. Jacobs contradicts himself on the question of whether PSC was offered to members of the general public ..................................................................................................... 25

IX.  Mr. Jacobs said that he does not have an opinion as to whether a PSC membership fee is relevant 26

4

**X. Mr. Jacobs misread, misinterpreted, or misrepresented CMS advice regarding usual and customary** ..............................................................................................................................**27**

**A. Mr. Jacobs incorrectly implies that CMS cannot expect the U&C to serve as a price ceiling** ....... 27

**B. Mr. Jacobs incorrectly claims that CMS distinguishes between U&C and "membership club" discount prices** ........................................................................................................ 27

**C. Mr. Jacobs misrepresents the advice that CMS provided on U&C** .................................... 28

**(1) Contrary to Mr. Jacobs' assertions, CMS advice is not limited to specific pharmacies, such as Walmart** ...................................................................................................... 28

**(2) Mr. Jacobs inappropriately dismisses the CMS advisory memo as applicable only to plan sponsors** ..................................................................................................... 29

**(3) Mr. Jacobs improperly dismisses the CMS advisory memo as not "authoritative"** ................... 30

**XI. Mr. Jacobs seems to misunderstand the purpose of the U&C price ceiling and demonstrably misrepresents my testimony on this issue** .................................................................**30**

**XII. Mr. Jacobs falsely claims that NCPDP differentiates between "cash retail" and other "self-pay prices" such as "membership clubs"** ...........................................................................**32**

**XIII. Mr. Jacobs inappropriately equates the Walgreens-sponsored Prescription Savings Club with third-party discount cards** .................................................................................**33**

**XIV. Mr. Hanifin's description of "obstacles" to joining the PSC is uninformed** ...............................**34**

**XV. Dr. Nordby's narrow focus on an economic principle is incomplete and ignores relevant evidence to the contrary** .............................................................................................**37**

5

## I.     Introduction and background

1.    I have been asked by counsel for Plaintiffs[1] to provide this rebuttal expert report in response to the reports of Mr. Michael S. Jacobs,[2] Dr. Kelly Lear Nordby[3] and Mr. John W. Hanifin,[4] who Defendant Walgreen Co.[5] have designated as expert witnesses.

2.    My report is based on my knowledge of the industry, professional experience, review of relevant industry publications, government statutes, regulations, rules, guidance, relevant case law and pleadings, and documents from the evidentiary record in this case, including deposition transcripts and exhibits, which have been provided to me by Plaintiffs' counsel.

3.    I submitted an Opening Report in this case on November 16, 2022.

4.    Through my education and experience, I have personal knowledge of the practices of PBMs, state and federal healthcare programs, third-party insurance payers, and pharmacies as they relate to the purchasing, pricing, dispensing, and reimbursement of prescription drugs.  My qualifications are described in my Opening Report (paragraphs 1-10).  My *curriculum vitae* is attached as **Exhibit A** to my Opening Report and contains a list of all publications I have authored in the last ten years and the cases in which I have testified within the last five years.

5.    Lists of the materials I considered in forming my opinions are attached as **Exhibit B** to my Opening Report and, **Exhibit C** to this report.  I am compensated at the rate of $600 per hour for research, review, preparation, and testimony.  My compensation is not dependent upon rendering any particular opinion.

6.    To the extent that I refer to court and arbitration opinions, contracts, statutes, regulations, government advisory opinions and other documents, I am not giving a legal opinion, nor should my opinions be construed as such.  Instead, my reliance on such documents serves only to inform, confirm and support my long-held understanding of the issues involved in this case.  In particular, court and arbitration opinions that I reference confirm what industry standards and common sense have long indicated: that Walgreens should have

---

[1] Plaintiffs in this case include: (1) Individual Plaintiffs, who are individual consumers who are beneficiaries of both private commercial health insurance benefit plans that provide prescription drug benefits and Medicare Part D; and (2) Fund Plaintiffs, three TPPs operating as trusts that provide healthcare benefits to their beneficiaries that maintain employee health and welfare plans and "employee benefit plans" pursuant to Section 302(c)(5) of the Labor Management Relations Act, specifically: IBEW; IUOE; and Steamfitters.

[2] Jacobs Report.

[3] Nordby Report.

[4] Hanifin Report.

[5] Walgreens is a large pharmacy chain operating over 8,000 retail pharmacies in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

reported or otherwise included its PSC prices when determining the U&C prices to report for PSC prescriptions.

## II. Mr. Jacob's limited view of U&C is incomplete and inaccurate and, therefore, unreliable

7. In his deposition testimony, Mr. Jacobs testified that his understanding of the terms that are not defined in contracts, such as "cash" and "retail," is based on ███████████ ██████████████████████████████████."[6]

8. When asked what was included in this industry understanding, he limited it to "███ ██████████████████████████████████████████████████."[7]

9. Mr. Jacobs admitted that he did not consider the expectations of insurers, consumers, TPPs, Medicare Part D, or Medicaid in forming his "understanding."[8]

10. For example, Mr. Jacobs stated that "████████████████████████████████ ████████████████████████████████."[9]

11. As described in my Opening Report, (paragraphs 59-75) government payers consider discounts offered to cash customers, such as the PSC, are reportable as U&C. Whether or not the contracts in question in this case involve Medicaid claims, Medicaid programs' understanding of U&C show that Mr. Jacobs' position regarding the definition of U&C is not the "████████████████" as he claims.

12. Even though Mr. Jacobs testified that ████████████████████████████ ████████████████, he did not consider cases that government payers or other entities had brought against Walgreens.[10]

### A. Mr. Jacobs' view of pharmacies' understandings is unreliable

13. Mr. Jacobs declared that his view of "industry-accepted definitions" was based on the understanding of certain retail pharmacies, namely, ████████████████. (Walmart, however, considers its discount program prices to be its U&C prices and reports them as such.)[11] Mr. Jacobs admitted ████████████████████████████████████ ████████████████████

---

[6] Jacobs dep. at 124:8-18.

[7] Jacobs dep. at 124:19-22.

[8] Jacobs dep. at 124:23 – 125:14; 126:12-18; and 127:7-11.

[9] Jacobs Report at 78.

[10] ████████████████████████████████████████████████████ ████████████████████████ Jacobs dep. at 187:3-10.

[11] Declaration of Darren K. Townzen on Behalf of Walmart, *Forth v. Walgreens* (Apr. 24, 2020).

███████████████████████████████████████████████████[redacted].[12]

**B. Mr. Jacobs gives testimony and declarations by certain PBM representatives undue weight and ignores declarations, testimony, and evidence to the contrary**

**(1) Mr. Jacobs fails to consider declarations and testimony that are contrary to his view**

14. ████████████████████████████████████████████████████
████████████████████

15. His selection of certain PBM representatives' statements and omissions of others renders his opinions unreliable as he omitted declarations and testimony by others associated with PBMs whose opinions are in opposition to his, including the following opinions:

- Mr. Dale Chamberlain.

  o Mr. Chamberlain, who – like Mr. Jacobs – is a former vice president of Express Scripts, provided a sworn declaration for the same case from which Mr. Jacobs derives other PBM declarations and testimony.[13]

  o Mr. Chamberlain stated that "within the NCPDP and among its members there is a broad consensus that a 'cash customer' is a customer who purchases a prescription drug from a pharmacy without using third-party insurance, and for whom no third-party pays any portion of the drugs' price. [ ] This reflects the major distinction between customers in the pharmacy industry: those who have and use prescription drug insurance and those who don't."[14]

  o Mr. Chamberlain also stated that patients using a club membership discount program to purchase medication are "cash customers because, for those [ ] transactions, they are not using health coverage purchased from a health plan, and no health plan pays any portion of the medication's costs."[15]

---

[12] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

[13] Expert Declaration of Dale Chamberlain, *Corcoran v. CVS* (redacted), June 6, 2017.

[14] *Id*. at 25-28.

[15] *Id*. at 33-34.

- o  Mr. Jacobs testified that he was aware of the Chamberlain declaration but did not consider it.[16]

- Dr. Robert Navarro.

  - o  Dr. Navarro, who – like Mr. Jacobs – is a former vice president of Express Scripts, provided sworn testimony for the same case from which Mr. Jacobs derives other PBM declarations and testimony.[17]

  - o  Dr. Navarro is also author of the definitive textbook on managed care pharmacy,[18] and a co-founder and first president of the AMCP.

  - o  Dr. Navarro disputed the declarations submitted by various PBM representatives and testified that they were inconsistent with his experience and understanding, which is that "membership club" discounts should be included in the U&C price reported by pharmacies and adjudicated by PBMs.[19]

- Ms. Bretta Grinsteinner.

  - o  Ms. Grinsteinner is a former assistant vice president of network management for Prime Therapeutics, a PBM.

  - o  In his opinion in the *Humana v. Walgreens* arbitration, Arbitrator Gordon found that Walgreens was required to include its discounted PSC prices in the calculation of its U&C, he cited a series of declarations in which Ms. Grinsteinner "retreated from previous declaration she had submitted in other U&C litigation around the country stating that her employer, Prime Therapeutics did not consider pharmacy club prices to be usual and customary prices."[20]

---

[16] Jacobs dep. at 58:2-12.

[17] Trial Testimony of Robert P. Navarro, *Washington v. CVS*, No. CV 15-03504-YGR (N.D. Cal.) [Also referenced elsewhere as *Corcoran v. CVS*].

[18] Navarro RP. (ed.), *Managed Care Pharmacy Practice*, 2nd Edition, Sudbury, MA: Jones and Bartlett Publishers, 2009.

[19] Trial Testimony of Robert P. Navarro, *Washington v.* CVS, No. CV 15-03504-YGR (N.D. Cal.) [Also referenced elsewhere as *Corcoran v. CVS*].

[20] Arbitrator Eliot K. Gordon, Corrected Final Award, *Humana v. Walgreens* (Mar. 28, 2023) p. 26.

**(2) The Caremark declaration referenced by Mr. Jacobs is contradicted by Caremark's selective enforcement of its own contracts**

16. The FEP provides health insurance to approximately 8 million federal employees, retirees, and their dependents.[21]

17. Prior to 2012, FEP issued a Request for Proposal for prescription drugs that required the winning PBM bidder to include membership discounts in the calculation of U&C. Caremark responded to the FEP Request for Proposal and won the account.

18. 

19.

**(3) Mr. Jacobs failed to consider PBM provider manuals that help explain PBMs' understanding of "usual and customary price"**

20. Provider manuals serve to inform readers about the PBM's policies and procedures and the definitions contained therein help explain the PBM's understanding of important issues related to prescription drug benefits that they administer. Although contracts are not disclosed to the public, provider manuals or pharmacy manuals are sometimes made available to the public. Despite denials by some PBM representatives, almost all PBM

---

[21] Congressional Research Service, *Federal Employees Health Benefits (FEHB) Program: An Overview*, R43922 (February 3, 2016), https://sgp fas.org/crs/misc/R43922.pdf.

[22] CVS Caremark Network Update (May 22, 2014).

provider manuals make it clear that they consider "membership club" discounts to be included in the U&C price. As demonstrated in my Opening Report, wording such as "all applicable discounts," "any advertised or sale price discounts," "discounts for special member programs," "any special promotions or discounts," "discounts intended to attract customers," and the catch-alls "or other discounts" and "any and all discounts" are ubiquitous in provider manual definitions of U&C. (*See* paragraphs 87-94 of my Opening Report.).

21. The definition of U&C from the Caremark Provider Manual, clearly includes all discounts in its definition of U&C.[23] Another example is the 2016 Express Scripts provider manual which defines "usual and customary" as follows:



22. Provider manuals inform readers about what PBMs intend. Otherwise, one wonders why PBMs would publish and distribute them. Mr. Jacobs, however, did not consider PBMs' understandings of U&C as documented in their provider manuals.

### (4) Despite Mr. Jacobs reliance on them, declarations and testimony of PBM representatives with a financial interest in this matter should not be afforded weight

23. Not only are Mr. Jacobs' references to PBM representatives' declarations and testimony selective and incomplete they are, in my opinion, irrelevant for several reasons:

- The Ninth Circuit Court of Appeals stated in the *Corcoran* case (to which Mr. Jacobs referred) that it was not concerned with representations by PBMs.[25]

---

[23] *See* Caremark Provider Manuals' definitions of U&C in my Opening Report, p. 23-24.

[24] *Express Scripts Provider Manual*, 2016 (ESI-0000323 at 0449).

[25] "Contrary to CVS's assertion, plaintiffs need not produce evidence that the PBMs believed that CVS misrepresented the U&C price. It is enough for plaintiffs to show that CVS failed to report the HSP prices as U&C prices contrary to the PBM contracts, and that, as a result, plaintiffs were charged higher copayments." Appeal from the United States District Court for the Northern District of California, *Corcoran v. CVS* (Dec. 17, 2018), p. 3. (Jacobs Ex. 564).

- In another case involving Walgreens, the arbitrator specifically found that:

  > The weight of the PBM evidence is placed into question because the testimony and declarations fail to offer a persuasive explanation as to *why* lower but widely available prices were disregarded, thereby leading to higher cost for Medicare and other programs. It is, after all, the payors (and insured customers, in the form of higher copays), not the PBMs, that bear the ultimate cost of prescription drug coverage.[26]

- PBMs benefit from artificially high U&C prices and have a financial interest in the outcome of this case. In my Opening Report I discuss PBMs' financial reasons for their representations on this issue. (*See* Section V.E of my Opening Report.).

- Another reason for not giving weight to PBM representatives' declarations and testimony is that "PBMs that aligned themselves on the definition of U&C could potentially face their own liability from claims by third-party payor customers or consumers for failing (arguably knowingly, based upon their testimony and declarations) to require the pharmacies to report discounted prices as their U&C rates."[27]

- And yet another factor that diminishes the reliability of the specific PBM representatives' declaration and testimony Jacobs relies on is that there is no evidence that Walgreens was actually aware of any uniform PBM understanding of the issue and relied upon it in deciding not to report its PSC prices as U&C when it created the PSC program, and decided that these prices were not U&C. According to the Corrected Final Award in the *Humana v. Walgreens* arbitration matter: "In fact, that 'understanding' [that PSC prices were not reportable as U&C prices] appears to have followed rather than proceeded the creation of those clubs."[28]

**C. Summary**

24. Because Mr. Jacobs incorrectly limits his "industry-accepted definitions" to the "understanding" of selected retail pharmacies and a selection of their PBM partners, without considering opposing view from other pharmacies and PBM and totally disregards other important players in the prescription insurance industry (*e.g.*, insurers,

---

[26] Arbitrator Eliot K. Gordon, Corrected Final Award, *Humana v. Walgreens*, (Mar. 28, 2023), p. 28. (emphasis in original.)

[27] *Id*. at p. 28-29.

[28] *Id*. at p. 29.

consumers, TPPs, Medicare Part D, and Medicaid), his opinions are incomplete, inaccurate and not reliable.

25. Mr. Jacobs even went so far as to say that ███████████████████████████ ███████████ .[29]

26. Other than statements from parties with a financial interest in keeping U&C prices artificially high, Mr. Jacobs does not cite any independent authorities (such as publications, industry standards, statutes, regulations, or government reports) to support his opinion. Even then, the "evidence" he cites is contradicted by other pharmacies and PBM representatives, as well as long-term industry standards. Furthermore, there are numerous reasons to question the statements made by PBM representatives that have incentives to allow their pharmacy partners to circumvent the long-established meaning of U&C.

### III. Mr. Jacobs' opinion that PSC transactions were not cash transactions by cash customers is wrong and not supported by reliable evidence

27. Mr. Jacobs opines that ██████████████████████████████████████████ ████████████████████████████[30]██████████████████████████████████ ████████████████████[31]

28.  He makes these pronouncements even though customers pay cash for these prescriptions without any payment by insurance.

29. Mr. Jacobs admitted that "███████████████████████████████████████████ ██████████."[32] Common sense (as well as documentation presented in this Rebuttal Report and my Opening Report) refutes Jacobs' position that cash-paying customers who were targets of the PSC program and who received discounts off cash prices without using insurance were somehow no longer "cash patients."

30. Mr. Jacobs' opinion is wrong for various reasons stated in my Opening Report, including those described in Sections V.C and V.G.1. My Opening Report extensively cites industry publications, government statutes, regulations, rules, guidance and relevant court opinions and pleadings, as well as documents from the evidentiary record, including deposition transcripts and exhibits.

---

[29]  Jacobs dep. at 208:24 – 209:4.

[30] Jacobs Report at 27.

[31] Jacobs dep. at 111:10-113:12.

[32] Jacobs dep. at 191:16-17.

13

31. Mr. Jacobs' Report, on the other hand, fails to present credible evidence to support his opinion.[33] Instead, he relies on his and Walgreens' misconstructions of certain industry definitions and concepts.

### A. The Academy of Managed Care Pharmacy's definition of "usual and customary price" does not support Mr. Jacobs' view

32. Mr. Jacobs attempts to support his view by citing a short passage from a publication by the AMCP.[34] This passage references an anecdotal observation of an industry blogger who merely describes what some pharmacies do (which we know from the facts in this case), not what they *should do* (which is the reason for this case).

33. If Mr. Jacobs wanted to know AMCP's understanding of "usual and customary price," he could have looked at the official definition of "usual and customary price" in the glossary of the same publication that he quoted.

34. The *AMCP Guide to Pharmaceutical Payment Methods*, a document upon which Mr. Jacobs relied in his report, actually defines "usual and customary price" quite differently than what he states as his opinion.

35. AMCP defines "usual and customary price" as "[t]he price for a given drug or service that a pharmacy would charge ***a cash-paying customer without the benefit of insurance*** provided through a payer or intermediary with a contact with the pharmacy."[35]

36. Clearly, AMCP: (1) differentiates prescriptions as *either* cash *or* insurance and (2) equates cash-paying customers with those without benefit of insurance. This definition comports with my long-held and the industry understanding of U&C.

### B. Mr. Jacobs incorrectly assigns insurance terminology to PSC

37. According to Mr. Jacobs, a [36]

---

[33] ███████████████████████████████████████ Jacobs dep. at 187:3-10. ███████████████████

[34] Jacobs Report at 27, footnote 6; repeated at 43, footnote 32.

[35] Academy of Managed Care Pharmacy, *AMCP Guide to Pharmaceutical Payment Methods*, 2013 Update at 75.

[36] Jacobs Report at 49.

38. Mr. Jacobs promotes a novel theory that pharmacy-sponsored discount programs, like the PSC, are "███████████████"[37] ███████████████████████████████ ██████████."[38]

39. In my experience, terms such as "pharmacy benefit programs" and "prescription insurance programs" are used interchangeably to refer to insurance (*i.e.*, a third-party prescription benefit) – not programs in which patients pay for prescriptions without use of insurance.[39]

40. In my opinion the term "unfunded benefit" is not something that existed or was used in the industry in this context until after litigation challenging these programs was brought. Thus, it is not a term that existed prior to litigation, nor is it a term that differentiates between a cash customer and an insured customer.

41. While the terms "health benefit program," "prescription benefit program," and "pharmacy benefits" are in wide use, I was unable to find any independent reference that used these terms to include cash discount programs like the PSC.

42. Mr. Jacobs cites no industry publication or independent authority that supports his view and admits that his description of "cash customers" being customers without a "prescription benefit" is not defined in any contracts that he has reviewed.[40]

43. A review of two journal articles that Mr. Jacobs coauthored reveals that he equated "prescription benefit programs" with prescription insurance.[41,42] He has not provided evidence that he has ever attributed the term "prescription benefit program" (or similar terms) to denote pharmacy or third-party discount programs prior to submitting his report.

---

[37] Jacobs Report at 14, 27 and 57 (emphasis added).

[38] Jacobs Report at 17; Jacobs dep. at 139:20-24 and 219:9-17.

[39] Dictionary definitions of the word "benefit" as a noun refers to insurance – not store discounts. Following are examples of the definition of "benefit: (1) "a payment or service provided for under an annuity, pension plan, or insurance policy" (*Merriam-Webster Dictionary* at https://www.merriam-webster.com/dictionary/benefit?src= search-dict-box); (2) "an advantage such as medical insurance, life insurance, and sick pay, that employees receive from their employer in addition to money" (Cambridge Dictionary at https://dictionary.cambridge.org/us /dictionary/english/benefit); and (3) "a payment or gift, as one made to help someone or given by an employer, an insurance company, or a public agency" (Dictionary.com at https://www.dictionary.com/browse/benefit).

[40] Jacobs dep. at 219:18-21.

[41] Taylor, J. and Jacobs, M., "The Tough Decisions No One Wants to Make," *Benefits Quarterly*, First Quarter 2003, 19.

[42] Owens, G., et al., "Prescription Benefit Design: Perspectives, Reimbursement Issues, and Future Trends." *The American Journal of Managed Care*, Oct. 2004. P. S420.

44. Furthermore, Mr. Jacobs contradicts himself again by admitting in his own report that ▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[43]

45. Misapplying insurance terminology in this manner is misleading and renders Mr.
   Jacobs' opinions unreliable.

IV. **Mr. Jacobs' ignores, disregards or fails to consider evidence supporting the fact that "cash customers" are, indeed, customers who do not use a prescription *insurance* benefit**

46. By calling club membership discounts a "benefit program" and conflating them with
   insurance programs, Mr. Jacobs then declares that they are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

47. In my experience, the term "cash customer" has always been understood in the industry
   to mean a customer not using insurance to pay for any part of the prescription. For
   decades, there was no controversy over this issue until some pharmacies, like
   Walgreens, clouded the issue by twisting terminology as part of a scheme to
   manipulate U&C.

48. Mr. Jacobs admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[44]

49. As described in my Opening Report, the long-held industry understanding of U&C price
   equates "cash customers" with "customers paying without use of insurance." (*See* my
   Opening Report, Section V.G.1.).

50. Following is additional evidence supporting the fact that "cash customers" are customers
   who do not use a prescription insurance benefit:

   A. **Walgreens' own documents confirm that Walgreens understood that PSC prescriptions were cash prescriptions and PSC customers were cash customers**

51. Walgreens repeatedly characterized the PSC as a cash program. In an internal document,
   Walgreens stated that the PSC "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮."[45]

52. Walgreens' website describes PSC prices as cash prices: "***The Walgreens Prescription Savings Club provides discounts on the cash price*** of brand-name and generic
   medications."[46]

---

[43] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Jacobs Report at 16.

[44] Jacob dep. at 133:3-14.

[45] Amiet Dep. Ex. 73 at 3486 (internal Walgreens slide set and notes titled "▮▮▮▮▮▮▮▮") (emphasis added).

[46] Walgreens website (on or about Sep. 13, 2019) (Jacobs Dep. Ex. 567) (emphasis added).

53. An internal email string titled ████████████████████████████████████
████████████[7] and ████████████████████[48]

54. A ████████████████████[49]

**B. Mr. Jacobs did not consider relevant court/arbitration decisions that support my long-held the industry understanding of U&C price**

55. In his list of materials considered, Jacobs listed several court cases that addressed the U&C issue, specifically, the *Garbe*, *Proctor* and *Schutte* cases.[50] The findings of these cases, however, are consistent with my long-held understanding of U&C price and not consistent with Mr. Jacobs' position.[51] Following are examples.

56. The Seventh Circuit Court's findings do not support the argument that Jacobs makes:[52]

> The district court found that the "usual and customary" price is generally *understood to mean the* "*cash price* offered to the general public."[53]

> Unless state regulations provide otherwise, the "usual and customary" price is *defined as the* "*cash price* offered to the general public."[54]

> The CMS [Centers for Medicare & Medicaid Services] Manual has long noted that "where a pharmacy offers a lower price to its customers throughout a benefit year" the *lower price is considered the 'usual and customary' price* rather than "a one-time 'lower cash' price," *even where the cash purchaser uses a discount card.*[55]

57. In addition, the U.S. District Court for the Central District of Illinois in *U.S. ex. rel. Schutte v. SuperValu, Inc.*, supports my long-held and industry understanding:

---

[47] Walg_Forth_00038103, Email from Jay Bernstein, Walgreens' former Manager for Product Development and Innovation (Sep. 8, 2013) (emphasis added).

[48] Walg_Forth_00038104, Email from Joseph Kristie, Sr. Director, Product Development and Innovation (Sep. 5, 2013) (emphasis added).

[49] *See* Walg_Forth_00191697; *see also* Arbitrator Eliot K. Gordon, Corrected Final Award, *Humana v. Walgreens*, (Mar. 28, 2023) at 24 (emphasis added).

[50] Jacobs Report, Ex. A.

[51] Note that this discussion should not be construed as a legal opinion on my part. These court and arbitration decisions did not inform my opinion – they only confirmed what I have long understood.

[52] *See* Opening Report, ¶¶37, 81, 128-134, 178 (discussion of the *Garbe* case).

[53] *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 636 (7th Cir. 2016) (emphasis added).

[54] *Id.* at 643 (emphasis added).

[55] *Id.* at 644 (emphases added).

The Defendants' actual usual and customary price can be determined by noting the discount lower cash prices that were offered to the general public and accepted over the years. As in *Garbe*, those were the lowest prices for which the drugs were widely and consistently available . . . . ***The offer to the general public determines the usual and customary price—not whether the offer was couched as a discount club*** or whether the majority of people accepted it.[56]

58.    In addition, my long-held and industry understanding of U&C is supported by findings in *Humana v. Walgreen Co.*, which determined that Walgreens' discount membership program was "very similar" to that of Kmart's and relies on *Garbe* and other cases by stating:

> *Garbe* and its progeny established a ***default rule that a pharmacy's usual and customary price is the lowest price widely and consistently available to the general public.*** It applied that rule to find that the prices offered to members of a prescription savings club very similar to the [Walgreens] PSC (and, indeed, even sharing the same name) were Kmart's usual and customary prices.[57]

59.    The final award in the *Humana v. Walgreens* case noted "U&C" is the lowest prices widely and consistently available to the general public), and that PSC prices were, indeed, cash prices that were widely and consistently available to the general public. This is consistent with my long-held and industry understanding of the U&C.

60.    Mr. Jacobs was ███████████████████████████████████████████████████████.[58]

**V.    Mr. Jacobs correctly opines that contract terms referring to U&C are uniform**

61.    Mr. Jacobs stated that ████████████████████████████████████████████████████████████████████████[59]

---

[56] *United States v. SuperValu, Inc.*, No. 11-3290, 2019 WL 3558483, at *6 (C.D. Ill. Aug. 5, 2019) (emphasis added).

[57] Arbitrator Eliot K. Gordon, Corrected Final Award, *Humana v. Walgreens*, (Mar. 28, 2023). at 32-33 (emphasis added).

[58] The *Interim Award* was published Nov. 8, 2021; Mr. Jacob's Report was submitted Mar. 16, 2023.

[59] Jacobs dep. at 122:2 – 123:16.



62.  Mr. Jacobs and I do not disagree on this point; we only disagree on whether customers who pay cash for prescriptions themselves without using an insurance benefit are, indeed, "cash customers." Nevertheless, it appears to me that Mr. Jacobs and I agree that the contracts are, indeed, uniform in their intent with regard to U&C.

63.  Jacobs also agrees that U&C definitions in agreements between PBMs and TPPs as well as agreements between PBMs and participating pharmacies are consistent.[62]

64.  I also agree with Mr. Jacobs on this point.  The fact that Mr. Jacobs agrees with this consistency in understanding the definition of U&C supports the applicability of viewpoints of industry participants like payers and insurers that Jacobs did not consider.

## VI.  The industry definition of "usual and customary price" does not change if contractual partners decide to exclude specific discounts

65.  The NCPDP is an accredited, not-for-profit organization designated to standardize how electronic payment data is transferred between pharmacies, PBMs, and third-party plans.[63]  In other words, NCPDP is the authority setting standards for electronic payment of prescription insurance claims.  Mr. Jacobs admits that NCPDP is the organization that establishes industry standards for electronic prescription claims.[64]

66.  Mr. Jacobs does not acknowledge or dispute that 

67.  NCPDP standards elaborate that the U&C price "represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a

---

[60] To be clear, "same drug" in this context means same drug, dosage form, strength and quantity and on the same day.

[61] In response to Plaintiffs' Interrogatory No. 9 and Plaintiffs' Request for Admission No. 26, Walgreens acknowledged

[62] ████████████████████████████████████████████ Jacobs dep. at 216:13-17.

[63] "Who We Are," NCPDP, https://www.ncpdp.org/Who-We-Are.aspx (last accessed June 20, 2023).

[64] Jacobs Report at 68.

[65] *NCPDP Data Dictionary* (Sep. 1999) at p. 71.

cash-paying customer."[66] In my opinion, "total reimbursement" in this context connotes the total price is paid by the cash customer and no TPP (*i.e.*, insurer) is involved.

68. I understand that the NCPDP definition of U&C to be the industry standard but that U&C can be defined otherwise by statute or between contracting parties, though, as discussed herein, an agreement between two parties does not, in my opinion, change industry norms and standards.[67]

69. Mr. Jacobs stated that ████████████████████████████████████████
████████████████████████████████████████
██████████[68]

70. While I am not disputing what Mr. Jacobs says, he misses the point. Pharmacies and their PBM partners may agree between themselves to exclude a specific discount from the calculation of U&C. This confidential agreement, though, would not alter the industry definition of U&C nor would it alter the payer's reasonable expectations as to the meaning of the U&C price. Furthermore, neither the payer nor its insured beneficiaries would necessarily be aware of this secret arrangement.

## VII. Mr. Jacobs' misconstruction of the adjudication process is incorrect and misleading

71. Mr. Jacobs incorrectly asserts that ████████████████████████████
████████████████████.[69]

72. Contrary to Mr. Jacobs' assertions, PSC transactions are not actually adjudicated, and, in any event, whether or not a prescription is adjudicated does not impact whether the price offered should be reported or otherwise included when determining the U&C price to report.

---

[66] NCPDP *Telecommunications Version 5: Questions, Answers and Editorial Updates* (Nov. 2010) at 39 (emphasis added), https://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf.

[67] My long-held understanding of U&C price is supported by the District Court in *Garbe* that "the NCPDP definition (which reflects the industry standard) of 'cash price to the general public' controls, unless further defined by an individual state statute or relevant contract and/or payer sheet." *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002, 1016 (S.D. Ill. 2014).

[68] Jacobs Report at 67.

[69] Jacobs Report at 17-18.

### A. PSC transactions are not actually adjudicated

73. Despite acknowledging that the PSC was not insurance, evidence indicates that

█████████████████████████████████████████████████████████ [70]

74. The primary difference between a PSC transaction and other cash transactions is that Walgreens assigns a BIN for PSC transactions. A BIN is used to identify a particular third-party prescription program for insurance purposes.[71] In other words, the assignment of a BIN number causes Walgreens' computer system to route the transaction to an outside processor creating the illusion that the prescription must be adjudicated like an insured prescription and, therefore, something other than a cash discount. But this is only an illusion designed to protect the inflated U&C Walgreens reported.[72]

75. A BIN number is typically used to identify a particular third-party prescription program for insurance purposes. This is reflected in an NCPDP White Paper which defines BIN/PCN/Group Number as:

> The BIN (Bank Identification Number), PCN (Processor Control Number), and Group Number combinations are used by pharmacies, switches, and processors to electronically route and adjudicate pharmacy claims for prescriptions *and typically identify pharmacy insurance programs*.[73]

76. Assigning a BIN number is not necessary to offer a discount and appears to be nothing more than an attempt to further disguise these discounts. To be clear, Walgreens may have caused PSC "claims" to be "administered" or "processed" unnecessarily by an outside entity, but these transactions certainly were not "adjudicated" as that term is understood in the industry.

---

[70] ████████████████████████████████████████████████████████
(Walg_Forth_00122127).

[71] Specifically, the BIN number, along with a PCN and Group Number, is "used by pharmacies, switches, and processors to electronically route and adjudicate pharmacy claims for prescriptions *and typically identify pharmacy insurance programs*." *See* NCPDP Recommendations for Use of the NCPDP Telecommunication Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs, Version 1.1 (May 2017), *available at* https://ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf (last accessed June 20, 2023).

[72] ████████████████████████████████████████████████████████
Bernstein Dep. at 56:22-58:7.

[73] NCPDP Recommendations for Use of the NCPDP Telecommunication Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs, Version 1.1 (May 2017), available at https://ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf (emphasis added).

77. In the pharmaceutical industry, "adjudication" describes a multi-step process of making decisions or judgments on insurance claims. These decisions involve issues such as:

- Determining customer eligibility based on information unknown to the pharmacy staff;

- Determining prescription coverage based on information unknown to the pharmacy staff;

- Determining payment based on the "lesser-of" or "lower-of" logic;

- Subjecting the prescription information to various administrative edits (*e.g.*, refill too soon or refill not authorized); and

- Subjecting the prescription information to various safety edits (*e.g.*, contraindications, drug interactions, drug utilization review, or prior authorization requirements).[74]

78. Most of the typical claims adjudication functions were not provided for PSC transactions. Figure 1 illustrates the differences between adjudicating insurance claims and processing PSC and other cash prescriptions.

79. As described in my Opening Report, Walgreens employed various PBMs to process PSC discounts. (*See* paragraph 72 of my Opening Report.).

80. According to Mr. Jacobs, ████████████████████████████████████
████████████████████████ [75]

81. This is obviously not true with regard to the PSC. Testimony confirms that Walgreens created the program, enrolled customers, and set and maintained prices.[76] Walgreens did not need to hire another company to tell it which customers it enrolled and what prices it already decided to charge. The pharmacist at the prescription counter should have been able to determine this information from Walgreens' own computer system. The BIN was superfluous and PBM processing of PSC discounts served only to help cover Walgreens' manipulation of U&C.[77]

---

[74] *See* Discussion of prescription benefit management adjudication systems in Black, G.E. and Romza, J.H., in Robert P. Navarro, *Managed Care Pharmacy Practice*, (Jones and Bartlett Publishers, 2nd ed., 2009) pp. 205-07.

[75] Jacobs Report at 18.

[76] *See* Opening Report, ¶188.

[77] ████████████████████████████████████████████████████
(Walg_Forth_00122127).

**Figure 1. Adjudication of Insurance Claims v. Processing Other Prescriptions**

| | Insurance Transactions | Non-Insurance Transactions | |
| --- | --- | --- | --- |
| | | PSC Transactions | Other Cash Transactions |
| Eligibility determined by PBM | ✓ | ✘ | ✘ |
| Formulary created by PBM | ✓ | ✘ | ✘ |
| Price determined by PBM | ✓ | ✘ | ✘ |
| PBM payment made on behalf of a TPP | ✓ | ✘ | ✘ |
| Administrative edits by PBM | ✓ | ✘ | ✘ |
| Safety edits by PBM | ✓ | ✘ | ✘ |
| BIN/PCN required for purchase | ✓ | NOT NECESSARY | ✘ |

82. From Mr. Jacobs' admissions in his deposition testimony, it is clear that these PBM processors did <u>not</u> provide "adjudication" functions described in the previous paragraphs. Mr. Jacobs admitted that:



---

[78] Jacobs dep. at 143:10-14.

[79] Jacobs dep. at 141:3-6.

[80] Jacobs dep. at 136:20-22.

[81] Jacobs dep. at 136:23 – 137:2.

[82] Jacobs dep. at 134:20-24.

- [black redacted text] [83]

83. In essence, Walgreens created the PSC and owned the PSC database used by its PBM processors.

84. In addition to these admissions, Mr. Jacobs also admitted [black redacted text] [4]

85. Since Walgreens enrolls and maintains a list of "club members," it could merely enter this information on the patient profile that is already in Walgreens' computer system along with the discount prices that it created.

**B. Whether or not a prescription is adjudicated is irrelevant to whether a membership club (or pharmacy discount program) price should be considered a U&C price**

86. Mr. Jacobs confuses cause and effect. The notion that "membership club" transactions are not "cash" prescriptions because they have BIN numbers and are "adjudicated" is misleading. In reality, non-insurance transactions do not have to be adjudicated. They are processed by an outside entity *only* because Walgreens assigned a BIN number to disguise them to *appear* as a third-party "adjudicated claim" – even though the customer pays the full amount without using insurance. This so-called "adjudication" for a store-sponsored discount is a choice – not a requirement.

87. Pharmacies can, and do, offer discounts to other cash customers (*e.g.*, employee family discounts, senior citizen discounts, military discounts, and prescriber discounts) and do so without "adjudicating" claims.

88. Some discounts, such as those for senior citizens, may even require some type of "enrollment," which could be as simple as a notation in the patient profile in the pharmacy's computer system.

89. Figure 2 illustrates that the PSC operates much like any other store-sponsored discount with the major difference being that Walgreens assigned a BIN number for PSC so that these cash discounts would look like insurance, even though they are not.

**Figure 2. Comparison of the PSC to Other Store-Sponsored Discounts**

| | PSC | Other Store-Sponsored Discounts |
|---|---|---|
| Offered to cash-paying customers? | ✓ | ✓ |
| Available to the general public? | ✓ | ✓ |

---

| | | |
|---|---|---|
| Designed to attract customers? | ✓ | ✓ |
| Exclusive to the pharmacy's customers? | ✓ | ✓ |
| Discounts on medications? | ✓ | ✓ |
| Percent discount off select retail prices? | ✓ | ✓ |
| Owned and managed by the pharmacy? | ✓ | ✓ |
| Eligible customers determined by the pharmacy? | ✓ | ✓ |
| Third-party adjudication necessary? | ✗ | ✗ |

90. It is my opinion that Walgreens' "adjudication" process for PSC transactions is a mere pretense that should have no impact on whether a "club membership" program is excluded from U&C.[85]

## VIII. Mr. Jacobs contradicts himself on the question of whether PSC was offered to members of the general public

91. Mr. Jacobs agrees that  [86] Mr. Jacobs admits that [87] [88] [89]

---

[85] The *Garbe* Court also considered this issue for Kmart's "adjudication" process (which it said was similar to Walgreens'). *Garbe*, 824 F.3d at 636.



[86] Jacobs dep. at 78: 14-24.

[87] Jacobs dep. at 79:14-17.

[88] Jacobs dep. at 118:10-18.

[89] Jacobs dep. at 157:2-7.

92. Mr. Jacobs acknowledges that [90]

93. Although Mr. Jacobs cited the *Garbe* case and found "certain portions" relevant,[92] he said
███████████████████████████████████████████████████████[93]

94. The *Garbe* decision, however, comports with my understanding that:

> [T]here was no meaningful selectivity for the people who join Kmart's programs, and thus that they could be distinguished in any way from the "general public."[94]

> Cash customers walking into Kmart *do not cease to be members of the general public* the minute they are offered or pushed into membership in Kmart's discount program.[95]

## IX. Mr. Jacobs said that he does not have an opinion as to whether a PSC membership fee is relevant

95. Walgreens stated that [96]

96. In his deposition, Mr. Jacobs agreed with the statement that:
███████████████████████████████████████[98]

---



[90] Jacobs dep. at 149:24-150:2.

[91] Connecticut Department of Social Services, Declaratory Ruling (Dec. 28, 2010), p. 8.

[92] ████████████████████████████████████████ Jacobs dep. at 169:13-17.

[93] ████████████████████████████████████████ Jacobs dep. at 168:22-169:2. *See also id.* at 117:14-21; 151:7-11; 170:16-22.

[94] *Garbe*, 824 F.3d at 643.

[95] *Id.* (emphasis added).

[96] ████████████████████████████████████ (Aug. 24, 2011); Erlund Ex. 63; Walg_Forth 00122128.

[97] Bernstein Dep. Ex. 35 at Walg_Forth_00190302 (███████████████████).

[98] Jacobs dep. at 167:11-16.

97.  Mr. Jacobs further stated that ██████████████████████████████████
     ████████████████████████████████████ [9]

98.  Mr. Jacobs, however, was inconsistent in his testimony.  Despite giving an opinion that
     ████████████████████████████████████████████████████████ [100]
     ██████████████████████████████████████████████████████████████
     ██████████████████████████████████████████████ [01]

99.  Mr. Jacobs' inconsistency makes his opinions unreliable.

## X.  Mr. Jacobs misread, misinterpreted, or misrepresented CMS advice regarding usual and customary

### A.  Mr. Jacobs incorrectly implies that CMS cannot expect the U&C to serve as a price ceiling

100. Mr. Jacobs says that ████████████████████████████████████████████
     ██████████████████████████████████████████████████████████████

101. Although I disagree with his viewpoint and consider it a red herring, I will refrain from
     giving a legal opinion.  I note, however, that CMS is authorized to establish regulations
     and guidance for Medicare and Medicaid and that doing so is different from "negotiating
     drug pricing."

### B.  Mr. Jacobs incorrectly claims that CMS distinguishes between U&C and "membership club" discount prices

102. Mr. Jacobs asserted that ████████████████████████████████████████
     ████████████████████████████████████████████ ." [102]

103. These documents, however, do not support his argument.  The first and third *Federal
     Register* references are about the transitional Medicare Part D discount card that was
     temporarily used only in the first year of the Medicare Part D program.  As I opined
     previously, a "cash customer" is defined as one who does not use insurance coverage.
     Medicare Part D offered a discount program exclusively for Medicare Part D
     beneficiaries.  Since Medicare is an insurance program and beneficiaries were using an

---

[99] Jacobs dep. at 162:3-6.

[100] Jacobs dep. at 170:1-10.

[101] Jacobs dep. at 155:3-18.

[102] Jacobs dep. at 76.

insurance benefit, Mr. Jacobs' implication that the Medicare Part D discount card is equivalent to a "membership club" discount card is not accurate or relevant.

104. His second *Federal Register* reference merely points out that patients can use discount programs for those prescriptions for which they pay cash (*e.g.*, while they are in the deductible and coverage gap phases). These references do not support his argument that "membership club' discount prescriptions are not cash transactions.

105. I have not seen anything in the record indicating that CMS has made "████████████████ ████████████████████████████████████" as Mr. Jacobs claims. Furthermore, his premise is not supported by the "evidence" he offers.

### C. Mr. Jacobs misrepresents the advice that CMS provided on U&C

106. Mr. Jacobs makes three claims related to CMS advice regarding U&C that require rebuttal. First, he opines that the Tudor Memo (to which I referred in paragraphs 56-57 of my Opening Report) is ███████████████████████████[103] ████████████████████████████████████████ ███████[04]███████[05] I will comment on each of these claims.

### (1) Contrary to Mr. Jacobs' assertions, CMS advice is not limited to specific pharmacies, such as Walmart

107. A more careful reading of the Tudor Memo, however, shows that CMS advice was not about Walmart's program specifically; it used Walmart only as an example of how discount prices are subject to being reported as a pharmacy's U&C.[106]

108. Mr. Jacobs should have also noted when the CMS memo was written, (October 11, 2006) Walmart's competitors had not yet devised their "membership club" program schemes. For the most part, they were launched in 2007 or later. Indeed, Mr. Jacobs admits that ████████████████████████████████████████████. The CMS memo, therefore, indicates that cash discounts offered by *any* pharmacies are reportable as U&C if the discounts are "made available throughout the benefit year."[107]

109. Mr. Jacobs also misrepresents that ████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[103] Jacobs Report at 76.

[104] Jacobs Report, footnote 91.

[105] *Id.*

[106] "*For example*, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers." Tudor Memo.

[107] *Id.*

[108]

110. Actually, the Tudor Memo references "cases where a pharmacy offers a lower price to its customers throughout a benefit year" and then says that in these cases "Part D sponsors consider this [discount program price] to be "usual and customary.""[109]

111. The memo goes on to explain that Medicare Part D expects claims to be adjudicated at the discounted price and that beneficiaries would pay a lower copayment so that "both the Plan and the beneficiary are benefiting from the Wal-Mart 'usual and customary' price...."[110]

112. CMS incorporated the Tudor Memo into its *Prescription Drug Benefit Manual*[111] and has not given any guidance contrary to that in the memo, which advised that discount program prices are reportable as U&C prices.

113. Mr. Jacobs' representation of the Tudor Memo differs from that of the Seventh Circuit in *Garbe*:[112]

> The *CMS Manual* has long noted that "where a pharmacy offers a lower price to its customers throughout a benefit year" the lower price is considered the "usual and customary" price rather than "a one-time 'lower cash' price," even where the cash purchaser uses a discount card. [Centers for Medicare & Medicaid Servs.,] Chapter 14 – *Coordination of Benefits*, in [Medicare Prescription Drug Benefit Manual] 19 n.1 (2006), https://perma.cc/MW6AH4P6.

114. It is my opinion that Mr. Jacobs is incorrect in his representation of the CMS advisory memo and that his testimony on this issue is not reliable.

### (2) Mr. Jacobs inappropriately dismisses the CMS advisory memo as applicable only to plan sponsors[113]

115. Mr. Jacobs fails to recognize that CMS requires pharmacies to certify that they have complied with all laws, regulations, and CMS instructions.[114] Pharmacies are required to submit truthful claims. Plan sponsors rely on accurate claims, which they must then

---

[108] Jacobs Report at 76.

[109] *See* Tudor Memo.

[110] *Id.*

[111] CMS, Medicare Prescription Drug Benefit Manual, Chapter 14 - Coordination of Benefits, (2006), https://perma.cc/MW6AH4P6.

[112] *Garbe*, 824 F.3d at 644.

[113] Jacobs Report, footnote 91.

[114] 42 C.F.R. §§ 423.505(i)(3)(iv), (i)(4)(iv).

submit to CMS in the form of prescription drug event (PDE) records. The notion that CMS advice does not pertain to pharmacy providers like Walgreens is not consistent with the way that Medicare Part D works.

**(3) Mr. Jacobs improperly dismisses the CMS advisory memo as not "authoritative"**

116. Mr. Jacobs tries to give a legal opinion about whether CMS advisory opinions are "authoritative."[115] Since legal opinions are beyond the scope of an expert, I will not attempt to interpret what is or is not authoritative under the False Claims Act. I do note, however, that whether the Tudor Memo or not is authoritative, CMS felt it was important enough to include this advice in the *Prescription Drug Benefit Manual*[116] and this advice serves to explain how U&C is understood in the industry. This understanding, based on CMS advice, is hardly consistent with what Mr. Jacobs represents as the "prevailing industry understanding."

**XI.  Mr. Jacobs seems to misunderstand the purpose of the U&C price ceiling and demonstrably misrepresents my testimony on this issue**

117. Mr. Jacobs stated in his report that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[117] He must have felt this was an important point, because he repeated his claim a second time.[118]

118. Upon questioning, he admitted during deposition that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[119]

119. It is possible that Mr. Jacobs misread or misunderstood the point that I was making about the U&C price serving as a price ceiling. To be clear, a "price ceiling" is defined as "the mandated maximum amount a seller is allowed to charge for a product or service."[120]

---

[115] Jacobs Report, footnote 91.

[116] *Medicare Prescription Drug Benefit Manual*, Ch. 14 – Coordination of Benefits, Section 50.4.2., https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Chapter-14-Coordination-of-Benefits-v09-17-2018.pdf.

[117] Jacobs Report at 36: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[118] *See also* Jacobs Report at 95: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[119] Jacobs dep. at 84:11-87:8.

[120] *What is a Price Ceiling? available at* https://www.investopedia.com/terms/p/price-ceiling.asp.

30

120. Mr. Jacobs agreed that 

121. Certainly, "lesser-of" logic including the pharmacy's U&C price as one of the prices comparators means that the price paid will not exceed the pharmacy's U&C price. The "U&C price" would be meaningless without the "lesser of" requirement.

122. Publicly available testimony states that U&C is meant to ensure that insured patients get lower costs. For instance, Thomas Gibbons, CVS's former SVP of Payer Relations, testified in the *Washington/Corcoran v. CVS* case that the purpose of "lower of" U&C pricing is to reduce costs and ensure that customers do not pay more than the usual and customary price.[124]

123. Also, the United States Court of Appeals for the Seventh Circuit supports my long-held understanding that the U&C serves as a price ceiling. The Court held that:

> The purpose of these regulations [42.C.F.R.] § 447.200 (citing 42 USC § 1396(a)(30))] is clear: state agencies are not to pay more for prescribed drugs than the prevailing market price.... Regulations related to "usual and customary price" should be read to ensure that where the pharmacy regularly offers a price to its cash purchasers of a particular drug, Medicare Part D receives the benefit of that deal.[125]

124. Mr. Jacobs correctly points out that

[126] I am not sure what argument he is trying to make because this point is not in dispute. The parties to this suit know that cash prices can sometimes be lower than the insurance contract price. The point Mr. Jacobs misses or refuses to acknowledge is that these lower cash prices, if widely and consistently available, becomes the pharmacy's U&C price.

---

[121] Jacobs dep. at 88:10-25.

[122] Jacobs dep. at 89:3-12.

[123] *See* footnote 7 on page 4 of Opening Report.

[124] *Washington v. CVS*, Trial Tr. at 1860:17 - 1861:11 (Thomas Gibbons).

[125] *Garbe*, 824 F.3d at 644.

[126] Jacobs Report at 36-37.

XII. **Mr. Jacobs falsely claims that NCPDP differentiates between "cash retail" and other "self-pay prices" such as "membership clubs"**

125. In paragraph 71 of his report, Mr. Jacobs claims that ███████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████[127]

126. This statement is false and misleading.

127. Mr. Jacobs does not provide a reference for this ███████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████

128. The purpose of this data field is to report back from the plan to the pharmacy the type of program under which the claim adjudicated.[128] While the A28-ZR data field has existed for some time, the values "self-pay" values report were only recommended in April 2017 – long after Walgreens implemented the PSC and decided that it was not going to include its discounted PSC prices in its calculation of U&C.[129]

129. Prior to NCPDP's Recommendations in May 2017, the A28-ZR data field was called "Adjudicated Payment Type" and included only ten code values.[130]

130. Of note, prior to NCPDP's Recommendations in May 2017, there were no "self-pay" or "cash" code values identified in the A28-ZR data field.

131. The differences in the A28-ZR data field pre-May 2017 and post-May 2017 are important because they reflect the purpose of NCPDP's recommendations in May 2017. The purpose of the additional code values in the A28-ZR data field recommended by the NCPDP in 2017 was to enhance transparency by identifying sources of financial contribution in order to determine whether federal healthcare programs were being utilized, triggering potential Anti-Kickback Statute (AKS) liability.[131] *The revisions had nothing to do with U&C at all.*

---

[127] Jacobs Report at 71.

[128] NCPDP Recommendations for Use of the NCPDP Telecommunications Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs, Version 1.1 (May 2017) (the "2017 NCPDP White Paper"), *available at* https://ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf (last accessed Jun. 16, 2023).

[129] *See id.*; *see also* NCPDP External Code List, April 2017, https://stds.ncpdp.org/ExternalCodeList/.

[130] NCPDP External Code List, September 2010, pp. 16, 329.

[131] 2017 NCPDP White Paper, Sections 1 and 2 ("Background" and "Purpose," respectively), pp. 5-7.

132. Further, the Adjudicated Program Type data field will only become available in Version F6 of the Telecommunication Standard, if approved by the Department of Health and Human Services.[132] Since Version F6 is not yet in effect, the definitions included in Version F6 are not an appropriate basis to explain the industry understanding of the meaning of "cash customer" or U&C pricing during the relevant time period of this case.

133. Nevertheless, the forthcoming definitions do indicate the industry's thinking and directions regarding reporting of "self-pay" transactions. The inclusion of "self-pay" values in the expanded list of code values for A28-Z confirms that the NCPDP accepts that there are multiple circumstances in which customers may pay without insurance (*i.e.*, as self-pay or cash customers) and pay the full cost of the prescription themselves, discounted or not. A customer that is receiving a discounted price from a pharmacy, without any insurance, is a "cash customer," and these transactions may return the value "Self-Pay: Discount Program" or "Self-Pay: Cash." *The fact that one self-pay value or the other is returned does not change the fact that these "cash transactions" as that term is understood in the industry.*

134. The "Self-Pay: Cash" and "Self-Pay: Discount Program" code values *do not modify the NCPDP definition of U&C.* Nor do they show any intention on behalf of the NCPDP to distinguish cash transactions from pharmacy discount programs like the PSC or to alter in any way the understanding of "cash customer" in the industry. If the conclusions of Mr. Jacobs' report were correct, there would have been some reference to U&C in the Recommendations. There is none.

## XIII. Mr. Jacobs inappropriately equates the Walgreens-sponsored Prescription Savings Club with third-party discount cards

135. Throughout his report, ██████████████████████████████████████████████
    ██████████████████████████████████████████████████████████
    ████████[133]

136. I understand that Walgreens contends that PSC prices are excluded from U&C because the PSC program was administered by a third party. This is faulty for at least three reasons. First, as described earlier in this report, third-party administration does not comprise the functions of claims adjudication. Second, administration by itself does not remove a cash price from U&C. If a discount program price is the lowest cash price that the pharmacy makes widely and consistently available, industry practice would be to treat it as U&C. To be sure, questions of who actually controls the price (the pharmacy or third party) may bear on whether it is the pharmacy's program, but the concept of "third party cash discount card programs" sweeps in broadly a wide variety of contractual arrangements, so the label alone does not remove a program price from consideration as

---

[132] The NCPDP Telecommunication Guide Version F6, published January 2020.

[133] For example, *see* Jacobs Report at 18.

the U&C price. Third, and in any event, the PSC was not a third-party cash discount program. (I expand on the latter point below.).

137. The PSC was created and owned by Walgreens. Various parties, including Optum and Express Scripts, administered PSC under Walgreens' direction but did not create the program or control eligibility or pricing.[134]

138. Third-party discount cards, on the other hand, are not owned by Walgreens and, unlike PSC (which is exclusive to Walgreens) are offered by both Walgreens and competing pharmacies.

139. Walgreens sets its own prices for the PSC program while prices for third-party discount cards are the product of negotiation with a third-party discount card sponsor.

140. Figure 3 illustrates the differences between the PSC and third-party discount cards.

**Figure 3.  Comparison of PSC and Third-Party Discount Cards**

|  | PSC | 3rd-Party Discount Cards |
|---|---|---|
| Created, owned and controlled by Walgreens? | ✓ | ✗ |
| Eligibility determined by Walgreens? | ✓ | ✗ |
| Could eligibility be determined from patient records without need for a "membership card"? | ✓ | ✗ |
| Formulary determined by Walgreens? | ✓ | ✗ |
| Prices determined by Walgreens? | ✓ | ✗ |
| Exclusive to Walgreens? | ✓ | ✗ |
| Marketed by Walgreens? | ✓ | ✗ |
| Meaningful "lesser of" comparison? | ✗ | ✓ |

141. Third-party discount card prescriptions are not insurance prescriptions and, therefore, are cash prescriptions.  These third-party discount prescriptions are, however, quite distinct from the PSC prescriptions and discounted cash prices offered to the general public by Walgreens.

**XIV.  Mr. Hanifin's description of "obstacles" to joining the PSC is uninformed**

142. Mr. Hanifin offers the opinion that the PSC is a subscription loyalty program, like Amazon Prime, and that there are obstacles to signing up including: (1) the time and effort required to sign up, (2) the provision of personal information, and (3) the membership fee.  According to Mr. Hanifin, these are sufficient "obstacles" (as he calls

---

[134] *See* Mr. Jacobs' admission of these points in his deposition at 138:10-143:14.

them) discouraging individuals from joining PSC and separating them from members of the general public.[135]

143. Mr. Hanifin's errors are understandable in that he has no experience in the pharmacy industry[136] and does not consider himself to be an expert in the pharmacy industry or pharmacy operations.[137]

144. Pharmacy is a unique industry and quite different from Amazon Prime. A prescription is an instruction by a medical practitioner that a patient receive medically necessary medication, the amount of the medication to be dispensed and the manner in which the medication is to be used. Many medications, such as oral contraceptives and maintenance medications (*e.g.*, antihyperlipidemics, antihypertensives, oral hypoglycemics, etc.) require patients to take them for extended periods of time, sometimes for the rest of their lives. Demand, therefore, can be predictable to some degree making it easier to predict savings from joining a "subscription loyalty program" such as the PSC.

145. The supposed "obstacle" of signing up takes minimal time and effort. According to Michael Amiet, Walgreens' 30(b)(6) designee, enrollment requires nothing more than an email address, a signature and a certification that the customer is not a Medicare or Medicaid recipient.[138] The latter is payment information that Walgreens already needs to know before dispensing prescriptions. The email address is simply contact information that pharmacy's routinely maintain in conjunction with prescription customers and, for example, on-line refill requests.

146. Clearly, the time and effort required to get a prescription in the first place – to drive to the pharmacy, to navigate the parking lot, or wait to be for service from pharmacy staff or the cashier – is more than the effort required for the one-time enrollment procedure, especially since enrollment can be done at the pharmacy counter when getting a prescription.

147. Also, every member of the general public getting a prescription is required to provide personal information to obtain their medication, whether joining the PSC or not. Information needed for PSC is nothing more than what a pharmacy already captures for patient records or for dispensing prescriptions. Ergo, providing this information is not a barrier. To suggest, as Hanifin does, that provision of personal information is a

---

[135] Hanifin Report.

[136] In his deposition, Mr. Hanifin admitted that he has taken no courses on pharmacy operations and has never been employed by a pharmacy, PBM, or TPP. In addition, he has no peer-reviewed publications and has not published anything related to U&C. Hanifin dep. at 51:2-5 and 63:24-67:19.

[137] Hanifin dep. at 51:7-11.

[138] Amiet dep. at 91:15 -93:18.

35

meaningful obstacle is to simply be uninformed as to what is required to obtain a prescription in the first place.

148.    In his deposition, Mr. Hanifin admits as much, agreeing that "because the pharmacist already has the relevant information, the task of providing the information requires significantly less effort than the patient needing to affirmatively provide that information."[139]

149.    The cost "obstacle" is rebutted by the facts that: (1) the savings are easily calculable, requiring only simple addition and subtraction,[140] and (2) Walgreens offered a guarantee for a significant amount of the relevant time.[141]

150.    Walgreens' brochure titled ██████████████████████████████████████
         ████████████████████████████████████████████████████ [42]

151.    Mr. Hanifin agreed that "in joining the PSC, the customer receives a discounted cash price when filling their prescription immediately."[143]

152.    In his testimony, Mr. Hanifin acknowledged that, using examples from Walgreens' own brochure, that a cash-paying patient coming to Walgreens with a prescription could be faced with a decision of paying $35 for both the PSC fee ($20) and the PSC price for the medication ($15) or not joining and paying the non-PSC cash price ($42).[144] Therefore, Mr. Hanifin testified, there would be a net savings of $7 on the first prescription and $27 on the next prescription. In other words, even without the "savings guarantee," customers could sign up knowing that they could immediately save more than the membership fee -- essentially eliminating the fee as an "obstacle."

---

[139] Hanifin dep. at 14:9-18. *See also id.* at 87:7-16.

[140] Hanifin dep. at 112:12-115:22

[141] Walgreens' PSC promotional materials informed ████████████████████████████
     ████████████████████████████████████████████████████████████████████████
     ████████████████████████████████████████████████████

[142] Walgreens' brochure titled "Feel Better with Guaranteed Savings." Hanifin Dep. Ex. 552. At his deposition, Hanifin admitted to and demonstrated ignorance of Walgreens' guarantee.

[143] Hanifin dep. at 88:14-21 and 89:14-21. *See also* Walgreens brochure "Like Savings? Join the Club" at Hanifin Dep. Ex. 554. *Note also*, **Mr. Hanifin agreed that PSC was a "*cash discount price*."**

[144] Hanifin dep. at 111:11-114:14. *See also* 114:15-115:19.

36

153. An article cited by Mr. Hanifin supports the understanding that loyalty program membership fees are negated by savings that equal or exceed the fee:



[145]

154. Having taught microeconomics and pharmacy operations management for many years (both of which included break-even analysis), I can attest that the previous quote is true and serves to refute the notion that the membership fee was some type of "obstacle" or barrier for individuals joining PSC.

155. As "evidence" that the membership fee is an "obstacle," ████████████████████████████ .[146] Having taught research methods to graduate students, it appears to me that Mr. Hanifin has confused association with causation. The fact that enrollments increased during a promotion (that presumably included advertising) means that promotion itself could have increased enrollments with or without the fee discount. Without evidence documenting that there was control for extraneous variables, such as advertising, in-store promotions or staff incentives to enroll customers, there is no way to tell whether decreased fees *caused* increased enrollments. Therefore, the "evidence" to which Mr. Hanifin cites lacks both reliability and validity.

## XV. Dr. Nordby's narrow focus on an economic principle is incomplete and ignores relevant evidence to the contrary

156. Dr. Nordby opines that ████████████████████████████████████ [147]

157. I have seen no documents showing that Walgreens considered the membership fee as part of the PSC price.

158. Furthermore, there is no NCPDP data field that would account for the membership fee. In fact, NCPDP defines "U&C price" as "[the] [a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."[148] NCPDP explains that

---

[145] "Reward Me, Charity, or Both? The Impact of Fees and Benefits in Loyalty Programs," *Journal of Retailing and Consumer Services*, April 2015, at 79. (Hanifin Report footnote 20 and Hanifin Dep. Ex. 155).

[146] Hanifin Report at 12.

[147] Nordby Report at 12.

[148] *NCPDP Data Dictionary* (1999) at 71. *Available at* http://www hosinc.com/products/ascend/help/billing/EDI% 20Manuals/data%20dictionary%20september%2099.pdf (last accessed June 23, 2023). This same definition remains in effect today. *See also* https://ushik.ahrq.gov/ViewItemDetails?system=sdo&itemKey=62832000 (last accessed June 23, 2023).

the term "other amounts claimed" refers to costs added to the cost of the medication itself, such as sales tax, shipping, delivery, postage, etc. In my opinion, a membership fee would be an "other amount claimed" and would not be considered part of the U&C price.[149]

159. Dr. Nordby does not offer an opinion as to how U&C should be calculated legally or as an industry practice or whether PSC administrative or operational costs should be excluded from U&C.[150]

160. Regardless of what Dr. Nordby says, the membership fee is better understood as a profit center.[151]

161. Dr. Nordby's premise rests in part on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[152]

162. The first factor, according to Dr. Nordby, is that PSC prices are "only available to club members who are eligible, enroll, agree to the terms and conditions, and pay the membership fee."

163. Dr. Nordby's opinion, though, is incomplete and contradicted by Walgreens, itself. Dr. Nordby did not consider that Walgreens, in fact, acknowledged that *everyone* is eligible:



- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[153]

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[154]

---

[149] NCPDP External Code List, pp. 389-90.

[150] Nordby dep. at 124:16-125:9. *See also id.* at 141:16-24.

[151] Dr. Nordby recognized that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Nordby Report at 22. Obviously, there would also be some expenses associated with creating, operating and promoting the program as well as paying the PBM partners for their participation in the scheme.

[152] Nordby Report at 49.

[153] Amiet dep. at 116:9-12.

[154] Walgreens' Response to Plaintiffs' First Request for Admission to Defendant (Feb. 28, 2020), Response to Request for Admission No. 8.

164. Dr. Nordby also ignores the fact that Walgreens provided PSC prices to FEP and state Medicaid enrollees *without including the membership fee*.

165. Further, as set forth in Mr. Smith's report, at least 24,000 "Unique Account Holders" were able to purchase PSC drugs at PSC prices *without paying a membership fee*.[155]

166. I responded to the supposed "obstacles" of enrolling and paying a fee earlier in this Rebuttal Report. (*See* my response in Section XV.)

167. In my Opening Report (as well in Section XIV of this Rebuttal Report) I discussed the fact that the savings guarantee also serves to remove the membership fee as an "obstacle." Dr. Nordby goes to some length in her report ███████████████ ███████ [156] Her discussion misses the point. The issue is *not* whether customers saved enough to cover the fee and, if not, whether they bothered to ask for a refund. The point is that *Walgreens represented that there was no net cost to signing up*. Dr. Nordby fails to recognize that, if anything, a low number of refunds indicates that savings exceeded the cost and there actually was no net cost – just as Walgreens had promised. Whether or not any refunds were provided, the savings guarantee effectively nullifies the fee as a barrier.

168. The second factor that Dr. Nordby claims ███████████████████ ███████████████████████████████ "[157]

169. I understand the concepts of price discrimination and market segmentation that Dr. Nordby discusses. Her view is limited, however, in that she does not consider the pharmacy operations and managed care environment relevant to this case and, therefore, the degree to which these principles may or may not operate or even be relevant.

170. Based on my knowledge and experience in this industry and examination of the record, I disagree with Dr. Nordby's conclusions.

171. To support her premise, Dr. Nordby cites a passage in the Seventh Circuit Court's decision in *Garbe*. However, in this same paragraph that Dr. Nordby cites, *Garbe* found that "[t]he evidence submitted shows that the barriers to joining the Kmart 'programs' were almost nonexistent."[158]

---

[155] Smith Report, Attachment 3.

[156] Nordby Report at 66-73.

[157] Nordby Report at 49.

[158] *Garbe*, 824 F.3d at 643 (emphasis added).

172.  Another passage on the same page of the *Garbe* decision that Dr. Nordby cites also serves to refute her premise:

> Saying that someone is a member of a "particular" organization, however, does not make it so. We are given **no reason to think that there was any meaningful selectivity for the people who joined Kmart's programs**, and thus that they could be distinguished in any way from the "general public."[159]

173.  In her deposition testimony, Dr. Nordby did admit that the *Garbe* Court **did not view the membership fee as a barrier**.[160]

174.  Dr. Nordby's errors are understandable in that she is not an expert in pharmacy operations, has no experience in the pharmacy industry, has no knowledge of insurance claims practices and has never published about these issues.[161]

**Declaration**

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and ability.

Dated:  June 20, 2023

_____
Kenneth W. Schafermeyer, Ph.D.

---

[159] *Id.*

[160] Nordby dep. at 121:16-18; 122:20-123:4.

[161] Nordby dep. at 62:16-70:17.

**EXHIBIT C:**
**MATERIALS RELIED ON**
**REBUTTAL EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Production Documents |
| --- |
| ESI-0000323 |
| Walg_Forth_00038103 |
| Walg_Forth_00053004 |
| Walg_Forth_00074709 |
| Walg_Forth_00122126 |
| Walg_Forth_00122127 |
| Walg_Forth_00122128 |
| Walg_Forth_00180170 |
| Walg_Forth_00190302 |
| Walg_Forth_00191697 |
| Walg_Forth_00271867 |

| Deposition Transcripts |
| --- |
| Nov. 20, 2019 Deposition of Michael Amiet |
| Sept. 14, 2019 Deposition of Jay Bernstein |
| May 4, 2023 Deposition of John W. Hanifin |
| May 25, 2023 Deposition of Michael Steven Jacobs |
| April 21, 2023 Deposition of Kelly Lear Nordby, Ph.D. |

| Deposition Exhibits |
| --- |
| Amiet Deposition Exhibit 73 |
| Amiet Deposition Exhibit 82 |
| Bernstein Deposition Exhibit 35 |
| Erlund Deposition Exhibit 63 |
| Erlund Deposition Exhibit 64 |
| Hanifin Deposition Exhibit 155 |
| Hanifin Deposition Exhibit 552 |
| Hanifin Deposition Exhibit 554 |
| Jacobs Deposition Exhibit 564 |
| Jacobs Deposition Exhibit 567 |
| Schuler Deposition Exhibit 174 |
| Schuler Deposition Exhibit 181 |

**EXHIBIT C:**
**MATERIALS RELIED ON**
**REBUTTAL EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Manuals |
| --- |
| *Medicare Prescription Drug Benefit Manual*, Ch. 14 – Coordination of Benefits, Section 50.4.2., https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Chapter-14-Coordination-of-Benefits-v09-17-2018.pdf |

| Pleadings |
| --- |
| Connecticut Department of Social Services, Declaratory Ruling (Dec. 28, 2010), p. 8 |
| Expert Declaration of Dale Chamberlain (Redacted) (June 6, 2017) |
| Expert Report of Jed Smith (Mar. 17, 2023) |
| Expert Report of John W. Hanifin (Mar. 17, 2023) |
| Expert Report of Michael S. Jacobs (Mar. 16, 2023) |
| Expert Report of Kelly Lear Nordby, Ph.D. (Mar. 17, 2023) |
| *Humana v. Walgreen Co.*, No. 01-19-0002-5131 (Am. Arb. Ass'n), Final Award (April 5, 2023) |
| *Humana v. Walgreen Co.*, No. 01-19-0002-5131 (Am. Arb. Ass'n), Interim Award (Nov. 8, 2021) |
| *Russo v. Walgreens.*, No. 1:17-cv-02246 (N.D. Ill. Nov. 17, 2022), ECF 556-54, Exhibit 54, Declaration of Darren K. Townzen |
| Walgreens' Second Amended Objections and Responses to Plaintiffs' Second Set of Requests for Admission (Jan. 19, 2021) |
| Walgreens' Response to Plaintiffs' First Request for Admissions to Defendant (Feb. 28, 2020) |
| Walgreens' Sixth Supplemental and Amended Objections and Responses to Plaintiffs' First Set of Interrogatories (Nov. 20, 2020) |
| *Washington v. CVS*, No. CV 15-03504-YGR Trial Transcript from June 8, 2021, ECF 565 |
| *Washington v. CVS*, No. CV 15-03504-YGR Trial Transcript from June 17, 2021, ECF 593 |

| Publications |
| --- |
| Academy of Managed Care, *AMCP Guide to Pharmaceutical Payment Methods* (2013) |

**EXHIBIT C:**
**MATERIALS RELIED ON**
**REBUTTAL EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Publications |
|---|
| Gary Owens, MD, *et al.*, *Prescription Benefit Design: Perspectives, Reimbursement Issues, and Future Trends*, 10 The Am. Journal of Managed Care S420 (Oct. 2004), https://www.ajmc.com/view/oct04-1928ps420-s423 |
| Joe Taylor & Michael Jacobs, *The tough decision no one wants to make*, Benefits Quarterly, First Quarter 2003 |
| NCPDP, External Code List, April 2017, https://stds.ncpdp.org/ExternalCodeList/ |
| NCPDP, Telecommunication Guide Version F6, published January 2020 |
| Robert P. Navarro, *Managed Care Pharmacy Practice*, pp. 205-07 (2d ed. 2009) |

| Publicly Available |
|---|
| 42 C.F.R. §423.505 |
| Agency for Healthcare Research and Quality, https://www.ahrq.gov/data/ushik.html |
| Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/benefit |
| Congressional Research Service, Federal Employees Health Benefits (FEHB) Program: An Overview, R43922 (Feb. 3, 2016), https://sgp.fas.org/crs/misc/R43922.pdf |
| Dictionary.com, https://www.dictionary.com/browse/benefit |
| Memorandum from Cynthia Tudor, Director of the CMS Medicare Drug Benefit Group and CMS (Oct. 11, 2006) https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/QADiscountsandTrOOP_100606.pdf |
| *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/benefit?src=search-dict-box |
| NCPDP, Data Dictionary, http://www.hosinc.com/products/ascend/help/billing/EDI%20Manuals/data%20dictionary%20september%2099.pdf |
| NCPDP, Recommendations for Use of the NCPDP Telecommunication Standard to Prevent Use of Copayment Coupons by Medicare Part D Beneficiaries and Applicability to other Federal Programs, Version 1.1 (May 2017), https://ncpdp.org/NCPDP/media/pdf/WhitePaper/Recommendations-Telecomm-Standard-Prevent-Copayment-Coupons-by-Part-D.pdf?ext=.pdf NCPDP, "Pharmacy: A Prescription for Improving the Healthcare |
| NCPDP, "Telecommunication Version 5 Questions, Answers, and Editorial Updates," (Nov. 2010) https://www.ncpdp.org/NCPDP/media/pdf/Version5-Editorial.pdf |
| NCPDP, Who We Are, https://www.ncpdp.org/Who-We-Are.aspx |

**EXHIBIT C:**
**MATERIALS RELIED ON**
**REBUTTAL EXPERT REPORT**
**OF KENNETH W. SCHAFERMEYER, Ph.D.**

| Publicly Available |
| --- |
| Troy Segal, *Price Ceiling Types, Effects, and Implementation in Economics*, Investopedia (May 27, 2023) https://www.investopedia.com/terms/p/price-ceiling.asp |
| *United States ex rel. Garbe v. Kmart Corp.*, 73 F. Supp. 3d 1002 (S.D. Ill. 2014) |
| *United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016) |
| *United States v. SuperValu, Inc.*, No. 11-3290, 2019 WL 3558483 (C.D. Ill. Aug. 5, 2019) |
| Walgreen Prescription Savings Club, https://www.walgreens.com/psc/prescription-savings-club |