# EXHIBIT 63

# Pharmacy Investigators & Consultants

*Russo v. Walgreen Co.*

Civil Case No.:  1:17-cv-02246

DATE: June 20, 2023

Rebuttal Expert Opinion Report of Dr. Susan A. Hayes, LPD, CPhT., AHFI



830 West Route 22, #118 | Lake Zurich, IL 60047 | 847.540.9590 | www.piconsulting.com

## I.    Qualifications and Experience[1]

1.  I am a Principal, owner, and founder of Pharmacy Investigators and Consultants. I have
    been working in healthcare consulting since 1980 and in the Pharmacy Benefit Manager
    ("PBM") industry since 1985. Before founding Pharmacy Investigators and Consultants in
    2019 and its predecessor company, Pharmacy Outcomes Specialists, I was Vice President
    of Marketing for Systemed Pharmacy, Inc. and Vice President of Marketing for Walgreens
    Healthcare Plus. In both positions, I was responsible for the strategic development of the
    target market and product mix for PBMs, growing retail and mail service revenues and
    enhancing overall client retention. For five years prior to my work at Walgreen Co., I was the
    National Pharmacy Practice Leader for William M. Mercer, Inc.

2.  In addition to my work at Pharmacy Investigators and Consultants, I am the Director of the
    HEAL Counter Fraud Studies Program at Roosevelt University and an Assistant
    Professional Practices Professor.  I teach four graduate level classes in Healthcare
    Analytics, Healthcare Ethics, Healthcare Crime and Law, and a Capstone Research class.

3.  I have received Accredited Health Care Fraud Investigator credentials from the National
    Health Care Anti-Fraud Association in 2012. I am also a Certified Registered Pharmacy
    Technician (049.123224) in Illinois and a Licensed Private Detective in the State of Illinois
    (license number 115.002527) and the State of Washington (license number 21023320). I
    have a bachelor's degree in criminal justice from Northeastern Illinois University, a master's
    degree in criminal justice from Boston University and a Doctoral degree from the University
    of Portsmouth, U.K., Institute for Criminal Justice Studies.  My research and dissertation
    discuss pharmaco-moral and pharmaco-ethical decision-making and the effects of
    fraudulent pharmacy activity.

4.  Pharmacy Investigators and Consultants ("PIC") was founded in 2019 and its predecessor
    firm, Pharmacy Outcomes Specialists, was founded in 1996.  Essentially, Pharmacy
    Investigators and Consultants was a rebranding of the predecessor to recognize new
    ownership, to reflect its Women Business Enterprise status and to reflect its ownership by a
    Licensed Private Detective performing investigations in fraud, waste, and abuse.  PIC and
    its predecessor firm has been conducting fraud, waste, and abuse ("FWA") services for 20
    years.  The firm employs pharmacists, pharmacy technicians, accountants, data scientists,
    and private investigators who work as a team to solve complex financial and administrative
    concerns of benefit plan sponsors.   As such, the firm takes in over a million claims a week
    and scores those claims for potential fraud, waste, or abuse (see next paragraphs).  In
    addition, the firm performs the following:

    - Audits of PBMs
    - Procurement of PBM services for third party payers (unions, health plans/sponsors,
      employers and government agencies)
    - On-site and desk audits of retail, mail order, long term care, and home infusion
      pharmacies
    - FWA programs under Medicare Part D, Medicaid and Commercial Plans
    - Expert witness analysis and testimony
    - General clinical and benefits consulting

5.  In 2016, the firm developed the Cluster Optics Process ("COPs") system.  The system
    provides immediate access to clients' uploaded data and downloads and scores the data for
    potential fraud, waste, and abuse.  The COPs system uses a series of proprietary algorithms

---

[1] See Exhibit A for the list of documents considered in this report. See Exhibit B for the full *curriculum vitae* of Susan A.
Hayes.

to score both pharmacies and claims, mainly developed from criminological theory.[2] Such algorithms include the density of the association of prescribers, patients, and pharmacies. Pharmacies are scored based on additional characteristics such as number of claims per patient, number of NDCs[3] per patient, number of claims per person, number of reversals and distance from patient, prescriber, and pharmacy. Once a pharmacy is scored, a percentage of that score is carried over to individual claims. A claim is scored using its pharmacy's score in addition to other characteristics that include standard deviations from the mean (of the NDC for brands and the GPI[4] for generics) in terms of cost/unit, age, units/day, and days supply.

6. Once a sample of claims have been identified by COPs, Claims Audit Recovery System ("CARs") notifies pharmacies (through an Application Programming Interface with secure fax and email servers) of requested documentation (prescription orders, patient signatures), allows auditors to audit prescriptions, and provides clients recoveries that can be auto adjudicated. This process is referred to as "desk auditing."

7. The COPs/CARs systems are patented under the United States Patent Office. The System and Method for Detecting Health Care Insurance Fraud Based on Criminological Theory has been filed for patent protection with the U.S. Patent and Trademark Office under Application Number 62 / 855,922.

8. In addition to our FWA work, PIC also performs audits for plan sponsors of the performance of PBMs, specifically the financial performance terms, such as discounts off Average Wholesale Price ("AWP") and adherence to National Average Drug Acquisition Costs ("NADAC"), rebates and other financial performance requirements. PIC has audited the submission of usual and customary ("U&C") pricing, maximum allowable cost ("MAC") provisions, and discounts off average wholesale price ("AWP") for large plan sponsors and has significant expertise in this area. In the last 25 years, PIC has performed over 1,000 audits of PBMs, 100 rebate audits, and several hundred procurements for PBM services. We have audited and reviewed pharmacy claims data from almost every PBM in the industry, including the "Big Three" (CVS/Caremark, OptumRx, and Express Scripts, Inc.) and many of the mid-size and smaller PBMs, such as MedImpact, Prime Therapeutics, CapitalRx, Southern Scripts, Benecard, and Elixir (formerly Envision).

9. The following is a list of research and articles I have published in the last ten years:

   - Doctoral Thesis: Exploring U.S. Pharmacists' Willingness to Fill Prescriptions Illegally, or Not to Fill Prescriptions That Are Legal but Morally Offensive to Pharmacists and the Rationale Behind Their Decision-Making, May 2021
   - Leaders' Edge: June 2018, "Susan Hayes is Fed Up"
   - Benefits Magazine: June 2017: "How to Find and Prevent Prescription Drug Fraud"

10. I have offered expert testimony regarding the foregoing topics in a number of prior matters, including in *United States ex rel. Garbe v. Kmart Corp.*, a case involving allegations that Kmart submitted falsely inflated U&C prices to PBMs and TPPs, including governmental programs, by not including its discount membership program prices in calculating and submitting its U&C prices. I have also provided an expert report regarding U&C issues in *Corcoran v. CVS Pharmacy*, as well as in several confidential arbitrations involving TPPs and pharmacies. A majority of the cases listed in my CV have centered on PBM pricing, including *Blue Cross and Blue Shield of Michigan v. MedImpact* and the cases regarding

---

[2] Specifically, the system uses the differential association theory that posits that white-collar crime is learned from others and is neutralized through the association with like-minded members of the criminals' associates.
[3] National Drug Code ("NDC") is used to identify the drug, strength, package size, and manufacturer.
[4] Generic Produce Indicator ("GPI") identifies all generics from a single therapeutic category so that all claims for that category are included in the mean calculations.

U&C pricing above. These U&C cases involved not only pricing issues but an understanding of the relationships between PBMs and Third Party Payors ("TPP") and the transactional claims data that PBMs possess.

11. Attached as Exhibit A is a list of the materials that I have considered in reaching my opinions and the basis for those opinions. Attached as Exhibit B is my current curriculum vitae, including a list of cases and proceedings in which I have submitted expert testimony (either by report or through trial/hearing or deposition testimony).

12. I am being compensated for my expert services in this matter at a rate of $400 per hour. My opinions are in no way dependent on my compensation.

## II. Background on Engagement

13. I understand Plaintiffs Lisa Bullard, Ricardo Gonzales, and Cynthia Russo are persons and Plaintiffs International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund ("Plaintiff IBEW Local 38"), International Union of Operating Engineers Local 295-295c Welfare Fund ("Plaintiff IUOE Local 295"), and Steamfitters Fund Local 439 ("Plaintiff Steamfitters Local 439") are TPP entities (collectively, "Plaintiffs") that allege that they have been damaged because Walgreen Co.'s ("Walgreens") Prescription Savings Club ("PSC") price was not reported or otherwise included when determining the usual and customary ("U&C") price to report for PSC Generics.

14. As an expert in the PBM industry, I have been retained by counsel for Plaintiffs and asked to review and rebut the testimony proffered by Walgreens' retained experts James W. Hughes and Jed Smith relating to:

1. The industry standards and practices relating to identifying and assessing overcharges, including relating to U&C pricing.
2. The availability and uses of PBM data relating to consumer and TPP overcharges.

## III. Relevant Facts in this Case

15. I understand that Plaintiffs seek to certify a class defined in relevant part as follows:

> All persons, or entities, for whom prescription drug insurance benefits were provided through the Relevant PBMs (a.k.a., A&A Services, LLC d/b/a SAV-RX Prescription Services; Caremark, LLC; Castia Rx (f/k/a Leehar Distributors Missouri, LLC); Express Scripts, Inc.; Medco Health Solutions, Inc.; MedImpact Healthcare Systems, Inc.; MedTrak Services, LLC; and/or OptumRx, Inc.), and who paid or reimbursed, in whole or in part, for generic prescription drugs from Walgreen Co. at any point in time from the period January 1, 2007 through the present, in Arizona, California, Connecticut, Delaware, Florida, Illinois, Massachusetts, New York, North Carolina, Ohio, Pennsylvania, and Wisconsin, where the usual and customary price was a basis for the amount paid or reimbursed in connection with the purchase of such drug, and the amount paid or reimbursed was inflated because the Prescription Savings Club price was not reported or otherwise included when determining the usual and customary price to report.

> Excluded from the class are: (1) Walgreen Co. and its management, employees, subsidiaries, and affiliates; (2) the Court, members of their immediate families, and judicial staff; (3) all federal government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries; (4) all state government entities and their beneficiaries, except for state political subdivisions, such as, for example, cities, towns, municipalities, counties, and school districts, and their

beneficiaries; (5) all pharmacy benefit managers and entities that have or had a parent or subsidiary relationship with any pharmacy benefit manager at any time since January 1, 2007; and (6) all individuals and entities, except for the named Plaintiffs, that have sued or initiated formal dispute resolution proceedings against Walgreen Co. relating to its determination of usual and customary prices in connection with the Prescription Savings Club.[5]

16. During the relevant timeframe, pharmacies, including Walgreens, were required to submit their U&C price with the claim submission to the PBM. The PBM then electronically, during the claim adjudication process, compares the "lower of" the U&C price or the contractual discounted price (like a discount off AWP or the NADAC price) for reimbursement to the pharmacy and for charging the consumer and TPP for a single claim transaction.

17. The prescription drug claim processing process is highly standardized and uniform. The National Council of Prescription Drug Programs (NCPDP) has for over 40 years established a sophisticated data schematic so that multiple TPPs, PBMs, pharmacies and pharmacy chains, wholesalers, and drug manufacturers can communicate and today adjudicates over four billion U.S. prescriptions annually with over 67,000 retail, mail order, and specialty pharmacies. The data that is generated using the NCPDP standards, which is required by PBMs, reflects data that is created and maintained relating to a given transaction. While a pharmacy like Walgreens may not transmit or retain all data associated with a given NCPDP code, my experience is that, when created, the data is likely maintained by PBMs, including the Relevant PBMs. This is due to obligations that PBMs have to clients and to obligations imposed by the Centers for Medicaid and Medicare Services ("CMS").

## IV.    Summary of Opinions

18. In rebuttal of the opinions of Dr. Hughes and Mr. Smith, it is not necessary when auditing claims or determining damages to re-adjudicate every single claim after a claim is paid on the basis of incorrect information. In our industry, when a claim is paid in error, it is corrected and monies are reallocated to the damaged parties. This practice is very common when reconciling annual performance guarantees and when claw backs occur. However, should it be determined that all claims must be re-adjudicated, the Relevant PBMs can reprocess the claims accounting for PSC prices.

19. Matching claims data from different data sets using common variables is standard industry practice. Occasionally, there are data that cannot be matched, and, in those cases, it is common to eliminate these claims and focus the analysis on the matching data in the data sets.

20. The NCPDP has maintained a standard of data in the PBM industry for over 30 years. PBMs, including the Relevant PBMs, maintain data in the standard NCPDP data layouts because they are the data elements collected during the claims adjudication process and the Relevant PBMs are required to maintain such data for extended periods of time. One of the data elements maintained is whether the claim required cost sharing by the patient in the form of a copay or coinsurance. Similarly, whether a part of the claim is attributed to a deductible or contributed to a patient's out-of-pocket maximum is maintained by the Relevant PBMs. Additional data variables maintained by the Relevant PBMs relate to whether the U&C price was used to determine the amounts paid by consumers and TPPs. It is important to maintain these variables so that there is a record of the basis of the pricing methodology for auditing and data integrity purposes.

---

[5] I understand that Plaintiffs propose to modify the exclusions originally proposed to the exclusions identified here. My conclusions are not impacted by the proposed modification.

21. Medicare Part D has standard levels of coverage during a plan year for beneficiaries. While there are certainly differences between commercial plans and Medicare Part D plan designs, the manner in which data is stored for prescription drugs does not differ. Commercial patients may have a front-end deductible, copays, or coinsurance and then progress to and exceed out of pocket limits. Similarly, Medicare Part D beneficiaries have stages or coverage bands during a plan year, referred to as the deductible, cost share, donut hole, and catastrophic bands. For Medicare Part D beneficiaries, it is recorded in the NCPDP format which coverage band the claim falls into when a claim is adjudicated. Further, PBMs, including the Relevant PBMs, record the TPP to which a claim is assigned and whether or not the claim is attributable to a government plan (Medicare or Medicaid) or a commercial plan. While fully insured and self-insured plans may have a different plan design, these claims are treated no differently and are recorded in the same NCPDP format. The fully insured/self-insured dichotomy thus does not need to be addressed in assessing damages.

## V. Basis of Opinions

### a. A Transaction-Level Analysis is an Accepted and Well-Used Methodology to Identify Overcharges. It is Unnecessary to Evaluate Overcharges on the Plan-Level

22. It is unnecessary to evaluate consumer or TPP damages on the level of a plan from the beginning of the consumer's involvement in the TPP plan. The methodology proposed by Dr. Hilton to evaluate damages on the level of the transaction is an acceptable and well-used methodology.

23. Both Dr. Hughes (Section IV.B.1.a) and Mr. Smith (Paragraphs 29-31) in their reports are critical of Dr. Hilton's proposed methodology for calculating damages in this case on the level of an individual transaction. Specifically, Dr. Hughes and Mr. Smith both indicated that if the proper U&C has been submitted, and the claim properly adjudicated, then each and every member's claim, for the entire plan year, would need to be re-adjudicated according to the member's plan design terms to determine true damages. However, this is neither necessary nor routinely done in the industry.

24. First, let's say that the PSC price of a generic drug was $4, but Walgreens transmitted an inflated U&C price of $18, and the consumer's copay was $10. Using the "lower of" method of assigning a price, the consumer should have only paid $4 and the TPP $0. But because an inflated U&C price was submitted, the consumer paid $10 and the TPP paid $8. In this case, consistent with Dr. Hilton's methodology, the consumer was out of pocket $10 and not $4 and therefore was damaged in the amount of $6. Following this logic, if there were 10 instances over the year of this scenario, then the consumer was damaged $60 ($6 times 10 instances).

25. Dr. Hughes and Mr. Smith argue that each claim must be re-adjudicated to take into account claims processed in error in prior situations.[6] However, this is inconsistent with industry practice.

26. This is exemplified by the treatment of back-end reconciliation payments identified in Dr. Hughes and Mr. Smith's reports like GERs and stop-loss insurance, which do not result in the re-adjudication of claims. Dr. Hughes indicates in Section C.3 of his report that stop loss insurance and GER payments would need to be taken into consideration to calculate damages. I disagree. First, stop loss insurance pays TPPs when an aggregate (overall plan level) or specific (by patient) threshold is met so that the TPP does not carry the financial

---

[6] Dr. Hughes suggests that any re-adjudication must also account for medical claims, in addition to pharmacy claims. This is entirely inconsistent with practices in the auditing industry.

responsibility for high-cost member(s). These payments are processed as soon as the TPP claimant reaches the specific amount, or the plan reaches the aggregate amount. So, if a TPP has spent over the specific limit, the claim is forwarded to the stop loss carrier and the carrier pays the TPP for the claims amount without waiting for the year end.

27. However, a TPP audits its PBM for plan performance after the end of a year. As Dr. Hughes indicates, a TPP has overall guarantees that the PBM will perform at a given discount off AWP. To calculate if the PBM has met these guarantees, the TPP waits until the end of the year and the claims are aggregated by distribution channel (i.e., mail, retail, specialty) and the auditors determine if the discount guarantees are met. If the discount arrangements are not met, the PBM pays the TPP for the missed guarantees.

28. However, the stop loss carrier has already paid the loss during the year. Therefore, it is not practice in the industry that the TPP reimburse the stop loss carrier for amounts found in an audit that are reimbursed by a PBM.[7]

29. For example, let's say at the end of the year, PBM XYZ discovers that Walgreens has not met its Generic Effective Rate in performance guarantees of the contractual terms. Instead of all generics claims in a given year averaging AWP – 85%, which is the hypothetical guarantee, the actual discount was AWP – 86% and the 1% differential meant that Walgreens owed the PBM $10 million. The PBM would not be obligated to go back and re-adjudicate all claims as if the PBM priced each and every claim at AWP – 85%, adjusting copays, out-of-pocket, and other plan design limits. The PBM simply would "clawback" $10 million from Walgreens' next invoice.

30. As explained in an article by *Pharmacy Times*,[8] PBMs do not re-adjudicate claims to reimburse consumers or TPPs when they claw back overpayments paid to pharmacies. This article states that "There is no evidence that the clawback obtained from the pharmacy is ever credited back to the patient." This is again the situation because reprocessing the claim months after the claim has been adjudicated when the claw back and true up occur is not an accepted industry practice.

### b. If Necessary, PBMs Can Re-adjudicate Plaintiffs' and Class Members' Pharmacy Claims

31. While Dr. Hughes and Mr. Smith argue that re-adjudicating every subsequent claim in which the U&C price was not reported accurately should be done, as pointed out above, in actual practice, it is not done in the industry. However, this is really a two-pronged argument. While the first part of this Hughes/Smith argument is that a claim-by-claim re-adjudication must be done in order to calculate damages, which as set forth above, is incorrect, the second part of the prong is that no one knows the benefit plans of all of the Plaintiffs, and therefore, claim by claim adjudication cannot be done. This is false. The Relevant PBMs know the details of any relevant plan design, as the Relevant PBMs adjudicated the pharmacy claims in the first place. To the extent the Relevant PBMs still have the applicable plan design, they have the ability to re-adjudicate pharmacy claims. In order to do so, the

---

[7] Nevertheless, TPPs and stop loss carriers both maintain records of any payment associated with stop loss insurance. TPPs can report if a stop loss payment was made. Unlike Dr. Hughes' allegation that it would be "a major undertaking" to collect and review all stop loss insurance policies and the documents necessary to assess their implications on TPP payment, I do not believe it would be. However, I do not believe this is even necessary as GER payments (derived through auditing) and stop loss payments are never off-set due to the timing of these payments.

[8] True North Political Solutions, *White Paper: DIR Fees Simply Explained*, PHARMACY TIMES (Oct. 25, 2017), https://www.pharmacytimes.com/view/white-paper-dir-fees-simply-explained

Relevant PBMs would only require PSC prices to re-adjudicate Plaintiffs' and Class members' pharmacy claims with the correct information.

32. The claim re-adjudication process can account for errors or revised information related to claims processing that occurs during a plan year and readjusts future pharmacy claims accordingly. The following example shows how a re-adjudication would account for the submission of an incorrect U&C price.

Claims Submissions Reflecting Incorrect U&C

|  | Deductible - $100 | Copay - $25 Brand, $10 generic, $200 specialty drug | Out of Pocket - $500 | Amount paid by Patient | Amount Paid by Insurer |
|---|---|---|---|---|---|
| Claim 1 - $100 |  |  | $100 | $100 (deductible) | $0 |
| Claim 2 - $100 |  | $25 | $25 | $25 (copay) | $75 |
| Claim 3 - $500 |  | $25 | $25 | $25 (copay) | $75 |
| Claim 4 - $1,500 |  | $200 | $200 | $200 | $1,300 |
| Claims 5 - $1,500 |  | $200 but reduced by $50 for out-of-pocket limit | $200 | $150 | $1,350 |

33. Now assume in claim 1, there was an inaccurate U&C amount reported and instead, the claim only costs $75. That means that out of pocket amount would have been satisfied later and in claim 5, the patient would have paid $175.

Re-adjudicated Claims Reflecting Correct U&C

|  | Deductible - $100 | Copay - $25 Brand, $10 generic, $200 specialty drug | Out of Pocket - $500 | Amount paid by Patient | Amount Paid by Insurer |
|---|---|---|---|---|---|
| Claim 1 - $75 |  |  | $75 | $75 (deductible) | $0 |
| Claim 2 - $100 |  | $25 | $25 | $25 (copay) | $75 |
| Claim 3 - $500 |  | $25 | $25 | $25 (copay) | $75 |
| Claim 4 - $1,500 |  | $200 | $200 | $200 | $1,300 |
| Claims 5 - $1,500 |  | $175 but reduced by $175 for out-of-pocket limit | $175 | $175 | $1,325 |

34. In the correct U&C scenario, the PBM would have the ability to recalculate the correct amount since the PBM retains the plan design and cost of the claims submissions. The resulting re-adjudication reflects the corrected pharmacy claims amounts with mathematical precision.

35. In my work, I have reviewed data from each of the Relevant PBMs, as well as other PBMs. It is my understanding and experience that PBMs such as the Relevant PBMs regularly maintain the data necessary to re-adjudicate Plaintiff and Class member pharmacy claims and the data related to the overcharges at issue in this action.

### c. Data Produced by TPPs, PBMs, and Pharmacies Are Regularly Matched

36. When attempting to match data from a Pharmacy Benefit Manager (PBM) and a Third-Party Payor (e.g., insurance company) to the same data from a PBM and a pharmacy, the overwhelming majority of data are regularly matched.

37. It is expected that there may be limited instances where claims do not match. This can occur due to various reasons such as differences in data formats, discrepancies in data elements, variations in claim processing, or data transmission errors.

38. In such limited circumstances, it is common practice to drop those claims that cannot be successfully matched from the analysis. These unmatched claims are typically excluded because they cannot be reliably attributed to the same individual or transaction across both datasets. By focusing only on the matched claims, the analysis can provide a more accurate representation of the specific subset of data that is consistent between the two sources.

39. My understanding of Dr. Hilton's methodology is that the code used specifies the conditions for dropping unmatched claims to maintain transparency and ensure the integrity of the analysis. This accords with industry best practices.

### d. PBMs Maintain Data in NCPDP Format

40. PBMs routinely maintain claims data in NCPDP (National Council for Prescription Drug Programs) format. The NCPDP is a standards development organization that establishes guidelines and formats for electronic transactions in the pharmacy industry. NCPDP layouts were provided in this case (Bates NCPDP_ForthvWalgreens000001, NCPDP_ForthvWalgreens000340 and NCPDP_ForthvWalgreens002074).

41. NCPDP format is widely used for transmitting prescription drug-related data between various healthcare entities, including pharmacies, PBMs, health plans, and other stakeholders. It provides a standardized structure and data elements to facilitate accurate and consistent communication of prescription drug information.

42. PBMs utilize NCPDP format to process and transmit pharmacy claims data, which includes information such as patient demographics, prescribed medications, dosage instructions, dispensing details, and reimbursement information. By adhering to the NCPDP standards, PBMs ensure interoperability and seamless data exchange among different systems and entities involved in the pharmacy benefit process.

43. Maintaining claims data in NCPDP format allows PBMs to effectively communicate with pharmacies, process claims efficiently, and comply with industry regulations and requirements. It also enables effective coordination of pharmacy benefits, formulary management, claims adjudication, and reporting functions within the PBM's operations.

44. In many cases, PBMs are required to retain claims data for a certain period to comply with various legal and regulatory requirements. For example, healthcare regulations such as the Health Insurance Portability and Accountability Act ("HIPAA") in the United States may specify retention periods for certain types of health-related data, including prescription claims data. HIPAA generally requires the retention of protected health information (PHI) for

a minimum of six years from the date of creation or the date it was last in effect, whichever is later.

45. It's worth noting that while the NCPDP format is widely used in the pharmacy industry, there may be variations in the names of the specific data elements or implementation guides adopted by different PBMs. However, adherence to the core NCPDP standards ensures compatibility and consistency in the transmission and processing of claims data.

### e. Data in NCPDP Format Reflects Whether a Consumer Payment was a Copay or Coinsurance

46. It is my understanding and experience that PBMs regularly maintain data sufficient to identify whether a consumer payment was a copayment or coinsurance and the respective amounts, including whether the amount was determined by reference to the U&C price. These details are important for tracking and analyzing consumer cost-sharing in pharmacy claims.

47. The NCPDP has promulgated separate field codes associated with the payment of a copay or coinsurance, including the following:

| Field | Name of Field | Definition of Field |
|---|---|---|
| 572-4U | Amount of Coinsurance | Amount to be collected from the patient that is included in Patient Pay Amount (505-F5) that is due to a per prescription coinsurance. |
| 518-FI | Amount Of Copay | Amount to be collected from the patient that is included in Patient Pay Amount (505-F5) that is due to a per prescription copay. |

48. Whether or not a copay or a coinsurance was paid on a given claim is part of the information that many TPPs require the PBM to retain.

49. PBMs retain data related to consumer payments, which includes information about the type of payment (copayment or coinsurance) and the specific amount associated with it. This data allows for the accurate determination of how much the consumer contributed towards the cost of a medication.

50. By analyzing this data, PBMs can monitor trends in copayments and coinsurance amounts, assess the impact on consumers, and evaluate the effectiveness of benefit designs and cost-sharing structures.

### f. Data in NCPDP Format Reflects Whether a Consumer, TPP, or Pharmacy Payment was Determined by Reference to the U&C Price

51. Pharmacies submit U&C charges in the adjudication process to ensure that claims are being processed accurately. By evaluating the reported U&C charges, auditors can verify whether claims are being properly adjudicated and TPPs and consumers receive lesser-of-pricing. This helps validate that pharmacy claims are being processed fairly and consistently and that insured customers do not pay more than uninsured customers to receive prescription drugs.

52. U&C charges are submitted by the pharmacy before the TPP plan design is known by the PBM. During the normal claims processing, a pharmacy technician or pharmacist will enter basic information about the transaction (i.e., the patient's name, the drug, identification number of the patient, the amount the pharmacy would like to be paid – the submitted

charge and the U&C amount). These data are transmitted to the PBM regardless of the TPP.

53. It is my understanding and experience that PBMs such as the Relevant PBMs regularly maintain data sufficient to determine whether the consumer and TPP payments associated with a given claim were determined by reference to the U&C price.

54. When a pharmacy submits a U&C charge to a PBM with a claim for adjudication, the pharmacy indicates the method that it used to determine the applicable ingredient cost submitted with the claim. This information is transmitted in NCPDP code 423-DN.

| Field | Name of Field | Definition of Field |
|-------|---------------|---------------------|
| 423-DN | Basis Of Cost Determination | Code indicating the method by which Ingredient Cost Submitted (409-D9) was calculated. |

55. When the PBM submits its response to the pharmacy, the PBM provides information about how the payment for a specific claim was calculated or determined to help identify the factors considered in the adjudication process, such as U&C pricing, reimbursement methodology, or other payment rules. This information is transmitted in NCPDP code 522-FM.

| Field | Name of Field | Definition of Field |
|-------|---------------|---------------------|
| 522-FM | Basis Of Reimbursement Determination | Code identifying how the reimbursement amount was calculated for Ingredient Cost Paid (506-F6). |

56. With regard to fields 423-DN, Basis Of Cost Determination, and 522-FM, the Basis of Reimbursement Determination, the External Code List promulgated by the NCPDP identifies several codes to identify the applicable basis for the cost determination, including whether the U&C charge was used. For example, the NCPDP directs that the following values are to be reported when the U&C charge was used in the adjudication process to determine an applicable charge:

| CODE | DESCRIPTION |
|------|-------------|
| 4 | Usual & Customary Paid as Submitted – Indicates when the ingredient cost reimbursed to the provider is based upon the submitted Usual and Customary Price. |
| 5 | Paid Lower of Ingredient Cost Plus Fees Versus Usual & Customary – Used to indicate that the processor has compared submitted U&C to the cost plus the fee (may be either their negotiated value for cost plus fee, or the submitted cost and fee), and is paying the lower of the amounts. |

57. Where a TPP payment to the PBM is tied to the PBM's payment to the pharmacy, as is common in the industry, the data associated with NCPDP code 522-FM identify the basis of the TPP's payment in connection with a given transaction, including whether the payment was made by reference to the U&C price.

58. PBMs create and maintain data sufficient to determine the basis of the amount paid by a TPP in connection with a given transaction. This information is retained in NCPDP code 223.

| Field | Name of Field | Definition of Field |
|---|---|---|
| 223 | Client Pricing Basis Of Cost | Code indicating the method by which ingredient cost submitted is calculated based on client pricing. |

59. With regard to field 223, the External Code List promulgated by the NCPDP identifies several codes to identify the applicable basis of cost, including whether the U&C charge was used. For example, the NCPDP directs that the following values are to be reported when the U&C charge was used in the adjudication process to determine an applicable TPP cost:

| CODE | DESCRIPTION |
|---|---|
| 06 | Usual & Customary - The pharmacy's price for the medication for a person paying cash on the day of dispensing. |
| 10 | Usual & Customary or Copay – The pharmacy's price for the medication for a person paying cash on the day of dispensing or the patient copay whichever is less. |

60. It is common practice in the industry to determine whether the U&C price was used to determine the amount paid by a TPP in connection with a given transaction by reference to the data associated with NCPDP codes 522-FM and 223.

61. PBMs also create and maintain data sufficient to determine the basis of the amount paid by a consumer in connection with a given transaction. If the consumer payment was a copayment, this information would be retained in NCPDP code 347-HJ. If the consumer payment was coinsurance, this information would be retained in NCPDP code 573-AV.

| Field | Name of Field | Definition of Field |
|---|---|---|
| 347-HJ | Basis Of Calculation-Copay | Code indicating how the Copay reimbursement amount was calculated for Patient Pay Amount (505-F5). |
| 573-4V | Basis of Calculation - Coinsurance | Code indicating how the Coinsurance reimbursement amount was calculated for Patient Pay Amount (505-F5). |

62. With regard to fields 347-HJ, Basis Of Calculation- Copay, and 573-4V, Basis of Calculation - Coinsurance, the External Code List promulgated by the NCPDP identifies the value that indicates when the U&C charge was used to determine the applicable basis of calculation:

| NAME OF VALUE | Value |
|---|---|
| Usual and Customary/Prorated<br><br>*Used when payment is based upon the submitted U&C value rather than the calculated/contracted rate, causing a situation where the copay/dispensing fee is higher than the U&C value, so the plan/processor returns a copay/dispensing fee to the provider which is less than the plan copay/dispensing fee, thereby being prorated.* | 03 |

63. While the specific data elements captured and retained by PBMs can vary, they typically maintain information such as U&C pricing that allows them to track and document the basis

on which payments are determined for pharmacy claims. This information is crucial for auditing, analyzing payment trends, and collecting payments from TPPs.

### g. Data in NCPDP Format Reflects Consumer Deductibles

64. It is my understanding and experience that PBMs, including the Relevant PBMs, regularly maintain data sufficient to identify whether a deductible applied to a given claim, and how a given claim, bears upon any potentially applicable deductible amount.

65. The NCPDP has promulgated field codes that identify whether a deductible applied to a given claim, and how a given claim, bears upon any potentially applicable deductible amount, including the following:

| Field | Name of Field | Definition of Field | Comments/Examples |
|-------|---------------|---------------------|-------------------|
| 517-FH | Amount Applied To Periodic Deductible | Amount to be collected from a patient that is included in Patient Pay Amount (505-F5) that is applied to a periodic deductible. | <u>Examples:</u> A patient has a $50.00 deductible to meet. The patient's first prescription costs $95.00. The amount applied to the periodic deductible would reflect $50.00. This field would reflect: 500{.<br><br>A patient has a $100.00 deductible to meet. The patient has previously met $80.00 of the deductible. The next prescription purchased costs $42.00. The amount applied to the periodic deductible would reflect $20.00. This field would reflect: 200{. |
| 513-FD | Remaining Deductible Amount | Amount not met by the patient/family in the deductible plan. | <u>Examples:</u> The patient has $50.00 deductible. The patient pays $20.00 for a prescription. The remaining deductible is $30.00, and this field would reflect: 300{. |
| 512-FC | Accumulated Deductible Amount | Amount in dollars met by the patient/family in a deductible plan. | <u>Examples:</u> The deductible amount on the patient's plan is $100.00. The patient purchases two prescriptions, one for $15.00 and another for $35.00. The accumulated deductible at that point would be $50.00. This field would reflect: 500{. |

### h. Data in NCPDP Format Reflects Out-of-Pocket Maximums

66. It is my understanding and experience that PBMs, including the Relevant PBMs, regularly maintain data sufficient to identify whether an out-of-pocket maximum applied to a given claim, and how a given claim, bears upon any potentially applicable out-of-pocket maximum.

67. The NCPDP has promulgated field codes that identify whether a deductible applied to a given claim, and how a given claim, bears upon any potentially applicable deductible amount, including the following:

| Field | Name of Field | Definition of Field |
|---|---|---|
| 514-FE | Remaining Benefit Amount | Amount remaining in a patient/family plan with a periodic maximum benefit. |
| 520-FK | Amount Exceeding Periodic Benefit Maximum | Amount to be collected from the patient that is included in Patient Pay Amount (505-F5) that is due to the patient exceeding a periodic benefit maximum. |

### i. Data in NCPDP Format Reflects Medicare Part D's Coverage Bands

68. Medicare Part D claims have different "bands" in which the claim falls or would fall if the claim was re-adjudicated. For example, Mr. Smith states that "To properly address the benefit stages requires analyzing a consumer's full benefit-year of transactions (including brand and generics as well as any transactions at other pharmacies) and their benefit plans to understand their thresholds for each benefit stage to recalculate the consumer payment." Mr. Smith criticizes Dr. Hilton because Mr. Smith states that a claim in which a coinsurance applies (say because the patient was in the cost share Medicare Part D band) would, because prior claims that would need to be recalculated, a subsequent claim would fall into another Medicare Part D cost band, requiring a copay. However, damages could still be calculated using Dr. Hilton's method of comparing each claim using the correct U&C amount, without having to re-adjudicate all subsequent claims. As stated above, with commercial claims, this methodology is acceptable.

69. However, if pharmacy claims do need to be re-adjudicated because Medicare Part D PBM's know what the Medicare Part D plan design was at the time the erroneous claim was processed, they could re-adjudicate all subsequent pharmacy claims.

70. Further, PBMs both retain and transmit data regarding Medicare Part D coverage bands, and the NCPDP has promulgated fields that specifically associate a given coverage band with a given transaction, including the following:

| Field | Name of Field | Definition of Field |
|---|---|---|
| 137-UP | Amount Attributed to Coverage Gap | Amount to be collected from the patient that is included in Patient Pay Amount (505-F5) that is due to the patient being in the coverage gap (for example Medicare Part D Coverage Gap (donut hole)). A coverage gap is defined as the period or amount during which the previous coverage ends and before an additional coverage begins. |
| 394-MW | Benefit Stage Amount | The amount of claim allocated to the Medicare Part D benefit stage, allocated to other Medicare benefit, or paid by an alternative benefit coordinated with or by the responding Medicare Part D payer as identified by the Benefit Stage Qualifier (393-MV). |
| 392-MU | Benefit Stage Count | Count of Benefit Stage Amount (394-MW) occurrences. |

| 393-MV | Benefit Stage Qualifier | Code qualifying the Benefit Stage Amount (394-MW). |
|---|---|---|
| 653-S4 | Accumulated Gross Covered Drug Cost Amount | The accumulated cost incurred by the plan for covered Part D drugs including amounts paid by or on behalf of an enrollee and including certain dispensing fees, but not including administrative costs. |
| 652-S3 | Accumulated Patient True Out Of Pocket Amount | The accumulated cost for covered Part D drugs incurred by a patient that are applicable towards the out-of-pocket limit set by the Centers for Medicare and Medicaid Services (CMS). |

71. With regard to field 393-MV, the Benefit Stage Qualifier, the External Code List promulgated by the NCPDP identifies several codes to identify which coverage stage is associated with a given claim associated with a Part D beneficiary. For example, the NCPDP directs that the following values are to be associated with specific coverage bands:

| CODE | DESCRIPTION |
|---|---|
| 01 | Deductible - The amount of covered expenses that must be incurred and paid by the insured before benefits become payable by the insurer. |
| 02 | Initial Benefit - The first monthly benefit, or the first monthly benefit following any break in participation. |
| 03 | Coverage Gap (donut hole) - Commonly referred to as the "donut hole." Amount paid for Medicare prescription drug coverage, with a PDP or an MA-PD, **after** the initial coverage limit and **until** the total out of your pocket paid for covered prescription drugs reaches a certain amount. |
| 04 | Catastrophic Coverage - Once a total maximum is reached, the insured pays a small amount for a drug claim until the end of the calendar year. |

### j. Data in NCPDP Format Reflects Medicare Part D's Coverage Bands

72. It is my understanding and experience that PBMs always have access to information about their parent companies, subsidiaries, and acquired entities (e.g., ESI purchasing Medco). They may utilize various methods to establish the relationships between different entities, including common plan identifiers such as Bank Identification Numbers (BINs).

73. BINs are unique identifiers assigned to a pharmacy benefit plan or program to facilitate electronic claims processing. They are often used to link specific plans or programs to PBMs and other entities involved in the prescription drug benefit process.

74. By leveraging BINs and other plan identifiers, PBMs can identify the parent and subsidiary relationships, including acquired entities, within their system. This information allows them to track and manage the different entities associated with the administration of prescription drug benefits.

### k. PBMs Can Identify Their Clients and Can Identify if TPPs are Government Entities or if Consumers are Government Entity Beneficiaries

75. It is my understanding and experience that PBMs can typically identify TPPs that are government entities. PBMs often have access to information about the entities with which they work, including the type of TPP involved in the prescription drug benefit process.

76. When processing pharmacy claims, PBMs may receive information about the TPP associated with each claim, which can include details such as the name, type, or identifier of the TPP. This information allows PBMs to distinguish between different types of TPPs, including government entities. As PBMs have direct relationships with TPPs that pharmacies typically do not have, in my experience, PBMs have more robust and reliable information about TPPs than pharmacies.

77. PBMs may utilize various data sources and systems to identify government entities as TPPs. These can include databases of government programs, contractual agreements, or specific identifiers associated with government entities. This includes whether a TPP is a state or federal government entity. As with commercial TPPs, PBMs are able to identify transactions associated with TPPs that are government entities.

78. Identifying government entities as TPPs can be important for various reasons, such as complying with specific regulations, determining reimbursement rates, or applying government-specific pricing and reimbursement methodologies.

### l. The fully insured/self-insured dichotomy does not need to be addressed in assessing damages.

79. Dr. Hughes argues that fully insured plans "would not have been injured and would not be part of the class." Hughes Report, ¶144. This represents a misunderstanding of the difference between fully and self-insured plans and Dr. Hilton's methodology. It is necessary to understand the difference between fully-insured and self-insured plans and how they relate to damages.

80. Fully Insured Plan: In a fully insured plan, an employer or organization pays premiums to an insurance company. The insurance company assumes the financial risk and responsibility for administering the plan, including the payment of claims. In this case, the damages related to the plan would typically be handled between the insurance company and the insured party, rather than the employer or organization.

81. Self-Insured Plan: In a self-insured (also known as self-funded) plan, the employer or organization takes on the financial risk and responsibility for providing healthcare benefits. Instead of paying premiums to an insurance company, the employer or organization directly pays for the medical or pharmacy expenses of its employees or members. Self-insured plans may contract with a third-party administrator (TPA) to handle claims processing, but the ultimate financial liability lies with the employer or organization.

82. Regarding damages, Dr. Hilton's methodology calculates a TPP Overpayment as the Total Overpayment minus the Consumer Overpayment. Hilton Report, ¶26. This methodology does not depend on the distinction between fully insured and self-insured plans. In a fully insured plan, the insurance company is typically responsible for paying claims related to covered medical or pharmacy expenses. In a self-insured plan, the employer or organization would bear the responsibility for any claims incurred. Both the PBM adjudicating a given

claim and the TPP will maintain data reflecting the entity or entities responsible for paying a given pharmacy claim.

## VI. Conclusions

83. The above constitutes my opinions on the matters in which I was asked to render an opinion based on the documents I reviewed and my experience and expertise in the industry. If new documents are presented, I reserve the right to supplement my opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 16, 2023

_____
Susan A. Hayes

# EXHIBIT A

## Materials Considered

**Pleadings**
- Fourth Amended Consolidated Class Action Complaint and Jury Demand
- Memorandum of Law in Support of Plaintiffs' Motion for Class Certification
- Opposition of Defendant Walgreen Co. to Plaintiffs' Motion for Class Certification

**Expert Reports**
- Expert Report of Lynette Hilton
- Expert Report of Jed Smith
- Expert Report of James W. Hughes

**Depositions**
- Deposition of Chris Dymon on behalf of Defendant Walgreen Co.
- Deposition of Scott Schuler on behalf of Defendant Walgreen Co.
- Deposition of Jay Bernstein
- Deposition of Cade Erlund
- Deposition of Erica Reaves

**Bates Stamped Documents**
- NCPDP_ForthvWalgreens000001
- NCPDP_ForthvWalgreens000340
- NCPDP_ForthvWalgreens002074

# EXHIBIT B

Dr. Susan A. Hayes
CPhT, LPD, AHFI
*Curriculum Vitae*

Dr. Susan Hayes, LPD, AHFI, CPhT
Director, Health Care Ethics and
Analytics Program, Roosevelt University
Assistant Professional Practice Professor
Principal, Pharmacy Investigators and
Consultants
www.piconsulting.org
708 828 0797

## Personal Profile

Susan is the Director of the Healthcare Ethics and Analytics (HEAL) Certificate Program for Roosevelt University, College of Science, Health and Pharmacy. In that role, Susan coordinates the administrative functions of the Certificate Program. Additionally, she provides instruction at the master's degree level for students in both the Criminal Investigations/Health Law and the Capstone classes for the Certificate Program. During the Capstone phase of the Certificate Program, students research key areas of multi-disciplinary interests in social justice, health care and ethics using analytical tools, such as Excel, Python and Business Intelligence.

In coordination with the work with Roosevelt University, Susan continues her work at her firm, Pharmacy Investigators and Consultants (PIC), a Women's Business Enterprise (WBE). Susan is responsible for the strategic direction of the firm. Susan is a lead project manager for the firm's clients, which include McKee Foods, Meridian Health Plan and UNITE HERE HEALTH and many other government, managed care, pharmacy benefit managers (PBMs) and hospital/clinical organizations. The firm provides pharmacy benefit consulting and health care anti-fraud services. Susan has developed a specific expertise in applied criminological theory applications to fraud and investigation techniques. By specializing in analytics and Big Data combinations to solve issues, both of her inventions, the $COPs^{TM}$ and $CARs^{TM}$ systems are patented products through the United States Patent Office.

Lastly, Susan provides expert witness testimony in key pharmacy litigation issues and was the testifying expert in the landmark *Rutledge v. PCMA* case involving states' rights to control inferior contracting practices in the pharmacy benefit management industry, rendering a unanimous 8-0 decision by the United States Supreme Court. Susan is a strong advocate for community pharmacists and transparency. Susan has testified to the Committee on Oversight and Government Reform, Subcommittee on Federal Workforce, Postal Service and the District of Columbia on Transparency in the PBM Industry and several times to the Department of Justice.

Susan has over 40 years' experience in the health care consulting, pharmacy benefit management industry. Prior to POS, Susan was Vice President of Marketing for Systemed Pharmacy, Inc. and Vice President, Marketing of Walgreens Healthcare Plus. In both positions, she was responsible for the strategic development of the target market and product mix for PBMs, growing retail and mail service revenues and enhancing overall client retention. For five years prior to Walgreen Co., Susan was the National Practice Leader for William M. Mercer, Inc., specializing in prescription drug auditing and bid procurement amounting to over $1 million annually in revenue. Clients included Fortune 500 employers.

Susan has a Bachelor of Science Degree in criminal justice from Northeastern Illinois University, a master's degree in criminal justice from Boston University, Metropolitan College and a Doctoral Degree from the University of Portsmouth, United Kingdom. She is a Certified Registered Pharmacy Technician in the State of Illinois (license # 049-123224) and a Licensed

Private Detective in the State of Illinois (license # 115.002527) and Washington (license # 21023320).  In 2012, Susan earned her Accredited Healthcare Fraud Investigator (AFHI) designation from the National Healthcare Anti-Fraud Association.

## Education

| **Bachelor's Degree** | **Northeastern Illinois University** | **1980** |
| Criminal Justice | **Chicago, IL** | |

| **Master's Degree** | **Boston University** | **2016** |
| Criminal Justice | Boston, MA | |

| **Professional Doctorate** | **University of Portsmouth** | **2021** |
| Criminology | Portsmouth, United Kingdom | |

Thesis Topic:  Pharmcoethical and Pharmacomoral Decision Making and Rationales

## Employment History

| 2021 – Present | **Roosevelt University** | Schaumburg, IL |
| | **Director, Health Care Ethics and Analytics Program, Roosevelt University** | |
| | **Assistant Professional Practice Professor** | |

As the Director, Health Care Ethics and Analytics Program and Assistant Professional Practice Professor for Roosevelt University, College of Science, Heath and Pharmacy, Susan is responsible for managing the program and ensuring its success through an active student enrolment.  Her teaching responsibilities include two of the four course certificate which is comprised of these classes: Criminology and Health Care Law, Health Care Analytics, Health Care and Ethics, Capstone Research Project. The online Certificate program provides education and training to investigators wanting to better understand the world of health care and for pharmacy and nursing students to learn key investigation skills. All students will learn basic analytical and entry level programming skills. The curriculum is heavily weighted towards instilling the process of ethical decision-making in investigation work and health care provider responsibilities.

| 2019 – Present | **Pharmacy Investigators and Consultants** | |
| | **Founder/Lead Investigator** | Lake Zurich, IL |

Founder and lead investigator in pharmacy fraud investigation firm.  Firm services include COPs analytic fraud detection system, security assessments, on-site audits, legal threat assessments to hospital/pharmacies and pharmacy operations assessments.  Susan also provides expert witness testimony in key plaintiff and class action litigation concerning the prescription drug industry. She is a Licensed Private Investigator in the State of Illinois and Washington (IL 115.002527 WA 21023326) and an IL Certified Pharmacy Technician (049.123224).

| 2016 – 2021 | **Boston University** | Boston, MA |
| | **Facilitator** | |

Susan is a Facilitator (tutor) in the Master's Degree in Criminal Justice program at Boston University for the Crime and Crime Theory, Forensic Behavioral Analysis, Trauma and Cybercrime courses. As a Facilitator, Susan has the responsibility of up to 20 Master Degree level students for grading student assignments and mentoring the students throughout the program.

| 1996 - Present | **Pharmacy Outcomes Specialists** | Lake Zurich, IL |
| | **Principal/Owner** | |

Partner in Pharmacy Investigators and Consultants' predecessor firm, pharmacy benefits consulting firm specializing in finance, clinical management and contract compliance/audits, as well as pharmacy fraud detection. Susan has an in-depth knowledge of PBM systems and operations, claims data and client management. Clients include McDonalds, SBC Corporation, Department of Defense, Office of Personnel Management/ Federal Civilian Employees, Wal Mart Corporation, Connecticut Coalition of Taft Hartley Health Care Funds and Health Plus. Co-Producer/Educator/Facilitator of the Pharmacy Benefits Academy.

| 1994 - 1996 | **Systemed Pharmacy, Inc.** | Itasca, IL |
| | **Vice President, Sales and Marketing** | |

Formed marketing function within two recently merged companies, built and developed staff of 12, positioned Company within marketplace with a brand identity and responsible for sales support, member and sales communications, research, graphics design and production unit, video studio and product development functions for a $180 million, publicly traded, independent prescription drug benefit management company.

| 1991 - 1994 | **Walgreen Co./Healthcare Plus** | Deerfield, IL |
| | **Vice President, Marketing** | |

Strategically designed marketplace and product mix for Healthcare Plus division, growing mail service revenues from $12 million to $120 million in two years. Responsible for client/member communication, sales support, pricing and strategic partnership development; and related budget and staff of 7.

| 1987 - 1991 | **William M. Mercer, Inc.** | Chicago, IL |
| | **Associate** | |

Developed and managed a team of national consultants specializing in prescription drug auditing and bid procurements amounting to over $1 million in annual revenue. Clients included Arthur Andersen & Co., Exxon, USA, Ameritech, Sara Lee Corporation, the Marmon Group and Uniroyal. Responsible for revenue generation and project management. Also designed and underwrote pricing for flexible benefit plans.

| 1985 - 1987 | **Towers Perrin** | Chicago, IL |
| | **Consultant** | |

Co-chaired effort to initiate health claim audit practice for Towers Perrin growing practice to over 50 clients in two year span. Responsible for technical consulting, product development and revenue generation.

| 1984 - 1985 | **Hewitt Associates** | Lincolnshire, IL |
| | **Consultant** | |

Audited health claims for Fortune 500 clients, including first audit of Aetna's AECCLAIMS systems. Responsible for technical audit and report to clients.

| 1983 - 1984 | **Wickes Corporation** | Lincolnwood, IL |
| | **Benefit Manager** | |

Managed all employee benefit programs, including Defined Benefit, 401(k), Medical, Dental, Disability and Life Insurance programs, including all financial and funding arrangements and government filings for 5,000 Leath/Maxwell employees in over 25 states. Managed staff of five including self-administered, self-funded claims processing unit.

| 1980 - 1983 | **Quaker Oats Company** | River Forest, IL |
| | **Fraud Investigator** | |

Investigated and recovered coupon redemption fraud and provided evidence for prosecution to agencies such as the United States Postal Authorities. Our unit saved over $3 million a year in redemption fraud and prosecuted one of the largest grocery store chains for fraud in the Northeast to date. Was lead investigator for on-site grocery store audits.

# Patents

The System and Method for Detecting Health Care Insurance Fraud Based on Criminological Theory has been filed for patent protection with the U.S. Patent and Trademark Office under Application Number 62 / 855,922.

## Professional Memberships

- Association of Detectives and Security Agencies of Illinois, Illinois Chapter Vice President
- National Healthcare Anti-Fraud Association
- National Association of Drug Diversion Investigators, Illinois Chapter Communications and Social Media Chairperson
- American Society of Criminologists
- Alpha Phi Sigma: The National Criminal Justice Honors' Society, Boston University's Nu Mu Chapter
- Illinois Pharmacists Association

## Academic Research and Presentations

"Blinded By the White: Can Pharmacists See Fraud?" Presented (accepted for presentation) to the American Society of Criminologists, November 2018, Academic Research conducted as part of the Doctoral Thesis programme, University of Portsmouth, UK, Institute for Criminal Justice Studies

Doctoral Thesis: Exploring U.S. Pharmacists' Willingness to Fill Prescriptions Illegally, or Not to Fill Prescriptions That Are Legal but Morally Offensive to Pharmacists and the Rationale Behind Their Decision-Making, May 2021

Predictors of loss due to pharmaceutical fraud: Evidence from the U.S., (2021). Timofeyev, Y., Hayes, S., Jakovljevic, M., *Cost Effectiveness and Resources Allocation*. https://doi.org/10.1186/s12962-022-00337-4

## Selected Article Quotes and Contributions

<u>Leaders' Edge:</u> June, 2018, "Susan Hayes is Fed Up"

<u>Benefits Magazine:</u> June 2017: "How to Find and Prevent Prescription Drug Fraud"

<u>Drug Benefit News,</u> October 2008 "PBM Auditing Increases as Rx Cost Rise,"

<u>Wall Street Journal,</u> February 15, 2005 – "Generic Drugs By Mail Can Be A Raw Deal"

<u>Employee Benefit Plan Review,</u> February 2003 – "Plan Sponsors Guide to Managing Life Enhancing, Lifestyle and Cosmetic Drugs"

<u>Wall Street Journal</u>, August 14, 2002 – "Firms Paid to Trim Costs Also Toil For Drug Makers"

<u>Managed Care</u>, April 2002 – "HMOs Should Prepare How to Handle Injectables"

<u>Employee Benefit News</u>, February 2001 – "Pills on Parade"

<u>Employee Benefit News</u>, July 2000 – "To Control Rx Costs, Enforce Your Rights"

Employee Benefit News, February 2000 – "Under the Microscope"

Employee Benefit News, September 1997 – "Influencing Care"

Employee Benefit News, April 1995 – "Speaking Out"

Employee Benefit News, February 1995 – "Worksite Wellness"

Fortune, October 2013 - "Painful Prescriptions"

USA Today, October 2015 – Walmart/Rite Aid Merger

## Authored Articles

Benefits Magazine: December 2020 and January 2021: "Solving the Specialty Drug Puzzle"

Employee Benefit Plan Review, September 2002 – "Pharmacy Case Management: Applying Lessons Learned from Medical Utilization Review" Authored with Rami Rihani and Shannon Spears

PBM News, Summer 2001 – "Rebate Contracting 101" Authored with Wendy Smith, Touchpoint Health Plan

Employee Benefit News, January 1999 – "Auditing Prescription Drug Benefit Programs"

Employee Benefits News – March 1998 – "Managing Prescription Drug Programs"

Compensation and Benefits Management, Spring 1992, "Managed Prescription Programs: Integrating Retail and Mail Order Services"

Employee Benefit News, July 1990 – "Mail Order Programs: Where are We Now?"

## Books

Health Insurance Answer Book, 2002 Supplement, A Panel Publication, Chapter 16, Pharmacy Benefit Management

## Speeches and Industry Presentations

International Foundation of Employee Benefits, October 2020, "Understanding the Prescription Drug Industry: A Five-Hour Workshop"

International Foundation of Employee Benefits, November 2016, "Defining Pharmacy Fraud"

International Foundation of Employee Benefits, February, April, June, 2015, "Managing the World of Prescription Drugs"

Working Professionals in Employee Benefits, September 2015, "Laws, Drugs and Money"

Michiana Human Resource Association, October 2014, "Pharmacy Benefit Management"

New Jersey State Police Association, February 2015, "Understanding Prescription Drugs, Benefits and Diversion"

Page 6
*Curriculm Vitae of Dr. Susan A. Hayes*

National Health Care Anti-Fraud Association Training, July 2011, "How to Detect, Investigate and Recover Pharmacy Fraud"

Federal Employees Health Benefit Program Carrier Conference, March 18, 2010, Transparency Issues at the Office of Personnel Management, HR 4489

National Labor Alliance of Health Care Coalitions, June 2010, "Pharmacy Benefit Programs and Evaluations"

Center for Business Intelligence, "Contracting for the Delivery of Specialty Drugs, September, 2010

Atlantic Information Services, April 2010, "How to Guarantee PBM Transparency, Reduce Prescription Costs and Maximize Pharmacy Benefits"

Fourth Annual Medicare Financial Management Summit, February 2010, "Building a Better PBM Relationship"

International Foundation of Employee Benefits, June 18, 2009, Webinar "How to Manage Specialty Drugs"

Financial Research Associates, December 2008 "Hot Buttons in Compliance with CMS Requirements"

Financial Research Associates, April 2008, "Managing Internal and External Risk in Medicare Part D"

Financial Research Associates, July 2007, "How to Monitor your PBM's Monitoring of Retail and Mail Order Pharmacies

Working Professionals in Employee Benefits, March 2005, "The Role or a Broker and Consultant in Pharmacy Plans"

International Foundation of Employee Benefit Plans, November 2004, "Prescription Drugs: Opening Session" and "Plan Design Beyond Formularies"

Department of Defense Contract Auditors, November 2003, "Audits and Overview of Pharmacy Benefits Industry"

International Foundation of Employee Benefit Plans, November 2003, "How Are Funds Better Managing Pharmacy Costs?"

International Foundation of Employee Benefit Plans, September 2003, "Managing Prescription Drug Costs"

Working Professionals in Employee Benefits, August 2003, "Case Management:  The Next Frontier in Disease Management"

International Foundation of Employee Benefit Plans, April 2003, "Increasing Drug Costs for the Sheet Metal Industry"

Fraud Prevention Institute, July 2003, "Pharmacy Fraud:  How to Spot It and What to Do about It"

AFL-CIO Health Care Seminar, June 2003, "Between a Rock and a Hard Place:  The Health Care Squeeze on America's Workers, Strategies for Bargaining and Policy Reform"

National Educational Association, November 2002, "Increasing Drug Costs, The Role of PBM's and Audits"

Health Action Council of Northeast Ohio, March 2002, "Full Disclosure of PBM Revenue Sources"

Dutchess Educational Health Insurance Consortium, February 2002, "Rebates, Formularies and Prescription Drug Programs"

International Foundation of Employee Benefit Plans, February 2002, "Administering Drug Programs"

International Foundation of Employee Benefit Plans, February 2002, "Managing Prescription Drugs"

Department of Defense Briefing, November 2001, "Department of Defense (DoD) Pharmacy Programs for Beneficiaries Age 65+, Background, Current Programs and Future"

American Federation of Teachers/National Education Association, October 2001, "How to Control Rising Prescription Drug Costs: A Case Study"

Corporate Benefits Conference, October 2001, "Steps to Managing Prescription Drugs"

Data Niche Symposium, September 2001, "Rebate Contracting: What They Aren't Telling Them"

Cost Containment Strategies for Pharmaceutical Benefits, September 2001, "Rebate Contracting for Benefit Managers"

International Foundation of Employee Benefit Plans, August 2001, "Benefits Communication Technology"

Benefits Conference for Public Employees, July 2001, "Prescription Drug Management"

Pharmacy Benefits Management Institute, April 2001, "Rebate Contract Management 101"

American Federation of Teachers/National Education Association, March 2001, "How to Control Rising Prescription Drug Costs: A Case Study"

American Federation of Teachers, March 2001, "Rising Drug Costs and the Effect on Chicago Public Schools"

Working Professionals in Employee Benefit Plans, March 2001, "Pharmacy Rebates 101"

Institute for International Research, February 2001, "How to Cap Rising Drug Costs"

Benefits Management Forum and Expo, September 2000, "How to Cap Rising Drug Costs"

Certified Employee Benefits Specialists Symposium, September 2000, "Real Solutions for Growing Drug Costs

Working Professionals in Employee Benefit Plans, July 2000, "Understanding and Managing Drug Costs"

HMO Pharmacy Symposium Northeast May 2000, "Fraud and Abuse: Keeping Up With the Latest Tricks"

Pharmacy Benefit Management Institute, April 2000, "Overview of Utilization Management"

Wisconsin Educators Association, April 2000, "Innovative Pharmacy Plan Designs"

BCBS Association Symposium, October 1999, "Auditing Prescription Drug Plans"

Working Professionals in Employee Benefit Plans, October 1999, "Managing Lifestyle and Life Enhancing Drugs"

Certified Employee Benefits Specialists Symposium, October 1999, "Prescription Drug Costs: The Hottest 1999 Topic"

International Foundation of Employee Benefits, Conference for Public Employees, June 1999, "Maximizing Quality in Prescription Drug Programs"

Certified Employee Benefits Specialists, June 1999, Managing Lifestyle and Life Enhancing Drugs"

Pharmacy Benefits Management Institute, April 1999, "Managing Lifestyle and Life Enhancing Drugs"

Chicago Business Group on Health, March 1999, "Pharmacy Trends: What Employers Can Do About Rising Costs"

National Managed Health Care Coalition, March 1999, "Missing Link: Pharmacy and Medical Data Management"

The Employer Conference, October 1998, "Prescription Drug Dilemma"

"Painful Prescription", Fortune Magazine, October 2013

Pharmacy Benefits Academy West, East and Central, Faculty Member and Co-Producer, 2007 to Present

International Foundation of Employee Benefit Plans, October 2014, "Formulary Management"

International Foundation of Employee Benefit Plans, December 2014, "The World of Prescription Drug Programs"

## Expert Witness Cases

Expert Reports and/or Analysis/Depositions/Bench Trials:
Anna Mohr, et al. v United Health Group et al. (CASE 0:16-cv-03352-JNE-BRT)
Argus v Texas Department of Insurance
Benecard v. Argus
Castellano et al. v. HEB et al., No. C-1166-16H (Hidalgo Cty., Tex.).
Diversified Pharmaceutical Services v. Medica Health Plans
Express Scripts, Inc. v. UFCW Local 1776
Fidelity v. Express Scripts, Inc.
Group Hospitalization and Med. Services d/b/a Carefirst Blue Cross Blue Shield v. Merck-Medco Managed Care
HealthFirst, Inc. v. Medco
Hill Dermaceutcals v. Blue Cross Blue Shield of Florida (CASE NO.: 6:16-cv-01282-PGB-GJK)
Kimberely Negron v Cigna Insurance Company (Case 3:16-cv-01702)

National Health Plan v Teamsters Local 418/469 Welfare Fund v Pascarella, et al.

New England Health Care Local 1199 v. Express Scripts, Inc.

New York City Transit Authority v. Express Scrips Inc. Case No. 1:19-cv-05196

Northstar Healthcare Consulting v. Magellan Health Inc.

Office of Personnel Management (no complaint filed)

Rutledge for The State of Arkansas v. PCMA (Case No. 4:15-cv-00510-BSM) note: heard on appeal at the Supreme Court of the United States

SMART D v. Benecard

State of Illinois (no complaint filed)

State of Texas v. Caremark (State and Federal cases)

The State of California (CALPERS) v. Caremark

United States of America et al ex re Garbe v. Kmart Corporation No 3:12-cv-00881-NJR-PMF

United States, et al v. Medco Health Solutions

Arbitrations:

Blue Cross and Blue Shield of Michigan v. MedImpact

Express Scripts, Inc. v. UFCW Local 1776

Humana Health Plan, Inc.; Humana Insurance Company; and Humana Pharmacy Solutions, Inc. v. Walgreen Co.; and Walgreens Boots Alliance, Inc. AAA Case Number 01-19-0002-5131

Humana Health Plan, Inc.; Humana Insurance Company; and Humana Pharmacy Solutions, Inc. v. CVS and CVS Health Corporation, AAA Case Number 01-19-0000-6924

LA Care v MedImpact (Claim No. 2862)

Total Health Care v Catamaran (Case No. 01-15-0002-6049)

Ellsworth Corporation, Claimant and Clay Babcock, Respondent, AAA Case Number 01-20-0014-5169

Jury Trials and Results:

State Teachers Retirement System of Ohio v. Medco (Plaintiff awarded $7.9 million for breach of fiduciary duty and constructive fraud)

New York City Transit Authority v ESI (award not yet determined)

# Congressional Testimony

Testified to Congressional Committee on Oversight and Government Reform, Subcommittee on Federal Workforce, Postal Service and the District of Columbia on Transparency in the PBM Industry, June 2009.

# Department of Labor Testimony

Testified to the Department of Labor, Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Board Plans, US Department of Labor, PBM Compensation and Fee Disclosure, August 20, 2014

## Professional/Licensure

Licensed Private Detective, State of Illinois, September 2016 to present, License Number 115-002527

Licensed Private Investigator, State of Washington, August 2, 2021 to present, License Number 21023320

Licensed Pharmacy Technician, State of Illinois, 1997 to Present, License Number 049-123224

An Accredited Health Care Fraud Investigator through the National Health Care Anti-Fraud Association, December 2012

## Professional Committee Involvement

Northeastern Illinois University, Board of Alumni Advisors, 1996 to Present

Council Member, Roosevelt University, College of Pharmacy, Professional Council, April 2012 to Present

Association of Detectives and Security Agents in Illinois, Vice President, 2019, Treasurer, 2020