# EXHIBIT 67

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - - - -x

CYNTHIA RUSSO, et al.,

                    Plaintiffs,    No.

    -against-                      1:17-CV-02246

WALGREEN CO.,

                    Defendant.

- - - - - - - - - - - - - - - - - - -x

                    Virtual Zoom Deposition


                         April 21, 2023

                         9:00 a.m.


    CONFIDENTIAL DEPOSITION of KELLY LEAR

NORDBY, Ph.D., in the above-entitled action,

held at the above time and place, taken before

Jeremy Richman, a Shorthand Reporter and

Notary Public of the State of New York,

pursuant to the Federal Rules of Civil

Procedure, and stipulations between Counsel.


          *     *     *

```
                                              Page 2
1
2    APPEARANCES:
3
       SCOTT + SCOTT, ATTORNEYS AT LAW, LLP
4           Attorneys for Plaintiffs
            156 S Main Street
5           Colchester, Connecticut 06415
       BY:  ERIN GREEN COMITE, ESQ.
6
7
       ROBBINS GELLER RUDMAN & DOWD LLP
8           Attorneys for Plaintiffs
            655 West Broadway, Suite 1900
9           San Diego, California 92101
       BY:  ARTHUR L. SHINGLER, III, ESQ.
10              -and-
            120 E Palmetto Park Road, Suite 500
11          Boca Raton, Florida 33432
       BY:  ERIC S. DWOSKIN, ESQ.
12
13
       REED SMITH LLP
14          Attorneys for Defendant
            1301 K Street, NW, Suite 1000
15          East Tower
            Washington, D.C. 20005
16     BY:  SELINA COLEMAN, ESQ.
                -and-
17          1717 Arch Street
            Three Logan Square
18          Philadelphia, Pennsylvania 19103
       BY:  KRISTIN PARKER, ESQ.
19
20
     PRESENT:
21   RON MARRAZZO, Videographer
     JAMES FARMER, Concierge
22
23              *      *      *
24
25
```

```
                                              Page 62
 1          K. NORDBY, Ph.D. - CONFIDENTIAL
 2          Q.      Likewise, in your graduate
 3    studies, you also didn't take any
 4    pharmacy operations specific courses;
 5    is that correct?
 6                  MS. COLEMAN:  Objection to
 7       form.
 8          A.      That's correct.
 9          Q.      Your dissertation didn't have
10    anything to do with pharmacy
11    operations; is that correct?
12                  MS. COLEMAN:  Objection to
13       form.
14          A.      That's correct.  It focused
15    on firm incentives.
16          Q.      Do you consider yourself an
17    expert in pharmacy operations?
18          A.      No, I do not.  I'm an
19    economist.
20          Q.      In looking at your CV, you
21    worked at MetLife; is that right,
22    between 1990 and 1993?
23          A.      Yes.
24          Q.      And you worked for several
25    years at Indiana University as a
```

```
                                              Page 63

 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2    research assistant and an interviewer;
 3    is that right?
 4        A.    I had a number of different
 5    positions at Indiana University.  I
 6    taught there as well.  I worked for the
 7    survey -- Center For Survey Research
 8    and the Center For Econometric Model
 9    Research as well, and I was a teaching
10    assistant.
11        Q.    Is an associate instructor a
12    tenured position?
13        A.    It is not.
14        Q.    Is it considered adjunct?
15        A.    It's similar to an adjunct
16    position.  But -- it's similar.
17        Q.    Is it accurate to say that
18    you've never been an employee of a
19    pharmacy?
20        A.    Yes.
21        Q.    Is it accurate to say that
22    you've never been an employee of a
23    pharmacy benefit manager?
24        A.    I believe that's accurate,
25    unless MetLife has acquired some
```

```
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2   pharmacy benefit manager that I'm not
 3   aware of, but...
 4        Q.    Is it accurate to say you've
 5   never been an employee of a third-party
 6   payor?  You're taking a long time to
 7   answer the question.  Is it possible
 8   that you worked for a third-party
 9   payor?
10        A.    I guess it depends on if you
11   would include a health insurance
12   company as a third-party payor.  I
13   mean, I guess it's a life insurance
14   company, so I guess, no, I guess the
15   answer would be no.
16        Q.    Okay.  So you were an
17   employee of MetLife?
18        A.    Right.
19        Q.    Which provides life
20   insurance?
21        A.    Yes.
22        Q.    But you've never --
23        A.    You -- your -- can --
24        Q.    Do you want me to start over?
25        A.    Yes, why don't you define
```

Page 65

```
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2    "third-party payor," as you're using
 3    it?
 4        Q.    Okay.  I'm using "third-party
 5    payor" in the same context that you
 6    describe third-party payors as being
 7    potential class members in this case.
 8    This is referring to health insurance
 9    providers, do you understand that?
10        A.    Yes.
11        Q.    So my question is, you've
12    never been an employee of a third-party
13    payor; is that correct?
14        A.    That's correct.
15        Q.    In fact, you've never been an
16    employee of any person or entity within
17    the pharmacy industry; is that correct?
18        A.    As long as you don't include
19    hospitals as within the pharmacy
20    industry, then that would be correct.
21        Q.    Were you an employee of a
22    pharmacy at some point -- I mean of a
23    hospital at some point?
24        A.    Yes, I was.
25        Q.    What hospital was that?
```

```
1          K. NORDBY, Ph.D. - CONFIDENTIAL
2          A.     Bayshore Community Hospital
3     in New Jersey.
4          Q.     And what years were you
5     employed by Bayshore Community Hospital
6     in New Jersey?
7          A.     That's when I was in high
8     school and college.  So I don't recall
9     the exact years -- actually, it might
10    have been, I'm sorry, it was when I was
11    in -- I did volunteer work there in
12    high school, and then I did have a
13    part-time summer job in college.  I
14    forget the exact years.  And then in
15    graduate school I worked there
16    occasionally on breaks.
17         Q.     Do you understand that when I
18    refer to being an employee, that I'm
19    not referring to a volunteer, correct?
20         A.     Right, the volunteer position
21    was when I was in high school.  The
22    employee positions were when I was in
23    college and graduate school.
24         Q.     Okay.  You don't mention that
25    you were an employee of Bayshore
```

```
                                    Page 67
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2    Community Hospital on your CV.  Is
 3    there a reason for that?
 4        A.    Yes, I mean, I don't consider
 5    it part of my professional experience.
 6    It's a part-time job.  I had other
 7    part-time jobs when I was in high
 8    school that are also not on my CV.
 9        Q.    Is it fair to say that your
10    work at Bayshore did not include you to
11    -- did not include or expose you to
12    pharmacy operations within the
13    hospital?
14            MS. COLEMAN:  Objection to
15        form.
16        A.    Can you be more specific
17    about, expose me to pharmacy
18    operations?
19        Q.    Fair enough.
20        A.    Yeah.
21        Q.    In your work at Bayshore
22    Hospital, did you participate in the
23    reporting of U&C prices to payors, or
24    any intermediary, as part of the claims
25    process?
```

Page 68

```
 1          K. NORDBY, Ph.D. - CONFIDENTIAL
 2              MS. COLEMAN:  Objection to
 3       form.
 4        A.    I did not.
 5        Q.    Basically, you're saying that
 6   your work at Bayshore is entirely
 7   irrelevant to this matter, correct?
 8              MS. COLEMAN:  Objection to
 9       form.
10        A.    I'm saying it's, it was not
11   relevant to my testimony in this
12   matter.  My testimony in this matter is
13   as an economist, and based on my
14   professional experience and background
15   as an economist, I have knowledge of
16   certain things in the healthcare
17   industry from working in those
18   positions, but it's not relevant to my
19   opinions in this matter.
20        Q.    Did the pharmacy at Bayshore
21   County Hospital have a discount savings
22   programs?
23              MS. COLEMAN:  Objection to
24       form.
25        A.    It's Bayshore Community
```

```
                                            Page 69

 1          K. NORDBY, Ph.D. - CONFIDENTIAL

 2     Hospital, and it's not something I have

 3     any knowledge of either way, I don't

 4     know.

 5          Q.    All right, let's take a look

 6     at Exhibit 2 of your report, which is

 7     materials considered.  Give me just one

 8     moment.  I think I clicked the wrong

 9     button.  Okay, for the record, I've

10     marked as Exhibit 529, Exhibit 2 to

11     your report, which consists of

12     materials considered.  Is that correct?

13               (Exhibit 529, marked for

14          identification, Exhibit 2 to the

15          expert report of Kelly Nordby,

16          Ph.D.)

17          A.    Yes.

18          Q.    And are you able to access

19     that document electronically?

20          A.    Yes.

21          Q.    Does this exhibit list all of

22     your publications since 1998?

23          A.    Sorry, I thought we were

24     looking at the Exhibit 2 to my report;

25     is that correct?
```

```
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2        Q.    It is.  Let's go back to
 3   Exhibit 1.
 4        A.    Okay.
 5        Q.    So I'll direct your attention
 6   to the publications and working papers
 7   section of Exhibit 1.  Does this
 8   exhibit list all of your publications
 9   since 1998?
10        A.    Yes, I believe it does.
11        Q.    Which of these publications
12   discussed the calculation of U&C prices
13   in the pharmacy industry?
14            MS. COLEMAN:  Objection to
15       form.
16        A.    None of these discuss the
17   calculation of U&C pricing.
18        Q.    With regard to Exhibit 1,
19   does your CV identify all matters,
20   whether in governmental or court
21   proceedings, or some other form of
22   dispute resolution, like mediation or
23   arbitration, where you were retained to
24   offer an opinion as an expert in the
25   last four years?
```

```
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2    follows it would not be a barrier for
 3    multiple prescriptions on the first
 4    fill, right?
 5              MS. COLEMAN:  Objection to
 6        form and objection to scope.
 7        Q.    You can answer.
 8        A.    My understanding, again,
 9    about the Garby court's decision
10    regarding this is that they're
11    referring to the $10 membership fee.
12        Q.    Well, that's what my question
13    referred to.
14        A.    Yes.
15        Q.    So let me ask it again.
16        A.    Yes, so they did say they did
17    not view a $10 membership fee as a
18    barrier.
19        Q.    Okay.  So my question, then,
20    with that understanding, you would
21    agree that if the Garby court did not
22    view the membership fee as a barrier
23    for one prescription on the first fill,
24    then it follows it would not be a
25    barrier for multiple prescriptions on
```

```
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2    the first fill, right?
 3              MS. COLEMAN:  Objection to
 4        form and to scope.
 5        Q.    I think you gave --
 6        A.    That wasn't part of my
 7    assignment, to review the Garby
 8    decision.  I think, again, my opinions
 9    about the Garby decision are what it
10    found with respect to allocating the
11    membership fee, and with respect to the
12    barrier, it is specific to the fee in
13    that case, which was $10, which is
14    different from the fee in this case.
15        Q.    Okay, but I asked you a very
16    specific question, and you said yes --
17        A.    Yes, I think they said that
18    they didn't consider the $10 membership
19    fee to be a barrier.
20        Q.    All right.  And it would
21    follow, then, that if, on the first
22    fill, there were multiple
23    prescriptions, but the fee would still
24    not be a barrier, correct?
25              MS. COLEMAN:  Objection to
```

```
                                    Page 123
 1        K. NORDBY, Ph.D. - CONFIDENTIAL
 2        form and to scope.
 3        A.    Yes, I would say that's
 4   correct.
 5        Q.    Is it correct that your
 6   opinion is not based on an analysis of
 7   the legal meaning of U&C?
 8        A.    Yes, my opinion is that of an
 9   economist.
10        Q.    In fact, your opinion offers
11   "A method of addressing membership fees
12   as part of the discount program,"
13   correct?
14        A.    My opinion offers a method
15   for calculating the true U&C -- I'm
16   sorry, PSC price, so the prices paid by
17   PSC members, which, in my opinion,
18   includes the membership fee, and yes, I
19   offered a method of doing that.
20        Q.    Right.  And your method was
21   -- strike that.
22             Your opinion is that the
23   membership program at Walgreens
24   constitutes a two-part pricing
25   strategy, and that from an economist
```

1      K. NORDBY, Ph.D. - CONFIDENTIAL

2   perspective, the "price" of any of

3   these PSC prescription drugs purchased

4   would include the membership fee,

5   correct?

6      A.   Yes, my opinion with respect

7   to, you know, I have other opinions,

8   but my opinion with respect to the PSC

9   price is that, yes, it would include a

10   portion of the membership fee if people

11   paid, you know, purchased more than one

12   prescription during the year.

13      Q.   And that's from an

14   economist's perspective, correct?

15      A.   Yes.

16      Q.   You're not offering an

17   opinion as to how U&C should be

18   calculated from a legal perspective,

19   right?

20      A.   Correct.

21      Q.   And you're not offering an

22   opinion as, that's based on an analysis

23   of the pharmaceutical industry's

24   understanding of the U&C, either, are

25   you?

```
                                        Page 125
 1          K. NORDBY, Ph.D. - CONFIDENTIAL
 2          A.     That's correct.
 3          Q.     You also don't offer an
 4     opinion as to whether PSC
 5     administrative or operational costs
 6     should be excluded from U&C; is that
 7     correct?
 8          A.     Correct.  I don't offer any
 9     opinions about the U&C.
10          Q.     Are you aware whether anyone
11     has offered an opinion in this case
12     that PSC administrative or operational
13     costs should be excluded from U&C?
14          A.     No, I'm aware that there have
15     been opinions offered in this case
16     about the U&C.  But I don't know what,
17     you know, specifically what they say
18     with respect to what should be included
19     and not included.
20               MR. SHINGLER:  Objection,
21          nonresponsive, strike everything
22          after the initial affirmation.
23          Q.     If the court in this case
24     determines that U&C excludes
25     administrative and operational costs,
```

1      K. NORDBY, Ph.D. - CONFIDENTIAL
2    think that the only basis for
3    understanding the meaning of U&C is
4    from your economic perspective, do you?
5              MS. COLEMAN:  Same objection.
6      A.    I don't opine on anything to
7    do with the U&C.
8      Q.    I'm asking you whether you
9    think that the only basis for
10   understanding the meaning of U&C is
11   from your own economic perspective.
12             MS. COLEMAN:  Objection to
13      form.
14      A.    I don't have an economic
15   perspective on the U&C.
16      Q.    Would you agree that there
17   may be different understandings as to
18   the meaning of U&C pricing that could
19   be based on industry standards and
20   practices in the pharmacy industry?
21             MS. COLEMAN:  Objection to
22      scope.
23      A.    I don't have any opinions on
24   the U&C.
25      Q.    Have you read -- strike that.

Page 146

1      K. NORDBY, Ph.D. - CONFIDENTIAL
2      think we are concluding the
3      deposition.
4              THE VIDEOGRAPHER:  Very good,
5      I'll read us off.  The time is
6      approximately 1:34 p.m., this
7      concludes today's testimony, we are
8      off the record.
9              (Time noted:  1:33 p.m.)
10             MR. SHINGLER:  We'll take a
11     rough.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1

2                    **CERTIFICATION**

3

4

5      I, JEREMY RICHMAN, a Notary Public for and

6   within the State of New York, do hereby

7   certify:

8      That the witness whose testimony as herein

9   set forth, was duly sworn by me; and that the

10  within transcript is a true record of the

11  testimony given by said witness.

12     I further certify that I am not related to

13  any of the parties to this action by blood or

14  marriage, and that I am in no way interested

15  in the outcome of this matter.

16     IN WITNESS WHEREOF, I have hereunto set my

17  hand this 2nd day of May, 2023.

18

19

20  _____

21  JEREMY RICHMAN

22

23

24

25