# EXHIBIT 68

Page 1

1

2            UNITED STATES DISTRICT COURT

3           NORTHERN DISTRICT OF ILLINOIS

4                 EASTERN DIVISION

5    ---------------------------------------X

6    CYNTHIA RUSSO, LISA BULLARD,

7    RICARDO GONZALES, INTERNATIONAL        Case No.

8    BROTHERHOOD OF ELECTRICAL WORKERS    1:17-CV-02246

9    LOCAL 38 HEALTH AND WELFARE FUND,

10   INTERNATIONAL UNION OF OPERATING

11   ENGINEERS LOCAL 295-295C WELFARE

12   FUND, and STEAMFITTERS FUND LOCAL

13   439, on Behalf of Themselves and

14   All Others Similarly Situated,

15                   Plaintiffs,

16          vs.

17   WALGREEN CO.,

18                   Defendant.

19   ---------------------------------------X

20              ** CONFIDENTIAL **

21        STENOGRAPHIC AND VIDEO-RECORDED

22         REMOTE VIRTUAL DEPOSITION OF

23                 JED R. SMITH

24            Friday, April 28, 2023

25                 10:03 a.m.

Page 2

1

2                    Friday, April 28, 2023

3                         10:03 a.m.

4

5          T R A N S C R I P T  of the stenographic and

6     video-recorded remote virtual deposition of JED R.

7     SMITH, pursuant to the Federal Rules of Civil

8     Procedure, held on Friday, April 28, 2023,

9     commencing at approximately 10:03 a.m.,

10    stenographically recorded by Josephine H. Fassett, a

11    Registered Professional Reporter, Certified Court

12    Reporter, and Notary Public of the states of New

13    York and New Jersey.

14

15

16

17

18

19

20

21

22

23

24

25

Page 75

1               CONFIDENTIAL - SMITH

2    would seem to be reasonable.  But, again, this

3    information's not in the data and would therefore

4    █████████████    ██████████████

5    ██████████████████████████████████

6    ██████████████████████████████

7    ████████████████████████████

8    document like this that says, "This is for TPP X.

9    This is for TPP Y."

10        Q.   All right.

11        MR. ALEXANDER:  I move to strike

12       everything after "reasonable" as

13       nonresponsive.

14        Q.   Mr. Smith, can you turn to page 55 of

15    your report.

16        Let me know when you're there.

17        A.   I'm at -- you said page 55, correct?

18        Q.   Yes.

19        A.   I'm at page 55.

20        Q.   Paragraph 115.  Are you at paragraph

21    115?

22        A.   Yes, I am.

23        Q.   Thank you.

24        In the final sentence of paragraph 115

25    you say with regards to Mr. Gonzalez's Arizona

Page 76

CONFIDENTIAL - SMITH

1
2   transactions that they're associated with a
3   fulfillment center and not a retail pharmacy.  And
4   as support you cite in Footnote 205 to the
5   Declaration of Henry Thompson dated March 15,
6   2023.
7            Are you aware of any transactional data
8   that indicates that Mr. Gonzalez's Arizona
9   transactions are associated with a fulfillment
10  center?
11       A.   Other than just Googling the address,
12  you might be able to determine that, but I'm not
13  aware of anything in the data that specifically
14  says it's a fulfillment center.
15       Q.   Did you Google the address to determine
16  whether it's a fulfillment center?
17       A.   I did not.  I relied on Mr. Thompson's
18  declaration.
19       Q.   So prior to seeing Mr. Thompson's
20  declaration dated March 15, did you have any
21  reason to believe that Mr. Gonzalez's Arizona
22  transactions were associated with a fulfillment
23  center?
24       A.   Counsel had informed me before at that
25  point that that store was a fulfillment center,

1                    CONFIDENTIAL - SMITH

2    but prior to that information from counsel I would

3    not.

4         Q.    When did counsel inform you that that

5    store was a fulfillment center?

6         A.    I don't remember the specific date.

7         Q.    Approximately when did counsel inform

8    you that that store was a fulfillment center?

9         A.    Probably sometime in January or February

10   of this year.

11        Q.    Do you recall who, which counsel,

12   informed you that that store was a fulfillment

13   center?

14        A.    I don't.

15        Q.    Do you recall how counsel informed you

16   that that store was a fulfillment center?

17        A.    Via a phone call.

18        Q.    Prior to counsels informing you that

19   that store was a fulfillment center at the

20   beginning of this year, did you have any reason to

21   believe that Mr. Gonzalez's Arizona transactions

22   were associated with a fulfillment center?

23        A.    No.

24        Q.    Do you believe that Walgreens is able to

25   identify which store numbers are associated with

```
                                            Page 78
 1              CONFIDENTIAL - SMITH
 2     fulfillment centers?
 3              MR. LEIB:  Objection.
 4         Q.   You can answer.
 5         A.   I believe the data dictionary for the
 6     ███████████████████████████████████████
 7     ███████████████████████████████████████
 8     that data element, but my recollection is it was
 9     not produced in this matter.
10         Q.   I'm not sure that I understand that
11     testimony.  Are you saying that you have seen a
12     data dictionary that applies to Walgreens' data
13     that may not have been produced in this matter?
14         A.   No.  I -- the data dictionary I believe
15     ██████████████████████    █████████████████
16     █████████████████████████████████████████
17     matter.
18         Q.   So you believe that there is a field
19     available in Walgreens' data that may indicate
20     whether a store is a fulfillment center?
21              MR. LEIB:  Objection.
22         Q.   You can answer.
23         A.   I don't know definitively, but that
24     field might contain that type of information.
25         Q.   Well, just to back up for a second.
```

```
                                                Page 79

 1                    CONFIDENTIAL - SMITH

 2              Mr. Thompson put in a declaration that

 3       this store is a fulfillment center.  Is it

 4       unreasonable to assume that Walgreens is capable

 5       of identifying the other fulfillment centers and

 6       what store numbers are associated with them?

 7              MR. LEIB:  Objection.

 8          Q.   You can answer.

 9          A.   I would expect that they would know what

10       stores are their fulfillment centers.

11          Q.   Could you please turn to page 58 of your

12       report.  Could you let me know when you're there.

13          A.   I'm there.

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                        Page 133

 1                  CONFIDENTIAL - SMITH
 2   ████████████████████████████████
 3   ████████████████████████████████████
 4   ██████████████████████████████████████
 5   ███████████████████████████████████████
 6   ████████
 7                  Are you offering an affirmative opinion
 8   in this matter that not all plans use lesser-of
 9   logic to price transactions?
10        A.   I am not offering that opinion.  I'm
11   relying on Mr. Jacobs and Mr. Hughes for that.
12        Q.   Sitting here today, do you know what
13   Dr. Jacobs' support for that proposition was?
14        A.   I don't remember all of his support.  I
15   believe there was at least one contract in this
16   matter that had no reference to lesser-of logic
17   for usual and customary.
18        Q.   If the amount paid by a health plan,
19   plus the amount paid by a consumer, equals the
20   usual and customary price, is that suggestive that
21   the usual and customary price was the basis for
22   determining the amount paid by the health plan?
23        A.   For that transaction, yes, that the
24   usual and customary price was the basis of the
25   price.
```

```
                                        Page 136
 1                  CONFIDENTIAL - SMITH
 2    provide certain information that necessarily
 3    requires individualized review?
 4              MR. LEIB:  Objection.
 5         Q.   You can answer.
 6         A.   I'm not sure I understood the question.
 7    Can you ask it again?
 8         Q.   Is it your understanding that if class
 9    members do provide certain information that the
10    damages analysis necessarily requires
11    individualized review?
12         A.   I think that would depend on what
13    information is provided and how you would
14    implement it.
15         Q.   So it may but you're not sure?
16              MR. LEIB:  Objection.
17         A.   It seems like it would be a case-by-case
18    basis of what type of information we're talking
19    about.
20         Q.   Do you understand that plaintiffs'
21    proposed class definition excludes Walgreens and
22    its management, employees, subsidiaries, and
23    affiliates?
24         A.   I recall that piece of class definition,
25    yes.
```

```
                                            Page 137
 1                   CONFIDENTIAL - SMITH
 2         Q.   And just so that you can look at this,
 3    I'm on page 2 of your report, at the top, which
 4    begins, "Excluded from the Class are (a) Walgreens
 5    and its management, employees, subsidiaries, and
 6    affiliates."
 7                  To the best of your knowledge, does any
 8    of the data produced in this action identify
 9    whether a given individual is a member of
10    Walgreens' management?
11         A.   I'm not sure if there's anything that
12    would identify specific management employees
13    unless they had a different health plan than the
14    rest of the employees.
15         Q.   And in that circumstance, are you aware
16    of any data produced in this action that would
17    identify whether a given individual is a member of
18    Walgreens' management?
19         A.   It's not something I specifically looked
20    into, so I'm not sure.
21         Q.   To the best of your knowledge, does any
22    of the data produced in this action identify
23    whether a given individual is a Walgreens
24    employee?
25         A.   It is not something I specifically
```

```
                                                    Page 138
 1                    CONFIDENTIAL - SMITH
 2     looked into, but I would expect that Walgreens has
 3     a health plan and you would at least be able to
 4     identify members of the Walgreens health plan.
 5          Q.    To the best of your knowledge, does any
 6     of the data produced in this action identify
 7     whether a given entity is a Walgreens subsidiary?
 8          A.    Not that I'm aware of.
 9          Q.    To the best your knowledge, does any of
10     the data produced in this action identify whether
11     a given entity is a Walgreens affiliate?
12          A.    Not that I'm aware of.
13          Q.    In your opinion, is the identity of
14     Walgreens management, employees, subsidiaries, and
15     affiliates knowable?
16               MR. LEIB:  Objection.
17          Q.    You can answer.
18          A.    I would expect that Walgreens could
19     provide that information.
20          Q.    Walgreens can identify its employees,
21     its management, its subsidiaries, and its
22     affiliates, right?
23          A.    They may have challenges over certain
24     periods of time, but I would expect that they, to
25     the extent they have records, they could provide
```

```
                                                    Page 139

 1                    CONFIDENTIAL - SMITH
 2      them.
 3           Q.   And would you give the same answer as to
 4      the relevant PBMs, that they could identify their
 5      subsidiaries?
 6           A.   I would expect that PBMs would be able
 7      to identify their subsidiaries.
 8           Q.   Would you expect that the relevant PBMs
 9      could identify their affiliates?
10                MR. LEIB:   Objection.
11           A.   I believe so, but there may be some
12      challenges there with the mergers and acquisitions
13      as well.
14           Q.   Sitting here today, do you have any
15      reason to believe that the relevant PBMs are less
16      capable than Walgreens at identifying their
17      subsidiaries or affiliates?
18           A.   No.
19           Q.   On page 2 let's look at b, "Excluded
20      from the Class are the Court, members of their
21      immediate families, and judicial staff."
22                To the best of your knowledge, does any
23      of the data produced in this action identify
24      whether an individual is a judge, a member of the
25      judge's immediate family, or judicial staff?
```

1                    CONFIDENTIAL - SMITH

2              MR. LEIB:  Objection.

3         A.   I don't believe so.

4         Q.   In your experience, working on other

5    class actions, have you ever worked on a matter

6    where the court, members of their immediate family

7    or judicial staff were not excluded from a class

8    definition?

9         A.   I'm not sure.  I remember seeing class

10   definitions that I don't remember having that

11   level of specificity in them.

12        Q.   So you don't recall?

13        A.   I don't.

14        Q.   In your opinion, do members of the court

15   know who they are?

16        A.   I would assume so, but I don't know, I

17   have not talked to anyone in the court.

18              MR. ALEXANDER:  Can the videographer

19         let us know, how long have we been going

20         since the last break?

21              THE VIDEOGRAPHER:  We have been going

22         for 37 minutes.

23              MR. ALEXANDER:  Great.

24        Q.   Mr. Smith, what does it mean to

25   adjudicate a claim?

1          CONFIDENTIAL - SMITH

2          A.    In a general high-level description

3     would be to run that claim through the different

4     coverage and benefit aspects of a prescription

5     drug plan.

6          Q.    What entity adjudicates claims?

7          A.    It depends on what type of claim you're

8     talking about.

9          Q.    Is it fair to say that PBMs generally

10    adjudicate claims for the purchases of

11    prescription drugs made at retail pharmacies?

12          MR. LEIB:  Objection.

13          Q.    You can answer.

14          A.    I believe that that's generally the

15    case, or, I guess, third-party administrators that

16    they subcontract to.

17          Q.    Do you have an understanding as to what

18    information is generally considered as part of the

19    adjudication process?

20          A.    Yes.

21          Q.    And what information do you believe is

22    generally considered as part of the adjudication

23    process?

24          A.    Eligibility.  Plan design.  Drug

25    formularies.  Contract terms.  Benefit structure,

```
                                              Page 142
 1               CONFIDENTIAL - SMITH
 2    among other things.
 3         Q.   And all of those factors are considered
 4    through the process of adjudicating a claim,
 5    correct?
 6              MR. LEIB:  Objection.
 7         Q.   You can answer.
 8         A.   Based on my general understanding, yes.
 9         Q.   Is it fair to say that pharmacies submit
10    the data that is used in the adjudication process?
11              MR. LEIB:  Sorry, can you repeat that
12         question, Carey?
13         Q.   Is it fair to say that a pharmacy
14    submits data that is used in the adjudication
15    process?
16              MR. LEIB:  Objection.
17         Q.   You can answer.
18         A.   It would be fair to say that data
19    submitted by the pharmacy is relied upon in the
20    adjudication process.
21         Q.   And is it fair to say that PBM when
22    adjudicating a claim then returns data to the
23    pharmacy identifying the results of that
24    adjudication process?
25              MR. LEIB:  Objection.
```

```
                                            Page 143

 1                    CONFIDENTIAL - SMITH

 2          Q.    You can answer.

 3          A.    The PBM will generally return certain

 4     information to the pharmacy identifying the result

 5     of the adjudication process.

 6          Q.    When you say, "the PBM will generally

 7     return certain information," is it your

 8     understanding that the PBM will retain information

 9     that was not submitted to the pharmacy as a result

10     of the adjudication process?

11          A.    I can't speak specifically to what they

12     retain, but I don't believe they provide all of

13     the information that underlies an adjudication

14     back to the pharmacy.

15          Q.    So the PBMs may have more information

16     than the pharmacy about the information that

17     underlies an adjudication, correct?

18          A.    That would be my expectation is that the

19     pharmacy -- or the PBM has information beyond what

20     the pharmacy has that's used in adjudication.

21          Q.    Are you familiar with the NCPDP

22     standards?

23          A.    I'm familiar with them, yes.

24          Q.    At a high level, what is your

25     understanding of what the NCPDP standards are?
```

```
                                              Page 151

 1              CONFIDENTIAL - SMITH

 2              MR. LEIB:  I'll instruct the witness,

 3         to the extent he's obligated or there are

 4         any confidentiality agreements, not to

 5         disclose that information, that he

 6         shouldn't disclose that information.  To

 7         the extent he's free to, then of course he

 8         should.

 9         A.   I believe all the instances where I have

10    worked with a PBM we were retained, there's

11    confidentiality clauses in our engagement and that

12    wasn't publicly disclosed, so I don't believe I

13    can name those PBMs.

14         Q.   Have you ever seen data from a PBM --

15    strike that.

16              Have you ever seen data fields produced

17    by PBMs that were not produced in connection with

18    this action?

19         A.   I believe so, yes.

20         Q.   Have you seen data fields produced by

21    PBMs that include information on whether

22    co-insurance as opposed to a co-pay was paid?

23         A.   I have seen some PBMs produce fields

24    that had different columns for co-pay and

25    co-insurance, but those fields are not always
```

```
 1              CONFIDENTIAL - SMITH
 2    matter if there was -- if they have this
 3    information available.
 4         Q.   Just to save time.  That would be the
 5    same answer that applies to subparagraph one
 6    above, you don't have an opinion in this matter
 7    about whether the relevant PBMs do or don't have
 8    information regarding the periodic deductible
 9    amount that would be associated with a given
10    transaction, correct?
11         A.   Identified in subparagraph 1.
12              MR. LEIB:  What paragraph are you
13         referring to, Carey?
14              MR. ALEXANDER:  Subparagraph m, that's
15         one above n that starts on page 44.
16              THE WITNESS:  Okay.
17              MR. LEIB:  M as in Mary.
18         A.   You said one paragraph -- paragraph one
19    above and I was trying to find subparagraph one
20    and I was completely lost, so I apologize, I
21    missed your question.
22         Q.   That's okay.  It's very difficult to
23    give verbal directions in a text document, so let
24    me, let me ask -- let me ask the question again.
25              Do you have the same opinion -- strike
```

```
                                          Page 166
 1                  CONFIDENTIAL - SMITH
 2    that.
 3              Are you also not offering an opinion
 4    with regards to the data identified in
 5    subparagraph (m) whether or not the relevant PBMs
 6    maintain information regarding a periodic
 7    deductible that would be applicable to a given
 8    transaction?
 9         A.   That's correct.
10         Q.   Are you familiar with the term generic
11    effective rate?
12         A.   Yes, I am.
13         Q.   To what does that refer?
14         A.   It's generally a -- it depends on --
15    it's between a TPA -- TPP and a PBM or a PBM and a
16    pharmacy.  Each could have a generic effective
17    rate, but it generally sets a floor or a ceiling
18    on the amount that is going to be paid for generic
19    drugs.
20         Q.   Is it correct that generic effective
21    rate payments are made after claims have already
22    been adjudicated and paid?
23         A.   Generic effective rates are
24    reconciliations of previously paid transactions,
25    yes.
```

1                    CONFIDENTIAL - SMITH

2          A.    Can you ask one more time.

3          Q.    Is it fair to say, in general, that PBMs

4     make GER payments and TPPs receive them; is that

5     one of the general setups?

6          A.    I would agree with you that that's one

7     of the setups.  I don't know that I agree with the

8     first way you phrased the question, because there

9     could also be the PBM pharmacy GER payments.

10         Q.    Okay.  When a PBM makes a GER payment to

11    a TPP, is it correct that the PBM knows the amount

12    of the GER payment that it's making?

13         A.    If they're making the payment, then I

14    would think they know the amount they're making.

15    But I remember at least one of the named

16    plaintiffs they were getting allocated GER

17    payments from their, I guess, GPO, or whatever

18    entity that helped them contract with the PBM.

19         Q.    And in that situation did the named

20    plaintiff know how much it was receiving as a GER,

21    in your understanding?

22         A.    That's my understanding.

23               MR. LEIB:  I object to that question.

24         Q.    Is it fair to -- do you have any

25    knowledge as to whether or not PBMs maintain

1          CONFIDENTIAL - SMITH

2   records of GER payments that they make?

3          A.   I would expect that they, for at least

4   some period of time, maintain records of GER

5   payments they've made.

6          Q.   In your review of the data produced in

7   this action, have you been able to associate any

8   GER payment with an overcharge that plaintiffs

9   have identified?

10              MR. LEIB:  Objection.

11         A.   So in paragraph 108 on page 50 of my

12   report, I cite to EHPC00240 that shows that IBEW

13   ████████████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████

17         Q.   Well, that wasn't my question.  I asked:

18              Have you reviewed any data that allows

19   you to tie the GER payment that you reference here

20   to a specific overcharge?

21         A.   I think I just answered that question.

22         Q.   And to make sure I understand your

23   answer, you're simply saying the fact of a GER

24   payment in 2018 and the fact of an overcharge that

25   Dr. Hilton identified in 2018 means that somehow

```
                                              Page 182
 1                   CONFIDENTIAL - SMITH
 2     different than the amount of an overcharge?
 3             MR. LEIB:  Objection.
 4        Q.   You can answer.
 5        A.   My general understanding is that it
 6     relates to the amount that one party received in
 7     excess of what it would have received absent
 8     conduct.
 9        Q.   That the focus is instead on the party
10     that's receiving the benefit, correct?
11             MR. LEIB:  Objection.
12        Q.   You can answer.
13        A.   That's my general understanding.
14        Q.   Do most claims adjudication items have
15     any bearing on the amount that Walgreens received
16     in connection with a given claim?
17        A.   It impacts the amount that Walgreens
18     could receive through generic effective rate
19     payments from the PBM.
20        Q.   So you believe the unjust enrichment
21     amount in a separate GER calculation between
22     Walgreens and the PBM may change as a result; is
23     that correct?
24        A.   That's correct.
25        Q.   Okay.  You created a methodology to
```

1                  CONFIDENTIAL - SMITH

2       identify PSC prices in this action, right?

3           A.   I applied Dr. Hilton's methodology and I

4       adjusted it for the purposes of applying the PSC

5       enrollment fee, but other than that that's the

6       only methodology I applied.

7           Q.   You didn't create your own methodology

8       for identifying PSC prices?

9           A.   I did not.

10          Q.   How did you adjust Dr. Hilton's

11      methodology?

12          A.   As discussed in my report, I applied

13      Dr. Hilton's methodology.  And then the only

14      variation, when it came to selecting PSC prices in

15      analyzing her analysis, was to calculate an

16      allocation of the PSC enrollment fee per

17      Ms. Nordby's expert report.

18          Q.   So you're offering no opinion that

19      relies on your own methodology as to what the PSC

20      price should be in connection with any PSC drug,

21      correct?

22               MR. LEIB:  Objection.

23          A.   It was for this part of the matter I was

24      not asked to calculate a specific PSC price for

25      any given transaction, so I analyzed Dr. Hilton's

Page 184

1          CONFIDENTIAL - SMITH

2    PSC prices and applied the enrollment fee per my

3    scope of work.

4          Q.    When you say, "for this part of the

5    matter," what do you mean?

6          A.    The class certification discussion.

7          Q.    And so it's your understanding that in a

8    later phase of this matter you may develop a

9    separate methodology for identifying PSC prices?

10         A.    My understanding that if the matter

11   proceeded past class certification, I may or may

12   not be asked to perform damages calculations or

13   other items that may require a PSC price

14   calculation or analyzing further plaintiffs'

15   experts' PSC price determinations, but I don't

16   know if I will or will not.

17         Q.    I'd like you to turn to page 30 of your

18   report.

19         A.    I'm there.

20         Q.    Table 17.  The final column there refers

21   ██████████████████████████    ████████████

22   that?

23         A.    I see that.

24         Q.    Without developing your own methodology

25   to identify PSC prices, what is the basis for your

```
 1              CONFIDENTIAL - SMITH
 2    opinion that this PSC price is correct?
 3         A.   Based on my understanding of
 4    Dr. Hilton's methodology and what the Connecticut
 5    Reconciliation data reflects.  So I didn't
 6    undertake a universal analysis to identify PSC
 7    prices.  I'm pointing out here an example of a
 8    price she selects that based on how I understood
 9    the Connecticut Reconciliation data works, would
10    have been the price item I would have expected her
11    to pick under her methodology.
12         Q.   So you have no opinion in this action
13    whether or not any of the PSC prices that you
14    identify in your report are actually PSC prices;
15    is that correct?
16              MR. LEIB:  Objection.
17         A.   Can you ask that question one more time.
18         Q.   You have no opinion in this action
19    whether or not any of the PSC prices that you
20    identify in your report are actually PSC prices,
21    correct?
22              MR. LEIB:  Objection.
23         A.   My review was to determine whether I
24    would get the same PSC price if I applied the
25    methodology that Dr. Hilton applied, so it's
```

1          CONFIDENTIAL - SMITH

2       A.    I was not asked to undertake an effort

3    to calculate my own independent determination of

4    PSC prices for this report.

5       Q.    So the answer is no, none of the PSC

6    prices that you identify in this report in your

7    opinion are necessarily correct PSC prices?

8           MR. LEIB:   Objection.

9       A.    My analysis was whether Dr. Hilton

10   implemented her own methodology consistently.   I

11   have not put forth an opinion as to what my own

12   independent determination of each PSC price would

13   be, that would require significant more analysis

14   and determination.

15      Q.    So to the extent that you identify a PSC

16   price in your report, you have no idea whether

17   that's correct, right?

18           MR. LEIB:   Objection.

19      Q.    You can answer.

20      A.    Again, my analysis was whether it was

21   the correct price under Dr. Hilton's methodology,

22   not whether it's the actual PSC price at the time.

23      Q.    To the extent that you failed to

24   replicate Dr. Hilton's methodology accurately,

25   would you then agree that any opinions that you

1          CONFIDENTIAL - SMITH

2      Q.   But you aren't offering any affirmative

3   opinion on your own about whether damages can be

4   determined on a class-wide basis because you

5   haven't come up with a way to identify PSC prices

6   and you agree that's one aspect of analyzing

7   damages, right?

8          MR. LEIB:  Objection.

9      A.   I'm not understanding how you're

10   connecting those two points.

11      Q.   You've already told me that in order to

12   evaluate whether damages can be determined on a

13   class-wide basis, you need to first be able to

14   come up with a methodology for identifying PSC

15   prices.  Because you haven't come up with a way to

16   identify PSC prices, you haven't evaluated whether

17   damages can be determined on a class-wide basis.

18          Separate and apart, all you've done is

19   evaluate and respond to Dr. Hilton's report,

20   right?  You haven't made any independent

21   evaluation about whether damages can be determined

22   on a class-wide basis.

23          MR. LEIB:  Objection.

24      A.   I disagree with that.  Because I

25   performed analyses and identified the steps that

Page 194

1          CONFIDENTIAL - SMITH

2    would be required to calculate damages on a

3    class-wide -- or calculate damages.  And even if

4    you did that using Dr. Hilton's PSC prices, I've

5    shown examples of how you cannot calculate damages

6    without factoring in deductibles, out-of-pocket

7    maximums, generic effective rates and other

8    re-adjudication items.

9          Q.   So because of the steps that you've

10   identified that would be required to calculate

11   damages, separate and apart, you didn't think you

12   needed to determine whether or not you could

13   identify PSC prices on your own, right?

14              MR. LEIB:  Objection.

15          A.   Again, I did not -- I was not asked to

16   and I did not feel like I needed to for the

17   purposes of this report calculate my own set of

18   PSC prices.  What I was asked to do was review

19   Dr. Hilton's report and also evaluate whether I

20   could calculate damages on a class-wide basis, and

21   I relied on performing that analysis using the

22   methodology of Dr. Hilton for determining PSC

23   prices.  But if asked to in the future, I could

24   perform an analysis that potentially could

25   identify PSC prices, but I would need to know the





```
                                              Page 217
```

1           CONFIDENTIAL - SMITH

2    ██████████████

3        ██    ████████████████████

4    █████████████████

5        ██    ██████████████████████

6    ██████████████████████████

7    █████████████████████████████

8    ████████████

9        A.   My review of Dr. Hilton's report and

10   scripts, I could not determine what she used for

11   the Connecticut Reconciliation data.

12           When I reviewed her prices where we

13   disconnected on Connecticut Medicaid

14   reconciliation, I looked at all different

15   possibilities, and if the price she selected could

16   tie to one of those, then it was not one of the 72

17   I identified.

18       Q.   When you couldn't determine what price

19   she used, did you consider that your

20   methodology -- strike that.

21           When you couldn't determine the price

22   that she used, did you consider that your

23   replication of her methodology was incorrect?

24       A.   When I could not replicate her price

25   from the Connecticut Medicaid Reconciliation data,

1    CONFIDENTIAL - SMITH
2    opinion is that you would need to factor in the
3    enrollment fee in determining the PSC price.  So
4    if you did not do that, then the PSC price would
5    be misstated.
6        Q.   If the court were to agree with
7    Dr. Nordby that membership fees do need to be
8    accounted for, you're opining in this action that
9    there's a methodological way to account for them,
10   correct?
11       A.   I performed a methodology to account for
12   them, yes.
13       Q.   And the methodology that you created is
14   reliable in your opinion, correct?
15       A.   That's correct.
16       Q.   I'd like you to go to page 14 of your
17   report.  Can you let me know when you are there.
18       A.   I'm at page 14.
19       Q.   So Note 79, the final sentence.
20   ████████████████████████████
21   ██████████████████████████████████████
22   ████████████████████████████████
23   ██████████████████████  ██████████████████
24      ██  ████████████████████
25      ██  ██████████████████████████████████



```
                                            Page 296

1                  CONFIDENTIAL - SMITH

2      ████████████████████████████

3         ██    ████████████████████

4         ██    ██████████████    ████████████████

5      ████████████████████████████████████

6         ██    ████████████████████████████

7      ████████████████████████████████

8           Q.   Let's take a look at the Dymon

9      declaration.  Can you go to Exhibit 536.

10          A.   I'm at 536.

11          Q.   Go to page 31.  Let me know when you're

12     at page 31.

13          A.   Okay.

14          Q.   Four lines from the bottom, paragraph

15     32, "Walgreens identifies PSC transactions by

16     identifying transactions where third_party_plan_id

17     equals WCARD and plan_group_nbr equals 4934WCARD."

18     Do you see that line?

19          A.   I see that line.

20          Q.   That's not how you identify PSC

21     transactions, correct?

22          A.   Did not limit, apply a specific filter

23     in here.  My analysis when I limit to sold

24     records, there were only third-party plan IDs and

25     Wcard.
```

```
                                              Page 316

 1                    CONFIDENTIAL - SMITH
 2         record.  The time is 8:18 p.m.
 3              (Whereupon, off the record.)
 4              (Whereupon, resumed.)
 5              THE VIDEOGRAPHER:  We're back on the
 6         record.  The time is 8:24 p.m.
 7              MR. ALEXANDER:  Mr. Smith, thank you
 8         very much for spending this rainy day with
 9         us.  I have no further questions.
10              THE VIDEOGRAPHER:  Okay.  We are off
11         the record at 8:24 p.m. and this concludes
12         today's testimony given by Jed Smith.
13              The total number of media used was
14         eight and will be retained by Veritext.
15              (Whereupon, off the record.)
16              (Whereupon, stenographic and
17         video-recorded deposition adjourned 8:24
18         p.m.)
19
20
21
22
23
24
25
```

Page 317

1

2                    C E R T I F I C A T E

3

4        I, JOSEPHINE H. FASSETT, a Registered

5    Professional Reporter, Certified Court Reporter, and

6    Notary Public of the states of New York and New

7    Jersey, do hereby certify that the witness, whose

8    stenographic remote virtual deposition is

9    hereinbefore set forth, was first duly sworn by me

10   on the date indicated, and that the foregoing

11   stenographic remote virtual deposition is a true and

12   accurate record of the testimony given by such

13   witness.

14       I FURTHER CERTIFY that I am not employed by nor

15   related to any of the parties to this action by

16   blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18       IN WITNESS WHEREOF, I have subscribed my hand

19   this 10th day of May 2023.

20

21

22   _____

                 JOSEPHINE H. FASSETT, RPR, CCR

23               NCRA License No. 32148

                 CCR License No. 30XI00098400

24               New York Notary Public

                 New Jersey Notary Public

25