# EXHIBIT 69

Page 1

1          IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3
     CYNTHIA RUSSO, LISA BULLARD,)
4    RICARDO GONZALES,          )
     INTERNATIONAL BROTHERHOOD   )
5    OF ELECTRICAL WORKERS       )
     LOCAL 38 HEALTH AND         )
6    WELFARE FUND,               )
     INTERNATIONAL UNION OF      )
7    OPERATING ENGINEERS LOCAL   )
     295-295C WELFARE FUND, AND  )
8    STEAMFITTERS FUND LOCAL     )
     439, on Behalf of           )
9    Themselves and All Others   )
     Similarly Situated,         )
10                               )
        Plaintiffs,              ) CIVIL NO.:
11                               ) 1:17-cv-02246
     V.                          )
12                               )
     WALGREEN CO.,               )
13                               )
        Defendant.               )
14
15
16
     *********************************************************
17            ORAL AND VIDEOTAPED DEPOSITION OF
18                   JAMES W. HUGHES
19                    May 3, 2023
20   *********************************************************
21
22
23
24
25

Page 2

1                 ORAL AND VIDEOTAPED DEPOSITION OF JAMES W.

2       HUGHES, produced as a witness at the instance of the

3       Plaintiffs, and duly sworn, was taken in the

4       above-styled and numbered cause on the 3rd day of May,

5       2023, from 8:01 a.m. to 2:46 p.m., via videoconference,

6       before Abigail Guerra, CSR, in and for the State of

7       Texas, reported by machine shorthand, where all

8       attendees appeared via Zoom in their respective

9       locations, pursuant to the Federal Rules of Civil

10      Procedure and the provisions stated on the record or

11      attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                            Page 17
 1    everything now?

 2        A.   There's Apple Mac TV, YouTube.  Basically --

 3    Apple basically is a small country.  I don't know what

 4    it is.

 5        Q.   Let's go off the record.

 6        A.   It has nothing to do with this case.

 7        Q.   Yeah.  Let's go off the record to fix that so

 8    it doesn't distract you.

 9        A.   Okay.

10             THE VIDEOGRAPHER:  Off the record at

11    8:14 a.m.

12             (A break was taken from 8:14 a.m. to

13    8:15 a.m.)

14             THE VIDEOGRAPHER:  On the record at

15    8:15 a.m.

16        Q.   (BY MR. GUGLIELMO)  Dr. Hughes, before this

17    break, you mentioned Mr. Karacosky [sic] performed

18    certain analyses.

19             I'm trying to understand.  Did he perform

20    queries of the data sets that were produced in this

21    action?

22        A.   To be clear, if you mean -- by queries, if you

23    mean like Microsoft Excel queries and the like, no, he

24    did not.

25             There were -- as you see in the figures,
```

Page 18

1    there were certain observations that were pulled from

2    the data, but -- I'm just going to call him Igor.  Igor

3    never did any type of crunching of the numbers, if you

4    will.  It wasn't necessary to reach the conclusions that

5    I reached in my report.

6         Q.  And so fair to say that the opinions set forth

7    in your report are not based on any queries that could

8    have been run on the transaction?

9              (Reporter clarification.)

10        Q.  (BY MR. GUGLIELMO)  My question is, is it fair

11   to say that the opinions set forth in your report are

12   not based on any queries that could have been run on the

13   data produced in the action?

14        A.  Yes, that's correct.

15        Q.  And so do you have a high-level understanding

16   of how Igor was able to extract certain information that

17   ended up in the figures set forth in your report that

18   you just testified to?

19              MR. LEIB:  Objection.

20        Q.  (BY MR. GUGLIELMO)  You can answer.

21        A.  Sure.

22              The process would have been for one or more

23   of the figures is -- let's give an example of what the

24   data contained -- the data that Dr. Hilton proposes to

25   use.  What does it contain regarding copayment,

```
                                                   Page 19
```

 1   coinsurance?  Outside of the data, let's construct some

 2   examples of what happens to the damages when one

 3   considers things like deductibles and out-of-pocket

 4   maximums and Medicare Part D and the like.

 5       Q.  So the examples that are set forth in your

 6   figures are hypothetical, correct?

 7               MR. LEIB:  Objection.

 8               You can answer.

 9       A.  Not all of them.  There are figures that are

10   based on data that have been produced in this matter.

11   There are examples, which are hypotheticals in other

12   figures.  So it's both.

13       Q.  (BY MR. GUGLIELMO)  Okay.

14               But with respect to any figures that are

15   based on data, they're not based on actual queries of

16   the data itself?

17       A.  No.

18               It's simply extracting certain

19   observations.

20       Q.  Okay.

21               Turning back to Exhibit 545, which is your

22   retainer agreement with Reed Smith, in terms of the

23   language there -- I think it's about three to four lines

24   down.  It says (as read):  "Professor Hughes' work under

25   this agreement shall include, but is not to be limited

1    in connection with the preparation for this deposition

2    today?

3         A.  We went through -- basically, we kind of go

4    through the report and discuss.  Make sure that -- make

5    sure that -- for one thing -- that everything's correct,

6    which is where the amended report came from.  But also

7    to make sure that the math and the hypotheticals is

8    correct, and that's about it.

9         Q.  Did you review any documents with the

10   individuals at Analysis Group when you were preparing

11   for this deposition?

12        A.  Probably.  There probably would have been

13   questions that came up during these meetings that

14   required us to look at a document that appeared in a

15   footnote, and so it would appear in Appendix C.

16        Q.  And you indicated that you produced an amended

17   or correct report in this action, correct?

18        A.  That's correct.

19        Q.  Okay.

20             How did those edits come to be in

21   connection with the filing of your amended report?

22        A.  Some of the errors I uncovered, and some of the

23   errors Analysis Group uncovered.

24        Q.  Did anyone else besides you and Analysis Group

25   uncover any errors that are set forth in the report?

Page 57

1    you offered an opinion that class certification was

2    appropriate?

3        A.  I actually never offer an opinion as to whether

4    class certification is appropriate.

5              My opinion is limited to examining the

6    analyses of the plaintiffs' experts, and opining on

7    whether I believe that their presented methodology is

8    accurate and reliable for determining classified entry

9    and damages using common proof.

10       Q.  And in those actions, have you ever agreed with

11   the plaintiffs' experts that the information offered is

12   -- and the methodology presented is accurate and

13   reliable for determining classified damages?

14       A.  No.

15              Because the issues -- the facts are

16   different across some of the cases, but the issues

17   involved in plaintiff's expert reports tend to be

18   roughly the same, and so my criticisms tend to fall into

19   the same categories.

20       Q.  Have you ever been asked to offer a classwide

21   damages methodology in any of the 17 cases that you've

22   identified here in Appendix B?

23       A.  No.  I've never been asked to produce such a

24   methodology.

25       Q.  Have you ever tried to create such a

1    named plaintiffs' data you were looking at for purposes

2    of understanding or supporting the opinions that are set

3    forth in your report?

4         A.  I believe -- yes, there was -- I believe it's

5    Mr. Gonzalez.  We looked at his data and noticed that

6    there were times when his payment for his prescriptions

7    dropped to zero, and we use that as an example of

8    someone who appeared to have hit their out-of-pocket

9    maximum, and so no longer was required to contribute to

10   the cost of their prescription.

11        Q.  In looking at the data entitled

12   "2019.12.03_Named Plaintiffs' Data," did you also review

13   any of the other data sets to compare those data sets to

14   this?

15             MR. LEIB:  Objection.

16        A.  Yeah.  I'm not quite sure exactly what you mean

17   something else to compare these two.

18        Q.  (BY MR. GUGLIELMO)  Sure.

19             Did you perform any analysis of this

20   particular Excel data set to the other data sets that

21   were produced in this matter?

22        A.  No, I don't believe so.  That wouldn't have

23   been necessary to reach the conclusions that I do in my

24   report.

25        Q.  And you didn't perform any queries of the data,

```
                                                      Page 66
 1    the 2019 data, that is referenced there in Excel,
 2    correct?
 3                  MR. LEIB:  Objection, asked and answered.
 4        A.  Yes, that's correct.
 5        Q.  (BY MR. GUGLIELMO)  If you turn towards the
 6    bottom of this section, the next page, for example,
 7    "Walgreens_Russo_2015_Data_Sample_20230126.xlsx."
 8                  Do you see that?
 9        A.  Probably.  I was scrolling and not listening
10    exactly to which data set that you were --
11        Q.  Sure.
12                  It's on Page 96.
13        A.  Okay.
14                  Yeah, there's three Walgreens' data --
15    three Walgreens' spreadsheets on this list.
16        Q.  Sure.
17                  Let's talk about the first one, the
18    "Walgreens_Russo_2015_Data_Sample_20230126.xlsx."
19                  Do you see that?
20        A.  Yes.
21        Q.  What is that?
22        A.  That is the sample of Walgreens' transaction
23    data that was provided to us, and it was from the year
24    2015.
25        Q.  Who provided you that data set?
```

```
                                                      Page 67

 1         A.  I don't know.

 2                   Analysis Group provided it to me, and I

 3   don't know exactly how they obtained it.

 4         Q.  And what is in that data sample?  Do you

 5   recall?

 6         A.  To the best of my recollection, it's Walgreens'

 7   transaction data, prescription transaction data.

 8         Q.  And do you know how that sample was created?

 9         A.  I did.  I don't remember sitting here today.

10                   I was told, I believe, by Anna, how it was

11   created, but I don't remember the specific.

12         Q.  Do you have a general understanding of how it

13   was created?

14         A.  Sitting here today, no; but my recollection is

15   when I was told how it was created, I was like, Yeah,

16   okay, that's fine -- was my response; but, no, I don't

17   remember particularly anything that I was told about

18   the -- how the sample was created.

19         Q.  And did you actually review this sample?

20         A.  Yes, at least parts of it.

21                   I don't know if I paged through the

22   entire -- this may be the one that's only 100

23   observations.  I don't remember, but...

24         Q.  Do you still have a copy of this?

25         A.  Yes.  I would have the one on my computer.
```

```
                                              Page 69
 1   would have been produced.
 2       Q.  Okay.
 3            Let's turn to the second sample so we
 4   understand.  It says "Walgreens_Russo_PSC_Data_Sample."
 5            Do you see that?
 6       A.  Yes.
 7       Q.  What is that?
 8       A.  That is PSC, Prescription Savings Club, data
 9   that was produced from Walgreens.
10       Q.  Do you know what it was produced from?
11       A.  Sitting here today, I don't exactly remember,
12   but I believe it was PSC transaction data or either PSC
13   price data, one or the other.  I don't remember.
14       Q.  Do you believe it was in sample of the PSC
15   transactional data set that was produced in this action?
16       A.  That -- I don't know specifically.  Wouldn't
17   surprise me if it was.
18       Q.  Okay.
19            Do you know how the query -- or how the
20   sample was created?
21       A.  This one, no, I did not.  I was not told how
22   this was created.
23       Q.  And do you know who provided this sample to
24   you?
25       A.  Analysis Group provided the sample to me.
```

Page 72

1    data.

2         Q.  And do you have any understanding of who

3    provided you this data set?

4         A.  Again, it was provided to me by Analysis Group.

5              But who provided it to them, I don't know.

6         Q.  And you have no understanding of how the data

7    set was created, correct?

8         A.  No, I don't.

9         Q.  Okay.

10        A.  But since we didn't do any analysis of those

11   data to extrapolate to a larger population, it doesn't

12   really matter whether it was random or not.

13        Q.  With respect to that data sample, do you know

14   if that's all the data that the fund plaintiffs possess?

15        A.  That they possess?

16        Q.  Right.

17        A.  You know, I'm sure it's probably -- I'm sure

18   it's not, but it's what we got wasn't terribly complete.

19   So that's a long way around of saying no.

20        Q.  Okay.

21             And with respect to the fund plate of data,

22   that was obtained by PBMs; is that your understanding?

23             MR. LEIB:  Objection.

24        A.  Yes.  There was Express Scripts data that was

25   provided to one of the union funds as the best of my

```
                                                     Page 75
 1                  Is it your understanding that you didn't
 2      review any of the documents that Dr. Hilton produced in
 3      this action?
 4                  MR. LEIB:  Objection.
 5          A.  Did I go through her document list and look at
 6      all of her documents?  No, I didn't.
 7          Q.  (BY MR. GUGLIELMO)  And are you aware that
 8      Dr. Hilton produced certain queries of the transactional
 9      data set that were also produced with her Bates prefix?
10          A.  I understand there were queries that she
11      produced, yes.
12          Q.  Okay.
13                  And you did not review them for the
14      purposes of offering your opinions in this report,
15      correct?
16          A.  No, I didn't.
17                  To review those queries wasn't necessary to
18      reach the conclusions that I did in my report.
19          Q.  And are you aware that Dr. Smith ran queries in
20      connection with the opinions he offered in his report?
21          A.  No, I'm not aware of that.  I didn't speak with
22      Dr. Smith.  I didn't read his report so -- or Mr. Smith.
23          Q.  Okay.  Sorry.
24          A.  I don't know.
25          Q.  All right.
```

1             And is it fair to say that you're not

2     offering an opinion of any of the queries that

3     Dr. Hilton ran?

4          A.  No.

5             It seems to me that some of the things that

6     I have done in my report in response to Dr. Hilton

7     probably, I think, used the results of those queries.

8     So that, you know, I looked at some of the output of her

9     data manipulation to form my opinions.  So I don't think

10     it's accurate to say I didn't look at any of the output

11     of those queries.

12          Q.  But you're not offering an opinion as to the

13     query she ran?  You couldn't have because you didn't

14     read them -- you didn't review them?

15             MR. LEIB:  Objection.

16          A.  That's right.  I did not.

17             To review those queries wasn't necessary to

18     reach the opinions and the conclusions that I did in my

19     report.

20          Q.  (BY MR. GUGLIELMO)  All right.

21             MR. GUGLIELMO:  We can go off the record.

22             THE VIDEOGRAPHER:  Off the record at

23     9:38 a.m.

24             (A break was taken from 9:38 a.m. to

25     9:52 a.m.)

Page 82

1    economic perspective.

2         Q.   Okay.

3                   Is it fair to say -- am I correct,

4    Dr. Hughes, that you're not offering any opinion as to

5    any aspect of Rule 23(b)(3)?

6                   MR. LEIB:   Objection.

7         A.   I -- you'll have to tell me what Rule 23(b)(3)

8    is.

9         Q.   (BY MR. GUGLIELMO)   Okay.

10                  So you're not -- you're not familiar with

11   rule -- what Rule 23(b)(3) is, correct?

12        A.   Oh, I've been through Rule 23 numerous times in

13   my career; but, no, I couldn't tell you what

14   Rule 23(b)(3) is right at the moment.

15        Q.   Okay.

16                  Are you offering an opinion as to whether

17   any of the particular data fields you identify in your

18   report are required for the purposes of granting class

19   certification?

20        A.   No.

21                  Again, my opinion has no -- I offer no

22   opinion as to whether class certification is appropriate

23   or not.  The data fields that I use would be to comment

24   and evaluate Dr. Hilton's report and whether her

25   methodology is reliable and accurate for determining

```
                                                    Page 84
 1   common injury?
 2        A.  I am not aware that complete data on that would
 3   exist, no.
 4        Q.  And let me ask you:  With respect to PBM data,
 5   for example --
 6        A.  Uh-huh.
 7        Q.  -- what have you done to determine whether or
 8   not the relevant PBMs possess the data that you claim is
 9   relevant to the determining common injury?
10        A.  Well, that's just it.  One of my critiques of
11   Dr. Hilton is she simply states, "Oh, I can get these
12   data from the PBMs," and she offers no proof or other
13   evidence that the PBMs, indeed, possess such data,
14   especially going back as far as 2007.
15                  So in my experience in other cases dealing
16   with the PBM data, it tends to be spotty.  They don't
17   retain everything.  They don't always retain in an
18   accessible fashion.  Data that's been acquired through a
19   merger, for example.
20                  So I am doubtful that the data that
21   Dr. Hilton lightly assumes that would be readily
22   available to her, I sincerely doubt that it would be
23   either complete or even accurate.
24        Q.  With respect to that statement, you haven't
25   actually queried the relevant PBMs as to whether such
```

Page 85

1    data exists, correct?

2        A.  No.

3            I mean, it's my understanding that it is

4    Dr. Hilton's burden to demonstrate that such data

5    exists.  And all I can say is from my experience in

6    other cases in 25 years, I sincerely doubt that the --

7    the type of data that she, again, lightly claims would

8    be readily available, I sincerely doubt that it is.

9        Q.  But, again, you offer no evidence, for example,

10   that ESI doesn't maintain no coinsurance field, right?

11       A.  Well, you can't prove a negative, but I

12   conducted no analysis.  I'm only relying on my prior

13   experience with ESI and Optum and Caremark data that I

14   have dealt with in other cases.  That when such data are

15   produced, there can be fields missing; there can be

16   transactions missing; there can be -- it -- just coding

17   mistakes in the data, and just time gaps in the data

18   that just don't have it for certain periods of time.

19       Q.  But in the past when you've reviewed ESI data,

20   for example, you've identified coinsurance data,

21   correct?

22            MR. LEIB:  Objection.

23       A.  No.  I don't know that it was relevant to those

24   other assignments that I had.  So I couldn't say that I

25   did , no.

1          Q.  (BY MR. GUGLIELMO)  Do you recall providing any

2     expert testimony in the EpiPen litigation?

3          A.  Vaguely, yes.

4          Q.  Do you vaguely recall indicating that certain

5     PBMs contained data that included coinsurance?

6          A.  I don't remember, pretty much, anything from

7     the EpiPen report, no.

8          Q.  Would it surprise you that in your report you

9     identify that coinsurance data was available from

10    certain of the PBMs?

11         A.  Well, again, you have to -- you have to be

12    cognizant of time frame, and so I don't know what time

13    frame I was referring to in the EpiPen report.  But I'm

14    confident that it's different from the time frame

15    required in this -- in this matter.

16         Q.  But to determine whether or not certain data

17    exists, wouldn't you first have to understand, for

18    example, what has been requested, what has been

19    deferred, and what the PBMs have actually indicated that

20    they possess?

21         A.  Could you repeat that?  I don't quite

22    understand the question.

23         Q.  Sure.  I'll break it out for you.

24              With respect to the relevant PBMs here, you

25    haven't reviewed plaintiffs' subpoena for data in this

```
                                                Page 94

 1    "Connecticut Reconciliation Data"?

 2        A.   Yes.

 3        Q.   Okay.

 4             Did you review that?

 5        A.   I believe I asked Analysis Group to look at it,

 6    but I didn't -- don't believe I looked at it personally.

 7        Q.   All right.

 8             And it is not identified in Appendix C, so

 9    I would understand it doesn't form the basis of any of

10    your opinions, correct?

11        A.   That would be correct.

12        Q.   Are you aware of a data set called "ESI PSC

13    Transactional Data"?

14        A.   I couldn't tell you if I -- there's a lot of

15    different names and a lot of different data sets.  So I

16    don't know whether I'm aware of that particular Bates

17    number or not.

18        Q.   Okay.

19             And one of the things you indicated in your

20    report is that you reviewed Dr. Hilton's report,

21    correct?

22        A.   Yes.

23        Q.   Okay.

24             Did you review any of the data or queries

25    that Dr. Hilton used to create Exhibit 3 of her report?
```

1      A.  I would have to look at Exhibit 3.  But as I

2   said, earlier, I did not look at any of her queries

3   because to do so was not necessary to reach the

4   conclusions that I do in my report.

5      Q.  Okay.

6              In the course of forming your opinions, did

7   you become aware of data that Walgreens possesses that

8   would have assisted Dr. Hilton in her analysis?

9      A.  I have no idea what Walgreens would have

10  produced, and that's up to Dr. Hilton to decide whether

11  it would have assisted in her analysis.

12     Q.  With respect to the critiques of her

13  methodology, did you query Walgreens as to whether or

14  not, for example, they possess certain data that

15  presently Dr. Hilton does not?

16     A.  I did not communicate with Walgreens at all.

17     Q.  Okay.

18              Be fair to say, you didn't ask or have

19  Analysis Group ask Walgreens if they had certain data

20  that you identified as necessary for creating a

21  classwide damages methodology, correct?

22     A.  The data that I used was confined to the data

23  that had been produced -- produced in this case by the

24  time I -- report was filed.

25     Q.  And is it your understanding that Analysis

1       A.  Well, again, this -- all the payments -- or all

2  the calculation of all the payments don't always happen

3  at the time of the transaction.  Because in the case of

4  GER contracts or price guarantees, there are payments

5  that are made well after transaction -- the particular

6  transaction that would effect the net price that the TPP

7  pays the PBM for a particular prescription.

8       Q.  You mentioned GER contracts a few times.

9  You're talking about a generic effective rate; is that

10  right?

11      A.  That's right.

12      Q.  And in a GER contract, Walgreens doesn't pay

13  that, right?  That's the PBM that pays any GER amount,

14  correct?

15      A.  Not quite.

16          The -- there is -- in the GER contract,

17  there is an agreed-upon guarantee price for particular

18  generics, and then the TPP is responsible for paying the

19  PBM according to the GER contract.  And then if the

20  practice guarantee is not met, there can be an

21  adjudicate -- excuse me -- a reconciliation payment

22  later that brings the total payment of the TPP into line

23  with the contract -- the GER contract.

24      Q.  In your hypothetical , to the extent a TPP

25  receives a GER payment from a PBM, it is not receiving

Page 110

1   that payment from Walgreens, correct?

2       A.  No, it would not be receiving that from

3   Walgreens.

4       Q.  Okay.

5           And so any GER payment that you're

6   referring to in your report, as it pertains to TPPs,

7   would be a PBM paying a TPP, correct?

8       A.  The -- the reconciliation payment, if any,

9   would be from the PBM to the TPP.  That's correct.

10      Q.  And do you have an understanding of what the

11  term "collateral source" is?

12      A.  Oh, gosh.  That -- that goes back to my Ph.D.

13  dissertation, 1985, which probably is not the same

14  collateral sources that you're talking about.

15          It's a legal term and probably has a

16  definition here that I'm not privy to.

17      Q.  And so is it correct you're not offering an

18  opinion as to whether or not a GER payment is a

19  collateral source?

20      A.  Well, again, that's a legal term.

21          From an economic perspective, a GER payment

22  can effect the net price of the prescription -- that the

23  price of the prescription that TPP pays to the PBM, and

24  that's the economic question that I'm interested in.

25      Q.  And are you offering an opinion that a GER

1   question.  So, no, I don't go into legal -- I don't

2   address any legal questions.

3        Q.  And is it your understanding that a stop-loss

4   payment, if made, would not be made by Walgreens to any

5   third-party payor, correct?

6        A.  No.

7                 That would be made by the stop-loss

8   insurer.

9        Q.  And those payments, if any, would only be made

10  if, in fact, certain deductibles and, in fact, certain

11  thresholds were met, correct?

12       A.  Yes.

13                Depending on the structure of the contract,

14  either individual threshold would have to be met or a

15  group-wide threshold would have to be met.

16       Q.  And in your critique of Dr. Hilton's analysis

17  and not considering stop-loss payments, do I understand

18  that you do not consider stop-loss premiums; is that

19  right?

20       A.  No, that's not -- it doesn't enter into my

21  opinion.

22       Q.  Okay.

23                So wouldn't you agree with me that your

24  failure to consider stop-loss premiums, if necessary,

25  would artificially deflate potential damages to class

```
                                                Page 126
 1        A.  Yes.
 2        Q.  In terms of the calculation of what a
 3   deductible or out-of-pocket maximum would be, is it your
 4   understanding that the PBMs make those determinations?
 5               MR. LEIB:  Objection.
 6        A.  Well, no.  Probably not.
 7               The -- the deductible and the out-of-pocket
 8   maximum would be in the contract between the TPP and the
 9   PBM.  So I would think that the deductible and
10   out-of-pocket maximum would depend on what the TPP is
11   willing to pay.  So it would be set by the TPP.
12        Q.  (BY MR. GUGLIELMO)  But adjudicating a claim in
13   order to determine the deductible or out-of-pocket
14   maximum, wouldn't that be something that the PBM would
15   be adjudicating?
16        A.  Okay.  That's a different question from the
17   previous one.
18        Q.  That's what I meant to ask.  I apologize if I
19   confused you.
20        A.  Yes, the consumer deductible and the
21   out-of-pocket maximum would be in the PBM computer
22   system at the moment of the transaction.
23        Q.  With respect to the class definition, Dr.
24   Hughes, is it your understanding that cash-paying
25   customers are excluded from the definition of the class?
```

1      A.  I haven't.

2      Q.  Okay.

3            And so it's your testimony that you've not

4  attempted to perform such linking?  So is it fair to say

5  you wouldn't have an understanding of whether or not

6  it's possible or how complex it would be?

7            MR. LEIB:  Objection.

8      A.  As a statistician, I think I have an idea of

9  how complex it might be; but, again, I'm relying on my

10  experience with the PBM data and pharmacy data in the

11  past.  And what you get from pharmacies and what you've

12  get from PBMs can -- it's -- the quality of the data

13  don't necessarily allow Dr. Hilton's analysis to be

14  done.  And it may not -- in my experience, may not even

15  allow such a matching to be done.

16            So, no, it wouldn't.  There's been matching

17  done on a relatively small sample from the data.  It

18  doesn't convince me that you can do this in an accurate

19  and reliable method over whatever it is a -- back

20  to 2007, how ever many years that is.

21      Q.  (BY MR. GUGLIELMO)  But one of the -- I think

22  earlier you told me that you decided what aspects of

23  Dr. Hilton's report you were going to respond to,

24  correct?

25      A.  Yes.

1          A.   Brand transactions are not included in

2     Dr. Hilton's methodology, I believe, incorrectly.   But

3     if the court were to accept her methodology completely,

4     that brand transactions would not need to be included in

5     the analysis would be my understanding.

6          Q.   And based on your opinions, brand transactions

7     would be relevant if readjudication of all claims was

8     required, correct?

9          A.   Not only brand transactions, but transactions

10    at pharmacies other than Walgreens would be required to

11    do the readjudication properly.

12         Q.   So every transaction at every pharmacy; all

13    medical claims, correct?

14         A.   Under certain contracts.   Under certain

15    contracts, it wouldn't be -- it wouldn't be relevant.

16    That's why you have to look at the contract.

17         Q.   Turn to Figure 2 of your analysis, which, I

18    believe, is on Page 27 of your report.

19         A.   Okay.

20         Q.   Who created this figure that's appearing here

21    on Page 27?

22         A.   I believe that Igor created this at my

23    direction.   I asked for an example of how deductible

24    payments would change the readjudication process.

25         Q.   Do you know who picked the PSC prices that were

Page 142

1    used here?

2         A.   No.   Not specifically, but I assume Igor did.

3    I believe he created the entire -- created the entire

4    figure.

5         Q.   Do you know if these are hypothetical prices?

6         A.   I believe they're hypothetical prices, yes.

7         Q.   Okay.

8              And with respect to the overpayment, where

9    I think the indication there is actual but-for world

10   total payment.

11             Do you see that?

12        A.   Yes.

13        Q.   Who determined that amount?

14        A.   Well, that's what I determined from looking at

15   the 310 and the 290 difference and the actual cumulative

16   expenditures of a particular -- of this hypothetical

17   situation.

18        Q.   And in this hypothetical situation, why didn't

19   you also include the corresponding TPP payment, if any?

20        A.   Because that isn't what I was trying to

21   demonstrate at that point.

22        Q.   Wouldn't it be fair to include the TPP payment

23   in such a hypothetical?

24        A.   Well, individual consumers and TPPs are two

25   separate sets of class members.   So if I'm looking at

1   consumer overpayments, then the TPP wouldn't be relevant

2   to the analysis of consumer overpayments.

3        Q.  Is it your opinion that based on your

4   hypothetical if the actual but-for world total

5   overpayment was $20 where Dr. Hilton calculated 50, is

6   it your opinion that the $30 would not go to the

7   third-party payor, or TPP?

8                 MR. LEIB:  Objection.

9        Q.  (BY MR. GUGLIELMO)  You can answer.

10       A.  No.

11                 I believe the $30 goes to the pharmacy.

12       Q.  Why wouldn't the third-party payor, to the

13  extent they obviously had some payment portion, why

14  wouldn't it go towards their overpayment calculation?

15       A.  Well, in Dr. Hilton's calculation, it would;

16  but, again, that -- the third-party payor situation is

17  nothing that I'm trying to examine in Figure 2.

18       Q.  But if, in fact, you used her analysis, which

19  you include a third-party payor payments, wouldn't that

20  $30 that you took away from the consumer go to the

21  third-party payor?

22                 MR. LEIB:  Objection.

23       Q.  (BY MR. GUGLIELMO)  You can answer.

24       A.  I haven't looked at that.  This regards only

25  payments to the pharmacy.

1     Q.  So is it fair to say that Figure 2 doesn't

2  actually determine what overpayment a third-party payor

3  may have suffered as a result of this same transactional

4  set?

5     A.  That's correct.

6             The heading says that it is Dr. Hilton's

7  calculation overstates potential consumer overpayments,

8  and this figure does not get into any potential

9  overpayment by a TPP.

10    Q.  It's your understanding in a -- for example, a

11 transaction for someone with insurance, there's going to

12 be an amount paid by a consumer and an amount paid by a

13 third-party payor, correct?

14             MR. LEIB:  Objection.

15    A.  Yes.

16    Q.  (BY MR. GUGLIELMO)  And so the question is, why

17 would your methodology not include the consideration of

18 third-party payor payments?

19             MR. LEIB:  Objection.

20    A.  It's considering the price of the -- of the

21 prescription in total.

22    Q.  (BY MR. GUGLIELMO)  But it omits the amount

23 paid by the third-party payor?

24    A.  It doesn't have anything to do with the

25 third-party payor.  That's correct.

1     Q.  If you could turn to, I guess, Figure 3 of your

2  report.

3     A.  Okay.

4     Q.  And that one says (as read):  "Out-of-pocket

5  maximums Dr. Hilton's calculation falsely identifies

6  potential consumer overpayments."

7           Do you see that?

8     A.  Yes.

9     Q.  Who created this figure?

10    A.  Well, again, I asked Analysis Group -- Igor,

11  specifically -- to create an example of how

12  out-of-pocket maximums would effect the -- out-of-pocket

13  maximums can -- out-of-pocket maximums along with the

14  PSC prices, how that would effect the total expenditure

15  of the patients in the actual -- the patient in the

16  actual world and the hypothetical, but-for world.

17    Q.  Okay.

18           And the PSC prices, who determined those

19  prices for this figure?

20    A.  I believe that would -- that Igor came up with

21  those prices.

22    Q.  Do you know if Analysis Group performed any

23  review of, for example, what the average PSC price would

24  be?

25    A.  No.

1         It wasn't necessary to create this

2    hypothetical example.

3         Q.  And do you know how the PSC prices were

4    determined for this figure?

5         A.  No, I didn't inquire.  I simply directed

6    Analysis Group to show how the out-of-pocket maximum --

7    the existence of an out-of-pocket maximum would effect

8    the readjudication of the claims over the entire set of

9    claims.

10        Q.  So is it fair to say you don't know what the,

11   for example, average PSC price was for the transactional

12   data that was produced in this case?

13        A.  It wasn't necessary to create this hypothetical

14   example.  And, of course, the average PSC price would

15   vary from month to month and year to year.  So it's not

16   like there's a single average PSC price that would be --

17   that would inform this in any way.  It's just a

18   hypothetical example.

19        Q.  So you don't know whether these prices are

20   above, below, or on average with actual PSC prices,

21   correct?

22        A.  That's correct.

23            These prices are hypothetical like

24   everything else in this example.

25        Q.  Okay.

1          And why was it that you didn't utilize

2     actual data to create this example?

3          A.  Again, it's a hypothetical example showing what

4     could happen to someone when you take the out-of-pocket

5     maximum and lower PSC prices into account.

6          Q.  And, again, in this figure, you didn't include

7     any TPP payments or overcharges, correct?

8          A.  No.

9               The -- I mean, TPP -- excuse me.

10              Again, the TPP responsibility is implicit

11     in the difference between where there's a 25 percent

12     coinsurance, the 75 percent would be paid by the TPP,

13     but that's implied in the calculation; but it's not used

14     to create any estimate of an overcharge.

15          Q.  If you included the TPP calculation here, would

16     the -- wouldn't the $160 overcharge that Dr. Hilton

17     attributes, wouldn't that, under your hypothesis, be

18     allocated to the TPP as an overpayment?

19          A.  That's not something they looked into.  This

20     simply is looking at the consumer overpayment.

21          Q.  So you don't know what the TPP overpayment

22     would be in this hypothetical using the scenario you set

23     forth here?

24          A.  No.

25              Because that would depend on -- see, at the

 1   outset, we have to set the deductible, the coinsurance,

 2   and the out-of-pocket maximum.  And if we were to

 3   include the TPP, we would have to pick parameters from

 4   particular contracts or the types of parameters from

 5   types of contracts to do that, and that was not anything

 6   that I asked Analysis Group to do for this figure.

 7        Q.  But using this analysis that you have, the

 8   deductible, zero; coinsurance, 25; out-of-pocket max,

 9   2,500 -- you could have included TPP payments as part of

10   your hypothetical, correct?

11        A.  I haven't really thought about that.  That

12   wasn't something we were thinking of when I directed

13   them to create this exhibit.

14        Q.  And if you included the TPP payments, wouldn't

15   the $160 that Dr. Hilton attributes, wouldn't that have

16   been an overcharge attributable to the TPP?

17             MR. LEIB:  Objection.

18        A.  I don't know.  I haven't looked into that.  It

19   would, again, depend on the terms of the contract that

20   the TPP would have with the PBM.

21        Q.  (BY MR. GUGLIELMO)  Let's see.  Turn to

22   Paragraph 106.  I believe, if you go -- there is a third

23   bullet -- talk about all copay coupons as part of -- is

24   discussing overpayments.

25             Just have you -- you can read the bullet to





















1     A.  No, I don't think so.

2         I mean, that's part of the problem when --

3  if Walgreens identifies a so-called, third-party payor,

4  is that a PBM?  Is it an ASO or TPA organization?  Or is

5  it actually the TPP end payor, who is supposed to be a

6  member of the proposed class.

7         And very often, in my experience in the PBM

8  data, they are listing as the "TPP." They're listing the

9  ASO organization, which is very common because

10  self-insured -- in employer's insurance, self-insurance

11  is very common, and so using an insurance company to

12  administer the plan is quite common.

13     Q.  Do you have any understanding that whether or

14  not Dr. Smith reviewed Walgreens' data to identify the

15  number of health plans who had claims adjudicated by the

16  relevant PBMs?

17     A.  No, I'm not aware of anything that Dr. Smith --

18  Mr. Smith did.

19     Q.  Okay.  Yes, Mr. Smith.  Thank you.

20         And so you're not aware of whether

21  Mr. Smith offered a methodology to identify plans who

22  had claims adjudicated by relative PBMs?

23     A.  Again, I didn't read Dr. Smith -- excuse me --

24  Mr. Smith's report, nor did I speak with him about his

25  conclusions.

1    Steamfitters only because that they have contracted

2    directly with the PBM.  And as far as reviewing the

3    Walgreens' data, it's neither here nor there.

4                Because, again, in my experience, the --

5    what's listed as the TPP may be the class member.  But

6    for self-insured plans, more often than not, it's not

7    the class member.  It's the ASO representative.

8         Q.  So it's your opinion that you don't need to

9    look at Walgreens' data to form an opinion that you

10   can't identify what, for example, plan is actually

11   attributed to that transaction?

12                MR. LEIB:  Objection.

13        A.  No.

14                I mean, I have -- I've seen pharmacy

15   transaction data and PBM data all along, and it's quite

16   common that it's not the actual end payor.  It's not the

17   actual class member that is represented in the data.

18        Q.  (BY MR. GUGLIELMO)  Again, my question is, did

19   you look at -- is it your opinion you don't need to look

20   at Walgreens' data to render this opinion?  In other

21   words, you haven't looked at Walgreens' data as to this

22   issue.  You don't need to look at it to render this

23   opinion, correct?

24                MR. LEIB:  Objection.

25        A.  From my experience, I would not need to look at

1   the Walgreens' data to render this opinion.  That's

2   correct.

3        Q.  (BY MR. GUGLIELMO)  And you're not relying on

4   whether or not the data contains fields sufficient to

5   identify whether it's a TPP, whether it's an ASO, and

6   all the other concerns that you just identified,

7   correct?

8        A.  I have not reviewed the Walgreens' data for

9   that, but, no.  I'll leave it at that.  I have not

10  reviewed the Walgreens' data for that.

11       Q.  And you don't know if Dr. Smith has -- or

12  Mr. Smith?

13       A.  Yes.  I don't know anything that Mr. Smith may

14  have done.

15       Q.  Okay.

16            Dr. Hughes, are you offering an opinion as

17  to whether or not Walgreens' data is accurate?

18       A.  Depends on what you mean by "accurate."

19       Q.  Are you offering an opinion as to whether or

20  not Walgreens' data is accurate to allow the parties to

21  create a classwide method to identify damages?

22       A.  To TPP class members?

23       Q.  To class members.

24       A.  Well, there's two types of class members, and

25  so I need to know which one we're talking about.

1      Q.  If you want to delineate your response, go

2   right ahead.

3      A.  So, I believe, the Walgreens' data allows -- I

4   believe the Walgreens' data is accurate as far as the

5   transaction between the consumer and the pharmacy;

6   however, it's not clear to me that it contains all of

7   the information -- what they put down is accurate, but

8   whether it contains all the information that is needed

9   in terms of the structure of the copayment and the

10  structure of the coinsurance -- excuse me -- copayment,

11  coinsurance, or deductible, or maximum -- sorry -- total

12  out-of-pocket maximum.  Those data are not in the

13  Walgreens' data that I've seen.

14     Q.  And do you believe that Walgreens' data is

15  reliable?

16           MR. LEIB:  Objection.

17     A.  I believe that they fill in the fields.  You

18  know, they attempt to fill in the fields accurately.

19           But as I showed in Figure 6 and Figure 7,

20  there can be problems with how Walgreens' data is filled

21  in, if you will.

22     Q.  (BY MR. GUGLIELMO)  Are you offering an opinion

23  as to whether or not the relevant PBMs data is accurate?

24     A.  Well, again, it depends on what you mean by

25  "accurate."  Can the PBM data always identify the class

                                        Page 191

1    member that is the ultimate payor?  And the answer to

2    that is no.  In my experience, it does not always

3    identify the ultimate payor.

4              The PBM is really only concerned with who's

5    going to send them a check for the prescriptions that

6    they dispensed, and they don't care whether it's the

7    class member or whether it's an ASO or a TPA.

8              So it is -- you know, to some extent, the

9    entries are fine, but they don't always show -- they

10   don't always show what Dr. Hilton would need to conduct

11   her analysis.

12       Q.  Are you offering an opinion that PBMs don't

13   maintain data as to who the ultimate clients would be?

14       A.  In my experience, they don't always do that.

15   That's correct.

16       Q.  Are you offering an opinion here as to whether

17   or not PBMs would have such data?

18       A.  Again, in my experience, the PBM data that I've

19   seen does not always consistently reveal the identity of

20   the actual class member TPP.

21       Q.  Do you know if, in your opinion, PBMs would

22   have such data for the majority of transactions?

23       A.  I don't know specifically because I haven't

24   looked at all the PBM data; but, again, in my

25   experience, I believe, it's more often than not they

                                                    **Page 214**

1                    THE CERTIFIED STENOGRAPHER:  You want a

2    rough as well?

3                    MR. LEIB:  Yeah.

4                    (Proceedings concluded at 2:45 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 215

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION
 3
      CYNTHIA RUSSO, LISA BULLARD,)
 4    RICARDO GONZALES,          )
      INTERNATIONAL BROTHERHOOD  )
 5    OF ELECTRICAL WORKERS      )
      LOCAL 38 HEALTH AND        )
 6    WELFARE FUND,              )
      INTERNATIONAL UNION OF     )
 7    OPERATING ENGINEERS LOCAL  )
      295-295C WELFARE FUND, AND )
 8    STEAMFITTERS FUND LOCAL    )
      439, on Behalf of          )
 9    Themselves and All Others  )
      Similarly Situated,        )
10                               )
         Plaintiffs,             ) CIVIL NO.:
11                               ) 1:17-cv-02246
      V.                         )
12                               )
      WALGREEN CO.,              )
13                               )
         Defendant.              )
14
15
16
                     REPORTER'S CERTIFICATION
17              DEPOSITION OF JAMES W. HUGHES
                        May 3, 2023
18
19           That the deposition transcript was delivered
20    to Mr. Joseph Guglielmo.
21           That a copy of this certificate was served on
22    all parties and/or the witness shown herein on
23    _____.
24           I further certify that pursuant to FRCP Rule
25    30(f)(1) that the signature of the deponent:
```

Page 216

1          (X) was requested by the deponent or a party

2    before the completion of the deposition and that

3    signature is to be before any notary public and returned

4    within 30 days from date of receipt of the transcript.

5          If returned, the attached Changes and

6    Signature Page contains any changes and the reasons

7    therefore:

8          ( ) was not requested by the deponent or a

9    party before the completion of the deposition.

10          I certify that I am neither counsel for,

11    related to, nor employed by any of the parties or

12    attorneys in the action in which this proceeding was

13    taken, and further that I am not financially or

14    otherwise interested in the outcome of the action.

15          Certified to by me this 18 day of May,

16    2023.

17

18

19

20

21    _____

     ABIGAIL GUERRA, Texas CSR 9059

22    Expiration Date:  02/28/24

     VERITEXT LEGAL SOLUTIONS

23    Firm Registration No. 571

     300 Throckmorton Street

24    Suite 1600

     Fort Worth, Texas 76102

25    Phone:  (817) 336-3042