# EXHIBIT 79

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br>NIASPAN ANTITRUST LITIGATION | MDL 2460<br>Master Case No. 2:13-md-2460 |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | |

## DECLARATION OF STEVEN SCHAPER

I, Steven Schaper, declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am employed by Caremark, L.L.C. ("Caremark"), an indirect subsidiary of CVS Health Corporation, and hold the position of Group Head, Employer Sales & Account Services. My day-to-day responsibilities include involvement in Caremark's contractual relationships with certain of its clients. The information contained in this declaration is derived from my personal knowledge and/or from CVS Health Corporation's 2017 Annual Report and Form 10-K, and/or CVS Health's related public filings.

2. Caremark provides a full range of pharmacy benefit management ("PBM") services and solutions, including formulary management, Medicare Part D services, mail order, specialty pharmacy and infusion services, retail pharmacy network management services, prescription management systems, clinical services, disease management services and medical spend management services.

3. Caremark serves in excess of 65 million members of its clients' health plans. Its clients are primarily employers, insurance companies, unions, government employee groups and other sponsors of prescription drug benefit plans located throughout the United States ("Clients").

As set forth in CVS Health's 2017 Form 10-K, during the year ended December 31, 2017, Caremark's and its affiliates PBM operations "filled or managed approximately 1.8 billion prescriptions."

4. As part of its PBM business, Caremark contracts with numerous third-party pharmacy providers in establishing its networks. In that regard, Caremark's national network consists of approximately 68,000 retail pharmacies at which eligible members in Caremark's Clients' plans may receive services.

5. For its services, Caremark is paid by its Clients through a variety of contractual terms. Caremark's PBM business is not the ultimate payor of prescription benefits provided by its Clients; rather, it is an intermediary service provider that helps third-party payors provide high quality affordable health care coverage to their plan members.

6. Caremark maintains records by which Clients and a Client's members can be identified for purchases of Niaspan that Caremark adjudicates on behalf of its Clients. As set forth on page 5 of CVS Health's 2017 Form 10-K, "[w]hen a customer fills a prescription in a retail pharmacy, the pharmacy sends prescription data electronically to us from the point-of-sale. This data interfaces with our proprietary prescription management systems, which verify relevant plan member data and eligibility, while also performing a drug utilization review to help evaluate clinical appropriateness and safety and confirming that the pharmacy will receive payment for the prescription."

7. Further, "[a]ll prescriptions processed through our systems, whether they are filled through one of our mail order or specialty dispensing pharmacies or through a pharmacy in our retail network, are analyzed, processed and documented by our proprietary prescription management systems. These systems provide essential features and functionality to allow a plan

member to use their prescription drug benefit. These systems also streamline the process by which prescriptions are processed by staff and network pharmacists, by enhancing review of various items through automation, including, but not limited to, plan eligibility, early refills, duplicate dispensing, appropriateness of dosage, drug interactions or allergies, overutilization and potential fraud."

8. Further, "[w]e currently operate and support a small number of claim adjudication platforms to support our Pharmacy Services Segment. However, the majority of our clients have migrated to one platform. These information systems incorporate architecture that centralizes the data generated from filling mail order prescriptions, adjudicating retail pharmacy claims and delivering other solutions to our PBM clients."

9. The data maintained for our Clients includes, among other things, the total amount paid by the Client's individual member (i.e., the applicable co-pay, and other aspects that are dependent on the Client's plan design) as well as the total amount paid by the Client for each prescription it adjudicates. Generally, Client plan sponsors have their plan/group structure broken out by plan design, allowing the data to be sorted to exclude, for example, members who have a flat co-pay structure. The data is generally maintained in an industry standard format created by the National Council for Prescription Drug Programs, and data fields available to a Client would include among others: a) Unique Patient ID; b) Patient Name; c) Patient Street Address; d) Patient City; e) Patient State; f) Patient Zip; g) NDC Number; h) Fill Date or Date of Service; i) Amount Billed (not including dispensing fee); j) Amount Paid by Patient - Co-Pay; k) Amount Paid by Client plan (net of co-pays and/or deductibles); l) Plan or Group Name; m) Plan or Group FEIN; n) Pharmacy Name; o) Pharmacy State; p) Prescription (Rx) Number; q) Drug Label Name; r) Drug Strength/Dosage; s) Drug Quantity; t) Client Name; and u) Plan co-pay structure.

10. I understand that "capitation contracts" are generally contracts that provide only a flat fee for each patient covered, regardless of how many prescriptions are filled for that patient. My understanding is that Caremark does not use capitation contracts with its Clients.

11. We generally offer certain rebate-related pricing terms to our Clients. As set forth at pages 17-18 of Exhibit 13 to CVS Health's 2017 Form 10-K, "We deduct from our revenues the manufacturers' rebates that are earned by our clients based on their members' utilization of brand-name formulary drugs. We estimate these rebates at period-end based on actual and estimated claims data and our estimates of the manufacturers' rebates earned by our clients. We base our estimates on the best available data at period-end and recent history for the various factors that can affect the amount of rebates due to the client. We adjust our rebates payable to clients to the actual amounts paid when these rebates are paid or as significant events occur. . . . Because the inputs to most of these estimates are not subject to a high degree of subjectivity or volatility, the effect of adjustments between estimated and actual amounts have not been material to our results of operations or financial position."

12. Caremark's contracts with its Clients govern the pricing of drug products dispensed to the Clients' members, and generally such contracts, depending on the Client's preferences and contracting objectives, would provide for the plan to be charged either the same price for any given drug dispensed to a member by a retail network pharmacy as Caremark reimburses such network pharmacy pursuant to the terms of Caremark's network agreement with that pharmacy, or that the plan is to be charged a specific, set price for a drug dispensed to a member, which may or may not be the same as the amount reimbursed the pharmacy. In any event, I am not aware of a specific instance where a Client was charged a price for Niaspan or generic Niaspan dispensed to a member that was lower than the amount reimbursed the

pharmacy.

13. As previously noted, we offer formulary management services to our Clients. Many of our clients choose to adopt our template formulary offerings as part of their plan design.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2018

*[signature]*

Steven Schaper
Group Head, Employer Sales & Account Services
Caremark, LLC