# EXHIBIT 80

Page 1

1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4
5    CYNTHIA RUSSO, LISA BULLARD,        )
     RICARDO GONZALES, INTERNATIONAL     )
6    BROTHERHOOD OF ELECTRICAL WORKERS   )
     LOCAL 38 HEALTH AND WELFARE FUND,   )
7    INTERNATIONAL UNION OF OPERATING    )
     ENGINEERS LOCAL 295-295C WELFARE    )
8    FUND, AND STEAMFITTERS FUND LOCAL   )
     439, on Behalf of Themselves and    )
9    All Others Similarly Situated,      )
                                         )
10                   Plaintiffs,         )
                                         )
11                      vs.              )Case No.
                                         )17-cv-2246
12   WALGREEN CO.,                       )
                                         )
13                   Defendant.          )
     _____)
14
15
16        VIDEO-RECORDED REMOTE DEPOSITION OF
17              LYNETTE HILTON, Ph.D.
18            Tuesday, January 17, 2023
19                   Volume I
20
21    *** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***
22   Reported by:
     CARLA SOARES
23   CSR No. 5908
24   Job No. 5645367
25   Pages 1 - 347

Page 2

1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4
5    CYNTHIA RUSSO, LISA BULLARD,        )
     RICARDO GONZALES, INTERNATIONAL     )
6    BROTHERHOOD OF ELECTRICAL WORKERS   )
     LOCAL 38 HEALTH AND WELFARE FUND,   )
7    INTERNATIONAL UNION OF OPERATING    )
     ENGINEERS LOCAL 295-295C WELFARE    )
8    FUND, AND STEAMFITTERS FUND LOCAL   )
     439, on Behalf of Themselves and    )
9    All Others Similarly Situated,      )
                                         )
10                   Plaintiffs,         )
                                         )
11                     vs.               )Case No.
                                         )17-cv-2246
12   WALGREEN CO.,                       )
                                         )
13                   Defendant.          )
     _____)
14
15
16          VIDEO-RECORDED REMOTE DEPOSITION OF
17   LYNETTE HILTON, Ph.D., Volume I, taken on behalf of
18   Defendants, beginning at 9:07 a.m., and ending at
19   7:29 p.m., on Tuesday, January 17, 2023, before
20   CARLA SOARES, Certified Shorthand Reporter No. 5908.
21
22
23
24
25

Page 104

```
 1    my restrictions.                                    17:32:31

 2           Are you talking about Exhibit 3?

 3      Q   Well, you produced queries.  You're aware

 4    of the queries that have been produced through

 5    counsel to us, your queries?                        17:32:35

 6      A   I know that there were certain queries

 7    that were produced.

 8      Q   And those queries came from you, correct?

 9      A   They came from -- yes, from -- from me and

10    my staff.  Yes.                                     17:32:40

11      Q   Well, did you -- did you do those queries

12    or did your staff do those queries?

13           MR. ALEXANDER:  Objection to form.

14           THE WITNESS:  My staff did the coding at

15    my direction.                                       17:32:44

16    BY MR. LEIB:

17      Q   Ultimately, it's your work product,

18    correct?

19      A   Yes.

20      Q   And you're familiar with your queries,       17:32:46

21    correct?

22      A   Yes.

23      Q   And if there happens to be an error in

24    your queries, that's on you, not on your staff,

25    correct?                                            17:32:50
```

Page 106

```
 1              THE WITNESS:  That's fine with me.        17:33:10

 2              MR. ALEXANDER:  That works.

 3              THE VIDEO OPERATOR:  We're off the record

 4    at 11:37 a.m.

 5              (Recess, 11:37 a.m. - 11:48 a.m.)         17:33:12

 6              THE VIDEO OPERATOR:  On the record, the

 7    time is 11:48 a.m.

 8    BY MR. LEIB:

 9        Q   Dr. Hilton, in your list of materials

10    considered, you do include the 2015 sample data.    17:33:15

11              Are you familiar with the 2015 sample

12    data?

13        A   Yes.

14        Q   What is your understanding of what the

15    2015 sample data is?                                17:33:18

16        A   Well, it's outlined in more detail in the

17    Dymon declaration, but it's my understanding that

18    it's the transactions at Walgreens stores in six

19    different states for the year 2015.

20        Q   And did you use the 2015 sample data in     17:33:23

21    any way in your analysis?

22        A   I did -- I looked at it, yes.  I ran

23    queries on it.  I used it to test certain queries.

24        Q   Did you produce those queries to us?

25        A   I am not sure.                              17:33:28
```

Page 107

1      Q   We're unaware of any queries having been        17:33:29

2   produced relating to the 2015 data.  And you

3   produced those?

4          MR. ALEXANDER:  Counsel, it's something we

5   can take under advisement.  I don't believe the        17:33:32

6   witness is in a position to respond to that

7   otherwise.

8   BY MR. LEIB:

9      Q   What queries did you run on the 2015 data?

10     A   That's -- sitting here today, I cannot          17:33:35

11  give you a list of all the queries I ran on the 2015

12  data.

13         As we go through the report, I might be

14  able to tell you certain things that I've looked at

15  using the 2015 data.  But sitting here right now --     17:33:40

16  I've been working on this case for a while.  I ran

17  quite a few tests.

18     Q   You said you -- you ran queries -- you ran

19  queries on it.  You said you used it to test certain

20  queries.                                                17:33:46

21         What do you mean by "test certain

22  queries"?

23     A   I used it to look at the variables that

24  would be available in Walgreens' data.

25         For example, we were just talking about         17:33:50

Page 108

1    the plan type.  I looked at it to see what sorts of          17:33:51

2    data appear in "plan type."  That sort of thing.

3        Q   Did you -- there's one thing in looking at

4    a dataset to see what fields are in it and what it's

5    comprised of, and there's another thing to run               17:33:56

6    queries on the dataset; am I correct?  Those are two

7    different things?

8        A   I guess you're distinguishing between just

9    reading it in and looking at it, analyzing it.  I'm

10   not sure what you're --                                      17:34:01

11       Q   Well, what does "running a query over a

12   dataset" mean?

13       A   It can mean a lot of things.

14           It can mean just doing something as simple

15   as a frequency table to determine what values               17:34:05

16   populate a certain field.  It can mean taking an

17   average of a certain field.  I mean, I could go on

18   forever.  There's unlimited --

19       Q   Did you do anything with the 2015 --

20           MR. ALEXANDER:  Counsel, please let the              17:34:10

21   witness finish her answer before asking your next

22   question.  Thank you.

23           MR. LEIB:  I believe the witness had

24   finished her answer.

25       Q   But if I'm wrong, tell me, Dr. Hilton.               17:34:13

```
                                                          Page 109
 1        A    No, I'm finished now.  Thank you.           17:34:15

 2        Q    Dr. Hilton, using the 2015 sample data,

 3   did you attempt to identify any transactions that

 4   would be considered in the class, according to the

 5   proposed definition?                                  17:34:19

 6        A    I guess, are you asking if I ran my whole

 7   methodology to determine class members?

 8        Q    Let's start there.  Did you run your whole

 9   methodology over the 2015 sample data?

10        A    No.                                         17:34:23

11             MR. ALEXANDER:  Objection to form.

12             THE WITNESS:  Sorry.

13   BY MR. LEIB:

14        Q    Did you run your whole -- did you run your

15   whole methodology over the -- in a query over the     17:34:25

16   2015 sample data to determine who would be in the

17   class under the proposed definition?

18             MR. ALEXANDER:  Objection to form.

19             THE WITNESS:  No.

20   BY MR. LEIB:                                          17:34:29

21        Q    Did you run any part of your methodology

22   in a query over the 2015 sample data to identify

23   transactions that would be considered in the class?

24             MR. ALEXANDER:  Objection to form.

25             THE WITNESS:  I guess I'm not sure how to   17:34:32
```

```
                                              Page 110
 1   answer that.                              17:34:33

 2          I did -- I ran a lot of queries on the

 3   2015 data sample, and a lot of those queries had to

 4   do with the methodology that I'm putting forth to

 5   identify class members.                   17:34:37

 6       Q    So what queries did you run?

 7          MR. ALEXANDER:  Objection to form.

 8   BY MR. LEIB:

 9       Q    What queries did you run over the 2015

10   sample data that had to do with the methodology that  17:34:40

11   you're putting forth to identify class members?

12       A    As I said earlier, I can't sit here today

13   and give you a list of every query that I ran on the

14   2015 sample.  I --

15       Q    I'm asking you right now -- sorry.    17:34:46

16          MR. ALEXANDER:  Counsel, please let the

17   witness answer.

18   BY MR. LEIB:

19       Q    Finish your answer.  Go ahead.

20       A    I can't give you a list of every query I    17:34:49

21   ran on the 2015 data, or even a list of all the

22   queries I ran having to do with checking certain

23   variables, et cetera, for my class methodology.

24          I did use -- one thing that I can tell

25   you, and that's -- this is why I was saying I think   17:34:54
```

Page 111

1    it would be helpful if we could just go through the        17:34:55

2    filters and I can tell you whether it was something

3    that I looked into on the 2015 data or not.

4              But I did use it to identify the -- let me

5    get the phrasing right in one of my paragraphs.           17:35:00

6         Q    Why don't you tell us which paragraph

7    you're referring to when you read it.

8         A    Okay.  So paragraph 36, for example.

9         Q    Okay.  What about paragraph 36?

10        A    So I state that "I estimate that applying        17:35:04

11   the methodologies to the data sources described

12   herein would identify, at a minimum, thousands of

13   transactions associated with an overpayment and

14   identifiers for persons or entities in each of the

15   states identified in the Class definition for every       17:35:09

16   year from 2007 to the present."

17             And so I did run analysis on the 2015 data

18   sample to identify -- and was able to identify many

19   thousands of transactions with overpayments, and

20   many thousands of identifiers for patients and also       17:35:14

21   many thousands of identifiers for TPPs.

22        Q    And your statement that you would be able

23   to do so for each of the states for every year from

24   2007 to the present is based on what?

25        A    It's based on my analysis of the 2015 data       17:35:19

```
                                                              Page 112
 1    sample and my understanding that those data are        17:35:20

 2    representative of other years and states.

 3        Q   Did you produce the 2015 queries -- I'm

 4    sorry.  Strike that.

 5        Did you produce the queries that you ran          17:35:24

 6    on the 2015 data to counsel?

 7        A   I don't believe so.

 8        Q   Why not?

 9        A   I wasn't asked to do so.

10        Q   You did produce some queries.  Who decided    17:35:27

11    which queries would be produced to us in this case?

12            MR. ALEXANDER:  Objection to form.

13            And again, I would caution the witness not

14    to disclose the substance of communications with

15    counsel.                                              17:35:32

16            MR. LEIB:  I'm not going to go over the

17    same territory again with you, Carey.

18        Q   Go ahead.

19        A   The question is who decided?

20        Q   Yeah.                                         17:35:35

21        A   I don't know who decided.  I didn't

22    decide.

23        Q   Do you know -- do you know if all the

24    queries that you produced to counsel were produced

25    to us, to Walgreens?                                  17:35:39
```

Page 117

```
 1        Q    But you're not the PBM so you don't know      17:36:54

 2   100 percent for sure; is that my understanding?

 3            MR. ALEXANDER:   Objection to form.

 4   BY MR. LEIB:

 5        Q    Is that my understanding of what you're       17:36:57

 6   saying?

 7            I'm sorry.   You're right.   You can't tell

 8   me what my understanding is.   So that was a proper

 9   objection.

10            MR. ALEXANDER:   Thank you, Counsel.           17:37:00

11   BY MR. LEIB:

12        Q    Are you saying "should be able to" because

13   you're not the PBM and you don't know for sure

14   100 percent whether they can produce that

15   information?                                            17:37:03

16        A    I believe they have those data and they

17   can produce them.   I've seen the PBM data here.

18   I've seen PBM data in other cases.   So I do believe

19   those data exist.

20        Q    I'm not asking whether you believe the       17:37:07

21   data exists and they can produce it.   I'm asking if

22   you know if the data exists and they can produce it.

23            MR. ALEXANDER:   Objection to form.

24            THE WITNESS:   I know the data exists.

25   Whether or not they exist for the entire time         17:37:11
```

Page 146

```
 1    you're saying all you need is the Walgreens data.      17:46:02

 2    And for the TPPs, you're saying you need both the

 3    Walgreens and the -- and the fund -- and the PBM

 4    data, correct?

 5         A    Yes.                                          17:46:06

 6         Q    And so in both cases, you need Walgreens'

 7    data?

 8         A    Yes.

 9         Q    And if that transaction doesn't have a 4

10    or a 5 in the "basis of reimbursement determination"    17:46:08

11    field in the Walgreens data, do you exclude that

12    transaction?

13              MR. ALEXANDER:  Objection to form.

14              THE WITNESS:  No.

15    BY MR. LEIB:                                            17:46:11

16         Q    Why not?

17         A    What I have done is I have determined,

18    using the 2015 sample, whether -- based on the bin

19    number, whether a particular PBM has ever

20    adjudicated the claim using a -- has a 4 or a 5, has    17:46:15

21    adjudicated a claim based on U&C in the 2015 sample.

22              If they have, then I include all of that

23    PBM's information in my -- or transaction in my

24    analysis.

25         Q    The 4 or 5 is in Walgreens' data, correct?    17:46:20
```

Page 147

1      A   Yes.                       17:46:21

2      Q   It's returned by the PBM, but it's found

3  in the Walgreens data?

4      A   This particular variable we're talking

5  about, yes.                     17:46:24

6         PBMs will also have an indicator for

7  whether they adjudicated the claim based on U&C.

8  But this particular variable we're talking about,

9  yes, it's in the Walgreens data.

10     Q   So which data do you look at to determine   17:46:28

11  if a transaction -- let's just take consumers.

12        For consumers, I thought you just said you

13  only look at the Walgreens data.

14     A   That's right.

15     Q   So if there's not a 4 or a 5 in the     17:46:32

16  transaction, would you exclude it?

17     A   No.

18        MR. ALEXANDER:  Objection to form.

19  BY MR. LEIB:

20     Q   Why not?                    17:46:34

21     A   So as I explained a minute ago, what I'm

22  doing is, if a given bin is associated -- bin number

23  is associated with a 4 or a 5 at any time in the

24  2015 sample in the Walgreens data, then the

25  assumption is that all of its plans use U&C to    17:46:40

Page 167

1          Do you see this, Dr. Hilton?                    17:52:51

2      A   Kind of.  It's disappearing.  Hold on one

3   second.  Okay.  Yes, I have it up.

4      Q   Looking at this data, can you tell me if

5   there are any fields that show whether the PBM used    17:52:55

6   U&C in determining the amount to pay or reimburse

7   Walgreens?

8      A   Okay.  I'm sorry.  What was the question?

9   I'm looking at the --

10     Q   Looking at this data, can you tell me if       17:53:00

11  there are any fields that show whether the PBM used

12  U&C in determining the amount to pay or reimburse?

13     A   No.  This -- these data do not contain

14  that information.

15     Q   And what's your basis for believing that      17:53:05

16  Caremark could produce that data?

17     A   It's my understanding that the PBMs have

18  that information in their possession.  It's

19  something that they need to use to determine when

20  they're going to adjudicate a claim.                  17:53:09

21     Q   What is the basis of your understanding?

22         MR. ALEXANDER:  Objection to form.

23         THE WITNESS:  Other than what I just told

24  you, the fact that some of the other PBMs have it in

25  their data.  It's something that -- PBMs exchange     17:53:14

Page 174

1    for prescriptions filled by a Steamfitters          17:55:07

2    beneficiary, would you agree that Steamfitters is

3    not entitled to any damage during the time the 2014

4    contract was in effect?

5              MR. ALEXANDER:  Objection to form and      17:55:11

6    objection to scope.

7              THE WITNESS:  I don't have an opinion

8    about that.  I was asked to assume liability.

9    BY MR. LEIB:

10        Q    And when you say, "I was asked to assume    17:55:15

11   liability," do you understand that instruction from

12   counsel to ask you to assume that "lower of" logic

13   was required to be used by each of the relevant PBMs

14   in the adjudication process?

15        A    I think there are a lot of issues that go   17:55:19

16   into the liability aspects of the case, but my

17   understanding is that I was asked to assume that

18   the PSC should have been reported as the U&C or

19   otherwise included, and that plans are entitled to

20   U&C.                                                  17:55:26

21        Q    And that TPPs are entitled to U&C as a

22   basis for the determination of how much they pay

23   PBMs?

24        A    Yes.

25        Q    Regardless of what the contract between     17:55:29

Page 234

```
 1        Q    Did you -- and they did so at your          18:14:36

 2   instruction, correct?

 3        A    Yes.

 4        Q    Did you review the query before it was

 5   produced to us?                                       18:14:38

 6        A    No.  It's not my practice to review the

 7   code.

 8        Q    So do you understand that this code

 9   relates to finding a PSC price?

10        A    No, other than I see it's reading in PSC    18:14:41

11   data.

12        Q    So the queries that you produced to us or

13   that we received from counsel, you've never reviewed

14   those before?

15             MR. ALEXANDER:  Objection to form.          18:14:45

16             THE WITNESS:  I wouldn't say I've never

17   reviewed them.  I've looked briefly at some code.

18             The rest, I asked my staff explain to me

19   what this code is doing.  They'll walk me through

20   it.  Or we just talk about it in words rather         18:14:49

21   than -- I don't look at the code.

22   BY MR. LEIB:

23        Q    Do you have any experience with code

24   yourself?

25        A    I do, but it's very old.                    18:14:52
```

Page 271

1    And if the co-insurance was 25 percent, the TPP          18:27:09

2    would pay the PBM $75, and the consumer would pay

3    Walgreens $25; is that correct?

4         A    That's my understanding, yes.

5         Q    Is there a field that you look at to          18:27:13

6    determine whether an individual consumer had

7    co-payment versus co-insurance?

8         A    I used the -- I calculated it myself.

9              So I looked at the consumer portion

10   divided by the total amount paid by the consumer and    18:27:16

11   the TPP for a given PBM in a given month.

12             And if 90 percent of those transactions

13   were the same percentage, then I assumed that it was

14   a co-insurance situation.  Otherwise, it was a

15   co-payment situation.                                   18:27:23

16        Q    So that's the number you used, 90 percent.

17   If 90 percent of the time it was the same

18   percentage, then you decided it was co-insurance?

19        A    Yes.  It's my understanding that there are

20   some variables in Walgreens' data that potentially      18:27:28

21   have information on that, and also that the PBMs

22   would have information on that.

23             But this is the way that I did it with

24   what -- the data that I have currently.

25        Q    What data were you looking at to determine     18:27:32

Page 272

1    that?                                            18:27:33

2          A    To determine what?  Sorry.

3          Q    Whether 90 percent had a certain

4    percentage.

5          A    So I was looking at -- for the PBM data    18:27:36

6    merged onto the Walgreens data.

7                If the consumer payment from the Walgreens

8    data, the TPP payment from the PBM data, the sum of

9    those becomes the denominator, the consumer payment

10   is the numerator, and if that percentage is greater    18:27:41

11   than -- if I see that percentage in greater than

12   90 percent of the transactions for a given month for

13   a given PBM, then I assume that it's a co-pay --

14   excuse me -- co-insurance situation.

15         Q    And if it was 89 percent of the time, you    18:27:48

16   would figure it was co-pay?

17         A    Yes.  That's the current methodology.

18         Q    What are you looking at -- what are we

19   getting as the sum total that we're trying to find a

20   denominator for?  How do we determine that             18:27:52

21   denominator?  What are we looking at?  Is it for an

22   individual?

23               So Bob Smith, we're looking at all Bob

24   Smith's transactions in a month?

25         A    No.  This is a transaction-by-transaction    18:27:57

Page 277

```
 1        A    So I only have transactions for          18:29:26

 2   Steamfitters at this point.

 3        Q    Okay.  So then you're only looking at one

 4   plan.  What's your methodology if there's more than

 5   one plan?                                           18:29:29

 6        A    So like I said earlier, I believe that the

 7   PBMs would be able to give that information.  And I

 8   also believe there are variables in Walgreens' data

 9   that indicate co-insurance.  But that's not

10   something I looked at at this point.  I did -- I     18:29:34

11   used the methodology that I just described for the

12   data that I have.

13        Q    We looked at -- first of all, what

14   fields -- what fields are you talking about?

15             MR. ALEXANDER:  Objection to form.        18:29:38

16   BY MR. LEIB:

17        Q    In the PBM data, what fields are you

18   talking about?

19        A    I don't have a particular field name in

20   the PBM data.  That would be something that we would  18:29:41

21   ask them to produce.

22        Q    Well, do you know if they have data that

23   would differentiate between -- I'm sorry -- if they

24   have fields that would differentiate between co-pay

25   and co-insurance?                                   18:29:45
```

Page 278

```
 1          A    I assume they do because they need it to       18:29:45

 2     adjudicate the claim.

 3               MR. LEIB:  Well, let's look at Tab R, and

 4     mark that as Exhibit 526.

 5               (Exhibit 526 was marked for identification     18:29:49

 6          and is attached hereto.)

 7               MR. WOROBIJ:  Exhibit marked.

 8     BY MR. LEIB:

 9          Q    Do you see any fields here that are either

10     co-pay or co-insurance?                                 18:29:51

11               And this is Express Scripts data 1548, ESI

12     1548.

13               MR. ALEXANDER:  Objection to form.

14               MR. LEIB:  I'm just putting -- what's the

15     form?  I'm telling what the Bates number is.  It's      18:29:55

16     ESI 1548.

17               MR. ALEXANDER:  I have no objection to

18     that aspect of the question.

19               MR. LEIB:  There you go.

20          Q    Do you see -- I'll just point you to it.       18:29:58

21               Do you see in column K, it says, "bill

22     patient pay amount," and under that it says, "co-pay

23     amount"?

24          A    I'm not there.  Hold on.  I was just

25     looking at the rest of the variables here.              18:30:02
```

Page 284

```
 1    Bush Administration and the Obama Administration,        18:31:30

 2    and now the donut hole is down to 25 percent

 3    co-insurance, just to let you know.

 4         A    Okay.

 5         Q    Have you heard the -- that there's a           18:31:34

 6    catastrophic phase after the donut hole?

 7         A    I have heard --

 8              MR. ALEXANDER:  Objection to form.

 9    Objection to scope.

10    BY MR. LEIB:                                             18:31:37

11         Q    And are you aware that that could be

12    co-insurance or co-pay?

13              MR. ALEXANDER:  Same objections.

14              THE WITNESS:  I don't have an

15    understanding of that.                                  18:31:39

16    BY MR. LEIB:

17         Q    So if, in fact, the plan had both

18    co-insurance and co-pay in with it, your methodology

19    could end up causing you to assign everybody a

20    co-pay, because it wasn't 90 percent of the             18:31:43

21    individual transactions, correct?

22         A    Well, my methodology actually is -- the

23    PBMs will turn over data that has that information.

24    So that's my first line.

25              What I have done at this point is the         18:31:47
```

Page 345

1          All right.  This will conclude the                    19:28:55

2    deposition of Lynette Hilton, Ph.D.  The total

3    number of media units used in today's deposition was

4    nine and will be retained by Veritext Legal

5    Solutions.                                                   19:29:03

6          We are going off the record.  The time

7    is 7:29 p.m. Pacific Standard Time.  Thank you all.

8               (TIME NOTED:  7:29 p.m.)

9                    --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 347

1          I, the undersigned, a Certified Shorthand
2    Reporter of the State of California, do hereby
3    certify:
4          That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that any witnesses in the foregoing proceedings,
7    prior to testifying, were administered an oath; that
8    a record of the proceedings was made by me using
9    machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is
11   a true record of the testimony given.
12         Further, that if the foregoing pertains to
13   the original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [x] was not requested.
16         I further certify I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19         IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21
22   Dated: January 23, 2023
23
                              *Carla Soares*
24
25                            CARLA SOARES
                              CSR No. 5908