# EXHIBIT 87

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4
 5    CYNTHIA RUSSO, LISA BULLARD,
 6    RICARDO GONZALES, INTERNATIONAL
 7    BROTHERHOOD OF ELECTRICAL
 8    WORKERS LOCAL 38 HEALTH AND
 9    WELFARE FUND, INTERNATIONAL UNION OF
10    OPERATING ENGINEERS LOCAL 295-295C
11    WELFARE FUND, AND STEAMFITTERS FUND
12    LOCAL 439, on Behalf of Themselves and
13    All Others Similarly Situated,
14          Plaintiffs,
15          vs.             Case No.  17-CV-2246
16    WALGREEN CO,
17          Defendant.
18
19              VIDEO DEPOSITION OF
20           DR. KENNETH SCHAFERMEYER
21        Taken on behalf of the Defendant
22              January 13, 2023
23
24
25
```

Page 2

INDEX

QUESTIONS BY:

    Mr. Robinson                                7

INDEX OF EXHIBITS

| Exhibit 500 | 11/16/22 Schafermeyer report | 20 |
| Exhibit 501 | Waig_Forth 358831-38 | 53 |
| Exhibit 502 | Waig_Forth 359015-020 | 58 |
| Exhibit 503 | Waig_Forth 359031-48 | 60 |
| Exhibit 504 | Schafermeyer_288-394 | 80 |
| Exhibit 505 | Waig_Forth 59325-47 | 93 |
| Exhibit 506 | Waig_Forth 359332 | 96 |
| Exhibit 507 | Waig_Forth 59289 | 98 |
| Exhibit 508 | Waig_Forth 358734-830 | 155 |
| Exhibit 509 | Waig_Forth 359354-443 | 175 |
| Exhibit 510 | Schafermeyer_564-591 | 185 |
| Exhibit 511 | Schafermeyer_231-235 | 189 |
| Exhibit 512 | Answers to Interrogatories | 202 |
| Exhibit 513 | Depo of Erica Reaves | 214 |
| Exhibit 514 | Depo of David Schroff | 222 |
| Exhibit 515 | Waig_Forth 358844-014 | 245 |

Page 51

1   pharmaceutical industry to refer to the manner in
2   which claims of cash customers using discount cards
3   are processed by the pharmacy and the discount card
4   sponsor?
5       A.   Well, I believe I answered that, but
6   I'll repeat that.
7            Some people have decided to misuse
8   the term so the fact that people misuse the term
9   doesn't make it true.
10      Q.   (BY MR. ROBINSON)  When a customer
11  uses a discount card to get a discounted price for
12  a prescription it's your opinion that that's still
13  a cash transaction, right?
14      A.   Well,  there's two types of
15  prescriptions, there's insurance and there's cash.
16  What is not insurance is cash.
17      Q.   So if a customer comes in to a store
18  and uses a discount card, like a GoodRx card or a
19  Script Saver card to get a discount on their
20  prescription that is still a cash transaction in
21  your opinion, correct?
22           MR. DWOSKIN:  Form.
23      A.   Not just my opinion, it's always
24  been.  So if a person isn't using an insurance
25  benefit they're a cash customer.

Page 63

1      A.     Okay.  I'm going to read this and
2  then I'm going to come back to the second sentence
3  and point out something here, because it does
4  relate to adjudication but let me finish reading
5  the document.
6      Q.     (BY MR. ROBINSON)  Dr. Schafermeyer,
7  let me know when you're ready for the next
8  question.
9      A.     I will.
10            I'm reading this so I can go back and
11  clarify any previous answers.
12     Q.     Why don't I put a question on the
13  record so you have some context for anything you
14  want to say later.
15            Let's turn to page 9 of the document
16  please.
17     A.     Let me get to a stopping point.  Just
18  a minute.  That's about where I am on page 9, go
19  ahead.
20     Q.     My question here is do you agree that
21  in the, towards the bottom of the page that in the
22  first bullet and the third bullet the authors of
23  this document began, used the word adjudication to
24  describe the processing of claims with a pharmacy
25  discount card.

Page 64

1            MR. DWOSKIN:  Form.
2       A.    Okay.  I hear your question, I'm
3  going to go ahead and finish reading this and I'll
4  answer your question.
5            Okay.
6       Q.    (BY MR. ROBINSON)  So do you agree
7  with me in the first bullet and the third bullet of
8  this article on page 9 that the authors of this
9  document used the word adjudication to describe the
10 processing of claims purchased with a pharmacy
11 discount card?
12           MR. DWOSKIN:  Form.
13      A.    I see they use the term adjudication,
14 but this article is not about adjudication of
15 claims.  The article I referenced in my report was,
16 and it was an authoritative article about
17 adjudication.  This is more about discount cards
18 and they misuse the term adjudication.  Much like
19 people misuse the term deductible when they mean
20 co-payment, but we still understand what they mean,
21 it's patient cost sharing, I understand that they
22 mean this term to mean processed or administered,
23 but if we look at the authorities on an
24 adjudication they say that adjudication has to do
25 with insurance and by authorities I mean MCPDP and

Page 150

1   not sure it's responsive to your question.  Ask me
2   your question again.
3         Q.     Do you have any basis for saying that
4   Walgreens and Express Scripts were legally
5   prohibited from agreeing to the language that they
6   put into section 1.26?
7         A.     So my basis for this is that there is
8   an agreement between the payer and the PBM, in this
9   case Express Scripts, and there's also an industry
10  definition of usual and customary which was in
11  effect before Walgreens contrived this scam.  So
12  the fact that Walgreens convinced Express Scripts
13  to look the other way and they both benefit
14  financially from it, the question is does that
15  relieve them of their duty to provide the true
16  usual and customary.  I see they have this
17  agreement, but this agreement doesn't meet the
18  reasonable expectations of the payer who contracted
19  with Express Scripts and the payer expects to
20  receive the true usual and customary in an accurate
21  and truthful claim.  The fact that Walgreens and
22  Express Scripts get together and make a change
23  doesn't change the first contract between the payer
24  and Express Scripts, that contract's still in
25  effect.  And so the reasonable expectations of the

Page 151

1  payer is they would receive accurate claims in the
2  true usual and customary.
3       Q.    Have you talked to any of the payers
4  who contracted with Express Scripts in this case to
5  determine what they expected Express Scripts to
6  charge them for prescriptions?
7            MR. DWOSKIN:  Form.
8       A.    Well, I read the complaint and I
9  think the complaint lays out what their
10 expectations were and I understand with a, what
11 they would reasonably expect.
12      Q.    (BY MR. ROBINSON)  Did you -- let me
13 ask again.
14           Have you talked to any of the payers
15 who contracted with Express Scripts in this case to
16 determine what they expected Express Scripts to
17 charge them for prescriptions covered by their
18 plans?
19           MR. DWOSKIN:  Form.
20      A.    I didn't talk with them because
21 there's other information available and I already
22 had an understanding what that expectation should
23 be.
24      Q.    (BY MR. ROBINSON)  Besides the
25 complaint that was drafted by the lawyers for the

Page 185

1    book chapter was 2009 and that you wrote it in
2    2007?
3             MR. DWOSKIN:  Form.
4        A.   There's two editions of this book,
5    which one are you talking about?
6        Q.   (BY MR. ROBINSON)  I'll show you what
7    I'm talking about.  I'm talking about the edition
8    that you produced through your lawyers in this
9    case.
10            MR. ROBINSON:  Let's put up Exhibit
11   TT and mark that as, formally as Exhibit 510
12   please.
13            MR. WOROBIJ:  Exhibit 510 is marked.
14       Q.   (BY MR. ROBINSON)  So if you pull
15   Exhibit 510 from the Exhibit Share you'll see it
16   has the Bates numbers that say Schafermeyer_0000564
17   through 591.
18       A.   Okay.
19       Q.   You'll see there's a copyright date
20   of 2009 on page 2 of the document?
21       A.   Yeah.  Uh-huh.
22       Q.   Okay.  And do you remember telling me
23   in the Humana case that you believe you wrote this
24   in 2007?
25       A.   At least by then.  That may be when I

Page 186

1  finished it, I may have, or when I submitted the
2  last copy edits.  I probably started before that.
3  I remember this book took a long time and I was
4  finished with my chapter well before the book got
5  published.  So I would say 2007, maybe even before.
6       Q.    And you see, and you called this the
7  definitive, this textbook as in your words the
8  definitive textbook on managed care pharmacy, is
9  that correct?
10      A.    At that time it was, yeah.
11      Q.    And let's turn to page 391.  Do you
12 see at the top of the page it says usual and
13 customary prices?
14      A.    Okay.  Yeah.
15      Q.    Okay.  Says PBM says will not
16 reimburse pharmacies more than their usual and
17 customary price, i.e., the amount charged to cash
18 customers for prescriptions, pharmacy computers
19 should transmit the correct usual and customary
20 price when required by the PBM.  Usual and
21 customary has different definitions but basically
22 it is translated as the cash price normally charged
23 to patients who do not have prescription insurance
24 coverage, this is an attempt by the PBM to assure
25 that they are not getting charged more than the

1    current quote, market, end of quote, prices for
2    medications.
3             Did I read that correctly?
4       A.   Yes.
5       Q.   And in this description that you
6    wrote the usual and customary price the phrase
7    quote, lowest price, unquote, doesn't appear in the
8    text you wrote, isn't that right?
9       A.   Well, let's look at the historical
10   perspective here.
11      Q.   No.  Answer my question first before
12   you go talking about history.
13      A.   I'd be glad to explain why.  It
14   doesn't and there's good reason why it doesn't.
15      Q.   Have there been subsequent editions
16   of this book, this chapter, in the managed care
17   pharmacy practice textbook?
18      A.   Is this the second edition?
19      Q.   Yes.
20      A.   That's the last one I know about.
21      Q.   Okay.  So this, as far as, if anybody
22   went and looked for this book, Managed Care
23   Pharmacy Practice, in their local library what they
24   would find, or their university library, they'd
25   find the same definition that you wrote on page 391

Page 188

1  is what they would see today, is that correct?
2         A.    I don't understand your question.
3  You're saying if somebody read this this is what
4  they would see.
5         Q.    Yes.  It hasn't changed.  There's
6  never been a change, there's never been a revision
7  to this publication to your knowledge?
8         A.    I'm not the author of this
9  publication, that was Dr. Navarro.
10        Q.    If they revised it wouldn't you get a
11 royalty?
12        A.    Who's they?
13        Q.    Anybody.  If they revised your
14 chapter wouldn't you know about that?
15              MR. DWOSKIN:  Form.
16        A.    Well, if they revised my chapter, I
17 would be the one revising the chapter and by the
18 way, I don't think I got royalties on this.  So.
19 Yeah, at the time, everybody is in historical
20 perspective, right?  So at the time there was
21 almost zero controversy, this is before Walgreens
22 employees became exposed so I couldn't really
23 respond to it, what Walgreens was doing when I
24 wrote this chapter.  I was reporting, because at
25 the time there was no controversy here.  Pharmacies

Page 189

1   had one cash price, they didn't have multiple cash
2   prices they were using to hide from people, in the
3   computer they had a cash price and that's the price
4   that they normally charged patients and that's the
5   price they would report.  At the time it was very
6   simple.  Things got more confusing over time.  Now,
7   I'm not responsible for updating this chapter, it
8   was written at a particular point in time and if
9   things change, you know, well, things have changed.
10  But this was accurate when I wrote it.
11       Q.    So let's look, I want to now put up
12  another document that was produced in discovery
13  with your Bates number on it, and let's put up
14  exhibit tab double V as Exhibit, I believe this is
15  going to be 511.  And this document has the Bates
16  numbers Schafermeyer_0000321.
17       A.    I got to get there.
18             MR. WOROBIJ:  Exhibit 511 marked.
19       Q.    (BY MR. ROBINSON)  This is Bates
20  numbers from Schafermeyer 0000231 through 0000235.
21       A.    Okay.  Where did I refer to this in
22  my report?  Obviously this is something I
23  referenced in my report, right?  Where is it?
24       Q.    I don't know if you did or you --
25       A.    Well, it would be important to know

1    to go off of the record?
2                MR. ROBINSON:  Yes.
3                MR. DWOSKIN:  Yes.
4                VIDEOGRAPHER:  Going off the record.
5    The time is 5:24 p.m.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 256

1  REPORTER CERTIFICATE

2

3       I, SUZANNE BENOIST, Certified Shorthand
4  Reporter, do hereby certify that there came before
5  me via Zoom, the above-referenced parties, that the
6  proceeding was translated and proofread using
7  computer-aided transcription, and the above
8  transcript of proceedings is a true and accurate
9  transcript of my notes as taken at the time of said
10 event.
11      I further certify that I am neither attorney
12 nor counsel for nor related nor employed by any of
13 the parties to the action in which this examination
14 is taken; further, that I am not a relative or
15 employee of any attorney or counsel employed by the
16 parties hereto or financially interested in this
17 action.
18      Dated this 25th day of January, 2023.
19
20 
21              Ms. Suzanne Benoist, RPR,
22              CCR-MO, CCR-KS, CSR-IL, CSR-IA
23 Notary Public No. 07541281
24 State of Missouri - Jefferson County
25 My commission expires:  5/10/2024