## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated,<br><br>                           Plaintiffs,<br><br>    v.<br><br>WALGREEN CO.,<br><br>                           Defendant. | Civil No. 1:17-cv-02246<br><br>Judge Edmond E. Chang<br><br>Magistrate Judge Sheila Finnegan |

## PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE [DR.] HILTON'S EXPERT REPORT AND TESTIMONY UNDER FEDERAL RULE OF EVIDENCE 702

## **TABLE OF CONTENTS**

LEGAL STANDARDS ................................................................................................................ 1

ARGUMENT ............................................................................................................................... 2

I.  As An Experienced Senior Economist With a Ph.D in Economics, Dr. Hilton is Qualified to Offer Expert Economic Analysis Regarding Methodologies to Calculate Classwide Damages .......................................................................................................................... 2

A.  Dr. Hilton Has the Experience, Skill, and Training to Support Her Conclusion that Overpayments Made by Proposed Class Members Can Be Calculated on a Classwide, Formulaic Basis ................................................................................... 2

B.  Dr. Hilton Is Not Unqualified Because She Relied on Her Staff to Code Queries at Her Direction and Under Her Supervision ................................................................ 4

II.  Dr. Hilton's Methodology is Reliable and Her Extensive Economics Training Will Help the Jury Understand Why Overpayments Made by Proposed Class members Can be Calculated on a Classwide, Formulaic Basis ...................................................................... 6

A.  Dr. Hilton Adequately Tested Her Methodology to Ensure Its Reliability ............ 8

B.  Dr. Hilton's Multi-Pronged Methodology for Distinguishing Consumer Copays and Coinsurance Is Reliable .................................................................................... 8

C.  Dr. Hilton Can Determine Whether the U&C Price Was Used to Determine the Price Class Members Paid for a PSC Generic ....................................................... 10

D.  Plan Designs Are Reflected in PBM Adjudication Logic and Can Be Accounted for ........................................................................................................................... 12

E.  Dr. Hilton Does Not Need to Account for Collateral Source Payments Like Purchases at Other Pharmacies, GERs, or Stop Loss Insurance ........................... 14

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&E Adventures LLC v. Intercard, Inc.*,
529 F. Supp. 3d 1333 (S.D. Fla. 2021) ...................................................................7

*Coady v. Wellfleet Marine Corp.*,
816 N.E.2d 124 (Mass. 2004) .............................................................................7

*Cottrell v. AT&T Inc.*,
No. 19-CV-07672, 2020 WL 4818606 (N.D. Cal. Aug. 19, 2020) .......................15

*DL v. D.C.*,
730 F. Supp. 2d 78 (D.D.C. 2010) ......................................................................4

*Donovan v. Philip Morris USA, Inc.*,
65 F. Supp. 3d 251 (D. Mass. 2014) ...................................................................15

*Downing v. Abbott Labs*,
48 F.4th 793 (7th Cir. 2022) ..............................................................................2

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) .............................................................................4

*Elkies v. Johnson and Johnson Servs., Inc.*,
No. CV 17-7320, 2018 WL 11223465 (C.D. Cal. Oct. 18, 2018) .........................7

*Gopalratnam v. Hewlett-Packard Co.*,
877 F.3d 771 (7th Cir. 2017) .........................................................................2, 7, 8

*Grimmelmann v. Pulte Home Corp.*,
No. CV-08-1878, 2010 WL 3430706 (D. Ariz. Aug. 30, 2010)............................6

*Gurliacci v. Mayer*,
590 A.2d 914 (Ct. 1991) ...................................................................................15

*Ha v. Alexander*,
No. FSTCV095012884S, 2010 WL 3259914 (Conn. Super. Ct. July 21, 2010)......7

*Hairston v. Harward*,
821 S.E.2d 384 (N.C. 2018)...............................................................................15

*Hall v. Flannery*,
840 F.3d 922 (7th Cir. 2016) .............................................................................3

*In re Gruver*,
No. 1:20-CV-229, 2022 WL 1500695 (W.D. Pa. May 12, 2022) ..........................7

*In re NorthShore Univ. HealthSystem Antitrust Litig.*,
   No. 07 CV 04446, 2023 WL 2138971 (N.D. Ill. Feb. 20, 2023) (Chang, J.) ...........................7

*Joerg v. State Farm Mut. Auto. Ins. Co.*,
   176 So. 3d 1247 (Fla. 2015)...................................................................................................15

*Jordan v. Dominick's Finer Foods*,
   115 F. Supp. 3d 950 (N.D. Ill. 2015) .....................................................................................13

*Kleen Prod. LLC v. Int'l Paper Co.*,
   831 F.3d 919 (7th Cir. 2016) ...................................................................................................8

*Kurtz v. Costco Wholesale Corp.*,
   818 F. App'x 57 (2d Cir. 2020) .............................................................................................13

*Kurtz v. Kimberly-Clark Corp.*,
   321 F.R.D. 482 (E.D.N.Y. 2017) ............................................................................................7

*Leitinger v. DBart, Inc.*,
   736 N.W.2d 1 (Wis. 2007)......................................................................................................15

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ...................................................................................................6

*Manpower, Inc. v. Ins. Co. of Pennsylvania*,
   732 F.3d 796 (7th Cir. 2013) .......................................................................................8, 10, 13

*McReynolds v. Sodexho Marriott Servs., Inc.*,
   349 F. Supp. 2d 30 (D.D.C. 2004) ..........................................................................................4

*Mitchell v. Haldar*,
   883 A.2d 32 (Del. 2005) .........................................................................................................15

*Nguyen v. Nissan N. Am., Inc.*,
   932 F.3d 811 (9th Cir. 2019) ...................................................................................................7

*Prayitno v. Nextep Funding LLC*,
   No. 17 C 4310, 2019 WL 6497374 (N.D. Ill. Dec. 3, 2019) ...................................................3

*Robinson v. Bates*,
   857 N.E.2d 1195 (Ohio 2006)................................................................................................15

*Sharpe v. Puritan's Pride, Inc.*,
   466 F. Supp. 3d 1066 (N.D. Cal. 2020) ...................................................................................7

*Smith v. Ford Motor Co.*,
   215 F.3d 713 (7th Cir. 2000) ...................................................................................................3

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) (under California, Illinois, and New York law
  "damages can be estimated") ........................................................................................7

*Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*,
  620 S.E.2d 222 (N.C. 2005)..........................................................................................7

*Taylor v. S. Pac. Transp. Co.*,
  637 P.2d 726 (Ariz. 1981).............................................................................................15

*Timm v. Goodyear Dunlop Tires N. Am., Ltd.*,
  932 F.3d 986 (7th Cir. 2019) .........................................................................................1

*Turnbull v. USAir, Inc.*,
  133 F.3d 184 (2d Cir. 1998)..........................................................................................15

*Wills v. Foster*,
  892 N.E.2d 1018 (Ill. 2008) ..........................................................................................15

*United States ex rel. Garbe v. Kmart Corp.*,
  No. 12-CV-881-NJR-RJD, 2017 WL 3175983 (S.D. Ill. July 21, 2017) ................................14

## Statutes, Rules & Regulations

Fed. R. Civ. P. 702 ..............................................................................................................3

Fed. R. Evid. 702 ........................................................................................................1, 2, 3, 7

Fed. R. Evid. 703 ................................................................................................................4

Plaintiffs Cynthia Russo, Lisa Bullard, Ricardo Gonzales, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, International Union of Operating Engineers Local 295-295 Welfare Fund, and Steamfitters Fund Local 439 ("Plaintiffs") respectfully submit this opposition to Defendant Walgreen Co.'s ("Walgreens") Motion to Exclude [Dr.] Hilton's Expert Report and Testimony Under Federal Rule of Evidence 702. ECF No. 584 ("Motion").

Dr. Hilton is a Senior Economist with over 22 years of experience in the field of economics of the pharmaceutical industry. After carefully analyzing millions of lines of transaction claims data produced by Walgreens and pharmacy benefit managers ("PBMs"), Dr. Hilton developed a straightforward and formulaic methodology to identify overpayments made by Class members.

Walgreens' criticisms of Dr. Hilton's methodology boil down to an Oliver Twist-like demand for more: more testing – not just of the queries she ran to ensure their validity and that the necessary data were available, but testing across all sample data Walgreens produced; more variables – not just indicating whether a copay or coinsurance was charged, but of deductibles and collateral source payments like generic effective rate or stop loss payments made by non-parties; and more proof – not just data identifying whether the usual and customary price was considered in determining a Class member's payment, but a manual review of contracts reflected in the underlying adjudication logic.

Walgreens can present its criticisms to the jury. Its criticisms do not establish that Dr. Hilton's qualifications or the reliability of her methodology justify excluding her testimony.

## LEGAL STANDARDS

"Federal Rule of Evidence 702 and *Daubert* govern the admissibility of expert testimony." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019). Under Federal Rule of Evidence 702, expert testimony is admissible when: (1) "the expert's scientific, technical,

or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under *Daubert*, the court engages in a three-step analysis that evaluates "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony"). *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Where the *Daubert* standards are met by a preponderance of the evidence, the expert testimony is admissible. *Downing v. Abbott Labs*, 48 F.4th 793, 809 (7th Cir. 2022).

## ARGUMENT

I. **AS AN EXPERIENCED SENIOR ECONOMIST WITH A Ph.D IN ECONOMICS, DR. HILTON IS QUALIFIED TO OFFER EXPERT ECONOMIC ANALYSIS REGARDING METHODOLOGIES TO CALCULATE CLASSWIDE DAMAGES**

A. **Dr. Hilton Has the Experience, Skill, and Training to Support Her Conclusion that Overpayments Made by Proposed Class Members Can Be Calculated on a Classwide, Formulaic Basis**

Dr. Hilton had two assignments:

> First, I have been asked to develop a formulaic methodology that can identify and calculate overpayments paid by Plaintiffs and Class members as a result of Walgreens' failure to report or otherwise include PSC prices when determining the U&C price to report for PSC Generics. Second, I have been asked to provide a formulaic methodology that can be used to identify and calculate Walgreens' unjust enrichment as a result of its failure to report or otherwise include PSC prices when determining the U&C price to report for PSC Generics.

Hilton Rpt., ¶7.[1]  Her conclusion is that "overpayments made by proposed Class members can be calculated on a classwide, formulaic basis that will not require individualized inquiries regarding members of the Class." *Id.*, ¶8.

Under Federal Rule of Evidence 702, an expert may be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Civ. P. 702.  When assessing an expert's qualifications, the court must consider "'each of the ***conclusions*** [s]he draws individually to see if he has the adequate education, skill, and training to reach them.'"  *Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016).[2]  "[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area."  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  "This is a liberal standard; the expert need only have some "specialized knowledge that would assist the trier of fact."  *Prayitno v. Nextep Funding LLC*, No. 17 C 4310, 2019 WL 6497374, at *3 (N.D. Ill. Dec. 3, 2019) ("'The question is not whether [the proffered expert] witness is more qualified than other experts in the field; . . . [r]ather, the issue is whether the witness is more competent to draw the inference than the lay jurors and judge.'").

Dr. Hilton is a Senior Economist qualified to offer her expert opinion on the ability to identify and quantify classwide damages.  Dr. Hilton earned a bachelors and a doctoral degree in economics from the University of California, San Diego.  Hilton Rpt., ¶1.  She has over 22 years of experience in the field of economics of the pharmaceutical industry, during which she has assessed the calculation of damages in class action litigation, including damages incurred by pharmaceutical purchasers.  *Id.*  Dr. Hilton has also co-authored a number of articles concerning a

---

[1]     Declaration of Joseph P. Guglielmo in Support of Plaintiffs' Motion for Class Certification, ECF 556 (Nov. 17, 2022) ("Guglielmo Decl."), Ex. 55 ("Hilton Rpt.").

[2]     Unless otherwise noted, emphasis is added and citations are omitted.

wide range of topics relating to economics, statistics, and damages calculation. *Id. & id.*, Ex. 1. Dr. Hilton is thus well-qualified to opine as to the conclusions in her report regarding the identification and calculation of consumer overpayments for prescription medication and the formulaic approach she used to do so.

### B.    Dr. Hilton Is Not Unqualified Because She Relied on Her Staff to Code Queries at Her Direction and Under Her Supervision

Notwithstanding that as part of her qualifications, Dr. Hilton has experience coding in Fortran and SAS, Walgreens claims that Dr. Hilton is unqualified because she could not read the "particular code" associated with a Python function in a single file and because Dr. Hilton relied on her staff to draft code at her direction and under her supervision.

Under Federal Rule of Evidence 703, an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."  Fed. R. Evid. 703.  "An expert witness is permitted to use assistants in formulating [her] expert opinion. . . ."  *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002).

Dr. Hilton's testimony that she was unfamiliar with a Python function in a single file does not render her unqualified.  Courts have repeatedly held that an expert "does not need to personally write computer code in order for a resulting analysis to be admissible."  *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36–37 (D.D.C. 2004) ("Rather, pursuant to Fed. R. Evid. 703, an expert may rely on any facts or data 'of a type reasonably relied upon by experts in the particular field,' including facts, data, and opinions that are otherwise inadmissible.  This includes relying on one's assistants to carry out analyses that the expert designed."); *DL v. D.C.*, 730 F.

Supp. 2d 78, 82 (D.D.C. 2010) ("Even if Dr. Cupingood relied on Mr. Niederberger to help write computer code and carry out analyses, the Court finds that such reliance is permissible.").

Walgreens' attempt to discredit Dr. Hilton is unpersuasive. Dr. Hilton does not offer an expert opinion on computer coding, and as such, Walgreens' focus on this facet of testimony is misplaced. Dr. Hilton's testimony makes clear that her staff coded queries at her direction and that she exhibited close supervision over her staff.

> Q: Well, did you – did you do those queries or did your staff do those queries?
>
> A: My staff did the coding at my direction.
>
> Q: Ultimately, it's your work product, correct?
>
> A: Yes.
>
> Q: And you're familiar with your queries, correct?
>
> A: Yes.

Hilton Tr.[3] at 104:11-22.

> Q: So the queries that you produced to us or that we received from counsel, you've never reviewed those before?
>
> A: I wouldn't say I've never reviewed them. I've looked briefly at some code. The rest, I asked my staff explain to me what this code is doing. They'll walk me through it. Or we just talk about it in words rather than – I don't look at the code.

Hilton Tr. at 234:12-21.

Accordingly, the Court should permit Dr. Hilton to offer her expert opinion on the identification and calculation of classwide damages using her formulaic approach and refuse to apply a stricter standard to scrutinize immaterial computer coding capabilities.

---

[3]     Supplemental Declaration of Joseph P. Guglielmo in Support of Plaintiff's Motion for Class Certification ("Supp. Guglielmo Decl."), Ex. 80 ("Hilton Tr.").

## II. DR. HILTON'S METHODOLOGY IS RELIABLE AND HER EXTENSIVE ECONOMICS TRAINING WILL HELP THE JURY UNDERSTAND WHY OVERPAYMENTS MADE BY PROPOSED CLASS MEMBERS CAN BE CALCULATED ON A CLASSWIDE, FORMULAIC BASIS

Dr. Hilton developed a reliable and formulaic methodology for assessing damages consistent with Plaintiffs' theory of liability. Plaintiffs' theory of liability is that Plaintiffs and Class members were overcharged as a result of Walgreens' deceptive or unfair "price scheme to artificially inflate the 'usual and customary' prices reported and used to charge Plaintiffs and members of the Class for" PSC Generics. FAC, ¶1. Consistent with this theory of liability, Dr. Hilton developed a model that is capable of identifying and calculating the Class's overcharges as the difference between the amount a Plaintiff or Class member paid to receive a PSC Generic and the PSC price for that same drug. Hilton Rpt., ¶¶21-28. Plaintiffs' claims have always been framed on the level of an individual transaction, *see* FAC, ¶¶17, 20, 23, 28, 32 & 36, and Dr. Hilton's methodology is thus consistent with Plaintiffs' theory of liability.

Walgreens takes the view that Dr. Hilton's transaction-by-transaction level methodology of identifying and calculating damages is inappropriate and, instead, that the damages flowing from Walgreens' deceptive acts can only be assessed over a given plan year. That is not the law. "It is certainly acceptable through expert economic testimony to make a reasonable estimation of actual damages through probability and inferences. 'Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty it would be a perversion of fundamental principles of justice to deny all relief to the injured person.'" *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 490 (7th Cir. 2002).[4]

---

[4]    *See also, e.g.*, *Grimmelmann v. Pulte Home Corp.*, No. CV-08-1878, 2010 WL 3430706, at *5 (D. Ariz. Aug. 30, 2010) ("Generally, 'once the right to damages has been established, uncertainty as to amount of damages will not preclude recovery.' . . . The party seeking damages must prove them with 'reasonable certainty,' by providing 'some basis for estimating his loss.'"); *Elkies v. Johnson and Johnson Servs., Inc.*,

"Rule 702's reliability elements require the district judge to determine only that the expert is providing testimony that is based on a correct application of a reliable methodology and that the expert considered sufficient data to employ the methodology." *Gopalratnam*, 877 F.3d at 780–81. "'[S]ufficient data' simply means that the expert employed the 'kinds of facts or data on which experts in the filed [sic] would reasonably rely.'" *In re NorthShore Univ. HealthSystem Antitrust Litig.*, No. 07 CV 04446, 2023 WL 2138971, at *5 (N.D. Ill. Feb. 20, 2023) (Chang, J.). "The critical inquiry is whether there is a connection between the data employed and the opinion offered," however "[t]he reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury; the court's role is generally limited to assessing the reliability of the methodology – the framework – of the expert's analysis" *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806-08 (7th Cir. 2013).

---

No. CV 17-7320, 2018 WL 11223465, at *9 (C.D. Cal. Oct. 18, 2018) ("'Class wide damages calculations under the UCL , FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'"); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 818 (9th Cir. 2019); *Sharpe v. Puritan's Pride, Inc.*, 466 F. Supp. 3d 1066, 1076 (N.D. Cal. 2020) ("No specific damages measure is prescribed in the CLRA, and the door is open to any reasonable measure."); *Ha v. Alexander*, No. FSTCV095012884S, 2010 WL 3259914, at *13 (Conn. Super. Ct. July 21, 2010) ("'[T]he likely amount of damages need not be determined with mathematical precision. . . .'"); *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1345 (S.D. Fla. 2021) ("[T]he plaintiff need not calculate these damages with 'mathematical precision.' . . . 'The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data.'"); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (under California, Illinois, and New York law "damages can be estimated"); *Coady v. Wellfleet Marine Corp.*, 816 N.E.2d 124, 131 (Mass. 2004) ("Although mere speculation is insufficient, 'the amount of damages need not be proved with mathematical precision; the extent of damages often must be left to estimate and judgment.' Evidence that enables the jury to arrive at an approximate estimate of damages is sufficient."); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 550 (E.D.N.Y. 2017) ("Plaintiffs need not prove exactly what their damages will be. . . . 'New York law does not require that the injury must be proven with a specified degree of certitude. . . .'"); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 620 S.E.2d 222, 231 (N.C. 2005) ("[W]here a claim for damages . . . are shown to a reasonable certainty, the plaintiff should not be required to show an exact dollar amount with mathematical precision."); *In re Gruver*, No. 1:20-CV-229, 2022 WL 1500695, at *12 (W.D. Pa. May 12, 2022) ("'[D]amages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. . . . [D]amages are speculative only if the uncertainty concerns the fact of damages rather than the amount.'").

## A. Dr. Hilton Adequately Tested Her Methodology to Ensure Its Reliability

Walgreens claims that Dr. Hilton's methodology is unreliable because she "did not test her methodology over the available, larger data set produced by Walgreens. . . ." Mot. at 7. As a factual matter, Dr. Hilton used the 2015 sample data to develop and test her methodology to ensure its reliability. Hilton Tr. at 106:9-23 ("I ran queries on it. I used it to test certain queries."). When asked what tests she ran against the 2015 data, she testified that she ran so many that "I can't give you a list of every query I ran on the 2015 data, or even a list of all the queries I ran having to do with checking certain variables, et cetera, for my class methodology." *Id.* at 110:20-23. Dr. Hilton specifically confirmed that she used her analysis of the 2015 data to support the assertions made in her Report bearing on numerosity, which Walgreens does not contest, and testified "I did run analysis on the 2015 data sample to identify – and was able to identify many thousands of transactions with overpayments, and many thousands of identifiers for patients and also many thousands of identifiers for TPPs." *Id.* at 111:9-112:2.

More fundamentally, however, Walgreens distorts what is required at the class certification stage. "[A]t the class certification stage, plaintiffs are not obliged to drill down and estimate each individual class member's damages." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016). Dr. Hilton has adequately tested her methodology and considered "sufficient data to employ the methodology." *Gopalratnam*, 877 F.3d at 781; *Manpower, Inc.*, 732 F.3d at 807. The Court should not exclude testimony about her methodology as unreliable just because it could have been run across a broader data set.

## B. Dr. Hilton's Multi-Pronged Methodology for Distinguishing Consumer Copays and Coinsurance Is Reliable

Walgreens next claims that Dr. Hilton's methodology is unreliable because of its belief that a consumer's cost-sharing payment cannot "accurately" be determined by reference to

transactional data. Mot. at 15. This claim defies industry practice, industry standards, and the record generated in this case.

Dr. Hilton's multi-pronged methodology accounts for multiple sources of data that bear upon whether a given transaction involved a copay or coinsurance. First, her methodology is that "the PBMs will turn over data that has that information." Hilton Tr. at 284:17-24. As Dr. Hilton testified, the reason PBMs would have this data is because "they need it to adjudicate the claim." *Id.* at 277:22-278:2.

There is ample support for Dr. Hilton's reliance on PBM data to distinguish between copayments and coinsurance. The NCPDP standards for claims processing specifically distinguish between copays and coinsurance. As explained further in the rebuttal report of Dr. Susan A. Hayes,[5] the NCPDP standards provide that the "[a]mount to be collected from the patient . . . that is due to a per prescription copay" is specifically reported in the "Amount Of Copay" field, 518-FI. The "[a]mount to be collected from the patient . . . that is due to a per prescription coinsurance," however, is specifically reported in the "Amount of Coinsurance" field, NCPDP field 572-4U. Hayes Rpt., ¶47; *see also id.*, ¶¶46-50. PBMs thus distinguish between copays and coinsurance when adjudicating claims. Mr. Smith, Walgreens' own expert, conceded as much during his deposition, testifying: "I have seen some PBMs produce fields that had different columns for co-pay and co-insurance. . . ." Supp. Guglielmo Decl., Ex. 68 ("Smith Tr.") at 151:23-25.

If PBM data is not available, Dr. Hilton testified that "there are variables in Walgreens' data that indicate co-insurance." Hilton Tr. at 277:3-12. This accords with Walgreens' testimony, which confirms that ███████████████████████████████████████. For example, Walgreens testified that "███████████████████████████████████████

---

[5]    Supp. Guglielmo Decl., Ex. 63 ("Hayes Rebuttal Rpt.").

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████.￼" Guglielmo Decl.,

Ex. 58 ("Dymon Decl."), ¶59 at 45-46. Walgreens further testified that ████████████

████████████████████████ *id.*, ¶18(b) at 17-18.

Finally, to reflect "the data that I have currently," Hilton Tr. at 271:23-24, Dr. Hilton developed her own supplemental methodology to determine whether a given plan used copays or coinsurance. Under her methodology, she considered "the consumer portion divided by the total amount paid by the consumer and the TPP for a given PBM in a given month," and where 90% of the consumer payments associated with a given plan are determined by reference to a percent of the total amount paid, it indicates the use of a copayment, as opposed to a copay. *Id.* at 271:9-272:14. Dr. Hilton tested her methodology against the data CastiaRx produced for Plaintiff Steamfitters and determined that it was reliably able to identify the use of coinsurance as opposed to copays. *See id.* at 277:1-12 ("So I only have transactions for Steamfitters at this point. . . . I used the methodology that I just described for the data that I have.").

Walgreens' claim that the data available is insufficient to distinguish copayments from coinsurance thus goes to the weight of Dr. Hilton's methodologies, not their reliability. *Manpower*, 732 F.3d at 806 ("[R]eliability is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced.").

### C.  Dr. Hilton Can Determine Whether the U&C Price Was Used to Determine the Price Class Members Paid for a PSC Generic

In developing her methodology, Dr. Hilton was asked to assume that liability was established and that Class members were entitled to lower-of pricing on the basis of the U&C

price.  Hilton Tr. at 174:7-24.[6]  Walgreens erroneously characterizes this as an "unsupportable assumption."

In her Report, Dr. Hilton testifies that "PBM data can be used to determine whether the U&C price was used as a basis for determining the amount paid or reimbursed when adjudicating the claim."  Hilton Rpt, ¶66.  At deposition, Dr. Hilton testified that the basis for her assumption that "PBMs have that information in their possession" is because it's "something that they need to use to determine when they're going to adjudicate a claim."  Hilton Tr. at 167:17-20; *id.* at 147:6-9 ("PBMs will also have an indicator for whether they adjudicated the claim based on U&C.").

Dr. Hilton tested the validity of her assumption against the 2015 data by confirming that each of the Relevant PBMs adjudicated claims on the basis of the U&C price.  *Id.* at 146:17-24.  For her analysis, Dr. Hilton used the ███████████████ field in Walgreens' data, which is ██████████████████████████.  Dymon Decl., ¶59(cc) at 48.  While Walgreens affirmatively argues in its Motion that the ██████████████ field in Walgreens' data "***does not*** indicate how the TPP reimburses the PBM," Mot. at 13, this is contradicted by Walgreens' testimony that "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Dymon Decl., ¶59(cc) at 49.

As set forth in the rebuttal report of Dr. Hayes, the NCPDP standards provide several codes that extensively and meticulously document the use of U&C pricing.  In addition to NCPDP code 522-FM, ████████████████████████, data associated with the "Client Pricing Basis of

---

[6]     With regard to liability, Dr. Schafermeyer testified that the "U&C price serves as a '"ceiling"' or '"cap"' on prescription drug prices for TPPs and their insured members," Guglielmo Decl., Ex. 56, ¶40, and that he was not "not aware of any third-party prescription programs that did not use the 'lower of' logic during the Class Period. . . ." *id.*, ¶42.

Cost," NCPDP code 223, which would be populated by the PBM, reflects whether the PBM used the U&C price when determining how much to charge a TPP client. Hayes Rebuttal Rpt., ¶¶58-60. The "Basis Of Calculation- Copay," NCPDP code 347-HJ, and the "Basis of Calculation – Coinsurance," NCPDP code 573-4V, similarly reflect whether the PBM used the U&C price when determining the amount of a consumer's copay or coinsurance, respectively. *Id.*, ¶¶61-62.

Further, in her rebuttal report, Dr. Hilton proposes an additional method for determining whether the U&C price was a basis for determining a Class member's payment, namely by comparing whether the amounts paid by the TPP and consumer are equal to the U&C price. Mr. Smith, Walgreens' expert, confirmed that PBM data could be used for this calculation:

> Q. If the amount paid by a health plan, plus the amount paid by a consumer, equals the usual and customary price, is that suggestive that the usual and customary price was the basis for determining the amount paid by the health plan?
>
> A. For that transaction, yes, that the usual and customary price was the basis of the price.

Smith Tr. at 133:18-25.

Thus, there is ample support in the record that the use of the U&C price can be reliably determined by reference to common, classwide data.

**D.      Plan Designs Are Reflected in PBM Adjudication Logic and Can Be Accounted for**

Walgreens claims that certain plan design features, such as deductibles, Medicare Part D coverage bands, and out-of-pocket maximums, must be accounted for when estimating damages. The selection of which variables to consider in forming a damages estimate, however, goes to the weight, not admissibility, of an expert's opinion. *See, e.g.*, *Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 963 (N.D. Ill. 2015) ("objections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion,

not its admissibility"); *see also Manpower*, 732 F.3d 796; *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 61–62 (2d Cir. 2020).

Walgreens fails to acknowledge that plan design features are accounted for and reflected on the level of an individual transaction when adjudicated by a PBM, as Mr. Smith testified:

> Q.  And what information do you believe is generally considered as part of the adjudication process?
>
> A.  Eligibility.  Plan design.  Drug formularies.  Contract terms. Benefit structure, among other things.
>
> Q.  And all of those factors are considered through the process of adjudicating a claim, correct?
>
> A.  Based on my general understanding, yes.

Smith Tr. at 141:21-142:8.   Mr. Smith further testified that "the PBM has information beyond what the pharmacy has that's used in adjudication."  *Id.* at 142:21-143:20.

As set forth in Dr. Hayes' report, several NCPDP codes reflect data bearing on deductibles, Medicare Part D coverage bands, and out-of-pocket maximums.  Hayes Rebuttal Rpt., ¶¶64-71. Three codes in particular, the "Amount Applied To Periodic Deductible," NCPDP code 517-FH; the "Remaining Deductible Amount," NCPDP code 513-FD; and the "Accumulated Deductible Amount," NCPDP code 512-FC, all provide transaction-level data reflecting any applicable deductibles.  *Id.*, ¶¶64-65.  Additional NCPDP codes provide transaction-level details reflecting Medicare Part D's coverage bands, including the "Amount Attributed to Coverage Gap," NCPDP code 137-UP; the "Benefit Stage Amount," NCPDP code 394-MW; and the "Benefit Stage Qualifier," NCPDP code 393-MV, which specifically identifies whether a transaction is associated with Medicare Part D's deductible, initial benefit, coverage gap, or catastrophic coverage phase. *Id.*, ¶¶68-71.  At deposition, Mr. Smith confirmed that he was offering no opinion that PBMs would not maintain this data.  *See* Smith Tr. at 165:19-166:9.

13

The existence of these data is bolstered by Walgreens' 30(b)(6) testimony, which identifies a litany of fields reflecting data ███████████████████████████████████:



Dymon Decl., ¶59.n at 45.

*Id.*, ¶59.o at 45.

*Id.*, ¶59.p at 45.

*Id.*, ¶59.m at 44-45.

*Id.*, ¶59.cc at 49.

In her rebuttal report, Dr. Hilton confirms that in her experience she has seen PBM data that reflects among other things, deductible information and data regarding out-of-pocket maximums, and that her methodology is sufficiently flexible to account for such data if required. Supp. Guglielmo Decl., Ex. 61, ¶49; *see also United States ex rel. Garbe v. Kmart Corp.*, No. 12-CV-881-NJR-RJD, 2017 WL 3175983, at *4 (S.D. Ill. July 21, 2017) (denying exclusion of testimony that purportedly failed to account for Part D coverage bands).

### E. Dr. Hilton Does Not Need to Account for Collateral Source Payments Like Purchases at Other Pharmacies, GERs, or Stop Loss Insurance

Walgreens claims that "back-end reconciliation" payments associated with generic effective rates ("GERs") that TPPs may have negotiated with PBMs or stop-loss insurance must be accounted for in Plaintiffs' damages model as relevant to Walgreens' affirmative defenses. Walgreens' experts testified that both GERs and stop-loss payments are made by third parties

14

independent of Walgreens. Supp. Guglielmo Decl., Ex. 69 at 109:8-110:9 & 117:3-6. As such, evidence regarding these collateral source payments is inadmissible as a matter of law and need not be considered as part of Plaintiffs' damages model.[7]

To the extent the Court determines that such payments are legally cognizable offsets, Mr. Smith testified that the PBM or TPP would have data reflecting GERs, which could then be accounted for as part of a damages model. Smith Tr. at 169:3-170:5.

## CONCLUSION

For the foregoing reasons, the Court should deny Walgreens' motion to exclude Dr. Hilton's testimony.

Dated: June 20, 2023

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 *s/ Joseph P. Guglielmo*
Joseph P. Guglielmo (IL Bar #2759819)
Carey Alexander (IL Bar #5188461)
Amanda M. Rolon (*admitted pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-4478
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com
arolon@scott-scott.com

Erin Green Comite (IL Bar #420630)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

---

[7]     *See, e.g.*, *Taylor v. S. Pac. Transp. Co.*, 637 P.2d 726, 729–30 (Ariz. 1981); *Cottrell v. AT&T Inc.*, No. 19-CV-07672, 2020 WL 4818606, at *7 (N.D. Cal. Aug. 19, 2020); *Gurliacci v. Mayer*, 590 A.2d 914, 928 (Ct. 1991); *Mitchell v. Haldar*, 883 A.2d 32, 39 (Del. 2005); *Joerg v. State Farm Mut. Auto. Ins. Co.*, 176 So. 3d 1247, 1256 (Fla. 2015) ("It is a basic principle of law that tortfeasors should not receive a windfall due to benefits available to the injured party, however those benefits were accrued."); *Wills v. Foster*, 892 N.E.2d 1018, 1022 (Ill. 2008); *Donovan v. Philip Morris USA, Inc.*, 65 F. Supp. 3d 251, 279 (D. Mass. 2014); *Turnbull v. USAir, Inc.*, 133 F.3d 184, 186 (2d Cir. 1998) (New York law); *Hairston v. Harward*, 821 S.E.2d 384, 391 (N.C. 2018); *Robinson v. Bates*, 857 N.E.2d 1195, 1199 (Ohio 2006); *Leitinger v. DBart, Inc.*, 736 N.W.2d 1, 8 (Wis. 2007) ("In other words, '[t]he tortfeasor who is legally responsible for causing injury is not relieved of his obligation to the victim simply because the victim had the foresight to arrange, or good fortune to receive, benefits from a collateral source for injuries and expenses.'").

156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 531-2632
Facsimile:  (860) 537-4432
ecomite@scott-scott.com

David W. Mitchell (IL Bar #199706)
Arthur L. Shingler III (IL Bar # 181719)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 231-1058
Facsimile:  (619) 231-7423
davidm@rgrdlaw.com
ashingler@rgrdlaw.com

Mark J. Dearman (IL Bar #0982407)
Stuart A. Davidson (IL Bar #084824)
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: (561) 750-3000
Facsimile:  (561) 750-3364
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com

*Interim Co-Lead Counsel*

Katrina Carroll (IL Bar #6291405)
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
katrina@lcllp.com

*Local Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically through the Court's Electronic Case Filing System, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

 *s/ Joseph P. Guglielmo*
Joseph P. Guglielmo