**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated,<br><br>       Plaintiffs,<br><br> v.<br><br>WALGREEN CO.,<br><br>       Defendant. | Civil No. 17-cv-2246<br><br>Judge Edmond E. Chang<br>Magistrate Judge Sheila Finnegan |

**WALGREEN CO.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
MICHAEL S. JACOBS'S EXPERT REPORT AND TESTIMONY
UNDER FEDERAL RULE OF EVIDENCE 702**

Walgreen Co. ("Walgreens") opposes Plaintiffs' motion to exclude the expert report and testimony of Michael S. Jacobs, Dkt. 605 ("Motion"), whose more than four decades of experience in the Pharmacy Benefit Manager ("PBM") and retail pharmacy industries qualifies him as an expert here. Although Plaintiffs do not dispute Jacobs's qualifications, they seek to exclude nearly all of his opinions, either by arguing that they are improper legal opinions or that they are unreliable opinions formed without considering certain sources of information. But Plaintiffs' challenges boil down to mischaracterizations and critiques of conclusions with which Plaintiffs disagree. None merit excluding Jacobs's opinions, and the Court should deny Plaintiffs' motion.

I.  APPLICABLE STANDARD

"The admissibility of expert testimony is governed by Rule 702 and the Supreme Court's seminal decision in *Daubert*." *Sgouros v. Trans Union LLC*, No. 14 C 1850, 2022 U.S. Dist. LEXIS 49585, at *3 (N.D. Ill. Mar. 21, 2022) (citations omitted). Federal Rule of Evidence 702 allows for opinion testimony by an expert—that is, someone with the requisite "'knowledge, skill, experience, training, or education'—to help the trier of fact 'understand the evidence or [] determine a fact in issue.'" *United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2016) (quoting Rule 702). Specifically, "[t]he proponent of an expert witness bears the burden of demonstrating that the expert's testimony is admissible by a preponderance of the evidence." *Sgouros*, 2022 U.S. Dist. LEXIS 49585, at *3 (citing *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009)). Expert testimony is admissible when (1) it is "based on sufficient facts or data," (2) it is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.*

The Supreme Court made clear in *Daubert* that district courts reviewing Rule 702 motions must perform the "critical gatekeeping function" concerning the admissibility of such evidence. *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018). "Because expert testimony can be

1

both highly persuasive and difficult for a lay jury to evaluate, the importance of this gatekeeping function cannot be overstated." *Id.* (citations omitted). Judicial gatekeeping is thus "indispensable." *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021). Indeed, the Amendments to Rule 702, which are merely clarifying amendments and which take effect in December 2023, further emphasize this gate-keeping function. *See* Report of the Advisory Committee on Evidence Rules, at 6 (May 15, 2022) *available at* https://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-evidence-rules-may-2022.

## II. ARGUMENT

### A. Jacobs Offers Relevant And Reliable Opinions As To The Meaning Of Terms Of Art In The Relevant Contracts, None of Which Are Legal Conclusions

Plaintiffs mischaracterize as a legal conclusion Jacobs's opinion that the usual and customary ("U&C") definitions in Walgreens' agreements with the PBMs at issue in this case (the "Relevant PBMs") would not be understood in the PBM or retail pharmacy industries to encompass membership club prices. *See* Mot. at 4-8. These opinions are not legal conclusions. Rather, Jacobs draws upon his decades of experience in the PBM and retail pharmacy industries to opine on the meaning of industry terms of art featured in the U&C definitions set forth in Walgreens' agreements with Relevant PBMs. On that basis, he opines that the definitions that include those terms would not be understood in the pharmacy and PBM industries as encompassing membership club prices. While Plaintiffs may disagree with that view, Jacobs's opinions as to the meaning of industry terms of art used in the operative provisions of Walgreens' PBM agreements, and their bearing on how the industries understand those provisions, are relevant and admissible.[1]

It is well established that experts are permitted to opine on the meaning of industry terms

---

[1] Notably, despite Plaintiffs' criticism of Jacobs related to the U&C definitions in Walgreens' PBM agreements, Plaintiffs' expert, Dr. Kenneth W. Schafermeyer, also offers opinions about the meaning of those agreements. *See, e.g.,* Dkt. 553-45 (Schafermeyer Report) ¶¶ 95-101.

2

of art within their area of expertise, including when those opinions bear upon a contract dispute. *See, e.g.*, *Burbach Aquatics, Inc. v. City of Elgin*, 2011 U.S. Dist. LEXIS 4573, at *17-18 ("To the extent that [the expert] proposes to inform lay jurors of the technical implications of the terms of art used in the contract as understood by professional architects, his testimony may provide the type of concrete information against which jurors may measure abstract legal concepts."); *Rush Presbyterian St. Luke's Med. Ctr. v. Safeco Ins. Co.*, 722 F. Supp. 485, 497 (N.D. Ill. 1989) ("[I]t is permissible for experts to testify about the customs and usages in an industry, and to amplify the terms of a contract if customs and usages shed light on the meaning of those terms."); *see also*, *Cage v. City of Chi.*, 979 F. Supp. 2d 787, 803 (N.D. Ill. 2013) (collecting cases) ("[A]n expert witness may opine on the accepted meaning . . . of a word or phrase within a particular industry based [on] his or her experience and training"). Jacobs's expert opinions as to the meaning of industry terms of art, and their bearing on how the industry would understand contractual U&C definitions that employ those terms, are not only relevant, but also will aid the Court (and, as appropriate, the jury) in evaluating the meaning of those definitions as they relate to the ultimate issues in the case.

Based on his decades of experience, Jacobs opined that the terms "***cash price***" and "***retail price***" have the same meaning, and are the prices paid by "***cash customers***" and "***cash-paying customers***"—terms that Jacobs explained, in his experience, are not understood to encompass pricing available to customers who have joined a membership club like Walgreens' Prescription Savings Club ("PSC"). Dkt. 586-2 (March 16, 2023 Expert Report of Michael S. Jacobs) ("Jacobs Report") ¶ 41 (emphasis added). As he opined, terms such as "***cash price***" and "***retail price***" are "consistently understood in the industry to refer to a price that a customer pays for a prescription without using any benefits, including insurance, a pharmacy membership club, or a third-party

3

discount card."[2] *Id.* ¶ 12. Jacobs also pointed out that his opinion finds support in sworn testimony in this case from Express Scripts, Caremark, and Optum—three of the largest PBMs in the industry—and that he was not aware of any contrary testimony from the PBM representatives deposed in the case. *Id.* ¶ 47.

Consistent with the prevailing understanding across the relevant industries as to the meaning of terms of art, such as "cash" or "retail" price, Jacobs explained that the U&C definitions in Walgreens' agreements with PBMs—which invoke those specialized terms—would not be understood as encompassing membership club prices. In his report, Jacobs examined each of the U&C definitions in those agreements and pointed out that each one uses the terms of art on which he opined. Therefore, based on his experience in the industry, Jacobs opined that those definitions would not be understood to include PSC prices. *See, e.g.*, Dkt. 586-2 (Jacobs Report) ¶ 49. That is not a legal opinion—it is an industry expert offering specialized knowledge that will assist the trier of fact in considering the issues.

Nor are Jacobs's opinions "contradictory" on the meaning of the contract term "discounts," as Plaintiffs wrongly assert. *See* Mot. at 7. For each U&C definition that expressly excludes "discounts," Jacobs noted that fact in his broader discussion of the terms of art used in the definition as further support for his opinion that the definition would not be understood to encompass membership club prices. *See, e.g.,* Dkt. 586-2 (Jacobs Report) ¶¶ 50, 52, 54, 56, 60. Indeed, even under Plaintiffs' theory of the case, a definition that expressly *excludes* discounts

---

[2] Expert testimony as to the meaning of terms of art used within an industry is particularly important where, as here, those terms are not defined in the contracts and have specific meanings that are not readily apparent for someone without experience in the industry. For example, a lay person likely would not know that, as used in the PBM and retail pharmacy industries, the term "cash customer" means something different than a customer who pays using dollar bills or coins, and, indeed, a "cash customer" can include someone paying with a credit card. Accordingly, testimony from an industry expert as to the meaning of those terms of art will aid the court and/or the jury in weighing Plaintiffs' claims and Walgreens' defenses.

4

does not encompass membership club prices. *See* Dkt. 553-45 (November 16, 2022 Report of Kenneth W. Schafermeyer Ph.D.) ("Schafermeyer Report") ¶¶ 95-101, 127. And for each U&C definition that *includes* "discounts," Jacobs pointed out that the surrounding context of the definition—namely that it includes the word "applicable" before "discounts"—shows that the definition refers to a discount to the "cash" or "retail" price, terms of art that he opined are not understood in the industry to include membership club prices. *See, e.g.,* Dkt. 586-2 (Jacobs Report) ¶¶ 49, 53, 55, 61, 62, 63. Thus, Plaintiffs' attempt to manufacture a contradiction falls flat.

Finally, Plaintiffs' assertion that Jacobs "purports to perform a conflict of laws analysis" regarding PBM manuals rings hollow. *See* Mot. at 7. Far from Plaintiffs' hyperbolic label, Jacobs explained that, based on his experience, it is generally understood in the PBM and retail pharmacy industries that, in the event of a conflict between a provision of a pharmacy-PBM agreement and a provision of a PBM manual, the provision of the pharmacy-PBM agreement prevails. *See* Dkt. 586-2 (Jacobs Report) ¶¶ 82-86. As he explained, "[t]his industry understanding makes good sense because, whereas pharmacy-PBM agreements are the result of extensive negotiations and tailored to address the unique needs of the contracting parties, provider manuals are unilaterally drafted and issued by the PBM to all network pharmacy providers." *Id*. ¶ 83.

The Court should thus reject Plaintiffs' attempt to mischaracterize Jacobs's opinions as to industry understanding and practice as improper legal conclusions.

### B. Jacobs's Recognition That The District Court's And Seventh Circuit's Opinions In *Garbe* Provide That Contracts Govern The PBM-Pharmacy Relationship Is Not A Legal Analysis, And Is Consistent With Those Opinions

Plaintiffs' request for the court to exclude Jacobs's "opinions" regarding *United States ex rel. Garbe v. Kmart*, 73 F. Supp. 3d 1002 (S.D. Ill. 2014), *aff'd in part, rev'd in part*, 824 F.3d 632 (7th Cir. 2016) ("*Garbe*") is a tactic designed to shoehorn a discussion of Plaintiffs' views of that case. In fact, Plaintiffs' nearly two-page argument regarding *Garbe* is more extensive than Jacobs's

5

two-paragraph reference. *Compare* Mot. at 8-10; *with* Dkt. 586-2 (Jacobs Report) ¶¶ 80-81. Jacobs's brief mention of *Garbe* is far from a "legal analysis," much less an "extensive" one, as Plaintiffs' claim, and is set forth in full below:

> 80. My opinion that it is the pharmacy-PBM agreement that governs the pharmacy's U&C reporting obligations to the PBM also finds support in *United States ex rel. Garbe v. Kmart Cop.*, a case which examined Kmart's U&C submission practices, which [Plaintiff's proffered expert] references in his report.
>
> 81. Although *Garbe* involved materially different facts than those at issue here, the district court in *Garbe* recognized that "[i]t would be nonsensical to find that these definitions would not control the specific contracts or agreements with these specific payers." Accordingly, as here, it is the U&C provision agreed upon by the PBM and pharmacy, and reflected in their agreement, that controls the pharmacy's U&C reporting obligations.

Dkt. 586-2 (Jacobs Report) ¶¶ 80-81 (footnotes omitted). Jacobs also mentioned in a footnote that "[t]his part of the opinion was not overturned by the Seventh Circuit on appeal, and, in fact, the Seventh Circuit stated, "*[u]nless state regulations provide otherwise*, the 'usual and customary' price is defined as the 'cash price offered to the general public.'" *Id.* ¶ 81 n.96 (emphasis added in Jacobs's report). That is, Jacobs references *Garbe*: (i) in response to Plaintiffs' expert, who discussed it,[3] and (ii) to point out that *Garbe* is consistent with his opinion that contracts matter—i.e., that "it is the pharmacy-PBM agreement that governs the pharmacy's U&C reporting obligations." The passage from *Garbe* that Jacobs cites is consistent with his opinion that it is the U&C definition in a pharmacy-PBM agreement that controls, as the *Garbe* court emphasizes that it would be "nonsensical" to conclude that definitions in specific contracts would not control a pharmacy's obligations with those payers.

---

[3] Plaintiffs' expert, Schafermeyer, not only discusses the *Garbe* case, he even includes a subheading in his report titled "*United States v. Garbe*" where he discusses the Seventh Circuit Opinion. *See* Dkt. 553-45 (Schafermeyer Report) ¶ 81. In Paragraph 37 of his report, he further discusses the district court opinion in *Garbe* to which Jacobs refers in his report. Schafermeyer also refers to *Garbe* in Paragraphs 133 and 178 of his report.

Plaintiffs also wrongly accuse Jacobs of opining that PBMs administering Medicare Part D insurance plans are "free to ignore *Garbe*." *See* Mot. at 9. Jacobs points out only that *Garbe*—which Plaintiffs' own expert referenced—is consistent with Jacobs's opinion that the pharmacy-PBM agreement governs the pharmacy's U&C reporting obligations, (*see* Dkt. 586-2 (Jacobs Report) ¶¶ 80-81), and that there is nothing in Medicare Part D that would override a contractual definition of U&C agreed upon by a PBM and retail pharmacy. *See id.* ¶¶ 72-77. Far from "contradicting" *Garbe*, Jacobs's opinions note only that *Garbe* is consistent with his views.

### C. Jacobs's Opinions As To Industry Understanding Are Reliable, And Plaintiffs' Arguments To The Contrary Fail

Plaintiffs argue that Jacobs defined the relevant industry too narrowly when opining on the industry understanding of U&C in the absence of a contractual definition in a PBM-pharmacy contract and that he did not consider certain alternative materials. Mot. at 10-12. These arguments are without merit. Jacobs explained in detail the bases of his opinions and his conclusions are the product of a reliable methodology that he reliably applied and are, therefore, admissible.

*First*, Plaintiffs' argument that Jacobs too narrowly defined the industry when he opined on the industry meaning of U&C has no merit, as Jacobs properly defined the industry as PBMs and pharmacies. Mot. at 10-11. The issue is the meaning of U&C in the absence of a contractual definition ***in a PBM-pharmacy agreement***. In other words, how would PBMs and pharmacies understand the pharmacy reporting obligation under their contractual agreement where they did not define U&C? In that circumstance, the proper industry participants to consider are the ones who are the parties to the contracts, namely PBMs and pharmacies. Certainly, Jacobs's decision to define the industry that way has a strong basis and is reliable; it is not a ground for exclusion. Moreover, Plaintiffs' critique that Jacobs did not include government payers in defining the relevant industry, (Mot. at 10-11), is without merit, as government payers generally act under laws

7

independent of the contracts at issue and are excluded under Plaintiffs' class definition.[4]

*Second*, Plaintiffs' argument that Jacobs did not consider certain materials within the PBM and pharmacy industry when he opined on the industry meaning of U&C has no merit. Mot. at 11. Plaintiffs assert that Jacobs "ignored publicly available PBM manuals that define discount club prices as the U&C price." *Id*. Regardless of whether Plaintiffs' characterization of the manuals is correct, their argument that Jacobs ignored PBM manuals is not. Apart from Plaintiffs' failure to identify which "publicly available PBM manuals" they believe Jacobs ignored, not only did Jacobs identify numerous PBM manuals on his materials considered list, (Dkt. 586-2 (Jacobs Report) at Ex. A to Jacobs Report), but also Jacobs reviewed and considered the expert report of Plaintiffs' industry expert, Dr. Kenneth W. Schafermeyer, which itself quotes the U&C definitions in 32 PBM manuals. *See* Dkt. 553-45 (Schafermeyer Report) ¶ 89, Table 2. In other words, Jacobs considered the exact same PBM manual U&C definitions that Plaintiffs' own expert considered. Dkt. 586-2 (Jacobs Report) ¶ 2 (noting that he was retained to provide testimony regarding the Schafermeyer report). Jacobs also explained his view that Schafermeyer's reliance on PBM manuals in forming his opinion on the definition of U&C does not align with the industry understanding of the role of manuals, given that "[t]he purpose of a manual is to provide operational guidance to support the successful submission of prescription claims to the PBM." *Id.* ¶ 86. In other words, contrary to Plaintiffs' position, Jacobs considered the U&C definitions from all of the PBM manuals in rendering his opinions.

Equally unavailing is Plaintiffs' criticism that Jacobs "failed to consider whether other retail pharmacy [discount] clubs treat their club prices as U&C prices." *See* Mot. at 11. Apart from

---

[4] On the other hand, Plaintiffs' proffered industry expert, Schafermeyer, has ignored not only the viewpoint of retail pharmacies like Walgreens, but also the sworn testimony in this case by the PBMs that adjudicate the overwhelming majority of prescription drug claims nationwide.

Plaintiffs' failure to identify a single pharmacy discount club, Plaintiffs' argument is particularly ironic given that the publicly available information shows that, to the best of Walgreens' knowledge, **all** retail pharmacies exclude their membership club prices in determining their U&C prices.[5] Certainly, Plaintiffs have not pointed to a single retail pharmacy that has included their membership club prices when determining their U&C prices to PBMs, which is telling.[6]

Nor was Jacobs required to consider, as Plaintiffs suggest, two "governmental enforcement actions" identified in Plaintiffs' motion, both of which are actually settlement agreements that are irrelevant to this dispute. *Id*. The first resulted in a public settlement between Walgreens and the Department of Justice that was **limited to fee-for service Medicaid** and the dismissal with prejudice of all of relator's Medicare Part D claims (*see* Stipulation and Order of Settlement and Dismissal, *U.S. ex rel. Baker v. Walgreen Co.*, No. 1:12-cv-00300 (S.D.N.Y. Jan. 2019, https://www.justice.gov/d9/press-releases/attachments/2019/01/22/stipulation_and_order_of_settlement_walgreens_discount_pricing.pdf); the second, which was **limited only to one Medicaid program**, implicated Connecticut, which had **changed its laws** to obtain prices like Walgreens' PSC prices as its U&C prices (*see*

---

[5] *See, e.g., Corcoran v. CVS Health Corp.*, 779 F. App'x 431, 433 (9th Cir. 2019) (". . . CVS and the PBMs agreed during this litigation . . . that the PBM contracts did not require CVS to submit its HSP prices as the U&C prices . . . ."); *Sheet Metal Workers Local No. 20 Welfare & Ben. Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182 (D.R.I. 2021) ("From November 2008 to February 2016, CVS did not report [its club] price as the U&C price for [club]-eligible drugs."); Defendant's Answering Br. in Opp'n to Centene Plaintiff's Mot. for JNOV or, Alternatively, a New Trial at 7, *Envolve Pharmacy Solutions, Inc. v. Rite Aid Headquarters. Corp.*, No. N19C-12-214 (Del. Super. Ct. June 30, 2023) ("The evidence confirms that neither Caremark nor Rite Aid considered [its club] prices to be Rite Aid's U&C under the 1996 Contract."); Kroger Co.'s Mem. of Law ISO its Mot. to Dismiss Plf.'s Am. Compl., Dkt. 32-1 at 3, *Kirkbride v. The Kroger Co.*, No. 21-cv-22 (S.D. Ohio Jan. 5, 2021) ("Plaintiffs claim that, for drugs in the Savings Club, Kroger should have reported its Savings Club prices as its U&C prices, and that, if it had, some insured customers, including Plaintiffs, would have paid less for some prescription fills.").

[6] Certain retailers, like Walmart, do treat certain lower prices as U&C, but that is because those prices are provided to all customers automatically, without any obligation to enroll or pay a membership fee, which Jacobs discusses in his report. Dkt. 586-2 (Jacobs Report) ¶ 76.

Conn. Gen. Stat. § 17b-226a (P.A. 10-179 changed "provider" to "pharmacy provider," rephrased provision requiring that department is billed lowest accepted amount, and defined "savings or discount program," effective May 7, 2010)). The fact that Jacobs did not consider the existence of settlement agreements involving issues materially different than those now in dispute, and that do not govern any of Walgreens' obligations with respect to any of the Relevant PBMs, has no bearing on the reliability of Jacobs's opinions.

### III. CONCLUSION

For these reasons, Walgreens' respectfully requests that the Court deny Plaintiffs' motion.

DATED: August 22, 2023

*Michael Scott Leib*
Michael Scott Leib
Anthony Robert Todd
**REED SMITH LLP**
10 S Wacker Dr # 4000
Chicago, IL 60606
Telephone: 312/207-1000
*mleib@reedsmith.com*
*atodd@reedsmith.com*

Frederick Robinson (*pro hac vice*)
Selina Coleman (*pro hac vice*)
Megan Engel (*pro hac vice*)
Jessica Christensen (*pro hac vice*)
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 East Tower
Washington, DC 20005
Telephone: 202-414-9200
*frobinson@reedsmith.com*
*scoleman@reedsmith.com*
*mengel@reedsmith.com*
*jchristensen@reedsmith.com*

**Attorneys for Defendant Walgreen Co.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of August, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*Michael Scott Leib*
Michael Scott Leib