# EXHIBIT A

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4

5       CYNTHIA RUSSO, LISA BULLARD,

6       RICARDO GONZALES, INTERNATIONAL

7       BROTHERHOOD OF ELECTRICAL

8       WORKERS LOCAL 38 HEALTH AND

9       WELFARE FUND, INTERNATIONAL UNION OF

10      OPERATING ENGINEERS LOCAL 295-295C

11      WELFARE FUND, AND STEAMFITTERS FUND

12      LOCAL 439, on Behalf of Themselves and

13      All Others Similarly Situated,

14           Plaintiffs,

15           vs.          Case No.  17-CV-2246

16      WALGREEN CO,

17           Defendant.

18

                    ***CONFIDENTIAL***

19               VIDEO DEPOSITION OF

20           DR. KENNETH SCHAFERMEYER

21        Taken on behalf of the Defendant

22             January 13, 2023

23

24

25

CONFIDENTIAL

Page 150

1    not sure it's responsive to your question.  Ask me

2    your question again.

3              Q.      Do you have any basis for saying that

4    Walgreens and Express Scripts were legally

5    prohibited from agreeing to the language that they

6    put into section 1.26?

7              A.      So my basis for this is that there is

8    an agreement between the payer and the PBM, in this

9    case Express Scripts, and there's also an industry

10   definition of usual and customary which was in

11   effect before Walgreens contrived this scam.  So

12   the fact that Walgreens convinced Express Scripts

13   to look the other way and they both benefit

14   financially from it, the question is does that

15   relieve them of their duty to provide the true

16   usual and customary.  I see they have this

17   agreement, but this agreement doesn't meet the

18   reasonable expectations of the payer who contracted

19   with Express Scripts and the payer expects to

20   receive the true usual and customary in an accurate

21   and truthful claim.  The fact that Walgreens and

22   Express Scripts get together and make a change

23   doesn't change the first contract between the payer

24   and Express Scripts, that contract's still in

25   effect.  And so the reasonable expectations of the

CONFIDENTIAL

Page 151

1    payer is they would receive accurate claims in the

2    true usual and customary.

3            Q.    Have you talked to any of the payers

4    who contracted with Express Scripts in this case to

5    determine what they expected Express Scripts to

6    charge them for prescriptions?

7                  MR. DWOSKIN:  Form.

8            A.    Well, I read the complaint and I

9    think the complaint lays out what their

10   expectations were and I understand with a, what

11   they would reasonably expect.

12           Q.    (BY MR. ROBINSON)  Did you -- let me

13   ask again.

14                 Have you talked to any of the payers

15   who contracted with Express Scripts in this case to

16   determine what they expected Express Scripts to

17   charge them for prescriptions covered by their

18   plans?

19                 MR. DWOSKIN:  Form.

20           A.    I didn't talk with them because

21   there's other information available and I already

22   had an understanding what that expectation should

23   be.

24           Q.    (BY MR. ROBINSON)  Besides the

25   complaint that was drafted by the lawyers for the

CONFIDENTIAL

Page 191

1    while.

2              All right.  Let's see the context.

3    And I should have commented about the context in my

4    report where I quoted the book in Navarro's chapter

5    too, because the context was an important point.

6              133 you said?

7         Q.   (BY MR. ROBINSON)  I didn't say it

8    but somebody on the line said it.

9              MR. DWOSKIN:  Yeah, that's the

10   footnote number.  Just trying to move it along.

11   Let's see what the record says.

12        A.   Okay.  I see that.

13        Q.   (BY MR. ROBINSON)  So you quoted,

14   this is on page 42 of your report, you cite to the

15   article by Dr. Mattingly and state a U.S.

16   Pharmacist article quoting the GAO definition

17   indicates that quote, the U&C rate is often

18   referred to as the cash price for patients, and

19   then you cited to the Mattingly article, correct?

20        A.   That's what it says.

21        Q.   Okay.  And then if we look at the

22   Mattingly article, the article is called

23   Understanding Drug Pricing.  See that?

24        A.   I see that.

25        Q.   Okay.  Do you know Professor

CONFIDENTIAL

Page 192

1    Mattingly?

2            MR. DWOSKIN:  Form.

3        A.      University of Maryland?  No.  No, I

4    wouldn't say I know him personally.

5        Q.      (BY MR. ROBINSON)  Do you know Dr.

6    Mattingly by reputation?

7            MR. DWOSKIN:  Form.

8        A.      I really don't recall.  No.

9        Q.      (BY MR. ROBINSON)  Okay.  And on the

10   second page of his article, see there's a table?

11       A.      Uh-huh.

12       Q.      That's entitled Common Terms and

13   Acronyms Used In Drug Pricing?

14       A.      Uh-huh.

15       Q.      And then for usual and customary

16   price it says that the definition is the average

17   cash price paid at a retail pharmacy.

18            Is that right?

19       A.      That's what it says but that's not

20   the portion I was quoting, and he also says later

21   on that, my point was to point out these are cash

22   prices.  I'm not agreeing that it's average.  You

23   put this in context to the article and this is

24   where Navarro fit in too is he was saying that

25   usual and customary is based on cash prices.  In

CONFIDENTIAL

Page 193

1    other words, prices not paid by patients using

2    insurance benefit and that illustrates my point.

3    I'm not agreeing with this statement about average

4    cash price, I'm just saying look, he understands

5    the cash price, and so did the GAO, right?

6         Q.    So he was, Dr. Mattingly was

7    authoritative enough for you to quote as supporting

8    your opinion but you would agree with me that he

9    provides a different definition of usual and

10   customary in 2012 than either the definition that

11   you provided in the book chapter in 2009 or the

12   definition in your expert report that you produced

13   in this case.

14            MR. DWOSKIN:  Form.

15       A.    Okay.  So I think you're

16   misrepresenting my report.  If you look at

17   paragraph 141 (b) I talked about the GAO definition

18   and this whole discussion has to do with the fact

19   that PSC customers are cash customers and I'm

20   illustrating that point.  GAO defined usual and

21   customary as the price that a person without

22   insurance would pay.  This author then refers to

23   that GAO definition, right, and he agrees that it's

24   the cash price.  That's my point.  I am not

25   endorsing his definition that it's average price or

CONFIDENTIAL

Page 194

1    saying that he's even expert in this.  I'm just say

2    that he quoted GAO and agreed with the cash price

3    and that was my point.

4           Q.    (BY MR. ROBINSON)  Look, I understand

5    how you used Dr. Mattingly's article to support

6    what you were saying about the GAO report, but

7    isn't it true that Dr. Mattingly in his article

8    which you thought was authoritative to cite for the

9    quote you wanted, he says that the usual and

10   customary price means the average cash price paid

11   at a retail pharmacy, that's what he says.

12              MR. DWOSKIN:  Form.

13          A.    Well, again, from a historical

14   perspective, I'm not sure how aware he was of what

15   was going on in 2011, but historically average cash

16   price was the cash price because there was only one

17   cash price and so before 2007 for example or 2006

18   that statement would have been entirely correct.

19   I'm not sure that he was aware at that time when he

20   wrote this that things, that people were trying to

21   manipulate definitions.  Maybe he would have been

22   more careful, but at one point the average price

23   was the price because there weren't multiple

24   different prices, not until we started playing

25   games with usual and customary.

CONFIDENTIAL

Page 256

1                    REPORTER CERTIFICATE

2

3        I, SUZANNE BENOIST, Certified Shorthand

4    Reporter, do hereby certify that there came before

5    me via Zoom, the above-referenced parties, that the

6    proceeding was translated and proofread using

7    computer-aided transcription, and the above

8    transcript of proceedings is a true and accurate

9    transcript of my notes as taken at the time of said

10   event.

11       I further certify that I am neither attorney

12   nor counsel for nor related nor employed by any of

13   the parties to the action in which this examination

14   is taken; further, that I am not a relative or

15   employee of any attorney or counsel employed by the

16   parties hereto or financially interested in this

17   action.

18       Dated this 25th day of January, 2023.

19

20   

21                    Ms. Suzanne Benoist, RPR,

22                    CCR-MO, CCR-KS, CSR-IL, CSR-IA

23   Notary Public No. 07541281

24   State of Missouri - Jefferson County

25   My commission expires:  5/10/2024