# **EXHIBIT E**

# Exhibit 28

*Walgreen Co. v. Humana et al.*
Case No. 22-cv-307-ACR

**Redacted**

**AMERICAN ARBITRATION CASE NO. 01-19-0002-5131**

HUMANA HEALTH PLAN, INC.,
HUMANA INSURANCE COMPANY,
and HUMANA PHARMACY SOLUTIONS, INC.,

      Claimants,
and

WALGREEN CO. and WALGREENS
BOOTS ALLIANCE, INC.,

      Respondents.

## PHASE II DAMAGES "FRAMEWORK" RULING

### I.
### PROCEDUDRAL BACKGROUND

On March 26, 2020, the Arbitrator granted Walgreens' motion to bifurcate the liability and damages phases in the Arbitration (and the discovery related to each of those phases). *See Ruling on Walgreens' Motion to Bifurcate Liability and Defer Damages Discovery.* Following the Phase I hearing on liability conducted via Zoom from June 21-29, 2021 and a round of post-hearing briefing and oral argument, the Arbitrator issued an Interim Award on November 8, 2021 finding in Humana's favor on its breach of contract claim and in Walgreens' favor on Humana's negligent misrepresentation and fraud claims. (Exh. 495). Following the issuance of the Interim Award, the parties commenced the discovery process relating to the damages phase.

Pursuant to a stipulated schedule, the parties exchanged their initial expert reports on May 26, 2022. Humana submitted a single expert report from Michael Petron ("Petron"), the Managing Director and President of Disputes, Compliance and Investigations for Stout Risius Ross, LLC. His report presented an opinion as to the damages Humana suffered and described the data and methodology used to calculate those damages. (Exh. 471). Walgreens submitted an alternative damages analysis prepared by its Phase I data expert Jed Smith ("Smith"), a Senior Managing Director at Ankura Consulting, Inc. (Exh. 472). Both Petron and Smith have substantial experience conducting damages analyses in healthcare disputes, and neither party challenged their respective qualifications to serve as an expert. In addition, Walgreens submitted an expert report by economist Kelly Lear Nordby, Ph.D. ("Nordby"), who also is a Managing Director at Ankura. (Exh. 474). Her report opined that the usual and customary price from which damages should be measured should include an allocated amount for the enrollment fee paid by PSC members. Finally, Walgreens submitted the expert report of its Phase I industry expert Donald Dietz. (Exh 473). Dietz opined that (1) even under the Interim Ruling, for the PSC price to be the U&C price for a Humana transaction, there must have been a PSC transaction for the same drug, in the same strength, dosage form and quantity in the same Walgreens pharmacy on the same day; (2) the phrase "at the time of dispensing" in the 2009 Pharmacy Agreement means

1

that every PSC member who did not achieve their enrollment fee in savings would have applied for and obtained the savings guarantee fund offered to PSC members during at least a portion of the damages period. (Phase II Tr. 602:12-19). Relying on the Nordby report and testimony, Walgreens contends that for purposes of calculating damages, that amount should be added to the PSC formulary or transaction price for each Humana transaction.[29] Presumably, not including those amounts would in effect give Humana a better deal than PSC members because it did not have to pay enrollment fees for its members to get the benefit of PSC prices. In this regard, Walgreens contends that the following language in the Seventh Circuit's *Garbe* decision "requires" an allocation of the PSC membership fee (Walgreens Phase II Post Hearing Br. at 37): "[f]or [club members], the program fee is part of the cash price" and "[f]or people who fill more than one prescription, the [annual membership] fee would need to be allocated in some sensible way." 824 F.3d 632, 643-44 (7th Cir. 2016).

Humana makes multiple arguments as to why the membership fees should not be the basis for an "offset" of damages. (Humana Phase II Post Hearing Br. at 28-30).[30] First and foremost, it contends that the NCPDP definition of U&C as the "[a]mount charged cash customers for the prescription *exclusive of sales tax and other amounts claimed*" expressly excludes incorporation of membership fees. (Exh. 552 (NCPDP 1999 Data Dictionary) at 71; Exh. 41 (NCPDP Reference Manual, Ch. 3: NCPDP Flat File Format, Oct. 2005) at 3-72)(emphasis supplied); Phase II Tr. 1305:3-19)(Beckley). Second, it asserts that Walgreens' witness Thompson acknowledged that (1) the pharmacy does not charge membership fees to third-party payers in order to access its U&C prices; (2) to do so would require an agreement between the parties; and (3) Humana did not agree to pay any type of fee for its members to access Walgreens' usual and customary prices. (Phase II Hearing Tr. at 994:21-995:3; 998:16-1001:4; 1001:5-10). Third, it points out that both Smith and Thompson testified that Walgreens does not include enrollment fees as part of the PSC prices in the PSC formularies or its transaction data. (Phase II Tr. at 1106:5-1107:19)(Smith); Exh. 832 at 57:17-25)(Thompson). Fourth, Humana argues that the Pharmacy Agreements require that Humana and its members get the benefit of the PSC prices and that there is no requirement that Humana members pay enrollment fees in order to do so; rather, their "access" to PSC prices was through payment of their premiums. Finally, Humana asserts that by allocating the entire enrollment fee to PSC transactions, Smith ignored the facts that club members got other benefits for their enrollment fee, could obtain a refund of their enrollment fee within 30 days, and in some instances obtained the benefits of the PSC without ever paying the fee.

As a matter of pure economic theory, there is no question that Nordby's opinion is correct: the true cost of drugs purchased through the PSC included the membership fee customers had to pay to access those drugs. The question that now must be answered is whether it is appropriate and consistent with the Pharmacy Agreements to include an allocated amount of the fee to the PSC prices to determine the correct U&C charge for purposes of calculating damages. Humana relies primarily on the argument that the NCPDP definition of "usual and customary" – at least as of 2003 – expressly excluded "other amounts claimed" and asserts that

---

[29] Nordby testified that Smith's allocation methodology was consistent with her opinion. (Phase II Tr. 474:10-20).
[30] Inclusion of the enrollment fee is not accurately characterized as an "offset" to damages. Rather, as Smith explains in his rebuttal report, the PSC enrollment fee is more accurately characterized as "part of the price a customer must pay when purchasing a drug using the PSC." (Exh. 480 at ¶ 90).

25