CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295c WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, *Plaintiffs,* <br><br> -v.- <br><br> WALGREEN CO., *Defendant.* | Civil No. 1:17-cv-02246 <br><br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan |

Surrebuttal Expert Report of Jed Smith

September 14, 2023

Signed: _____



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## CONTENTS

I.    INTRODUCTION AND QUALIFICATIONS ........................................................................1

II.    SUMMARY OF SCOPE ....................................................................................................1

III.    SURREBUTTAL OPINIONS.............................................................................................2

IV.    CONCLUSION ...............................................................................................................21

## LIST OF ATTACHMENTS

**Attachment 1:** Curriculum Vitae Of Jed Smith

**Attachment 2:** Additional Documents Relied Upon

**Attachment 3:** Plan Review

**Attachment 4:** Summary Of Transactions On HILTON_0000310 With An Incorrect PSC Price

**Attachment 5A:** Example: PSC Transaction With Non-Populated NDC

**Attachment 5B:** Example: Transaction That Sold At Retail Price

**Attachment 5C:** Example: Hilton's Updated Methodology Does Not Account For Tax

**Appendix A:** Expert Production Timeline

**Appendix B:** MedTrak Transactions Potentially Not Adjudicated Using U&C

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I. INTRODUCTION AND QUALIFICATIONS

1.      My name is Jed Smith. I am a Senior Managing Director with Ankura Consulting, Inc. ("Ankura") and lead the Pharmacy sector of the Healthcare Disputes Forensics Practice. I am a licensed CPA in the State of California, and I have over 15 years of experience calculating damages in healthcare disputes involving pharmacies, Pharmacy Benefit Managers ("PBMs"), payers, and providers. For many of the nation's largest pharmacies, commercial health insurance companies, government contractors for Medicare and TRICARE programs, third-party administrators, PBMs, and physician practices, I have managed projects and performed analysis to calculate damages relative to provider agreements, statutory requirements, and/or industry standards. As part of this work, I have analyzed over a billion pharmacy claims records and contributed to dozens of expert reports and privileged damage analyses.

2.      Ankura is a consulting firm with offices located throughout the world. Ankura's work in this matter was performed by me or by those under my supervision. Ankura is being compensated at a rate of $625 per hour for my work on this matter, and at hourly rates ranging from $275 to $550 for my colleagues' work. The compensation to Ankura for my services as well as for those under my supervision is not dependent on the outcome of this matter.

3.      A copy of my curriculum vitae is attached to this report as **Attachment 1.**

## II. SUMMARY OF SCOPE

4.      On August 4, 2023, Plaintiffs in this matter submitted an amended rebuttal expert report from Dr. Lynette Hilton ("Hilton Rebuttal") in which she updated the opinions she offered in her November 16, 2022 report ("Hilton Affirmative Report") based on Plaintiffs' new proposed class definition and responded to critiques I made in my April 25, 2023 report ("Smith Report"). The Hilton Rebuttal also contains new information and details about the analysis Hilton prepared.

5.      On June 20, 2023, Plaintiffs in this matter also submitted a rebuttal expert report from Dr. Susan Hayes ("Hayes Rebuttal"), a new expert for Plaintiffs, which Hayes provided, in part, in response to the Smith Report.

6.      On June 20, 2023, Plaintiffs in this matter submitted Plaintiffs' Opposition To Motion To Exclude [Dr.] Hilton's Expert Report and Testimony Under Federal Rule of Evidence 702 ("Plaintiffs' 702 Opposition").

7.      Since my initial report was filed on April 25, 2023, Plaintiffs have made three separate additional productions of over 150 pages of computer scripts, workpapers, and other materials supporting Hilton's analysis. Each additional production contained materials that amended or replaced materials in the prior productions. Refer to **Appendix A** for a timeline of the various Hilton reports, depositions, and data productions.

8.      I have been asked to respond to the opinions and information in the Hayes Rebuttal and the new opinions and information provided in the Hilton Rebuttal, as well as select statements in Plaintiffs' 702 Opposition. As discussed in more detail in Section III, below, I make the following responses to the information in these documents:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a. Hayes's hypothetical claims readjudication example proves why it is necessary to readjudicate claims and that readjudication of these claims cannot be done using only the available data for these claims,

b. Hayes makes incorrect assumptions regarding the availability of data necessary to readjudicate claims,

c. Plaintiffs make incorrect assumptions regarding the availability of data necessary to readjudicate claims,

d. Hilton's methodology for concluding that PBMs use lesser-of logic remains flawed,

e. Hilton's assumptions in her rebuttal report regarding the accuracy and availability of PBM data are flawed and unsupported,

f. Hilton's rebuttal opinions do not eliminate the need for individualized review of data and documentation for each class member,

g. Hilton draws incorrect conclusions from her flawed matching of PBM data to Walgreens data,

h. Hilton has not resolved the flaws in her analysis of available PSC prices,

i. Hilton's calculated alleged overpayment for IBEW for 2018 should be reduced based on GER payments received by IBEW in 2018, and

j. Hilton does not propose a methodology to divide unjust enrichment between the consumer Plaintiffs and the fund Plaintiffs.

9. The additional documents I relied upon for this report not already cited in the Smith Report are listed on **Attachment 2.**

## III. SURREBUTTAL OPINIONS

10. **Hayes's Hypothetical Claims Readjudication Example Proves Why It Is Necessary To Readjudicate Claims And That Readjudication Of The Claims Cannot Be Done Using Only The Available Data For These Claims:** In the Smith Report, I stated that "Due to the complex nature of pharmacy reimbursement, any damages calculation in this matter would require re-adjudication of each transaction at issue, but in the context of all transactions in a benefit year…and could not be done on a class-wide basis using only the data."[1] In her rebuttal report, Hayes asserts that readjudication is not necessary to calculate damages, but if the Court rules that it is, it is possible for the PBMs to do so.[2] She provides a hypothetical example in her report showing benefit year readjudication in which she changes the usual and customary amount ("U&C") on one claim to the Prescription Savings Club ("PSC") price. Hayes then recalculates the patient and insurer payments on the adjusted claim as well as others in the same calendar year where the U&C does not change. Her hypothetical example provides the exact evidence for why readjudication is necessary and why it is impossible to readjudicate a benefit year using only the available data and without additional individualized analysis.

---

[1] Smith Report, paragraph 29.
[2] Hayes Rebuttal, paragraph 31.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a. Hayes presents a hypothetical example in her rebuttal report in which a patient purchases five drugs within a calendar year. The patient has a $100 deductible, a $10 copay on generic drugs, a $25 dollar copay on brand drugs, a $200 copay on specialty drugs, and a $500 out-of-pocket maximum. In Hayes's hypothetical, under the original adjudication, the patient pays their full $100 deductible on the first transaction, then pays their copay on transactions two through five, until their out-of-pocket maximum is reached. The tables Hayes includes in her report contain both arithmetic and substantive errors which I discuss in the following paragraphs. Table 1 below replicates the content of Hayes's "Claim Submissions Reflecting Incorrect U&C" table, without correcting for errors.

**Table 1: Hayes's Claims Submissions Reflecting Incorrect U&C Example _Without Correcting For Arithmetic Errors_**

| | Total Charged by Walgreens A | Amount Paid by Patient B | Patient Payment Type C | Amount Paid by Insurer D=A-B |
|---|---|---|---|---|
| Claim 1 (Brand Drug) | $100 | $100 | Deductible | $0 |
| Claim 2 (Brand Drug) | $100 | $25 | Copay | $75 |
| Claim 3 (Brand Drug) | $500 | $25 | Copay | $75 |
| Claim 4 (Specialty Drug) | $1,500 | $200 | Copay | $1,300 |
| Claim 5 (Specialty Drug) | $1,500 | $150 | Copay Capped at Out-of-Pocket Maximum | $1,350 |
| Total | $3,700 | $500 | | $2,800 |

b. First, Hayes has an arithmetic error related to Claim 3 in the table. Hayes records the claim amount as $500, but only allocates $100 between the patient and the insurer. She should have assigned the insurer $475 on Claim 3 instead of $75. Table 2 below replicates the content of Hayes's "Claim Submissions Reflecting Incorrect U&C" table, but corrects this arithmetic error. With this correction, in total the patient paid $500 for the five drugs and their insurer paid $3,200 using the original U&C submitted on the claims.

**Table 2: Hayes's Claims Submissions Reflecting Incorrect U&C Example _With Corrected Arithmetic_**

| | Total Charged by Walgreens A | Amount Paid by Patient B | Patient Payment Type C | Amount Paid by Insurer D=A-B |
|---|---|---|---|---|
| Claim 1 (Brand Drug) | $100 | $100 | Deductible | $0 |
| Claim 2 (Brand Drug) | $100 | $25 | Copay | $75 |
| Claim 3 (Brand Drug) | $500 | $25 | Copay | $475 |
| Claim 4 (Specialty Drug) | $1,500 | $200 | Copay | $1,300 |
| Claim 5 (Specialty Drug) | $1,500 | $150 | Copay Capped at Out-of-Pocket Maximum | $1,350 |
| Total | $3,700 | $500 | | $3,200 |

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

c. In Hayes's hypothetical example, she assumes the drug sold in the first transaction (Claim 1) was a PSC drug where the PSC price was $75 (compare Table 2, above, with Table 3, below). As a result, if the PSC price should have been submitted as the U&C, the drug sold in the first transaction would have sold for $75 instead of $100. If the entire benefit year was not readjudicated, and only the transaction with the U&C price change was adjusted, one would conclude that the patient overpaid by $25 because they originally paid $100 on the first transaction when they allegedly should have paid $75.

d. However, by readjudicating the entire benefit year, it becomes clear that the patient was not in fact damaged. Whether the first transaction was sold at $100 or $75 does not impact how much the patient pays for prescription drugs over the entire benefit year because the patient hit their out-of-pocket maximum during the calendar year. At either price, the patient pays the same total amount: $500. As it turns out, it is the insurer who would pay $25 less, not the patient. However, this can only be discovered by readjudicating all the claims within the benefit year.

e. Hayes presents a table in her report purportedly showing the impact of readjudicating all five transactions. However, her table contains several arithmetic and substantive errors. Table 3, below, shows the information in Hayes's "Re-adjudicated Claims Reflecting Correct U&C" table, without correcting for these errors.

**Table 3: Hayes's Re-adjudicated Claims Reflecting Correct U&C _Without Correcting For Arithmetic Errors_**

| | Total Charged by Walgreens<br>A | Amount Paid by Patient<br>B | Patient Payment Type<br>C | Amount Paid by Insurer<br>D=A-B |
|---|---|---|---|---|
| Claim 1 (Brand Drug) | $75 | $75 | Deductible | $0 |
| Claim 2 (Brand Drug) | $100 | $25 | Copay | $75 |
| Claim 3 (Brand Drug) | $500 | $25 | Copay | $75 |
| Claim 4 (Specialty Drug) | $1,500 | $200 | Copay | $1,300 |
| Claim 5 (Specialty Drug) | $1,500 | $175 | Copay Capped at Out-of-Pocket Maximum | $1,325 |
| Total | $3,700 | $500 | | $2,775 |

f. The "Re-adjudicated" table that Hayes presents in her report contains arithmetic and substantive errors on Claims 2, 3, and 5, as shown in the table above. On Claim 2, Hayes assigns $25 to the patient as a copay before the $100 patient deductible has been exhausted, resulting in an incorrect allocation of the claim between the patient and the insurer. The correct allocation should be that the patient pays $50 on the claim - $25 to satisfy their remaining deductible and $25 as a copayment on the remaining balance.[3] On

---

[3] Though plans can differ on how copays are treated relative to deductibles including 1) not charging copays until deductible is met; 2) not applying copays to deductbles, or 3) applying copay payments to deductibles, for this hypothetical I assume the plan does not charge copays until the deductble is met. For a description of copayment options see: https://www.metlife.com/stories/benefits/deductible-vs-copay.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Claim 3, Hayes records the claim amount as $500, but only allocates $100 between the patient and the insurer. The insurer should pay $475 on the claim, not $75. On Claim 5, Hayes assigns $175 instead of $150 to the patient because she did not correctly account for the patient's deductible on Claim 2.

g. Table 4 below shows a version of Hayes's "Re-adjudicated Claims Reflecting Correct U&C" table with the arithmetic and substantive errors discussed above corrected. When Table 4 is compared to Table 2, above, it shows that when the U&C on Claim 1 is adjusted from $100 to $75 to account for the PSC price, it does not impact the amount paid by the patient in the calendar year. The patient would pay $500 under either U&C amount. Instead, it is the insurer who pays $25 less when the claims are readjudicated using the lower U&C, dropping from a $3,200 payment to $3,175. Full calendar year readjudication is necessary to correctly determine whether patient payments or insurer payments would be impacted by a change in U&C because if only the Claim 1 transaction that had the change in U&C was adjusted, one would incorrectly conclude that the patient would pay $25 less and the change in U&C would have no impact on payments made by the insurer.

**Table 4: Hayes's Re-adjudicated Claims Reflecting Correct U&C _With Corrected Arithmetic_**

|  | Total Charged by Walgreens<br>A | Amount Paid by Patient<br>B | Patient Payment Type<br>C | Amount Paid by Insurer<br>D=A-B |
|---|---|---|---|---|
| Claim 1 (Brand Drug) | $75 | $75 | Deductible | $0 |
| Claim 2 (Brand Drug) | $100 | $50 | $25 Copay + $25 Deductible | $50 |
| Claim 3 (Brand Drug) | $500 | $25 | Copay | $475 |
| Claim 4 (Specialty Drug) | $1,500 | $200 | Copay | $1,300 |
| Claim 5 (Specialty Drug) | $1,500 | $150 | Copay, Capped at Out-of-Pocket Maximum | $1,350 |
| **Total** | **$3,675** | **$500** |  | **$3,175** |

h. Hayes's hypothetical example also shows why readjudication is not possible using the available data because data from other pharmacies (e.g., when customers filled some prescriptions at other pharmacies, rather than Walgreens) and health care providers other than Walgreens will be necessary to complete this analysis. Hayes's example includes two transactions for specialty drugs. Although Walgreens has specialty pharmacies, it would not be unusual for patients to fill their prescriptions for specialty drugs at pharmacies other than Walgreens.[4] Hayes's hypothetical example shows that in order to readjudicate transactions across the entire benefit year to accurately assess class member damages, data on transactions from all pharmacies, including non-Walgreens pharmacies, would need to be collected. Additionally, information on each patient's benefit structure would

---

[4] Michelle Byrne, _The Ins and Outs of Specialty Pharmacy_, (Dec. 6, 2018). For example, the 2019 agreement between Caremark and EHPC on behalf of IBEW which states, "Caremark shall be the exclusive provider of Specialty Drugs to Plan Participants" (See EHPC 00162).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

need to be collected. I have seen no evidence in the data produced to date by the Relevant PBMs in this matter that the necessary fields of information used in the example Hayes presents in her rebuttal report, like out-of-pocket maximum amounts and deductible amounts, will be available to properly readjudicate claims.

i. Additionally, as Hayes's hypothetical example shows, if any transaction in a benefit year is missing from the data, readjudication could result in incorrect assessments of deductibles, out-of-pocket maximums, or other patient responsibilities. Only by readjudicating every transaction for a patient within a benefit year can one accurately determine the true injured party, if any, on a transaction. Hayes's and Hilton's opinions that it is appropriate to exclude at-issue transactions from the analysis due to inability to match the data between the PBM productions and Walgreens data under Hilton's methodology contradicts Hayes's opinion that benefit year readjudication is possible under the current framework, because data on all claims in a patient's benefit year must be available for accurate readjudication.[5] In other words, if damages were assessed by reviewing Claim 1 only in Hayes's hypothetical, it would appear as if the patient suffered $25 in damages and the plan had no damages; however, when the full benefit year in the example is reviewed including the specialty drugs, the patient suffers no damages (the patient pays $500 across the 5 example claims for the regardless of the U&C) and the plan has $25 damages (the plan's total payments for the year decrease from $3,200 to $3,175).

j. Furthermore, Hayes's assertion that readjudication is a simple process is contradicted by the numerous errors she made in the hypothetical example she included in her report. Hayes selected a simplified hypothetical to illustrate readjudication, yet made several errors in arithmetic and in allocating payment between the patient and the plan. Plaintiffs' experts assert that readjudication would be simple to apply formulaically, but Hayes's inability to accurately readjudicate the simplified claims that she selected as a hypothetical is evidence of the complexities and individualized review required for readjudication, separate and apart from the other issues outlined here.

k. Lastly, Hayes's assertion that PBMs could readjudicate the claims is inconsistent with my experience working with PBMs and other clients where I have been told that certain PBMs did not have the functionality to readjudicate claims without manual intervention and that readjudicating large batches of claims would be overly burdensome, if not impossible, due to the complexity of recalculating all the benefits for the year and the impact processing large volumes of claims could have on the system's ability to timely adjudicate claims submitted by pharmacies in the ordinary course of business.

---

[5] Hayes Rebuttal, paragraph 19. Hilton Rebuttal, paragraph 27.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

11.     **Hayes Makes Incorrect Assumptions Regarding The Availability Of Data Necessary To Readjudicate Claims:** PBMs do not actively maintain all fields of data alleged by Hayes to be available. In the Smith Report, I state that a damages calculation based on claims readjudication "requires individualized review of plan designs to understand member benefits including copays, coinsurance, deductible amounts, [and] out-of-pocket maximum levels."[6] In her rebuttal, Hayes references several NCPDP fields as evidence that PBMs will have the necessary data to readjudicate claims.[7] However, in my experience in collecting large data sets for multiple years from most of the nation's largest PBMs, I know not all values in NCPDP data fields are retained by PBMs in an active data warehouse post-adjudication and that the fields available vary by time period and the specific adjudication platform used by the PBM. Most of the fields Hayes cites have not been included in the PBM data productions made to date in this matter, nor are they listed on the Caremark and ESI declarations from the *In Re: Niaspan Antitrust Litigation*[8] that Hilton refers to in Paragraph 23 of her Amended Rebuttal Report, which addresses available data fields.[9] The table below lists the fields that Hayes opines would be used for readjudication along with information on whether the field has been made available in any PBM data productions or *Niaspan* declarations to date.[10]

### Table 5: NCPDP Fields Cited in Hayes Report

| Field | Field Name | Included in Any PBM Data Production or Declaration |
|---|---|---|
| 572-4U | AMOUNT OF COINSURANCE | None |
| 518-FI | AMOUNT OF COPAY | ██████ and Declaration, ██████ and Declaration[11] |
| 522-FM | BASIS OF REIMBURSEMENT DETERMINATION | ████████ |
| 223 | CLIENT PRICING BASIS OF COST | None |
| 347-HJ | BASIS OF CALCULATION – COPAY | Caremark Declaration |
| 573-4V | BASIS OF CALCULATION – COINSURANCE | None |
| 513-FD | REMAINING DEDUCTIBLE AMOUNT | None |
| 512-FC | ACCUMULATED DEDUCTIBLE AMOUNT | None |
| 514-FE | REMAINING BENEFIT AMOUNT | None |
| 52Ø-FK | AMOUNT EXCEEDING PERIODIC BENEFIT MAXIMUM | None |
| 137-UP | AMOUNT ATTRIBUTED TO COVERAGE GAP | None |
| 394-MW | BENEFIT STAGE AMOUNT | None |
| 393-MV | BENEFIT STAGE QUALIFIER | None |
| 517-FH | AMOUNT APPLIED TO PERIODIC DEDUCTIBLE | None |
| 392-MU | BENEFIT STAGE COUNT | None |
| 423-DN | BASIS OF COST DETERMINATION | None |
| 653-S4 | ACCUMULATED GROSS COVERED DRUG COST AMOUNT | None |
| 653-S3 | ACCUMULATED PATIENT TRUE OUT OF POCKET AMOUNT | None |

---

[6] Smith Report, paragraph 31.
[7] Hayes Rebuttal, paragraphs 47 – 71.
[8] *In re: Niaspan Antitrust Litig.*, No. 2:13-md-2460 (E.D. Pa. Sept. 17, 2013).
[9] Ex. 78 to J. Guglielmo Decl. to Class Cert. Reply and Ex. 79 to J. Guglielmo Decl. to Class Cert. Reply.
[10]   NCPDP Post Adjudication Standard Implementation Guide, October 17, 2011. NCPDP_ForthvWalgreens001790-1981.
[11] ████████████████ ESI Declaration: Ex. 78 to J. Guglielmo Decl. to Class Cert. Reply, ████████, Caremark Declaration: Ex. 79 to J. Guglielmo Decl. to Class Cert. Reply. Because these data files only contain a member payment field labeled "copay," additional investigation would be needed to determine if amounts recorded in the copay field relate to copays, coinsurance or deductibles. For example, the ████████████████████████████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

12.     **Plaintiffs Make Incorrect Assumptions Regarding The Availability Of Data Necessary To Readjudicate Claims:** The existence of data fields in Walgreens Transaction Data does not guarantee the fields are populated. In Plaintiffs' Opposition to Motion to Exclude Hilton's Expert Report and Testimony Under Federal Rule of Evidence 702, they reference the existence of certain fields in Walgreens' data "regarding deductibles and Part D's coverage bands."[12] However, based on my review of the Walgreens 2015 Sample Data, the fields cited by Plaintiffs are frequently not populated in Walgreens' data. Additionally, according to the Walgreens data dictionary, the benefit stage fields cited by Plaintiffs were not populated prior to July 10, 2012.[13] Furthermore, the Dymon declaration states, "Although Walgreens receives certain data back from the Relevant PBM, it only retains the data for which it has an ongoing business purpose."[14] Simply because the fields exist does not mean they are populated with relevant information. The table below lists the fields cited by Plaintiffs along with the percentage of records in the Walgreens 2015 Sample Data where the field is blank or contains a null value.

**Table 6: Fields Cited In Plaintiffs 702 Opposition**

| Field Name | Table Name | % of Records with Blank/Null Value |
|---|---|---|
| pat_remain_deductable_dlrs | Patient Plan | 80.20% |
| pat_remain_benefit_dlrs | Patient Plan | 96.05% |
| pat_acc_ded_dlrs | Prescription SDL | 88.45% |
| pat_ded_apply_dlrs | Prescription SDL | 80.48% |
| pfp_benefit_stg_1_amt | Prescription Fill Plan | 82.04% |
| pfp_benefit_stg_2_amt | Prescription Fill Plan | 99.82% |
| pfp_benefit_stg_3_amt | Prescription Fill Plan | 100.00% |
| pfp_benefit_stg_4_amt | Prescription Fill Plan | 100.00% |
| pfp_benefit_stg_1_qlfr_cd | Prescription Fill Plan | 82.04% |
| pfp_benefit_stg_2_qlfr_cd | Prescription Fill Plan | 99.82% |
| pfp_benefit_stg_3_qlfr_cd | Prescription Fill Plan | 100.00% |
| pfp_benefit_stg_4_qlfr_cd | Prescription Fill Plan | 100.00% |

13.     **Hilton's Methodology For Concluding That PBMs Use Lesser-Of Logic Remains Flawed**

   a.   **Hilton's Response In Her Rebuttal Report To My Critique Proves That PBM Data May Not Always Be The Most Reliable Data Source And Investigation Is Required:** According to her January 17, 2023 deposition testimony, Hilton assumes that if a PBM has one transaction in the Walgreens 2015 Sample Data where it paid Walgreens based on the U&C price, then all transactions adjudicated by that PBM also use U&C as a basis for reimbursement.[15] In the Smith Report, I criticize this approach for two reasons: first, "the Walgreens 2015 Sample Data relates to payments between the PBM and Walgreens and does not reflect the payment terms between the PBM and the TPP," and second

---

[12] Plaintiffs' Opposition to Motion to Exclude Hilton's Expert Report and Testimony Under Federal Rule of Evidence 702, page 14.
[13] EDW_Pharmacy_Metadata_20171020.xlsx (Walg_Forth_0000041).
[14] Dymon Declaration, paragraph 17.
[15] Hilton Deposition, Jan. 17, 2023, 149:1-8.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"when we review the data produced by ███████ …we can find example transactions where ██████ did not appear to reimburse ██████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████.[16] In her rebuttal report, Hilton suggests that to evaluate whether the example ███████ transactions use lesser-of logic when billing the third-party payer, one should use ████████ ██████████████████████ ███████████████████ ████████████████████ If Hilton is correct that the PBM U&C price and tax fields cannot be relied upon, then this is an example of how data produced by the PBMs can be unreliable. Moreover, if Hilton is correct that the PBM data U&C field cannot be relied upon, then Plaintiffs have shown no data that would indicate what U&C price was reported to the third-party payer by the PBM. According to Hilton, the dollar amounts reported as "U&C" and "Tax" in the ████████████ are not the U&C and tax amounts that should be used to determine the U&C reported to the plan and the amounts paid by the third-party payer on the transaction. To identify how the transaction was originally adjudicated when there is conflicting U&C information between the PBM data and the Walgreens data, experts may need to investigate to determine which data set is more reliable, something that would require individualized review.

b. **Hilton's Revised Methodology Identifies Transactions In Which Lesser-Of Logic Is Not Used:** As discussed above, in her rebuttal report, Hilton opines that the U&C and tax fields from Walgreens data should be used to determine whether of lesser-of logic was used rather than relying solely on those fields as produced by the PBMs.[18] Though I disagree that using those fields is correct, applying the logic and fields described by Hilton still results errors where Hilton determines lesser-of logic applies; however, the claims data reflects payments above the U&C price. That is, if I updated my table of examples based on Hilton's proposed methodology in her rebuttal and use "the U&C price and a tax field reported in the Walgreens data"[19] instead of the U&C price and tax fields contained in the PBM-produced data to compare the approved amount on the transaction to the U&C price, then I still identify named fund Plaintiff transactions where it appears that lesser-of logic was not used. As a result, my statement in the Smith Report that we can find example transactions where "[the TPP] did not appear to reimburse [the PBM] on the basis of U&C pricing because the total approved amount on the transactions is greater than the U&C amount submitted" remains accurate.[20] For example, ███████████████████ associated with named fund Plaintiffs that Hilton includes in her analysis have approved amounts that exceed the submitted U&C using Hilton's fields.[21] Refer to the table below

---

[16] Smith Report, paragraph 19.
[17] Hilton Rebuttal, paragraph 7.
[18] Hilton Rebuttal, paragraph 7.
[19] Hilton Rebuttal, paragraph 7.
[20] Smith Report, paragraph 19.
[21] Refer to **Appendix B** for a list of the 123 MedTrak transactions.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

for examples[22] of  transactions that Hilton includes in her analysis even though the approved amount reported by the PBM is greater than the U&C amount recorded in Walgreens' data.

**Table 7: Ten Examples of ▮▮▮▮▮▮ Transactions Potentially Not Adjudicated Using U&C[23]**



c. **Hayes's Statement That TPP Payments Are Commonly Tied To PBM Payments Does Not Account For Spread Pricing Arrangements:** In the Smith Report, I critique Hilton's use of the Walgreens 2015 Sample Data for establishing that U&C was a basis for payment between the PBM and TPP because "the Walgreens 2015 Sample Data relates to payments between the PBM and Walgreens and does not reflect the payment terms between the PBM and the TPP."[24] In her rebuttal, Hayes states that it is "common in the industry" for "a TPP payment to the PBM [to be] tied to the PBM's payment to the pharmacy."[25] As a result, she opines that information on the Basis of Reimbursement Determination used for the PBM's payment to the pharmacy can also be used to determine if lesser-of logic was used for the TPP payment to the PBM.[26] However, TPPs and PBMs often use spread pricing arrangements where the TPP payment to the PBM is not tied to the PBM's payment to the pharmacy.[27] As stated in the March 17, 2023 Expert Report of James Hughes ("Hughes Report"), "spread pricing occurs when the PBM charges the

---

[22] The transactions in Table 7 are ten examples from ▮▮▮▮▮▮. Table 7 does not contain every instance from ▮▮▮▮▮▮ where the Approved Amount under Hilton's methodology exceeds the Walgreens reported U&C amount on the transaction.
[23] The "Approved Amount" in this table equals the Member Pay from the PBM plus the Plan Pay from the PBM minus the Dispensing Fee from the PBM and the Submitted Tax from Walgreens. Footnote 7 in the Hilton Rebuttal suggests that "fill_sold_dlrs" should be used instead of the Member Pay from the PBM data. If fill_sold_dlrs were used to calculate the Approved Amount on the transaction, there would be more examples of transactions where the Approved Amount exceeds the Walgreens U&C.
[24] Smith Report, paragraph 19.
[25] Hayes Rebuttal, paragraph 57.
[26] Hayes Rebuttal, paragraph 57.
[27] Hughes Report, paragraph 146.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

health plan more than the PBM paid the pharmacy for the prescription. The PBM earns a 'spread' based on the difference between what it pays the pharmacy and what it receives from the health plan or insurer."[28] In order to know if the TPP payment to the PBM is tied to the PBM's payment to the pharmacy, contract documents would need to be reviewed. Additionally, in an expert report she authored for another matter, Hayes appears to draw the opposite conclusion regarding the commonality of TPP payments being tied to the PBMs' payments to pharmacies, stating that "typically, only smaller PBMs offer pass-through arrangements" and that spread-pricing arrangements where the "PBM charge[s] the plan sponsor one price and reimburse[s] the pharmacy a lesser price…comprise 90% of the marketplace."[29]

14. **Hilton's Assumptions In Her Rebuttal Report Regarding The Accuracy And Availability Of PBM Data Are Flawed And Unsupported**

a. **PBM Data Cannot Be Relied Upon To Identify Accurately The Entity That Paid For A Prescription Drug Transaction:** In the Smith Report, I state that "the data does not show the specific TPP entity that paid in whole or in part for a transaction."[30] Hilton appears to assert in her rebuttal report that "the TPP listed in the PBM data" will be the entity "paying for prescription drug purchases."[31] This is not always true. The data produced by the PBMs in this matter show that this is not the case. ██████████████████████████████ ██
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████ to date, we will not be able to rely on PBM data to identify the proposed TPP class members because the TPP listed in the PBM data may not always be the TPP that paid for the claim. For the named fund Plaintiffs, the TPP can be identified in the data produced by the PBMs in this case only because data was requested specifically for these entities and the PBMs represented that these are the claims for those TPPs. However, if class-wide data is collected from PBMs, data would need to be provided for tens if not hundreds of thousands of TPPs.[37] Given that we have found issues with TPP identification in the limited data sets provided for the three named fund Plaintiffs, it is reasonable to assume that as we increase the population to tens if not hundreds of thousands of plans, these same issues would occur for many additional plans, requiring

---

[28] Hughes Report, paragraph 53.
[29] Expert Report of Susan Hayes, ¶ 21, Pharm. Care Mgmt. Ass'n v. Leslie Rutledge, in her official capacity as Attorney General of Arkansas, No. 4:15-cv-00510-BSM) (E.D. Ark. Aug. 13, 2015), ECF No. 77-5.
[30] Smith Report, paragraph 20.
[31] Hilton Rebuttal, paragraph 10.
[32] ████████████
[33] Hilton Rebuttal, Exhibit 3C.
[34] ████████████
[35] ████████████
[36] Hilton Rebuttal, paragraph 33.
[37] Smith Report, paragraph 21.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

individualized research and analysis to determine what entity actually paid for the claims produced by the PBMs. This issue will be significant because Plaintiffs will not be requesting data for a single specific plan, but for all plans whose claims are adjudicated by that PBM that could potentially be included in the proposed class. As stated in the Smith Report, the flaws that appear in the limited data analyzed to date would be magnified when applied to the larger data sets needed for class-wide analysis.[38]

b. **Hilton's Opinion That All PBMs Will Be Able To Provide Additional Fields of Data To Determine Whether A Copay Or Coinsurance Was Paid Is Not Supported By The *In Re: Niaspan* Declarations On Which She Relies:** In the Smith Report, I state that it is not possible to determine "the patient's plan design including…copayments vs. coinsurance…using only the information available in the Walgreens Transaction Data and the PBM Transaction Data."[39] Hilton references declarations submitted by the PBMs in the case *In Re: Niaspan Antitrust Litigation* as evidence that additional fields regarding information on a consumer's copay or coinsurance would be available from the PBMs.[40] This is not correct. The declaration from Optum does not contain information about available fields of data.[41] The declarations from Caremark and Express Scripts that Hilton references do contain lists of fields that the PBMs have available. However, the Express Scripts declaration does not contain any fields with information on consumer's copay or coinsurance that were not already produced in ███████████████████[42] The Caremark declaration contains only a single payment related field with information on consumer's copay or coinsurance – "Plan co-pay structure" – that was not provided in ███████████████████.[43] Hilton provided no information on what information this additional field may contain, whether it would be populated back to 2007, how she would use it on a class-wide basis, and whether it would be relevant for calculating damages if the field is only available in Caremark data. Therefore, Hilton's speculation in her rebuttal report that all of the Relevant PBMs will provide necessary information to accurately categorize the patient responsibility on every transaction from 2007 to the present as copay or coinsurance is not supported by the data.

15. **Hilton's Rebuttal Opinions Do Not Eliminate The Need For Individualized Review Of Data And Documentation For Each Class Member**

a. **Hilton Misstates My Analysis Of The Number Of Potential TPP Class Members:** In the Smith Report, I state that health plans "would need to be individually reviewed to determine if the groups are self-insured or fully insured, [and] whether U&C was a basis for how much they paid the Relevant PBMs."[44] I also state that "based on my review of the Walgreens 2015 Sample Data alone, Walgreens submitted claims to over 149,725

---

[38] Smith Report, paragraph 15.
[39] Smith Report, paragraphs 30 – 31.
[40] Hilton Rebuttal, paragraphs 23 – 24.
[41] See Declaration of Non-Party OptumRx submitted in *In re Niaspan Antitrust Litig.*, No 2:13-md-2450 (E.D. Pa).
[42] Ex. 78 to J. Guglielmo Decl. to Class Cert. Reply.
[43] Ex. 79 to J. Guglielmo Decl. to Class Cert. Reply.
[44] Smith Report, paragraph 21.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

different health plans who had claims adjudicated by the Relevant PBMs."[45] For this count, I identify a health plan as the unique combination of Plan Type, Plan Name, PBM Name, Employer or Sponsor Name, BIN, PCN, and Group Number.[46] In her rebuttal, Hilton attempts to critique the count of health plans I identified, citing the fact that there are "almost 10,000 group numbers"[47] associated with PSC in Walgreens' transaction data as evidence that my count of potential TPP class members is overstated. Hilton's critique is irrelevant for the following reasons:

i.  First, PSC groups were not included in my count of 149,725 health plans in the Walgreens 2015 Sample Data. PSC is not an insurance plan and, therefore, I would not expect the data Walgreens collects for the plan group number field on PSC transactions to be used in the same manner as on insured transactions.

ii.  Second, the count I provided was the number of potential health plans that would need to be investigated. If transactions with different group numbers reported to Walgreens ultimately turn out to be the same plan after investigation, this could only be determined through individualized research of plan documentation. Therefore, multiple group numbers representing the same health plan do not reduce the amount of effort it would take to investigate those group numbers to make that determination.

iii.  Third, Hilton ignores the Dymon Declaration that specifically states "It is Walgreens' position that a unique third-party payer (i.e., a prescription drug/health plan) can be identified in Walgreens' Transactional Claims Data by reference to the third_party_plan_id plus the plan_group_nbr. Were Walgreens to attempt to identify third-party payer(s), however, consistent with footnote 7, it would do so through a holistic review of the information in the third_party_plan table and/or the plan_category tables, including with reference to the information such as the pbm_name_field, the third_party_plan_id, the history_seq_code, and the BIN, PCN, and group identifiers."[48]

iv.  Fourth, even if Hilton had correctly assumed that the same plan can have different plan group number values in Walgreens data, and health plans should be counted by the unique combination of Plan Type, Plan Name, PBM Name, Employer or Sponsor Name, BIN, and PCN, but **not** Group Number, there would still be over 7,000 health plans to investigate in the Walgreens 2015 Sample Data alone, which is only one of the 16 plus years at issue. However, I disagree with this assumption because it is inconsistent with the Dymon Declaration and the Walgreens' data contains plans like "Caremark Unidentified" where the plan group number is used to differentiate thousands of separate plans.[49] As described in the Smith Report,

---

[45] Smith Report, paragraph 21.
[46] Smith Report, footnote 35.
[47] Hilton Rebuttal, paragraph 11.
[48] Dymon Declaration, paragraph 18c.
[49] Smith Report, paragraph 24.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

when the data contains these non-descript names, "all we know is that the plan was adjudicated by Caremark; we do not know the name of the health plan, who the plan sponsor is, if that plan is self-insured or fully insured, or who the insurer is. All this information would need to be collected through additional data files and document review."[50]

b. **Plaintiffs' Proposed Changes To The Class Definition Do Not Render Hilton's Methodology For Identifying Government-Related Class Exclusions Accurate**: Plaintiffs have now changed their proposed class definition to exclude "all federal government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries" and "all state government entities and their beneficiaries, except for state political subdivisions, such as, for example, cities, towns, municipalities, counties, and school districts, and their beneficiaries."[51] In her rebuttal report, Hilton opines that the Walgreens-provided plan_type and fed_gov_funded_payr_ind fields can be used to identify entities that fall within the scope of Plaintiffs' revised exclusions from the proposed class.[52] Hilton limits the TPPs included in the proposed class to those that have a plan_type value of "Commercial," "Union," or "Medicare Part D" and a fed_gov_funded_payr_ind value of "N."[53] However, when I review Hilton's methodology to limit the data to TPPs that meet the revised definition of the class, it is clear that entities are being included in which further research beyond the data is necessary to determine if the entity is (1) a "government entity" and should be excluded, or (2) a "state political subdivision" and should be included.[54]

i. **A Review Of Walgreens Data Shows That The "Plan Type" And "Fed Gov Funded Payr Ind" Fields Do Not Accurately Identify Class Member Exclusions**: Plaintiffs have not provided a definition for "federal government entities," "state government entities," or "state political subdivisions," making it unclear what information may be required to identify entities falling into these categories. Instead, Hilton relies on Walgreens' testimony in the Dymon Declaration that the plan_type field contains the value of "Commercial" if the "record has been identified by Walgreens as a commercial plan, to the best of Walgreens' knowledge,"[55] and uses this information to try to identify entities included in the proposed class and entities excluded from the proposed class. But Hilton does no due diligence to determine if the parameters for "Commercial" that Walgreens uses in the plan_type field align with the terms used in Plaintiffs' newly updated class definition for "federal government entities," "state government entities," and "state political subdivisions." Furthermore, a review of the Walgreens 2015 Sample Data for records associated with the Relevant PBMs shows that the

---

[50] Smith Report, paragraph 24.
[51] Hilton Rebuttal, paragraph 13.
[52] Hilton Rebuttal, paragraphs 15 – 17.
[53] Hilton Rebuttal, footnote 24.
[54] Hilton Rebuttal, paragraph 13.
[55] Dymon Declaration, paragraph 18h.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

plan_type field cannot be relied upon to properly include or exclude entities falling under the updated class definition terms. I reviewed a list of the 200 plans[56] with the greatest number of transactions in the Walgreens 2015 Sample Data associated with the Relevant PBMs that also had a Commercial or Union Fund plan_type and a fed_gov_funded_payr_ind of "N." Based on my review of the plan names and employer/plan sponsor names for these 200 plans, I identified at least 54 plans (27%) that Hilton includes in the class, but require additional research and analysis to determine if they should be excluded as a "federal government entity" or a "state government entity" or included as a "state political subdivision." The table below shows a few examples of plans with a value of "Commercial" in the plan_type field and a value a "N" in the fed_gov_funded_payr_ind field that are included, yet appear to be "government entities" but not "state political subdivisions" and should be investigated. Therefore, Hilton's opinion that these fields in Walgreens' transactional data can be relied upon to accurately identify class member exclusions without additional research is incorrect. Please see Attachment 3 for the detail of my review of these top 200 plans.

**Table 8: Examples Of Potential Government Entities With "Commercial" Plan Type**
**In 2015 Sample Data**



16.      **Hilton Draws Incorrect Conclusions From Her Flawed Matching Of PBM Data To Walgreens Data**

a.   **Hilton Is Incorrect That Inexact Claim Matching Will Not Be Problematic:** Hilton has testified that the class member transaction data from the PBMs needs to be matched to Walgreens' transaction data for the transaction to be included in the class.[58] In the Smith Report, I state that "Hilton has not provided an accurate and formulaic methodology for

---

[56] I identify a health plan as the unique combination of Plan Type, Plan Name, PBM Name, Employer or Sponsor Name, BIN, PCN, and Group Number.
[57] University of Wisconsin School of Medicine and Public Health, WEA Trust, available at https://www.med.wisc.edu/education/master-of-public-health-mph/apex-ile/apex-opportunities/wea-trust/.
[58] Hilton Deposition, Jan. 17, 2023, 145:17-20.

ankura.com

Case: 1:17-cv-02246 Document #: 635-3 Filed: 09/14/23 Page 18 of 51 PageID #:15756

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

matching the Walgreens Transaction Data to the PBM Transaction Data."[59] Additionally, I state that "the fields [Hilton] uses to match the PBM Transaction Data to the Walgreens Transaction Data do not establish a unique transaction...which will result in incorrect matches when applied at a large scale."[60] I also state that "Hilton's matching methodology yields discrepancies between the TPP identified in the PBM transaction data and the Walgreens Transaction Data."[61] Hilton's response to the criticism of her inexact matching methodology is that her "method is flexible and can be amended"[62] and that her "methodology is sufficiently flexible that [she] can add additional matching variables."[63] Yet Hilton does not explain in her rebuttal report how she would "amend" her methodology to address my critiques. Adding additional matching criteria will only improve the accuracy of the resulting matched data if the fields are accurately and consistently populated across sources.

b. **Hilton Does Not Include Store Number In Her Matching Criteria For LDI/Castia RX Data Even Though The Field Is Available:** In the Hilton Rebuttal Report, Hilton incorrectly states that "Mr. Smith concedes in his report, where store number is a variable that is provided it is a variable that I use to match claims."[64] To the contrary, in my initial report, I note that even though the store number was provided in the ████████████ ████ production,[65] Hilton does not incorporate the field in her matching criteria for that PBM.[66] Even in the updated scripts produced after her rebuttal report, it appears that Hilton still does not use the store number when matching the ████████████ to Walgreens data, even though it is a field that is available.[67]

17. **Hilton Has Not Resolved The Flaws In Her Analysis Of Available PSC Prices**

a. **Hilton's Critique Of The Methodology I Use To Create the PSC Transaction Data Is Incorrect and Irrelevant:** In the Smith Report, I state that "Hilton's method of determining PSC prices for use as an alternate U&C submission is flawed" and provide examples of incorrect PSC price selections Hilton makes in Tables 13 – 21 of the Smith Report and Attachment 4 of the Smith Report.[68] In her rebuttal report, Hilton states that one reason she selects different PSC prices is that she "applies different filters to identify PSC transactions" than I do.[69] According to the Dymon Declaration, the PSC Claims Data produced by Walgreens has three possible categories of identification based on the third_party_plan_id, plan_group_nbr and plan_name fields. The three categories include: (1) transactions where third_party_plan_id equals "WCARD" and plan_group_nbr equals "4934WCARD", (2) transactions where third_party_plan_id equals "WCARD",

---

[59] Smith Report, paragraph 43.
[60] Smith Report, paragraphs 48-49.
[61] Smith Report, paragraph 50.
[62] Hilton Rebuttal, paragraph 29.
[63] Hilton Rebuttal, paragraph 30.
[64] Hilton Rebuttal, paragraph 27.
[65] ████████████
[66] Smith Report, Tables 7 and 8.
[67] HILTON_0000187.
[68] Smith Report, page 24, Section III.
[69] Hilton Rebuttal, paragraph 34.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

plan_group_nbr does not equal "4934WCARD," and plan_name in the Plan Category table equals "Walgreens Prescription Savings Club", and (3) transactions where third_party_plan_id equals "WCARD", plan_group_nbr does not equal "4934WCARD," and there is no record in the Plan Category table for the plan_group_nbr.[70]

When Hilton limits the Walgreens PSC Transaction Data production she uses to only categories 1 and 2, above.[71] However, this approach ignores that the Dymon Declaration states that "Walgreens has no reason to doubt that any transaction it produced where the third_party_plan_id is "WCARD" but the plan_group_nbr is not "4934WCARD" is a PSC transaction except for those situations where the transaction has a price that is inconsistent with other PSC transactions with the correct group number."[72] When I replicated Hilton's methodology for selecting PSC prices based on the most frequent prices in the Walgreens PSC Transaction Data, I applied her methodology to the most complete and accurate set of PSC Transaction Data reflecting PSC prices. To do this, consistent with the Dymon Declaration, I included all three categories of PSC transactions in my analysis, which is the more accurate approach as it also includes any transactions with a third_party_plan_id of "WCARD".[73]

Furthermore, her critiques as to how I filtered the Walgreens PSC Transaction Data on the third_party_plan_id, plan_group_nbr, or plan_name fields are irrelevant because none of the PSC prices that I could not replicate to Hilton's analysis[74] relate to the differences in how we filtered the three categories of Walgreens PSC Transaction Data discussed above. As discussed below in paragraphs 17b and 17c, the incorrect PSC prices Hilton selects are due to other flaws in her analysis.

b. **Hilton Does Not Create an Accurate Population of PSC Transactions for Her Analysis:** Based on the scripts Hilton produced with her rebuttal report, I have determined that Hilton does not appropriately identify PSC prices in her analysis. This is because she does not eliminate from her PSC data records that are identified as PSC transactions in Walgreens data, but do not contain the PSC price for the drug. When I replicated Hilton's methodology for selecting PSC prices based on the most frequent prices in the Walgreens PSC Transaction Data, I applied her methodology to the most complete and accurate set of PSC Transaction Data reflecting PSC prices. In performing her analysis, Hilton fails to apply the steps set forth below that are required to identify PSC prices within the Walgreens PSC Transaction Data rather than some other price, consistent with my review of the Walgreens PSC Transaction Data, the information in Walgreens' data dictionary, and the Dymon Declaration.

---

[70] Dymon Declaration, paragraph 32.
[71] Hilton Rebuttal, footnote 58.
[72] Dymon Declaration, paragraph 32.
[73] Smith Deposition, page 297:1-4.
[74] HILTON_0000310

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

    i.    If the transaction is for a partial fill of the prescription, then the amount paid for the prescription may not be the full PSC price for the quantity dispensed.[75]

    ii.    If another discount code is used on the transaction, like an employee discount, then the price paid on the transaction may not be the PSC price.[76]

    iii.    If the PSC price happens to be greater than the retail cash price at a specific store, then Walgreens will adjudicate PSC transactions at the specific store's retail cash price instead of the PSC price.[77]

    iv.    When taxes are charged on a VPG drug, Walgreens lowers the VPG price of the drug so that the VPG price plus the taxes will equal the advertised PSC price in total.[78] That lower VPG price would be available only in the locality with that specific taxation rate.

    c.    **Hilton Does Not Select Correct PSC Prices In Her Revised Workpapers:** Hilton produced a revised list of fund Plaintiff transactions where she opines that if the PSC price she selects were used to adjudicate the claim, then the fund Plaintiffs would pay less than they originally did on the transaction (HILTON_0000310). While Hilton does correct the PSC prices that she selected on certain transactions to align with what I reported in Attachment 4 to my initial expert report, she has added and changed PSC price selections on other transactions, some of which I dispute. When I update the analysis I conducted to test Hilton's PSC price selection to evaluate her newly produced HILTON_0000310 and I include the "pscrate" and "vpgrate" files[79] from the Connecticut Reconciliation data in my analysis as Hilton did, I still find that Hilton is not selecting the correct PSC price under her own methodology on 72 transactions. Refer to **Attachment 4** for a list of these transactions. As shown by Hilton's continued revisions to her analysis and the numerous inaccuracies, her proposed methodology does not create an automated process for identifying the available PSC price on a class member's transaction. Instead, each PSC price she purports to determine will need to be individually reviewed to verify if it was accurately selected. I also have been able to identify, in certain instances, the specific errors Hilton makes in selecting PSC prices on HILTON_0000310. With the additional scripts and testimony Hilton has provided, I am now able to better determine the root cause of many of the errors she continues to make in her analysis. These errors include:

    i.    As discussed in more detail below in paragraph 17d, Hilton incorrectly uses the "Null and Multi NDC Table" to update NDCs in the PSC Transaction Data, which results in incorrectly assigning or not assigning NDCs to PSC transactions. As shown in **Attachment 5A**, Hilton improperly assigns a PSC price of $8.00 to a fund Plaintiff transaction on 5/8/2012 because she excludes PSC transactions sold

---

[75] EDW_Pharmacy_Metadata_20171020.xlsx (Walg_Forth_0000041).
[76] EDW_Pharmacy_Metadata_20171020.xlsx (Walg_Forth_0000041).
[77] Dymon Declaration, paragraph 34: "There may, however, be limited exceptions where the price returned by the PBM does not reflect the PSC price, such as when the retail cash price is less than the PSC price, in which case, the amount Walgreens collected from the patient will instead reflect the retail cash price."
[78] Dymon Declaration, paragraph 34.
[79] HILTON_0000136-150.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

between 5/8/2012 – 5/10/2012 for $8.33 from her analysis since she does not use the Drug_Table.txt to assign them an NDC.

ii.    As discussed in 17.b.i – 17.b.iii, Hilton does not exclude transactions from the Walgreens PSC Transaction Data where the transaction does not reflect a PSC Price. For example, as shown on **Attachment 5B**, Hilton identifies the PSC price on a fund Plaintiff transaction dated 10/31/2013 as $23.89. However, $23.89 was the retail price for the drug, not the PSC price. The retail price of a drug can vary between Walgreens stores (that is, some stores in some geographies or competitive landscapes may have lower retail prices than other Walgreens stores)[80], and at stores where the retail price is greater than the PSC price, the PSC transactions reflect the PSC price of $27.97.

iii.   As discussed in 17.b.iv, Hilton improperly excludes taxes from the PSC price on VPG transactions, resulting in her incorrectly opining that available PSC prices were lower than they actually were. As shown on Attachment 5C, Hilton identifies the PSC price on a fund Plaintiff transaction dated 4/6/2018 as $14.22. However, $14.22 reflects the amount charged for the drug on 4/6/2018 to a PSC member in Louisiana, excluding tax. Including tax, the PSC member in Louisiana paid $15.00 for the drug. PSC members in other states like Ohio, Kentucky, and Pennsylvania where taxes are not charged on prescription drugs paid $15.00 for the drug on 4/9/2018, 4/10/2018, and 4/11/2018. As stated in the Dymon Declaration, when tax is charged on a VPG drug, it is included within the PSC price.[81] As a result, the $14.22 that Hilton selects is not the PSC price for the drug. The correct PSC price is $15.00.

iv.    As described in the Smith Report at paragraph 61 and in Hilton's January 27, 2023 deposition, Hilton has described her PSC price selection methodology as relying on PSC Transaction Data, PSC Formularies and Connecticut Reconciliation data. However, contrary to her stated methodology, based on a review of the HILTON_0000155 computer script produced on July 13, 2013 (after the Smith Report dated April 25, 2023), she also uses data from the Baker matter without disclosing that in either of her reports or testimony. Hilton uses the "Baker Data"[82] file to populate PSC prices for named fund Plaintiff transactions between May 2012 and February 2013. Notwithstanding that Hilton does not disclose that she uses this file, Hilton also uses the Baker data for a time period inconsistent with the Dymon Declaration. The "Baker Data" is described in the Dymon Declaration as "an Excel document specifically prepared in connection with a different litigation matter" that contains "PSC pricing information."[83] The file "was prepared in approximately October 2015 and would have reflected the operative PSC prices at

---

[80] Deposition of Michael Amiet ("Amiet Dep."), 196:10 – 197:12.
[81] Dymon Declaration, paragraph 34.
[82] Walg_Forth_00354564
[83] Dymon Declaration, paragraph 12.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the time of the data pull."[84]   However, in the produced HILTON_0000155 computer script, Hiton incorporates the October 2015 PSC prices from the "Baker Data" to fund Plaintiff transactions between May 2012 and February 2013 a period of time over two years before the "Baker Data."[85]

d.   **Hilton Relies On Data She Did Not Cite In Her Affirmative Report To Normalize NDCs, And Incorrectly Adjusts NDCs On PSC Transactions:** In her rebuttal report, Hilton criticizes my analysis because she says I used a different source to normalize or "clean" NDCs in the Walgreens PSC Transaction Data than she did. Hilton states that she used the "2020.11.06_Walgreens_Forth_PSC_Null and Multi_NDCs.xlsx" table ("Null and Multi NDC Table") while I used the "Drug_Table.txt."[86]

   i.   First, there was no clear method for me to have known this because Hilton does not include the "2020.11.06_Walgreens_Forth_PSC_Null and Multi_NDCs.xlsx" file on the Exhibit 2 "List of Materials Considered" in her Affirmative Report. Hilton does include the "Drug Table.txt" on Exhibit 2 as a document considered, which is the data file I used. Additionally, nothing in the text of Hilton's affirmative report discusses any process she undertook to normalize NDCs.

   ii.   Second, Hilton's additional explanation on how she uses the "Null and Multi NDC Table" indicates she is incorporating that data into her analysis in a manner that is contrary to the information provided in the Dymon Declaration. In her deposition, Hilton stated that she uses the NDCs in the "Null and Multi NDC Table" to replace populated NDCs in Walgreens' data by joining the Walgreens transaction data to the "Null and Multi NDC Table" on Drug ID.[87] The Dymon Declaration states that this table is a "portion of the drug table housed in EDW and/or IDH."[88] Nothing in the description of the table indicates that it should be used to replace NDCs already populated in the Prescription Fill table. By using this data subset instead of the complete "Drug_Table.txt," Hilton will (1) incorrectly match PSC transactions to named fund Plaintiff transactions, causing her to assign PSC prices to a different NDC than the one reported on the PSC transaction or (2) improperly exclude PSC transactions from her analysis because she does not assign them an NDC at all.

e.   **Hilton Misstates My Analysis Regarding PSC Membership Fees:** Hilton critiques my analysis that allocates PSC membership fees to the PSC price by stating that a class member with 12 transactions in a year would pay more than Walgreens' advertised PSC membership fee price.[89] Hilton mischaracterizes my PSC membership fee allocation analysis in her rebuttal report. My analysis is not asserting that the potential class members are paying a portion of the membership fee with each transaction where Plaintiffs assess alleged damages. Instead, my analysis calculates the true price

---

[84] Dymon Declaration, paragraph 12.
[85] HILTON_0000155.
[86] Hilton Rebuttal, paragraph 34.
[87] Hilton Deposition, Aug. 11, 2023, pp. 95:23 – 96:5.
[88] Dymon Declaration, paragraph 8.
[89] Hilton Rebuttal, paragraph 58.

ankura.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Walgreens received from PSC members on the PSC transactions for the drug by allocating an average portion of the membership fee to each PSC transaction. As stated by Dr. Nordby in her March 17, 2023 Expert Report ("Nordby Report"), "as a matter of economics, the PSC membership fee is part of the PSC price" and "the PSC price includes a portion of the annual membership fee."[90]

18. **Hilton's Calculated Alleged Overpayment For IBEW For 2018 Should Be Reduced Based on GER Payments Received by IBEW in 2018**: In the Smith Report, I state that "because of GER payments, certain transactions, where Hilton's methodology appears to calculate damages, would actually result in no damages, because they would reduce GER payments due from the PBM to the TPP."[91] I further note that the file ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████ █ ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████

19. **Hilton Does Not Propose A Methodology To Divide Unjust Enrichment Between The Consumer Plaintiffs And The Fund Plaintiffs**: In the Smith Report, I state that "Hilton's methodology of calculating unjust enrichment damages would result in double-counting damages if both a consumer class and a TPP class existed…because the dollars [Hilton] assigns to unjust enrichment damages have already been assigned as overpayments."[94] In her rebuttal report, Hilton responds by stating that the consumer Plaintiffs and fund Plaintiffs would not "each separately be entitled to the entire amount that Walgreens was unjustly enriched."[95] But Hilton proposes no methodology to allocate unjust enrichment between consumer Plaintiffs and fund Plaintiffs if they are damaged on the same transaction. Even though Hilton's approach to damages calculation contemplates consumer Plaintiffs and fund Plaintiffs being damaged on the same transaction, she fails to provide a method for allocating the unjust enrichment between consumer Plaintiffs and fund Plaintiffs to prevent double counting.

## IV.    CONCLUSION

20. For the reasons set forth above and in my prior report, it is my view that Plaintiffs' proposed class would require individualized review of each class member's information and documents, including information that is not in the produced transaction data. In addition, Hilton's proposed methodology suffers from numerous flaws. These opinions are formed based on the information now available to me.

21. As additional information becomes available, I may evaluate and consider that information. Therefore, I reserve the right to modify or supplement my opinions and conclusions. In the event any class is certified, I will offer additional analysis and opinions regarding the certified class.

---

[90] Nordby Report, paragraph 10.
[91] Smith Report, paragraph 107.
[92] Smith Report, paragraph 108.
[93] Damages from HILTON_0000310 are calculated as "Plan Paid Amt" minus "Fund Should Pay."
[94] Smith Report, paragraph 100.
[95] Hilton Rebuttal, paragraph 64.

ankura.com

**Attachment 1**





2000 K Street, NW, Suite 1200
Washington, DC 20006
United States

+1.202.973.3152 Direct
+1.703.389.1603 Mobile

jed.smith@ankura.com

**EDUCATION**
BBA, The College of William and Mary

**CERTIFICATIONS**
Certified Public Accountant, Licensed in the State of California

**AFFILIATIONS**
American Society for Pharmacy Law, Member

National Council for Prescription Drug Programs, Member

American Institute for Certified Public Accountants, Member

## JED SMITH
Senior Managing Director

### Healthcare Damages, Forensics, Investigations, & Compliance for Pharmacies, Payers & Providers

Jed Smith is a Senior Managing Director at Ankura, based in Washington, DC. He has expertise in healthcare disputes and forensics, and leads the pharmacy sector. Jed focuses on performing complex data analysis for disputes and investigations for payors, providers, pharmacies, and pharmaceutical manufacturers including damages calculations and complex forensic data analytics assistance in defending government investigations and preparing self-disclosures. He has extensive experience leveraging payer and provider claims data as well as third-party data sets to analyze compliance with contracts and regulations including Medicare Advantage, Medicare Part D, and Medicaid.

Jed's professional experience includes:

Pharmacy Disputes and Investigations

- Project manager for multiple disputes related to allegations that a national pharmacy company was submitting false claims to federal and state funded healthcare programs.

- Project manager for multiple disputes related to allegations that a national pharmacy was providing kickbacks to obtain additional federal and state funded business.

- Project manager for an investigation into whether a pharmacy chain was submitting false claims to the federal government related to failure to reverse returned prescriptions.

- Project manager for an investigation into whether a national pharmacy was submitting false claims to federal and state funded programs by billing for a different drug than actually dispensed.

- Project manager for an investigation into whether a regional pharmacy chain was submitting inaccurate usual and customary prices to a state Medicaid agency resulting in overpayments.

- Project manager for an investigation to determine the amount overpayment, if any, received by a regional pharmacy chain that was submitting claims with incorrect information that could result in higher reimbursements.

- Conducted a compliance review for a national pharmacy chain to evaluate the current policies and practices related to areas of significant compliance risk related to recent False Claims Act qui tams and provide recommendations to strengthen the compliance program.

**JED SMITH**

Healthcare Damages Disputes

- Privileged consulting in numerous lawsuits and investigations involving reimbursement of out-of-network providers under state regulations, contracts, and industry standards (e.g., UCR). The analyses included the review of hundreds of millions of claims records and the calculation of damages based on contract terms, regulatory guidance, industry benchmarks, and plan documents.

- Led a project calculating damages on behalf of a large physician practice related to improper billing from other hospitals under IPA contracts, this review involved repricing professional, inpatient and outpatient facility claims under the contract terms.

- Led multiple projects, support of experts, and privileged consulting on numerous payer-provider reimbursement disputes calculating damages related reimbursement under various contract terms including professional, outpatient and inpatient rates.

- Analyzed damages related to appropriate reimbursement for automobile "personal injury protection"/ Med-pay payments according to various state regulations and beneficiary contracts.

- Privileged support in numerous matters involving damages related to alleged violation of various prompt pay/ 'clean claim' provisions in a variety of states.

- Supported health plans in calculating lost profits due to membership losses, allegations of breach of contract, or interference from third parties.

- Evaluation of payer medical necessity denials and incorporating the findings of clinical reviewers to calculate damages.

Pharmacy Benefit Manager Engagements

- Project manager for multiple engagements related to calculation of damages in disputes between national pharmacy benefit managers, their clients, and/or network pharmacies regarding compliance with contractual provisions related to the pricing and administration of mail order and retail drug benefits.

- Project manager for an engagement where Ankura serves as the Independent Review Organization for a national pharmacy benefits manager under a corporate integrity agreement with CMS Office of Inspector General related to the improper payment and rejection of Medicaid secondary payer claims.

- Project manager for an audit conducted on behalf of a pharmaceutical manager regarding whether a pharmacy benefit manager was complying with the terms of its Medicare Part D rebate agreements including formulary placement and utilization thresholds.

- Project manager for a platform assessment of a pharmacy benefits manager's technology platform to assess gaps related to industry functionality and technical architecture. The project included reviewing company documents, conducting interviews, reviewing claims adjudication platform and



**JED SMITH**

reviewing the technical architecture including data structure. Ankura provided a summary of gaps and recommendations.

Medicare Advantage Risk Adjustment Investigations

- For multiple regional and national Medicare Advantage plans, performed privileged consulting related to investigations of the accuracy of risk adjustment data submissions including the review of medical records for adequate documentation as well as proper filtering of RAPS submission to CMS. This work has involved developing overpayment submission, developing presentations of findings and presenting to government agencies regarding results.

- Lead the development of a provider coding risk assessment tool for a national Medicare Advantage plan that involved analyzing data from throughout the business to identify providers for follow-up actions.

- Assisted providers in conducting internal investigations to quantify the impact of potential incorrect diagnosis code submissions for risk adjustment purposes. Led teams that reviewed medical record documentation as well as analyzing claims data.

- In a qui tam matter, led a project team that supported the expert testifier in quantifying the potential financial impact of relator's allegation regarding fraudulent diagnosis codes submitted to a Medicare Advantage plan by capitated providers. Responsible for analyzing the client's risk adjustment data as well as the data of relator's expert to identify the scope of the issue and calculate the financial impact under different scenarios.

Compliance Reviews for a Pharmaceutical Manufacturer

- Provided assistance to the compliance department of a large pharmaceutical manufacturer to perform audits of its health outcomes and publications departments for compliance with the company's standard operating procedures and industry regulations. These audits involved conducting interviews of key personnel, reviewing company documents, and drafting a report of findings.

- Provided assistance to the contracting department of a large pharmaceutical manufacturer by auditing a third-party group purchasing organization's (GPO) compliance with the terms of the contract between the two parties. This review involved the analysis of the GPO's sales data, rebate data, membership designation process, and the timely payment of rebates.

**Testimony Experience:**

- *The Wellness Group, LLC v. King Bio, Inc.* - United States District Court For The Western District Of North Carolina Asheville Division – Submitted two expert reports and provided deposition testimony.

- *United States v. Reddy Vijay Annappareddy* - United States District Court For Maryland – Submitted three expert declarations.



**Smith Attachment 1**

**JED SMITH**

- *United States ex rel. Schutte et al. v. SUPERVALU, Inc. et al.* - United States District Court for Southern Illinois, Expert Report and Deposition.

- *United States ex rel. Proctor et al. v. Safeway Inc. et al.* - United States District Court for Central District of Illinois, Expert Report and Deposition.

- Confidential Arbitration between a Pharmacy Benefits Manager and a Physician – Submitted two expert reports and provided testimony at deposition and hearing.

- *Humana Pharmacy Solutions v. Walgreen Co.* – Submitted multiple expert reports and provided testimony at deposition and hearing.

- Confidential Arbitration between a Health Insurer and Hospital – Submitted Declaration.

- Confidential Arbitration between a National Retail Pharmacy and Health Insurer – Submitted two expert reports and provided testimony at deposition and hearing.

- *VD Pharmacy, LLC et al. v. Andrew Michael Nye II et al.* - Circuit Court for Baltimore County, Maryland, Expert Report.

- *Annappareddy v. Lating et al*. - United States District Court for the District of Maryland –Expert Report, deposition and testimony.

- *Envolve Pharmacy Solutions, Inc., et al. v. Rite Aid Hdqtrs. Corp and Rite Aid Corp* – Superior Court of the State of Delaware – Submitted Expert Report and deposition.

- *Russo et al v. Walgreen Co.* – United States District Court for Northern District of Illinois – Submitted Expert Report.

  <u>**Publications**</u>

-  Co-author: "Understanding the Payment Implications of Diagnosis Coding Under Risk Adjustment," AHIA New Perspectives, Summer 2016



**Attachment 2**

Smith Attachment 2                                                                                    CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**Sur-Rebuttal Of Jed Smith**
**Additional Documents Relied Upon**

| No. | Description | Bates Numbers |
|---|---|---|
| 1 | Amended Expert Report of Jed Smith, *Russo, et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Apr. 25, 2023). | |
| 2 | Rebuttal Expert Opinion Report fo Dr. Susan A. Hayes, LPD, CPhT., AHFI, *Russo, et. al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Jun. 20, 2023). | |
| 3 | Amended Rebuttal Report of Lynette Hilton, Ph D., *Russo, et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Aug. 4, 2023). | |
| 4 | Deposition of Jed Smith, *Russo et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Apr. 28, 2023). | |
| 5 | Deposition of Lynette Hilton, *Russo et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Aug. 11, 2023). | |
| 6 | Plaintiffs' Opposition to Motion to Exclude [Dr.] Hilton's Expert Report and Testimony Under Federal Rule of Evidence 702, *Russo et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Jun. 20, 2023). | |
| 7 | Expert Report of Susan Hayes, *PCMA v. State of Arkansas*, Case 4:15-cv-00510-BSM (Jul 24, 2016). | |
| 8 | Notice of Partial Withdrawal of Plaintiffs' Motion to Exclude the Expert Report and Testimony of Jed Smith Under Federal Rule of Evidence 702 To the Extent Mr. Smith Purports to Have Determined PSC Prices, *Russo et al. v. Walgreen Co.*, Civil No. 1:17-CV-02246 (Aug. 9. 2023). | |
| 9 | Ex. 77 to J. Guglielmo Decl. to Class Cert. Reply. Declaration of Non-Party OptumRx, submitted in *In Re: Niaspan Antitrust Litig.*, No. 2:13-MD-2450 (E D. Pa). | |
| 10 | Ex. 78 to J. Guglielmo Decl. to Class Cert. Reply. Declaration of Non-Party Express Scripts, Inc., submitted in *In Re: Niaspan Antitrust Litig.*, No. 2:13-MD 2450 (E.D. Pa). | |
| 11 | Ex. 79 to J. Guglielmo Decl. to Class Cert. Reply. Declaration of Stephen Schaper, submitted in *In Re: Niaspan Antitrust Litig.*, No. 2:13-MD-2450 (E.D. Pa). | |
| 12 | What's the Difference Between a Deductible vs Copay? (August 30, 2023). https://www.metlife.com/stories/benefits/deductible-vs-copay/ | |
| 13 | The Ins and Outs of Specialty Pharmacy (December 6, 2018). *https://www.pharmacytimes.com/view/the-ins-and-outs-of-specialty-pharmacy* | |
| 14 | WEA Trust. https://www.med.wisc.edu/education/master-of-public-health-mph/apex-ile/apex-opportunities/wea-trust/ | |
| 15 | Hilton Published Scripts for Expert Analysis (Jul. 13, 2023). | H LTON_0000134-0000179; H LTON_0000183-0000194 |
| 16 | Hilton Workpapers Regarding Consumer Named Plaintiff and Fund Plaintiff Damages Transactions (Jul 13, 2023). | HILTON_0000180; HILTON_0000195 |
| 17 | Hilton Formulary & CT Reconciliation File Listing (Jul 13, 2023). | H LTON_0000181-0000182 |
| 18 | Additional Hilton Published Scripts for Expert Analysis (Jul. 27, 2023). | H LTON_0000196-0000250; H LTON_0000252-0000306 |
| 19 | Hilton Revision to fund Plaintiff damages transaction listing (Jul. 27, 2023). | HILTON_0000251 |
| 20 | Additional Hilton Published Scripts for Expert Analysis (Aug. 7, 2023). | H LTON_0000307-0000309 |
| 21 | Hilton Revision to fund Plaintiff damages transaction listing (Aug. 7, 2023). | HILTON_0000310 |
| 22 | Baker Data | Walg_Forth_00354564 |
| 23 | New York State Health Insurance Program. *https://www.cs.ny.gov/employee-benefits/pa-market/faq.cfm#1* | |
| 24 | Unity Health Plan https://bloximages.chicago2.vip townnews com/wiscnews com/content/tncms/assets/v3/editorial/5/76/576ed7c5-1e62-56e2-9327-8a325a613c2/535e5f6f57549.pdf pdf | |
| 25 | WEA Trust. https://weatrust.org/ | |
| 26 | United Federation of Teachers Welfare Fund. *https://www.uft.org/your-union/about-uft* *https://www.schools.nyc.gov/about-us/funding/funding-our-schools* | |
| 27 | WCA Group Health Trust. *http://www.wcasi.com/program/wca-group-health-trust/* | |
| 28 | The Intergovernmental Personnel Benefit Cooperative ( PBC). *https://ipbchealth.org/About-IPBC.aspx* | |
| 29 | Northwestern Medicine & Northwestern University *https://www.usnews.com/best-colleges/northwestern-university-1739* | |
| 30 | EIT Benefits Fund. *https://www.fundoffice.org/about.html* | |
| 31 | Social Service Employees Union Local 371. *https://mightyunion.org/elementor-656/* | |

CONFIDENTIAL - Subject to Protective Order

Russo v. Walgreens
Sur-Rebuttal Of Jed Smith
Additional Documents Relied Upon

| No. | Description | Bates Numbers |
|---|---|---|
| 32 | Rush University Medical Center.<br>*https://www.rushu.rush.edu/about/fast-facts* | |
| 33 | Building Service 32BJ Health Fund.<br>*https://www.seiu32bj.org/about-us/* | |
| 34 | Sergeants Benevolent Association.<br>*https://sbanypd.nyc/* | |
| 35 | Central Dupage Hospital Employees.<br>*https://www.nm.org/locations/central-dupage-hospital* | |
| 36 | Central States Joint Board Health and Welfare.<br>*https://csjbunion.org/* | |
| 37 | PSC CUNY Welfare Fund.<br>*https://www.cuny.edu/about/administration/offices/budget-and-finance/services/budget-adminstration/#1441743860095-68bf52d6-38c5* | |
| 38 | Federal Reserve Bank.<br>*https://www.federalreserve.gov/faqs/about_14986.htm* | |
| 39 | Argonne National Laboratory.<br>*https://www.anl.gov/* | |
| 40 | Medical College of Wisconsin.<br>*https://www.wisconsinsprivatecolleges.org/colleges/medical-college-wisconsin* | |
| 41 | New York State Nurses Association Benefits Fund.<br>*https://www.nysna.org/strength-at-work/about-nysna* | |
| 42 | Mount Sinai Medical Group.<br>*https://www.mountsinai.org/about* | |
| 43 | Interpublic Group.<br>*https://www.interpublic.com/* | |

**Attachment 3**

Smith Attachment 3

CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**Plan Review**



**Smith Attachment 3**

**CONFIDENTIAL - Subject to Protective Order**

**Russo v. Walgreens**
**Plan Review**

CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**Plan Review**

**Smith Attachment 3**                                                                 CONFIDENTIAL - Subject to Protective Order

Russo v. Walgreens



**Smith Attachment 3**

CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**Plan Review**



**Attachment 4**

Smith Attachment 4

CONFIDENTIAL  Subject to Protective Order

**Russo v. Walgreens**
Summary Of Transactions On HILTON_0000310 With An Incorrect PSC Price

**Attachment 5A**

CONFIDENTIAL - Subject to Protective Order

Russo v. Walgreens
HILTON  0000310 Disagreements
Example: PSC Transaction With Non-Populated NDC



**Attachment 5B**

**Smith Attachment 5B**

CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**HILTON 0000310 Disagreements**
**Example: Transaction That Sold At Retail Price**



**Attachment 5C**

Smith Attachment 5C

CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**HILTON  0000310 Disagreements**
**Example: Hilton's Updated Methodology Does Not Account For Tax**



**Appendix A**

Smith Appendix A                                                 CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**
**Expert Production Timeline**
**As of September 14, 2023**

| Bates Numbers | Description |
|---|---|
| **11/16/2022** | |
| N/A | • Expert Report of Lynette Hilton |
| **1/6/2023** | |
| HILTON_0000001 - 0000045 | • Initial production of analysis scripts |
| HILTON_0000046 - 0000077 | • Document cited regarding US Commercial Pharmaceutical Supply Chain |
| HILTON_0000078 | • Field Listings for Walgreens Data Tables |
| **1/17/2023** | |
| N/A | • 1st Deposition of Lynette Hilton |
| **2/6/2023** | |
| HILTON_0000079 - 0000129 | • 2nd round of analysis script produc ion (supersedes and/or amends HILTON_000001 - HILTON_000045) and provides scripts on PSC transaction cleaning, mode calculation, consumer and fund filtering, PBM filtering, and U&C/PSC price lookup |
| HILTON_0000130 | • Analysis of 2015 sample data |
| HILTON_0000131 | • Listing of [pbm_name] values for at-issue PBMs in the Walgreens Plan Category Table |
| HILTON_0000132 | • Consumer named plain iff damaged transactions |
| HILTON_0000133 | • Named fund plaintiff damaged transactions |
| **4/25/2023** | |
| N/A | • Expert Report of Jed Smith |
| **4/28/2023** | |
| N/A | • Deposition of Jed Smith |
| **6/19/2023** | |
| N/A | • Rebuttal Report of Lynette Hilton |
| **7/13/2023** | |
| HILTON_0000134 - 0000179; HILTON_0000183 - 0000194 | • 3rd round of analysis script production. Includes new scripts concerning formulary, CT Reconciliation vpgrate, & CT Reconciliation pscrate file import. Revises other scripts produced in HILTON_000079 - HILTON_0000130 including revising mode price calculation from Python to SAS plus incorporating updates to class definition |
| HILTON_0000180 | • Consumer named plaintiff damaged transactions |
| HILTON_0000181 | • Listing of PSC Formulary files |
| HILTON_0000182 | • Listing of pscrate & vpgrate CT reconcilia ion files |
| HILTON_0000195 | • Revised fund named plain iff damaged transactions |
| **7/27/2023** | |
| HILTON_0000196 - 0000249; HILTON_0000252 - 0000306 | • 4th round of analysis script production (includes new scripts further detailing he data import process) |
| HILTON_0000251 | • 2nd revision of named fund plain iff damaged transactions |
| **8/7/2023** | |
| HILTON_0000307 - 0000309 | • Additional script revision related to CT Reconciliation VPG rate analysis. |
| HILTON_0000310 | • 3rd revision of named fund plaintiff damaged transactions |
| **8/9/2023** | |
| N/A | • Notice of Partial Withdrawal of Plaintiffs' Motion to Exclude the Expert Report and Testimony of Jed Smi h Under Federal Rule of Evidence 702 To the Extent Mr. Smi h Purports to Have Determined PSC Prices |
| **9/14/2023** | |
| N/A | • Surrebuttal Report of Jed Smith |

**Appendix B**

CONFIDENTIAL - Subject to Protective Order

Russo v. Walgreens

█████ Transactions Potentially Not Adjudicated Using U&C

**Smith Appendix B**

CONFIDENTIAL - Subject to Protective Order

**Russo v. Walgreens**

Transactions Potentially Not Adjudicated Using U&C

Smith Appendix B

**Russo v. Walgreens**
Transactions Potentially Not Adjudicated Using U&C

CONFIDENTIAL - Subject to Protective Order

