**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 17-cv-2246<br><br>Judge Edmond E. Chang<br>Magistrate Judge Sheila Finnegan<br><br>**ORAL ARGUMENT REQUESTED** |
| Plaintiffs, | |
| v. | |
| WALGREEN CO., | |
| Defendant. | |

**MOTION TO STRIKE OR EXCLUDE LYNETTE HILTON'S**
**REBUTTAL REPORT AND ANY TESTIMONY REGARDING THE SAME**
**PURSUANT TO FEDERAL RULES OF EVIDENCE 702 AND 403**
**AND FEDERAL RULE OF CIVIL PROCEDURE 26**

Walgreen Co. ("Walgreens") moves this Court pursuant to Federal Rules of Evidence 702 ("Rule 702") and 403 ("Rule 403") and Federal Rule of Civil Procedure 26(a)(2)(D)(ii) to exclude and/or strike the Amended Rebuttal Report of Plaintiffs' expert, Lynette Hilton, Ph.D., (**Ex. A:**[1] (Amended Rebuttal Report of Dr. Lynette Hilton) ("Hilton Reb. Report")), and to preclude Plaintiffs from relying on her testimony.[2]

## I.    WALGREENS' MOTION MUST BE ADDRESSED BEFORE THE COURT ADDRESSES CLASS CERTIFICATION

As set forth in Walgreens' Motion to Exclude Opinions 3, 6, and 7 of Schafermeyer's Expert Report pursuant to Rule 702 (Dkt. 580) ("Schafermeyer Motion I"), the Court must resolve the admissibility of Hilton's rebuttal opinions before resolving class certification.

## II.    FACTS AND LEGAL STANDARD

Walgreens refers to and incorporates the facts set forth in Section I of the Schafermeyer I Motion, which includes background on the adjudication of pharmacy claims, Walgreens' Prescription Savings Club ("PSC"), Walgreens' reporting of the usual and customary price ("U&C") to pharmacy benefit managers ("PBMs"), and specifically the PBMs relevant to this case (the "Relevant PBMs"), and how pharmacy claims are paid by PBMs, consumers, and health insurers and health plans (also known as third-party payers or "TPPs"). The applicable standard for a Rule 702 Motion is stated in Walgreens' Opposition to Plaintiffs' Motion to Exclude Michael S. Jacobs's Expert Report and Testimony Under Federal Rule of Evidence 702 (Dkt. 623 at 1-2), and the applicable standard for a Rule 403 Motion is stated in and Section II of Walgreens' Motion to Strike or Exclude Portions of Schafermeyer's Rebuttal Report. Dkt. 627.

---

[1] All cites to exhibits in this brief refer to the exhibits to the Declaration of Michael S. Leib, attached as Exhibit 1.

[2] Plaintiffs filed Dr. Hilton's Rebuttal Expert Report, (Dkt. 553-44) in connection with their reply to their class certification brief, but provided an amended report on August 4, 2023, attached as Exhibit A.

## III.    ARGUMENT

### A.    Hilton's Rebuttal Report Does Not Address Her Methodological Deficiencies That Fail To Satisfy Rule 702 In Her Initial Report

In Walgreens' Motion to Exclude Hilton's Expert Report and Testimony under Federal Rule of Evidence Rule 702, (Dkt. 583) ("Hilton I Motion")), Walgreens argues that Hilton is not qualified and that her methodology does not meet the Rule 702 standards. *See* Dkt. 583 (Hilton I Motion), which Walgreens incorporates here by reference. Nothing Hilton does in her Rebuttal Report resolves these issues and, therefore, the Court should exclude her Rebuttal Report as well.

### B.    Hilton Provides No Facts To Support Her Claim That PBMs Could Identify The TPP That Pays For A Given Transaction

As Smith states in his opening report, Plaintiffs' proposed class definition requires determining which TPP paid in whole or in part for a transaction. Dkt. 627-1 (Jed Smith's April 25, 2023, Amended Expert Report) ("Smith Report") ¶ 20. Relying on the April 27, 2023 Expert Report of James W. Hughes, Ph.D ("Hughes Report"),[3] Smith notes that, as to fully insured plans, the TPP class member would be the health insurance company, while for self-insured plans, the health plan itself would be the TPP.[4] *Id*. And Smith opines that the data in the case "do not contain any information regarding the funding status of plans." *Id*. In rebuttal, Hilton states:

> My methodology is able to identify the entity that overpaid in connection with a given transactions, regardless of whether the entity is self-insured or fully insured. The TPP listed in the PBM data as paying for prescription drug purchases is the Class member, and to the extent that any other entity or entities were responsible for payments associated with a given claim, I understand that data would be in the PBM's possession to identify that or any other entity or entities.

---

[3] Walgreens filed Dr. Hughes's expert report on the docket at Dkt. 583-2 on March 17, 2023. However, Walgreens served Dr. Hughes's amended expert report, the operative report, on Plaintiffs on April 27, 2023.

[4] Under a fully insured plan, "the health plan pays a health insurer a certain amount per beneficiary and the insurer is then responsible for any payments to the PBM related to the beneficiaries' prescription costs." (Hughes Report) ¶¶ 59, 142-144; Dkt. 609-3 (Hayes Report) ¶ 82. It is therefore the insurer that would be the potential class member. In a self-insured plan, the health plan is responsible for payments for its beneficiaries' purchases, and it is, therefore, the health plan that is the potential class member. (Hughes Report) ¶¶ 58, 142-144; Dkt. 609-3 (Hayes Report) ¶ 8.

**Ex. A:** (Hilton Reb. Report) ¶ 10. This opinion, however, is not supported by facts and data and, instead, is completely speculative.

While Hilton states that the TPP listed in the PBM data is the class member, that does not address Smith's point that the TPP listed in the data may not be the entity that paid for part or all of a transaction. Instead, Hilton goes on to say that, if other entities not listed in the data were responsible for payment, she "understands" the PBMs would have that information. **Ex. A:** (Hilton Reb. Report) ¶ 10. Hilton, however, does not provide any support for that statement. *See In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 U.S. Dist. LEXIS 48792, at *19 (N.D. Ill. Mar. 31, 2017). ("In an *ipse dixit* opinion, the expert asserts a 'bottom line' conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion."). Moreover, Hilton's statement evidences a lack of understanding of how pharmacy reimbursement works and that what is shown in transactional claims data as the TPP listed in the PBM may not be the ultimate payer. In fact, as shown in Smith's proposed surrebuttal report:



(Proposed Surrebuttal Report of J. Smith, Ex. B to Walgreens' Mot. for Leave to file a surreply and surrebuttal report) ("Smith Surreb. Report") ¶ 14. The data produced here to date is only for the Named Plaintiffs and, thus, despite these data issues, Hilton was able to determine the ultimate payer. This, however, would not be possible for classwide data, as the PBMs would not be limited

to providing data for three union funds, but for tens, if not hundreds, of thousands of TPPs.[5]

Hilton attempts to minimize this issue by asserting that Smith overstated the number of unique health plans in the 2015 sample data, citing to the fact that, based on the field combinations Smith used, there are over 10,000 group numbers for PSC alone. **Ex. A:** (Hilton Reb. Report) ¶ 11. PSC, however, is not included in Smith's identification of 149,725 unique plans. (Smith Surreb. Report) ¶ 15. Moreover, despite this information being included in Smith's initial expert report filed with Walgreen's Opposition to Plaintiffs' class certification briefing on March 17, 2023,[6] (*see* Dkt. 586-1 (Smith Initial Report) ¶ 21), Hilton does not include in her Rebuttal Report any examples of any other health plans in the 2015 data with multiple unique group numbers to support her assertion that Smith's 149,725 number is overstated. *See generally* **Ex. A:** (Hilton Reb. Report). One assumes that if Hilton found a health plan in the 2015 sample data with 10,000 unique group numbers linked to it, she would have included it in her expert report. Thus, either Hilton did not run any tests on the 2015 data to test her theory, or she did run tests and did not find support for her theory. Either way, Hilton's opinion is not "based on sufficient facts or data" and is not the "product of reliable principles and methods" as required by Rule 702.

Given the above, the Court should exclude Paragraphs 9-11 of Hilton's Rebuttal Report.

### C. Hilton's Opinion That Relevant PBMs Will Have Data To Show Their Own Parents And Subsidiaries Is Irrelevant And Improper Rebuttal

One of the exclusions from the proposed class is all PBMs "and entities that have or had a parent or subsidiary relationship with any pharmacy benefit manager at any time since January 1, 2007." In the Smith report, Smith points out that the data does not show which entities have or had

---

[5] To the extent Plaintiffs must obtain this information from the TPPs, it would require individualized discovery as to each TPP and, therefore, would not support certification.

[6] Smith amended his report on April 25, 2023 (filed on the docket at Dkt. 627-1) and that is the operative version of his report. Walgreens' reference to the originally filed Smith Report is to illustrate how long Hilton has had access to this information without doing anything to test it.

a relationship with a PBM. Dkt. 627-1 (Smith Report) ¶¶ 22-24. In Paragraph 12 of her Rebuttal Report, Hilton opines that it is her "understanding" that Relevant PBMs have sufficient information to identify parent and subsidiary relationships within their system, but this opinion is irrelevant. **Ex. A:** (Hilton Reb. Report) ¶ 12. That Relevant PBMs have information about their own parent and subsidiary relationships is not in dispute. Rather, the issue is that Relevant PBMs do not have information on whether a TPP with whom they contract ever had a relationship with *any* PBM since January 1, 2007. This is why Smith opined that "there is no field in the data produced in this matter that can be used to determine whether a TPP entity is excluded for being affiliated with a PBM." Dkt. 627-1 (Smith Report) ¶ 22. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(D)(ii), parties are permitted "to contradict or rebut evidence on the same subject matter identified by" another expert. *See Lowe v. CVS Pharm., Inc.*, No. 14 C 3687, 2017 U.S. Dist. LEXIS 74908, at *4 (N.D. Ill. May 17, 2017) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.") (citation omitted). Here, because Hilton's opinion does not rebut anything, it is improper rebuttal and irrelevant.[7] The Court should strike or exclude Paragraph 12 of Hilton's Rebuttal Report.

### D. Hilton's Methodology Fails To Identify Which Government Entities Are Included In Plaintiffs' Proposed Class And Which Are Excluded

In their original proposed class definition, Plaintiffs proposed to exclude "all government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries" and "all government-funded entities, and their beneficiaries." Dkt. 554 (Pls. Mot. for Class Certification), at 2-3. Hilton had originally opined that she could determine the entities excluded by limiting the transactions in Walgreens' data to transactions with a Plan Type of

---

[7] Even if a PBM could identify the parents and subsidiaries of TPPs, that would require individualized discovery as to each TPP and, thus, would not support certification.

Commercial, Union, or Medicare Part D. Smith criticizes this opinion, opining that "whether a TPP with a Plan Type of 'Unions' or 'Commercial' is a government entity or a government-funded entity is not information available" in the data produced in the case. Dkt. 627-1 (Smith Report) ¶ 25. Smith shows, for example, records that show TPPs with a Plan Type of Commercial that appear to be government-funded entities. *Id*. ¶ 26. He thus opines that Hilton's methodology "will result in overinclusive class member identification" that can only be resolved through individual inquiry. *Id*. ¶ 17; *see also id*. ¶¶ 56-58. Smith also notes that Named Plaintiff Gonzales would be excluded under this definition because he received his benefits through the New Mexico Public School Insurance Authority ("NMPSIA"), which is government funded. *Id*. ¶ 58; *see also* Dkt. 587 (Walgreens' Opp'n to Pls. Motion for Class Cert) ("Opp'n to Class Cert") at 44-45.

In response, Plaintiffs amended their proposed class exclusions. Instead of all government entities and all government-funded entities and their beneficiaries, except Medicare Part D beneficiaries being excluded, Plaintiffs now exclude from the class all "federal government entities, including Medicare and Medicaid, and their beneficiaries, except Medicare Part D beneficiaries," and "all state government entities, and their beneficiaries, except for state political subdivisions, such as, for example, cities, towns, municipalities, counties, and school districts, and their beneficiaries." **Ex. A:** (Hilton Reb. Report) ¶ 13. This change was apparently made in an attempt to ensure Gonzales is not excluded from the class, although, as will be shown below, this ploy fails. And for several reasons, Hilton's opinions in Paragraphs 13-19 of her Rebuttal Report as to identifying government entities in light of this revised definition should be excluded.

*First*, Hilton only changes her methodology in a minor way. Now, instead of limiting Plan Types to Commercial, Union, and Part D, where the Plan Type is Commercial or Union, she also restricts the transactions she includes to those where the "fed_gov_funded_payr_ind" field equals

"N." **Ex. A:** (Hilton Reb. Report) ¶ 16 n.24. Walgreens, however, testified that this field is unreliable. Dkt. 553-46 (Dymon Decl.) ¶ 18(h) n.11; **Ex. B:** (Dec. 2, 2020 Data Sample Stipulation) ¶ 2(a). Yet, even though Hilton testified that it is not her practice to use unreliable data, she still uses that field. **Ex. C:** (Jan. 17, 2023 Deposition of L. Hilton) ("Hilton Dep.") 74:12-14, 76:10-80:9. In his proposed surrebuttal report, Smith provides evidence that this field is, in fact, unreliable. (Smith Surreb. Report) ¶ 15. Given her reliance on unreliable data, her methodology itself is unreliable.

*Second*, Hilton responds to Smith's listing in Table 3 of his Report numerous entities that are identified in Plan Type as Commercial but that are clearly government entities, including the ██████████, by stating that Walgreens testified that TPPs identified as "Commercial" in Walgreens' data are commercial "to the best of Walgreens' knowledge." **Ex. A:** (Hilton Reb. Report) ¶ 15. In other words, Hilton puts her head in the sand and ignores evidence Smith presented that, in fact, a TPP that is identified as "Commercial" may still be a government entity. In fact, in his proposed surrebuttal report, Smith points out that 27% of the top 200 plans from the Relevant PBMs with Commercial or Union Plan Types that also have a Federal Government Funded Indicator of N in the 2015 sample data needs further investigation to determine if they are government entities. (Smith Surreb. Report) ¶ 15(b)(i). Based on her deposition testimony, however, Hilton has no understanding of what is or is not a "government entity" and, therefore, could not conduct such an investigation. **Ex. D:** (Aug. 11, 2023 Dep. of L. Hilton) ("Hilton Reb. Dep.") 22:13-33:18, 35:14-40:19. Thus, Hilton's methodology is not reliable.

*Third*, within those entities Hilton claims to identify as government entities, she does not have a reliable methodology for identifying "state political subdivisions," which, according to Plaintiffs' new proposed class definition, must be ***included*** in the proposed class. **Ex. D:** (Hilton

Reb. Dep) 48:10-60:8. In fact, in her Rebuttal Report, Hilton does not even mention a methodology for attempting to identify "state political subdivisions." **Ex. A:** (Hilton Reb. Report) ¶¶ 13-19. Moreover, aside from the examples provided in the proposed definition of "cities, towns, municipalities, counties, and school districts," Hilton testified she is not aware of any types of entities that would be "state political subdivisions," nor was she able to opine on what state entities are or are not "state political subdivisions." **Ex. D:** (Hilton Reb. Dep.) 35:7-37:15, 38:20-39:19 (stating she does not have an opinion whether ███████████████ are a "state political subdivision"). In fact, when faced with this issue, she testified that entities could self-identify because she claimed an entity would know if they were a "state political subdivision." *Id*. Of course, Plaintiffs do not define what "state political subdivision" means and Hilton did not know, so it is not clear how a TPP would know. Moreover, Hilton did not include anything about self-identification in her Rebuttal Report and, thus, admitted she does not intend to testify about self-identification, but instead only about the data. *Id*. at 37:16-38:13. And Hilton was not able to identify in her deposition any way to know from the data whether an entity is a "state political subdivision." *Id*. at 58:17-23. In her deposition, she stated that her methodology somehow did result in keeping in the proposed class what she believed were school districts, but she did not check if it kept in cities, counties, or any of the other examples of "state political subdivisions." *Id*. at 59:10-60:8. Thus, her methodology and the application of that methodology are unreliable.

*Fourth*, Hilton testifies that the PBMs themselves will know whether a given plan is federally funded, (**Ex. A:** (Hilton Reb. Report) ¶ 18), but while they might know that information for current plans they are administering, Hilton provides no reason to believe they know that information for historical plans and for how long PBMs retain that information. Moreover, she does not testify that there is a data field that would provide this information and, thus, it seems to

contradict her claim that damages can be shown on a classwide basis, as individual discovery would be needed. In addition, while whether a TPP is federally funded was part of the original class exclusion, the revised class-exclusion only asks if an entity is a "federal government entity." Hilton herself testified that a "federal government entity" was one "that is funded by the federal government" or "associated with the federal government," but did not know if the entity had to be fully funded by the federal government to be a "federal government entity," and she did not know of any entities "associated" with the federal government that would not be funded by the federal government. **Ex. D:** (Hilton Reb. Dep.) 27:6-13, 33:2-12. For example, she did not know if a government contractor funded in part by the federal government is a "federal government entity." *Id*. at 33:13-18. In other words, Hilton has no methodology to determine whether a TPP is actually a "federal government entity" and, thus, whether it is in or out of Plaintiffs' proposed class.

*Fifth*, despite all these uncertainties, Hilton states that she "can confirm that Plaintiff Gonzales' claims would be included within the Class." **Ex. A:** (Hilton Reb. Report) ¶ 19. Hilton's opinion, however, is based solely on her haphazard methodology resulting in school districts just "end[ing] up" in the class. **Ex. D:** (Hilton Reb. Dep.) 57:25-59:19. Yet, while Hilton testified that "it would appear" that the NMPSIA is a school district, she did not opine that it is a school district and instead testified that she has no opinion on what the NMPSIA is. *Id.* at 71:2-72:14. Additionally, when asked whether finding out that "state funds from the state general coffers funded" the NMPSIA would affect her opinion on whether it was a "state government entity," she testified she would have to consider that information but had no opinion at the time she was asked the question. *Id*. at 73:9-24. In other words, Hilton is confused as to whether the NMPSIA is a "state political subdivision" and, therefore, cannot testify whether Gonzales should be included within Plaintiffs' proposed class.

For these reasons, the Court should exclude Paragraphs 13-19 of Hilton's Rebuttal Report.

**E.      In Opining That The Data Will Show Whether A Consumer Paid A Copayment Or Coinsurance, Hilton Relies On Speculative And Irrelevant Testimony, Declarations That Do Not Support Her Position, And An Unreliable Methodology**

In Paragraph 23 of her Rebuttal Report, Hilton claims that Hughes is incorrect that PBM data does not always capture whether a consumer payment is a copayment, coinsurance, or a deductible. **Ex. A** (Hilton Reb. Report) ¶ 23-24. In support, she states that "I have reviewed PBM data produced in other cases that provide information regarding whether a copay or coinsurance was paid and the amount." *Id*. ¶ 23. She does not, however, testify about the information the Relevant PBMs could produce (only unknown PBMs) and for what time period. As Hughes testified, PBMs do not retain all data and, even if they do, the data is not always accessible, including because of data acquired through mergers. *See* Dkt. 609-9 (Deposition of James W. Hughes) ("Hughes Dep.") 84:4-23. Thus, Hilton's testimony is speculative and irrelevant. Hilton also refers to declarations from Optum, Express Scripts, and Caremark filed in *In Re: Niaspan Antitrust Litigation*. *Id*.; *see also* Dkt. 609-17, 609-18, 609-19 (Supp. Guglielmo Dec., Exs. 77-79 (Declarations)). But Hilton's reading of those declarations is incorrect. As Smith points out in his proposed surrebuttal report:

> The declaration from Optum does not contain information about available fields of data. . . . [T]he Express Scripts declaration does not contain any fields that were not already produced [in this case]. The Caremark declaration contains only a single field – "Plan co-pay structure" – that was not provided [in this case]. Hilton provided no information on what information this additional field may contain, whether it would be populated back to 2007, how she would use it on a class-wide basis, and whether it would be relevant to calculating damages if the field is only available in Caremark data.

(Smith Surreb. Report) ¶ 14(b). Plaintiffs subpoenaed data from the Relevant PBMs and could have asked for these fields to the extent they exist, but did not. Plaintiffs also deposed the Relevant PBMs and could have asked if these fields were available, but did not. Relying on speculation and

declarations from another case that do not actually say that additional fields are available and for how long does not meet the standard for Rule 702 of relying on "sufficient facts or data" and being "the product of reliable principals and methods." For this same reason, the Court also should exclude Paragraph 49 of Hilton's Rebuttal Report, which also relies on speculative testimony on what the Relevant PBMs could produce and the three *In Re: Niaspan* declarations.

As for the "90%" methodology Hilton says she developed for determining whether a payment was coinsurance or copay, (**Ex. A:** (Hilton Reb. Report) ¶ 24), Smith and Hughes pointed out in their reports that this methodology is not based on reliable principles. (Amended Report of James Hughes) (Ex. A to Walgreens' Opp'n to Mot. to Excl. Hughes's Report, also filed today) ("Hughes Report") ¶¶ 116-121, 123; Dkt. 627-1 (Smith Report) ¶¶ 74-75; *see also* Dkt. 587 (Opp'n to Class Cert.) at 14-15. Hilton, however, does not address Smith's criticisms. Instead, she attempts to sneak in a change to her methodology without stating it is a change. In her initial methodology, Hilton looked to see if consumers for a certain PBM had the same consumer share percentage on at least 90% of transactions in a given month and, if so, she determined that the PBM used coinsurance for all of its consumers. **Ex. C:** (Hilton Dep.) 271:5-275:11.[8] Now Hilton adds a new restriction by looking if 90% of a PBM's consumers "***for a given plan***" have the same consumer share percentage. **Ex. A:** (Hilton Reb. Report) ¶ 24. But while that new restriction addresses one of the issues raised by Smith, it does not address them all. For the reasons Smith points out in Paragraphs 74-75 of his Report (as well as the reasons Hughes pointed out in his Report at Paragraphs 116-121 and 123), this is not a reliable methodology.

For these reasons, the Court should exclude Paragraphs 23-24 and 49 of Hilton's Rebuttal

---

[8] Hilton failed to provide this methodology in her initial report and stated it for the first time in her January 17, 2023 deposition.

Report.[9]

### F.   Hilton's Opinion Regarding Identification Of Whether The U&C Price Was The Basis For The Adjudication Of All Claims By A PBM Is Unreliable

In her initial expert report, Hilton opined that she could determine "whether the adjudicating PBM used U&C prices in the adjudication process" by reference to the information in the "basis_of_reimb_determ" field in the Walgreens data. Dkt. 553-44 (Hilton Report) ¶ 63. According to Hilton's deposition testimony, Hilton assumes that if a PBM has one transaction in the Walgreens 2015 Sample Data in which it paid Walgreens based on the U&C price, then all transactions adjudicated by that PBM also use U&C as a basis or reimbursement. Dkt. 627-1 (Smith Report) ¶ 19 (citing Jan. 17, 2023 Hilton Dep. 149:1-8). Citing to the Hughes and Jacobs Reports, Smith criticized her methodology, including because it would be necessary to review the contracts to determine if U&C was the basis of reimbursement. *Id.* ¶ 18. Citing to the Hughes and Jacobs Reports, Smith further criticized Hilton's opinion because the payment information in Walgreens' data only shows payments between the PBM and Walgreens and not between the TPP and PBM, and the payment methodologies in the contract between the PBM and Walgreens can differ from the payment methodology in the contract between the TPP and PBM. *Id.* at 19.

Hilton now claims in her Rebuttal Report that she can identify whether the adjudicating PBM used U&C prices in the adjudication process based on Smith's testimony that, if the amount paid by a TPP and consumer combined equals the U&C price, it suggests that the U&C price was the basis of the price "[f]or that transaction." **Ex. A:** (Hilton Reb. Report) ¶ 8 (citing Smith Dep. 133:18-25). Hilton is wrong. That a single transaction may reflect the U&C price does not allow

---

[9] In Paragraph 53 of her Rebuttal Report, Hilton states that Class members and PBMs can provide information on stop loss and General Effective Rate payments. **Ex. A:** (Hilton Reb. Report) ¶ 53. This, however, would require individualized discovery and, thus, does not support class certification. *See* Dkt. 587 (Opp'n to Class Cert) at 33-35.

general conclusions about how an "adjudicating PBM used U&C prices in the adjudication process" for each of the plans the PBM adjudicated. **Ex. A:** (Hilton Reb. Report) ¶ 8. In fact, Hilton ignores Smith's testimony, which is based on Walgreens' PBM expert Michael Jacobs's testimony, that "[e]ven within a single plan, certain drugs can be adjudicated using lesser-of-logic while others are not[.]" Dkt. 627-1 (Smith Report) ¶ 18 (citing Dkt. 586-2 (Expert Report of Michael Jacobs) ¶¶ 25, 87-90). In other words, knowing, based on Walgreens' data, whether U&C was the basis on an individual transaction is not helpful for knowing if it was considered as one of the lower-of price points on all of the transactions for that PBM, including for a given plan.

Hilton's methodology for determining whether transactions are paid on the basis of U&C is unreliable. Accordingly, the Court should exclude Paragraph 8 of Hilton's Rebuttal Report.

### G.    Hilton's Criticism of Smith's Allocation Of The Membership Fee Is Based On Improper Rebuttal, A Misstatement Of Facts That Would Lead To Unfair Prejudice, And Unreliable Principles

Walgreens' expert Dr. Kelly Nordby opined that, when determining the PSC prices, an allocation of the PSC membership fee must be added to the prices to determine the actual PSC price. Dkt. 586-48 (Expert Report of Kelly Nordby) ¶¶ 10, 27-28, 33-39. Smith developed a methodology for such an allocation. Dkt. 627-1 (Smith Report) ¶¶ 38-39, Table 5. In her Rebuttal Report, Hilton takes issue with Smith's opinion (without mentioning Nordby). Her criticism, however, does not use a reliable methodology.

*First*, in Paragraph 55 of her Rebuttal Report, Hilton points out that Smith identified 24,069 "Unique Account Holders" who did not pay the PSC membership fee and purchased a PSC drug. **Ex. A:** (Hilton Reb. Report) ¶ 55; *see also* Dkt. 627-1 (Smith Report) ¶ 37, Attach. 3. However, she provides no reason for referring to this, and, thus, it is not proper rebuttal. Moreover, Hilton fails to put the 24,069 number into perspective. *See Barber v. United Airlines, Inc.,* 17 F. App'x 433, 437 (7th Cir. 2001) ("[S]elective use of facts fails to satisfy the scientific method and

*Daubert*, and it thus fails to 'assist the trier of fact.'") (citation omitted). In fact, Hilton fails to mention that this number accounts for only 0.02% of PSC members. *See* Dkt. 627-1 (Smith Report) ¶ 37, Attach. 3. In addition to failing to explain why she points this fact out, she fails to explain how such a small percentage supports any critique of Smith. Thus, Paragraph 55 fails to support her opinion and should be stricken or excluded.

*Second*, in Paragraphs 56 and 57 of her Rebuttal Report, Hilton claims that Walgreens did not include membership fees in determining PSC prices when reconciling prices for the State of Connecticut and claims that "the benefit of PSC prices was extended to beneficiaries of the Federal Employees Program" without membership fees being included. But these assertions misstate the record. With regard to Connecticut, the Walgreens and Connecticut agreed to a methodology for reconciliation over a decade ago as part of a settlement to resolve litigation related to a Connecticut law that is not at issue in this case. Dkt. 553-45 (Schafermeyer Report) ¶¶ 71-75. And as to the

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████ (Opp'n to Class Cert.) at 26 n.23. Because Hilton's statements are demonstrably false, they have no probative value and are unfairly prejudicial and confuse the issues. They are also not based on sufficient facts or data. The Court should strike or exclude Paragraphs 56 and 57 under Rules 403 and 702.

*Third*, in Paragraph 58 of her Rebuttal Report, Hilton claims that Smith's methodology involves charging insured members the membership fee through the allocation. It does not. Instead, as Smith points out in his proposed surrebuttal report, his "analysis calculates the true price Walgreens received ***from PSC members*** on the PSC transactions for the drug by allocating an average portion of the membership fee to each PSC transaction." (Smith Surreb. Report) ¶ 17(e)

(emphasis added). The allocation goes to determining the true PSC prices and is not charged to potential class members. Hilton's methodology for her criticism is not reliable and, thus, the Court should exclude Paragraph 58 of Hilton's Rebuttal Report.

### H. Hilton Provides No Methodology For Allocating Alleged Unjust Enrichment Damages Between Consumers And TPPs

Smith opined that "Hilton's methodology for calculating unjust enrichment damages would result in double-counting damages if both a consumer class and a TPP class existed." Dkt. 627-1 (Smith Report) ¶ 100. Hilton responds by stating:

> My methodology for calculating unjust enrichment does not calculate unjust enrichment twice on the same claim, rather it may identify that Walgreens was unjustly enriched by both a consumer and fund in a single transaction, not that they would be each separately be [sic] entitled to the entire amount that Walgreens was unjustly enriched.

**Ex. A:** (Hilton Reb. Report) ¶ 64. Hilton, however, fails to provide ***any*** methodology for how she would divide damages between consumers and TPPs. She says only that she would not charge Walgreens twice. But if a class is certified and liability found there would be individual damages proceedings for consumers and TPPs. Hilton not only fails to provide a methodology for dividing the damages, but also fails to explain how those individual proceedings would work without consumers and TPPs needing to be represented in each other's damages proceedings.

Because Hilton fails to provide any methodology for dividing unjust enrichment damages, she has failed to provide a reliable methodology based on "reliable principles and methods" and has failed to "reliably appl[y] the principles and methods to the facts of the case" in violation of Rule 702. The Court should exclude Paragraphs 63-64 of Hilton's Rebuttal Report.

## IV. CONCLUSION

For the reasons set forth above, the Court should exclude and/or strike Hilton's Rebuttal Report, and Plaintiffs should be precluded from offering or relying on her testimony.

DATED: September 14, 2023

/s/ Michael S. Leib
Michael Scott Leib
Anthony Robert Todd
**REED SMITH LLP**
10 S Wacker Dr # 4000
Chicago, IL 60606
Telephone: 312/207-1000
*mleib@reedsmith.com*
*atodd@reedsmith.com*

Frederick Robinson (*pro hac vice*)
Selina Coleman (*pro hac vice*)
Megan Engel (*pro hac vice*)
Jessica Christensen (*pro hac vice*)
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 East Tower
Washington, DC 20005
Telephone: 202-414-9200
*frobinson@reedsmith.com*
*scoleman@reedsmith.com*
*mengel@reedsmith.com*
*jchristensen@reedsmith.com*

***Attorneys for Defendant Walgreen Co.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of September, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

/s/ Michael S. Leib
Michael S. Leib