**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 17-cv-2246<br><br>Judge Edmond E. Chang<br>Magistrate Judge Sheila Finnegan<br><br>**ORAL ARGUMENT REQUESTED** |
| Plaintiffs, |  |
| v. |  |
| WALGREEN CO., |  |
| Defendant. |  |

**WALGREEN CO.'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE
LYNETTE HILTON'S EXPERT REPORT AND TESTIMONY PURSUANT
TO FEDERAL RULE OF EVIDENCE 702**

Walgreen Co. ("Walgreens") already has demonstrated that Dr. Lynette Hilton's opinions are not based on reliable methodologies and should be excluded. Nothing in Plaintiffs' opposition brief ("Opposition") (Dkt. 607), remedies the issues Walgreens has raised in its motion to exclude Hilton's expert report and testimony ("Motion"). Dkt. 583.

## I.    BECAUSE HILTON CANNOT EXPLAIN THE CODE SHE RELIED UPON FOR HER OPINIONS, SHE IS NOT QUALIFIED

Walgreens has shown that, because Hilton cannot read, or even explain, the data queries that form the basis for her opinions, and because she has not reviewed the queries to ensure their accuracy, she is not qualified to develop a formulaic methodology. Dkt. 583 (Mot.) at 6-8. In response, Plaintiffs argue that Hilton's use of her staff to write the code at her direction does not render her unqualified. Dkt. 607 (Pls. Opp'n to Walgreens' Mot. to Exclude Hilton) ("Opp'n"), at 4 (citing *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)). While it is generally true—and Walgreens does not contest—that a testifying expert can use staff to write code under the testifying expert's direction, that general rule is not applicable here because Hilton could not explain the data queries that form the basis for her opinions during her deposition. Thus, it is clear she personally could not assess the accuracy of the data she used in her methodology and, therefore, is unqualified. *See Dura*, 285 F.3d at 613 (affirming exclusion of expert who "lack[ed] the necessary expertise to determine whether the techniques [his assistants used] were appropriately chosen and applied.").

Plaintiffs attempt to cabin Walgreens' argument about Hilton to a lack of expertise in one coding language in a single file, but this misses the point. *See* Dkt. 607 (Opp'n), at 5. As the proffered testifying expert, Hilton must supervise her staff and be responsible for any outcomes. Hilton cannot do this because she cannot read and understand the queries her staff used. *Cf. McReynolds v. Sodexho Marriott Servs.*, 349 F. Supp. 2d 30, 36-37 (D.D.C. 2004) (declining to

exclude an expert where the court "ha[d] no reason to doubt [the expert's] statement that 'when I review the computer output I am able to determine if the programming was performed as I requested and if any significant mistakes were made in the programming.'") (citation omitted). It is Hilton's failure to review, and inability to assess or explain, the code that renders her unqualified.

Although, during her deposition, Walgreens did not go through each script Hilton produced to determine if she could read each one, Hilton admitted that it is not her practice to read the code written by her staff. *See* Dkt. 607 (Opp'n), at 5 (quoting **Ex. A:**[1] (Jan. 17, 2023 Deposition of Lynette Hilton, Ph.D.) ("Hilton Dep.") 234:12-12) ("[W]e just talk about it in words rather – I don't look at the code."). Moreover, with regard to the code Walgreens did ask Hilton about, she could not explain what it did.

Q: Did you review the query before it was produced to us?

A: No. it's not my practice to review the code.

Q: So do you understand that this code relates to finding a PSC price?

A: No, other than I see it's reading in [sic] PSC data.

**Ex. A:** (Hilton Dep.) 234:4-11. Because Hilton cannot explain what the queries do, she cannot determine whether her staff correctly implemented her methodology and, therefore, whether her methodology works and is reliable.

Plaintiffs rely on *DL v. District of Columbia*, 730 F. Supp. 2d 78 (D.D.C. 2010) and *McReynolds v. Sodexho Marriott Servs.*, 349 F. Supp. 2d 30 (D.D.C. 2004) for the proposition that Hilton does not have to run the code herself. Dkt. 607 (Opp'n), at 4. The facts of both cases, however, differ from those here. In *DL v. District*, although the expert relied on a computer programmer to assist with writing code and carrying out analyses, there was no allegation that the

---

[1] All cites to exhibits in this brief refer to the exhibits to the Declaration of Michael S. Leib, attached as Exhibit 1.

expert could not read or explain the code, so the court did not address that issue. 730 F. Supp. 2d at 82. In *McReynolds*, the court found that, when the expert reviewed the computer output, he was able to determine if the programming was created as he requested and if any significant mistakes were made in the programming. 349 F. Supp. 2d at 36-37. The court found that the expert "created and orchestrated the analysis," reviewed "the output to ensure that the test was properly conducted," was able to determine if mistakes were made, and "worked hand-in-glove" with his assistants. *Id.* at 37. Here, however, Hilton hardly worked "hand-in-glove" with her staff, nor did she check the programming or look for mistakes. She did not review the scripts and, therefore, does not know whether the outputs are reliable. And she testified that, for at least one script—the one selecting Walgreens' Prescription Savings Club ("PSC") prices—she could not tell what it did. *See* **Ex. A:** (Hilton Dep.) 234:4-11. She also testified it is not her practice to review code. *Id.* Because Hilton failed to perform the necessary corroboration and cannot determine if the code implements her methodology, she cannot determine whether her methodology works and, therefore, is not qualified. The Court should exclude her report, and Plaintiffs should be precluded from relying on her testimony.

## II.   HILTON'S METHODOLOGY HAS NO RATIONAL CONNECTION TO THE REALITY OF PHARMACY ADJUDICATION

In its Motion, Walgreens pointed out that, because Hilton (1) ignored "the complex set of payment steps that actually occurs with each pharmacy transaction," (2) failed to test her ***entire*** methodology over the data provided, (3) used an imprecise methodology, and (4) relied on inaccurate assumptions with no rational connection between the data and her conclusions, her methodology is wholly unreliable. Dkt. 583 (Mot.) at 8-15. Plaintiffs' Opposition does nothing to resolve these issues, some of which, as will be discussed below, Plaintiffs fail to even address.

### A. Because Hilton's Methodology Ignores The Complex Set Of Payment Flows In The Pharmaceutical Industry, It Is Not Reliable

Walgreens has shown that Hilton's methodology is not reliable because it "ignores the complex set of payment steps that actually occurs with each pharmacy transaction between TPPs, PBMs, pharmacies, and individual consumers." Dkt. 583 (Mot.) at 9-11. Specifically, Hilton's transaction-by-transaction methodology fails to consider how a change in the pricing of one transaction affects other transactions, and it fails to take into account contractual reimbursements third-party payors ("TPPs") receive through Generic Effective Rate ("GER") payments and stop-loss insurance. *Id*. Plaintiffs' two-fold response to this issue lacks merit.

*First*, Plaintiffs argue that Hilton's transaction-by-transaction methodology allows for "a reasonable estimation of actual damages," which Plaintiffs claim is acceptable under the law. Dkt. 607 (Opp'n) at 6**.** But this ignores the evidence in the case that shows that, assuming Plaintiffs could establish liability, Hilton's methodology would not be a reasonable estimation of damages. Instead, it would assign damages to those that have no damages and understate or overstate damages to those that do have damages. Dkt. 627-1 (Amended Report of Jed Smith) ("Smith Report") ¶ 74. This violates Seventh Circuit law. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013) (affirming decertification order where the plaintiffs' damage theory would provide a "windfall" to some class members while "undercompensating" others).

Here, Walgreens' experts Jed Smith and Dr. James Hughes have shown that Hilton's damages methodology would, in fact, award damages to those with no damages at all. For example, someone who met their out-of-pocket maximum during the course of a benefit year may have paid more than the PSC price for one or more transactions, but would have paid the same overall amount during the plan year regardless. (Amended Expert Report of James Hughes) (attached as Ex. A to Walgreens' Opp'n to Mot. to Excl. Hughes's Report, also filed today) ("Hughes Report") ¶¶ 98-

104; Dkt. 627-1 (Amended Report of Jed Smith) ("Smith Report") ¶¶ 93-96. In addition, the failure

to account for the effect an entire year of deductibles and copayments/coinsurance has on other

transactions during the year could impact damages, which could result in assigning damages to

consumers with none or misallocating damages between the consumer and the TPP. (Hughes

Report) ¶¶ 91-112, 177-178. Moreover, GER and stop loss payments could eliminate TPP damages

completely for a year, yet Hilton fails to take this into account at all. *Id.* at ¶¶ 152-167; Dkt. 627-1

(Smith Report) ¶¶ 104-109. This is not a mere hypothetical. As Smith shows, IBEW and IUOE

received GER payments from pharmacy benefit managers ("PBMs"), with IBEW receiving

███████ for retail purchases in 2018 alone. Dkt. 627-1 (Smith Report) ¶ 108. This means that,

because Hilton claims that IBEW had only ███████ in damages in 2018, IBEW actually had █

damages in that year. Dkt. 627-1 (Smith Report) ¶ 108; (Proposed Surrebuttal Report of Jed Smith)

(attached as Ex. B to Walgreens Mot. for Leave to file a surreply and surrebuttal report, also filed

today) ("Smith Surreb. Report") ¶ 18. And, yet, Hilton **would** assign damages to IBEW.

The hypothetical proposed by Plaintiffs' newly disclosed expert, Dr. Susan Hayes, is

instructive. Dkt. 609-3 (Rebuttal Report of Dr. Susan A. Hayes) ("Hayes Report") ¶¶ 32-33. As

Smith explains in his proposed surrebuttal report, Hayes assigns $25 in damages to the consumer.

(Smith Surreb. Report) ¶ 10. But a readjudication of the entire plan year shows that the consumer

was not damaged because the patient hit the out-of-pocket maximum before the end of the year.

*Id.* Instead, it is the TPP insurer, not the consumer, that would have paid less if Walgreens had

reported the PSC prices as U&C. *Id.* In other words, this is not an issue of a reasonable estimation

of damages: this is an issue of whether there were damages at all, and who was damaged.

*Second*, as to GERs and stop-loss insurance, Plaintiffs argue that the collateral source

doctrine bars Walgreens from admitting evidence as to those payments and that Hilton did not

need to consider them as part of her damages model. Of course, the issue of GERs and stop-loss insurance only goes to one part of Walgreens' criticism of Hilton's transaction-by-transaction methodology and, thus, regardless of how the Court rules, the Court should still exclude Hilton's Report. Further, as stated in Section V of Walgreens' proposed surreply, GER payments are not collateral sources. As described in Walgreens' Opposition to Plaintiffs' Class Certification Motion, the TPPs do not pay Walgreens for prescription drugs purchased by their members; they pay the PBMs. Dkt. 587 (Opp'n to Class Cert), at 4-5. The GER provisions are where "the PBM guarantees that, over a certain amount of time, the TPP will not be charged more than a certain amount, which is not based on U&C." *Id*. at 33 (citations omitted). If the PBM charges more than allowed under the guarantee, the PBM returns money to the TPP. Thus, it is not a third party making a payment to the TPP—rather, it is the very entity that the TPP paid returning some of the money back to it. In other words, it is like a customer paying $50 for a product and the store informing the customer of an accidental overcharge, refunding $5 back to the customer. The $5 would not be considered a collateral source payment. Here, the fact that the TPP pays the PBM rather than Walgreens does not make the PBM payment back to the TPP a collateral source payment.

In addition, Plaintiffs' cases do not show that the collateral source rule could even apply in this case. As an initial matter, an Ohio statute has modified the collateral source doctrine to make it clear that collateral source evidence may be introduced for any damage resulting from "loss to person or property." Ohio Rev. Code Ann. § 2315.20. In Illinois, the doctrine does not apply when a plaintiff has not suffered an injury. *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1059-61 (Ill. 2020). For example, as noted above, in 2018, Hilton claims IBEW had ▮▮▮▮▮ in damages, but received ▮▮▮▮ in GER payments for retail purchases. *See* Section II.A, above. Moreover, the cases Plaintiffs cite are virtually all personal injury/wrongful death cases. The only case Plaintiffs

cite that applies to one of the claims brought in this case is *Cottrell v. AT&T Inc.*, No. 19-cv-07672-JCS, 2020 U.S. Dist. LEXIS 151270, at \*17-19 (N.D. Cal. 2020), where the court stated that it was not aware of any cases applying the collateral source doctrine to the California Unfair Competition Law, then decided to allow it in that case. But even the *Cottrell* Court cited an Eighth Circuit opinion that noted that the plaintiff there had not cited any case applying the collateral source doctrine to the Illinois Consumer Fraud Act, and it decided not to apply it in that case. *Id*. at \*13-14 (quoting *In re SuperValu, Inc.*, 925 F.3d 955, 965 (8th Cir. 2019)). Thus, Plaintiffs have not shown that the doctrine applies to consumer fraud claims such as the ones asserted in this case.

Given the above, and the argument in Walgreens' Motion, the Court should exclude Hilton's report and preclude her from testifying on Plaintiffs' behalf.

### B.     Hilton Fails To Test Her Methodology Adequately To Confirm It Works

Walgreens showed that Hilton's methodology is unreliable because she did not test it over the 2015 sample data to determine if it is workable on a classwide basis. Instead, she tested her methodology only on hand-selected examples. Dkt. 583 (Mot.), at 11. Plaintiffs state that Hilton did run queries over the 2015 sample data to test numerosity. Dkt. 607 (Opp'n), at 8. This ignores the core of Walgreens' argument. Walgreens does not argue that Hilton failed to run *any* queries over the 2015 data. And running tests to establish numerosity is irrelevant, as Plaintiffs admit that "Walgreens does not contest" that prong of Federal Rule of Civil Procedure 23. Rather, Walgreens' point is that Hilton did not test her *entire* methodology over the 2015 data to determine where the failures might be and whether it reliably determines accurate potential damages for the entire class. *See, e.g.*, Dkt. 627-1 (Smith Report) ¶¶ 15, 110-114 (explaining that the flaws in Hilton's methodology shown in the limited named Plaintiff data would be magnified in larger classwide data sets). The key problem is that Hilton admits she selected the "cleaner data," the "best examples of the methodology"—that is, the transactions that showed the data points she wanted—but did

not investigate where her methodology would fail to identify potential damages accurately. Dkt. 583 (Mot.), at 11-12; **Ex. A:** (Hilton Dep.) 317:1-320:8. The fact that Hilton only produced one of the queries she ran over the 2015 data and was not able to testify about her queries, meaning that neither Walgreens nor the Court can analyze what tests she performed, only adds to the problematic nature of Hilton's testing of her methodology. (Smith Surreb. Report), at App'x A (indicating that HILTON_0000130 is the only script analyzing 2015 sample data).

Plaintiffs also mistakenly argue that Walgreens seeks to require Hilton to "drill down and estimate each individual class member's damages." Dkt. 607 (Opp'n) at 8. That is not the case. To be a class member under Plaintiffs' proposed definition, the potential member must be subject to an overpayment, so Plaintiffs, and hence Hilton, must show that they would be able to accurately determine any such overpayment for each class member, which they fail to do. Dkt. 553-44 (Expert Report of Lynette Hilton, Ph.D.) ¶ 5. Walgreens is not arguing that Plaintiffs need to measure each class member's damages now, but they must show they could do so on a classwide basis with Hilton's methodology.

Rule 702 requires that an expert's methodology be "the product of reliable principles and methods" and that it be reliably applied. By failing to adequately test her methodology, Hilton has not shown that her methodology meets these requirements. Accordingly, the Court should exclude Hilton's Report and preclude her from testifying on Plaintiffs' behalf.

### C. Hilton's Methodology For Determining Whether A Consumer Paid A Copay Or Coinsurance Is Unreliable

Walgreens has shown that, "[w]hether a consumer's plan has a copay or coinsurance," a critical part of Hilton's methodology "cannot accurately be determined from looking at the data by itself." Dkt. 583 (Mot.), at 15. Plaintiffs' Opposition does not establish that Hilton provides proof to the contrary. Instead, Plaintiffs mischaracterize Walgreens' argument as "a consumer's

*cost-sharing payment* cannot 'accurately' be determined by reference to the transactional data." Dkt. 607 (Opp'n), at 8 (emphasis added). This is incorrect. Walgreen does not contest that the data shows how much a consumer paid for a transaction; rather Hilton cannot say if this amount represents a copayment or coinsurance, a critical distinction in Hilton's damages assessment.

Plaintiffs contend that Hilton's eventual methodology for making this determination is that "the PBMs will turn over data that has that information." Dkt. 607 (Opp'n), at 9. Plaintiffs argue that Hilton testified that "the reason PBMs would have this data is because 'they need it to adjudicate the claim.'" *Id*. (citing Hilton Dep. 277:22-278:2). Walgreens does not disagree that the Relevant PBMs would know this information for *current* claims they are adjudicating. After all, it is the Relevant PBM that tells Walgreens how much to charge a consumer based on the consumer's plan. But Hilton does not point to *any* evidence in the record that the Relevant PBMs maintain this data in a format that could be produced or that they have this data going back to 2007. In fact, as Hughes testified, PBMs do not retain all data and, even if they do, the data is not always accessible, including because of data acquired through mergers. *See* Dkt. 609-9 (Hughes Dep.) 84:4-23. Even Hayes concedes in her report that the Relevant PBMs may not maintain historical information about a consumer's plan design. Dkt. 609-3 (Hayes Report) ¶ 31 ("To the extent the Relevant PBMs still have the applicable plan design . . ."). Thus, it is not surprising that the data the Relevant PBMs produced to date contain only one field for a consumer payment that does not distinguish between whether it is a copayment, coinsurance, or a deductible. Dkt. 627-1 (Smith Report) ¶ 79; (Smith Surreb. Report) ¶ 11, Table 5. Plaintiffs even admit that the Relevant PBMs may not be able to produce the data, stating in their Opposition that the PBM data may not be available. Dkt. 607 (Opp'n) at 9 ("If PBM data is not available . . ."). Plaintiffs subpoenaed data from the Relevant PBMs and could have asked for these fields, but did not. Plaintiffs also deposed

the Relevant PBMs and could have asked if these fields were available, but did not. Speculation does not meet the standard for Rule 702 of relying on "sufficient facts or data" and being "the product of reliable principals and methods."

Plaintiffs then argue that, even if Hilton has not proven that the PBMs have this data, Hayes opines that she is aware of fields that distinguish between copays and coinsurance. Dkt. 607 (Opp'n), at 9. But, as set forth in Sections IV(A) and IV(E) of Walgreens' Motion to Exclude the Opinion and Testimony of Hayes ("Hayes Motion"), also filed today, and which for brevity, Walgreens incorporates here by reference, Hayes's opinion on this subject is improper rebuttal and is also irrelevant and unreliable. For the reasons stated in the Hayes Motion, the Court should either not consider Plaintiffs' argument regarding Hayes or reject that argument. As for Plaintiffs' argument that Smith testified that he has "seen some PBMs produce fields that had different columns for co-pay and co-insurance," (Dkt. 607 (Opp'n), at 9 (citing Smith Dep. 151:23-25)), it is irrelevant. Plaintiffs have failed to prove that *the Relevant PBMs*, not *some other* PBMs, have the data distinguishing copay and coinsurance as of 2007 and that they can produced that data.

As for Plaintiff's argument that "Hilton testified that 'there are variables in Walgreens' data that indicate co-insurance," (Dkt. 607 (Opp'n) at 9), that misrepresents Hilton's testimony. Hilton actually testified that she "believes" Walgreens' data contain these variables, "[b]ut that's not something I looked at this point." **Ex. A:** (Hilton Dep.) 277:3-12. Certainly, Hilton cannot reliably testify about something she did not look at. Moreover, Hughes showed in his report how the two fields Plaintiffs reference at the top of page 10 of their Opposition are not reliable for distinguishing between copayments and coinsurance. (Hughes Report) ¶ 116.

As for Hilton's "90%" methodology that Plaintiffs reference, (Dkt. 607 (Opp'n), at 10), Smith and Hughes showed in their Reports that this methodology is not based on reliable

principles. (Hughes Report) ¶¶ 116-121, 123; Dkt. 627-1 (Smith Report) ¶¶ 74-75; *see also* Dkt. 587 (Opp'n to Class Cert.), at 14-15. Plaintiffs do not address these criticisms. Instead, they attempt to sneak in a change to Hilton's methodology without stating it is a change. In her initial methodology, Hilton looked to see if consumers for a certain PBM had the same consumer share percentage on at least 90% of transactions in a given month and, if so, she determined that the PBM used coinsurance for all its consumers. **Ex. A:** (Hilton Dep.) 271:5-275:11. Now, Plaintiffs (and Hilton in her Rebuttal Report) add a new restriction by looking if 90% of a PBM's consumers for "***a given plan***" have the same consumer share percentage in a given month. (Hilton Amd. Reb. Expert Report) ("Hilton Rebuttal Report") (attached as Ex. B to Walgreens' Mot. to Excl. Hilton's Reb. Report, also filed today). But while that new restriction addresses one of the issues raised by Smith, it does not address them all. For the reasons Smith points out in Paragraphs 74-75 of his Report (as well as the reasons Hughes pointed out in his Report at Paragraphs 116-121 and 123), this is not a reliable methodology.

Finally, Plaintiffs argue that Walgreens' criticism "goes to the weight of Dr. Hilton's methodologies, not their reliability." Dkt. 607 (Opp'n), at 10 (citation omitted). This is incorrect. As the Advisory Committee on Evidentiary Rules has explained in relation to the Amendments to Rule 702 taking effect in December of this year, which are merely clarifying amendments, whether an expert's opinion relies on sufficient facts or data and applies a reliable methodology goes to admissibility, not weight, and courts that have said otherwise are incorrect. *See* Report of the Advisory Committee on Evidence Rules, at 6 (May 15, 2022), https://www.uscourts.gov/rulespolicies/archives/committee-reports/advisory-committee-evidence-rules-may-2022 ("Advisory Committee Report"). Here, Hilton has not used sufficient facts or a reliable methodology for her claim that data will show whether a consumer's payment

was a copayment or coinsurance. Accordingly, the Court should exclude Hilton's Report and preclude Plaintiffs' from relying on Hilton's testimony.

### D. Hilton's Methodology For Determining Whether U&C Price Was A Basis Of Payment By TPPs To PBMs Is Unreliable

In its opening brief, Walgreens showed that "Hilton assumes—without any support—that all TPPs reimburse the Relevant PBMs using a lesser-of reimbursement methodology that included U&C as a price point," and that Hilton improperly ignores the fact that each PBM would have hundreds or thousands of contracts with TPPs with different reimbursement methodologies and/or definitions of U&C. Dkt. 583 (Mot.), at 13-14. Plaintiffs now admit "Hilton was asked to assume that . . . Class members were entitled to lower-of pricing on the basis of the U&C price." Dkt. 607 (Opp'n), at 10-11. This admission further confirms that Hilton's methodology is unreliable.

Plaintiffs try to justify this assumption by pointing to Hilton's claim that the Relevant PBMs will have data in their possession that would allow her to determine whether U&C was used as a basis for determining the amount the TPP paid to the PBM. But the data produced by the Relevant PBMs to date does not have this information. ((Smith Surreb. Report) ¶ 11, Table 5.) And, as set forth in Section II.C, above, Plaintiffs have not proven the PBMs will have this data. Plaintiffs had the opportunity to try to develop such evidence but failed.

Further, Walgreens demonstrated that Hilton improperly looks at **Walgreens'** produced data, which "does not indicate how the **TPP reimburses the PBM**, but instead indicates **how the PBM reimburses Walgreens**." Dkt. 583 (Mot.), at 13 (emphasis in original). Rather than having Hilton attempt to rebut this in her Rebuttal Report (which she would not be able to do), Plaintiffs argue that "this is contradicted by Walgreens' testimony that 'Walgreens **has no understanding** as to whether or not any PBM uses the information that the PBM submits to Walgreens that is then reflected in the basis_of_reimb_detrm field in Walgreens' data when the PBM determines the

amount the PBM is owed by a third-party payer.'" Dkt. 607 (Opp'n) at 11 (citing Dymon Decl., ¶ 59(cc), at 49) (emphasis in Opp'n). Yet these statements are not contradictory. The Walgreens' data shows only the basis for the PBMs payment to Walgreens, and Walgreens has no idea if any PBM uses the information that the PBM transmits to Walgreens that ends up in that field in how it charges the TPP. Neither Hilton nor the Plaintiffs know this either, which is why it is improper for Hilton to look to that field in Walgreens' data as evidence as to how the TPP pays the PBM.

Plaintiffs then look to Hayes's testimony to bolster Hilton's testimony. This attempt, however, fails for the same reasons stated in Section II.C, above. Hayes's opinions regarding the *existence* of NCPDP fields does not support her assertion that the PBMs retain the necessary data from 2007 forward.

As for Plaintiffs' claim that Hilton's argument is supported by Smith's testimony that, if the amount paid by a TPP and consumer combined equals the U&C price, it suggests that the U&C price was the basis of the price "[f]or that transaction," Plaintiffs are wrong. Dkt. 607 (Opp'n), at 12 (citing Smith Dep. 133:18-25). That a single transaction may reflect the U&C price does not allow general conclusions about how an "adjudicating PBM used U&C prices in the adjudication process" for each of the plans the PBM adjudicated. (Hilton Reb. Report) ¶ 8. In fact, Hilton ignores Smith's testimony, which is based on Walgreens' PBM expert Michael Jacobs's testimony, that "[e]ven within a single plan, certain drugs can be adjudicated using lesser-of-logic while others are not." Dkt. 627-1 (Smith Report) ¶ 18 (citing Expert Report of Michael S. Jacobs ¶¶ 25, 87-90). In other words, knowing based on Walgreens' data whether U&C was the basis on an individual transaction does not even begin to show whether it was considered as one of the lower-of price points on all of the transactions for that PBM, including for a given plan.

Hilton's methodology for determining whether TPPs pay PBMs on the basis of U&C is unreliable. The Court should exclude Hilton's Report and preclude Plaintiffs from relying on Hilton's testimony.

**E.     Plaintiffs Fail To Address The Argument That Hilton's Methodology Is Vague**

Walgreens argued that Hilton's methodology is fatally imprecise, including that, in her Report, she provides only illustrative examples from the cleaner data because she did not want to show the "messy data" that would require individualized inquiry, rendering her opinion unreliable. Dkt. 583 (Mot.) at 12. Plaintiffs fail to address this argument, which is another reason the Court should exclude Hilton's Report and preclude her from testifying on Plaintiffs' behalf**.**

**F.     Hilton's Claim That PBM Data Will Have The Plan Designs Is Unsupported By The Record**

Walgreens' experts opine that Hilton's damages methodology must account for plan design features such as deductibles, Medicare Part D coverage bands, and out-of-pocket maximums. **Ex. B:** (Smith Dep.) 141:21-142:8; (Hughes Report) ¶¶ 44-46, 92-138. Plaintiffs claim that the PBM data will show plan design features such as deductibles, Medicare Part D coverage bands, and out-of-pocket maximums. Dkt. 607 (Opp'n), at 12-14. But for the same reasons stated in Section II.C, above, neither Plaintiffs nor Hilton have shown that the Relevant PBMs can provide this information or that they maintained this information for 2007 to the present, even though Plaintiffs had every opportunity to seek this information in discovery. The fact that Hilton states that, in her experience, she has seen PBM data that reflects deductibles and out-of-pocket maximums does not mean the Relevant PBMs actually do maintain or can produce this information for the entire time period from 2007 forward. Moreover, for the reasons stated in Section II.C, above, Plaintiffs' reliance on Hayes's Report to bolster Hilton's testimony is improper.

Plaintiffs also attempt to rely on descriptions of fields in Walgreens' data to show that data "bearing on deductibles, Medicare Part D coverage bands, and out-of-pocket maximums" exists in the PBM data. Dkt. 607 (Opp'n) at 13-14. But this reliance is similarly unavailing. First, the existence of fields in Walgreens' data does not prove that any data is populated in those fields at the time of adjudication or that Walgreens retains that information. Second—and more importantly—the existence of fields (or, for that matter, the existence of data in those fields) in *Walgreens'* data does not prove that the *PBMs* retain that data for the entire time period from 2007 forward. Moreover, even assuming that the fact that those fields were populated in Walgreens' data could support Hilton's claim that the PBMs would similarly have retained that same data from 2007 forward, Smith found that those fields in the 2015 Sample Data were blank or had null values between 80 and 100 percent of the time. (Smith Surreb. Report) ¶ 11(b), Table 6. Accordingly, there is no support for Hilton's assertion that plan design information will be available in the PBM data or in Walgreens' data.

Further, for the reasons stated in Section II.D, above, Plaintiffs misstate the law when they say that "[t]he selection of which variables to consider in forming a damages estimate . . . goes to the weight, not admissibility, of an expert's opinion." Dkt. 607 (Opp'n) at 12 (citation omitted).

Finally, Hilton has not set forth any methodology regarding how she would use plan design features to determine overpayments or potential damages, much less tested it to see if it can be reliably applied, as required by Rule 702. Accordingly, the Court should exclude Hilton's Report and preclude Plaintiffs' from relying on Hilton's testimony.

## III. CONCLUSION

For these reasons and those stated in Walgreens' Motion, the Court should exclude Hilton's report in its entirety, and Plaintiffs should be precluded from relying on her testimony.

DATED: September 14, 2023

/s/ Michael S. Leib
Michael Scott Leib
Anthony Robert Todd
**REED SMITH LLP**
10 S Wacker Dr # 4000
Chicago, IL 60606
Telephone: 312/207-1000
*mleib@reedsmith.com*
*atodd@reedsmith.com*

Frederick Robinson (*pro hac vice*)
Selina Coleman (*pro hac vice*)
Megan Engel (*pro hac vice*)
Jessica Christensen (*pro hac vice*)
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 East Tower
Washington, DC 20005
Telephone: 202-414-9200
*frobinson@reedsmith.com*
*scoleman@reedsmith.com*
*mengel@reedsmith.com*
*jchristensen@reedsmith.com*

***Attorneys for Defendant Walgreen Co.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of September, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Michael S. Leib*
Michael S. Leib
