# EXHIBIT A

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF ILLINOIS
 3                   EASTERN DIVISION
 4
 5  CYNTHIA RUSSO, LISA BULLARD,        )
    RICARDO GONZALES, INTERNATIONAL     )
 6  BROTHERHOOD OF ELECTRICAL WORKERS   )
    LOCAL 38 HEALTH AND WELFARE FUND,   )
 7  INTERNATIONAL UNION OF OPERATING    )
    ENGINEERS LOCAL 295-295C WELFARE    )
 8  FUND, AND STEAMFITTERS FUND LOCAL   )
    439, on Behalf of Themselves and    )
 9  All Others Similarly Situated,      )
                                        )
10               Plaintiffs,            )
                                        )
11                  vs.                 )Case No.
                                        )17-cv-2246
12  WALGREEN CO.,                       )
                                        )
13               Defendant.            )
    _____)
14
15
16          VIDEO-RECORDED REMOTE DEPOSITION OF
17               LYNETTE HILTON, Ph.D.
18             Tuesday, January 17, 2023
19                    Volume I
20
21    *** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***
22  Reported by:
    CARLA SOARES
23  CSR No. 5908
24  Job No. 5645367
25  Pages 1 - 347
```

Page 114

```
 1              MR. ALEXANDER:  We reserve our rights --        17:35:58

 2              MR. LEIB:  And I understand that you'll

 3    reserve your rights to object.

 4              MR. ALEXANDER:  Thank you, Counsel.

 5    BY MR. LEIB:                                             17:36:00

 6         Q    Paragraph 62, you say it's your

 7    "understanding that the Relevant PBMs should be able

 8    to provide information that can be used to identify

 9    transactions adjudicated by the Relevant PBMs."

10              And I didn't let you get to paragraph 62       17:36:04

11    before I asked my question, so I'm going to let you

12    get to paragraph 62, and then I'll ask it again.

13              Are you at paragraph 62?

14         A    Yes.  I'm reading it now.

15         Q    You state in the first sentence that it is     17:36:09

16    your "understanding that the Relevant PBMs should be

17    able to provide information that can be used to

18    identify transactions associated [sic] by the

19    Relevant PBMs."

20              What is that understanding based on?           17:36:13

21         A    Based on the fact that I have PBM data for

22    some of the PBMs, and it's my understanding that

23    plaintiffs are going to request that data.

24         Q    I'm sorry.  You dropped off a little bit.

25    So just make sure, at the end of sentences, you keep     17:36:18
```

Page 115

```
 1    your voice up so that the court reporter can get it.      17:36:19

 2         A    Okay.

 3              MR. LEIB:  Was the court reporter able to

 4    get that?

 5              THE REPORTER:  I believe so.  Would you          17:36:22

 6    like to hear it back?

 7              MR. LEIB:  I would.

 8              (Record read as follows:

 9               "Answer:  Based on the fact that I have

10          PBM data for some of the PBMs, and it's my           17:36:23

11          understanding that plaintiffs are going to

12          request that data.")

13    BY MR. LEIB:

14         Q    Is that what you said?

15         A    Yes.                                             17:36:24

16         Q    When you say "should be able to," does

17    that mean you're not sure they can provide the

18    information?

19         A    I guess that is potentially a legal

20    question.  It's just my understanding that that's         17:36:28

21    data that has to be requested.

22         Q    I don't think it's a legal question if

23    it's in your report.

24              It's in your report, so my question is,

25    you said you -- it's your understanding the relevant      17:36:32
```

Page 116

```
 1   PBMs should be able to provide information.  I'm          17:36:33

 2   asking, do you know if they can provide the

 3   information?

 4         A    If they can?  Yes.

 5         Q    So my question is, why did you phrase it       17:36:35

 6   as "should be able to" as opposed to "will be able

 7   to"?

 8         A    I guess there's potentially some sort of

 9   issue with production in the court rules that those

10   data can't be turned over.  Those sorts of things.       17:36:40

11         But it's my opinion that the PBMs have

12   those data and could produce them if they were

13   requested to.

14         Q    So the court deciding not to have the PBM

15   turn over data doesn't mean the PBM is unable to         17:36:44

16   produce the data.  So I'm not sure I understand why

17   you wrote it that way.

18         Was that just not crisp language?  Would

19   you change the language if you were writing it

20   today?                                                   17:36:49

21         A    No.  I stand by what I've written.

22         Yeah, I agree with you that the PBM should

23   have -- should have the data.  I believe they have

24   the data.  I believe they'd be able to turn it over,

25   barring any sort of legal issues.                        17:36:53
```

Page 117

```
 1       Q    But you're not the PBM so you don't know      17:36:54

 2   100 percent for sure; is that my understanding?

 3            MR. ALEXANDER:  Objection to form.

 4   BY MR. LEIB:

 5       Q    Is that my understanding of what you're       17:36:57

 6   saying?

 7            I'm sorry.  You're right.  You can't tell

 8   me what my understanding is.  So that was a proper

 9   objection.

10            MR. ALEXANDER:  Thank you, Counsel.          17:37:00

11   BY MR. LEIB:

12       Q    Are you saying "should be able to" because

13   you're not the PBM and you don't know for sure

14   100 percent whether they can produce that

15   information?                                          17:37:03

16       A    I believe they have those data and they

17   can produce them.  I've seen the PBM data here.

18   I've seen PBM data in other cases.  So I do believe

19   those data exist.

20       Q    I'm not asking whether you believe the       17:37:07

21   data exists and they can produce it.  I'm asking if

22   you know if the data exists and they can produce it.

23            MR. ALEXANDER:  Objection to form.

24            THE WITNESS:  I know the data exists.

25   Whether or not they exist for the entire time        17:37:11
```

Page 118

1  period, you know, there are some caveats to that.            17:37:12

2  But yes, I know that these data do exist with PBMs.

3  BY MR. LEIB:

4      Q   So it's a long time period, and it's

5  possible that they don't have data for 2007, for            17:37:15

6  example?

7      A   That's possible.

8      Q   You say that -- same paragraph -- you say

9  that several fields in Walgreens' transactional

10 claims data and the payer map can be used to               17:37:18

11 identify the PBM associated with a transaction,

12 including the relevant PBMs, and then you have a

13 footnote, Footnote 35.  Footnote 35 has certain

14 citations.

15          Are all the fields that you're relying on         17:37:23

16 for your statement contained in that Footnote 35?

17          MR. ALEXANDER:  Objection to form.

18 BY MR. LEIB:

19     Q   Are all the fields that you're relying on

20 for your statement contained in the references in          17:37:27

21 Footnote 35?

22     A   No.  I don't -- yeah.  No.

23     Q   What fields are not in these citations

24 that you're also relying on --

25     A   Well, I will say --                                17:37:32

Page 128

1   transaction in the Walgreens data and what the TPP       17:40:40

2   paid.

3        Q   What the TPP paid to whom?

4        A   To the PBM.

5        Q   And to make sure a Medicare Part D             17:40:43

6   beneficiary is included, do you know what fields you

7   would need in the data that was produced by the

8   relevant PBMs?

9        A   If the -- yeah.  I don't know what --

10  again, what the field would be called.                  17:40:47

11       But if they have fields that identify

12  whether it was federally funded, whether it was

13  Medicaid, Medicare, Medicare Part D, so that sort of

14  information would -- the PBMs would have.

15       Also, that's in Walgreens' data.  But the          17:40:52

16  PBMs should have that data as well.

17       Q   Paragraph 63, you refer to the data field

18  "basis of reimbursement determination."

19       Do you see that?

20       A   Yes.                                            17:40:56

21       Q   And that field that you're referring to is

22  a field in Walgreens' data.

23       Do you see that?

24       A   Yes.

25       Q   And you say that it's a way to determine,       17:40:58

Page 129

```
 1    quote, "whether the adjudicating PBM used U&C prices       17:40:59

 2    in the adjudication process."

 3           Do you see that?

 4       A   Yes.

 5       Q   Do you agree that the value in the "basis          17:41:02

 6    of reimbursement determination" field in the

 7    Walgreens data is the value returned by the PBM

 8    adjudicating the transaction?

 9       A   I believe that's right.  Yes.  Yes.

10       Q   That is not a value determined by               17:41:06

11    Walgreens, correct?

12       A   Yes.

13       Q   Do you agree that all this field indicates

14    is that the U&C was a basis for the amount paid or

15    reimbursed by the PBM to Walgreens?                     17:41:09

16           MR. ALEXANDER:  Objection to form.

17           THE WITNESS:  It indicates that the U&C

18    was used to adjudicate that particular transaction.

19    BY MR. LEIB:

20       Q   Well, "used to adjudicate that particular        17:41:13

21    transaction" could mean many things.  It could mean

22    it was used to tell how much the consumer should pay

23    Walgreens, correct?  That's one thing adjudication

24    is.

25           MR. ALEXANDER:  Objection to form.               17:41:18
```

Page 134

```
 1    Objection to scope.                               17:42:25
 2             THE WITNESS:  Yes.  I don't know what goes
 3    into determining what those ultimate prices will be.
 4    BY MR. LEIB:
 5         Q   And you don't know how the pharmacy      17:42:27
 6    benefit manager determines how much to charge the
 7    TPP for that transaction, correct?
 8             MR. ALEXANDER:  Same objection.
 9             THE WITNESS:  That's right.  I don't know
10    all the factors that go into determining what the    17:42:30
11    ultimate --
12    BY MR. LEIB:
13         Q   So getting back to the question, in
14    paragraph 63, you talk about a field in Walgreens'
15    data, the "basis of reimbursement determination"     17:42:34
16    field.
17             What is your understanding that the "basis
18    of reimbursement determination" field reflects?  And
19    feel free to refer to Figure 1.
20         A   My understanding is that it reflects        17:42:38
21    transactions -- so if there's a 4 or a 5, it's the
22    transaction where the adjudication was done with U&C
23    being the "lower of."  So U&C would be the lowest
24    price.
25         Q   That's "lower of" logic, sometimes called   17:42:42
```

Page 135

1    "lesser of" logic, correct?                          17:42:43

2         A    That's right.

3         Q    And "lower of" logic is just, if there's

4    multiple different variables for how a drug might be

5    priced, it's priced by the lowest of those           17:42:47

6    variables, correct?

7         A    Correct.

8         Q    Do you know who "lower of" logic is

9    applied to in the adjudication process?

10             In other words, going back to Figure 1, is  17:42:51

11   it applied to how much the TPP pays the PBM, how

12   much the PBM pays Walgreens, or how much the

13   consumers pays Walgreens, or all three?  What is

14   your understanding?

15             MR. ALEXANDER:  Objection to form.          17:42:56

16   Objection to scope.

17             THE WITNESS:  I don't have an

18   understanding of that.

19   BY MR. LEIB:

20        Q    Do you have an understanding of, when       17:42:57

21   there's a 4 or a 5 in the "basis of reimbursement

22   determination" field in the Walgreens data, whether

23   that means that the consumer paid Walgreens, with

24   U&C being a consideration in that payment?

25        A    I guess I would say that a transaction      17:43:02

Page 136

| | | |
|---|---|---|
| 1 | being adjudicated with U&C, my assumption is it | 17:43:02 |
| 2 | would apply to the whole transaction.  But that's | |
| 3 | really a liability question or issue. | |
| 4 | Q   Is it a liability issue?  If it's in your | |
| 5 | report and it's a basis for how you -- your | 17:43:07 |
| 6 | methodology was created, isn't it more than just a | |
| 7 | liability issue?  Isn't it an issue for class | |
| 8 | determination, who's in the class, and damages? | |
| 9 | MR. ALEXANDER:  Objection to form. | |
| 10 | Argumentative. | 17:43:11 |
| 11 | MR. LEIB:  I'm not arguing with the | |
| 12 | witness.  I'm just asking the witness her | |
| 13 | understanding. | |
| 14 | MR. ALEXANDER:  Same objection. | |
| 15 | THE WITNESS:  My understanding is that | 17:43:14 |
| 16 | that field, as I said earlier, indicates that U&C | |
| 17 | was used to adjudicate that claim using the "lesser | |
| 18 | of" logic. | |
| 19 | The assumption is that would apply, you | |
| 20 | know, to the whole claim.  Like I said, I think | 17:43:18 |
| 21 | that's a liability issue.  I was asked to assume | |
| 22 | liability. | |
| 23 | BY MR. LEIB: | |
| 24 | Q   Well, if it's a liability issue, why did | |
| 25 | you include it in your report? | 17:43:22 |

Page 137

```
 1              MR. ALEXANDER:  Objection to form.        17:43:23
 2    BY MR. LEIB:
 3         Q   You're not -- you're not the liability
 4    expert here, correct?
 5         A   That's correct.                            17:43:24
 6         Q   You're opining -- your opinions have
 7    nothing to do with liability; is that correct?
 8         A   That's correct.
 9         Q   Why did you include paragraph 63 in your
10    report?                                             17:43:27
11              MR. ALEXANDER:  Objection to form.
12              You can answer.
13              THE WITNESS:  This is indicating that
14    there are variables available in the data that my
15    methodology could use to identify transactions that 17:43:30
16    were adjudicated using U&C.
17    BY MR. LEIB:
18         Q   So you're saying that it is a field that
19    you could use to determine who's in the class,
20    correct?                                            17:43:33
21         A   Yes.
22         Q   That's not a liability issue then, is it?
23              MR. ALEXANDER:  Objection to form.
24              Counsel, I'd also just like to point out
25    we had discussed going 30 or 40 minutes and then    17:43:36
```

Page 138

```
 1    taking a break.                                   17:43:37

 2            MR. LEIB:  I'm going to finish this line

 3    of questioning.  I'm going to finish this line of

 4    questioning --

 5            MR. ALEXANDER:  Great.                     17:43:39

 6            MR. LEIB:  -- and then we can take the

 7    break.

 8            MR. ALEXANDER:  Of course.  Thank you,

 9    Counsel.

10            THE WITNESS:  That -- the way that you     17:43:41

11    phrased that, no, that's not a liability issue.  I

12    was referring to the issue you asked before, whether

13    I knew whether the consumer would also get the

14    "lower of" logic.

15    BY MR. LEIB:                                       17:43:45

16        Q   Well, let's look back at the definition,

17    for a second, of the class.  Because you are opining

18    on a methodology for determining who's in the class,

19    correct?

20        A   (Witness nods head.)                       17:43:48

21        Q   I need a verbal answer.

22        A   Yes.  Sorry.

23        Q   And one of the things defined in the

24    class, or included in the definition in the

25    "proposed class" definition on page 2 of your       17:43:51
```

Page 139

```
 1    report, is "where the usual and customary price was        17:43:53

 2    a basis for the amount paid or reimbursed in

 3    connection with the purchase of such drug," correct?

 4         A    Yes.

 5         Q    And that's the part of the definition that        17:43:56

 6    you are attempting to discuss here in paragraph 63,

 7    correct?

 8         A    Yes.

 9         Q    And this is in a section that's

10    Appendix B, identifying class members, correct?          17:43:59

11         A    I believe so.  Yes.

12         Q    So if there's a 4 or a 5, is it your

13    understanding that that means that the consumer paid

14    according to "lower of" logic, with U&C being one of

15    the considerations in the "lower of" logic?               17:44:04

16              MR. ALEXANDER:  Objection to form.  The

17    witness has now answered this question at least

18    twice.

19    BY MR. LEIB:

20         Q    You can answer.                                  17:44:07

21         A    Can you either restate it, or I can read

22    it off of the realtime?

23         Q    So assuming there's a 4 or 5 in the "basis

24    of reimbursement determination" field in the

25    Walgreens data for a particular transaction, is it        17:44:11
```

Page 140

```
 1    your understanding that that means that the consumer      17:44:11

 2    paid according to "lower of" logic, with U&C being

 3    one of the considerations in the "lower of" logic?

 4              MR. ALEXANDER:  Same objection.

 5              THE WITNESS:  I would say yes, that's my         17:44:16

 6    assumption.

 7    BY MR. LEIB:

 8         Q    And assuming that there's a 4 or 5 in the

 9    "basis of reimbursement determination" field in the

10    Walgreens data for a particular transaction, is it        17:44:19

11    your understanding that that means that the PBM paid

12    Walgreens according to "lower of" logic, with U&C

13    being one of the considerations in the "lower of"

14    logic?

15              MR. ALEXANDER:  Same objections.                17:44:23

16              THE WITNESS:  Again, that's -- that's my

17    assumption based on the fact that I was asked to

18    assume liability.

19    BY MR. LEIB:

20         Q    And assuming there's a 4 or 5 in the            17:44:26

21    "basis of reimbursement determination" field in the

22    Walgreens data for a particular transaction, is it

23    your understanding that that means that the TPP paid

24    the PBM according to "lower of" logic, with U&C

25    being one of the considerations in the "lower of"         17:44:31
```

```
                                                    Page 141
 1    logic?                                          17:44:31

 2               MR. ALEXANDER:  Same objection.

 3               THE WITNESS:  That's my assumption based

 4    on assuming liability.

 5               MR. LEIB:  We can take the lunch break.     17:44:33

 6               How long would you like for lunch,

 7    Dr. Hilton?

 8               MR. ALEXANDER:  I'll defer to Dr. Hilton.

 9               Do you need 30, 45 minutes?

10               MR. LEIB:  That's what I'm asking.       17:44:36

11               MR. ALEXANDER:  Which one would you

12    prefer?

13               THE WITNESS:  I'm sorry.  What were the

14    options?  30 or 45?

15               MR. LEIB:  30 or 45 would be normal       17:44:39

16    options.  Anything in between is also fine.

17    Whatever you want.

18               THE WITNESS:  Why don't we say -- I don't

19    know -- 45.  Is that --

20               MR. LEIB:  45.  We'll come back on the     17:44:42

21    record at 12:25 [sic] p.m.

22               THE WITNESS:  Okay.

23               THE VIDEO OPERATOR:  Off the record,

24    12:41 p.m.

25               (Recess, 12:41 p.m. - 1:28 p.m.)          17:44:45
```

Page 164

1      A    Yes.                                          17:51:58

2      Q    And on Exhibit 3C -- which is

3  illustrations of fund plaintiff overpayments,

4  correct?

5      A    Yes.                                          17:52:00

6      Q    -- did you check if some or all of these

7  transactions have a 4 or 5 in the "basis of

8  reimbursement determination" field in the Walgreens

9  data?

10      A    That's something, yes, that I might have     17:52:03

11  looked at.  Again, given my assumption and what we

12  were just talking about with respect to

13  paragraph 63, it wasn't something that was

14  necessary, but I probably did look at it.

15      Q    And do you know the results of what you      17:52:08

16  found?

17           MR. ALEXANDER:  Objection to form.

18           THE WITNESS:  I don't recall.

19  BY MR. LEIB:

20      Q    In paragraph 66 of your report, which you    17:52:09

21  pointed to a few minutes ago, you state that "PBM

22  data can be used to determine whether the U&C price

23  was used as a basis for determining the amount paid

24  or reimbursed when adjudicating the claim," correct?

25      A    Yes.                                          17:52:15

Page 165

1       Q    How could the PBM data be used to do this?        17:52:16

2       A    It's a variable that the PBMs would have

3    in their possession.  Same sort of variable, the

4    basis of reimbursement variable.

5       Q    Do you know whether each of the datasets        17:52:20

6    in paragraph 65 of your report contains fields

7    necessary for you to determine whether the U&C price

8    was used as a basis for determining the amount paid

9    or reimbursed when adjudicating the claim?

10      A    Yes.                                            17:52:25

11      Q    And do they?

12      A    They -- not all of them, no.

13      Q    Do some of them?

14      A    Yes.

15      Q    And the field you're looking at is the         17:52:28

16   "price basis determination" field, correct?

17           MR. ALEXANDER:  Objection to form.

18           MR. LEIB:  Strike that.

19      Q    The price -- the field you would need in

20   the data is the "price basis determination" field;    17:52:31

21   is that correct?

22           MR. ALEXANDER:  Objection to form.

23           THE WITNESS:  You're asking about PBM data

24   and variable name?

25   ///                                                    17:52:33

Page 270

1      A    Correct.                                          18:26:46

2      Q    Now, one of the things you talk about in

3   24 and 25 is that you make a distinction in your

4   formula for determining the consumer payment -- I'm

5   sorry -- the consumer overpayment in whether the        18:26:50

6   consumer had a co-insurance or co-pay, correct?

7      A    Correct.

8      Q    And just for the record, co-pay is a flat

9   amount, correct?

10     A    Yeah, it could be -- yeah, a flat amount.        18:26:54

11     Q    You pay $5 for Tier 1 drugs, $10 for

12  Tier 2 drugs, $15 for Tier 3 drugs, something like

13  that, correct?

14     A    Something like that.  Yes.

15     Q    And co-insurance is a percentage, correct?       18:26:59

16     A    Yes.

17     Q    Do you know what it's a percentage of?

18     A    I believe -- I'm trying to think.

19          The way that I calculated it here was a

20  percentage of -- the consumer paid the percentage of    18:27:03

21  the total amount paid, "total amount paid" being

22  consumer portion plus the TPP portion.

23     Q    So the amount that the TPP pays the PBM,

24  in other words, there's some total amount that the

25  PBM determines, some number.  Let's say it's $100.       18:27:08

Page 271

```
 1    And if the co-insurance was 25 percent, the TPP          18:27:09

 2    would pay the PBM $75, and the consumer would pay

 3    Walgreens $25; is that correct?

 4          A    That's my understanding, yes.

 5          Q    Is there a field that you look at to          18:27:13

 6    determine whether an individual consumer had

 7    co-payment versus co-insurance?

 8          A    I used the -- I calculated it myself.

 9               So I looked at the consumer portion

10    divided by the total amount paid by the consumer and    18:27:16

11    the TPP for a given PBM in a given month.

12               And if 90 percent of those transactions

13    were the same percentage, then I assumed that it was

14    a co-insurance situation.  Otherwise, it was a

15    co-payment situation.                                   18:27:23

16          Q    So that's the number you used, 90 percent.

17    If 90 percent of the time it was the same

18    percentage, then you decided it was co-insurance?

19          A    Yes.  It's my understanding that there are

20    some variables in Walgreens' data that potentially      18:27:28

21    have information on that, and also that the PBMs

22    would have information on that.

23               But this is the way that I did it with

24    what -- the data that I have currently.

25          Q    What data were you looking at to determine    18:27:32
```

Page 272

1    that?                                                18:27:33

2         A    To determine what?  Sorry.

3         Q    Whether 90 percent had a certain

4    percentage.

5         A    So I was looking at -- for the PBM data    18:27:36

6    merged onto the Walgreens data.

7              If the consumer payment from the Walgreens

8    data, the TPP payment from the PBM data, the sum of

9    those becomes the denominator, the consumer payment

10   is the numerator, and if that percentage is greater   18:27:41

11   than -- if I see that percentage in greater than

12   90 percent of the transactions for a given month for

13   a given PBM, then I assume that it's a co-pay --

14   excuse me -- co-insurance situation.

15        Q    And if it was 89 percent of the time, you   18:27:48

16   would figure it was co-pay?

17        A    Yes.  That's the current methodology.

18        Q    What are you looking at -- what are we

19   getting as the sum total that we're trying to find a

20   denominator for?  How do we determine that           18:27:52

21   denominator?  What are we looking at?  Is it for an

22   individual?

23             So Bob Smith, we're looking at all Bob

24   Smith's transactions in a month?

25        A    No.  This is a transaction-by-transaction   18:27:57

Page 273

1   analysis.                                        18:27:58

2       Q   Well, I thought you said to determine if

3   it's a co-insurance, you looked at a whole month.

4       A   So for a given transaction, I would

5   calculate the consumer portion as a percentage of    18:28:01

6   the total amount paid, which is given by the TPP

7   payment plus the consumer payment.  So that's on a

8   transaction-by-transaction -- I first do that.

9       Q   Okay.

10      A   Then for a given month, I look at all of     18:28:06

11  those transactions and determine whether most of the

12  transactions have that same 25 percent, for example.

13      Q   What do you mean by "those transactions"?

14      A   So first I start with the PBM

15  transactions, and I look at each transaction,         18:28:11

16  calculate the percentage that the consumer paid for

17  each transaction.

18          So do you have that in your mind?

19      Q   That one I've got.  The individual I've

20  got.                                                 18:28:15

21      A   Okay.  Okay.  So then, for every month,

22  let's say for month one, there are ten transactions.

23      Q   Ten transactions for -- ten transactions

24  for --

25          MR. ALEXANDER:  Please --                    18:28:19

Page 274

| | | |
|---|---|---|
| 1 | MR. LEIB:  I understand. | 18:28:20 |
| 2 | Q    Ten transactions for Bob Smith?  Is that | |
| 3 | what you're saying? | |
| 4 | MR. ALEXANDER:  Counsel, I would just ask, | |
| 5 | please let the witness complete her answer in full | 18:28:22 |
| 6 | before asking the next question, even if it's to | |
| 7 | clarify what she is testifying to. | |
| 8 | BY MR. LEIB: | |
| 9 | Q    No, it's not just for Bob Smith. | |
| 10 | So what are all the transactions that | 18:28:25 |
| 11 | you're looking at to decide if Bob Smith has a | |
| 12 | co-pay or co-insurance? | |
| 13 | A    So I'm looking at -- again, this is the | |
| 14 | PBM-produced data for the fund plaintiffs. | |
| 15 | So I'm looking at, for a given PBM, for a | 18:28:30 |
| 16 | given month, all of the transactions in that month. | |
| 17 | So these were the fund plaintiffs, right, for a | |
| 18 | given PBM. | |
| 19 | Q    Well, you first said, "For a given PBM for | |
| 20 | a given month."  And then you said, "So these were | 18:28:35 |
| 21 | the fund plaintiffs," right? | |
| 22 | So, look.  Steamfitters -- which did have | |
| 23 | co-insurance -- Steamfitters had a specific plan. | |
| 24 | That plan provided that they had co-insurance. | |
| 25 | Are you only looking at Steamfitters | 18:28:40 |

Page 275

1    beneficiaries in that month, or are you looking at        18:28:41

2    all CastiaRx transactions in that month?

3            MR. ALEXANDER:  Objection to form.

4            THE WITNESS:  So I'm doing it by PBM.  So

5    to answer your question, if I looked at -- I would        18:28:45

6    look at Castia transactions for month one for all

7    of -- all of the transactions in that month, and

8    determine if the majority, or more than the -- you

9    know, 90 percent, were the same percentage,

10   25 percent, 35 percent, whatever it is, then I would      18:28:50

11   identify that as a co-insurance situation.

12           That works with the data that I have here.

13   If I'm given more PBM data, my assumption is that

14   the PBM -- we would ask the PBM to turn over that

15   information that would allow me to identify whether        18:28:56

16   there was a co-insurance or co-pay situation.

17   BY MR. LEIB:

18       Q   Before we get to if the PBM turns over

19   more data, you understand that CastiaRx administers

20   thousands of plans, right?                                18:29:00

21       A   I don't know that.  It wouldn't surprise

22   me.

23       Q   It would surprise you or wouldn't?

24       A   Would not.

25       Q   What about Express Scripts?  You know         18:29:04

Page 276

```
1   Express Scripts, which is the largest PBM, I         18:29:05

2   believe, in the country.  They have thousands of

3   plans they work with.

4           You understand that, right?

5           MR. ALEXANDER:  Objection to form.           18:29:08

6           THE WITNESS:  Again, that wouldn't

7   surprise me.  I don't have a feel for how many plans

8   they have.

9   BY MR. LEIB:

10      Q   Do you understand that, for example, in       18:29:11

11  this case, Steamfitters' plan had co-insurance, but

12  IBEW's plan had a co-pay?

13      A   I'm looking at Exhibit 3 because I have

14  that in Exhibit 3.  I just don't remember.

15          So yes, IBEW had a co-pay plan and            18:29:16

16  Steamfitters had a co-insurance.

17      Q   Do you think all of CastiaRx's employers,

18  union funds, other entities that they work with,

19  other plans that they work with, do you think they

20  all had co-insurance?                                 18:29:22

21      A   I didn't say that.

22      Q   But you -- if 90 percent of the

23  transactions in the month for CastiaRx were

24  co-insurance transactions, you would apply

25  co-insurance to all of the transactions?             18:29:25
```

Page 277

```
 1        A    So I only have transactions for            18:29:26

 2   Steamfitters at this point.

 3        Q    Okay.  So then you're only looking at one

 4   plan.  What's your methodology if there's more than

 5   one plan?                                             18:29:29

 6        A    So like I said earlier, I believe that the

 7   PBMs would be able to give that information.  And I

 8   also believe there are variables in Walgreens' data

 9   that indicate co-insurance.  But that's not

10   something I looked at at this point.  I did -- I      18:29:34

11   used the methodology that I just described for the

12   data that I have.

13        Q    We looked at -- first of all, what

14   fields -- what fields are you talking about?

15             MR. ALEXANDER:  Objection to form.         18:29:38

16   BY MR. LEIB:

17        Q    In the PBM data, what fields are you

18   talking about?

19        A    I don't have a particular field name in

20   the PBM data.  That would be something that we would  18:29:41

21   ask them to produce.

22        Q    Well, do you know if they have data that

23   would differentiate between -- I'm sorry -- if they

24   have fields that would differentiate between co-pay

25   and co-insurance?                                     18:29:45
```

Page 278

```
 1        A   I assume they do because they need it to        18:29:45

 2   adjudicate the claim.

 3            MR. LEIB:  Well, let's look at Tab R, and

 4   mark that as Exhibit 526.

 5            (Exhibit 526 was marked for identification      18:29:49

 6        and is attached hereto.)

 7            MR. WOROBIJ:  Exhibit marked.

 8   BY MR. LEIB:

 9        Q   Do you see any fields here that are either

10   co-pay or co-insurance?                                  18:29:51

11            And this is Express Scripts data 1548, ESI

12   1548.

13            MR. ALEXANDER:  Objection to form.

14            MR. LEIB:  I'm just putting -- what's the

15   form?  I'm telling what the Bates number is.  It's       18:29:55

16   ESI 1548.

17            MR. ALEXANDER:  I have no objection to

18   that aspect of the question.

19            MR. LEIB:  There you go.

20        Q   Do you see -- I'll just point you to it.        18:29:58

21            Do you see in column K, it says, "bill

22   patient pay amount," and under that it says, "co-pay

23   amount"?

24        A   I'm not there.  Hold on.  I was just

25   looking at the rest of the variables here.               18:30:02
```

```
                                                    Page 279
 1          Okay.  Column K, you said?              18:30:03

 2      Q   Yeah.

 3      A   Okay.

 4      Q   That's the only field that says, "co-pay"

 5  or "co-insurance" in the data, and it says, "co-pay    18:30:06

 6  amount."

 7          Do you know whether there's co-insurance

 8  anywhere in this field or not?

 9          MR. ALEXANDER:  Objection to form.

10          THE WITNESS:  I don't know just looking at    18:30:09

11  it now.

12  BY MR. LEIB:

13      Q   And do you know if Express Scripts has, in

14  any data they could produce, a co-insurance field?

15      A   Do I know?  I'm not sure, but I believe    18:30:12

16  they would have that information.

17      Q   What's the basis of your belief?

18      A   They need that information to adjudicate

19  the claim.

20      Q   Well, when they adjudicate the claim, they    18:30:16

21  can put the data in any format they want, correct?

22      A   Yes.

23      Q   And they could put in this column here

24  both co-pay and co-insurance and just label it

25  "co-pay," correct?                              18:30:20
```

Page 280

```
 1            MR. ALEXANDER:  Objection to form.        18:30:21

 2            THE WITNESS:  In this particular column,

 3      yes, but they need to have information to allow them

 4      to determine what the co-pay amount is or what the

 5      amount is that needs to go in that column.          18:30:24

 6      BY MR. LEIB:

 7         Q    And that information is the plan design

 8      information, correct?

 9            MR. ALEXANDER:  Objection to form.

10            THE WITNESS:  That information would be --    18:30:28

11      yes.  Yes.

12      BY MR. LEIB:

13         Q    And that's a different document than this

14      document, correct?

15            MR. ALEXANDER:  Objection to form.          18:30:30

16      Objection to scope.

17            THE WITNESS:  I don't know if it's a

18      different document.  This could be a subset of that

19      document.  I don't know.

20      BY MR. LEIB:                                        18:30:32

21         Q    Well, nowhere here does it indicate for

22      any particular fund what their plan design is,

23      correct?

24            MR. ALEXANDER:  Objection to form.

25            THE WITNESS:  I don't know.  I haven't       18:30:35
```

Page 281

```
 1    studied it for that.  I can look and let you know if      18:30:36

 2    I think any of those variables fall into that

 3    category, but I don't know.  I don't have an opinion

 4    on that.

 5    BY MR. LEIB:                                               18:30:40

 6        Q   Looking at this data, for any particular

 7    line, can you know if it's co-insurance or co-pay?

 8        A   For any particular line?  I can determine

 9    that based on the calculation that I was describing

10    earlier.                                                   18:30:44

11        Q   Well, you would have to -- wouldn't you

12    now aggregate all the different -- even to do your

13    formulary or your methodology, you'd have to

14    aggregate all the transactions from a single plan,

15    correct?                                                   18:30:49

16            MR. ALEXANDER:  Objection to form.

17            THE WITNESS:  Possibly.  I haven't thought

18    about that.  I was working with the data that has,

19    you know, all -- it's all one plan.

20            But yes, you could do it by plan.              18:30:52

21    BY MR. LEIB:

22        Q   How would you know?  How would you figure

23    out how to group the plans together?

24        A   Again, I believe that's data that the PBM

25    would have.                                                18:30:56
```

Page 282

```
 1        Q    Do you know for sure that the PBM has that      18:30:56

 2   data?

 3        A    I'm fairly certain that they do, yes.

 4        Q    Are you aware that within a plan design,

 5   there can be both co-insurance and co-pays?              18:30:59

 6        A    No, I don't have that understanding.  I

 7   don't have --

 8        Q    Do you know how Medicare works?

 9             I'm sorry.  I may have interrupted you.

10   Did you mean to the finish something?                    18:31:03

11        A    No.  I just said I don't have knowledge of

12   that.

13        Q    Do you know how Medicare works?  I'm

14   sorry.  Medicare prescription drug plans.

15             MR. ALEXANDER:  Objection to form.            18:31:07

16   Objection to scope.

17             THE WITNESS:  I have a very general idea.

18   BY MR. LEIB:

19        Q    Are you aware that there's a deductible

20   stage?                                                   18:31:10

21        A    I'm not -- I'm aware there's a donut hole.

22   That's the -- that's the piece that gets all the

23   publicity.

24        Q    So there's usually a deductible stage.  In

25   fact, there's always a deductible stage.  There's an     18:31:13
```

```
                                                        Page 283

1    initial coverage stage.                            18:31:14

2           And are you aware that the initial

3    coverage stage can be both a co-pay -- can be either

4    a co-pay or co-insurance?

5           MR. ALEXANDER:  Objection to form.          18:31:18

6    Objection to scope.

7           THE WITNESS:  I don't have that

8    understanding.

9    BY MR. LEIB:

10       Q   Do you know what the coverage gap or the   18:31:19

11   "donut hole," as you called it, is?

12          MR. ALEXANDER:  Same objection.

13          THE WITNESS:  Do you mean do I know what

14   dollar amounts that corresponds to or -- what's your

15   question?                                          18:31:24

16   BY MR. LEIB:

17       Q   Whether it's co-pay or co-insurance.

18       A   During the donut hole?

19       Q   Um-hum.

20       A   No.                                        18:31:26

21       Q   The donut hole used to be 100 percent

22   individual pay.

23       A   Yeah.  That's why I was a little confused

24   by your question, but --

25       Q   But there were changes in the law in the   18:31:29
```

Page 284

```
 1    Bush Administration and the Obama Administration,        18:31:30

 2    and now the donut hole is down to 25 percent

 3    co-insurance, just to let you know.

 4         A    Okay.

 5         Q    Have you heard the -- that there's a           18:31:34

 6    catastrophic phase after the donut hole?

 7         A    I have heard --

 8              MR. ALEXANDER:  Objection to form.

 9    Objection to scope.

10    BY MR. LEIB:                                             18:31:37

11         Q    And are you aware that that could be

12    co-insurance or co-pay?

13              MR. ALEXANDER:  Same objections.

14              THE WITNESS:  I don't have an

15    understanding of that.                                   18:31:39

16    BY MR. LEIB:

17         Q    So if, in fact, the plan had both

18    co-insurance and co-pay in with it, your methodology

19    could end up causing you to assign everybody a

20    co-pay, because it wasn't 90 percent of the             18:31:43

21    individual transactions, correct?

22         A    Well, my methodology actually is -- the

23    PBMs will turn over data that has that information.

24    So that's my first line.

25              What I have done at this point is the          18:31:47
```

Page 285

```
 1    calculation that I described for you.  Yes.  But I      18:31:48

 2    believe that we'll be able to get that data from

 3    PBMs.

 4         Q   But if you're not able to get that data

 5    from the PBM, and you applied your methodology, and      18:31:51

 6    there is a plan that has both co-pay and

 7    co-insurance within it, you might take that and

 8    assign everybody co-pays because more than

 9    10 percent of the transactions among the plan

10    participants in a month don't have a fixed           18:31:56

11    percentage.

12              MR. ALEXANDER:  Objection to form.

13              THE WITNESS:  Potentially.  I haven't

14    looked at that.

15    BY MR. LEIB:                                         18:31:59

16         Q   Are you aware that plans have deductibles?

17         A   I am aware that there can be a deductible,

18    yes.

19         Q   And in a deductible phase, the consumer

20    generally is paying 100 percent and the TPP is       18:32:03

21    paying zero; is that your understanding of

22    deductibles?

23         A   Yes.

24         Q   Have you accounted for deductibles in any

25    way in your methodology?                             18:32:06
```

```
                                                      Page 286
 1        A    No.                                   18:32:07

 2        Q    Because you don't take that into account,

 3   couldn't that cause you to overstate the consumer's

 4   damage?

 5        A    No.                                   18:32:09

 6        Q    Let me give you an example.  Well, let me

 7   ask you, why do you say it couldn't cause you to

 8   overstate the consumer's damage?

 9        A    It's my understanding that the damage

10   is -- or the overpayment should be calculated on a   18:32:13

11   transaction-by-transaction basis.

12            So if a consumer has an overpayment on a

13   given transaction, the deductible doesn't make a

14   difference to that.

15        Q    Why wouldn't it?                       18:32:18

16            If you're in a phase where you're paying

17   100 percent and the TPP is paying zero, then in your

18   example, you're going to assign that person a

19   percentage of the PSC price as the amount they

20   should have paid, not 100 percent of the PSC price   18:32:23

21   as the amount they should have paid, correct?

22            MR. ALEXANDER:  Objection to form.

23            THE WITNESS:  I'm -- no.  I'm not

24   following you.  I'm sorry.

25   ///                                              18:32:27
```

```
                                                    Page 287
 1    BY MR. LEIB:                              18:32:27

 2         Q    Let's say you have a $500 deductible in a

 3    plan, and the plan has 25 percent co-insurance.

 4    Okay?

 5         A    $500 deductible, 25 percent co-insurance.    18:32:29

 6    Okay.

 7         Q    Right.  There's a transaction on

 8    January 1st.  The first transaction of the year.

 9    The consumer paid $50.  The PSC price is $10.

10         Do you have that in your head?             18:32:34

11         A    I think so.  I might need to ask you

12    again, but yes, so far.

13         Q    The consumer paid $50, the PSC price is

14    $10.

15         Under your methodology, because you don't    18:32:38

16    take deductibles into account, you're going to say

17    the person should have paid 25 percent of the $10

18    PSC price, or $2.50, correct?

19         MR. ALEXANDER:  Objection to form.

20         THE WITNESS:  If I could use my             18:32:42

21    calculator, I could do on the math for you.  But --

22    BY MR. LEIB:

23         Q    What's 25 percent of $10?

24         A    2.50.

25         Q    So you're going to say that that person    18:32:45
```

Page 288

```
 1    should have paid $2.50, correct?                    18:32:46

 2           MR. ALEXANDER:  Same objection.

 3           THE WITNESS:  Yes, provided they have a

 4    co-insurance.  Okay.  I'm with you.

 5    BY MR. LEIB:                                         18:32:49

 6      Q    The person actually paid $50 because they

 7    were in their deductible.  So they paid the full

 8    cost.  And you're going to take $50, and you're

 9    going to subtract $2.50, and you're going to say the

10    damage is $47.50, correct?                           18:32:54

11           MR. ALEXANDER:  Objection to form.

12           THE WITNESS:  Yes.

13    BY MR. LEIB:

14      Q    But if you're in a deductible phase and

15    you're paying 100 percent, you should pay            18:32:57

16    100 percent of the PSC price, or $10, correct?

17           MR. ALEXANDER:  Objection to form.

18           THE WITNESS:  It's my understanding that I

19    was to look at it on a transaction-by-transaction

20    basis and calculate the difference as the formulas   18:33:01

21    that I have listed in my report.

22    BY MR. LEIB:

23      Q    That wasn't my question.

24           If you're in the deductible phase and

25    you're paying 100 percent, you should pay            18:33:04
```

Page 289

1    100 percent of the PSC price, or $10, correct?         18:33:05

2              MR. ALEXANDER:  Objection to form.

3              THE WITNESS:  I don't know if that's the

4    case.

5    BY MR. LEIB:                                           18:33:08

6         Q    Well, if you're in a deductible, you

7    understand -- you just testified five minutes ago --

8    you understand that generally plan designs require

9    people in the deductible to pay 100 percent of the

10   cost of the drug, right?                               18:33:12

11             MR. ALEXANDER:  Objection to form.  I'm

12   sorry.  Objection to scope as well.

13   BY MR. LEIB:

14        Q    That's your understanding, correct,

15   Dr. Hilton?                                            18:33:14

16             MR. ALEXANDER:  Same objection.

17             THE WITNESS:  That is my understanding of

18   a deductible, yes.

19   BY MR. LEIB:

20        Q    And 100 percent of $10 is what?             18:33:16

21        A    $10.

22        Q    And $50 minus $10 is what?

23        A    $40.

24        Q    $47.50 minus $40 is what?

25        A    Wait.  Sorry.  It's late in the day for --   18:33:21

Page 290

1    those are not the easy math questions.                18:33:22

2         Q    $47.50 minus $40 is what?

3         A    7.50.

4         Q    So in this situation, because you didn't

5    take deductibles into account in your methodology,   18:33:25

6    the consumer would have overstated damages of $7.50,

7    correct?

8              MR. ALEXANDER:  Same objection.

9              THE WITNESS:  I don't know if I would

10   agree with you on that based on my instruction to     18:33:28

11   look at it on a transaction-level basis.

12   BY MR. LEIB:

13        Q    So you were instructed by counsel not to

14   consider deductibles?

15        A    Was I actually instructed?  I'm not sure    18:33:32

16   that was an actual instruction.

17             My understanding is that each -- the

18   overpayment should be calculated on a

19   transaction-by-transaction-level basis, though.

20        Q    This is a transaction-by-transaction         18:33:37

21   basis.  It's a transaction on January 1st, and I'm

22   trying to get the right division between the TPP and

23   the consumer.

24             The TPP paid --

25             MR. ALEXANDER:  Objection -- sorry.          18:33:40

```
                                                           Page 291
 1   BY MR. LEIB:                                    18:33:41

 2        Q    The TPP paid zero.  So under any

 3   methodology, right, the TPP couldn't be damaged

 4   because the TPP paid zero, right?

 5        A    That's right.                         18:33:44

 6        Q    The consumer paid $50.  So the maximum

 7   damage the consumer could have is $50, right?

 8        A    The maximum -- yes.

 9        Q    And under your methodology that we just

10   walked through, in the situation we just walked   18:33:48

11   through, you would assign damages to that person of

12   $47.50, correct?

13             MR. ALEXANDER:  Same objections.

14             THE WITNESS:  Yes, that's what the

15   methodology would do.                           18:33:52

16   BY MR. LEIB:

17        Q    If, in the plan design, the person paid

18   100 percent, which is what the person paid

19   initially, you would have to assign that person $10

20   of damage -- $10 -- strike that.                18:33:56

21             If the plan design said that the person

22   paid 100 percent because they were in the deductible

23   phase, they would have to pay the full $10 PSC

24   price, correct?

25             MR. ALEXANDER:  Objection to form.    18:34:00
```

Page 292

```
 1   Objection to scope.                              18:34:00

 2          THE WITNESS:  I didn't take into account

 3   the plan design.  That wasn't something I was asked

 4   to look at.

 5   BY MR. LEIB:                                      18:34:03

 6      Q    So another thing you didn't take into

 7   account.

 8          Are you aware that Steamfitters didn't

 9   have a straight co-insurance?

10          MR. ALEXANDER:  Objection to form.         18:34:05

11          THE WITNESS:  Do you mind if I turn the

12   light on again?  I'm sorry.

13   BY MR. LEIB:

14      Q    I do not mind at all.

15      A    If I don't move, it turns off.            18:34:08

16          I'm sorry.  Restate your question again.

17      Q    Sure.

18          Are you aware that Steamfitters' plan

19   design was not that it would always be 25 percent

20   co-insurance?                                     18:34:13

21      A    I don't have an understanding of that.  I

22   know we calculated it, and it turned out to be

23   whatever it was.  I don't have the calculation off

24   the top of my head, or if it varied by year or --

25   I'm not sure what you said -- year.               18:34:17
```

Page 293

```
 1        Q    And based on your calculation, you          18:34:18

 2   determined that at least 90 percent of the

 3   transactions had a specific set percentage of 75/25

 4   and, therefore, you assigned all transactions a

 5   75/25 division, correct?                             18:34:22

 6        A    That's not exactly right.

 7             I believe the way that it worked was, I

 8   would determine whether there was co-insurance in

 9   effect based on the 90 percent, you're saying.  But

10   then when I did my calculations, I used the          18:34:27

11   percentage that is shown for the transaction.

12             So whatever the transaction -- the

13   percentage is for a given transaction, that

14   percentage would remain in effect.

15        Q    For the whole month, for all of the         18:34:32

16   transactions for that PBM?

17        A    So looking at -- for example, looking at

18   Exhibit 3, if we take one transaction --

19        Q    What are we looking at?  The ESI data?

20        A    No.  Exhibit 3C.                            18:34:37

21        Q    Oh, okay.  In your report, Exhibit 3C.  Go

22   ahead.

23        A    Yes.

24             So there -- sorry.  Are you there?

25        Q    I'm there.  Go ahead.                       18:34:40
```

Page 294

| | | |
|---|---|---|
| 1 | A   Okay.  So there, we have -- the consumer | 18:34:41 |

2  paid $5, the TPP paid $15, for a total of $20.  So

3  that split is held constant.  Whatever the share

4  that the consumer paid of the total amount would be

5  applied to the rest of the calculation to figure out     18:34:46

6  the total -- sorry -- the consumer overpayment and

7  the TPP overpayment.  I believe you're saying --

8     Q   Which transaction --

9     A   -- something other than that.

10     Q   I'm sorry.  I apologize.     18:34:50

11        Which transaction are you looking at?

12     A   Right now I'm just looking at the first

13  transaction for the Arizona -- down below,

14  "Panel B:  Transactions with Co-Insurance."

15     Q   Okay.  You said $20, but the total --     18:34:54

16  total is 20.09.  $20.09, correct?

17     A   Yes.  Sorry.  Yes.

18     Q   Okay.  And the total overpayment -- well,

19  the total consumer payment is $1.27, and -- I'm

20  sorry.     18:35:00

21        The amount paid by the TPP was 15.07, and

22  the amount paid by the consumer was 5.07, which is

23  one-third of 15.07, approximately, correct?

24     A   Well, it would be -- you'd take the $5

25  relative to the $20.     18:35:06

Page 295

```
 1        Q    Right.  And then you figured out it was      18:35:06

 2   25 percent.

 3        A    Yes.  I thought you said a third.  That's

 4   why I was correcting you.

 5        Q    And then you applied that                    18:35:09

 6   75 percent/25 percent division to all of the

 7   transactions for Steamfitters for that -- in this

 8   case -- you just said you would do it month by

 9   month.  In this case, they always came out that way.

10        A    So I think you're confusing a couple        18:35:14

11   things.

12             First, I did the calculation that you're

13   referring to for a given month, for a given PBM, to

14   determine if a co-insurance was in effect versus a

15   co-pay.                                                18:35:18

16        Q    Okay.

17        A    If I determined that co-insurance was in

18   effect, I then used the Exhibit 3 -- the actual

19   numbers, the actual split, between what the consumer

20   paid and what the TPP paid.                           18:35:22

21             So I'm not -- the number that I found in

22   that initial analysis where I was determining

23   whether it was a co-pay or not isn't necessarily the

24   one I'm going to use.  I recalculated it.  It turns

25   out to be the same.  But it's not that I hold that    18:35:27
```

Page 296

```
 1   constant over some set of transactions or anything.      18:35:28

 2   It's specific to a given transaction.

 3        Q    So whatever the division was for the

 4   original, you would divide it for the revised number

 5   based on the PSC price?                                  18:35:32

 6        A    Correct.

 7             MR. LEIB:  Okay.  Let's look at Tab S, and

 8   then we'll take a break after we look at Tab S,

 9   which is Exhibit 527.

10             (Exhibit 527 was marked for identification    18:35:36

11        and is attached hereto.)

12             MR. WOROBIJ:  Exhibit 527 marked.

13   BY MR. LEIB:

14        Q    You can look at page 223.  On the bottom

15   right-hand corner, there are page numbers.  So 223       18:35:38

16   actually doesn't make sense.  Hold on one second.

17   242.  And this is LOCAL439_0000223.

18             And actually, before we go on, why don't

19   we look at the first page of the document.

20             Do you see on the first page of the           18:35:45

21   document it says, "Steamfitters Local 439 Health &

22   Welfare Plan, Summary Plan Description, January 1st,

23   2013"?

24        A    Yes.

25        Q    Do you understand what a summary plan         18:35:48
```

Page 347

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [x] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: January 23, 2023

23

              *Carla Soares*

24

25              CARLA SOARES

                CSR No. 5908