# EXHIBIT A

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295c WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Case No. 1:17-cv-02246 |
| Plaintiffs, | |
| v. | |
| WALGREEN CO., | |
| Defendant. | |

**Amended Expert Report of James W. Hughes, Ph.D.**

**April 27, 2023**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# TABLE OF CONTENTS

I.    Overview ........................................................................................................... 1

    A.    Qualifications ................................................................................... 1

    B.    Allegations ....................................................................................... 3

    C.    Assignment ...................................................................................... 4

II.    Summary of Conclusions ................................................................................ 5

III.    The Life of a Prescription Drug Payment ...................................................... 8

    A.    Who are the Parties Involved in a Prescription Transaction? ................ 9

        1.    Consumers ........................................................................... 9

        2.    Pharmacies .......................................................................... 9

        3.    Pharmacy Benefit Managers .............................................. 10

        4.    Third Party Payers ............................................................. 10

    B.    Life Cycle of a Prescription Transaction .............................................. 11

        1.    How Does a Consumer Pay for a Prescription? ...................... 11

        2.    How Is the Pharmacy Reimbursed for the Balance of the Prescription Cost After the Consumer Contribution? .............................. 14

        3.    How Is the PBM Reimbursed for Its Payment to the Pharmacy? ............. 14

        4.    Additional Complications in Prescription Drug Payment Flows .............. 16

    C.    Understanding the Path of a Generic Prescription Drug Payment Matters for This Case ...................................................................... 18

IV.    Identifying and Assessing Potential Injury, if any, to Proposed Class Members Requires Individualized Inquiry ...................................................... 20

    A.    Overview of Dr. Hilton's Classwide Formulaic Calculation of Alleged Overpayments ...................................................................... 22

    B.    The Data Dr. Hilton Proposes Using and Her Formulaic Calculations Cannot Determine Injury to Proposed Consumer Class Members on a Classwide Basis ...................................................................... 25

        1.    Consumer Injury Cannot be Assessed on a Classwide Basis ................. 25

            a.    Deductible Payments and Out-of-Pocket Maximums .................. 26

                i.    The Presence of Deductibles Means that Injury Cannot be Assessed Using a Transaction-by-Transaction Calculation .................................................... 26

                ii.    The Presence of Out-of-Pocket Maximums Means that Injury Cannot be Assessed Using a Transaction-by-Transaction Calculation ........................... 29

i

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

          iii.    The Data Dr. Hilton Proposes Using Cannot Assess Potential Consumer Overpayment for Consumers with Deductibles and Out-of-Pocket Maximums ............ 33

      b.    Copayment Versus Coinsurance Payments ................................. 35

          i.    It is Necessary to Know if a Consumer's Plan Requires a Copayment or Coinsurance Payment to Determine Injury ..................................................... 36

          ii.    The Data Dr. Hilton Uses Do Not Report Whether the Consumer Pays a Copayment or Coinsurance Payment.............................................................................. 37

          iii.    Dr. Hilton's Methodology to Infer Whether a Consumer Payment is a Copayment or a Coinsurance Payment is Flawed ........................................ 42

          iv.    Dr. Hilton's Calculation Ignores the Fact that Consumer Payments are Based on Factors Other than Just Copayment or Coinsurance Payments ............... 44

    2.    Medicare Part D Payments and Injury to Part D Consumers Cannot be Assessed on a Classwide Basis ........................................................ 45

      a.    Consumer Payments under Medicare Part D ............................... 45

      b.    Dr. Hilton's Transaction-by-Transaction Calculation Cannot Determine Potential Overpayment for Medicare Part D Consumers .................................................................... 50

      c.    The Data Dr. Hilton Proposes Using are Insufficient to Determine Potential Overpayment for Medicare Part D Consumers................................................................................... 58

C.    Injury to Third-Party Payer Members of the Proposed Class Cannot be Assessed on a Classwide Basis ................................................................. 59

    1.    Potentially Tens, or Even Hundreds, of Thousands of Individual TPPs Would Need to be Assessed as Possible Members of the Proposed Class ....................................................................................... 59

    2.    It is Not Possible to Determine When U&C is a Basis for TPP Payment or Reimbursement on a Classwide Basis with the Available Data ............................................................................... 61

    3.    Injury to TPPs Who Received Stop-Loss Insurance Payments Cannot be Assessed on a Classwide Basis................................................ 64

    4.    Injury to TPPs who Benefit from Generic Effective Rate Guarantee Clauses Cannot be Assessed on a Classwide Basis .................................. 67

    5.    Dr. Hilton Cannot Accurately Determine Injury to Medicare Part D Plan Sponsors............................................................................... 71

      a.    Medicare Part D Plan Payments and Government Subsidies ....... 72

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

        i.     Government Prospective Subsidies ................................... 73

        ii.    Government Reconciliation Payment ............................. 74

V.     Dr. Hilton's Methodology Highlights an Inherent Conflict Between Consumer And TPP Class Members ................................................................. 76

VI.    Conclusion ...................................................................................... 77

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I.     Overview

### A.     Qualifications

1.     I am the Thomas Sowell Professor of Economics, Emeritus at Bates College. I specialize in the fields of Industrial Organization, Law and Economics, Health Economics, Environmental Economics, and Labor Economics. I earned my M.A. in Economics from Boston University in 1978, and my Ph.D. in Economics from the University of Michigan in 1987. I joined the faculty of Amherst College in 1987 and the faculty of Bates College in 1992. In 2005, I was named the Thomas Sowell Professor of Economics at Bates College. In 2020, I was granted emeritus status upon my retirement from the College.

2.     I have expertise in the economic analysis of class certification issues, damages, and calculating economic harm in the pharmaceutical industry. I have testified and/or offered reports in matters involving the prescription pharmaceuticals Actos, Cardizem CD, Celexa and Lexapro, Cipro, EpiPen, HIV cART, Intuniv, Lamictal, Lidoderm, Lipitor, Loestrin, Namenda, Neurontin, Nexium, Niaspan, Opana, Procardia XL, Provigil, Restasis, Rezulin, Risperdal, Skelaxin, Thalomid and Revlimid, Xyrem, and Zetia.[1] I have also analyzed issues

---

[1]     *Painters and Allied Trades District Council 82 Health Care Fund et al. v. Takeda Pharmaceutical Company Limited et al.*, United States District Court Central District of CA, Case No. 2:17-cv-07223-SVW-AS; *In Re: Cardizem CD Antitrust Litigation, Blue Cross Blue Shield of Michigan, et al. v. Hoechst AG, et al.*, United States District Court, Eastern District of Michigan, Case No. 01-72806; *Celexa and Lexapro Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, Master Docket No. 09-MD-2067-(NMG); *Altman v. Bayer Corp.*, New York Supreme Court, Index No. 603820-00; *Cipro Cases I & II*, Superior Court of California, San Diego County, JCCP Proceeding Nos.: 4154 & 4220; *In Re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices, and Antitrust Litigation,* United States District Court, District of Kansas, Civil Action No. 2:17-md-02785-DDC-TJJ (MDL No: 2785); *Staley et al. v. Gilead Sciences, et. al.,* United States District Court, Northern District of California, Case No. 3-19-cv-02573-EMC; *In Re: Intuniv Antitrust Litigation,* United States District Court, District of Massachusetts, Lead Case No. 1:16-cv-12396-ADB; *In Re: Lamictal Direct Purchaser Antitrust Litigation*, United States District Court, District of New Jersey, Case No. 12-cv-995 (WHW); *In re: Lidoderm Antitrust Litigation*, United States District Court, Northern District of California, MDL Docket No. 14-md-02521-WHO; *In Re: Lipitor Antitrust Litigation,* United States District Court, District of New Jersey, MDL No. 2332; *In Re: Loestrin 24 Antitrust Litigation,* United States District Court, District of Rhode Island, MDL No. 2472; *In Re: Namenda Indirect Purchaser Antitrust Litigation*, United States District Court, Southern District of New York, Civil Action No. 15-cv-06549; *In Re: Neurontin Antitrust Litigation, Louisiana Wholesale Drug Company et al., v. Pfizer Inc., et al.,* United States District Court, District of New Jersey, MDL Docket No. 1479, Master Docket No. 02-CV-1390; *In Re: Nexium (esomeprazole) Antitrust Litigation*, United States District Court, District of Massachusetts, MDL 2409, Civil Action No.: 1:12-md-2409-WGY; *In Re: Niaspan Antitrust Litigation,* United States District Court, Eastern District of

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of injury and damages in multiple pharmaceutical average wholesale price ("AWP")
litigation cases. I submitted reports in AWP actions in the states of Alabama, Connecticut,
Illinois, Montana, Nevada, New Jersey, and similar actions in Florida.[2] Further, I have
testified in a class certification matter involving the Pharmacy Benefit Manager Medco
Health Solutions.[3]

3. My curriculum vitae is attached as **Appendix A**. A list of recent cases in which I have
testified is attached as **Appendix B**. I have been assisted on this report by staff at Analysis
Group, Inc. working under my direction. I am being compensated at my usual rate of $1,150
per hour, and I receive compensation based on the professional fees of Analysis Group. My
compensation is not contingent on the nature of my findings or on the outcome of this
litigation, and I have no financial interest in the outcome of this litigation.

---

Pennsylvania, MDL Docket No. 2460, Master Case No. 2:13-md-2460; *In Re: Opana ER Antitrust
Litigation,* United States District Court, Northern District of Illinois, MDL No. 2580, Lead Case No.
14cv-10150; *Great Lakes Health Plan et al. v. Pfizer, et al.*, United States District Court, Northern
District of West Virginia, No. 1:01CV106; *King Drug Company of Florence Inc. et al., v. Cephalon
Inc. et al.*, United States District Court, Eastern District of Pennsylvania, No. 2:06-cv-1797; *In Re:
Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation*, United States District Court,
Eastern District of New York, No. 18-md-2819 (NG) (LB); *Holoman, et al. v. Pfizer Inc. et al.,* Illinois
3rd Judicial Circuit, No. 02 L 480; *The State of Texas ex rel. Allen Jones v. Janssen, L.P. et al.,* 250th
Judicial District, Travis County, Tx, Cause No. D-1-GV-04-001288; *In Re: Skelaxin (metaxalone)
Antitrust Litigation*, United States District Court, Eastern District of Tennessee, Lead Case No. 2:12-
cv-4, MDL 2343; *In Re: Thalomid and Revlimid Antitrust Litigation*, United States District Court,
District of New Jersey, Case No. 2:14-cv-06997 (MCA) (MAH); *In Re: Xyrem (Sodium Oxybate)
Antitrust Litigation*, United States District Court, Northern District of California, Case No. 3:20-md-
02966-RS-SVK; *In Re: Zetia (Ezetimibe) Antitrust Litigation*, United States District Court, Eastern
District of Virginia, Norfolk Division, Civil Action No. 18-md-2836-RBS-DEM.

[2] State of Alabama v. Abbott Laboratories Inc. et al., Circuit Court of Montgomery County, Alabama,
C.C. Civil Action CV 2005-21; State of Connecticut v. Aventis Pharmaceuticals, Docket X07 CV03-
0083299 S (CLD); People of the State of Illinois v. Abbott Laboratories et al., Circuit Court, Cook
County IL No: 05 CH 2474; In Re: Pharmaceutical Industry Average Wholesale Price Litigation, in the
matters of: State of Nevada v. American Home Prods. Corp., et al., 02-cv-12086-PBS; and State of
Montana v. Abbott Labs., Inc., et al., 02-cv-12084-PBS, MDL No. 1456, Master File No. 01-cv-12257-
PBS; International Union of Operating Engineers Local 68 Welfare Fund v. Astra-Zeneca et al., Docket
MON-L-3136-06; U.S. ex rel. Ven-a-Care of the Florida Keys, Inc. v. Abbott Laboratories, Inc., United
States District Court, District of Massachusetts, Civil Action NO. 00-cv-10698 MEL; In Re:
Pharmaceutical Industry Average Wholesale Price Litigation, In the Matter of United State of America
ex re. Ven-a-Care of the Florida Keys, Inc., v. Abbott Laboratories, Inc., Civil Action No. 06-11337-
PBS.

[3] Brady Enterprises, Inc. v. Medco Health Solutions, Inc., United States District Court, Eastern District
of Pennsylvania, Civil Action No. 03-4730.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### B.     Allegations

4.    Plaintiffs allege that putative class members were overcharged on their purchases of generic prescription drugs at Walgreen Co. ("Walgreens") because of Walgreens' alleged inflation of the 'usual and customary' prices that were reported and used to overcharge Plaintiffs and putative class members "for purchases of certain generic drug purchases at Walgreens pharmacies."[4]

5.    Plaintiffs seek to bring this class action suit on behalf of the following proposed class of nationwide consumers and funds/Third Party Payers ("TPPs"), defined as:

> "All persons, or entities, for whom prescription drug insurance benefits were provided through the Relevant PBMs (a.k.a., A&A Services, LLC d/b/a SAV-RX Prescription Services; Caremark, LLC; Castia Rx (f/k/a Leehar Distributors Missouri, LLC); Express Scripts, Inc.; Medco Health Solutions, Inc.; MedImpact Healthcare Systems, Inc.; MedTrak Services, LLC; and/or OptumRx, Inc.), and who paid or reimbursed in whole, or in part, for generic prescription drugs from Walgreen Co. at any point in time from the period January 1, 2007 through the present, in Arizona, California, Connecticut, Delaware, Florida, Illinois, Massachusetts, New York, North Carolina, Ohio, Pennsylvania, and Wisconsin, where the usual and customary price was a basis for the amount paid or reimbursed in connection with the purchase of such drug, and the amount paid or reimbursed was inflated because the Prescription Savings Club price was not reported or otherwise included when determining the usual and customary price to report." [5]

6.    I understand that the Plaintiffs' proposed class definition also contains the following exclusions:

- "Walgreen Co. and its management, employees, subsidiaries, and affiliates;"

- "the Court, members of their immediate families, and judicial staff;"

- "all government entities, including Medicare and Medicaid, and their beneficiaries, except for Medicare Part D beneficiaries;"

- "all government-funded entities, and their beneficiaries;"

---

[4]    Fourth Amended Consolidated Class Action Complaint and Jury Demand, ECF No. 477 ("Complaint"), ¶ 1.

[5]    Pls.' Mem. of Law, ECF No. 554 ("Mem."), at p. 3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- "all pharmacy benefit managers and entities that have or had a parent or subsidiary relationship with any pharmacy benefit manager at any time since January 1, 2007;" and,

- "all individuals and entities, except for the named Plaintiffs, that have sued or initiated formal dispute resolution proceedings against Walgreens relating to its determination of usual and customary prices in connection with the Prescription Savings Club."[6]

### C.  Assignment

7.   I have been retained by Counsel for Walgreens to review and respond to certain assertions in the Report of Lynette Hilton, Ph.D. ("Hilton Report") regarding class certification issues related to Plaintiffs' allegations. I have been asked to assess from an economic perspective whether there is classwide evidence of common injury, or if, instead, individualized inquiry is necessary to assess injury to all or some of the proposed class members. Specifically, I have been asked to evaluate whether Dr. Hilton's formulaic methodology:

- Can be used to identify and calculate potential overpayments paid by class members as a result of Walgreens' alleged failure to report or otherwise include Prescription Savings Club ("PSC") prices when reporting the usual and customary ("U&C") price.

- Can be used to identify and calculate whether, and the extent to which, Walgreens was unjustly enriched as a result of its alleged failure to report or otherwise include PSC prices when determining the U&C price; and

- Can be used to determine who is in the class.

8.   My conclusions in this report are based on the information available to me at the date of filing of this report.  A list of materials I considered in this report and accompanying figures is attached as **Appendix C**.  I reserve the right to supplement my opinions if asked to provide additional research or analysis, or in response to additional information or materials that become available.

---

[6]   Mem, at p. 3, n. 1.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## II.    Summary of Conclusions

9.    Based on my review of the documentary evidence and analysis of the data produced in this case, as well as my expertise in evaluating potential economic harm from alleged overpayments in other pharmaceutical litigation matters, I find that the data Dr. Hilton proposes using and her formulaic calculation of alleged overpayment for each potential class member on a transaction-by-transaction basis cannot determine injury to proposed consumer and third-party payer class members on a classwide basis.

10.    Dr. Hilton proposes to rely on selected Walgreens transaction data and selected prescription claims data that she assumes would be produced by Pharmacy Benefit Managers ("PBMs") who are not members of the proposed class. She further accepted direction from counsel to evaluate injury to potential class members on a transaction-by-transaction basis.

11.    I describe in **Section III** the various factors that determine payments for a generic prescription drug. The payments involve numerous parties and many contractual terms that determine how much the consumer pays for a prescription, how much the PBM pays a pharmacy for a prescription, and how much the TPP pays the PBM for a prescription. In **Section IV**, I summarize the many reasons why Dr. Hilton's proposed classwide approach would not accurately identify which consumers and TPPs, if any, potentially overpaid for their generic prescriptions at Walgreens pharmacies.

12.    In addition, her approach could overstate any potential overpayment and falsely calculate overpayments for consumers and TPPs who did not actually overpay for their prescriptions. Specifically, I have reached the following conclusions.

13.    **Data Dr. Hilton proposes using are insufficient for determining whether U&C is a basis for a TPP payment to a PBM.** Dr. Hilton testified that she assumed certain information in Walgreens transaction data indicates if U&C was a basis for the amount paid to the pharmacy for a prescription. However, as I describe in this report, TPPs pay PBMs, not pharmacies, and Walgreens' data would not reflect the amount paid by the TPP to the PBM. Furthermore, my review of the PBM data produced in this matter, as well as the contracts between certain named plaintiff TPPs and their PBMs indicate both that U&C is not always a basis for the TPP payment and that the produced PBM data do not always contain information identifying whether U&C was a basis for payment. As I explain in **Section IV.C.2**, to determine if U&C

5

is a basis for the price paid by a TPP, as required by the proposed class definition, it would be necessary to review the pharmaceutical contracts involving each TPP and PBM. As I further discuss in **Section IV.C.1** these contracts likely number in the hundreds of thousands.

14. **Dr. Hilton's proposed transaction-by-transaction methodology cannot determine whether, or by how much, a consumer potentially overpaid for their generic prescriptions**. As I discuss in **Section IV.B.1.a**, Dr. Hilton's approach ignores the fact that a consumer's payment for a prescription depends not only on the current prescription, but also on the consumer's past spending on generic and brand drugs at all pharmacies, and potentially their past spending on medical costs. As I discuss in **Section IV.B.1.a**, this can occur when a consumer's health plan includes a deductible payment or an out-of-pocket maximum. As I further discuss in **Section IV.B.2**, it can also occur in virtually every Medicare Part D plan, as these plans include consumer payment phases that depend on the consumer's aggregate drug spend over the course of the plan year.

15. To accurately assess what a consumer would have paid for their drugs if Walgreens had reported its PSC prices as its U&C prices as plaintiffs allege it was required to do, would require a re-adjudication of all of the consumer's relevant prescription drug spending at both Walgreens and all other pharmacies. This assessment would also include the consumer's medical spending during a given year for some consumers and would require knowledge of their health plan's terms for determining the consumer's drug payments. Dr. Hilton's proposed transaction-by-transaction calculation fails to account for the fact that a consumer's payment for a prescription can depend on prior transactions and that the same payment can also impact future transactions. As a result, her approach would overstate potential overpayments, and find potential overpayments when there are none.

16. **The data Dr. Hilton proposes using are insufficient for determining whether, or by how much, a consumer potentially overpaid for their prescription for a given transaction.** As I discuss in **Section IV.B.1.b**, it is necessary to know how a consumer's payment was determined for a prescription to calculate any potential overpayment. For example, it is necessary to know if the consumer's payment varies with the overall cost of the drug, as occurs with a coinsurance payment where the patient pays a fixed percentage of the prescription cost, or if the consumer's payment does not vary with the cost of the drug as

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

occurs with a copayment where the patient pays a fixed dollar amount per prescription. Based on the Walgreens and PBM data produced in this matter, it is not possible to determine the basis for the consumer's payment for every transaction from the data alone. Furthermore, Dr. Hilton's description of how she might infer the basis for the consumer's payment is unreliable and would result in her finding overpayments where there are none.

17. **Dr. Hilton's flawed analysis of potential consumer overpayments also means that the potential TPP overpayments she calculates are incorrect.** Dr. Hilton proposes to calculate potential TPP overpayments by calculating an aggregate potential overpayment for each prescription and subtracting from that the potential consumer overpayment. Given that Dr. Hilton's approach fails to calculate accurate potential consumer overpayments, her approach will also fail to result in accurate calculations of potential TPP overpayments.

18. **The data Dr. Hilton proposes using cannot account for factors that reduce a TPP's potential overpayment but are not recorded when the prescription is filled.** In some cases, TPPs receive payments after the prescription is filled that reduce their prescription drug costs. Because these payments occur after the prescription transaction, they are generally not recorded in the prescription claims data Dr. Hilton proposes using in her transaction-by-transaction analysis. For example, some health plan TPPs purchase stop-loss insurance to guard against having to pay extraordinary health costs for their members as I discuss in **Section IV.C.3**. Payments from the stop-loss insurer to the health plan fund some of the plans' prescription drug costs, including alleged overpayments.

19. Many TPP contracts with PBMs also specify guaranteed discounts called Generic Effective Rate ("GER") clauses. As I discuss in **Section IV.C.4,** such GER clauses can result in retroactive payments from the PBM to the TPP to meet price discount guarantees, which can reduce alleged overpayments.

20. Medicare Part D plans receive many different types of prospective and retrospective payments from the federal government, which reduce the TPP's prescription drug costs, as I discuss in **Section IV.C.5.**, Dr. Hilton provides no explanation of how she would account for such payments, which would not be included in the data she proposes using for her formulaic calculation of potential overpayments by proposed TPP class members. Failing to

account for these types of payments would overstate potential TPP overpayments and potentially result in a finding of potential overpayments when there are none.

21. **Dr. Hilton's overpayment calculation formula highlights the inherent economic conflict in considering potential overpayment by consumer and TPP proposed class members.** As explained in **Section V**, Dr. Hilton defines the TPP overpayment as the difference between the total overpayment and the consumer overpayment on a transaction-by-transaction basis. The larger the share of any alleged overpayment going to consumer class members, the lower the share of the total overpayment left for TPP class members. As such, Dr. Hilton's approach puts proposed consumer and TPP class members' economic considerations at odds with each other.

## III. The Life of a Prescription Drug Payment

22. Dr. Hilton claims that it is possible to determine who is in the proposed class and the amount that each member overpaid for their generic drug prescriptions on a classwide basis. She also claims that she can determine these things using only (1) data that she believes would be available for a classwide assessment, and (2) a transaction-by-transaction analysis of those data. For the reasons set forth below, I disagree with Dr. Hilton's position.

23. In fact, payments for the prescriptions at issue in this case are very complex and involve a wide variety of entities. To understand why the classwide analysis proposed by Dr. Hilton is not feasible and would lead to highly inaccurate results, it is important to understand how payments for generic prescription drugs are made.

24. In the following paragraphs, I describe the variety of payments and entities involved in typical generic transactions, and briefly note the relevance of these payments to the allegations in this case. In the remainder of the report, I expand on these points and demonstrate why the important factors affecting payments and injury are in fact not readily ascertainable in the available data but can only be determined through seeking significant volumes of data and documents from third parties and potential members of the proposed class, and painstaking, individualized inquiry.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### A. Who are the Parties Involved in a Prescription Transaction?

25. I will start by introducing and defining each of the parties involved in dispensing and paying for almost all prescription drug transactions. The four main parties involved are the consumer, the pharmacy, the PBM, and the third-party payer, often a health plan or insurer.

#### 1. Consumers

26. Consumers are the people who purchase a prescription to treat a condition identified by their doctor. While the vast majority of consumers—around 90%—have some form of prescription drug and medical coverage, many have no coverage, or have limited coverage.[7] This distinction is important for this matter for two reasons. First, the total amount to be paid to the pharmacy for the prescription is generally different (and often very different) for transactions involving consumers paying without insurance as compared to consumers paying with insurance, and consumers paying with insurance generally pay only a portion of the total amount that is paid to the pharmacy, as I will explain later. Second, Plaintiffs have excluded uninsured consumers from the proposed class.

#### 2. Pharmacies

27. A pharmacy fills the prescription for the consumer and collects from the consumer some or all of the total payment due to the pharmacy for that prescription. A pharmacy generally sets the price to be charged to the retail customer, meaning the price the pharmacy charges to a customer who pays for the prescription without any benefits such as insurance, a club membership, or a third-party discount card like GoodRx or RxSaver.[8] I understand this price, unless defined otherwise by contract, is the "Usual and Customary" or "U&C" price, which is one of the amounts relevant to this matter.[9] How parties define and understand the U&C price is a key point of dispute between the parties because it can affect how much is paid to the pharmacy for generic prescriptions on transactions involving consumers using insurance.

---

[7] Keisler-Starkey, Katherine, and Lisa N. Bunch, "Health Insurance Coverage in the United States: 2020," *U.S. Census Bureau*, September 14, 2021, available at https://www.census.gov/library/publications/2021/demo/p60-274.html.

[8] Expert Report of Michael S. Jacobs, March 17, 2023 ("Jacobs Report"), ¶ 17.

[9] Jacobs Report, ¶ 13.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

28. Unlike the retail price, which the pharmacy has discretion to set, the pharmacy does not have the same discretion to set the total amounts to be paid by or on behalf of insured consumers. Those amounts are controlled by the terms of a contract between the pharmacy and the next entity in the chain, the PBM.

### 3. Pharmacy Benefit Managers

29. PBMs perform several functions in the pharmaceutical distribution system. PBMs are retained by health plans and health insurers to administer pharmacy benefits for health plans. The PBMs' primary relevance to this matter is their function in adjudicating pharmacy claims as contractors to their health plan clients.

30. PBMs also compile pharmacy networks for their clients' beneficiaries to use. PBMs negotiate with pharmacies for inclusion in some or all of a PBM's pharmacy networks. Pharmacies will often agree to accept lower drug reimbursement amounts from the PBM in exchange for participation in a smaller pharmacy network. The fewer pharmacies in a network, the more consumers from participating health plans each pharmacy can expect to receive.

31. It is these contracts between the PBM and the pharmacy that determines the total payment due the pharmacy for a particular prescription. As the terms of these contracts can vary across PBMs, pharmacies and pharmacy networks, as well as over time, it is not unusual for one pharmacy to be paid different amounts under different contracts for identical prescriptions.

### 4. Third Party Payers

32. Third-Party Payers ("TPPs") can take a variety of forms, but for the purposes of this report, I will focus on two types: health insurers and health plans.

33. Health insurers can act as an intermediary between the health plan and the PBM. Insurers may be responsible for reimbursing the prescription drug costs of the plan's members or may assist with processing the health plan's payments to the PBM for an administrative fee. Finally, health insurers may provide health plans to consumers seeking to purchase individual insurance.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

34. Health plans are sponsored by corporations, labor union funds, state and government entities, and many other types of organizations to provide health benefits, usually including pharmacy benefits, to their members. Health plans can contract directly with a PBM or can contract with a health insurer that has contracted with a PBM.

35. As mentioned previously, health plans negotiate a contract with PBMs that governs the plan's pharmacy benefit. This contract will contain, among other items, the formula for calculating the amount the health plan will reimburse the PBM for each prescription, the required beneficiary (i.e., the consumer) contribution to the cost of a prescription, the list of drugs the health plan will cover and which drugs are considered preferred or nonpreferred by the plan, and the fee, if any, that the health plan will pay for the PBM administration services, among other items.[10]

36. The health plan will summarize the different payment components for their beneficiaries in a plan summary description.[11] This is a document given to beneficiaries providing information on their health plan coverage.

### B. Life Cycle of a Prescription Transaction

37. For the purposes of this report, there are three key points in the life cycle of a prescription transaction: when a consumer pays for all or a portion of a prescription, when a PBM pays a pharmacy the amount required under the pharmacy/PBM contract, and when a TPP pays a PBM the amount required under the PBM/TPP contract.

### 1. How Does a Consumer Pay for a Prescription?

38. The life cycle of a prescription transaction begins when the consumer presents a prescription to the pharmacy to be filled.

39. As described above, a consumer with no benefits, such as prescription drug insurance, a pharmacy club, or a third-party discount card, is referred to as a "cash customer."[12] When

---

[10] Many plans have formularies that place drugs into preferred and non-preferred tiers. The plans will encourage patients to purchase the drugs in the preferred tiers by setting lower copayments or coinsurance amounts for drugs in those tiers.

[11] *See, e.g.,* 2017 Plan Guide, Verizon MEP HCP Advantage Guide, BULLARD_0000170-205 and 2017 Summary of Benefits, AARP MedicareRx Walgreens (PDP), RUSSO_0000035-579.

[12] Jacobs Report, ¶ 14.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

these cash consumers fill a prescription, they pay the pharmacy's retail price for the prescription, which is a price set by Walgreens that is specific to an individual pharmacy store.[13]

40. When a consumer paying with insurance presents a prescription at the pharmacy, several things happen. First, the pharmacist enters the consumer's identifying information and their insurance information into a computer. Some of this information is derived from the consumer's insurance card, which often contains three pieces of information – the Bank Identification Number ("BIN"), Processor Control Number ("PCN"),[14] and Group Number—which tell the pharmacy, among other things, which PBM administers the consumer's plan. Importantly, the consumer's insurance card does not give the pharmacy information about the specific insurance coverage that the consumer has; the PBM is the entity that has that information.[15]

41. The pharmacy transmits the information it obtains from the consumer, along with information about the prescription drug, to the PBM retained by the consumer's health plan.

42. The PBM then begins a process known as "adjudication," which refers to the process by which the PBM reviews a prescription claim to determine the total amount to be paid to the pharmacy based on the terms of the PBM/pharmacy contract, and the share that the consumer is required to pay based on the terms of the consumer's prescription drug plan and, sometimes, the PBM/pharmacy contract.

43. The transmission of information by the pharmacy and the adjudication by the PBM is accomplished through an automated system, which relays the consumer's information to the relevant PBM, which then nearly instantaneously reports information back to the pharmacy

---

[13]   Jacobs Report, ¶ 40.

[14]   Africa, Emily, "What Do BIN, PCN, RX, & RXGRP Mean on an Insurance Card?," *SuperMoney*, available at https://www.supermoney.com/what-do-bin-pcn-rx-rxgrp-mean-on-an-insurance-card/#/.

[15]   *See, e.g.,* CDPHP, "Understanding Your Health Insurance ID Card," March 22, 2018, available at https://blog.cdphp.com/how-to/understanding-health-insurance-id-card. *See also* "How to Read Your Insurance Card," *CommunityCare RX*, available at https://communitycaretx.org/wp-content/uploads/2021/06/HowToReadInsuranceCard_English.pdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

regarding how much the pharmacy should charge the consumer for the prescription and how much the pharmacy should expect to receive in additional payment from the PBM.[16]

44. How much consumers pay for the prescription at the pharmacy depends on the specific terms of their plans. Generally, consumers pay either a copay or coinsurance. A copay is a fixed amount per prescription, set by the terms of the consumer's health plan, e.g., $5 per prescription no matter the overall cost of the drug. Coinsurance reflects a percentage, e.g., 20% of the cost of the prescription.

45. In addition, most insurance plans have both a consumer deductible and an out-of-pocket maximum. A deductible is a pre-set amount of spending each year for which the consumer is entirely responsible, e.g., $500. Until that deductible amount is met, a consumer pays for the full cost of any prescription, rather than a copay or coinsurance, with the TPP paying nothing.

46. On the other end of the spectrum, many insurance plans provide for an out-of-pocket maximum, which is a set limit on the amount that a consumer will pay in a given year. Once that amount is met, the consumer will pay no more for their prescriptions, which will be entirely covered by their health plan.

47. Once the PBM "adjudicates" the claim and determines the amount the consumer owes the pharmacy, whether in the form of a deductible, a copay, or coinsurance, the PBM informs the pharmacy how much to charge the consumer. The consumer then pays the specified amount to the pharmacy and receives their prescription.

---

[16] *See* Popke, Michael, "PBMs ahead of health plans in automation efforts," *Benefits Pro*, December 21, 2020, available at https://www.benefitspro.com/2020/12/21/pbms-ahead-of-health-plans-in-automation-efforts/; Strongin, Robin J., "The ABCs of PBMs," *National Health Policy Forum*, Issue Brief No. 749, October 27, 1999, available at https://www.ncbi.nlm.nih.gov/books/NBK559746/. There can be an intermediary (a "switch") between the pharmacy and the PBM, responsible for the transmission of information from the pharmacy to the PBM or vice versa, but that is not relevant to this Report, nor does it affect any of the Report's conclusions. *See, e.g.,* NPCC, "Manufacturers Are Using "Switch Operators" To Undermine Your Plan's Cost Saving Efforts," available at https://nationalprescriptioncoveragecoalition.com/manufacturers-are-using-switch-operators-to-undermine-your-plans-cost-saving-efforts/.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 2. How Is the Pharmacy Reimbursed for the Balance of the Prescription Cost After the Consumer Contribution?

48. Consumers using insurance pay only a copay or coinsurance, except if they are in the deductible phase or have already reached their out-of-pocket maximum. When the pharmacy fills the prescription, that triggers payments by a number of other entities.

49. As I mentioned above, when a consumer using insurance brings a prescription into a pharmacy to be filled, the pharmacist contacts a PBM to determine how much that consumer should pay for their prescription. The PBM informs the pharmacy, which collects the payment from the consumer as instructed. However, generally that is not the total amount paid to the pharmacy for the prescription. It is the PBM that pays the pharmacy the remainder of the cost of the consumer's prescription.

50. A contract between the pharmacy and the PBM determines the PBM payment to the pharmacy for a specific drug. Because of differences in these contracts, the prices paid by PBMs are not uniform and can vary across pharmacies and across prescriptions within a pharmacy. Often, the price for the prescription is set as the lesser of several price points, such as:

- A percentage discount from the drug's Average Wholesale Price, or AWP, which is a list price widely used as a benchmark in pricing formulas;

- The Maximum Allowable Cost, or MAC, which is a price set by the PBM as the maximum amount the PBM will charge for certain multi-source generic drugs;

- Usual and Customary Price, or U&C, as described earlier;[17]

- The pharmacy's total submitted ingredient costs.[18]

### 3. How Is the PBM Reimbursed for Its Payment to the Pharmacy?

51. The amount that the health plan or insurer pays the PBM is determined by a separate set of contracts between the health plan or insurer and the PBM. Importantly, the amount paid by

---

[17]  Although the U&C price may be a basis for the PBM payment to the pharmacy, which is one of the requirements of the proposed Class definition, the PBMs are excluded from the proposed Class.

[18]  For many of these terms a dispensing fee, which is a fixed dollar amount per prescription, may be added to the price.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the health plan or insurer to the PBM is often not equal to the payment from the PBM to the pharmacy.

52. The payment from the PBM to the pharmacy is determined by the PBM/pharmacy contract. The health plan and insurer are not parties to that contract and generally do not know the terms of that contract.[19] Similarly, the pharmacy is not a party to and generally does not know the terms of the contract between the PBM and the health plan or insurer.[20]

53. The fact that the payment from the PBM to the pharmacy is governed by a different contract than the payment from the health plan to the PBM gives rise to the practice of "spread pricing." Spread pricing occurs when the PBM charges the health plan more than the PBM paid the pharmacy for the prescription. The PBM earns a "spread" based on the difference between what it pays the pharmacy and what it receives from the health plan or insurer.

54. There are two major pricing models that determine PBM compensation: spread pricing, and pass-through pricing. In the case of spread pricing, the PBM can bill the TPP a different amount (usually higher) than it pays the pharmacy and keep the difference as profit. In the case of pass-through pricing, the PBM charges the TPP the same amount it paid the pharmacy, plus an administrative fee.[21]

55. An important implication of spread pricing is that even if the PBM payment to the pharmacy is based on the U&C price, that does not mean that the payment from the health plan or insurer to the PBM is also based on the U&C price. Instead, it is necessary to consider the specific contract between the health plan or insurer and the PBM to determine the actual basis for the payment from the health plan or insurer to the PBM.

---

[19]  *See, e.g.,* "Pharmacy Benefit Managers and Their Role in Drug Spending," *The Commonwealth Fund*, April 22, 2019, available at https://www.commonwealthfund.org/publications/explainer/2019/apr/pharmacy-benefit-managers-and-their-role-drug-spending ("[P]ayment schedules PBMs generate for pharmacies are kept confidential from health plans.").

[20]  Jacobs Report, ¶ 23 ("Pharmacies generally are not privy to PBM-TPP agreements because the terms of those agreements are generally confidential to the parties that negotiated them. ").

[21]  *See* Stevens, Richard, "Spread vs. Pass-Through Pricing Models," *West Virginia Pharmacists Association*, January 31, 2019, available at https://wvpharmacy.org/2019/01/spread-vs-pass-through-pricing-models/.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 4. Additional Complications in Prescription Drug Payment Flows

56. Some patients may qualify for a variety of Patient Assistance Plans ("PAPs"). PAPs vary by state and the circumstance of the individual consumer, and the PAPs pay for all or a portion of a consumer's prescription.[22]

57. A common feature of contracts between TPPs and PBMs is a GER clause. The GER is a financial commitment by the PBM to a health plan that the cost of all or certain generic drugs during the contract performance period should be equal to a percentage of AWP.[23] The GER ensures that the average amount per prescription paid by the TPP to the PBM during the contract term does not exceed the amount specified in the PBM/TPP contract.[24]

58. In addition, there are two basic types of health plans, self-insured and fully insured. In self-insured plans, the health plan pays the PBM the amount required by the health plan's contract with the PBM less the amount paid at the pharmacy by the consumer. Alternatively, in some cases payments by self-insured plans pass through an insurer serving in an "Administrative Services Only", or ASO, capacity under contract to the plan. In this case the plan pays the insurer the amount required by their contract with the insurer and the insurer pays the PBM according to the insurer's contract with the PBM. Thus, for self-insured plans, the amount that the health plan pays depends on the actual health care costs incurred by their beneficiaries.

59. In fully insured plans, the health plan pays a health insurer a certain amount per beneficiary and the insurer is then responsible for any payments to the PBM related to the beneficiaries'

---

[22] Chase, Lauren, "What Are Patient Assistance Programs?," *GoodRX Health*, April 28, 2022, available at https://www.goodrx.com/healthcare-access/patient-advocacy/what-are-patient-assistance-programs.

[23] Ally, AJ, et al., "Pharmacy Benefit Manager Pricing Practices in Statewide Medicare Managed Care Program," *Florida Agency for Healthcare Administration*, December 2020, available at https://cdn.ymaws.com/www.floridapharmacy.org/resource/resmgr/docs_2021_legislative_session/milliman_report.pdf

[24] *See, e.g.,* Ally, AJ, et al., "Pharmacy Benefit Manager Pricing Practices in Statewide Medicare Managed Care Program," *Florida Agency for Healthcare Administration*, December 2020, available at https://cdn.ymaws.com/www.floridapharmacy.org/resource/resmgr/docs_2021_legislative_session/milliman_report.pdf ("All of plan-PBM contracts reviewed have […] generic effective rate guarantees…").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

prescription costs. In other words, the health plan pays the same amount regardless of what the pharmacy reports as the U&C price.

60. There are also situations where even self-insured health plans do not pay the cost of their members' prescriptions. Because self-insured health plans pay claims based on the actual pharmaceutical costs of their members, they often purchase "stop-loss" insurance to guard against the risk of extraordinary health costs for their members.

61. A stop-loss insurance policy limits the health plan's payments for prescription drugs and other health care expenditures to a specified stop-loss deductible. Once the plan has paid the amount of the stop-loss deductible, it no longer pays for additional prescriptions. Those prescriptions are paid by the stop-loss insurer for the remainder of the year. Stop-loss insurance can be designed to guard against extraordinary costs for individual plan members, or for extraordinary aggregate costs across all the plan's members.

62. Some health plans cover both medical expenses and prescription drugs. In those plans, the deductible and out-of-pocket maximums can be for both medical and pharmaceutical expenses combined. In addition, some stop-loss policies are for both medical expenses and prescription drugs combined.

63. In addition, many consumers who participate in Medicare have Medicare Part D plans that cover the cost of their prescription drugs. In these plans, the payment from the Medicare Part D plan to the PBM is partly or completely subsidized by the federal government. It can be difficult to separate what portion, if any, of a Medicare Part D prescription is paid by the federal government or the Medicare Part D plan.

64. Pharmacies also often create or participate in programs that can reduce the cost of prescriptions to uninsured and insured patients alike. Pharmacies and retailers sometimes create their own membership programs such as Walgreens' PSC, the program at issue in this case. These programs often require a monthly or annual membership fee that permits consumers to access the program prices. The relation between PSC and the prices paid by Walgreens' customers is examined in detail later in this report.

65. In addition, pharmacies often honor cards of third parties that allow consumers to save money on their prescriptions. These cards are honored at a network of pharmacies, and

generally do not require enrollment or a membership fee. GoodRx and RxSaver are examples of these types of programs.[25]

### C. Understanding the Path of a Generic Prescription Drug Payment Matters for This Case

66. I understand that one of the issues in this case is whether the U&C price reported by Walgreens should be the cash price (i.e., the retail price) for the generic drug, as Walgreens claims, or the PSC price, as Plaintiffs claim.[26]

67. In a "but-for world" based on Plaintiffs' allegations in this case, prices paid by consumers, health plans, and other potential class members might have been different if Walgreens had reported the PSC price as its U&C price rather than the cash price.

68. Based on these allegations and Plaintiffs' proposed class definition, to know if a consumer, health plan, or other entity is a member of the proposed class, it is necessary to know if the U&C price is a basis for their drug payment. It is also necessary to know if they would have paid less if Walgreens had reported the PSC price as the U&C price. To assess either of these things requires an understanding of how prescription drug payments are determined.

69. As I described above, the flow of payments for prescription pharmaceuticals is complex. A single prescription filled at a pharmacy can trigger payments by the consumer, a PBM, the consumer's health plan or insurer or both, private charities through PAP payments, manufacturers, a stop-loss insurer, and state governments and the Federal Government. **Figure 1** provides a graphical representation of the payments related to a commercially insured consumer not insured through a Medicare Part D plan.

---

[25] "How GoodRx Works," *GoodRx,* available at https://www.goodrx.com/how-goodrx-works; "7 Things to Know Before You Use RxSaver," *Clark.com,* April 27th, 2021, available at https://clark.com/health-health-care/retail-me-not-rxsaver/.

[26] For the purposes of my report, I was not asked to address Plaintiffs' allegation that Walgreens was required to submit its PSC prices as the U&C amount, or at least consider PSC prices as one factor when determining U&C prices. Cash paying consumers may receive discounts from many other sources besides a pharmacy discount program. Private discount programs such as GoodRx and RxSaver can reduce the consumer cash price, sometimes dramatically so. Consumers may also get help from government or charity-based Patient Assistance Programs, or PAPs.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 1**
**Payment Flow Diagram for a Typical Generic Pharmaceutical Drug and Commercially Insured Consumer**



70. Each green arrow in **Figure 1** reflects a different payment based on different contractual terms for a single generic prescription filled by a consumer using commercial insurance. To understand the payment flows involved in a single prescription transaction, it is necessary to understand the terms of the agreements and track the payments between each entity in the chart.

71. As I describe in the next section, it is also important to understand how payments for one prescription can affect the amount a consumer, a PBM or a health plan pays for a future prescription. These dynamics and their implications are important for understanding why Dr. Hilton's proposed transaction-based classwide approach to calculating overpayments is flawed and cannot be used to identify proposed class members or to determine the existence of overpayments on a classwide basis.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

IV.     **Identifying and Assessing Potential Injury, if any, to Proposed Class Members Requires Individualized Inquiry**

72.    Evaluating the many payments generated by even a single generic prescription can be complex. The fact that the amount paid by consumers and TPPs is determined by individually negotiated contracts, the terms of which are not known generally to all of the other parties to the transaction, also makes any assessment of whether a consumer or TPP is a member of the proposed class extremely difficult.

73.    To be a member of the proposed class it must be the case, among other things, that: (1) a consumer or TPP paid or reimbursed in whole, or in part, for generic prescription drugs from Walgreens between January 1, 2007 and the present; (2) U&C was a basis for the amount paid or reimbursed; and, (3) their payment or reimbursement would have been less in a but-for world where Walgreens had reported its PSC price as the U&C price.[27]

74.    As a result, to determine whether a consumer or TPP is a member of the proposed class and potentially overpaid for drugs purchased at Walgreens, it is necessary to assess what each of them paid in the actual world, whether U&C was a basis for the payment, and recalculate what each of them would have paid in the but-for world if Walgreens had reported its PSC price as the U&C price.

75.    Further, if a consumer fills or refills more than one drug prescription in a given benefit year, the determination becomes even more complex, as each prescription transaction has an impact on what is paid for the next prescription transaction. Any analysis would have to include not just individual transactions, but all transactions for each consumer at any pharmacy during a particular plan year. This would be a frequent concern in evaluating payments. For example, Kaiser Family Foundation reports that in 2019 there were an average of 11.6 retail prescriptions filled per person in the U.S.[28]

76.    As I demonstrate later in this section, Plaintiffs have not provided a methodology to determine accurately and reliably whether U&C was a basis for payment by potential class

---

[27]    *See* Mem, at pp. 1-2. The potential class member would also need to meet any other inclusion criteria to the class and not be excluded based on the class definition..

[28]    *See* "Retail Prescription Drugs Filled at Pharmacies per Capita," *Kaiser Family Foundation*, available at https://www.kff.org/6d93fdd/.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

members or whether a potential class member would have paid less in the but-for world for several reasons. I list a high-level description of these reasons here and provide a detailed discussion of each reason, along with examples, later in this report.

- First, as I discuss in **Section IV.C.2**, Dr. Hilton fails to demonstrate that the potential classwide data that Plaintiffs propose using, such as Walgreens' prescription transaction data and PBM claims data, consistently contain all the information needed to determine if U&C was a basis for payment or to re-adjudicate the claims and calculate an accurate potential overpayment. Detailed knowledge of the factors that determine what a consumer or a health plan pays would be necessary, and the data Dr. Hilton proposes using do not contain sufficient information. Instead, it would be necessary to review each consumer's Plan Summary Description document for each plan year, as well as the contracts between the health plan and the PBM for every potential consumer and TPP member of the proposed class.

- Second, potential classwide data do not accurately capture the net payment for many potential class members. Some relevant transactions will not be captured in the proposed transaction or claims data, such as receipt of government subsidies, retroactive payments based on discount guarantees, patient assistance payments, and stop-loss insurer payments. In some of these cases, potential payers will not be identified in the data Dr. Hilton proposes using.[29]

77. Further, Plaintiffs' proposed class contains two types of class members: individual consumers and TPPs. The sheer amount of individualized information necessary to assess whether a potential class member would have paid less if Walgreens had reported PSC as the U&C price is significant.

78. Assessing the proposed class definition would require a review of an untold number of generic prescriptions filled at Walgreens pharmacies over a 16-year proposed class period. Indeed, Dr. Hilton testified that the dataset containing all relevant PBM claims for these prescriptions during the at-issue time period would likely exceed 100 million transactions,

---

[29] For example, some payers such as stop-loss insurers (*see* **Section IV.C.3**) or government payers (*see* **Section IV.C.5**) may not be recorded at the point of sale.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and that it is possible that some PBMs may not have data going as far back as 2007.[30] As I discuss in **Section IV.C.1**, these prescriptions likely reflect tens of thousands or even hundreds of thousands, of health plans and insurers,[31] with each health plan and insurer potentially having a different PBM contract determining their generic drug prescription payments. Furthermore, it would also be necessary to review contracts with stop-loss insurers and government subsidy payments.

79. In addition, consumers change insurance plans often, not only from year to year, but sometimes during a given plan year. If, for example, the consumer changes jobs or decides to obtain insurance through a spouse's employer in the middle of the year, knowledge of the details of each and every plan will be required in order to assess whether that consumer was damaged. If a consumer changes insurance plans in the middle of a plan year, that consumer's deductible will generally reset, and any assessment of damages will be made even more complex.

### A. Overview of Dr. Hilton's Classwide Formulaic Calculation of Alleged Overpayments

80. Dr. Hilton argues "that overpayments made by proposed Class members can be calculated on a classwide formulaic basis that will not require individualized inquiries regarding members of the Class."[32] She defines total overpayment as the difference between the PSC price and the combined amounts paid by the consumer and the TPP.[33]

---

[30] Deposition of Lynette Hilton, January 17, 2023, (hereafter "Hilton Deposition"), at 118:4-7 ("Q. So it's a long time period, and it's possible that they don't have data for 2007, for example? A. That's possible."); 177:7-16 ("Do you have any idea of approximately how many transactions would be produced if the request from all the relevant PBMs was fulfilled for the entire time period? A. No, I don't have an estimate. Q. Would you agree it would be more than 100 million? […] THE WITNESS: Yes. That wouldn't surprise me.).

[31] *See* Hilton Deposition, at 111:17-21 ("And so I did run analysis on the 2015 data sample to identify -- and was able to identify […] many thousands of identifiers for patients and also many thousands of identifiers for TPPs.").

[32] Report of Lynette Hilton, Ph.D., November 16, 2022 ("Hilton Report"), ¶ 9.

[33] Hilton Report, ¶ 22.

Case: 1:17-cv-02246 Document #: 639-2 Filed: 09/14/23 Page 28 of 103 PageID #:16077

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

81.   Dr. Hilton proposes to rely on a mix of Walgreens prescription transaction data and PBM prescription claims data.[34] The Walgreens data reflect transactions at Walgreens pharmacies,

█████████████████████████████████████████████████████████████████████

████[35] Because the Walgreens data do not contain the amount paid by the health plan, she proposes to then link those transactions in the Walgreens data to claims in PBM data for the same prescriptions.[36]

82.   To calculate potential consumer overpayment, Dr. Hilton proposes to rely on the Walgreens prescription transaction data from January 1, 2007 to December 31, 2019.[37] Dr. Hilton then proposes to identify prescriptions that meet Plaintiffs' class definition criteria,[38] and calculate proposed overpayment for copay and coinsurance patients separately, as outlined below:

- *Copay:* Consumer Overpayment = Consumer Payment – PSC Price[39]

- *Coinsurance:* Consumer Overpayment = Consumer Payment – (PSC Price x Coinsurance %)[40]

83.   To calculate potential TPP overpayment, Dr. Hilton proposes to rely on her linked Walgreens and PBM data to compare the total amount paid by the TPP and the consumer for each generic drug prescription to the PSC price for that prescription to calculate her proposed "Total Overpayment."[41]

---

[34]   Hilton Report, ¶ 32 ("Using the Fund Plaintiffs' PBM data in combination with the Walgreens transaction data, I demonstrate how overpayment damages can be calculated for the named Fund Plaintiffs.").

[35]   Hilton Report, ¶ 63.

[36]   Hilton Report, ¶ 33 ("The resulting set of Walgreens transactions is then matched to the corresponding transactions in the PBM data."). *See, e.g.,* Hilton Deposition, at 142:20-143:1 ("Let me ask you this: If there's not a 4 or a 5 in the Walgreens -- am I correct, you attempt to match PBM data with Walgreens' data, right? You're attempting to match those transactions? […] THE WITNESS: Yes, for the fund plaintiffs. Yes.").

[37]   Hilton Report, ¶ 30.

[38]   Hilton Report, ¶ 33.

[39]   Hilton Report, ¶ 24.

[40]   Hilton Report, ¶ 25.

[41]   *See, e.g.,* Hilton Report, ¶ 32.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Total Overpayment = TPP and Consumer Payment – PSC Price[42]

84. She then calculates a potential overpayment by TPP proposed class member as:

- TPP Overpayment = Total Overpayment – Consumer Overpayment. [43]

85. Although Dr. Hilton proposes to rely on Walgreens transaction data and data from multiple PBMs, she fails to explain how she would link these PBM data to the Walgreens prescription transaction data for each prescription.

86. Dr. Hilton claims that she can determine the overpayment for an individual consumer or TPP based solely on the data she proposes using and her proposed formulaic calculation. However, even if it were possible to collect and compile all of the data Dr. Hilton proposes using, the resulting dataset would still be insufficient to calculate these potential overpayments.

87. First, Dr. Hilton fails to demonstrate that the fields necessary to determine whether U&C price was a basis for the amount paid by consumers and TPPs are consistently included in the data.

88. Second, Dr. Hilton was instructed by Plaintiffs' counsel to calculate overpayments for proposed class members on a transaction-by-transaction basis.[44] This is a flawed approach that fails to accurately reflect potential economic injury to proposed class members. As I demonstrate below, a transaction-by-transaction calculation fails to reflect the economic impact of important features of most health plans such as deductibles and out-of-pocket maximums. Dr. Hilton's transaction-by-transaction approach fails to recognize that each transaction in a benefit year can impact the amount a consumer must pay for a transaction later in that benefit year. In fact, Dr. Hilton acknowledges that she was instructed by

---

[42] Hilton Report, ¶ 22.

[43] Hilton Report, ¶ 26.

[44] *See, e.g.,* Hilton Deposition, at 290:9-11 ("I don't know if I would agree with you on that based on my instruction to look at it on a transaction-level basis."), at 290:17-19 ("My understanding is that each – the overpayment should be calculated on a transaction-by-transaction-level basis.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Plaintiffs' counsel to calculate overpayment on a transaction-by-transaction basis and, therefore, she did not account for deductibles in her calculations.[45]

**B.**     **The Data Dr. Hilton Proposes Using and Her Formulaic Calculations Cannot Determine Injury to Proposed Consumer Class Members on a Classwide Basis**

89.    To calculate consumer overpayment, it is necessary to assess what the consumer payment would have been if Walgreens had reported its PSC price as the U&C price. To do this, it is necessary to know whether the consumer met their deductible, whether they paid a copayment, coinsurance, or some hybrid of the two,[46] and whether they met their out-of-pocket maximum.

90.    Below, I discuss the importance of incorporating plan details for determining injury, and why Dr. Hilton's proposed calculation and data fail to properly assess potential consumer injury on a classwide basis.

**1.**     **Consumer Injury Cannot be Assessed on a Classwide Basis**

91.    Dr. Hilton's transaction-by-transaction based approach to calculating potential consumer overpayments is flawed and could substantially overstate economic injury or find economic injury where none exists.

---

[45]    For example, Dr. Hilton noted that, while not explicitly instructed by Counsel to omit the deductible from her methodology, she did not take deductibles into account in her calculations based on the instructions from Counsel to analyze damages on a transaction-by-transaction-level basis. *See* Hilton Deposition, at 285:24-292:4 ("Q: So you were instructed by counsel not to consider deductibles? A. Was I actually instructed? I'm not sure that was an actual instruction. My understanding is that each – the overpayment should be calculated on a transaction-by-transaction-level basis, though.").

[46]    In some cases, the consumer might pay a coinsurance amount for a prescription, up to a certain maximum limit, after which they pay a copayment. *See* Fein, Adam J., "How the Fourth Tier Coinsurance Boom Drives Copay Offset Programs," *Drug Channels*, September 2013, available at https://www.drugchannels.net/2013/09/how-fourth-tier-coinsurance-boom-drives.html ("[M]ost employees have maximum dollar limits on this coinsurance."). For example, the consumer may pay a 25% coinsurance for a generic drug up to the point when the consumer payment reaches a $50 limit, after which they will pay a flat fee of $50. Furthermore, in 2018, Named Plaintiff Bullard had a limit of her coinsurance for Tier 2 and Tier 3 drugs. For instance, for preferred branded drugs, she was required to pay 20% up to a $25 limit. *See, e.g.,* 2018 Annual Notice of Changes, BULLARD_0000130-153, at 138.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### a. Deductible Payments and Out-of-Pocket Maximums

92. It is not feasible to determine whether, or by how much, a consumer who pays a deductible or has an out-of-pocket maximum is injured using Dr. Hilton's proposed classwide methodology. Neither the data she proposes using nor the transaction-by-transaction approach she was instructed to take will capture the economic effect on consumer payments if Walgreens had reported the PSC price as the U&C price as Plaintiffs allege it should have. Further, while Dr. Hilton appears to acknowledge that some plan design features matter since she proposes separate overpayment calculations for consumers with copayments and consumers with coinsurance payments, she ignores other features critical to the calculation of overpayment and provides no information on how she would incorporate deductibles, out-of-pocket maximums, or other payment terms into her calculations.

#### i. *The Presence of Deductibles Means that Injury Cannot be Assessed Using a Transaction-by-Transaction Calculation*

93. To illustrate why Dr. Hilton's transaction-by-transaction calculation is flawed and results in an incorrect assessment of potential overpayment, consider the following hypothetical example of a consumer with a deductible and their prescription claims for a plan year, as outlined in **Figure 2** with certain simplifying assumptions:

- The consumer has no out-of-pocket maximum limit; and
- The consumer has a $250 deductible after which they pay a $20 copayment.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Figure 2
## Deductible Payments
## Dr. Hilton's Calculation Overstates Potential Consumer Overpayments

| Deductible | $250 |
|---|---|
| Copayment | $20 |

| Prescription | Prescription Price | | Actual World Patient Payment | | But-for World Patient Payment | | Overpayment | |
|---|---|---|---|---|---|---|---|---|
| | Actual | PSC Price | Transaction | Cumulative | Transaction | Cumulative | Dr. Hilton [2] | Actual - But-for World Total Payment |
| 1 | $100 | $75 | $100 | $100 | $75 | $75 | $25 | |
| 2 | $75 | $50 | $75 | $175 | $50 | $125 | $25 | |
| 3 | $75 | $75 | $75 | $250 [1] | $75 | $200 | $0 | |
| 4 | $50 | $50 | $20 | $270 | $50 | $250 [1] | $0 | |
| 5 | $100 | $100 | $20 | $290 | $20 | $270 | $0 | |
| 6 | $100 | $100 | $20 | $310 | $20 | $290 | $0 | |
| **Total** | | | | **$310** | | **$290** | **$50** | **$20** |

**Notes:**
[1] Patient fulfills their deductible on prescription 3 in the actual world and prescription 4 in the but-for world.
[2] Dr. Hilton assumes no injury for consumers with copayments if the consumer copayment is less than the PSC price.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

94. In the actual world, the consumer paid the full price on their first three prescriptions because they were fulfilling the deductible requirement in their plan. After the third prescription, they fulfilled their $250 deductible and only paid the $20 copayment on prescriptions four through six.

95. In the but-for world, however, the consumer would not have met their deductible after three prescriptions, because the price for the first three prescriptions would be lower, and they would actually have paid a higher price on the fourth prescription than in the actual world.

96. As shown in **Figure 2**, Dr. Hilton's transaction-by-transaction calculation ignores this change in the cost of the fourth prescription. She calculates a total overpayment for the consumer for the plan year that is higher than the consumer's actual aggregate overpayment.

- Dr. Hilton's Overpayment Calculation: Based on Dr. Hilton's transaction-by-transaction approach, she would calculate potential overpayments for the first and second prescriptions because the consumer's actual payment was higher than the PSC price. Thus, the potential overpayment would be $25 for each prescription. There would be no calculated overpayment for prescriptions #3 through #6 because the actual consumer payment was less than the PSC and the consumer paid a copayment. For the full year across all six prescriptions, Dr. Hilton's methodology would result in a total potential overpayment of $50.

- Actual Total Payments Minus But-for World Total Payments Calculation: If all of the consumer's claims for the plan year were re-adjudicated, the consumer would have paid a total of $310 in the actual world and would have paid $290 in the but-for world for all six of their prescriptions. This is a potential overpayment of only $20, not $50 as based on Dr. Hilton's approach, as reflected in the "Actual – But-for World Total Payment" column in **Figure 2**. While the consumer would have paid less on their first two prescriptions, they would still be paying the deductible on their fourth prescription rather than the copayment. Potential lower payments on the first two prescriptions would have been followed by a higher but-for payment on their fourth prescription.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

97.  As illustrated in the example, if the consumer would have paid less on prescriptions during the deductible phase, some of those cost savings would have been followed by higher payments on later prescriptions. Further, it is necessary to consider each consumer with a deductible individually to determine if Dr. Hilton's flawed transaction-by-transaction approach results in an overstatement of the consumer overpayment. In her deposition, Dr. Hilton acknowledges that she did not consider the deductible when calculating damages on a transaction-by-transaction basis.[47] As illustrated in the example above, this flawed approach ignores the fact that, in the but-for world, it can take the consumer more prescriptions to meet their deductible because they paid less on some prescriptions during their deductible period. As a result, Dr. Hilton's method can overstate consumer total overpayment.

### ii.  *The Presence of Out-of-Pocket Maximums Means that Injury Cannot be Assessed Using a Transaction-by-Transaction Calculation*

98.  Consumer health plans often include out-of-pocket maximums, after which their drug costs are fully covered by their insurance. For example, Named Plaintiff Bullard's health plan had



Similarly, Named Plaintiff Gonzales's plan contained

Indeed, documents produced in this matter demonstrate that

For example, in 2012, 2013, and 2015

---

47  *See, e.g.,* Hilton Deposition, at 285:16-286:1; 291:21-292:4.

48  2018 Annual Notice of Changes, BULLARD_0000130-153, at 137.

49  *See, e.g.,* Description of Uniform Benefits, ▮▮▮▮ 000235-281, at 240.

50  *See, e.g.,* Description of Uniform Benefits, ▮▮▮▮ 000235-281, at 240.

51  *See,* Walgreens Prescription Record, 11/10/2012 – 2/9/2014, ▮▮▮▮ 0000009-015, at 012, Walgreens Prescription Record 2012, ▮▮▮▮ 0000001-008, at 005-008, and Walgreens Prescription Record, 2/1/2016-2/7/2016, ▮▮▮▮ 0000016-024.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

99.   Consumers such as ▮▮▮▮▮ who met their out-of-pocket maximum before the end of their plan year, in most cases, would not have paid less for their prescriptions even if Walgreens had reported its PSC price as the U&C price, as such consumers would pay the same out-of-pocket maximum regardless of whether Walgreens reported retail prices or PSC prices as the U&C price. Yet, Dr. Hilton testified that she does not consider out-of-pocket maximums in her approach as she was instructed to conduct her analysis on a "transaction-by-transaction basis."[52]

100.  As a hypothetical example, consider a consumer in **Figure 3** below who has an out-of-pocket maximum of $2,500 and coinsurance of 25%. Further assume that the consumer's plan has no deductible, and that the out-of-pocket maximum reflects both prescription and medical costs.[53]

---

[52]   Hilton Deposition, at 311:16-313:2.

[53]   For example, the vast majority of plans offered in the ACA Marketplace include both prescription and medical costs in their deductibles. *See, e.g.,* "Cost-Sharing for Plans Offered in the Federal Marketplace, 2014-2023," *Kaiser Family Foundation,* February 13, 2023, available at https://www.kff.org/slideshow/cost-sharing-for-plans-offered-in-the-federal-marketplace/.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 3**
**Out-of-Pocket Maximums**
**Dr. Hilton's Calculation Falsely Identifies Potential Consumer Overpayments**

| | | |
|---|---|---|
| Deductible | $0 | |
| Coinsurance | 25% | |
| OOP Max | $2,500 | |

| Prescription | Prescription Price | | Actual World Patient Payment | | But-for World Patient Payment | | Overpayment | |
|---|---|---|---|---|---|---|---|---|
| | Actual | PSC Price | Transaction | Cumulative | Transaction | Cumulative | Dr. Hilton | Actual - But-for World Total Payment |
| 1 | $400 | $300 | $100 | $100 | $75 | $75 | $25 | |
| 2 | $200 | $120 | $50 | $150 | $30 | $105 | $20 | |
| 3 | $400 | $300 | $100 | $250 | $75 | $180 | $25 | |
| 4 | $300 | $220 | $75 | $325 | $55 | $235 | $20 | |
| 5 | $400 | $300 | $100 | $425 | $75 | $310 | $25 | |
| 6 | $300 | $220 | $75 | $500 | $55 | $365 | $20 | |
| 7 | $400 | $300 | $100 | $600 | $75 | $440 | $25 | |
| *Medical costs* | $1,900 | | $1,900 | $2,500 [1] | $1,900 | $2,340 | | |
| 8 | $200 | $120 | $0 | $2,500 | $30 | $2,370 | $0 | |
| 9 | $300 | $220 | $0 | $2,500 | $55 | $2,425 | $0 | |
| 10 | $400 | $300 | $0 | $2,500 | $75 | $2,500 [1] | $0 | |
| 11 | $200 | $160 | $0 | $2,500 | $0 | $2,500 | $0 | |
| **Total** | | | | **$2,500** | | **$2,500** | **$160** | **$0** |

**Note**:
[1] Patient hits their out-of-pocket maximum before prescription 8 in the actual world and before prescription 11 in the but-for world.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

101. In this example, in the actual world, the consumer paid $600 for their first seven prescriptions. After prescription #7, the consumer incurred $1,900 in medical expenses that pushed their aggregate spending to their out-of-pocket maximum of $2,500. The four prescriptions filled after that (prescriptions #8-#11) would result in no cost to the consumer, because they had already reached their out-of-pocket maximum.

102. In the but-for world, the consumer would have paid less for prescriptions #1 through #7, because they would have paid a coinsurance amount based on the lower PSC price for the drugs. As shown above, after prescription #7, the consumer incurred medical expenses of $1,900. That, however, would not have pushed their aggregate spending to their out-of-pocket maximum of $2,500. In the but-for world, they would not have hit their out-of-pocket maximum until after prescription #10. As a result, in the but-for world, they would have continued to pay a coinsurance payment for prescriptions #8 through #10.

103. In both the actual and but-for world the consumer hits their out-of-pocket maximum of $2,500 before the year end, and their aggregate spending in the actual and but-for world is the same.

- <u>Dr. Hilton's Overpayment Calculation</u>: Based on Dr. Hilton's transaction-by-transaction approach, one would calculate potential overpayments for the first through seventh prescriptions because the consumer's coinsurance would have been based on the lower PSC price in the but-for world. Her approach would calculate an overpayment of $160 in total across the first seven prescriptions and no overpayment on prescriptions #8 through #11 because the consumer had no actual payment on those prescriptions.

- <u>Actual Total Payments Minus But-for World Total Payments Calculation</u>: If one were to re-adjudicate the consumer's claims for the plan year, they would find that the consumer paid the same out-of-pocket maximum of $2,500 in the actual and but-for worlds. That is, in reality the consumer had no damages when considering all of their prescriptions and not just one prescription in isolation. Paying a coinsurance amount based on the PSC price in the but-for world only have resulted in the consumer taking a little longer to hit their out-of-pocket maximum.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

104. As demonstrated in this example, Dr. Hilton's flawed transaction-by-transaction methodology can result in her calculating a potential overpayment for consumers who did not actually pay more for their prescriptions in the aggregate. Without considering all of a consumer's transactions for a given plan year, along with the terms of that consumer's plan, an accurate assessment of potential overpayment cannot be made.

### iii. The Data Dr. Hilton Proposes Using Cannot Assess Potential Consumer Overpayment for Consumers with Deductibles and Out-of-Pocket Maximums

105. Dr. Hilton proposes to rely on Walgreens' prescription transaction data and PBM prescription claims data for only generic prescriptions filled at Walgreens pharmacies. Although a very large set of data, it is still substantially deficient for purposes of assessing potential overpayments for consumers with deductibles and out-of-pocket maximums.

106. Overpayments cannot be assessed on a transaction-by-transaction basis for these consumers. As I show above, if the price of one generic prescription would have been lower, that can impact the consumer's payments on several other prescriptions. Instead, it is necessary to determine how all of the consumer's payments would have been affected if Walgreens had reported the PSC price as its U&C price. This requires far more data and documents than the data on generic drug prescriptions filled at Walgreens pharmacies that Dr. Hilton proposes using. Instead, you would need to gather:

- *__All brand and generic prescriptions at all pharmacies:__* Whether a consumer meets a deductible or out-of-pocket maximum depends on all of their prescriptions, not only generic prescriptions filled at Walgreens' pharmacies. If a consumer paid a lower price on a generic drug at a Walgreens pharmacy, this can result in them staying in the deductible period longer and paying a higher price on a subsequent prescription filled at a different pharmacy. Similarly, you would need to know if a consumer would have met their out-of-pocket maximum based on all of their generic and brand prescriptions at all pharmacies, not only Walgreens. This would require a much larger production of PBM data.

- *__All medical claims for all physicians, hospitals, and other providers for some health plans:__* For some health plans, deductibles and out-of-pocket maximums depend on

prescription and medical costs combined.[54] So, at least for certain potential class members, you would need all prescription data *and all medical claims data* to know if and when a consumer would meet their deductible or out-of-pocket maximum, and to calculate how much they would pay for each prescription in the but-for-world. Medical claims data are not maintained by the PBM. Such data would need to be requested from all of the insurers administering the relevant health plans' medical benefits.

- ***All copay coupons used by consumers to help purchase their drugs:*** Brand manufacturers often provide copay coupons to help consumers afford their brand drugs. As described in the next bullet, some health plans apply copay coupons to the consumer's deductible and out-of-pocket maximum and other health plans do not.[55] If a health plan does not apply the copay coupon, it would be necessary to identify which consumer payments in the PBM or Walgreens data (if those data were available) reflect the use of a copay coupon and remove that amount when determining if a consumer met their deductible or out-of-pocket maximum.

- ***Information for each consumer on how their health plan applies copay accumulators:*** Some health plans stopped applying copay coupons to their member's deductibles and out-of-pocket maximums to ensure that the coupons did not remove financial incentives for consumers to rely on cheaper drugs. These programs are often referred to as copay accumulators.[56] While some health plans adopted the use of copay accumulators, many others chose not to. Also, as the use of copay accumulators grew

---

[54] For instance, one of the health plan options offered to the Named Plaintiff ████████ ████████████████████████ in 2007 covered both prescription drugs and medical expenses (physician office visits, preventative care, hospital services, etc.). As such, the plans' deductible and out-of-pocket maximum encompassed both prescription and medical costs combined. *See* 2007 Health Plan Highlights, ██████ 00001-002.

[55] For instance, when a plan has a copay accumulator adjustment, the "value of a manufacturer's copayment support payments are excluded from the patient's annual deductible and out-of-pocket maximum obligations." As of 2021, about 43% of commercial insurance plans had a copay accumulator adjustment implemented in the plan design. *See* Fein, Adam J., "Four Reasons Why PBMs Gain As Maximizers Overtake Copay Accumulators," *Drug Channels*, February 8, 2022, available at https://www.drugchannels.net/2022/02/four-reasons-why-pbms-gain-as.html.

[56] Keither, Katie, "Lawsuit Challenges Federal Copay Accumulator Policy," *Health Affairs Forefront*, September 28, 2022, available at https://www.healthaffairs.org/content/forefront/lawsuit-challenges-federal-copay-accumulator-policy.

34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

more common, some states outlawed their use to ensure that costs were not being unnecessarily shifted to consumers.[57] To know whether copay coupons used by a consumer apply to their deductible and out-of-pocket maximums, it would be necessary to determine which health plans adopted copay accumulators, when they adopted them, and when they stopped using them. Such information may be available in the consumer's Health Plan Summary Description, which would require obtaining the Plan Summary Description for each consumer and health plan (or their PBMs) and for each year, as plans change from year-to-year. It may also be necessary to determine if the consumer was in a state that outlawed the use of copay accumulators.

- ***Information for each consumer's deductible, copayment, coinsurance payment, and out-of-pocket maximum from their health Plan Summary Description***: Based on PBM claims data produced in this matter, it is not feasible to reliably identify a consumer's deductible or out-of-pocket maximum on a classwide basis. Instead, this information is available in the Health Plan Summary Description documents or from the PBM, which further underscores the need for individualized inquiry. It is then necessary to link that information to the pharmacy, and potentially medical, claims data for each consumer. This is further complicated by the possibility that some consumers change health plans in the middle of a given year. This information would need to be gathered from the PBM, the health plan, or, potentially, from each individual consumer.

### b. Copayment Versus Coinsurance Payments

107. Dr. Hilton's analysis is also unreliable for determining overpayments for prescriptions with copayments and coinsurance payments. Dr. Hilton's proposed overpayment calculation recognizes that determining injury depends on whether the consumer has a copayment or coinsurance payment.[58] Specifically, she proposes different formulas for calculating potential overpayments for copayments than for coinsurance payments. Even using Dr. Hilton's flawed transaction-by-transaction approach, it is not possible to calculate potential

---

[57] Keither, Katie, "Lawsuit Challenges Federal Copay Accumulator Policy," *Health Affairs Forefront*, September 28, 2022, available at https://www.healthaffairs.org/content/forefront/lawsuit-challenges-federal-copay-accumulator-policy.

[58] *See* Hilton Report, at ¶¶ 24-25.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

overpayments, if any, without knowing if the consumer made a copayment or coinsurance payment. However, as I discuss below, the data Dr. Hilton uses do not identify whether a consumer paid a deductible, copayment, or coinsurance payment on a given transaction. In addition, Dr. Hilton's description of how she might infer whether a patient is paying a copayment or coinsurance payment is unreliable.

### i. It is Necessary to Know if a Consumer's Plan Requires a Copayment or Coinsurance Payment to Determine Injury

108. The following example illustrates why it is necessary to know if a patient is paying a copayment or coinsurance payment for determining if a consumer is injured. The example contains the following simplifying assumptions:

- The consumer has no deductible payment and no out-of-pocket maximum limit;

- The consumer has either a copayment or a coinsurance payment but not a hybrid of the two; and

- The consumer does not receive any financial assistance payments.

**Figure 4**
**Copayments and Coinsurance Payments**
**Dr. Hilton's Calculation Falsely Identifies Potential Consumer Overpayments**

| Patient Paying | Prescription Price | PSC Price | Actual World Patient Payment | But-for World Patient Payment | Dr. Hilton's Overpayment |
|---|---|---|---|---|---|
| Copay ($5) | $25 | $10 | $5 | $5 | $0 |
| Coinsurance (20%) | $25 | $10 | $5 | $2 [1] | $3 |

**Note**:
[1] In the but-for world, a patient paying a coinsurance would pay 20% of the PSC price.

109. In this hypothetical example shown in **Figure 4**, the total cost of the prescription is $25. The consumer's payment was $5, which may either reflect a $5 copayment or a 20% coinsurance payment on that $25 prescription. There is no way, by looking at the data alone, to know if the consumer paid a copayment or coinsurance payment.

36

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

110. The PSC price for the drug in this example was $10, and according to the Plaintiffs' theory of the case, Walgreens would have reported its PSC price as the U&C price in the but-for world.

111. Therefore, whether a consumer overpaid for the prescription in the example depends entirely on whether they paid a copayment or coinsurance payment. In this example, the consumer is uninjured if they paid a copayment and injured if they paid a coinsurance payment, as outlined below:

- Assuming the payment reflects a copayment: If the consumer's actual payment of $5 reflects a copayment, that $5 is less than the PSC price of $10, and, based on Dr. Hilton's approach, that consumer would continue to pay a $5 copayment in the but-for world and was uninjured.

- Assuming the payment reflects a coinsurance payment: If the consumer's actual payment reflects a 20% coinsurance payment, based on Dr. Hilton's approach, that consumer would pay 20% of the PSC price of $10 in the but-for world, which is $2. In that case, Dr. Hilton's approach would conclude that the consumer overpaid by $3 ($5 actual payment minus the $2 but-for payment), and was, therefore, potentially injured.

112. As demonstrated in the simplified example in **Figure 4**, even after accepting every other aspect of Dr. Hilton's flawed approach, it is not possible to determine whether a consumer is injured if the data that Dr. Hilton proposes using do not identify if the payments was a copay or coinsurance payment.

### ii. *The Data Dr. Hilton Uses Do Not Report Whether the Consumer Pays a Copayment or Coinsurance Payment*

113. Dr. Hilton testified that she expects to receive PBM and Walgreens data that will allow her to identify whether a consumer paid a copayment or coinsurance payment.[59] However, the PBM and Walgreens data produced in this matter undermine this assertion.

114. For example, when presented with ███████████████████████████ ██████, Dr. Hilton was unable to identify separate fields for copayment and

---

[59] Hilton Deposition, at 271:5-24; 275:12-16; 277:3-12; 277:17-278:2.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

coinsurance.[60] Indeed, these data do not contain information identifying whether a consumer paid a copayment or a coinsurance payment, or other factors that can affect a consumer's payment such as the out-of-pocket maximum or deductible limits.[61] Rather, the data contain a single field identifying the total amount paid by consumers, "COPAY_AMT."[62] Although this field has "COPAY" in the title, it instead appears to reflect the full consumer payment, whether it be a copayment, coinsurance, or a deductible.[63]

**Figure 5**
**Excerpt of PBM Data -** ▮▮▮▮▮▮

| Row | RX# | FILL_DATE | [A] CLIENT_PAID_AMT | [B] COPAY_AMT | [B]/([A]+[B]) Patient share of total payment |
|---|---|---|---|---|---|
| 1 | | 10/26/2009 | $44.48 | $77.47 | 63.53% |
| 2 | | 7/22/2010 | $18.08 | $10.00 | 35.61% |
| 3 | | 10/26/2011 | $2.13 | $6.70 | 75.88% |
| 4 | | 3/14/2018 | $328.88 | $35.00 | 9.62% |
| 5 | | 12/7/2019 | $5.48 | $0.00 | 0.00% |
| 6 | | 1/15/2021 | $17.38 | $10.00 | 36.52% |
| 7 | | 1/31/2021 | $0.87 | $10.00 | 92.00% |
| 8 | | 2/1/2021 | $441.15 | $75.00 | 14.53% |
| 9 | | 2/1/2021 | $0.00 | $8.01 | 100.00% |
| 10 | | 2/1/2021 | $0.00 | $4.49 | 100.00% |

**Note**:
[1] The "RX#" field corresponds to prescription number. "FILL_DATE" corresponds to the date when a given prescription is filled. "CLIENT_PAID_AMT" contains the amount that the TPP pays for a given transaction. The "COPAY_AMT" field contains the dollar amount that consumer paid at the point of purchase. The "Row" and "Patient share of total payment" were developed for this figure for illustrative purposes.

**Source:**
[1] ESI-0001548.

---

60   *See* Hilton Deposition, at 278:9-279:11 ("A. That's the only field that says, "co-pay" or "co-insurance" in the data, and it says, "co-pay amount." Q. Do you know whether there's co-insurance anywhere in this field or not? […] THE WITNESS: I don't know just looking at it now.").

61   ▮▮▮▮▮▮

62   ▮▮▮▮▮▮

63   Other PBM datasets produced in this matter similarly contain what appear to be a single consumer payment field.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

115. **Figure 5** illustrates some of the values that appear under the COPAY_AMT field in the
███████████ data. As can be seen in the figure, in some cases the consumer appears to
pay the full prescription cost, in some cases the consumer appears to pay nothing, and in
other cases the consumer pays varying dollar amounts and shares of the prescription cost.
Indeed, Dr. Hilton acknowledged that PBMs can combine copayment and coinsurance
information into the same field in their data.[64]

116. ███████ *data relied on by Dr. Hilton* also do not identify whether consumers paid a
copayment, coinsurance payment, deductible or a mix of different types of payments. The
████ data sample Dr. Hilton relied on includes three fields where the title of the field appears
to correspond to consumer copayments,[65] and two fields where the title of the field appear
to correspond to consumer coinsurance payments.[66] However, as seen in **Figure 6** below,
these fields often include the exact same entries, or a mix of values that appear to be copay,
coinsurance, or neither. For instance, as can be seen in rows #1-2, #4, #6-7, and #10, the
same values simultaneously appear both in the copay and coinsurance fields, as identified in
the ███████████████

---

[64] *See* Hilton Deposition, at 279:20-280:19.

[65] These fields include "pfp_plan_copay_dlrs", "pfp_plan_return_copay_dlrs", and
"pfp_plan_submitted_copay_dlrs." According to the ███████████████, plan_copay_dlrs is defined
as ████████████████████████████████ and plan_return_copay_dlrs
and plan_submit_copay_dlrs are both defined as the ████████████████████████████

[66] These fields include "pfp_plan_rtrnd_coins_dlrs" and "pfp_plan_returnd_coins_dlrs." According to the ███████████████ both of these fields are defined as
█████████████████████████████████████████████████ *See*
████ at pp. 20-21.

[67] *See* ███████████████████████████, at pp. 20-21.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 6**

**Excerpt of** ███████████ **– Summary of Copay and Coinsurance Fields**



Sources:
[1] ████████████████████████████████
[2] ████████████████████████████, at pp. 20-21.

117. **Figure 7** further illustrates that the same consumer payment field in the ████████ data appears to reflect many different types of payments, using one of the consumer payment fields, ███████████████ Based on this field, in some cases the consumer appears to pay the full prescription cost, in some cases the consumer appears to pay nothing, and in other cases the consumer pays varying dollar amounts and shares of the prescription cost. In fact, at least one of these patient payments (e.g., prescription transaction #4) does not appear to reflect a typical copayment or coinsurance payment amount.[68] As such, it is unclear how Dr. Hilton can identify whether consumers paid copayments or coinsurance payments on transactions on a classwide basis by relying solely on these data.

---

[68] In many cases the payment may reflect complex payment determinations. For example, the ███ payment for prescription transaction #1 appears to reflect the minimum required payment for prescriptions in the Catastrophic Coverage phase for Medicare Part D prescriptions. As I describe in detail in **Section IV.B.2**, whether a patient is in the Catastrophic Coverage phase depends on their aggregate prescription drug spend for the year. Furthermore, during that phase, a consumer is required to pay the greater of, the minimum required payment, or 5% of the cost of the prescription. However, it is only possible to determine this with certainty by reviewing information specific to Medicare Part D plans for each plan and each plan year, and by reviewing the patient's aggregate drug spend for the year. *See, e.g.,* National Medicare Training Program, "Part D Benefit Parameters," *CMS*, available at https://www.cms.gov/files/document/2013partdbenefitspdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 7**

Excerpt of ████████ Data



**Note**:
[1] The field "pfp_rx_nbr" contains a unique transaction number. The field "pfp_rx_create_dt" contains the

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

**Sources:**
[1] ████████████████████████████████████
[2] █████████████████████████, at pp. 20-21, 40.

118. The information provided in the ████████████████ data produced in this case
is consistent with my experience using PBM claims and pharmacy data in the past.[69] In my
experience, these data do not always capture all the relevant components of the consumer's
payment. Instead, the data frequently contain copayment, coinsurance payments, deductible
payments, and other consumer payments combined in certain fields with no identifiers to
accurately distinguish the payment components. Further, the data typically do not contain
fields that provide information on what a consumer's out-of-pocket maximum is, or how
large a consumer's deductible is. The PBM that handles the claim may be aware of this
information, as it is contained in documents that the PBM may have possession of that would
have allowed it to adjudicate each claim, but the information is not generally reflected in the
PBM data.

---

[69] The other PBM datasets produced in this matter also contain what appear to be a single consumer
payment field.

### iii. Dr. Hilton's Methodology to Infer Whether a Consumer Payment is a Copayment or a Coinsurance Payment is Flawed

119. Dr. Hilton admitted that she did not rely on a data field in the produced PBM data to conclude definitively if a consumer payment was a copayment or coinsurance payment.[70] Instead, she claimed, based solely on a review of PBM data for Named Plaintiff ███████████ ███ that she could infer whether a consumer paid a copayment or a coinsurance payment by comparing the consumer payment to the total payment. If 90% or more of the generic drug prescription claims in the PBM data for a given month had the *same* division in the percentage paid by the consumer and the percentage paid by the TPP, then she assumes that *all consumers* whose claims were adjudicated by that PBM paid a coinsurance payment. Otherwise, if fewer than 90% of the claims had the same division in the percentage paid, she assumes that *all consumers* with that PBM paid a copayment.[71] However, Dr. Hilton's approach to inferring what kind of payment the consumer is making is flawed and unreliable for the following reasons:

- ***Dr. Hilton's 90% is an arbitrary threshold:*** As discussed above, Dr. Hilton uses a 90% threshold to categorize whether *all consumers* whose claims were adjudicated

---

[70] *See* Hilton Deposition, at 271:5-271:15 ("Q: Is there a field that you look at to determine whether an individual consumer had co-payment versus co-insurance? A. I used the -- I calculated it myself. So I looked at the consumer portion divided by the total amount paid by the consumer and the TPP for a given PBM in a given month. And if 90 percent of those transactions were the same percentage, then I assumed that it was a co-insurance situation. Otherwise, it was a co-payment situation.").

[71] *See* Hilton Deposition, at 271:5-277:5. Note that Dr. Hilton appears to state that she would apply this analysis at the PBM level rather than a health plan level, although given she did not describe the approach in her report it is unclear how she implemented the analysis or would implement it on a broader PBM dataset.

*See specifically,* Hilton Deposition, at 274:19-275:16.

Q: "… Are you only looking at ████████ beneficiaries in that month, or are you looking at all ████ transactions in that month?"

A: "So I'm doing it by PBM. So to answer your question, if I looked at – I would look at ███ transactions for month one for all of – all of the transactions in that month, and determine if the majority, or more than the – you know, 90 percent, were the same percentage, 25 percent, 35 percent, whatever it is, then I would identify that as a co-insurance situation.

That works with the data that I have here. If I'm given more PBM data, my assumption is that the PBM – we would ask the PBM to turn over that information that would allow me to identify whether there was a co-insurance or co-pay situation."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

by the same PBM in a given month paid either a copayment or coinsurance payment. This threshold is arbitrary and is not based on any literature or empirical evidence. For example, had Dr. Hilton found that for 89% of the transactions the consumer share of payments amounted to the same percentage, she would conclude that *all consumers paid a copay*. However, if that percentage was only slightly higher – say 91% – then she would conclude that *all consumers paid coinsurance payments*. The fact that her conclusion about whether *all consumers* paid a copay or coinsurance hinges on minor differences in the percentage of consumer payments reflecting the *same* share of claim amounts only emphasizes how arbitrary and unreliable Dr. Hilton's proposed methodology is for whether consumers paid a copay or coinsurance payment.

- ***Dr. Hilton's proposal for inferring copayment or coinsurance payments is unreliable and would need to incorporate plan specific information:*** Dr. Hilton testified that she would implement her approach by PBM, and that she tested her approach using the ███████ data produced for ██████████████████[72] It is not clear, however, how she proposes to apply her method to address substantial differences in plan designs for different plans involving the same PBM. For example, even if sufficient data were made available, it would be inappropriate to assume that an arbitrary 90% threshold would determine that each and every consumer using a specific PBM paid a copayment or coinsurance payment. Instead, one would need to review the Summary Plan Description or other document that showed the plan design to know if there was a copay or coinsurance for a specific plan, something that can only be obtained from the TPP or the PBM.

- ***No evidence Dr. Hilton's method would work for classwide data:*** Dr. Hilton testified that she relied on data from a single third-party payer, ██████████████ ███. She simply asserts that PBMs would provide data that "would allow [her] to identify whether there was a co-insurance or co-pay situation."[73] She provides no

---

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

evidence that she could collect adequate data to do so, or that the results would be reliable for all, or any, of the TPPs.

### iv. Dr. Hilton's Calculation Ignores the Fact that Consumer Payments are Based on Factors Other than Just Copayment or Coinsurance Payments

120. Dr. Hilton's calculation allows for only two types of consumer payments: a copayment or a coinsurance payment. Consumer payments are much more complex and not reflected in the formulaic calculation she proposes. As described in **Section III**, the consumer payment for a generic drug prescription is based on several terms, not just copayment and coinsurance payment. For example, an observed consumer payment may reflect a deductible payment, a copayment, a coinsurance payment, or an out-of-pocket maximum.

121. A consumer payment may also reflect a mix of payment factors, or hybrid of copayment and coinsurance payment terms for a prescription. For example, Plaintiff ███████████ ███████████████████████████████████████████████████████████.[74]

122. Medicare Part D plans are another example where it is common to have a combination of copayment and coinsurance for the same consumer, depending on how much the consumer has spent over the course of the year.[75] Other plans have a copay for one Tier of drugs (e.g., Tier 1), but coinsurance for a different Tier of drugs (e.g., Tier 2).[76] Dr. Hilton does not provide a calculation of overpayments that incorporates hybrid payment terms, nor does she explain how looking at the data itself and seeing if 90% of transactions have the same division between the percentage paid by the consumer and the TPP would reveal such hybrid payments.[77]

---

[74] Hilton Deposition, at 298:3-9 ("Q. And you see that there's an asterisk next to the ████████████████ ████████████████████████████ A. I see that.").

[75] For example, a consumer may face a copayment in the initial coverage phase, and then be responsible for a 25% coinsurance in the coverage gap phase. "Medicare Donut Hole 2023," *Boomer Benefits*, available https://boomerbenefits.com/medicare-part-d-plans/medicare-donut-hole-2023/.

[76] For instance, in 2018, █████████████████████████████████████████████████████ ██████████████████ *See* 2018 Annual Notice of Changes, ████████ 0000130-153, at 138.

[77] Hilton Deposition, at 282:4-285:14.

123. Indeed, Dr. Hilton admitted at her deposition that, when analyzing the PBM claims data pertaining to patients insured by [redacted], she concluded that if the fraction of claims having the same division of payment between TPP and consumer was 89% rather than 90%, she would apply a copayment to all of that PBM's claims.[78] If she applied a copayment where it was truly coinsurance, she would use the wrong one of her formulas to determine the consumer overpayment. That error would then affect the TPP overpayment, as consumer overpayments and TPP overpayments are linked in her formulas. By making a PBM-wide error in determining whether a transaction was copay or coinsurance, her resulting overpayment calculation would simply be wrong, even by her own methodology. The only way to implement Dr. Hilton's damage formulas using the correct inputs would be through a painstaking, individualized review of each plan's documents to determine whether consumers in that plan at that time were paying a copayment or coinsurance payment.

### 2. Medicare Part D Payments and Injury to Part D Consumers Cannot be Assessed on a Classwide Basis

124. For Medicare Part D consumers, there are even more challenges to determining whether, and by how much, they potentially overpaid on generic purchases at Walgreens pharmacies. Dr. Hilton's methodology fails to address these additional challenges, unique to Medicare Part D consumers. Further, the data Dr. Hilton proposes using are insufficient to determine injury to Medicare Part D consumers. Dr. Hilton's transaction-by-transaction approach also fails to provide an accurate calculation of potential overpayment by Medicare Part D consumers.

#### a. Consumer Payments under Medicare Part D

125. Medicare Part D plans have several *payment phases* that depend on aggregate drug spend over the course of a plan year. A consumer's payment on a Medicare Part D plan depends on which of the payment phases they are in. I describe the payment phases below, and **Figure 8** illustrates when a consumer moves from one payment phase to the next for each year from 2012 to 2023.

---

78 Hilton Deposition, at 272:5-17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 8**
**Medicare Part D Phases and Payment Thresholds**
**2007-2023**



**Note:**
[1] Drug spend for the Deductible amount includes only consumer payments.
[2] Drug spend for meeting the Initial Coverage Limit includes both consumer and Part D plan payments.
[3] Drug spend for meeting the Catastrophic Phase Limit includes both consumer and manufacturer discount payments (Part D plan payments are not considered in calculating this threshold).

**Sources:**
[1] "Medicare Part D: A First Look at Plan Offerings," *Kaiser Family Foundation*, 2016, available at https://files.kff.org/attachment/issue-brief-medicare-part-d-a-first-look-at-plan-offerings-in-2016.
[2] "2024-2006 Medicare Part D Standard Benefit Model Plan Parameters," *Q1 Medicare*, available at https://q1medicare.com/PartD-The-MedicarePartDOutlookAllYears.php.

- ***Deductible phase:*** The consumer is responsible for 100% of prescription drug costs in the deductible phase, much like on a typical health insurance plan. The standard deductible amount ranged from $250 in 2006 to $505 in 2023,[79] but this is not a

---

[79] "Medicare Program Description and Legislative History – Annual Statistical Supplement, 2006," *Social Security Office of Policy*, available at https://www.ssa.gov/policy/docs/statcomps/supplement/2006/medicare.html.

required amount. Each Medicare Part D plan can set its own deductible and, more recently, many plans do not have any deductible.[80]

- ***Initial coverage phase***: The consumer pays either a copayment or a coinsurance payment in this phase, with the remainder paid by the plan until the initial coverage limit is met.[81] The initial coverage limit, which reflects the consumer's and the plan's aggregate pharmacy spend in a year, was $4,660 in 2023.[82]

- ***Coverage gap phase (also called the "donut hole"):*** Prior to the passage of the Affordable Care Act ("ACA") in 2010, Medicare Part D consumers paid 100% of the drug cost during the coverage gap phase. Starting in 2011 for generic drugs and 2013 for brand drugs, Part D plans have been required to pay a share of the drug costs in this phase. **Figure 9** summarizes the consumer, Part D plan, and manufacturer cost sharing during the Coverage Gap Phase for each year from 2007 through 2023.

---

[80]  Zhou, Chao, and Yuting Zhang, "The Vast Majority Of Medicare Part D Beneficiaries Still Don't Choose The Cheapest Plans That Meet Their Medication Needs," *Health Affairs*, October 2012, Vol. 31(10). "Three-fourths of the study population opted for plans with no deductible." Armstrong, Steven, Brooks Conway, and Megan Ruzicka, "2022 Part D Competitive Environment and Emerging Trends, Medicare Advantage Part D and Prescription Drug Plans," *OliverWyman Report*, available at https://www.oliverwyman.com/our-expertise/insights/2021/dec/2022-medicare-advantage-part-d-trends.html. Furthermore, Named Plaintiff Russo was enrolled in a SilverScript Choice health plan that did not have a deductible in 2018 and 2019. *See, e.g.,* 2020 Silverscript Annual Notice of Changes, CAREMARK_FORTH-001060-083; CAREMARK_FORTH-001238-261.

[81]  "Medicare Program Description and Legislative History – Annual Statistical Supplement, 2006," *Social Security Office of Policy*, available at https://www.ssa.gov/policy/docs/statcomps/supplement/2006/medicare.html.

[82]  "2024-2006 Medicare Part D Standard Benefit Model Plan Parameters," *Q1 Medicare*, available at https://q1medicare.com/PartD-The-MedicarePartDOutlookAllYears.php.

47

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 9**
**Medicare Part D Cost Sharing in the Coverage Gap**
**(2007-2023)**

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020-2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Brand Products* | | | | | | | | | | | | | | |
| Consumer Cost-Sharing | 100% | 100% | 100% | 100% | 50% | 50% | 48% | 48% | 45% | 45% | 40% | 35% | 25% | 25% |
| Plan Cost-Sharing | 0% | 0% | 0% | 0% | 0% | 0% | 2.5% | 2.5% | 5% | 5% | 10% | 15% | 5% | 5% |
| Manufacturer Discount | 0% | 0% | 0% | 0% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 50% | 70% | 70% |
| *Generic Products* | | | | | | | | | | | | | | |
| Consumer Cost-Sharing | 100% | 100% | 100% | 100% | 93% | 86% | 79% | 72% | 65% | 58% | 51% | 44% | 37% | 25% |
| Plan Cost-Sharing | 0% | 0% | 0% | 0% | 7% | 14% | 21% | 28% | 35% | 42% | 49% | 56% | 63% | 75% |

**Sources:**
[1] "An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, October 19, 2022, available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit.
[2] "What kind of discount can we expect in the Medicare Part D Donut Hole or Coverage Gap?" *Q1 Medicare*, available at https://q1medicare.com/faq/FAQ.php?faq=What-kind-of-discount-can-we-expect-in-the-Medicare-Part-D-Donut-Hole-or-Coverage-Gap-&faq_id=470&category_id=129.

o    For 2007-2010, consumers paid 100% of brand and generic drug costs.

o    In 2010, under the ACA, all Medicare Part D consumers that reached the coverage gap phase received a one-time $250 rebate.[83]

o    Starting in 2011, manufacturers were required to discount brand drugs by 50%, consumers paid the remaining 50%, and Part D plans paid nothing. After that, consumer share and Part D plan share varied over time until 2019. Since 2019, brand drug manufacturers have been required to discount their drugs by 70%, consumers pay 25%, and Part D plans pay 5%.[84]

o    Starting in 2011, consumers paid 93% of the cost of generic drugs and Part D plans paid 7% of drug costs with no generic manufacturer discounts. After that, consumer share and Part D plan share varied over time until 2020.

---

[83]  "Health Reform in Action: Donut Hole Rebate Checks Start Arriving June 10, 2010," *Center for Medicare Advocacy*, June 10, 2010, available at https://medicareadvocacy.org/health-reform-in-action-donut-hole-rebate-checks-start-arriving-june-10-2010/.

[84]  "What kind of discount can we expect in the Medicare Part D Donut Hole or Coverage Gap? *Q1 Medicare*, available at https://q1medicare.com/faq/FAQ.php?faq=What-kind-of-discount-can-we-expect-in-the-Medicare-Part-D-Donut-Hole-or-Coverage-Gap-&faq_id=470&category_id=129.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Since 2020, consumers pay 25% and Part D plans pay 75% of generic drug costs.[85]

- ***Catastrophic coverage phase***: In this phase, the consumer pays 5% of the prescription drug cost,[86] the Part D plan pays 15% of the drug cost, and the Federal Government pays the remaining 80% of the prescription drug cost.[87] In 2023, the catastrophic coverage phase begins when the combined patient payments and manufacture discounts in a year exceed $7,400 (Part D plan payments are not considered in calculating this threshold).[88]

126. Medicare Part D consumer payments will further vary as a result of subsidies from the federal government or because they receive coverage through an employer-group Part D plan.

127. Some employers offer Medicare coverage under an employer-sponsored group-based Medicare PDP plan. These plans may bundle supplemental coverage that is not available

---

[85] "An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, October 19, 2022, available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/. *See also* "What kind of discount can we expect in the Medicare Part D Donut Hole or Coverage Gap?" *Q1 Medicare*, available at https://q1medicare.com/faq/FAQ.php?faq=What-kind-of-discount-can-we-expect-in-the-Medicare-Part-D-Donut-Hole-or-Coverage-Gap-&faq_id=470&category_id=129.

[86] Consumers pay the larger of 5% of the drug cost or a minimum fixed payment in the Catastrophic Coverage Phase. For example, in 2023, consumers pay a minimum of $4.15 for generic drugs and $10.35 for brand drugs in the Catastrophic Coverage Phase. *See* "An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, October 19, 2022, available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/.

[87] "What Medicare Part D drug plans cover," *Medicare*, available at https://www.medicare.gov/drug-coverage-part-d/what-medicare-part-d-drug-plans-cover; Cubanski, Juliette et al., "A Primer on Medicare: Key Facts About the Medicare Program and the People it Covers," *Kaiser Family Foundation*, March 20, 2015, https://www.kff.org/report-section/a-primer-on-medicare-what-is-the-medicare-part-d-prescription-drug-benefit/.

[88] "2024-2006 Medicare Part D Standard Benefit Model Plan Parameters," *Q1 Medicare*, available at https://q1medicare.com/PartD-The-MedicarePartDOutlookAllYears.php. *See also* Understanding True Out-of-Pocket (TrOOP) Costs," CMS Product No. 11223-P, revised October 2015, available at https://www.cms.gov/files/document/11223-ppdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

through the more common non-employer Medicare Part D plans.[89] For example, 

The employer-group Part D plan payment may also be reflected in the Walgreens or Medicare claims data. However, as I show below it is necessary to know how the payment is structured through the consumers' various payment phases to determine if there is a potential overpayment.

        **b.  Dr. Hilton's Transaction-by-Transaction Calculation Cannot Determine Potential Overpayment for Medicare Part D Consumers**

128. Dr. Hilton's transaction-by-transaction overpayment calculation cannot be used to determine accurate potential overpayments for Medicare Part D consumers. In fact, not only is Dr. Hilton's approach flawed, but in some cases it will calculate an overpayment for a consumer who would have paid ***more*** if Walgreens had reported the PSC price as its U&C price.

---

89  "An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, October 19, 2022, available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit.

90  *See, e.g.,* 2018 Annual Notice of Changes, ████████ 0000130-153.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Figure 10
## Medicare Part D - Consumer Payment Phases
## Hypothetical Consumer Payments for 2017 Plan Year

| Payment Phase | Phase Aggregate Spend Thresholds [1] Consumer Payment | Consumer + Plan Payments | Consumer + Manf. Payments | Payments [2] Consumer Generic | Consumer Brand | Part D Plan Generic | Part D Plan Brand | Manf. Generic | Manf. Brand | Government |
|---|---|---|---|---|---|---|---|---|---|---|
| Deductible (D) | $400 | | | 100% | 100% | 0% | 0% | 0% | 0% | 0% |
| Initial coverage (IC) | | $3,700 | | 25% | 25% | 75% | 75% | 0% | 0% | 0% |
| Coverage gap (CG) | | | $4,950 | 51% | 40% | 49% | 10% | 0% | 50% | 0% |
| Catastrophic coverage (CC) | | | | 5% | 5% | 15% | 15% | 0% | 0% | 85% |

| Prescription | Drug type | Pharmacy Price Actual | PSC Price | Consumer Paid | Plan Paid | Manf. Discount | Actual World Cumulative Spend Consumer | Cumulative Spend Consumer + Plan | Cumulative Spend Consumer + Manf. | Phase |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Generic | $400 | $300 | $400 | $0 | | **$400** | $400 | $400 | D |
| 2 | Generic | $200 | $100 | $50 | $150 | | | $600 | $450 | IC |
| 3 | Brand | $2,000 | | $500 | $1,500 | | | $2,600 | $950 | IC |
| 4 | Brand | $1,100 | | $275 | $825 | | | **$3,700** | $1,225 | IC |
| 5 | Brand | $200 | | $80 | $20 | $100 | | | $1,405 | CG |
| 6 | Brand | $3,140 | | $1,256 | $314 | $1,570 | | | $4,231 | CG |
| 7 | Generic | $200 | $150 | $102 | $98 | | | | $4,333 | CG |
| 8 | Brand | $685 | | $274 | $69 | $343 | | | **$4,950** | CG |
| 9 | Generic | $200 | $150 | $10 | $30 | | | | | CC |
| 10 | Generic | $150 | $130 | $8 | $23 | | | | | CC |
| 11 | Generic | $100 | $80 | $5 | $15 | | | | | CC |
| **Total payments** | | | | $2,960 | | | | | | |

Notes:

[1] The Initial Coverage threshold of $3,700 is based on the combined consumer and Part D plan payments. The Coverage Gap threshold of $4,950 is based on the combined consumer payments and manufacturer discounts (the Part D plan payments are not considered in the calculation of this threshold).

[2] In the Coverage Gap phase, cost sharing between the consumer, Part D plan, and manufacturer depend on whether the prescription is for a generic or brand drug.

[3] The reported payments reflect rounded values.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

129. **Figure 10** shows a hypothetical example of a Medicare Part D consumer's drug payments for 2017. As discussed above, the portion paid by the consumer depends on what payment phase they are in. Further, the portion paid by the consumer in the coverage gap phase is determined by law and differs for brand and generic drugs. Finally, the required manufacturer discount in the coverage gap phase is applied to the consumer's aggregate drug spend as required by law.

- ***Deductible Phase:*** The consumer's first prescription is for a generic drug that costs $400 and the consumer pays 100% of the cost of the drug. The drug costs the same amount as the consumer's deductible, so they complete the deductible phase with their first prescription.

- ***Initial Coverage Phase:*** The second through fourth prescriptions are a mix of generic and brand drugs, and the consumer pays a 25% coinsurance payment. After the fourth prescription the consumer and the Part D plan have paid a total of $3,700 dollars, which in 2017 was the upper limit for that phase, so the consumer has completed the initial coverage phase.

- ***Coverage Gap Phase:*** The fifth through eighth prescriptions are in the coverage gap phase. The consumer pays 40% of drug costs for the fifth, sixth, and eighth prescriptions, which are brand prescriptions. The brand manufacturer discounts the price by 50%, and both the consumer payment and the manufacturer discounts apply to the cumulative drug spend for determining when the Coverage Gap limit has been met. The seventh prescription is for a generic and the consumer pays 51% of the drug cost, and there is no manufacturer discount. After the eighth prescription, the consumer's cumulative drug spend with the cumulative manufacturer discounts is $4,950 and they move to the catastrophic coverage phase.

- ***Catastrophic Coverage Phase:*** The ninth through eleventh prescriptions are for generic drugs in the catastrophic phase and the consumer pays 5% of the drug cost.

130. In total, for this example the consumer pays $2,960 for drugs in 2017.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Figure 11
## Medicare Part D – Consumer Payment Phases
## Hypothetical Consumer But-for Payments for 2017 Plan Year

| Payment Phase | Phase Aggregate Spend Thresholds [1] | | | Consumer Payments [2] | |
|---|---|---|---|---|---|
| | Consumer Payment | Consumer + Plan Payments | Consumer + Manf. Payments | Generic | Brand |
| Deductible (D) | $400 | | | 100% | 100% |
| Initial coverage (IC) | | $3,700 | | 25% | 25% |
| Coverage gap (CG) | | | $4,950 | 51% | 40% |
| Catastrophic coverage (CC) | | | | 5% | 5% |

| Prescription | Drug type | Pharmacy Price | | Actual World | | | | But-for World | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Actual | PSC Price | Consumer Paid | Plan Paid | Manf. Discount | Phase | Consumer Paid | Plan Paid | Manf. Discount | Cumulative Spend Consumer | Cumulative Spend Consumer + Plan | Cumulative Spend Consumer + Manf. | Phase |
| 1 | Generic | $400 | $300 | $400 | $0 | | D | $300 | $0 | | $300 | $300 | $300 | D |
| 2 | Generic | $200 | $100 | $50 | $150 | | IC | $100 | $0 | | $400 | $400 | $400 | D |
| 3 | Brand | $2,000 | | $500 | $1,500 | | IC | $500 | $1,500 | | | $2,400 | $900 | IC |
| 4 | Brand | $1,100 | | $275 | $825 | | IC | $275 | $825 | | | $3,500 | $1,175 | IC |
| 5 | Brand | $200 | | $80 | $20 | $100 | CG | $50 | $150 | | $3,700 | | $1,225 | IC |
| 6 | Brand | $3,140 | | $1,256 | $314 | $1,570 | CG | $1,256 | $314 | $1,570 | | $4,051 | | CG |
| 7 | Generic | $200 | $150 | $102 | $98 | | CG | $77 | $74 | | | $4,128 | | CG |
| 8 | Brand | $685 | | $274 | $69 | $343 | CG | $274 | $69 | $343 | | $4,744 | | CG |
| 9 | Generic | $200 | $150 | $10 | $30 | | CC | $77 | $74 | | | $4,821 | | CG |
| 10 | Generic | $150 | $130 | $8 | $23 | | CC | $66 | $64 | | | $4,887 | | CG |
| 11 | Generic | $100 | $80 | $5 | $15 | | CC | $41 | $39 | | | $4,928 | | CG |
| Total payments | | | | $2,960 | | | | $3,015 | | | | | | |

Notes:

[1] The Initial Coverage threshold of $3,700 is based on the combined consumer and Part D plan payments. The Coverage Gap threshold of $4,950 is based on the combined consumer payments and manufacturer discounts (the Part D plan payments are not considered in the calculation of this threshold).

[2] In the Coverage Gap phase the consumer payment share depends on whether the prescription is for a generic or brand drug.

[3] The reported payments reflect rounded values.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

131. **Figure 11** shows the same hypothetical consumer's payments if Walgreen's had reported the PSC price as their U&C price for the generic drugs. In this case, the consumer actually pays more in aggregate, while brand manufacturers pay less in discounts.

- **_Deductible Phase:_** The consumer is now in the deductible phase for the first two prescriptions. The PSC price is lower than the actual price, so it takes more prescriptions for the consumer to move through the deductible phase in the but-for world. Despite the lower PSC price, the consumer pays more for the second prescription because they continue to pay 100% of the cost.

- **_Initial Coverage Phase:_** The third through fifth prescriptions are all brand drugs. While in the actual world the consumer moves through the initial coverage phase by the fourth prescription, in the but-for world they are in the initial coverage phase through the fifth prescription. This means that they pay less for the fifth prescription (a brand prescription), due to the lower consumer coinsurance payment in the initial coverage phase as compared to the coverage gap phase.

- **_Coverage Gap Phase:_** The sixth through eleventh prescriptions are in the coverage gap phase. The consumer pays 40% of drug costs for the sixth and eighth prescriptions, which are brand prescriptions. The manufacturer discounts the price by 50%, and both the consumer payments and the manufacturer discounts apply to the aggregate drug spend. The seventh and ninth through eleventh prescriptions are for generic drugs and the consumer pays 51% of the drug cost. Although the PSC price is lower for these generic drugs in the but-for world, the consumer pays more for prescriptions nine through eleven because they pay the 51% coverage gap phase share rather than the 5% catastrophic coverage phase share.

- In this case, the consumer never reaches the catastrophic coverage phase.

132. Despite the existence of lower generic prices, the consumer actually pays more in the but-for world in this example. In total, the consumer pays $3,015 (or $55 **_more_** than in the actual world) and brand manufacturers pay discounts of $1,913 (or $100 **_less_** than in the actual world). This unexpected result is due to the unique structure of Medicare Part D plans and

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the fact that brand manufacturer discounts help the consumer move more quickly through the coverage gap.

133. A lower but-for generic drug price changes the way in which the consumer moves through their payment phases. In the example shown here, the change in the way the consumer moves through their payment phases results in them having to pay more in the coverage gap because they do not get the same benefit from brand manufacturer discounts.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Figure 12**
**Medicare Part D – Consumer Payment Phases**
**Hypothetical Consumer Dr. Hilton's Overpayment Calculation is Wrong**
**2017 Plan Year**

| Payment Phase | Phase Aggregate Spend Thresholds [1] | | | Consumer Payments [2] | |
|---|---|---|---|---|---|
| | Consumer Payment | Consumer + Plan Payments | Consumer + Manf. Payments | Generic | Brand |
| Deductible (D) | $400 | | | 100% | 100% |
| Initial coverage (IC) | | $3,700 | | 25% | 25% |
| Coverage gap (CG) | | | $4,950 | 51% | 40% |
| Catastrophic coverage (CC) | | | | 5% | 5% |

| | | Pharmacy Price | | Actual World | | | | But-for World | | | | | | | Dr. Hilton's But-for World Calculation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prescription | Drug type | Actual | PSC Price | Consumer Paid | Plan Paid | Manf. Discount | Phase | Consumer Paid | Plan Paid | Manf. Discount | Cumulative Spend Consumer | Cumulative Spend Consumer + Plan | Cumulative Spend Consumer + Manf. | Phase | Consumer Paid* | Potential Overpayment |
| 1 | Generic | $400 | $300 | $400 | $0 | | D | $300 | $0 | | $300 | $300 | $300 | D | $300 | $100 |
| 2 | Generic | $200 | $100 | $50 | $150 | | IC | $100 | $0 | | $400 | $400 | $400 | D | $25 | $25 |
| 3 | Brand | $2,000 | | $500 | $1,500 | | IC | $500 | $1,500 | | | $2,400 | $900 | IC | | |
| 4 | Brand | $1,100 | | $275 | $825 | | IC | $275 | $825 | | | $3,500 | $1,175 | IC | | |
| 5 | Brand | $200 | | $80 | $20 | $100 | CG | $50 | $150 | | | $3,700 | $1,225 | IC | | |
| 6 | Brand | $3,140 | | $1,256 | $314 | $1,570 | CG | $1,256 | $314 | $1,570 | | | $4,051 | CG | | |
| 7 | Generic | $200 | $150 | $102 | $98 | | CG | $77 | $74 | | | | $4,128 | CG | $77 | $26 |
| 8 | Brand | $685 | | $274 | $69 | $343 | CG | $274 | $69 | $343 | | | $4,744 | CG | | |
| 9 | Generic | $200 | $150 | $10 | $30 | | CC | $77 | $74 | | | | $4,821 | CG | $8 | $3 |
| 10 | Generic | $150 | $130 | $8 | $23 | | CC | $66 | $64 | | | | $4,887 | CG | $7 | $1 |
| 11 | Generic | $100 | $80 | $5 | $15 | | CC | $41 | $39 | | | | $4,928 | CG | $4 | $1 |
| Total payments | | | | $2,960 | | | | $3,015 | | | | | | | | $155 |

Notes:

[1] The Initial Coverage threshold of $3,700 is based on the combined consumer and Part D plan payments. The Coverage Gap threshold of $4,950 is based on the combined consumer payments and manufacturer discounts (the Part D plan payments are not considered in the calculation of this threshold).

[2] In the Coverage Gap phase the consumer payment share depends on whether the prescription is for a generic or brand drug.

[3] The reported payments reflect rounded values.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

134. Finally, **Figure 12** once again uses the same hypothetical, but shows how Dr. Hilton's proposed calculation overstates potential overpayment both in total and for individual transactions.

135. First, note that Dr. Hilton's calculation would ignore the payment phases, ignore how the consumer moves through the payment phases, and ignore what that means for the consumer's but-for payment. Dr. Hilton's calculation would focus only on the generic drugs on a transaction-by-transaction basis.

- Dr. Hilton's calculation assumes that the share of cost paid by the consumer in the but-for world is the same as in the actual world. This is incorrect and is caused by her instructions to calculate overpayment on a transaction-by-transaction basis. For the second prescription, she would assume the consumer pays 25% in the but-for world and pays a potential overpayment. However, because the consumer would still be in the deductible phase in the but-for world, they would actually pay 100% for the second prescription and pay *more* than in the actual world for that prescription.

- Dr. Hilton's calculation has the same problem with the ninth through eleventh prescriptions. She assumes that in the but-for world, the consumer would pay 5% of the lower PSC price and would pay a potential overpayment on those prescriptions. This ignores the fact that in the but-for world the consumer would still be in the coverage gap phase for those prescriptions and would pay 51% of the cost. The consumer would actually pay more for those prescriptions in the but-for world, not less.

- Finally, Dr. Hilton's calculations would assume that the consumer pays a total of $155 in overpayments across their generic prescriptions. As shown above, this is incorrect. Not only would the consumer not have paid an overpayment in the but-for world, they would have paid *more* in the but-for world.

136. Because Dr. Hilton's proposed calculation ignores the factors that determine Medicare Part D consumer payments, it will result in an incorrect calculation of potential overpayments. A transaction-by-transaction approach is incapable of calculating the correct but-for consumer

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

payment under Medicare Part D. It also ignores the fact that while a consumer may pay more on some transactions, they will pay less on others. The extent of the inaccuracy of Dr. Hilton's calculation will depend on the consumer, their drug purchases, their Medicare Part D plan, and the year.

137. Not only do consumer payments vary depending on the payment phase, as illustrated in the above example, but also Medicare Part D terms for those payments differ across Medicare Part D plans and change over time.[91] It is not possible to calculate the consumer's potential overpayment without knowing the consumer's deductible, whether they pay a coinsurance or copayment during their initial coverage phase and what the coinsurance or copayment is, and what the consumer pays during the coverage gap and catastrophic phases. It is also necessary to re-adjudicate all of the consumer's brand and generic prescriptions for the full plan year.

### c. The Data Dr. Hilton Proposes Using are Insufficient to Determine Potential Overpayment for Medicare Part D Consumers

138. The PBM and Walgreens data on generic prescriptions filled at Walgreens pharmacies that Dr. Hilton proposed to use are insufficient to calculate potential overpayments for Medicare Part D consumers. Instead, it would be necessary to:

- Identify whether the consumer paid a copay or coinsurance payment in their initial coverage phase and the amount of any deductible they were required to pay. This information requires an individualized review of the consumer's Part D Plan Summary Description documents.

- Obtain all of the consumers' brand and generic prescriptions claims data for prescriptions filled at all pharmacies. In order to re-adjudicate a consumer's claims to determine if they potentially overpaid for their prescriptions, it is necessary to figure out how they would have moved through each of the payment phases

---

[91] For instance, for 2023 CMS has ruled that while "deductible expenses will vary between plans, no plan's deductible may exceed $505 in 2023." *See, e.g.,* Esch, Jagger, "Medicare Part D," *Medicare FAQ*, February 7, 2023, available at https://www.medicarefaq.com/original-medicare/medicare-parts/medicare-part-d/.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

described above. The payment phases are based on payments for all of their generic and brand prescriptions at all pharmacies, not just at Walgreens pharmacies.

### C. Injury to Third-Party Payer Members of the Proposed Class Cannot be Assessed on a Classwide Basis

139. Dr. Hilton alleges that overpayment by TPPs can be estimated on a classwide formulaic basis. However, as discussed in **Section IV.B**, the data she proposes using and her proposed formulaic transaction-by-transaction approach to calculating ***consumer*** overpayment is incorrect and leads to inaccurate results. Given that Dr. Hilton's methodology to calculate ***TPP*** overpayments relies on her calculation of ***consumer*** overpayments, her methodology to assess overpayments by TPP class members is also incorrect, and the errors would be compounded.

140. Dr. Hilton's classwide calculation also fails to provide an accurate and reliable assessment of alleged overpayment by proposed TPP class members, because it ignores numerous individualized factors that affect TPP payments. These additional individualized factors are outlined below.

### 1. Potentially Tens, or Even Hundreds, of Thousands of Individual TPPs Would Need to be Assessed as Possible Members of the Proposed Class

141. The number of health plans that may be affected by this litigation is likely to be substantial. In 2016, the U.S. Department of Labor reported that there were "approximately 2.3 million health benefit plans sponsored by private sector employers nationwide."[92] Most employer-sponsored health and welfare plans with more than 100 members are required to file a Form 5500 each year.[93] The Form 5500 is required under the Internal Revenue Code and provides

---

[92] "Workers' Right to Health Plan Information," *U.S. Department of Labor*, Employee Benefits Security Administration, Fact Sheet, November 2016, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/workers-right-to-health-plan-information.pdf.

[93] "The complete guide to Form 5500," *ADP*, available at https://www.adp.com/resources/articles-and-insights/articles/f/form-5500.aspx. Form 5500 was developed by the IRS, the U.S. Department of Labor, and the Pension Benefit Guarantee Corporation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"the government with key details about [the] plan's financial condition, investments and operations.[94]

**Figure 13**
**Number of Filings for Fully Insured Plans, Self-Insured Plans, and Mixed-Insured Plans**
**2010 – 2019**

| Year | Fully-Insured Plans | Self-Insured Plans | Mixed-Insured Plans | Total |
|------|--------------------|--------------------|---------------------|-------|
| 2010 | 24,800 | 19,800 | 4,000 | 48,600 |
| 2011 | 24,700 | 19,400 | 4,000 | 48,100 |
| 2012 | 25,700 | 20,600 | 4,000 | 50,300 |
| 2013 | 25,800 | 20,300 | 4,100 | 50,200 |
| 2014 | 26,700 | 21,200 | 3,800 | 51,700 |
| 2015 | 27,700 | 22,900 | 3,900 | 54,500 |
| 2016 | 28,400 | 23,700 | 4,100 | 56,200 |
| 2017 | 30,500 | 23,500 | 3,800 | 57,800 |
| 2018 | 30,900 | 25,500 | 4,100 | 60,500 |
| 2019 | 31,400 | 30,200 | 4,200 | 65,800 |
| **Total** | **276,600** | **227,100** | **40,000** | **543,700** |

**Source:**
[1] U.S. Department of Labor. Report to Congress, Annual Report on Self-Insured Group Health Plans (2013 - 2022).

142. As summarized in **Figure 13**, based on information published by the U.S. Department of Labor, approximately 48,000-65,000 health plans filed a Form 5500 each year from 2010 to 2019.[95] The health plans are classified in these reports as either fully insured, self-insured, or mixed-insured plans. As I describe in **Section III**, health plans may be self-insured, which means they themselves pay a portion of their pharmaceutical costs. Alternatively, health plans may be fully insured, which means that the health plan pays an insurance company a fixed monthly premium for each member that does not depends on the members' pharmaceutical costs. Finally, some health plans are a hybrid of the two, or mixed-insured.

143. The number of plans summarized in **Figure 13** likely understates the actual number of health plans nationwide because a relatively small share of all plans file Form 5500 due to the fact

---

94 "The complete guide to Form 5500," *ADP*, available at https://www.adp.com/resources/articles-and-insights/articles/f/form-5500.aspx. Form 5500 was developed by the IRS, the U.S. Department of Labor, and the Pension Benefit Guarantee Corporation.

95 U.S. Department of Labor. Report to Congress, Annual Report on Self-Insured Group Health Plans (2013 – 2022).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that "most private employer-sponsored group health plans with fewer than 100 participants" are exempt from filing this form.[96] This summary also does not include all health plans. For example, most Medicare Part D health plans are not included.[97] Further, annual counts of plans would not account for the fact that each year new health plans enter, and others exit.[98]

144. In total, there were 267,100 Form 5500 filings for self-insured and mixed-insured health plans between 2010 and 2019. There were also 276,600 fully insured plans and while those plans would not have been injured and would not be part of the class, the insurer they contracted with would be a TPP that could be a member of the class depending on whether they meet the class definition. Furthermore, many of the potential TPP class members will have multiple different PBM contracts covering their payment terms over the proposed class period, as well as separate contracts with, for example, stop-loss insurers that affect the amount they are reimbursed for generic prescription payments. As I describe below, this results in likely hundreds of thousands of contracts governing factors affecting TPP payments in this case.

## 2. It is Not Possible to Determine When U&C is a Basis for TPP Payment or Reimbursement on a Classwide Basis with the Available Data

145. To identify which TPPs should be included in the class, Dr. Hilton attempts to identify TPPs "where the usual and customary price was a basis for the amount paid or reimbursed."[99] She proposes using ████████████████████████████████████████████ ███████████████████████████████████████ ██ These data reflect payments by

---

[96] "Employee Benefits Security Administration 29 CFR Parts 2520 and 2590," *Department of Labor*, Annual Reporting and Disclosure, Federal Register, Vol. 81, No. 140, July 21, 2016, at p. 47499.

[97] Note that a relatively small number of consumers may enroll in an employer-sponsored Medicare Part D plan, and these employer-sponsored plans may file a Form 5500. *See, e.g.,* The Kaiser Family Foundation, "An Overview of the Medicare Part D Prescription Drug Benefit," available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/.

[98] "2019 Instructions for Form 5500 Annual Return/Report of Employee Benefit Plan," *Department of Labor*, pp. 2-4, available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

[99] Hilton Report, ¶ 5.

[100] Specifically, Dr. Hilton purports to "determine whether the adjudicating PBM used U&C prices in the adjudication process" by selecting Codes 4 and 5 in a field in the Walgreens data that "identif[ies] how

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

PBMs and consumers to Walgreens. The data do not include information on payments by TPPs such as health plans or insurers for the generic prescriptions.

146. As I describe in **Section III.C**, PBMs often engage in "spread pricing" where the amount paid by the PBM is different from the amount paid by the TPP. This can occur, in part, because the price paid by the PBM to Walgreens is based on a PBM/Pharmacy contract that is different from the PBM/TPP contract that determines the reimbursement paid from the TPP to the PBM.[101] These different contracts can have different terms for the basis of the price or reimbursement paid. As a result, even if the U&C price were a basis for the payment from the PBM to Walgreens, that does not mean that the U&C price was a basis for the reimbursement paid from the TPP to the PBM.[102]

147. To determine if the U&C price is a basis for the price paid by the TPP, it would be necessary to review the contracts between each TPP and PBM to see if the U&C price is a factor in setting the TPPs reimbursement to the PBM. However, as I discuss in **Section V.C.1**, the number of TPPs and health plans in the U.S. is enormous. Collection and review of all the PBM/TPP contracts necessary for a reliable assessment of whether the U&C price was a factor in the TPP payments to the PBM, including all amendments and, where there were multiple TPPs for the same transaction, the contracts between the health plan and the insurer and between the insurer and the PBM, would be a major undertaking. Such contracts would

---

the reimbursement amount was calculated for 'Ingredient Cost Paid' (506-F6)." Codes 4 and 5 in field "basis of reimbursement determination" in the Walgreens data indicate that U&C pricing was used in determining PBM reimbursement. *See* ███████████████ ; Hilton Deposition, at 146:9-24.

[101] For instance, the 2014 Pharmacy Benefits Management Agreement between ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████ Walg_Forth_00142496-523.

[102] Nevertheless, Dr. Hilton testified in deposition that since some PBMs relied on the U&C price in their contracts with Walgreens, it was her understanding that they would also rely on the U&C price when adjudicating claims with all TPPs they contract with. *See* Hilton Deposition, at 139:12-141:4. She did not explain the basis for this understanding.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

need to be collected from either the PBMs or the TPP class members. And, as Michael Jacobs notes in his Report, these contracts are often confidential, as they contain "pricing and other sensitive business information."[103] It is my understanding from counsel that some or all of the PBMs would likely demand that the contracts be redacted before production.

148. Notably, at least one contract between a TPP and its PBM produced in this case does not reference the U&C price as a basis for how much the PBM charged the TPP on any particular transaction. Specifically, 2014 PBM/TPP agreement between the Named Plaintiff



149. This example shows why each PBM/TPP contract will need to be collected and analyzed to determine which TPPs are in the class because their payment was based on the U&C price and which ones were allegedly damaged.

---

[103] Jacobs Report, ¶ 88.

[104] Pharmacy Benefits Management Agreement between ███████████████████████████████████████████████████████████████████████████████████████████████

[105] ████████████████████████████████████████████████████████████████████████████████████

[106] *See* Pharmacy Benefits Management Agreement between ██████████████████████ ████████_0001815-886.

[107] *See* Pharmacy Benefits Management Agreement between ██████████████████████ ████████_0001815-886.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

150. Dr. Hilton also fails to establish that PBM data would contain accurate information on whether the U&C price was a basis for the TPP payment. Indeed, a number of PBM datasets produced in this matter do not include any fields that would show whether the ██████ ████████████████████████████ ██ Although Dr. Hilton claims that "PBM data can be used to determine whether the U&C price was used as a basis for determining the amount paid or reimbursed adjudicating the claim" and that all PBMs should have this information available, she admits that the data produced by Caremark, as well as a number of PBM datasets she relies on, "do not contain this information."[109]

151. In sum, Dr. Hilton fails to demonstrate that she can reliably identify whether the U&C price was a basis for the TPP payments using the Walgreens and PBM data that she proposes for her classwide analysis. As discussed in more detail in **Section IV.C.1**, to properly assess TPP overpayment Dr. Hilton would need to review potentially hundreds of thousands of PBM/TPP contracts for the pricing terms covering TPP reimbursements for generic drugs dispensed at Walgreens pharmacies over the 16-year class period.

### 3. Injury to TPPs Who Received Stop-Loss Insurance Payments Cannot be Assessed on a Classwide Basis

152. Dr. Hilton assumes that all of the payment information necessary to determine the amount reimbursed by a TPP for a generic prescription will be contained in the PBM data she expects to receive in this matter. This assumption ignores the fact that many self-insured employer health plans and union health plans purchase stop-loss insurance. Stop-loss insurance provides a ceiling on the total amount of eligible expenses these TPPs are required to cover, and guards against having to pay unexpected, extraordinary health costs for their members. As such, it places a limit on the aggregate amount of costs that the health plan incurs over the course of a plan year either for all their members combined or specifically for each

---

[108] For instance, the PBM claims data produced by ██████████████ ████████████████████████████████████ was the basis for reimbursement. *See, e.g.,* CAREMARK_FORTH-003386 and ESI-0001548.

[109] Hilton Deposition, at 165:5-12 ("Q. Do you know whether each of the datasets in paragraph 65 of your report contains fields necessary for you to determine whether ██████████████████████████████ A. Yes. Q. And do they? A. They – not all of them, no."), 167:4-14 ("Q. Looking at this data, can you tell me if there are any fields that show whether ██████████████████████████ A. No. This – these data do not contain that information.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

individual member. After a stop-loss deductible is met, the health plan is reimbursed by the stop-loss insurer in part, or in total, for any additional costs. Dr. Hilton provides no explanation of how such payments would be observed and accounted for in her proposed formulaic calculation of potential overpayments by proposed TPP class members.

153. The PBM claims data, which Dr. Hilton proposes to rely on for calculating TPP reimbursements, records a payment from the TPP to the PBM for a prescription. However, it would not capture any subsequent payments from an independent stop-loss insurer to the TPP to reimburse the TPP for that prescription. As a result, the payment observed in the PBM data would overstate the TPP's actual out-of-pocket expenditures for those transactions. Dr. Hilton does not take this into account in her methodology, which could cause her to overestimate the potential overpayment of a TPP.

154. For example, Named Plaintiff





110

111

"Stop-Loss Insurance 101," *Springbuk*, available at https://www.springbuk.com/blogs/stop-loss-insurance-101.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



155. In sum, to accurately assess overpayment by TPPs that purchased stop-loss insurance, it would be necessary to obtain and conduct an individualized inquiry into each TPP's stop-loss insurance policies. It would also be necessary to obtain and analyze any data regarding stop-loss insurer payments. This would be needed to determine which prescriptions those payments covered, and potentially assess each TPP and their members' aggregate health care spending to determine when the TPP would have met their stop-loss insurance deductibles in the but-for world.

156. Moreover, as I discuss in **Section V.C.1**, the number of TPPs and health plans in the U.S. is substantial, and changes on a year-to-year basis. As such, collecting and reviewing all stop-loss insurance policies and the documents necessary to assess their implications on TPP payment would be a major undertaking. Dr. Hilton fails to consider this issue.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 4.    Injury to TPPs who Benefit from Generic Effective Rate Guarantee Clauses Cannot be Assessed on a Classwide Basis

157. As noted earlier, contracts between TPPs and PBMs often include a generic effective rate guarantee or GER clause.[112] The GER is a financial commitment by the PBM to a health plan that the cost of generic drugs subject to the GER clause during the contract performance period will be equal to a certain percentage of AWP.[113]As such, it ensures that the average price paid by the TPP to the PBM does not exceed an agreed-upon limit outlined in the PBM/TPP contract.

158. To determine if a health plan with a GER clause in their contract was injured and a member of the proposed class, it would be necessary to determine whether the TPP's payments, taking into account GER considerations, would have been affected if Walgreens had reported the PSC price as the U&C price. In other words, for TPPs that receive a GER payment in the actual world, Dr. Hilton's assessment of potential overpayment at the time of the transaction is flawed because it would also be necessary to determine whether the TPP would have received a GER payment from the PBM, if Walgreens had reported a lower price as its U&C price.

---

[112] Ally, AJ, et al., "Pharmacy Benefit Manager Pricing Practices in Statewide Medicare Managed Care Program," *Florida Agency for Healthcare Administration*, December 2020, available at https://cdn.ymaws.com/www.floridapharmacy.org/resource/resmgr/docs_2021_legislative_session/milliman_report.pdf ("All of plan-PBM contracts reviewed have […] generic effective rate guarantees…").

[113] Ally, AJ, et al., "Pharmacy Benefit Manager Pricing Practices in Statewide Medicare Managed Care Program," *Florida Agency for Healthcare Administration*, December 2020, available at https://cdn.ymaws.com/www.floridapharmacy.org/resource/resmgr/docs_2021_legislative_session/milliman_report.pdf

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



159. ███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████

160. Payments or clawbacks related to GER are calculated on a retroactive basis. If the TPP pays the PBM more for generic drug purchases on average than the price guaranteed in the PBM/TPP agreement, then the TPP may receive any excess payments back in the form of a reconciliation payment.[114] This payment would not be observed in the transaction and claims data that Dr. Hilton proposed using. Dr. Hilton's calculation focuses only on payments at a transaction-level and fails to capture reconciliation payments from the PBM to the TPP that would happen at a later date. Her proposed approach does not account for whether there was

---

[114] *See, e.g.,* Ally, AJ, et al., "Pharmacy Benefit Manager Pricing Practices in Statewide Medicare Managed Care Program," *Florida Agency for Healthcare Administration*, December 2020, available at https://cdn.ymaws.com/www.floridapharmacy.org/resource/resmgr/docs_2021_legislative_session/milliman_report.pdf. ("The PBM typically guarantees a specific discount off AWP on Drug Type and manages payments from the plan (and to the pharmacy) to achieve these guarantees over the contract performance period. Any over / under performance achieved through claims payment at the end of the contract period is reconciled retrospectively.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a GER payment in the actual world or what that payment would have been in the but-for world. As a result, her calculation would overstate many alleged TPP overpayments.

161. To understand why it is necessary to know whether a PBM/TPP contract had a GER clause and whether a TPP received GER reconciliation payments from a PBM consider the following example:

- Assume that the TPP reimburses the PBM for three prescriptions. For each of these prescriptions: (i) the TPP pays the PBM a U&C price of $90; (ii) the PSC price is $80; and, (iii) the AWP is $200.

- The TPP has a GER clause with its PBM that states that the average annual discount for generic drugs is AWP-60%, which implies an average generic drug price of $80 for the three prescriptions (*i.e.,* (1-60%)×$200 = $80).

162. Dr. Hilton's calculation: For each transaction, Dr. Hilton disregards the GER provision and assumes that the TPP would pay the PSC price, $80, for each transaction, or a total of $240=$80×3 across the three prescriptions. She would calculate overcharges as the TPP payment minus the PSC price. As such, she would calculate a potential overpayment of $10 ($90 - $80) on each transaction, and a total overpayment of $30 across the three transactions.

163. Calculation with GER clause: The TPP pays the PBM $90 per prescription, or $270=$90×3 across the three prescriptions. However, the GER guarantees that the TPP will pay only AWP-60%, or $80 on average for each of the three generic prescriptions. As such, the TPP would pay, at most, a total of $240=$80×3 across the three prescriptions net of the GER payment. Since the TPP paid $270 for the three prescriptions, as opposed to the $240 guaranteed under the GER provision, it will receive a reconciliation payment of $30. Therefore, in this example, the GER clause results in a net TPP payment to the PBM of $240 total for all three prescriptions, regardless of whether the U&C price was the actual TPP payment of $90 or the PSC price of $80. Consequently, the TPP incurs no overpayment in this example.

164. Moreover, as discussed above, GER provisions are common features of the PBM/TPP contracts. Notably, ████████████████████████████████████████
████████████████████████████████████████████████████████████

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



165. To account for potential reconciliation payments related to GER, it would be necessary to obtain and review the contracts between the PBMs and the TPPs to see what GER provisions are included and how any reconciliation payments would be determined under a lower U&C price. It would also be necessary to obtain information and data on any reconciliation payments made to a potential TPP member of the proposed class and whether the payment reflects only a GER reimbursement or if the payment is combined with other annual guarantees, such as for brand name drugs or other types of incentives contained in their contracts.



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



166. Separating the GER payment from reconciliation payments for other annual guarantees would require individualized inquiry. Finally, determining whether and to what extent a lower U&C price would affect the GER reimbursement would require individualized information from the PBM/TPP on the GER methodology and individualized data on the actual GER reimbursement. This information could only be obtained from the TPPs or their PBMs.

167. As discussed in **Section IV.C.1**, given the substantial number of TPPs reimbursing for generic drugs dispensed at Walgreens, collecting and reviewing all PBM/TPP contracts required to identify GER provisions, and collecting and reviewing all GER payments, would be a significant undertaking.

     **5.    Dr. Hilton Cannot Accurately Determine Injury to Medicare Part D Plan Sponsors**

168. The class definition is unclear as to whether Medicare Part D plans are included in the proposed class. Part D plans are administered by private insurers but are heavily subsidized by the federal government. While the proposed class definition explicitly *includes* "Medicare Part D beneficiaries" and explicitly *excludes* "all government entities, and their



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

beneficiaries," there is no mention of the private insurers who sponsor Medicare Part D plans. They are neither explicitly included nor excluded from the class definition.[120]

169. For the purposes of this report, I assume that the commercial insurers sponsoring Medicare Part D plans ("Part D plan sponsors") are included in the proposed class, but I reserve the right to revise my report if the proposed class definition is revised or clarified. By including an analysis of Medicare Part D transactions, I am not offering an opinion on whether Part D plan sponsors are included in the proposed class.

170. Because government entities are explicitly excluded from the proposed class, a valid TPP injury methodology in this case must be able to identify the government payments from the total payment for a prescription drug purchase in order to (1) remove the portion of any payment from the federal government from any alleged injury and overpayment assessment, and (2) assess accurately whether the insurer (and/or consumer) members of the proposed class are injured on their Medicare Part D transactions.

### a. Medicare Part D Plan Payments and Government Subsidies

171. Determining injury to the insurer sponsoring the Medicare Part D plan requires an analysis of numerous types of payments that are made by the federal government to Medicare Part D plans to subsidize drug costs.

172. Medicare Part D plans are offered through private insurers under contract with the Federal Government. The federal government pays Medicare Part D plans a subsidy equivalent to 74.5% of the standard coverage for all beneficiaries, with the remaining 25.5% being covered by Part D plans' member premiums.[121] This means that all of the Medicare Part D plan costs should ultimately be paid by the government or patients either through payments

---

[120] *See* Hilton Deposition, at 105:14-20 ("Q. 'Government plans' here in paragraph 61 does not include Medicare Part D; is that correct? A. That's right. Medicare Part D would not be excluded [sic]. Q. Do you consider Medicare Part D to be a government plan? A. I guess I don't have an opinion on that.").

[121] Cubanski, Juliette, et al., "A Primer on Medicare: Key Facts About the Medicare Program and the People it Covers," *Kaiser Family Foundation*, March 20, 2015, available at https://www.kff.org/report-section/a-primer-on-medicare-how-is-medicare-financed-and-what-are-medicares-future-financing-challenges/ ("**Part D** is financed through general revenues, beneficiary premiums, and state payments for dual-eligible beneficiaries [...] The monthly premium paid by enrollees is set to cover 25.5 percent of the cost of standard drug coverage, and Medicare subsidizes the remaining 74.5 percent."). (Emphasis in original).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

triggered by specific prescription drug transactions or through per-member and premium payments based on actual and estimated aggregate costs. In practice, at the end-of-year reconciliation the Medicare Part D plan may bear some of the risk of higher costs and keep some of the rewards of lower costs, although determining the extent of any pricing risk borne by the insurer due to changing the price of particular prescriptions is complex.

#### i. *Government Prospective Subsidies*

173. The total payment a Part D plan ultimately receives from the federal government is the result of a complex process that considers the plan's *expected* and *actual* expenditures. At the start of each plan year, Part D plans submit bids to the Centers for Medicare & Medicaid Services ("CMS") based on the plan's expected costs for a basic drug benefit for a typical Medicare beneficiary. Based on these bids, there are two ways the Federal Government prospectively subsidizes the cost of standard drug coverage for Part D plans:

- *__Direct subsidies.__* These are "prospective payments […] for each Part D enrollee" adjusted for "the health status of the beneficiaries expected to enroll," and "expected, additional costs associated with LIS enrollees."[122] A plan receives a monthly direct subsidy to cover its estimated prospective costs, adjusted for certain characteristics of the plan's enrollees, such as health status and income status. This subsidy is essentially a fixed, capitated payment per beneficiary that is reset at the beginning of each plan year.

- *__Individual reinsurance subsidies__*: These represent prospective payments aimed at covering 80% of the cost of prescription drugs purchased by a Part D plan's enrollee during the catastrophic coverage period.[123] As described in the prior section, once

---

[122] Kirchhoff, Suzanne, "Medicare Part D Prescription Drug Benefit," December 18, 2020, available at https://fas.org/sgp/crs/misc/R40611.pdf, at p. 44. Low-income subsidies (LIS) enrollees are Medicare beneficiaries who receive financial assistance to cover their Part D premiums and cost-sharing obligations. *See* Summer, Laura, Hoadely, Jack, and Elizabeth Hargrave, "The Medicare Part D Low-Income Subsidy Program – Experience to Date and Policy Issues for Consideration," September 2010, available at https://www.kff.org/wp-content/uploads/2013/01/8094.pdf. MedPAC, "Sharing Risk in Medicare Part D," in Report to the Congress: Medicare and the Health Care Delivery System, available at http://garnerhealth.com/wp-content/uploads/2014/02/june-2015-report-to-the-congress-medicare-and-the-health-care-delivery-system.pdf.

[123] Kirchhoff, Suzanne, "Medicare Part D Prescription Drug Benefit," November 2021, available at https://fas.org/sgp/crs/misc/R40611.pdf, at p. 44. *See also* MedPAC, "Part D Payment System,"

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

an enrollee reaches the catastrophic coverage phase, the Federal Government is responsible for paying 80% of any subsequent prescription costs.

174. Both the direct subsidy and individual reinsurance subsidy payments are *prospective*, meaning that they are calculated and paid out to the Part D plan over the course of the year *before* the plan's actual payments for drug claims, rather than serving as reimbursements for claims after they are incurred.

### ii. Government Reconciliation Payment

175. At the end of each plan year, CMS considers each plan's "actual levels of enrollment, risk factors, levels of incurred allowable drug costs (after rebates and other discounts), reinsurance amounts, and low-income subsidies" and reconciles discrepancies with the prospective payments defined at the beginning of the year.[124] As demonstrated in **Figure 16** below, this reconciliation is governed by the so-called "risk corridors," which serve to limit losses or profits for Medicare Part D plans when their estimated and actual costs diverge. In particular:

- If the prospective payments received from CMS are more than enough to cover the plan's actual expenses, the plan will remit some of these savings to CMS. The share of any cost savings that the plan pays back to CMS depends on the extent of cost savings. For example, the plan keeps all of the cost savings up to the point where actual costs are 0 to 5% less than expected, keeps 50% of cost savings to the extent that actual costs

---

available at https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_partd_final_sec.pdf, at p. 1. One of the four phases of the typical benefit design in a Medicare Part D plan (the other three phases being the deductible period, the initial coverage period, and the coverage gap period), the catastrophic coverage period begins when the consumer's total annual spending on prescription drugs reaches an upper limit ("out-of-pocket threshold"), which changes annually. *See* The Kaiser Family Foundation, "An Overview of the Medicare Part D Prescription Drug Benefit," available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit/.

[124] MedPAC, "Part D Payment System," available at https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_partd_final_sec.pdf, at p. 3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

were between 5 to 10% less than expected, and keeps 20% of cost savings to the extent that actual costs were more than 10% less than expected.[125]

- If instead, a Part D plan's actual costs exceed the prospective payments received from CMS, these extra costs will be shared between the plan and the government depending on the extent of the extra costs. As depicted in **Figure 16**, if the actual costs exceed the prospective payments by 0%-5%, the plan covers 100% of these additional costs. If the actual costs exceed the prospective payments by 5%-10%, then the plan would cover 50% of the additional costs and CMS would reimburse the plan for the remaining 50% of additional costs. Finally, if actual costs exceed the prospective payments by more than 10%, then the plan would cover 20% of the additional costs and CMS would reimburse the plan for the remaining 80% of additional costs.

**Figure 16**
**Medicare Part D: Risk Corridors**



Ratio Between Actual Costs and Expected Costs During a Single Plan Year

Source:
[1] Figure 6-3 in MedPAC, "Sharing Risk in Medicare Part D," in Report to the Congress: Medicare and the Health Care Delivery System, available at http://garnerhealth.com/wp-content/uploads/2014/02/june-2015-report-to-the-congress-medicare-and-the-health-care-delivery-system.pdf.

176. As a result of the sharing of aggregate drug costs, Part D plan payment towards an individual prescription are covered by the prospective Federal Government payments of the direct subsidies or individual reinsurance, net of member premiums, or risk corridor adjustments. Even if a Part D plan were determined to bear some of the cost of its members' prescription

---

[125] An analysis based on data from CMS reveals that between 2011 and 2013, "about three-fourths of parent organizations made risk corridor payments to Medicare because their reconciled benefit costs were at least 5 percent lower than their bids." *See* MedPAC, "Sharing Risk in Medicare Part D," in Report to the Congress: Medicare and the Health Care Delivery System, available at http://garnerhealth.com/wp-content/uploads/2014/02/june-2015-report-to-the-congress-medicare-and-the-health-care-delivery-system.pdf, p. 153 and Table 6-8).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

drugs, assessing the extent to which a Part D plan incurred any payment in the actual world requires individualized inquiry into the extent to which the drug cost was not fully borne by the various patient payment and federal government payments. Further, these payments occur at different points in time: some payments are prospective and in advance of the anticipated prescription costs, such as the government direct subsidy and individual reinsurance payment, and some are made at the pharmacy. such as the patient payments determined by the coverage phases and some payments are made *ex post* such as the risk corridor adjustments. An individualized inquiry is necessary to assess even the actual Part D plan payment, and, as discussed in the next section, additional individualized inquiry into the flow of government and enrollee payments would be required to assess what the Part D plan would have paid in a but-for world if Walgreens had reported its PSC price as the U&C price.

## V. Dr. Hilton's Methodology Highlights an Inherent Conflict Between Consumer And TPP Class Members

177. In addition to its potential for substantially inaccurate results, Dr. Hilton's proposed approach highlights the inherent economic conflict between proposed Consumer and TPP class members.

178. As discussed in **Section IV.A**, Dr. Hilton defines total overpayment as "the difference between what class members actually paid for a generic drug and the PSC price for the same generic drug."[126] To that effect, she first calculates the consumer overpayment on a given prescription, and then calculates the TPP overpayment as the total overpayment, minus consumer overpayment. The conflict is that any amount of potential overpayment she allocates to the proposed consumer class member will by its very nature reduce the amount of potential overpayment allocated to the TPP class member.[127] This puts proposed consumer and TPP class members at odds with each other as they may disagree on how much should be allocated to the consumers and the TPPs.

---

[126] Hilton Report, ¶ 22.

[127] Hilton Report, ¶ 26.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## VI.     Conclusion

179. Based on my review of the evidence in this matter, the data Dr. Hilton proposes using do not appear to contain sufficient information to determine the nature of consumer payments (e.g., copay or coinsurance payments) or whether U&C was a basis for the TPP and consumer payment. Therefore, Dr. Hilton's approach cannot identify members of the proposed class.

180. In addition, the data Dr. Hilton proposes using and her formulaic calculation of potential overpayment cannot assess injury to proposed consumer and TPP class members on a classwide basis. Her transaction-by-transaction based approach ignores the fact that consumer and TPP payments for an individual prescription are often dependent on all of the consumer's drug purchases, as well as potentially their medical costs, over the course of a plan year.

181. Finally, the data that Dr. Hilton proposes using do not capture important payments that can reduce the cost of generic prescriptions for consumers and TPPs such as stop-loss insurance payments, GER payments, and federal government payments. To appropriately determine injury to the proposed class members, it would be necessary to evaluate far more data than Dr. Hilton proposes, including data for all brand and generic prescriptions filled at all pharmacies, as well as data for medical expenses, where appropriate. It would also be necessary to review other documents for each consumer and TPP, such as plan design documents, PBM/TPP contracts, and potentially other insurance agreements and contracts, as well as documents regarding stop-loss insurance, GER payments, and federal government payments to all Part D plans. Given there are potentially millions of consumers and tens of thousands or even hundreds of thousands of potential TPP class members over the proposed class period, this would require a broad scope of individualized inquiry. As such, Dr. Hilton's proposed approach cannot accurately evaluate injury to proposed class members on a classwide basis.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

James W. Hughes, PhD

_____

April 27, 2023

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX A

**NAME**                                    **James W. Hughes**

**ADDRESS**          Home: 505 N. Edison Street
                     Fredericksburg, TX 78624
                     830-992-5518
                     jwh@jhughesecon.com

**DEGREES:**         Ph.D., Economics, The University of Michigan, 1987
                     M.A., Economics, Boston University, 1978
                     A.B., International and Comparative Studies, Boston University,
                         1977, *summa cum laude*, with distinction

**FIELDS:**          Industrial Organization and Antitrust Policy; Law and Economics; Health
                     Economics; Environmental Economics; Labor Economics
                     *Thesis: The Economics of Medical Malpractice Reform*

**ACADEMIC**         BATES COLLEGE, Lewiston, ME, 2020-.
**POSITIONS:**           Thomas Sowell Professor of Economics, Emeritus

                     BATES COLLEGE, Lewiston, ME, 2005-2020.
                         Thomas Sowell Professor of Economics

                     BATES COLLEGE, Lewiston, ME, 2004-2005.
                         Professor of Economics

                     BATES COLLEGE, Lewiston, ME, 1999-2006.
                         Chair, Department of Economics

                     BATES COLLEGE, Lewiston, ME, 1997-2004.
                         Associate Professor of Economics

                     BATES COLLEGE, Lewiston, ME, 1992-1997.
                         Assistant Professor of Economics

                     AMHERST COLLEGE, Amherst, MA, 1987-1992.
                         Assistant Professor of Economics

                     STATE UNIVERSITY OF NEW YORK AT ALBANY, Albany,
                         NY, 1986-1987.
                         Assistant Professor of Economics

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **ARTICLES IN REFEREED JOURNALS:** | "Human Trafficking in Southeast Asia: Results from a Pilot Project Vietnam," with Ngan Dinh, Conor Hughes and Margaret Maurer-Fazio, *Journal of Human Trafficking,* https://www.tandfonline.com/eprint/QFZUWKSXCVJINNI3MBKI/full?target=10.1080/23322705.2019.1650527 |

"Finding the Lost Jockeys," (with Debra Barbezat), *Historical Methods: A Journal of Quantitative and Interdisciplinary History,* v. 47, n. 1, 2014, pp. 19-30.

"A Comparison and Decomposition of Reform-Era Labor Force Participation Rates of China's Ethnic Minorities and Han Majority," (with M. Maurer-Fazio and Dandan Zhang), *International Journal of Manpower,* v. 31 n. 2, 2010, pp. 138-162 [also cited as IZA Discussion Paper #4148, April 2009].

"An Ocean Formed from One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage, and Location on Labor Force Participation in Urban China," (with M. Maurer-Fazio and Dandan Zhang), in <u>Gender, China, and the World Trade Organization</u>, Gunseli Berik, Xiaoyuan Dong, and Gale Summerfield, eds., (London and New York, Routledge, Taylor and Francis Group, 2009) pp. 157-185.

"海纳百川：民族、性别、婚姻、地区等因素对中国城市地区劳动参与 的作用和影响," (with M. Maurer-Fazio and Dandan Zhang), (An Ocean Formed from One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage, and Location on Labor Force Participation in Urban China,"), in Gunseli Berik, Xiaoyuan Dong, and Gale Summerfield edited 中国经济转型与女性经济学 (China's Economic Transition and Feminist Economics) Beijing: Economic Science Press, 2009, pp.130-157.

"An Ocean Formed From One Hundred Rivers: The Effects of Ethnicity, Gender, Marriage and Location on Labor Force Participation in Urban China, (with M. Maurer-Fazio and D. Zhang), *Feminist Economics,* v. 13, n. 3-4, July/October, 2007, pp. 159-187.

"Salary Structure Effects and the Gender Pay Gap in Academia," (with D. Barbezat), *Research in Higher Education*, v. 46, n 6, September, 2005.

"The Effect of Market Liberalization on the Relative Earnings of Chinese Women," (with M. Maurer-Fazio) *Journal of Comparative Economics*, v 30, n 4, pp. 709-731, December, 2002 [also cited as William Davidson Working Paper No. 460].

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"An Analysis of the Effects of Marital Status, Educational Attainment, and Occupation on the Size and Composition of Urban China's Gender Wage Differentials," (with M. Maurer-Fazio) *Pacific Economic Review*, v. 7, n. 1, pp. 137-156, February, 2002.

"The Effect of Job Mobility on Academic Salaries," (with D. Barbezat), *Comtemporary Economic Policy,* v. 19, n. 4, October, 2001, pp 409-423.

"Health Consequences of Smoking and Its Regulation," (with Michael Moore), *Frontiers in Health Policy* v. 4, 2001 pp.31-76  [also cited as NBER Working Paper #7979, October, 2000]

"Accounting for Censoring in Duration Data: An Application to Estimating the Effect of Tort Reforms on the Length of Time to Resolution of Medical Malpractice Claims" (with E. Savoca), *Journal of Applied Statistics* v. 26, n. 2, February, 1999, pp. 219-228

"allocation of litigation costs--American and English rules," (with Edward Snyder), *The New Palgrave Dictionary of Economics and the Law*, Peter Newman, editor, (London, The  Macmillan Press), July, 1998.

"Wal-Mart and Maine: The Effect on Employment and Wages," (with B. Ketchum), *Maine Business Indicators*, v. 42 n.2, Summer, 1997.

"The Effect of Legal Reforms on the Longevity of Personal Injury Claims," (with E. Savoca), *International Review of Law and Economics*, v 17, pp. 261-273, June, 1997.

"Basing Point Pricing and the German Steel Cartel: A Look at the 'New Competitive' Theory," (with Daniel Barbezat), *The Journal of Economic History*, March, 1996, pp. 215-222.

"Litigation Under the English and American Rules: Theory and Evidence," (with E. Snyder), *The Journal of Law and Economics,* April, 1995, p.225-250.

"Barriers to the Establishment of New Drug Treatment Facilities," (with F. Porell and H. Pollakowski),  *NIDA Services Research  Monograph: Access and Financing in Drug Abuse Services* (Gabrielle Denmead and Beatrice A. Rouse, eds.), no. 2, (1994).

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," (with E. Snyder), *Journal of Law, Economics, and Organization*, Fall, 1990, pp. 345-380.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"Sex Discrimination in Labor Markets: The Role of Statistical Evidence--Comment," (with Debra Barbezat), *The American Economic Review*, March, 1990, pp. 277-286.

The Effect of Medical Malpractice Reform Laws on Claim Disposition," *International Review of Law and Economics*, June, 1989, pp. 57-78.

"Policy Analysis of Medical Malpractice Reforms: What Can We Learn From Claims Data?" (with E. Snyder), *Journal of Business and Economic Statistics*, October, 1989, pp. 423-431.

"Evaluating Medical Malpractice Reforms," (with E. Snyder), *Contemporary Policy Issues*, April, 1989, pp. 83-98.

**EDITED VOLUMES AND CONFERENCE PROCEEDINGS**

"Economic Reforms, Gender, and Changing Patterns of Labor Force Participation in Urban and Rural China," (with James W. Hughes and Zhang Dandan) in *Conference Proceedings of the 2005 CES International Conference on Sustainable Growth in China*, Chongqing, China. 2005. Volume I-B, pp. 502-510.

"Risk Aversion and the Allocation of Legal Costs," (with G. Woglom), in David A. Anderson, ed., *DISPUTE RESOLUTION: Bridging the Settlement Gap*, (Greenwich, CT JAI Press, 1996).

**MONOGRAPHS:**

*Cost Estimates for Expanded Substance Abuse Benefits for Medicaid-Eligible Pregnant Women* (with M.J. Larson, G. Ritter, P. McQuide, C. Horgan), Institute for Health Policy, The Heller School, Brandeis University, 1993

*Socioeconomic Effects of Reducing Emissions of Chlorofluorocarbons (CFCs) in the OECD*, Environment Directorate, Organization for Economic Cooperation and Development, Paris, France (1983).

*Information Disclosure*, President's Regulatory Council, Washington, DC (1982).

**BOOK REVIEWS:**

*Insuring Medical Malpractice*, by Frank Sloan, Randall Bovbjerg, and Penny Githens, and *Medical Malpractice on Trial*, by Paul Weiler, reviewed in *Journal of Policy Analysis and Management*, v. 12, n. 2, Spring, 1993, pp. 396-399.

*Medicare's New Hospital Payment System*, by Louise Russell, reviewed in *Eastern Economic Journal*.

**WORKING**

"The Role of Productivity in the Demise of the African-American Jockey

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**PAPERS:**     in 19th Century Thoroughbred Racing," with Conor Hughes [*in progress*].

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), National Bureau of Economic Research Working Paper #9229, October, 2002, revised 2011.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **COURSES TAUGHT:** | Six Beverages That Changed the World |
| | Economics of Intellectual Property |
| | Law and Economics |
| | Labor Economics |
| | Economic Statistics |
| | Intermediate Microeconomic Theory |
| | Principles of Microeconomics |
| | The Economics of Women, Men, and Work |
| | Environmental and Natural Resource Economics |
| | Sustaining the Masses: Economic Development and Environmental Protection in the People's Republic of China |
| | Health Economics |
| | Environmental Issues in Economic Development |
| | Earth Under Siege: Global Warming and Atmospheric Change |
| | Principles of Macroeconomics |
| | Property, Liberty, and Law |
| | Industrial Organization and Antitrust Policy |
| | Business and Government |

**PRESENTATIONS:** "The Role of Productivity in the Demise of the African-American Jockey in 19th Century Thoroughbred Racing—Preliminary Findings," Maine Economics Conference, Colby College, April 29, 2017

"Estimating Human Trafficking in Asia Using Household Survey Results," International Atlantic Economic Society Conference, Berlin, Germany, March 23, 2017.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Forum for Economists International, Amsterdam, The Netherlands, May 30-June 1, 2015.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Economics Department Seminar Series, The University of Maine, September 9, 2014.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Maine Economics Conference, Colby College, April 26, 2014.

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Public Works in Progress Lecture, Harward Center for Community Engagement, Bates College, April 30, 2014.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"The Vietnam Migration and Human Trafficking Household Survey: Results From A Pilot Project," Phillips Lecture, Bates College, January 13, 2014.

"What Will Be Our Legacy: Hi-Tech and High Debt?" 2013 Reunion Lecture, Bates College, June 8, 2013.

"Finding the Lost Jockeys," Third International Conference on Sport and Society, Cambridge University, Cambridge, England, July 23-25, 2012.

"A Comparison of Reform-Era Labor Force Participation Rates of China and Han Majority" (with M. Maurer-Fazio and Dandan Zhang), Workshop on "Economy and Society Development in China and the World", Beijing October 13 and 14, 2011, hosted by: Institute of Ethnology and Anthropology Chinese Academy of Social Sciences.

"A Comparison and Decomposition of Reform-Era Labor Force Participation Rates of China's Ethnic Minorities and Han Majority," (with M. Maurer-Fazio and Dandan Zhang), American Economics Association Annual Meeting, Denver, CO, January, 2011.

"The Economic Status of China's Ethnic Minorities," (with M. Maurer-Fazio), Western Economics Association Pacific Rim Conference, Hong Kong SAR, China, January, 2005.

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), Applied Microeconomics and Economic and Legal Organization, Graduate School of Business, University of Chicago, October, 2002.

"'Napsterizing' Pharmaceuticals: Access, Innovation, and Consumer Welfare," (with M. Moore and E. Snyder), Annual Meeting of the Pharmaceutical Economics and Policy Council, Washington, DC, January 2002.

"The Gender Wage Gap in Urban China: The Effects of Institutional Change," (with M. Maurer-Fazio), Allied Social Sciences Association, Boston, MA January, 2000.

"The Effect of Job Mobility on Academic Salaries," (with D. Barbezat), Western Economics Association Meetings, San Diego, CA July, 1999.

"The Economics of the 'Loser-Pays" Rule," Edward T. Gignoux Inn of Court, Portland, Maine, February 12, 1997.

A-7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Keynote Address, Matriculation Dinner for the Class of 1999, Bates College, September 5, 1995.

Breckenridge Lecture,"Is the English Rule Really Cheaper?" Colby College, April 26, 1995.

"Can the English Rule Cure the Ills of Medical Malpractice?" presented to the Androscoggin County Medical Society, March 16, 1995.

"What Blue Cross Knows Can Hurt You: Ethical Dilemmas in Private Medical Insurance," TGIF Lecture, Muskie Archives, March 3, 1995.

"Female Academics: Mobility and the Returns to Seniority," Annual Meetings of the Southern Economics Association, Orlando, FL November 20, 1994.

Breckenridge Lecture, "Economics of the English Rule," Colby College, April 20, 1994.

"Health Care Reform and Medical Malpractice: Smoke or Fire?" TGIF Lecture, Muskie Archives, March 4, 1994.

"Litigation Under the English and American Rules: Theory and Evidence," Annual Meetings of The American Economics Association, Boston, Massachusetts, January 5, 1994.

"Marketable Permits for Chlorofluorocarbon Regulation," Colby College, October, 1993.

"Litigation Under the English and American Rules: Theory and Evidence," Research Seminar in Law and Economics, Harvard Law School, April 7, 1993.

"Litigation Under the English and American Rules: Theory and Evidence," Annual Meeting of the American Law and Economics Association, Yale University, May 1, 1992.

"NIMBY and the Location of Drug Treatment Facilities," National Institute on Drug Abuse, July, 1991.

American Bar Association, "Litigation, Justice, and the Public Good," San Diego, CA April 25-27, 1991.

"Contingent Fees, Litigation, and the Quantity of Litigation," Annual Meeting of the Law and Society Association, May 31, 1990, Berkeley,

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CA

"The English Rule for Allocating Legal Costs: Evidence Confronts Theory," Annual Meeting of the Law and Society Association, Madison, WI, June 1, 1989.

"Controlling for Sample Selection in the Analysis of Closed Claim Data," Annual Meetings of the Western Economics Association, Vancouver, BC, Canada, July, 1988.

"Medical Malpractice Reforms and the Resolution of Claims," Annual Meetings of the Eastern Economics Association, Arlington, VA March, 1987.

"Is the Sample of Litigated Claims Random? Preliminary Results of a Trivariate Probit Estimator," Annual Meetings of the Eastern Economics Association, Baltimore, MD, March, 1986.

**PROFESSIONAL SERVICE**

Referee for: *Journal of Comparative Economics, Journal of Law and Economics, International Review of Law and Economics, Economic Inquiry, Journal of Risk and Insurance, Journal of Law,Economics, and Organization, Journal of Policy Analysis and Management, Behavioral Science and the Law, Social Sciences Quarterly.*

Reviewer for the National Science Foundation.

**GRANTS AND AWARDS:**

"The Vietnam Migration and Human Trafficking Household Survey, Pilot Project," Bates Faculty Development Fund Grant, Bates College, 2012-2013.

The Vietnam Migration and Human Trafficking Household Survey, Pilot Project," PEAP Grant, The Harward Center for Community Engagement, Bates College, 2012-2013.

Phillips Faculty Fellowship, Bates College, 2012-2013.

"The 'Dis-Integration' of American Horse Racing," Bates College Faculty Development Fund Grant, 2010-2011.

Kroepsch Award for Excellence in Teaching, 2009-2010, Bates College.

"Inspirational Hall of Fame," Alfond Youth Center, Waterville, Maine, May, 2005.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Paganucci Award for Outstanding Community Service, Alfond Youth Center, Waterville, Maine, 2004.

Joint Student-Faculty Research Grant (with D. Barsky, '03), Freeman Foundation Asian Studies Grant Program, Bates College, 2002.

Curriculum Development Grant (with M. Maurer-Fazio and S. Yang), Freeman Foundation Asian Studies Grant Program, Bates College, 2002.

Mellon Summer Research Apprenticeship, Bates College, 2000.

Mellon Summer Research Apprenticeship, Bates College, 1998

The President's Fund for Faculty and Curricular Development, Bates College, 1997-1998.

Curricular Development Grant, Otis Fund, Bates College, 1997.

Mellon Summer Research Apprenticeship, Bates College, 1996.

Kroepsch Award for Excellence in Teaching, 1994-1995, Bates College.

Amherst College Research Award (1991-1992) to examine the effect of no-fault medical malpractice insurance on the size of awards, the number of claims, and the number of medical injuries.

Post-Doctoral Research Fellow in the Economics of Mental Health, Brandeis University, Florence Heller School for Advanced Studies in Social Welfare, 1990-1991.

Research grant from The Robert Wood Johnson Foundation Medical Malpractice Program (1987-1988) to examine the long-term effects of medical malpractice reform legislation on the size, frequency, and disposition of medical malpractice claims.

Miner D. Crary Fellow, Amherst College, 1988-1989.

**NON-ACADEMIC POSITIONS:**
LITIGATION CONSULTANT, 1990-
Economic expert for antitrust, regulation, and discrimination litigation. Retained on several cases involving the pharmaceutical industry, the prescription benefit manager industry, the environmental control industry, the synthetic rubber industry, nutritional supplement industry, the hospital industry, the automobile insurance industry, the sardine market, retail automobile sales, the retail gasoline market, school photography, musical instruments, airline transportation, and sex discrimination.

A-10

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

BRANDEIS INSTITUTE FOR HEALTH POLICY, Waltham, MA
    1992-1993
Co-Author of a report on the residential housing market in the San
Francisco-Oakland Bay Area, and the effect on property values resulting
from locating residential drug treatment facilities in that market. Co-
Author of a study of the effects on Medicaid expenditures of extending
coverage for outpatient and residential drug treatment to pregnant drug
users.

THE RAND CORPORATION, Santa Monica, CA  1985-1986.
Consultant on a study of the European chlorofluorocarbon industry for the
U.S. Environmental Protection Agency.  Examined the effect of proposed
regulations on competition within the European chemical industry.

ORGANIZATION FOR ECONOMIC COOPERATION AND
    DEVELOPMENT, Paris, France, 1982-1983
Author of a report to the Environment Directorate on the
socioeconomic implications of chlorofluorocarbon emissions and
their control in the OECD nations.  Report assessed progress in
controlling emissions and quantifies the potential economic effects
of further emissions reductions.

SRI INTERNATIONAL, Menlo Park, CA  1981.
Consultant to the Regulatory Analysis and Management Program.
Project included construction of a programming model to assist petroleum
refineries in finding the least cost method of reducing emissions of volatile
organic chemicals.  Author of a manual on the use of information
disclosure in regulatory reform for the President's Regulatory Council.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
    Washington, DC, 1978-1980.
Economist in the Office of Pesticides and Toxic Substances.
Authored several reports on the effects of regulating toxic chemicals
through the use of marketable rights.  Responsible for economic
analyses of proposed regulations to limit uses of
chlorofluorocarbons and asbestos.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX B

## James W. Hughes
## Experience as Testifying Expert since 2017

**In Re: Xyrem (Sodium Oxybate) Antitrust Litigation,** U.S. District Court CA, Case No. 3:20-md-02966-RS-SVK

**Peter Staley, et al., v. Gilead Sciences, Inc., et al.,** U.S. District Court N.D. Ca., Case No. 3:19-cv-02573-EMC

**State of Washington v. McKesson Corporation et al.,** Superior Court of the State of **Washington, King County,** No. 19-2-06975-9 SEA

**Painters and Allied Trades District Council 82 Health Care Fund et al. v. Takeda Pharmaceutical Company Limited et al.,** U.S. District Court, C.D. Ca., Case No.: 2:17-cv-07223-SVW-AS

**County of Bexar v. Purdue Pharma L.P., et al.,** 152nd Judicial District, Harris **County Texas,** MDL No. 18-0358

**County of Dallas v. Purdue Pharma L.P., et al.,** 116th Judicial District, Dallas **County Texas,** MDL No. 2018-77098

**In Re: Namenda Indirect Purchaser Antitrust Litigation,** U.S. District Court, **S.D.N.Y.,** No. 15-cv-06549

**City of Huntington v. Amerisource Bergen et al.,** U.S. District Court, S.D.W.Va., Civil Action No. 3:17-01362

**In Re: Zetia (Ezetimibe) Antitrust Litigation,** U.S. District Court, E.D.Va., Norfolk **Division,** Civil Action No. 18-md-2836-RBS-DEM

**In Re: Opana ER Antitrust Litigation,** U.S. District Court, N.D. IL, Eastern **Division,** MDL No. 2580, Lead Case 14-cv-10150

**In Re: National Prescription Opiate Litigation,** U.S. District Court, N.D. Ohio, **Eastern Division,** No. 18-op-45090

**In Re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation,** U.S. **District Court E.D.N.Y.,** No. 18-md-2819 (NG) (LB)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**In Re: EpiPen (EPINEPHRINE INJECTION, USP) Marketing, Sales Practices, and Antitrust Litigation,** Civil Action No. 2:17-md-02785-DDC-TJJ, MDL No. 2785 (D. Kan.)

**In Re: Intuniv Antitrust Litigation, U.S District Court MA,** Lead case no. 1:16-cv-12396-ADB

**In Re: Loestrin 24 Antitrust Litigation U.S. District Court RI,** MDL No. 2472

**In Re: Niaspan Antitrust Litigation, U.S. District Court E.D. Pa.,** Master Docket No. 2460

**American Vanguard Corporation v. United States of America, U.S. Court of Federal Claims,** Civil Action No: 16-194 C

**In Re: Lamictal Direct Purchaser Antitrust Litigation, U.S. District Court NJ,** Case No. 12-cv-995 (WHW)

**In Re: Thalomid and Revlimid Antitrust Litigation, U.S. District Court NJ,** Case No. 2:14-cv-06997 (MCA) (MAH)

**Celexa and Lexapro Marketing and Sales Practices Litigation, Kissiovski et al. v. Forest Pharmaceuticals et al.,** MDL No. 2067 Master Docket No. 09-MD-2067-(NMG)

**Celexa and Lexapro Marketing and Sales Practices Litigation, PAINTERS AND ALLIED TRADES DISTRICT COUNCIL 82 HEALTH CARE FUND v. Forest Pharmaceuticals et al.,** MDL No. 2067 Master Docket No. 09-MD-2067-(NMG) Case No. 13-CV-13113 (NMG)

**In Re: Lidoderm Antitrust Litigation,** MDL Docket No. 14-md-02521-WHO.

**Plumbers' Local Union no. 690 v. TAP Pharmaceutical Products, Inc., et al.**
Superior Court of New Jersey, Law Division: Monmouth County; Civil Action No. MON-L-3136-06

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# APPENDIX C
# MATERIALS CONSIDERED

## Expert Reports & Declarations (including associated backup materials)

Declaration of Christopher Dymon, November 9, 2022.

Declaration of Edward Fox, April 13, 2022.

Expert Report of Michael S. Jacobs, March 17, 2023.

Report of Lynette Hilton, Ph.D., November 16, 2022.

## Depositions

Deposition of David Schroff, June 15, 2020.

Deposition of Lynette Hilton, January 17, 2023.

## Court Documents

### Complaints

Fourth Amended Consolidated Class Action Complaint and Jury Demand, *Dorothy Forth et al. v. Walgreen Co.*, June 16, 2021, United States District Court, Northern District of Illinois, Eastern Division, ECF No. 477, Civil No. 1:17-cv-02246.

### Other Court Filings

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, *Dorothy Forth et al. v. Walgreen Co.*, November 17, 2022, United States District Court, Northern District of Illinois, Eastern Division, ECF No. 554, Civil No. 1:17-cv-02246.

## Bates-Stamped Documents

### Data

2019.12.03_Named Plaintiffs Data.xlsx.

CAREMARK_FORTH-003386.

CAREMARK_FORTH-006410.

CAST000081.

ESI-0001548.

ESI-0001549.

IBEW_0017832.

IBEW_0018825.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

IBEW_0019182.

IBEW_0020207.

LOCAL295_0025215.

LOCAL439_0000106.

LOCAL439_0000108.

LOCAL439_0001106.

MTRX0001070.

Walgreens_Russo_2015_Data_Sample_20230126.xlsx.

Walgreens_Russo_PSC_Data_Sample_20230126.xlsx.

Walgreens_Union_Fund_Data_Sample_20230126.xlsx.

**Other Bates Stamped Documents**

2007 Health Plan Highlights, SCAD_00001-002.

2017 Plan Guide, Verizon MEP HCP Advantage Guide, BULLARD_0000170-205.

2017 Stop Loss Choice Plan Contract for Steamfitters Local 439, LOCAL439_0000636-644.

2017 Summary of Benefits, AARP MedicareRx Walgreens (PDP), RUSSO_0000035-579.

2018 Annual Notice of Changes, BULLARD_0000130-153.

2019 Silverscript Annual Notice of Changes, CAREMARK_FORTH-001238-261.

2020 Silverscript Annual Notice of Changes, CAREMARK_FORTH-001060-083.

Description of Uniform Benefits, UWisconsin_000235-281.

Fidelity Security Life Insurance Policy, Group Stop Loss Insurance Policy, 2011, LOCAL439_0002020-036.

Fidelity Security Life Insurance Policy, Group Stop Loss Insurance Policy, 2013, LOCAL439_0002037-053.

Fidelity Security Life Insurance Policy, Group Stop Loss Insurance Policy, 2014, LOCAL439_0002056-074.

Fidelity Security Life Insurance Policy, Group Stop Loss Insurance Policy, 2017, LOCAL439_0002078-094.

Ingredient Cost Discount and Dispensing Fee Guarantee Calculations, 2/20/09-2/5/10, ESI-WAG0002946.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ingredient Cost Discount and Dispensing Fee Guarantee Calculations, 2/19/10-2/4/11, ESI-WAG0002947.

Ingredient Cost Discount and Dispensing Fee Guarantee Calculations, 2/18/11-2/17/12, ESI-WAG0002948.

Ingredient Cost Discount and Dispensing Fee Guarantee Calculations, 3/2/12-2/15/13, ESI-WAG00003676.

Letter from Employers Health, 6/19/2017, IBEW_0019604-608.

Letter from Employers Health, 6/21/2016, IBEW_0019609-614.

Letter from Employers Health, 8/23/2019, EHPC00240-241.

Participating Pharmacy Guarantee Performance, 2/16/13-4/14/14, ESI-WAG0002949.

Participating Pharmacy Guarantee Performance, 4/15/14-4/14/15, ESI-WAG0002950.

Participating Pharmacy Guarantee Performance, 4/15/15-4/14/16, ESI-WAG0002951.

Pharmacy Benefits Management Agreement between LDI and Steamfitters, January 1, 2014, LOCAL439_0001815-886.

Pharmacy Provider Agreement between LDI and Walgreens, October 27, 2010, Walg_Forth_00142496-523.

Ullico Stop Loss Choice Plan, 2017, LOCAL439_0000636.

Walgreens Prescription Record 2012, GONZALES_0000001-008.

Walgreens Prescription Record, 11/10/2012 – 2/9/2014, GONZALES_0000009-015.

Walgreens Prescription Record, 2/1/2016-2/7/2016, GONZALES_0000016-024.

## Publicly Available Documents

### Academic Literature

Zhou, Chao, and Yuting Zhang, "The Vast Majority Of Medicare Part D Beneficiaries Still Don't Choose The Cheapest Plans That Meet Their Medication Needs," *Health Affairs*, October 2012, Vol. 31(10).

Strongin, Robin J., "The ABCs of PBMs," *National Health Policy Forum*, Issue Brief No. 749, October 27, 1999, available at https://www.ncbi.nlm.nih.gov/books/NBK559746/.

### Government Reports

U.S. Department of Labor, Report to Congress, Annual Report on Self-Insured Group Health Plans (2013 – 2022).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Other Publicly Available Documents**

"2019 Instructions for Form 5500 Annual Return/Report of Employee Benefit Plan," *Department of Labor*, available at https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf

"2024-2006 Medicare Part D Standard Benefit Model Plan Parameters," *Q1 Medicare*, available at https://q1medicare.com/PartD-The-MedicarePartDOutlookAllYears.php.

"7 Things to Know Before You Use RxSaver," *Clark.com*, April 27, 2021, available at https://clark.com/health-health-care/retail-me-not-rxsaver/.

Africa, Emily, "What Do BIN, PCN, RX, & RXGRP Mean on an Insurance Card?," *SuperMoney*, available at https://www.supermoney.com/what-do-bin-pcn-rx-rxgrp-mean-on-an-insurance-card/#/.

Ally, AJ, et al., "Pharmacy Benefit Manager Pricing Practices in Statewide Medicare Managed Care Program," *Florida Agency for Healthcare Administration*, December 2020, available at https://cdn.ymaws.com/www.floridapharmacy.org/resource/resmgr/docs_2021_legislative_session/milliman_report.pdf.

Amstrong, Steven, Brooks Conway, and Megan Ruzicka, "2022 Part D Competitive Environment and Emerging Trends, Medicare Advantage Part D and Prescription Drug Plans," *OliverWyman Report*, available at https://www.oliverwyman.com/our-expertise/insights/2021/dec/2022-medicare-advantage-part-d-trends.html.

"An Overview of the Medicare Part D Prescription Drug Benefit," *Kaiser Family Foundation*, October 19, 2022, available at https://www.kff.org/medicare/fact-sheet/an-overview-of-the-medicare-part-d-prescription-drug-benefit.

CDPHP, "Understanding Your Health Insurance ID Card," March 22, 2018, available at https://blog.cdphp.com/how-to/understanding-health-insurance-id-card.

Chase, Lauren, "What Are Patient Assistance Programs?," *GoodRX Health*, April 28, 2022, available at https://www.goodrx.com/healthcare-access/patient-advocacy/what-are-patient-assistance-programs.

"Cost-Sharing for Plans Offered in the Federal Marketplace, 2014-2023," *Kaiser Family Foundation*, February 13, 2023, available at https://www.kff.org/slideshow/cost-sharing-for-plans-offered-in-the-federal-marketplace/.

Cubanski, Juliette et al., "A Primer on Medicare: Key Facts About the Medicare Program and the People it Covers," *Kaiser Family Foundation*, March 20, 2015, https://www.kff.org/report-section/a-primer-on-medicare-what-is-the-medicare-part-d-prescription-drug-benefit/.

"Employee Benefits Security Administration 29 CFR Parts 2520 and 2590," *Department of Labor*, Annual Reporting and Disclosure, Federal Register, Vol. 81, No. 140, July 21, 2016.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Esch, Jagger, "Medicare Part D," *Medicare FAQ*, February 7, 2023, available at https://www.medicarefaq.com/original-medicare/medicare-parts/medicare-part-d/.

Fein, Adam J., "Four Reasons Why PBMs Gain As Maximizers Overtake Copay Accumulators," *Drug Channels*, February 8, 2022, available at https://www.drugchannels.net/2022/02/four-reasons-why-pbms-gain-as.html.

Fein, Adam J., "How the Fourth Tier Coinsurance Boom Drives Copay Offset Programs," *Drug Channels*, September 2013, available at https://www.drugchannels.net/2013/09/how-fourth-tier-coinsurance-boom-drives.html.

"Health Reform in Action: Donut Hole Rebate Checks Start Arriving June 10, 2010*," Center for Medicare Advocacy*, June 10, 2010, available at https://medicareadvocacy.org/health-reform-in-action-donut-hole-rebate-checks-start-arriving-june-10-2010/.

"How GoodRx Works," *GoodRx*, available at https://www.goodrx.com/how-goodrx-works.

"How to Read Your Insurance Card," *CommunityCare RX*, available at https://communitycaretx.org/wp-content/uploads/2021/06/HowToReadInsuranceCard_English.pdf.

Keisler-Starkey, Katherine, and Lisa N. Bunch, "Health Insurance Coverage in the United States: 2020," *U.S. Census Bureau*, September 14, 2021, available at https://www.census.gov/library/publications/2021/demo/p60-274.html.

Keither, Katie, "Lawsuit Challenges Federal Copay Accumulator Policy," *Health Affairs Forefront*, September 28, 2022, available at https://www.healthaffairs.org/content/forefront/lawsuit-challenges-federal-copay-accumulator-policy.

Kirchhoff, Suzanne, "Medicare Part D Prescription Drug Benefit," available at https://fas.org/sgp/crs/misc/R40611.pdf.

"Medicare Donut Hole 2023," *Boomer Benefits*, available at https://boomerbenefits.com/medicare-part-d-plans/medicare-donut-hole-2023/.

"Medicare Part D: A First Look at Part D Plan Offerings in 2012," *Kaiser Family Foundation*, Medicare Policy, Data Spotlight, October 2011, available at https://www.kff.org/wp-content/uploads/2013/01/8245.pdf.

"Medicare Part D: A First Look at Plan Offerings," *Kaiser Family Foundation*, 2016, available at https://files.kff.org/attachment/issue-brief-medicare-part-d-a-first-look-at-plan-offerings-in-2016.

"Medicare Program Description and Legislative History – Annual Statistical Supplement, 2006," *Social Security Office of Policy*, available at https://www.ssa.gov/policy/docs/statcomps/supplement/2006/medicare.html.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

MedPAC, "Part D Payment System," available at https://www.medpac.gov/wp-content/uploads/2021/11/medpac_payment_basics_21_partd_final_sec.pdf.

MedPAC, "Sharing Risk in Medicare Part D," in *Report to the Congress: Medicare and the Health Care Delivery System*, available at http://garnerhealth.com/wp-content/uploads/2014/02/june-2015-report-to-the-congress-medicare-and-the-health-care-delivery-system.pdf.

National Medicare Training Program, "Part D Benefit Parameters," *CMS*, available at https://www.cms.gov/files/document/2013partdbenefitspdf.

NPCC, "Manufacturers Are Using "Switch Operators" To Undermine Your Plan's Cost Saving Efforts," available at https://nationalprescriptioncoveragecoalition.com/manufacturers-are-using-switch-operators-to-undermine-your-plans-cost-saving-efforts/.

"Pharmacy Benefit Managers and Their Role in Drug Spending," *The Commonwealth Fund*, April 22, 2019, available at https://www.commonwealthfund.org/publications/explainer/2019/apr/pharmacy-benefit-managers-and-their-role-drug-spending.

Popke, Michael, "PBMs ahead of health plans in automation efforts," *Benefits Pro*, December 21, 2020, available at https://www.benefitspro.com/2020/12/21/pbms-ahead-of-health-plans-in-automation-efforts/.

"Prescription Drugs: Trends in Usual and Customary Prices for Commonly Used Drugs," *U.S. GAO Reports*, GAO-11-306R, February 10, 2011, available at: https://www.gao.gov/assets/gao-11-306r.pdf.

"Retail Prescription Drugs Filled at Pharmacies per Capita," *Kaiser Family Foundation*, available at https://www.kff.org/health-costs/state-indicator/retail-rx-drugs-per-capita.

"Stop-Loss Insurance 101," *Springbuk*, available at https://www.springbuk.com/blogs/stop-loss-insurance-101.

Stevens, Richard, "Spread vs. Pass-Through Pricing Models," *West Virginia Pharmacists Association*, January 31, 2019, available at https://wvpharmacy.org/2019/01/spread-vs-pass-through-pricing-models/.

Summer, Laura, Hoadely, Jack, and Elizabeth Hargrave, "The Medicare Part D Low-Income Subsidy Program – Experience to Date and Policy Issues for Consideration," available at https://www.kff.org/wp-content/uploads/2013/01/8094.pdf.

"The complete guide to Form 5500," *ADP,* available at https://www.adp.com/resources/articles-and-insights/articles/f/form-5500.aspx.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"Understanding True Out-of-Pocket (TrOOP) Costs," *CMS Product No. 11223-P*, revised October 2015, available at https://www.cms.gov/files/document/11223-ppdf.

"Update Medicare Secondary Payer (MSP) Manual Publication 100-05 to reflect statutory changes included in the Medicare Modernization Act (MMA)," *Department of Health and Human Services*, February 5, 2005, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/r25msp.pdf.

"What kind of discount can we expect in the Medicare Part D Donut Hole or Coverage Gap?", *Q1 Medicare*, available at https://q1medicare.com/faq/FAQ.php?faq=What-kind-of-discount-can-we-expect-in-the-Medicare-Part-D-Donut-Hole-or-Coverage-Gap-&faq_id=470&category_id=129.

"What Medicare Part D drug plans cover," *Medicare*, https://www.medicare.gov/drug-coverage-part-d/what-medicare-part-d-drug-plans-cover.

"Workers' Right to Health Plan Information," *U.S. Department of Labor, Employee Benefits Security Administration*, Fact Sheet, November 2016, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/workers-right-to-health-plan-information.pdf.