# EXHIBIT B

Page 1

1          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3
    CYNTHIA RUSSO, LISA BULLARD,)
4   RICARDO GONZALES,          )
    INTERNATIONAL BROTHERHOOD   )
5   OF ELECTRICAL WORKERS       )
    LOCAL 38 HEALTH AND         )
6   WELFARE FUND,               )
    INTERNATIONAL UNION OF      )
7   OPERATING ENGINEERS LOCAL   )
    295-295C WELFARE FUND, AND  )
8   STEAMFITTERS FUND LOCAL     )
    439, on Behalf of           )
9   Themselves and All Others   )
    Similarly Situated,         )
10                              )
       Plaintiffs,              ) CIVIL NO.:
11                              ) 1:17-cv-02246
    V.                          )
12                              )
    WALGREEN CO.,               )
13                              )
       Defendant.               )
14
15
16
    ************************************************
17          ORAL AND VIDEOTAPED DEPOSITION OF
18                  JAMES W. HUGHES
19                    May 3, 2023
20  ************************************************
21
22
23
24
25

```
                                              Page 17
 1   everything now?

 2       A.   There's Apple Mac TV, YouTube.  Basically --

 3   Apple basically is a small country.  I don't know what

 4   it is.

 5       Q.   Let's go off the record.

 6       A.   It has nothing to do with this case.

 7       Q.   Yeah.  Let's go off the record to fix that so

 8   it doesn't distract you.

 9       A.   Okay.

10            THE VIDEOGRAPHER:  Off the record at

11   8:14 a.m.

12            (A break was taken from 8:14 a.m. to

13   8:15 a.m.)

14            THE VIDEOGRAPHER:  On the record at

15   8:15 a.m.

16       Q.   (BY MR. GUGLIELMO)  Dr. Hughes, before this

17   break, you mentioned Mr. Karacosky [sic] performed

18   certain analyses.

19            I'm trying to understand.  Did he perform

20   queries of the data sets that were produced in this

21   action?

22       A.   To be clear, if you mean -- by queries, if you

23   mean like Microsoft Excel queries and the like, no, he

24   did not.

25            There were -- as you see in the figures,
```

1    there were certain observations that were pulled from

2    the data, but -- I'm just going to call him Igor.  Igor

3    never did any type of crunching of the numbers, if you

4    will.  It wasn't necessary to reach the conclusions that

5    I reached in my report.

6         Q.  And so fair to say that the opinions set forth

7    in your report are not based on any queries that could

8    have been run on the transaction?

9              (Reporter clarification.)

10        Q.  (BY MR. GUGLIELMO)  My question is, is it fair

11   to say that the opinions set forth in your report are

12   not based on any queries that could have been run on the

13   data produced in the action?

14        A.  Yes, that's correct.

15        Q.  And so do you have a high-level understanding

16   of how Igor was able to extract certain information that

17   ended up in the figures set forth in your report that

18   you just testified to?

19              MR. LEIB:  Objection.

20        Q.  (BY MR. GUGLIELMO)  You can answer.

21        A.  Sure.

22              The process would have been for one or more

23   of the figures is -- let's give an example of what the

24   data contained -- the data that Dr. Hilton proposes to

25   use.  What does it contain regarding copayment,

Page 57

1    you offered an opinion that class certification was

2    appropriate?

3         A.  I actually never offer an opinion as to whether

4    class certification is appropriate.

5                    My opinion is limited to examining the

6    analyses of the plaintiffs' experts, and opining on

7    whether I believe that their presented methodology is

8    accurate and reliable for determining classified entry

9    and damages using common proof.

10        Q.  And in those actions, have you ever agreed with

11   the plaintiffs' experts that the information offered is

12   -- and the methodology presented is accurate and

13   reliable for determining classified damages?

14        A.  No.

15                   Because the issues -- the facts are

16   different across some of the cases, but the issues

17   involved in plaintiff's expert reports tend to be

18   roughly the same, and so my criticisms tend to fall into

19   the same categories.

20        Q.  Have you ever been asked to offer a classwide

21   damages methodology in any of the 17 cases that you've

22   identified here in Appendix B?

23        A.  No.  I've never been asked to produce such a

24   methodology.

25        Q.  Have you ever tried to create such a

```
                                                    Page 62
 1    but it's Mr. Smith.

 2              MR. GUGLIELMO:  Oh, okay.  Sorry.

 3         Q.  (BY MR. GUGLIELMO)  And with respect to the

 4    depositions, I see you identified Mr. Schroff and

 5    Ms. Hilton -- Dr. Hilton.

 6              Do you see that?

 7         A.  Yes.

 8         Q.  Do you know approximately how many depositions

 9    were taken in this case?

10         A.  Oh, I have no idea.

11         Q.  Did you ask to review the list of depositions

12    in this case so that you could confirm for yourself

13    whether or not there was information within those

14    depositions that would potentially influence your

15    opinions?

16         A.  That would have been an assignment that I gave

17    to Analysis Group.  So I did not do that personally.

18         Q.  And what did Analysis Group tell you as to all

19    the depositions that were taken in this case and their

20    relevancy to your opinions?

21         A.  I didn't ask them.

22              I worked with Analysis Group a long time,

23    and so I trust their review, and so I didn't ask them

24    specifically what the other depositions were.

25              They knew the analyses that I'd asked them
```

Page 65

1    named plaintiffs' data you were looking at for purposes

2    of understanding or supporting the opinions that are set

3    forth in your report?

4        A.  I believe -- yes, there was -- I believe it's

5    Mr. Gonzalez.  We looked at his data and noticed that

6    there were times when his payment for his prescriptions

7    dropped to zero, and we use that as an example of

8    someone who appeared to have hit their out-of-pocket

9    maximum, and so no longer was required to contribute to

10   the cost of their prescription.

11       Q.  In looking at the data entitled

12   "2019.12.03_Named Plaintiffs' Data," did you also review

13   any of the other data sets to compare those data sets to

14   this?

15            MR. LEIB:  Objection.

16       A.  Yeah.  I'm not quite sure exactly what you mean

17   something else to compare these two.

18       Q.  (BY MR. GUGLIELMO)  Sure.

19            Did you perform any analysis of this

20   particular Excel data set to the other data sets that

21   were produced in this matter?

22       A.  No, I don't believe so.  That wouldn't have

23   been necessary to reach the conclusions that I do in my

24   report.

25       Q.  And you didn't perform any queries of the data,

```
                                                 Page 66
 1    the 2019 data, that is referenced there in Excel,
 2    correct?
 3                 MR. LEIB:  Objection, asked and answered.
 4         A.  Yes, that's correct.
 5         Q.  (BY MR. GUGLIELMO)  If you turn towards the
 6    bottom of this section, the next page, for example,
 7    "Walgreens_Russo_2015_Data_Sample_20230126.xlsx."
 8                 Do you see that?
 9         A.  Probably.  I was scrolling and not listening
10    exactly to which data set that you were --
11         Q.  Sure.
12                 It's on Page 96.
13         A.  Okay.
14                 Yeah, there's three Walgreens' data --
15    three Walgreens' spreadsheets on this list.
16         Q.  Sure.
17                 Let's talk about the first one, the
18    "Walgreens_Russo_2015_Data_Sample_20230126.xlsx."
19                 Do you see that?
20         A.  Yes.
21         Q.  What is that?
22         A.  That is the sample of Walgreens' transaction
23    data that was provided to us, and it was from the year
24    2015.
25         Q.  Who provided you that data set?
```

```
                                                      Page 75
 1              Is it your understanding that you didn't

 2   review any of the documents that Dr. Hilton produced in

 3   this action?

 4              MR. LEIB:  Objection.

 5      A.  Did I go through her document list and look at

 6   all of her documents?  No, I didn't.

 7      Q.  (BY MR. GUGLIELMO)  And are you aware that

 8   Dr. Hilton produced certain queries of the transactional

 9   data set that were also produced with her Bates prefix?

10      A.  I understand there were queries that she

11   produced, yes.

12      Q.  Okay.

13              And you did not review them for the

14   purposes of offering your opinions in this report,

15   correct?

16      A.  No, I didn't.

17              To review those queries wasn't necessary to

18   reach the conclusions that I did in my report.

19      Q.  And are you aware that Dr. Smith ran queries in

20   connection with the opinions he offered in his report?

21      A.  No, I'm not aware of that.  I didn't speak with

22   Dr. Smith.  I didn't read his report so -- or Mr. Smith.

23      Q.  Okay.  Sorry.

24      A.  I don't know.

25      Q.  All right.
```

```
 1              And is it fair to say that you're not
 2   offering an opinion of any of the queries that
 3   Dr. Hilton ran?
 4       A.  No.
 5              It seems to me that some of the things that
 6   I have done in my report in response to Dr. Hilton
 7   probably, I think, used the results of those queries.
 8   So that, you know, I looked at some of the output of her
 9   data manipulation to form my opinions.  So I don't think
10   it's accurate to say I didn't look at any of the output
11   of those queries.
12       Q.  But you're not offering an opinion as to the
13   query she ran?  You couldn't have because you didn't
14   read them -- you didn't review them?
15              MR. LEIB:  Objection.
16       A.  That's right.  I did not.
17              To review those queries wasn't necessary to
18   reach the opinions and the conclusions that I did in my
19   report.
20       Q.  (BY MR. GUGLIELMO)  All right.
21              MR. GUGLIELMO:  We can go off the record.
22              THE VIDEOGRAPHER:  Off the record at
23   9:38 a.m.
24              (A break was taken from 9:38 a.m. to
25   9:52 a.m.)
```

```
                                               Page 84
 1   common injury?

 2        A.  I am not aware that complete data on that would

 3   exist, no.

 4        Q.  And let me ask you:  With respect to PBM data,

 5   for example --

 6        A.  Uh-huh.

 7        Q.  -- what have you done to determine whether or

 8   not the relevant PBMs possess the data that you claim is

 9   relevant to the determining common injury?

10        A.  Well, that's just it.  One of my critiques of

11   Dr. Hilton is she simply states, "Oh, I can get these

12   data from the PBMs," and she offers no proof or other

13   evidence that the PBMs, indeed, possess such data,

14   especially going back as far as 2007.

15             So in my experience in other cases dealing

16   with the PBM data, it tends to be spotty.  They don't

17   retain everything.  They don't always retain in an

18   accessible fashion.  Data that's been acquired through a

19   merger, for example.

20             So I am doubtful that the data that

21   Dr. Hilton lightly assumes that would be readily

22   available to her, I sincerely doubt that it would be

23   either complete or even accurate.

24        Q.  With respect to that statement, you haven't

25   actually queried the relevant PBMs as to whether such
```

Page 85

1    data exists, correct?

2         A.   No.

3              I mean, it's my understanding that it is

4    Dr. Hilton's burden to demonstrate that such data

5    exists.  And all I can say is from my experience in

6    other cases in 25 years, I sincerely doubt that the --

7    the type of data that she, again, lightly claims would

8    be readily available, I sincerely doubt that it is.

9         Q.   But, again, you offer no evidence, for example,

10   that ESI doesn't maintain no coinsurance field, right?

11        A.   Well, you can't prove a negative, but I

12   conducted no analysis.  I'm only relying on my prior

13   experience with ESI and Optum and Caremark data that I

14   have dealt with in other cases.  That when such data are

15   produced, there can be fields missing; there can be

16   transactions missing; there can be -- it -- just coding

17   mistakes in the data, and just time gaps in the data

18   that just don't have it for certain periods of time.

19        Q.   But in the past when you've reviewed ESI data,

20   for example, you've identified coinsurance data,

21   correct?

22              MR. LEIB:  Objection.

23        A.   No.  I don't know that it was relevant to those

24   other assignments that I had.  So I couldn't say that I

25   did , no.

Page 94

1    "Connecticut Reconciliation Data"?

2         A.  Yes.

3         Q.  Okay.

4              Did you review that?

5         A.  I believe I asked Analysis Group to look at it,

6    but I didn't -- don't believe I looked at it personally.

7         Q.  All right.

8              And it is not identified in Appendix C, so

9    I would understand it doesn't form the basis of any of

10   your opinions, correct?

11        A.  That would be correct.

12        Q.  Are you aware of a data set called "ESI PSC

13   Transactional Data"?

14        A.  I couldn't tell you if I -- there's a lot of

15   different names and a lot of different data sets.  So I

16   don't know whether I'm aware of that particular Bates

17   number or not.

18        Q.  Okay.

19              And one of the things you indicated in your

20   report is that you reviewed Dr. Hilton's report,

21   correct?

22        A.  Yes.

23        Q.  Okay.

24              Did you review any of the data or queries

25   that Dr. Hilton used to create Exhibit 3 of her report?

1      A.  I would have to look at Exhibit 3.  But as I

2  said, earlier, I did not look at any of her queries

3  because to do so was not necessary to reach the

4  conclusions that I do in my report.

5      Q.  Okay.

6           In the course of forming your opinions, did

7  you become aware of data that Walgreens possesses that

8  would have assisted Dr. Hilton in her analysis?

9      A.  I have no idea what Walgreens would have

10  produced, and that's up to Dr. Hilton to decide whether

11  it would have assisted in her analysis.

12     Q.  With respect to the critiques of her

13  methodology, did you query Walgreens as to whether or

14  not, for example, they possess certain data that

15  presently Dr. Hilton does not?

16     A.  I did not communicate with Walgreens at all.

17     Q.  Okay.

18          Be fair to say, you didn't ask or have

19  Analysis Group ask Walgreens if they had certain data

20  that you identified as necessary for creating a

21  classwide damages methodology, correct?

22     A.  The data that I used was confined to the data

23  that had been produced -- produced in this case by the

24  time I -- report was filed.

25     Q.  And is it your understanding that Analysis

Page 96

1    Group didn't seek to have additional data produced in
2    this case?
3          A.  Well, again, we rely in forming reports.  Like
4    Dr. Hilton relies on forming reports, we rely on the
5    data that's been produced.
6                 And examining the data that Dr. Hilton
7    used, it was inadequate to the task.  Whether -- she
8    claims that there's more data that will let her do what
9    she says she wants to do, that remains to be seen.
10         Q.  I guess my question is:  Are you aware whether
11   or not Analysis Group requested certain data from
12   Walgreens that you contend has not been produced and is
13   required for her analysis?
14         A.  I don't know.  I don't know whether Analysis
15   Group made such a request or not.
16         Q.  Okay.
17                 If you turn to Paragraph 10 of your report,
18   you indicate (as read):  "Dr. Hilton proposes to rely on
19   selected Walgreens transactional data and selected
20   prescription claims data she assumes would be produced
21   by pharmacy benefit managers (PBMs), who are not members
22   of the class" -- the proposed class."
23                 Do you see that?
24         A.  Yes.
25         Q.  Okay.

1   for example, if you're excluding the transactions from

2   -- all the transactions from one person, then it seems

3   you haven't constructed a methodology that works on a

4   classwide basis.

5         Q.  (BY MR. GUGLIELMO)  Wouldn't that be more of

6   your constructive conservative methodology as opposed to

7   not having a valid methodology?  Isn't that the real

8   concern?

9               MR. LEIB:  Objection.

10        A.  No.

11            I think it's a shortcoming in the

12   methodology if you have a situation where you might be

13   excluding all the transactions for a particular class

14   member.  And we don't know how extensive that might be.

15   Well, Dr. Hilton doesn't know.  I don't know, but she's

16   made no attempt to figure this out.

17         Q.  (BY MR. GUGLIELMO)  You wouldn't know one way

18   or another if the queries that Dr. Hilton produced would

19   allow, for example, you or Dr. Smith to replicate her

20   linking methodology, correct?

21        A.  I haven't looked at her queries.  That's

22   correct.

23        Q.  And you don't know Dr. Smith's queries either.

24   So you don't know how he proposed linking the

25   transactions, correct?

```
                                              Page 138
 1        A.   That's correct.
 2        Q.   If he linked transactions, would you reconsider
 3   your position there in Paragraph 85 --
 4             MR. LEIB:   Objection.
 5        Q.   (BY MR. GUGLIELMO)   There's --
 6             MR. GUGLIELMO:   I haven't finished the
 7   question.   So you can hold off.
 8        Q.   (BY MR. GUGLIELMO)   -- your criticism regarding
 9   the linking of transactions?
10             MR. LEIB:   Objection.
11        A.   No.
12             Again, I have a lot of experience with PBM
13   data going back over many years and across many
14   companies.   And the idea that you -- it's just like you
15   say match this number to that number, and that's all you
16   have to do is, in my opinion, fanciful.   It's not going
17   to work that way.   The data aren't of a sufficient
18   quality to make that linkage on an accurate and reliable
19   and extensive basis going back to 2007.
20        Q.   (BY MR. GUGLIELMO)   Okay.
21             How often do you perform analyses to link,
22   for example, pharmacy data to PBM data?
23        A.   It's not come up in my other work.
24        Q.   How often have you done it in the context of
25   litigation?
```

Page 139

1      A.   I haven't.

2      Q.   Okay.

3           And so it's your testimony that you've not

4  attempted to perform such linking?  So is it fair to say

5  you wouldn't have an understanding of whether or not

6  it's possible or how complex it would be?

7           MR. LEIB:  Objection.

8      A.   As a statistician, I think I have an idea of

9  how complex it might be; but, again, I'm relying on my

10  experience with the PBM data and pharmacy data in the

11  past.  And what you get from pharmacies and what you've

12  get from PBMs can -- it's -- the quality of the data

13  don't necessarily allow Dr. Hilton's analysis to be

14  done.  And it may not -- in my experience, may not even

15  allow such a matching to be done.

16           So, no, it wouldn't.  There's been matching

17  done on a relatively small sample from the data.  It

18  doesn't convince me that you can do this in an accurate

19  and reliable method over whatever it is a -- back

20  to 2007, how ever many years that is.

21      Q.   (BY MR. GUGLIELMO)  But one of the -- I think

22  earlier you told me that you decided what aspects of

23  Dr. Hilton's report you were going to respond to,

24  correct?

25      A.   Yes.

1        Q.  And one of the aspects of the report that

2    you're mentioning here is linking the data, correct?

3        A.  Yes.

4        Q.  And you didn't think it was necessary to

5    actually attempt to link the data?  You just want to

6    provide the critique of linking, but you didn't actually

7    try to link the data yourself here, correct?

8        A.  It wasn't something that I was asked to do, and

9    it wasn't something that was necessary to reach the

10   conclusions that I reach in my report.

11       Q.  And you have no idea what Dr. Smith's

12   conclusions are as to linking data either, correct?

13       A.  No, I don't know anything about Dr. Smith's

14   activities.

15              MR. LEIB:  Once, again, he's going to be

16   very happy, but it's Mr. --

17              MR. GUGLIELMO:  Mr. Smith.  Yes, Mr. Smith.

18   Thank you.

19       Q.  (BY MR. GUGLIELMO)  Dr. Hughes, is it your

20   understanding that the class definition excludes branded

21   drugs?

22       A.  Yes.

23       Q.  And if Dr. Hilton's transaction-by-transaction

24   methodology is approved by the court, would a review of

25   brand transactions be relevant in your opinion?

1     Q.  If you could turn to, I guess, Figure 3 of your

2  report.

3     A.  Okay.

4     Q.  And that one says (as read):  "Out-of-pocket

5  maximums Dr. Hilton's calculation falsely identifies

6  potential consumer overpayments."

7          Do you see that?

8     A.  Yes.

9     Q.  Who created this figure?

10    A.  Well, again, I asked Analysis Group -- Igor,

11  specifically -- to create an example of how

12  out-of-pocket maximums would effect the -- out-of-pocket

13  maximums can -- out-of-pocket maximums along with the

14  PSC prices, how that would effect the total expenditure

15  of the patients in the actual -- the patient in the

16  actual world and the hypothetical, but-for world.

17    Q.  Okay.

18          And the PSC prices, who determined those

19  prices for this figure?

20    A.  I believe that would -- that Igor came up with

21  those prices.

22    Q.  Do you know if Analysis Group performed any

23  review of, for example, what the average PSC price would

24  be?

25    A.  No.

1       It wasn't necessary to create this

2   hypothetical example.

3       Q.  And do you know how the PSC prices were

4   determined for this figure?

5       A.  No, I didn't inquire.  I simply directed

6   Analysis Group to show how the out-of-pocket maximum --

7   the existence of an out-of-pocket maximum would effect

8   the readjudication of the claims over the entire set of

9   claims.

10      Q.  So is it fair to say you don't know what the,

11  for example, average PSC price was for the transactional

12  data that was produced in this case?

13      A.  It wasn't necessary to create this hypothetical

14  example.  And, of course, the average PSC price would

15  vary from month to month and year to year.  So it's not

16  like there's a single average PSC price that would be --

17  that would inform this in any way.  It's just a

18  hypothetical example.

19      Q.  So you don't know whether these prices are

20  above, below, or on average with actual PSC prices,

21  correct?

22      A.  That's correct.

23          These prices are hypothetical like

24  everything else in this example.

25      Q.  Okay.

1          And why was it that you didn't utilize

2     actual data to create this example?

3          A.  Again, it's a hypothetical example showing what

4     could happen to someone when you take the out-of-pocket

5     maximum and lower PSC prices into account.

6          Q.  And, again, in this figure, you didn't include

7     any TPP payments or overcharges, correct?

8          A.  No.

9               The -- I mean, TPP -- excuse me.

10              Again, the TPP responsibility is implicit

11    in the difference between where there's a 25 percent

12    coinsurance, the 75 percent would be paid by the TPP,

13    but that's implied in the calculation; but it's not used

14    to create any estimate of an overcharge.

15         Q.  If you included the TPP calculation here, would

16    the -- wouldn't the $160 overcharge that Dr. Hilton

17    attributes, wouldn't that, under your hypothesis, be

18    allocated to the TPP as an overpayment?

19         A.  That's not something they looked into.  This

20    simply is looking at the consumer overpayment.

21         Q.  So you don't know what the TPP overpayment

22    would be in this hypothetical using the scenario you set

23    forth here?

24         A.  No.

25              Because that would depend on -- see, at the

1    refresh the recollection of your report, if you'd like.

2         A.   Yes.

3         Q.   Okay.  Great.

4              Are you aware of whether Dr. Hilton's

5    methodology takes into account where -- whether

6    manufacturer's coupons were used?

7         A.   It does not, to my recollection.

8         Q.   Okay.

9              And so you don't know if in the query sheet

10   performed, she excluded transactions from her

11   methodology where the plan type would have included

12   manufacturer coupons?

13        A.   I have no idea what you're talking about.

14        Q.   Okay.

15             You didn't -- in terms of forming your

16   opinion here, you didn't look to see whether or not her

17   analysis, based on the query she ran, excluded

18   manufacturer's coupons based on the data she reviewed

19   that Walgreens produced?

20        A.   Well, that's my point.  Why would you exclude

21   them?  They're still transactions.

22        Q.   My question is, you didn't look at the query to

23   know one way or another whether or not she did exclude

24   manufacturer's coupon transactions from consideration

25   for damages?

Page 150

```
 1       A.  Yeah.

 2               As I said numerous times before, I did not

 3   look at her queries because it wasn't necessary to reach

 4   the conclusions in my report.

 5       Q.  Well, you say (as read):  "To know whether

 6   copay coupons used by a consumer apply to their

 7   deductible and out-of-pocket maximums, it would be

 8   necessary to determine which health plans adopted copay

 9   accumulators."  I guess, you're talking about two things

10   there.

11               But in terms of the copay accumulator, are

12   you aware that PBMs maintain data as to the use of copay

13   accumulators?

14       A.  Yes, I assume that's a part of their

15   adjudication code.

16       Q.  Okay.

17               Going back to the bullet -- I think I was

18   referring to about copay coupons.  You state (as read):

19   "It would be necessary" -- I think it's in the middle of

20   that.  (As read):  "It would be necessary to identify

21   which consumer payments in the PBM are Walgreens' data

22   reflect the use of a copay coupon, and remove that

23   amount when determining if a consumer met their

24   deductible or out-of-pocket maximum."

25               Do you see that?
```

```
                                                      Page 151
 1         A.   Yes.
 2         Q.   Are you aware that data produced in this case
 3    does indicate or identify when a copay coupon was used?
 4         A.   I haven't -- I haven't looked at it.  So I
 5    don't know one way or another.  It wouldn't surprise me
 6    if it were.
 7         Q.   And if it were, would that resolve the concern
 8    you have here?
 9         A.   No.  Not really.
10              Because we're -- I mean, we're talking
11    about using transactional data.
12              And while they keep track of the copay
13    coupons and they keep track of the copay accumulators,
14    that doesn't mean that that's going to show up in the
15    transactional data.  That's going to be a different
16    file, if you will.
17         Q.   But if it is -- if, in fact, was produced in
18    the case, and, in fact, it does exist in the data, would
19    that resolve the concern you have here?
20         A.   No.
21              Because it -- sorry.
22              MR. LEIB:  Yeah, objection.
23              Go ahead.
24              THE WITNESS:  Okay.
25         A.   It doesn't.
```

1        Because, again, in transactional data, if

2   you see somebody hitting their out-of-pocket maximum

3   with a coupon or without a coupon, seeing that they've

4   hit their out-of-pocket maximum in the transactional

5   data doesn't tell you what their out-of-pocket maximum

6   is in order to do the readjudication.

7        Q.   (BY MR. GUGLIELMO)   I don't believe that was my

8   question.

9             MR. GUGLIELMO:   I'll move to strike.

10        Q.   (BY MR. GUGLIELMO)   I think my question was --

11   but if the data or indicating a copay coupon was, in

12   fact, produced and does exist in the data sets produced

13   by Walgreens and the relevant PBMs, wouldn't that

14   resolve the concern you have here about accounting for

15   copay coupons?

16             MR. LEIB:   Objection.

17        A.   Well, again, it's that -- where the copay

18   coupons are going to enter into as the last part of the

19   bullet says (as read):   "Determining if the consumer has

20   met the deductible or out-of-pocket maximum," the copay

21   coupon will be involved whether they met their

22   deductible or out-of-pocket maximum; but it's not going

23   to reveal what the deductible or out-of-pocket maximum

24   is for purposes of readjudication.

25        Q.   (BY MR. GUGLIELMO)   Okay.





```
                                                      Page 184
 1        A.   No.  It was a complete hypothetical, and so all

 2   of the prices in here should be considered hypothetical.

 3        Q.   Okay.

 4             Turn to Paragraph 141 of your report.  The

 5   heading reads --

 6        A.   Yes.

 7        Q.   -- "Potentially Tens or Even Hundreds of

 8   Thousands of Individual of TPPs Would Need to be

 9   Assessed as Possible Members of the Proposed Class."

10             Do you see that?

11        A.   Yes.

12        Q.   Okay.

13             And below that you cite to and, I believe,

14   rely on Form 5500 information; is that right?

15        A.   Yes.

16        Q.   Okay.

17             Are you aware of whether or not Walgreens

18   produced data sufficient to identify the third-party

19   payors or plans in this action?

20        A.   I don't know.

21        Q.   Okay.

22             If you were given access to data relating

23   to the identity of third-party payors, would you rely on

24   that information over the information you have here in

25   the Form 5500 data?
```

Page 185

1      A.  No, I don't think so.

2           I mean, that's part of the problem when --

3    if Walgreens identifies a so-called, third-party payor,

4    is that a PBM?  Is it an ASO or TPA organization?  Or is

5    it actually the TPP end payor, who is supposed to be a

6    member of the proposed class.

7           And very often, in my experience in the PBM

8    data, they are listing as the "TPP." They're listing the

9    ASO organization, which is very common because

10   self-insured -- in employer's insurance, self-insurance

11   is very common, and so using an insurance company to

12   administer the plan is quite common.

13     Q.  Do you have any understanding that whether or

14   not Dr. Smith reviewed Walgreens' data to identify the

15   number of health plans who had claims adjudicated by the

16   relevant PBMs?

17     A.  No, I'm not aware of anything that Dr. Smith --

18   Mr. Smith did.

19     Q.  Okay.  Yes, Mr. Smith.  Thank you.

20           And so you're not aware of whether

21   Mr. Smith offered a methodology to identify plans who

22   had claims adjudicated by relative PBMs?

23     A.  Again, I didn't read Dr. Smith -- excuse me --

24   Mr. Smith's report, nor did I speak with him about his

25   conclusions.

Page 186

1      Q.   Okay.

2                In looking at the list that you have here,

3      for example -- 2010, 2011, going onto 2013 -- in terms

4      of counting plans -- and you have 276,000 there, for

5      example, fully insured -- would you have counted a

6      single plan for each year?  So such that, if there's one

7      single plan, you've counted it ten times?

8      A.   Yes, that would be the case here.

9                Because there are -- over that time period,

10     there are plans that maintain the entire ten-year

11     period.  There are plans that disappear from the data

12     because they have changed or gone out of business or

13     whatever the case is, and there's new plans that come

14     along.

15               So, yes, this is a raw summation, and you

16     are correct that if there was one plan that was in there

17     in each of the ten years, it would be counted ten times.

18     That's correct.

19     Q.   And do you know what data fields exist within

20     Walgreens' data that would allow the parties to identify

21     unique plans?

22               MR. LEIB:  Objection.

23     A.   Again, when you say "identify plans," are you

24     identifying the class members as the plan, or are you

25     identifying some other entity like a PBM or an ASO as

1    the plan?

2         Q.  (BY MR. GUGLIELMO)  Well, let's start with --

3    let's start with, for example, a third-party payor such

4    as one of the plaintiffs in this action.

5               Are you aware of the data fields that exist

6    within Walgreens' data that would allow the parties to

7    identify, for example, Steamfitters?

8         A.  Right.

9               But the union benefit plans are different

10   because they're contracting directly with -- directly

11   with the PBM.  There's no other entity between the PBM

12   and the Steamfitters.

13              That's not the case for most of the

14   employer self-insured plans.  They -- the self-insured

15   plans, more often than not, do not contract directly

16   with the PBM, but rather contract with an insurance

17   company to administer their claims; and it's that

18   insurance company that usually appears in the data

19   usually in my experience.

20              MR. GUGLIELMO:  Move to strike.

21        Q.  (BY MR. GUGLIELMO)  My question is, have you

22   reviewed the data within Walgreens' systems to determine

23   whether or not that data would be sufficient to allow

24   the parties to identify, for example, Steamfitters?

25        A.  Well, again, they can -- they can identify

Page 188

1    Steamfitters only because that they have contracted

2    directly with the PBM.  And as far as reviewing the

3    Walgreens' data, it's neither here nor there.

4                  Because, again, in my experience, the --

5    what's listed as the TPP may be the class member.  But

6    for self-insured plans, more often than not, it's not

7    the class member.  It's the ASO representative.

8         Q.  So it's your opinion that you don't need to

9    look at Walgreens' data to form an opinion that you

10   can't identify what, for example, plan is actually

11   attributed to that transaction?

12                  MR. LEIB:  Objection.

13        A.  No.

14                  I mean, I have -- I've seen pharmacy

15   transaction data and PBM data all along, and it's quite

16   common that it's not the actual end payor.  It's not the

17   actual class member that is represented in the data.

18        Q.  (BY MR. GUGLIELMO)  Again, my question is, did

19   you look at -- is it your opinion you don't need to look

20   at Walgreens' data to render this opinion?  In other

21   words, you haven't looked at Walgreens' data as to this

22   issue.  You don't need to look at it to render this

23   opinion, correct?

24                  MR. LEIB:  Objection.

25        A.  From my experience, I would not need to look at

1   the Walgreens' data to render this opinion.  That's

2   correct.

3        Q.  (BY MR. GUGLIELMO)  And you're not relying on

4   whether or not the data contains fields sufficient to

5   identify whether it's a TPP, whether it's an ASO, and

6   all the other concerns that you just identified,

7   correct?

8        A.  I have not reviewed the Walgreens' data for

9   that, but, no.  I'll leave it at that.  I have not

10  reviewed the Walgreens' data for that.

11       Q.  And you don't know if Dr. Smith has -- or

12  Mr. Smith?

13       A.  Yes.  I don't know anything that Mr. Smith may

14  have done.

15       Q.  Okay.

16            Dr. Hughes, are you offering an opinion as

17  to whether or not Walgreens' data is accurate?

18       A.  Depends on what you mean by "accurate."

19       Q.  Are you offering an opinion as to whether or

20  not Walgreens' data is accurate to allow the parties to

21  create a classwide method to identify damages?

22       A.  To TPP class members?

23       Q.  To class members.

24       A.  Well, there's two types of class members, and

25  so I need to know which one we're talking about.

Page 215

1                   IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
2                           EASTERN DIVISION
3
      CYNTHIA RUSSO, LISA BULLARD,)
4     RICARDO GONZALES,            )
      INTERNATIONAL BROTHERHOOD    )
5     OF ELECTRICAL WORKERS        )
      LOCAL 38 HEALTH AND          )
6     WELFARE FUND,                )
      INTERNATIONAL UNION OF       )
7     OPERATING ENGINEERS LOCAL    )
      295-295C WELFARE FUND, AND   )
8     STEAMFITTERS FUND LOCAL      )
      439, on Behalf of            )
9     Themselves and All Others    )
      Similarly Situated,          )
10                                 )
         Plaintiffs,               ) CIVIL NO.:
11                                 ) 1:17-cv-02246
      V.                           )
12                                 )
      WALGREEN CO.,                )
13                                 )
         Defendant.                )
14
15
16
                       REPORTER'S CERTIFICATION
17                   DEPOSITION OF JAMES W. HUGHES
                             May 3, 2023
18
19            That the deposition transcript was delivered
20    to Mr. Joseph Guglielmo.
21            That a copy of this certificate was served on
22    all parties and/or the witness shown herein on
23    _____.
24            I further certify that pursuant to FRCP Rule
25    30(f)(1) that the signature of the deponent:

```
                                              Page 216

 1            (X) was requested by the deponent or a party

 2    before the completion of the deposition and that

 3    signature is to be before any notary public and returned

 4    within 30 days from date of receipt of the transcript.

 5            If returned, the attached Changes and

 6    Signature Page contains any changes and the reasons

 7    therefore:

 8            ( ) was not requested by the deponent or a

 9    party before the completion of the deposition.

10            I certify that I am neither counsel for,

11    related to, nor employed by any of the parties or

12    attorneys in the action in which this proceeding was

13    taken, and further that I am not financially or

14    otherwise interested in the outcome of the action.

15            Certified to by me this 18 day of May,

16    2023.

17

18

19

20

21    _____

      ABIGAIL GUERRA, Texas CSR 9059

22    Expiration Date:  02/28/24

      VERITEXT LEGAL SOLUTIONS

23    Firm Registration No. 571

      300 Throckmorton Street

24    Suite 1600

      Fort Worth, Texas 76102

25    Phone:  (817) 336-3042
```

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  CYNTHIA RUSSO, et al. vs. WALGREEN CO.

2  5/3/2023 — James W. Hughes (#5881051)

3             E R R A T A   S H E E T

4  PAGE 13 LINE 19 CHANGE "2021" to 2020"

5  REASON correcting testimony

6  PAGE 16 LINE 3 CHANGE "exclusively for occasionally" to

7  "exclusively except for occasionally"

8  REASON transcription error

9  PAGE 24 LINES 7-10 CHANGE "Specifically, I don't know what analysis

10 he would have done when we would have conference calls to discuss

11 the — the work so far.  Dr. Mortimer was usually on those calls" to

12 "Specifically, I don't know what analysis he would have done.  When

13 we would have conference calls to discuss the — the work so far,

14 Dr. Mortimer was usually on those calls"

15 REASON transcription error

16 PAGE 24 LINE 22 CHANGE "pulled the samples the data" to "pulled the

17 samples of the data"

18 REASON transcription error

19 PAGE 26 LINE 25 Add "the" — "if you turn to the page"

20 REASON transcription error

21 PAGE 27 LINE 3 CHANGE "off" to "on"

22 REASON transcription error

23 PAGE 32 LINE 7 CHANGE "is" to "are"

24 REASON transcription error

25 PAGE 38 LINE 17 CHANGE "by" to "of"

26 REASON transcription error

27 PAGES 40-41 LINE 25-1 ADD "at" — "transmitted to counsel at"

28 REASON transcription error

1  PAGE **51** LINE **4** ADD "a" - "plain with a drug benefit"

2  REASON transcription error

3  PAGE **54** LINE **9** ADD "not" - "I regretfully say they are not

4  publishable"

5  REASON transcription error

6  PAGE **54** LINE **11** CHANGE "through" to "them"

7  REASON transcription error

8  PAGE **57** LINE **8** CHANGE "classified" to "classwide"

9  REASON transcription error

10 PAGE **60** LINE **6** CHANGE "answer" to "ask for"

11 REASON transcription error

12 PAGE **61** LINE **1** CHANGE "Dymond" to "Dymon"

13 REASON transcription error

14 PAGE **61** LINE **6** CHANGE "Dymond's" to "Dymon's"

15 REASON transcription error

16 PAGE **62** LINE **22** ADD "For" - "Analysis Group for a long time"

17 REASON transcription error

18 PAGE **65** LINE **5** CHANGE "Gonzalez" to "Gonzales"

19 REASON transcription error

20 PAGE **70** LINE **13** CHANGE "picked" to "pick"

21 REASON transcription error

22 PAGE **72** LINE **18** CHANGE "it's not, but it's what we got" to "it's

23 not, but it's — what we got"

24 REASON transcription error

25 PAGE **72** LINE **25** CHANGE "as" to "to"

26 REASON transcription error

27 PAGE **78** LINE **10** CHANGE "academy" to "academic"

28 REASON transcription error

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  PAGE **84** LINE **21** CHANGE "lightly" to "likely"

2  REASON **transcription error**

3  PAGE **84** LINE **21** DELETE "likely"

4  REASON **clarification of testimony**

5  PAGE **85** LINE **7** CHANGE "lightly" to "likely"

6  REASON **transcription error**

7  PAGE **85** LINE **7** DELETE "likely"

8  REASON **clarification of testimony**

9  PAGE **89** LINE **12** CHANGE "Express Scripts" to "Walgreens"

10  REASON **correction of testimony**

11  PAGE **90** LINE **3** CHANGE "classified" to "classwide"

12  REASON **transcription error**

13  PAGE **90** LINE **12** CHANGE "perceives" to "proceeds"

14  REASON **transcription error**

15  PAGE **91** LINE **11** CHANGE "classified" to "classwide"

16  REASON **transcription error**

17  PAGE **91** LINE **13** CHANGE "classified" to "classwide"

18  REASON **transcription error**

19  PAGE **91** LINES **22-23** CHANGE "No. In the end, I was not asked to

20  offer an opinion on her unjust enrichment methodology" to "Dr.

21  Hilton's unjust enrichment methodology relies in part on her

22  ability to demonstrate that she can identify overpayments by class

23  members using common proof, which I am offering an opinion on. But,

24  no, I am not offering a separate opinion on her unjust enrichment

25  methodology beyond the part that addresses the inability of Dr.

26  Hilton's methodology to identify overpayments by class members"

27  REASON **Correction of testimony**

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  PAGE **94** LINE **5** CHANGE "I believe I asked Analysis Group to look at

2  it but I didn't – don't believe I looked at it personally" to "I

3  don't believe I looked at it personally"

4  REASON correction of testimony

5  PAGE **95** LINE **24** CHANGE "I" to "my"

6  REASON transcription error

7  PAGE **96** LINE **4** CHANGE "relies on" to "relies on in"

8  REASON transcription error

9  PAGE **97** LINE **10** CHANGE "data not" to "data is not"

10  REASON transcription error

11  PAGE **98** LINE **25** ADD "an" – "I am offering an opinion"

12  REASON transcription error

13  PAGE **103** LINE **1** CHANGE "methodology, it's" to "methodology is"

14  REASON transcription error

15  PAGE **104** LINE **22** DELETE "a" – "based on U&C"

16  REASON transcription error

17  PAGE **109** LINE **5** ADD "the" - "are made well after the transaction"

18  REASON transcription error

19  PAGE **109** LINE **20** CHANGE "practice" to "pricing"

20  REASON transcription error

21  PAGE **110** LINE **22** CHANGE "effect" to "affect"

22  REASON transcription error

23  PAGE **111** LINES **4-8** CHANGE "The GER payment formula is contained in

24  the contract between the TPP and the PBM, and Walgreens would

25  typically not have access to the terms of that contract.  So I

26  would think your answer – the answer to your question would be no"

27  to "The GER payment formula I refer to in my report is contained in

28  the contract between the TPP and the PBM, and Walgreens would

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  typically not have access to the terms of that contract. So I would

2  think your answer -- the answer to your question would be no

3  because Walgreens does not charge the TPP.  That GER payment should

4  be considered, however, in connection with evaluating any

5  overcharge paid by the TPP that Plaintiffs claim resulted from

6  Walgreens not reporting its PSC prices as its U&C prices to the

7  PBMs."

8  REASON  Correction of testimony

9  PAGE 113 LINE 21 CHANGE "identifying" to "identifiable"

10 REASON  transcription error

11 PAGE 115-116 LINES 25-1 CHANGE "overpayments as she calculates

12 derivative from the consumers overpayments that she calculates" to

13 "overpayments she calculates derives from the consumer overpayments

14 that she calculates"

15 REASON  transcription error

16 PAGE 117 LINE 14 CHANGE "either individual" to "either an

17 individual"

18 REASON  transcription error

19 PAGE 118 LINE 9 CHANGE "effect" to "affect"

20 REASON  transcription error

21 PAGE 119 LINES 2-4 CHANGE "I do believe that there were cases where

22 one of the named plaintiff received a stop-loss payment" to "I do

23 believe that there were cases where one of the named plaintiffs

24 purchased stop-loss insurance"

25 REASON  correction of testimony

26 PAGE 122 LINE 10 ADD "a" - "I can't really identify a"

27 REASON  transcription error

28 PAGE 130 LINE 13 CHANGE "Gonzalez" to "Gonzales"

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  REASON <u>transcription error</u>

2  PAGE <u>133</u> LINE <u>5</u> CHANGE "classified" to "classwide"

3  REASON <u>transcription error</u>

4  PAGE <u>133</u> LINE <u>13</u> CHANGE "classified" to "classwide"

5  REASON <u>transcription error</u>

6  PAGE <u>134</u> LINE <u>15</u> CHANGE "there" to "that"

7  REASON <u>transcription error</u>

8  PAGE <u>136</u> LINE <u>16</u> CHANGE "linking" to "link"

9  REASON <u>transcription error</u>

10 PAGE <u>136</u> LINE <u>17</u> CHANGE "classified" to "classwide"

11 REASON <u>transcription error</u>

12 PAGE <u>141</u> LINE <u>4</u> CHANGE "that" to "then"

13 REASON <u>transcription error</u>

14 PAGE <u>144</u> LINE <u>7</u> CHANGE "calculation overstates" to "calculation

15 <u>that overstates"</u>

16 REASON <u>transcription error</u>

17 PAGE <u>145</u> LINE <u>14</u> CHANGE "effect" to "affect"

18 REASON <u>transcription error</u>

19 PAGE <u>152</u> LINES <u>19-20</u> CHANGE "Determining if the consumer has met

20 <u>the deductible" to "Determining if a consumer has met their</u>

21 <u>deductible"</u>

22 REASON <u>clarification of testimony</u>

23 PAGE <u>162</u> LINE <u>19</u> ADD "of" - "or that it would be of sufficient

24 <u>quality"</u>

25 REASON <u>transcription error</u>

26 PAGE <u>167</u> LINE <u>18</u> CHANGE "been produced" to "have been produced"

27 REASON <u>transcription error</u>

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  PAGE <u>170</u> LINES <u>23-24</u> CHANGE "<u>the classwide data would show because</u>

2  <u>it's only 2015</u>" to "<u>the classwide data would show because it's only</u>

3  <u>2014 and 2015</u>"

4  REASON <u>correction of testimony</u>

5  PAGE <u>171</u> LINE <u>17</u> CHANGE "<u>Well, again, as I said, this is only for</u>

6  <u>2015</u>" to "<u>Well, again, as I said, this is only for 2014 and 2015</u>"

7  REASON <u>correction of testimony</u>

8  PAGE <u>175</u> LINE <u>17</u> DELETE "<u>[Sic]</u>"

9  REASON <u>unnecessary</u>

10  PAGE <u>175</u> LINES <u>18-20</u> CHANGE "<u>And, again, she didn't – she didn't</u>

11  <u>use the data to separate when she was doing for Steamfitters</u>" to

12  "<u>And again, she didn't – she didn't use the data to separate copay</u>

13  <u>and coinsurance when she was doing the analysis for Steamfitters</u>"

14  REASON <u>clarification of testimony</u>

15  PAGE <u>176</u> LINE <u>2</u> ADD "<u>is</u>" – "<u>We don't know what is there</u>"

16  REASON <u>transcription error</u>

17  PAGE <u>177</u> LINES <u>9-10</u> CHANGE "<u>that it's not</u>" to "<u>that she cannot</u>"

18  REASON <u>transcription error</u>

19  PAGE <u>180</u> LINE <u>20</u> CHANGE "<u>consumers</u>" to "<u>consumers'</u>"

20  REASON <u>transcription error</u>

21  PAGE <u>183</u> LINE <u>17</u> CHANGE "<u>manufacturer's discount</u>" to "<u>manufacturer</u>

22  <u>discounts</u>"

23  REASON <u>transcription error</u>

24  PAGE <u>188</u> LINE <u>1</u> DELETE "<u>that</u>"

25  REASON <u>transcription error</u>

26  PAGE <u>202</u> LINE <u>11</u> CHANGE "<u>Hey</u>" to "<u>hey</u>"

27  REASON <u>transcription error</u>

28  PAGE <u>202</u> LINE <u>12</u> CHANGE "<u>and</u>" to "<u>in</u>"

1 **REASON** <u>transcription error</u>
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1 CYNTHIA RUSSO, et al. vs. WALGREEN CO.

2 5/3/2023 — James W. Hughes (#5881051)

3                  **ACKNOWLEDGEMENT OF DEPONENT**

4      I, James W. Hughes, do hereby declare that I have read the

5 foregoing transcript, I have made any corrections, additions, or

6 changes I deemed necessary as noted above to be appended hereto,

7 and that the same is a true, correct and complete transcript of the

8 testimony given by me.

9

10

11 I declare under penalty of perjury under the laws of the United

12 States that the foregoing is true and correct.

13

14       _____

15      James W. Hughes

16

17

18 This____16____day of_____June_____,2023

19

20

21

22

23

24

25

26

27

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware