**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> WALGREEN CO., <br><br> Defendant. | Civil No. 17-cv-2246 <br><br> Judge Edmond E. Chang <br> Magistrate Judge Sheila Finnegan <br><br> **ORAL ARGUMENT REQUESTED** |

**WALGREEN CO.'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE
THE EXPERT REPORT AND TESTIMONY OF JAMES W. HUGHES PURSUANT TO
FEDERAL RULE OF EVIDENCE 702**

Walgreen Co. ("Walgreens") opposes Plaintiffs' Motion to Exclude James W. Hughes's Expert Report and Testimony Under Federal Rule of Evidence 702 ("Motion"). Dkt. 604. In attempting to exclude James W. Hughes's April 27, 2023 expert report ("Hughes Report") (attached as **Ex. A**[1]),[2] Plaintiffs mischaracterize Hughes's opinions and testimony. Rather than admit the significant errors Hughes identified in the methodology of Plaintiffs' expert, Dr. Lynnette Hilton ("Hilton"), Plaintiffs instead choose to attack Hughes, wrongly claiming that Hughes reviewed no discovery and attempting to shift the burden of proof onto Walgreens. Plaintiffs' arguments have no merit, and the Court should deny Plaintiffs' Motion.

I.     **INTRODUCTION AND BACKGROUND**

Hughes is an economist and an expert in the economic analysis of class certification issues, damages, and calculating economic harm in the pharmaceutical industry. Hughes has decades of experience in these areas, and Walgreens retained him to evaluate Hilton's expert report and determine whether Hilton's methodology for identifying class members and determining overpayments made by those class members is reliable and whether her methodology can be applied on a classwide basis. Among his opinions, Hughes opines that Hilton's failure to account for common elements of payment flows in the pharmaceutical industry, including features such as out-of-pocket maximums, deductibles, and copayments—as well as Generic Effective Rates ("GERs") and stop loss insurance—makes her methodology unreliable. *See* **Ex. A:** (Hughes Report) ¶¶ 9-21.

---

[1] All cites to exhibits in this brief refer to the exhibits to the Declaration of Michael S. Leib, attached as Exhibit 1.

[2] Walgreens filed Dr. Hughes's expert report on the docket at Dkt. 583-2 on March 17, 2023. However, Walgreens served Dr. Hughes's amended expert report, the operative report, on Plaintiffs on April 27, 2023.

Plaintiffs attempt to exclude Hughes's Report and testimony for four primary reasons, none of which have merit. *First*, Plaintiffs claim that Hughes did not analyze the available "data and discovery." Dkt. 604 (Mot.) at 4-6. This is simply incorrect, as the Hughes Report is replete with citations to and analysis of specific data sets and documents produced in discovery, many of which Hughes also testified about during his deposition. *Second*, Plaintiffs claim Hughes did not analyze Hilton's data queries. *Id.* at 6-7. This is irrelevant, as Hughes did not need to analyze Hilton's queries to reach his conclusions. *Third*, Plaintiffs allege that Hughes and his team "cherry-picked" data to reach their conclusions. *Id*. at 7-11. This is inaccurate as well as irrelevant; Hughes did not cherry-pick the data that was analyzed, and, even if he had, it would not lessen the impact of the problems that he identifies in Hilton's report. *Fourth*, Plaintiffs accuse Hughes of relying on his experience, rather than analyzing data and discovery produced in the case. *Id*. at 11-12. This is also inaccurate; as shown in his expert report and testimony, Hughes relies on both the discovery he reviewed and his own extensive experience to reach his conclusions.[3]

Importantly, to reach his conclusions, Hughes did not purport to replicate step-by-step Hilton's statistical analyses of various sets of claims data. He also did not purport to analyze the specific queries that Hilton ran on that claims data; that is the job of another Walgreens expert, Jed Smith. Instead, Hughes analyzed a variety of materials produced in discovery and applied his

---

[3] In addition, in the introduction to Plaintiffs' motion, they claim, in an apparent attempt to discredit Dr. Hughes, that he "is a serial defense expert in pharmaceutical pricing litigation who has submitted dozens of reports accompanying oppositions to class certification" and "[h]e has never opined that a class should be certified." Hughes responded to this criticism during his deposition. He noted that his function was not to opine on whether a class should be certified: "I actually never offer an opinion as to whether class certification is appropriate. My opinion is limited to examining the analyses of the plaintiffs' experts, and opining on whether I believe that their presented methodology is accurate and reliable for determining classwide entry and damages using common proof." Moreover, he testified that he has not agreed with Plaintiffs' experts in these cases because, while the facts are different in the cases, "the issues involved in plaintiff's [sic] expert reports tend to be roughly the same, and so my criticisms tend to fall into the same categories." *See* **Ex. B:** (Deposition of James W. Hughes) ("Hughes Dep.") 57:3-19.

2

understanding of payment flows in the pharmaceutical industry and identified significant problems with Hilton's methodology, as well as deficiencies in the data sets on which she intends to rely. The burden rests on Plaintiffs to explain why the problems Hughes identified are surmountable (or why they do not exist), not on Hughes to correct or replicate Hilton's work. Plaintiffs have failed to meet that burden.

## II.  APPLICABLE STANDARD

The applicable standard for a Rule 702 Motion is stated in Walgreens' Opposition to Plaintiffs' Motion to Exclude Michael S. Jacobs's Expert Report and Testimony Under Federal Rule of Evidence 702. Dkt. 623 at 1-2.

## III.  ARGUMENT

### A.  Hughes Reviewed The Appropriate Materials To Reach His Conclusions

For their first argument, Plaintiffs make the sweeping statements that "Dr. Hughes admits neither he nor the team that assisted him, Analysis Group, Inc. ("Analysis Group"), reviewed or analyzed the data and discovery produced in this case" and "Dr. Hughes did not analyze any available data." Dkt. 604 (Mot.) at 4-5. Based on this, Plaintiffs argue that Hughes does not know what is in the data and, therefore, he did not "perform the requisite analysis." *Id*. at 6. Plaintiffs' argument, however, is not only misguided, but also incorrect.

The evidence shows that Hughes did, in fact, consider data and discovery produced in this case. The Hughes Report contains extensive citations to those documents and data. In fact, Hughes spends a considerable amount of time in his Report analyzing portions of the data produced in the case by both Walgreens and Pharmacy Benefit Managers ("PBMs"). *See* **Ex. A:** (Hughes Report) ¶¶ 113-118. Moreover, his "Materials Considered" list includes six-and-a-half pages of materials produced in discovery by the parties and a variety of third parties, including declarations, other expert reports, deposition transcripts, sets of produced data, and Bates-stamped documents. *See*

3

**Ex. A:** (Hughes Report) at C1-C7. Hughes also testified that Analysis Group reviewed even more material at his direction and had access to a wide variety of materials produced in discovery. *See, e.g.,* **Ex. [xx]:** (Hughes Dep.) 62:11-17. In other words, Plaintiffs' argument is wrong.

Plaintiffs also take certain of Hughes's deposition quotes out of context. The block quote on page four of the Motion does not establish that neither Hughes nor his team "reviewed or analyzed the data and discovery produced in the case," but rather that Hughes's staff did not run any queries over the data—something that is the subject of Plaintiffs' second argument and which will be discussed below. As for the block quote on page five of their Motion, Plaintiffs claim the quote stands for the proposition that "Dr. Hughes testified that he did not need to review the data to conclude that Walgreens cannot identify fund's members particular purchases." Dkt. 604 (Mot.) at 5. Plaintiffs' argument is misleading. Hughes testified that the data are not sufficient to identify who the Third Party Payer ("TPP") is that would be the class member under Plaintiffs' proposed class definition because the TPP listed in the data may not be "the actual end payor" and may instead be, for example, a PBM or an Administrative Services Only entity hired by the actual end payor to interact with the PBM. **Ex. B:** (Hughes Dep.) 184:22-189:10; **Ex. A:** (Hughes Report) ¶ 58. He explained that he did not need to look at the data to know that this is the case. **Ex. B:** (Hughes Dep.) 184:22-189:10. Hughes is able to rely on his experience with transactional claims data to render this opinion, which is correct, as shown in Smith's proposed surrebuttal report. (Smith Surreb. Report) (Ex. B to Mot. for Leave to file a surreply and surrebuttal report, also filed today) ¶ 14 █████████████████████████████████

███████████████████████████████████████████████████████████████

4

██████████████████████████████████████████████

████████████████████████████████

Indeed, instead of addressing Hughes's actual arguments, Plaintiffs attack him for not doing work that he did not claim to have done and that was not necessary for him to reach his conclusions. Hughes is not acting in this case as a data expert; Walgreens has retained another expert to do a detailed analysis of the claims data produced in this case. To reach the majority of the conclusions in Hughes's Report, review of claims data was irrelevant; instead, Hughes's opinion is based on the structure of various types of health insurance plans, the effects that features like out-of-pocket maximums and deductibles would have on alleged damages, and the need to perform readjudication of each consumer's claims in order to determine which, if any, individuals and TPPs were allegedly damaged and thus eligible for inclusion in the class. *See, e.g.*, **Ex. A:** (Hughes Report) ¶¶ 14-15, 25-71, and 92-106. Hughes did not need to perform statistical analysis to reach his conclusions. Indeed, while Plaintiffs criticize Hughes for not running queries across large amounts of claims data, Hughes testified that it was not necessary for him to do that to reach his conclusions. *See, e.g.*, **Ex. B:** (Hughes Dep.) 17:16-18:5, 65:11-66:4, 75:7-76:19, 94:19-96:9, 137:17-140:10, 145:1-147:5, 149:4-152:24.

With respect to the conclusions Hughes reached that did involve review of data, he did not need to perform detailed statistical analysis of that data. Hughes opines as to deficiencies in the PBM data that would impede Hilton's ability to carry out her proposed methodology. **Ex. A:** (Hughes Report) ¶¶ 81-88. This is based on structural aspects of that data and the fields contained in the data produced by PBMs in the case. In fact, Hilton testified that she expects to receive additional data from PBMs in the future if a class is certified, which she admits she would need to determine whether a consumer paid a copayment (a flat amount per prescription) or coinsurance

5

(a percentage of the total amount paid by the TPP) and whether U&C was a basis for the amount paid by both consumers and TPPs, both of which are necessary components of Hilton's methodology. **Ex. A:** (Hughes Report) ¶¶ 113-14; *see* Dkt. 553-44 (Expert Report of Lynette Hilton) ("Hilton Report") ¶ 24-25. Hughes merely points out that "Hilton fails to demonstrate that the fields necessary to determine whether U&C price was a basis for the amount paid by consumers and TPPs are consistently included in the data" and that "the data . . . Hilton uses do not identify whether a consumer paid a deductible, copayment, or coinsurance payment on a given transaction." *See* **Ex. A:** (Hughes Report) ¶¶ 87, 107, 113-118. Hughes also points out that other fields that would be needed in the event the Court agrees that a re-adjudication is needed for each consumer's claims are not present in the PBM data produced to date. *Id.* ¶¶ 87, 114, 116, 150. Once again, Hughes did not need to perform a statistical analysis to reach this conclusion.

Plaintiffs also cite to what they claim is a similar case in which Hughes's conclusions were disputed and ask this Court to adopt the conclusions of that court. Mot. at 6. Specifically, Plaintiffs cite to *In re: Opana ER Antitrust Litig.*, No. 14-cv-10150, 2021 WL 3627733, at *3 (N.D. Ill. June 4, 2021), although neither Hughes nor the cited quote appear in that ruling. Plaintiffs appear to be referring to a different ruling in the same case, in which the district court commented unfavorably on some of Hughes's conclusions. Order, *In re: Opana ER Antitrust Litig.*, No. 14-cv-10150 (N.D. Ill. June 4, 2021), Dkt. No. 726. But the circumstances of that case were entirely different. To start, the opinion did not relate to a motion to exclude and, in fact, Hughes's opinions were not excluded in *Opana*. Moreover, while the district court did not adopt Hughes's expert opinion, the Seventh Circuit reversed and remanded on appeal, giving specific instructions to the district court to consider the issue of potentially uninjured class members, the very topic on which Hughes opined.

6

*In re Opana ER Antitrust Litig.*, No. 21-8017, 2021 U.S. App. LEXIS 27004, at *3-4 (7th Cir. July 13, 2021). Thus, the *Opana* decision is not relevant to this case.

Because Hughes reviewed data and discovery necessary to reach his conclusions, Plaintiffs' argument has no merit.

> **B. Plaintiffs Criticize Hughes For Failing To Review Queries, Which Was Not Necessary For Him To Reach His Conclusions**

Plaintiffs further criticize Hughes for not analyzing any of the data "queries" produced by Hilton. As Plaintiffs put it: "Even though Dr. Hughes was retained to rebut Dr. Hilton's opinions, he did not review or consider the data queries Dr. Hilton developed to effectuate her methodology." Dkt. 604 (Mot.) at 6. This argument, however, ignores the fact that Hughes did not purport to draw any conclusions regarding Hilton's data queries.

Hilton's opinions are not solely based on data or queries; she puts forth a methodology through which she claims to be able to identify class members and calculate their damages on a formulaic basis. Hughes responds to this methodology, not Hilton's analysis of the underlying data. As Hughes testified at his deposition: "I did not look at any of her [Hilton's] queries, because to do so was not necessary to reach the conclusions that I do in my report" and "[t]o review those queries wasn't necessary to reach the conclusions that I did in my report." **Ex. B:** (Hughes Dep.) 94:23-95:4, 75:12-18; *see also* 17:6-18:5, 65:11-66:4, 75:7-76:19, 94:19-96:9, 137:17-140:10, 145:1-147:5, 149:2-152:24 (repeatedly making the same point). Plaintiffs treat these as troublesome admissions, when in fact they appropriately describe the scope of Hughes's testimony. An expert can be retained to rebut only a portion of another expert's work; this does not make the rebuttal any less valid.

Moreover, Plaintiffs once again include a block quote for a misleading purpose. Plaintiffs claim that "Hughes conceded that he did not know the contents of the data produced by Walgreens

or used by Dr. Hilton," (Dkt. 604 (Mot.) at 7), when, in fact, a closer look at the testimony reveals that Hughes only testified that he is unaware of data Walgreens possesses that it did not produce in the case that would have been helpful to Hilton. **Ex. B:** (Hughes Dep.) 95:6-96:5 ("Q: . . . did you query Walgreens as to whether or not . . . they possess certain data that presently Dr. Hilton does not? A: I did not communicate with Walgreens at all.")

Plaintiffs base their criticism on a flawed premise—that anyone who criticizes a data expert must themselves analyze the data used by that expert. Hughes's role, however, is to point out the many flawed assumptions that underlie Hilton's methodology. If the methodology itself is fundamentally flawed, then no query can save it. Plaintiffs' argument is not a valid basis to exclude Hughes's opinions, and the Court should reject the argument.

C. **Hughes Did Not "Cherry-Pick" Data**

In the Hughes Report, Hughes criticizes Hilton's contention that she would be able to determine whether a consumer paid a copayment or a coinsurance payment from the available data. **Ex. A:** (Hughes Report) ¶¶ 115-118. Among other analyses that he performs to come to this conclusion, Hughes analyzes a small subset of Walgreens' data to show that this data does not reliably indicate whether, for a particular transaction, the payment made by the consumer was a copayment or coinsurance, which is a central data point for Hilton's damages methodology. Dkt. 553-44 (Hilton Report) ¶¶ 24-25. Plaintiffs criticize Hughes's analysis, arguing that he cherry-picked the data he used to conduct his analysis. Dkt. 604 (Mot.) at 7-11. Plaintiffs' argument, however, has no merit.

Neither Dr. Hughes nor his team cherry-picked the relevant data, and, even if they had, it would not matter because Hughes's opinions do not rely on any extrapolation from the sample. Plaintiffs criticize the fact that to create ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

meaning that it cannot be determined if the payment was coinsurance or copayment, (**Ex. A:** (Hughes Report) ¶ 116), Hughes only presents ten examples. Dkt. 604 (Mot.) at 8. Specifically, they argue that Hughes did not know if these ten examples were anomalies or representative across the entire Walgreens data set. *Id.* at 9. Yet, Hughes testified that Analysis Group told him that "these examples were not uncommon" in the data. **Ex. B:** (Hughes Dep.) 160:7-14. Moreover, regardless of how many examples Hughes identified, the deficiencies are in fact present. Hughes testified that he was not attempting to extrapolate from this data a percentage of anomalies across an entire data set but was identifying problems in the data that he analyzed. **Ex. B:** (Hughes Dep.) 172:2-6 ("I am not extrapolating and saying that this is any particular percentage of the -- of the population, but this type of -- of issue, which in my experience is not uncommon, would, indeed, prevent Dr. Hilton from performing her analysis."). In other words, he was pointing out that it is Plaintiffs' burden to show that Walgreens' data can accurately show whether a consumer payment is a copayment or coinsurance, and Hilton has not done that.

The same can be said about Figure 7, where Hughes takes approximately 100 transactions in Walgreens' data to show that, ████████████████████████████████████████ ████████████████████████████████████████. **Ex. A:** (Hughes Report) ¶ 117. He opines that, "it is unclear how Dr. Hilton can identify whether consumers paid copayments or coinsurance payments on transactions on a classwide basis by relying solely on these data." *Id.* Plaintiffs argue that because Hughes does not know how the sample was generated, his opinion is unreliable. Again, however, Hughes is not attempting to extrapolate to an entire data set, but rather is pointing out an issue with the data upon which Hilton claims she can rely. Further, the data was in fact not cherry-picked; portions of three data sets were generated by Smith's team

9

without any knowledge of the purpose for which Hughes and his team wanted these data sets. *See* **Ex. C:** (Decl. of Anthony R. Todd).

In an attempt to escape the problems Hughes identified with Hilton's reliance on the Walgreens data, Plaintiffs argue that Hilton's methodology does not rely primarily on the Walgreens data, but instead that "Hilton's methodology is that the PBMs will turn over data that has" the copay/coinsurance information. Mot. at 8 (internal quotation mark omitted). But this argument is flawed. As noted in Section III(A) above, the data the Relevant PBMs have produced in this case do not separate out whether a payment was a copayment or coinsurance. **Ex. A:** (Hughes Report) ¶¶ 113-115; *see also* (Smith Surreb. Report) ¶ 11 & Table 5, 14(b). Hughes testified that Plaintiffs have not shown that the Relevant PBMs could produce fulsome and accurate data for the entire time period of 2007 to the present separating out copayments versus coinsurance.

> Well, that's just it. One of my critiques of Dr. Hilton is she simply states, "Oh, I can get these data from the PBMs," and she offers no proof or other evidence that the PBMs, indeed, possess such data, especially going back as far as 2007. So in my experience in other cases dealing with the PBM data, it tends to be spotty. They don't retain everything. They don't always retain in an accessible fashion. Data that's been acquired through a merger, for example. So I am doubtful that the data that Dr. Hilton lightly assumes that would be readily available to her, I sincerely doubt that it would be either complete or even accurate.

**Ex. B:** (Hughes Dep.) 84:10-23; *see also* **Ex. A:** (Hughes Report) ¶ 118. Plaintiffs, of course, subpoenaed data from the Relevant PBMs and could have asked for the copayment and coinsurance amounts to be separated out in the data they produced, to the extent the PBMs could do this, and Plaintiffs could have asked the Relevant PBMs in their depositions whether the PBMs could separate out these values and whether it could be done for the entire time period. Plaintiffs, however, failed to do this and, therefore, Hilton relies purely on speculation that the Relevant PBMs could produce this data.

And here is perhaps the most critical point. After Hughes issued his Report, Hilton issued a rebuttal report. Plaintiffs had access to all the data sets used by Hughes, and Hilton could have tested Hughes's conclusions in Figures 6 and 7 to attempt to show that the problems he identified represent rare anomalies and the Walgreens data is reliable for differentiating between copayments and coinsurance. Yet, Hilton either did not conduct this analysis or chose not to report its results in her report. In other words, Hughes noted specific problems with Hilton's methodology and Hilton failed to rebut the point despite having the data available to her. Hilton apparently cannot rebut Hughes's criticism, yet Plaintiffs ask the Court to exclude Hughes's Report, despite there being no basis to do so. Accordingly, Plaintiffs' meritless request should be denied.

Plaintiffs point to a variety of cases in which courts have commented unfavorably on "cherry-picked" data. Dkt. 604 (Mot.) at 9. All of these cases, however, have key facts in common: the experts in those cases were attempting to draw a general conclusion about a large set of data and sometimes deliberately ignored contradictory data. *See Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (weather expert rejected testimony and data that did not fit his conclusions without explanation); *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019) (expert on sexual harassment ignored a dozen declarations from employees who alleged they did not experience harassment); *Kljajic v. Whirlpool Corp.*, No. 15-CV-5980, 2017 U.S. Dist. LEXIS 70784, at *44 (N.D. Ill. May 9, 2017) (expert purported to draw conclusions about the functioning of 2,000,000 ovens based on tests of only two); *Holden Metal & Aluminum Works v. Wismarq Corp.*, No. 00 C 0191, 2003 U.S. Dist. LEXIS 5247, at *4-5 (N.D. Ill. Apr. 2, 2003) (expert drew conclusions about an entire type of gutter after only performing visual examination of a single piece). As noted above, however, Hughes points out problems with the data upon which Hilton relies, but never attempts to draw larger conclusions about the frequency of these problems within

the data sets. **Ex. B:** (Hughes Dep.) 158:10-159:24. He also has not intentionally excluded contradictory data. These cases, therefore, are inapposite.

Plaintiffs also point to *In re Epipen Mktg., Sales Pracs. & Antitrust Litig.* ("*Epipen*"), No. 17-md-2785-DDC-TJJ (D. Kan.), arguing, in an attempt to compare Hughes's testimony in that case to his testimony in this case, that Hughes opined in that case that the PBM data do not always indicate whether a plan had a flat copay feature. Dkt. 604 (Mot.) at 10-11. They argue that, despite this testimony, the plaintiffs in that case submitted declarations from PBMs Optum, Caremark, and Express Scripts that contradict his opinion (the declarations were originally submitted in *In re: Niaspan Antitrust Litigation*, as shown in Supp. Guglielmo Decl., Exs. 77-79, Dkt. 609-17, 609-18 & 609-19). Dkt. 604 (Mot.) at 11. But there is no contradiction. As Smith points out in his proposed sur-rebuttal report:

> The declaration from Optum does not contain information about available fields of data. . . . [T]he Express Scripts declaration does not contain any fields with information on consumer's copay or coinsurance that were not already produced [in this case]. The Caremark declaration contains only a single payment related field with information on consumer's copay or coinsurance – "Plan co-pay structure" – that was not provided [in this case]. Hilton provided no information on what information this additional field may contain, whether it would be populated back to 2007, how she would use it on a class-wide basis, and whether it would be relevant to calculating damages if the field is only available in Caremark data.

(Smith Surreb. Report) ¶ 14(b). Moreover, the issue in *Epipen* involved ascertainability, not whether individualized damages would overwhelm any common issues, and, therefore, it is inapposite. *See In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2020 U.S. Dist. LEXIS 40789, at *51-58 (D. Kan. Feb. 27, 2020).[4] In addition, while the court did not deny class certification on the ascertainability ground in that case, it also did not exclude Hughes's opinion. *Id.* at *57-58. Indeed, the *EpiPen* court noted that Hughes's criticism of the

---

[4] As with *In re: Opana ER Antitrust Litig.*, Plaintiffs again cite to the wrong opinion in *Epipen*.

available data may be valid; it merely did not find that this criticism required a denial of class certification. *Id.*, at *58 n.15 (emphasis added).

Hughes has identified problems with the data that Hilton purports to rely on, has demonstrated the existence of those problems in the subsets of data cited in the Hughes Report, and has noted that, in his experience, these types of problems are common with PBM data. These are valid, supported opinions for an expert, and the Court should not exclude them.

### D. Hughes Appropriately Relied On His Experience In Coming To His Conclusions

Despite Plaintiffs' assertions to the contrary, Hughes relies on the data and documents produced in the case to reach his expert opinions. He also relies on his extensive experience, and Plaintiffs criticize this as somehow inappropriate for an expert. Plaintiffs are incorrect.

But even assuming Hughes had not evaluated documents and data to support his conclusions, he is entitled to rely on his own experience in forming his conclusions. "An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (emphasis added). While the Seventh Circuit has made it clear that an expert cannot simply say "it is so because I say it is so" (*id.*), that is not what Hughes has done here.

The cases cited by Plaintiffs are inapposite. In those cases, the purported experts failed to provide ***any*** reasoning to support their expert opinions, instead relying on bare assertions or unsupported assumptions. For example, in *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999), the excluded expert was retained to testify regarding a seat belt that allegedly failed during an accident. Rather than analyzing the seat belt to determine if it failed during the accident or was unlatched afterwards, the expert assumed that the seatbelt failed during the accident—the very

13

subject upon which he was retained to opine. Unsurprisingly, the court found this expert's testimony unhelpful. *Id.* Similarly, in *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005), the excluded expert submitted an opinion, unsupported by anything other than "intuition," regarding the potential growth of a particular TV broadcaster. Because the testimony was entirely unconnected to any empirical evidence, it was excluded.

Here, Hughes relies on both data and his own experience to reach reasonable conclusions. In addition, his past "experience" concerns precisely the same sort of PBM data as Hilton purports to use here. **Ex. B:** (Hughes Dep.) 85:12-18. He cites a variety of types of materials, including claims data and secondary sources regarding the structure of health insurance plans. He also lays out clear, easy to understand hypothetical examples which illustrate his various points. This is not a case in which it is impossible for an opponent to effectively rebut an expert because they hide behind (effectively unchallengeable) "experience." The Court should reject Plaintiffs' argument.

**IV.    CONCLUSION**

For the reasons stated above, the Court should deny Plaintiffs' Motion.

DATED: September 14, 2023

      */s/ Michael S. Leib*
Michael Scott Leib
Anthony Robert Todd
**REED SMITH LLP**
10 S Wacker Dr # 4000
Chicago, IL 60606
Telephone: 312-207-1000
*mleib@reedsmith.com*
*atodd@reedsmith.com*

Frederick Robinson (*pro hac vice*)
Selina Coleman (*pro hac vice*)
Megan Engel (*pro hac vice*)
Jessica Christensen (*pro hac vice*)
**REED SMITH LLP**
1301 K Street, N.W.
Suite 1100 East Tower
Washington, DC 20005
Telephone: 202-414-9200
*frobinson@reedsmith.com*
*scoleman@reedsmith.com*
*mengel@reedsmith.com*
*jchristensen@reedsmith.com*

**Attorneys for Defendant Walgreen Co.**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of September, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

/s/ Michael S. Leib
Michael S. Leib