**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> -against- <br><br> WALGREEN CO., <br><br> Defendant. | Case No. 1:17-cv-02246 <br><br> Judge Edmond E. Chang <br><br> Magistrate Judge Sheila Finnegan |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION TO EXCLUDE EXPERT REPORT AND TESTIMONY OF
<u>JAMES W. HUGHES, Ph.D</u>**

Plaintiffs Cynthia Russo, Lisa Bullard, Ricardo Gonzales, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, International Union of Operating Engineers Local 295-295C Welfare Fund, and Steamfitters Fund Local 439 (collectively "Plaintiffs") respectfully submit this Reply Memorandum of Law in further support of Plaintiffs' Motion to Exclude James W. Hughes' Expert Report and Testimony Under F.R.E. 702 (Dkt. No. 610 (Public)) ("Pls.' Opn. Br."), and in response to the opposition submitted by Defendant Walgreen Co. ("Walgreens") (Dkt. No. 639 (Public); Dkt. No. 641 (corrected opposition)).

## INTRODUCTION

Walgreens offers a series of conflicting arguments to avoid exclusion of Dr. Hughes' proffered expert report and testimony based on his failure to analyze the transactional data made available in this case. Walgreens initially argued that Dr. Hughes did in fact review some data, arguing that the Court should blindly accept the citations in his Report[1] and exhibits. However, during his deposition, Dr. Hughes candidly admitted that he did not review any of the transactional data in this case. In one instance relied upon by Walgreens, where Dr. Hughes' Report discusses co-payment and co-insurance data, he testified that he did not review any of the data and directed the Analysis Group to merely cherry-pick a few examples that supported his pre-determined opinions. Walgreens also cites to data compilation spreadsheets identified as "materials considered" in Dr. Hughes' Report; however, Dr. Hughes admitted in his deposition that he did not analyze the data compilation spreadsheets and had no understanding how those spreadsheets were even prepared. Walgreens attempts to resuscitate Dr. Hughes' opinions, claiming that Dr. Hughes' opinions are endorsed by the work done by another proffered expert, Jed Smith. But

---

[1] Declaration of Michael S. Leib in Support of Defendant Walgreen Co.'s Opposition to Plaintiffs' Motion for Class Certification, Dkt. No. 588 (Mar. 17, 2023), Ex. 24 (the "Report" or "Hughes Rpt.").

again, Dr. Hughes testified that he did not speak with Mr. Smith, read his expert report, or attribute any of his own opinions to Mr. Smith's analysis.

Walgreens claims that Dr. Hughes did not need to review any data to form his opinions, because he merely attacks Dr. Hilton's "methodologies." However, an unjaundiced review of his Report demonstrates that Dr. Hughes challenges Dr. Hilton's data and empirical analysis. His criticisms are not limited to her methodologies and his conclusions are not supported by the transactional prescription drug purchase, payment, and adjudication data he did not review. Lastly, Dr. Hughes' often-cited "experience" in other cases does not justify his failure to review the transactional data in this case and cannot serve as a substitute for the rigorous, scientific analysis he was required to perform in this case.

## ARGUMENT

### I. DR. HUGHES DID NOT PERFORM AN ANALYSIS OF THE AVAILABLE DATA AND DISCOVERY IN THIS CASE

Dr. Hughes candidly admitted that he did not perform any analysis of the data or discovery produced in this case by Walgreens, Plaintiffs, or third-party PBMs. Yet his Report concludes that Plaintiffs' expert, Dr. Hilton, who did perform that analysis, did not analyze the data and discovery correctly. Dr. Hughes based his conclusions on his "experience" as a defense expert in *other* cases. *See* Supplemental Declaration of Joseph P. Guglielmo in Support of Plaintiffs' Motion for Class Certification ("Supp. Guglielmo Decl.") (ECF No. 609), Ex. 69 ("Hughes Tr.") at 84:10-16, 85:11-14, 139:8-11, 171:25-172:6, 185:1-8, 188:25-189:2, 190:24-191:15. But an expert who relies on his past "experience" and *ipse dixit*, instead of opining on the available evidence in the case at

hand, has not offered admissible expert testimony. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005)[2]; *see also* Pls.' Opn. Br. at 12 (citing other decisions).

Walgreens offers multiple, and often contradictory, arguments to avoid exclusion of Dr. Hughes' Report and testimony. It argues that Dr. Hughes did review transactional data in this case, despite his contrary testimony, evidenced (it says) by the listing of some data spreadsheets in the "materials considered" exhibit to his Report. But Dr. Hughes testified that he did not analyze or even review those spreadsheets. Walgreens next argues that Dr. Hughes did not need to review any data or discovery in this case, the data queries used by Dr. Hilton, or the results of those data queries, to criticize Dr. Hilton's opinions because he only disagrees with her "methodologies" and not Dr. Hilton's empirical conclusions. His Report and testimony roundly refute that contention also. Last, Walgreens attempts to bootstrap work done by another proffered expert (Jed Smith) to justify Dr. Hughes' opinions, but Dr. Hughes admitted he never spoke with Mr. Smith or read his report.

### A. Dr. Hughes Did Not Analyze the Available Data

To be sure, Dr. Hughes' Report provides lip service to his review of "documentary evidence and analysis of the data produced in this case, [. . .]"). Hughes Rpt. ¶9.[3] Yet, Dr. Hughes admitted during his testimony that he did ***not*** perform any queries or analyze the data produced in this case concerning prescription drug purchases, payments, or adjudications. *See, e.g.*, Hughes Tr. at 85:9-11 ("Q. But, again, you offer no evidence, for example, that ESI doesn't maintain [a] coinsurance field, right? A. Well, you can't prove a negative, but I conducted no analysis.");

---

[2] Unless otherwise indicated, all emphasis is added and internal citations and quotations are omitted.

[3] Walgreens accuses Plaintiffs of attacking Dr. Hughes "for not doing work that he did not claim to have done" (Def.'s Corrected Opposition to Plaintiff's Motion to Exclude the Expert Report and Testimony of James W. Hughes Pursuant to F.R.E. 702, Dkt. No. 641 (Sept. 22, 2023) ("Opp.") at 5), but his Report claims to have analyzed the data produced in this case.

*accord Id*. at 18:10-14, 65:18-24, 72:10-12, 188:25-189:10. Walgreens agrees that Dr. Hughes did "not run[] queries across large amounts of claims data," Opp. at 5, arguing it was not necessary to form his opinions. *Id*.

Walgreens cites to Paragraphs 113-118 of the Report to rebut Plaintiffs' arguments about the paucity of Dr. Hughes' analysis of the available transactional data. But, as discussed in Section II.B *infra*, Dr. Hughes testified that he did ***not*** query, review, or analyze the data on co-payments and co-insurance discussed in that section of this Report. Hughes Tr. at 17:16-18:5. Rather, he directed employees of Analysis Group to locate ten (10) cherry-picked examples for Tables 6 & 7 (among millions of transactions) that supported opinions Dr. Hughes settled upon ***before*** Analysis Group performed even that limited review of the data. *See* Hughes Tr. at 19:13-17 ("Q. Okay. But with respect to any figures that are based on data, they're not based on actual queries of the data itself. A. No. It's simply extracting certain observations."); *Id.* at 160:6 ("A. Yes, I didn't look at the entire data set.").

Walgreens attempts to contradict Dr. Hughes' testimony by pointing to the data spreadsheets listed in Exhibit C ("materials considered") of Dr. Hughes' Report. *See* Opp. at 3. The problem with that argument is that Dr. Hughes' testified that he did ***not*** analyze those data spreadsheets. For example, the Report at Exhibit C lists an Excel file named: 2019.12.03_Named Plaintiffs Data.xlsx. But while listed in Exhibit C, Dr. Hughes testified that he did not review or analyze that spreadsheet:

> Q. In looking at the data entitled "2019.12.03_Named Plaintiffs' Data," did you
> also review any of the other data sets to compare those data sets to this?
> MR. LEIB: Objection.
> A. Yeah. I'm not quite sure exactly what you mean something else to compare
> these two.

4

> *Q. (BY MR. GUGLIELMO) Sure. Did you perform any analysis of this particular Excel data set to the other data sets that were produced in this matter?*
>
> *A. No, I don't believe so.* That wouldn't have been necessary to reach the conclusions that I do in my report.
>
> Q. And you didn't perform any queries of the data, the 2019 data, that is referenced there in Excel, correct?
>
> MR. LEIB: Objection, asked and answered.
>
> A. Yes, that's correct.

Hughes Tr. at 65:11-66:4 (emphasis added). The same is true for the other data compilations contained in the Excel spreadsheets listed in Exhibit C to the Report as:

- Walgreens_Russo_2015_Data_Sample_20230126.xlsx;
- Walgreens_Russo_PSC_Data_Sample_20230126.xlsx; and
- Walgreens_Union_Fund_Data_Sample_20230126.xlsx.

*Id*. at 66:5-72:12. *See Cunningham v. Masterwear, Inc.*, No. 1:04-cv-1616, 2007 U.S. Dist. LEXIS 29156, at *26 (S.D. Ind. Apr. 19, 2007) (excluding expert report where, "[o]ther than a reference to the materials reviewed, [the expert] provides no basis for this opinion in his report.").

Including a list of spreadsheets among the "materials reviewed" that were not actually reviewed is not the type of rigorous analysis required for admissible expert evidence.

### B. Dr. Hughes Cannot Rely on the Work Done by Another Expert

In an attempt to address Dr. Hughes' lack of analysis of the data and discovery produced in this case, Walgreens argues to substitute the analysis of a different proposed expert. Walgreens admits that while Dr. Hughes attributed his opinions to "his experience" from other cases, the work of another proposed expert (Jed Smith) on the data produced in this case supports Dr. Hughes' opinions. *See* Opp. at 4. There are two fatal problems with Walgreens' *ex post* argument. **First**, Dr. Hughes' Report does not even once attribute his opinions to derive from, or be supported by,

5

the work of Mr. Smith. Contrary to Walgreen's argument, Dr. Hughes did not speak with Mr. Smith or review his workcop in this case. *See* Hughes Tr. at 61:16-23 ("Q. And you're aware of Dr. Smith? A. Yes. Q. You know who he is? A. No, not specifically. Q. Do you know the opinions he's offering in this case? A. No. I was not asked to read his report, and I did not.").

***Second***, even had Dr. Hughes relied on Mr. Smith's work in this case, "[a]n expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017). Because Dr. Hughes' "own expert opinions were not sufficiently reliable to pass Rule 702 strictures[,]" Walgreens cannot try to substitute the purported analysis and opinions of Mr. Smith to salvage Dr. Hughes' lack of analysis. *Id.*; *see also United States v. Truitt*, 938 F.3d 885, 891 n.1 (7th Cir. 2019) (an expert may not "serve as a mere mouthpiece [for another expert] in order to circumvent the Rules of Evidence."); *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (same).

Walgreens invents a basis for Dr. Hughes' opinions he himself did not proffer. Whatever merit Mr. Smith's work in this case may or may not possess standing on its own, it cannot support Dr. Hughes' opinions, nor his admitted lack of analysis of the transactional data produced in this case.

    **C.**     **Dr. Hughes Impermissibly Opines on Dr. Hilton's Empirical Analysis and Results Without Having Reviewed the Available Data and Discovery**

Walgreens falls back on an argument that Dr. Hughes did not need to review the available data concerning purchases, payments, or adjudications. It reasons that because Dr. Hughes disputes only Dr. Hilton's "methodologies," but not her queries of the data or empirical analysis, he need not have reviewed the data he claims Dr. Hilton analyzed incorrectly. Opp. at 7-8. But contrary to Walgreens' argument, Dr. Hughes' Report ***does opine*** that Dr. Hilton's data and

empirical analysis is flawed and should not be accepted by the Court. In other words, contrary to Walgreens' effort to recast Dr. Hughes' Report, he does not merely dispute Dr. Hilton's methodologies. He should not be permitted to offer those expert opinions without having reviewed the available data and discovery.

As the cornerstone of his Report, Dr. Hughes cites his "review of the documentary evidence and analysis of the data produced in this case," along with his experience in other cases, to conclude that Dr. Hilton's "formulaic calculation of alleged overpayment" by class members is mistaken. Hughes Rpt. ¶9. That opinion overstates the case data reviewed by Dr. Hughes (*see* Sec. II.A. *supra*) and contradicts Walgreens' argument that Dr. Hughes did not challenge Dr. Hilton's empirical analysis of the available data. The Report contains many similar attacks of Dr. Hilton's data and empirical analysis not limited to her "methodology." *See* Hughes Rpt. ¶¶13, 16, 17, 18, 85, 86, 87, 107, 113, 114, 115, 116, 117, 123, 138, 139, 140, 145, 153, 179, 180, 181.

Without having reviewed the data produced in this case concerning Class members' generic drug purchases, payments, and adjudications, and certainly not the data analyzed by Dr. Hilton, Dr. Hughes simply failed to perform the requisite analysis to provide expert testimony to dispute Dr. Hilton's empirical analysis and conclusions. Instead, he primarily relied on his experiences in other cases using different data sets, or hypotheticals he crafts throughout his Report to substitute for his lack of analysis of the actual, available data. *See* Hughes Rpt. ¶¶93, 100, 109, 129, 131, 134; *Id.*, Figures 10, 11, 12; Hughes Tr. at 139:2-20 ("A. [. . .] I'm relying on my experience with the PBM data and pharmacy data in the past."); *see also Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) ("An expert's opinion must be reasoned and founded on data.").

7

Walgreens' attempt to recast Dr. Hughes' Report as limited to challenging only Dr. Hilton's methodologies, and not her empirical analyses and conclusions, is belied by his Report. Because Dr. Hughes did not analyze the available data in this case, his opinions challenging Dr. Hilton's analyses should be excluded.

## II. HUGHES HAD OTHERS CHERRY-PICK A FEW EXAMPLES TO SUPPORT HIS OPINIONS

Dr. Hughes did not review or analyze the transaction data produced by Walgreens in this action. Yet, Dr. Hughes' Report contains two tables, Figures 6 & 7, that contain a handful of examples that he concluded show that neither Plaintiffs nor Walgreens can discern ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Dr. Hughes testified, however, that he never saw the data universe from which those few examples were taken, has no idea how the examples he used in his Report were located, and merely relied on others to provide him with those examples. *See* Hughes Tr. at 158:10-161:6, 166:25-167:22. The most he knows is that he instructed others to find him a handful of examples from the extensive adjudication data universe that support his opinions. *See id.* at 159:11-16 (A. No, [the Analysis Group] gave me what I asked for which was examples of issues with coinsurance and copayment fields."). Dr. Hughes did not form his opinions based on the data. Instead, he formulated his opinions first, and only then asked others to locate specific cherry-picked examples to support his opinions. Dr. Hughes' process was backwards, unscientific, and unreliable.

To be precise, Figures 6 & 7 each contain only 10 examples, drawn from the millions of generic drug purchases at issue and which were analyzed by Dr. Hilton for her Report. Dr. Hughes admitted the obvious, namely that Figures 6 & 7 do not contain a statistically relevant sample of

8

the adjudication data upon which he is opining. Hughes Tr. at 157:1-5, 158:10-159:5.[4] The fact that even those few examples were chosen using a results-driven process renders Dr. Hughes' opinions in Section IV.B.1.b. of his Report excludable.

Walgreens offers a few responses to defend Dr. Hughes' cherry-picking of data for his Report. Walgreens argues that Figures 6 & 7 were *not intended* to "extrapolate" broader conclusions about the adjudication data other than to find 10 examples (from millions) where Walgreens' data had ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Figure 6) or where that data may have ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Figure 7). *See* Opp. at 9 (citing Hughes Tr. at 160:7-14).[5] Even if true, it does little to contradict the methods used, and conclusions reached, by Dr. Hilton, who explained in her Report, Rebuttal Report, and testimony how class members' co-payments versus co-insurance can be discerned from the data. *See* Supp. Guglielmo Decl., Ex. 80 at 271:5-15, 277:3-12, 284:17-24.

Walgreens does not dispute that the courts disfavor, and often exclude, expert opinions where the supporting "evidence" was cherry-picked rather than based on reliable, scientific analysis. Unsurprisingly, Walgreens concludes while those cases warrant exclusion, Dr. Hughes' practices do not. Walgreens attempts to distinguish *Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) as a case where the "expert rejected testimony and data that did not fit his conclusions without explanation." Opp. at 11. Dr. Hughes uses the same approach by choosing 10 examples that fit his pre-determined conclusions, while ignoring the millions of transactions

---

[4] Walgreens' argument that unnamed third parties at the Analysis Group told Dr. Hughes that other examples could have been chosen is obvious hearsay that should not be considered. *See* Opp. at 9.

[5] That position is a considerable concession that contradicts Dr. Hughes' position that his Report, as reflected in Figures 6 & 7, should be extrapolated to question the reliability of Walgreens' entire data set as it pertains to determining whether a class member paid a co-pay or co-insurance. *See* Hughes Rpt. ¶117; Hughes Tr. at 157:21-158:6.

9

that did not. Even less helpful to Walgreens is its characterization of *Kljajic v. Whirlpool Corp.*, No. 15-cv-5980, 2017 U.S. Dist. LEXIS 70784 (N.D. Ill. May 9, 2017) as criticizing an "expert [who] purported to draw conclusions about the functioning of 2,000,000 ovens based on tests of only two."). That is precisely what Dr. Hughes does in Figures 6 & 7 of his Report.

Dr. Hughes is quick to rely on his "experience" in other cases throughout his Report, but only where he perceives it to help Walgreens' class defenses. As discussed in Plaintiffs' opening brief, omitted from Dr. Hughes' Report were the opinions he proffered in the *In re Epipen Mktg., Sales Practices & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ (D. Kan.), about the perceived impossibility of determining whether insured consumers paid a co-payment or co-insurance. Pls.' Opn. Br. at 10-11. In that case, the PBMs disagreed with Dr. Hughes' opinions and the Court certified the class. *Id*. Walgreens asks this Court to ignore that decision and Dr. Hughes' opinions in that case.

Walgreens maintains that Dr. Hughes identified "problems" with the adjudication data because Dr. Hughes' colleagues found 10 examples (among millions) that support his opinions. But even Walgreens concedes those few examples cannot be extrapolated to the entire data set. Opp. at 13. Dr. Hughes' use of cherry-picked examples should be excluded.

## CONCLUSION

For the foregoing reasons and those contained in Plaintiffs' opening motion, Plaintiffs respectfully request that the Court enter an order excluding the opinions offered in Paragraphs 7, 9, 10-21, 45-46, 52, 55-65, 75, 76, 78, 79, 81, 86-89, 92-98, 100-118, 124-137, 141-144, 147-153, 157-167, 175, 176 of Dr. Hughes' Report, and any related testimony by Dr. Hughes.

Dated: November 15, 2023　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

　　　　　　　　　　　　　　　　　　　　 */s/ Joseph P. Guglielmo*

10

Joseph P. Guglielmo (IL Bar #2759819)
Carey Alexander (IL Bar #5188461)
Amanda M. Rolon (*admitted pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-4478
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com
arolon@scott-scott.com

Erin Green Comite (IL Bar #420630)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 531-2632
Facsimile: (860) 537-4432
ecomite@scott-scott.com

David W. Mitchell (IL Bar #199706)
Arthur L. Shingler III (IL Bar #181719)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
davidm@rgrdlaw.com
ashingler@rgrdlaw.com

Mark J. Dearman (IL Bar #0982407)
Stuart A. Davidson (IL Bar #084824)
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com

*Interim Co-Lead Counsel*

        Katrina Carroll (IL Bar #6291405)
        **CARLSON LYNCH LLP**
        111 W. Washington Street, Suite 1240
        Chicago, IL 60602
        Telephone: (312) 750-1265
        kcarroll@carlsonlynch.com

        *Local Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically through the Court's Electronic Case Filing System, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

                                           */s/ Joseph P. Guglielmo*
                                           Joseph P. Guglielmo