## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | Civil No. 1:17-cv-02246 <br><br> Judge Edmond E. Chang <br><br> Magistrate Judge Sheila Finnegan |
| Plaintiffs, | |
| v. | |
| WALGREEN CO., | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT WALGREEN CO.'S MOTION TO STRIKE OR EXCLUDE LYNETTE HILTON'S REBUTTAL REPORT AND ANY TESTIMONY REGARDING THE SAME PURSUANT TO FEDERAL RULES OF EVIDENCE 702 AND 403 AND FEDERAL RULE OF CIVIL PROCEDURE 26**

Plaintiffs Cynthia Russo, Lisa Bullard, Ricardo Gonzales, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, International Union of Operating Engineers Local 295-295 Welfare Fund ("IUOE 295"), and Steamfitters Fund Local 439 (collectively, "Plaintiffs")[1] respectfully submit this Opposition to Defendant Walgreen Co.'s ("Walgreens") Motion to Strike or Exclude Lynette Hilton's Rebuttal Report and any Testimony Regarding the Same Pursuant to Federal Rules of Evidence 702 and 403 and Federal Rule of Civil Procedure 26 ("Motion").

Walgreens asks the Court to believe that within the retail pharmaceutical industry, where claims are adjudicated in seconds by a real-time claims adjudication system, that it is impossible to determine basic facts regarding transactions, such as who paid for the drug and how the price of the drug was determined. Walgreens twists itself into knots trying to argue either that such data does not exist or cannot be trusted. As explained in her Rebuttal Report, Dr. Hilton proposes a reliable methodology that considers reliable data generated and relied on by Walgreens and pharmacy benefit managers ("PBM") to adjudicate prescription drug claims. Dr. Hilton has tested her methodology by reference to the data she has available and determined that it can reliably identify class members and class member damages on a classwide, formulaic basis. For the reasons set forth below, the Court should deny Walgreens' Motion.

---

[1] "Fund Plaintiffs' refers to the International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, IUOE 295, and Steamfitters Fund Local 439. Emphasis is added and citations are omitted throughout unless otherwise noted.

## ARGUMENT

**I.     DR. HILTON REMAINS QUALIFIED TO OFFER EXPERT ECONOMIC ANALYSIS REGARDING METHODOLOGIES TO CALCULATE CLASSWIDE DAMAGES AND HER METHODOLOGY IS RELIABLE**

Walgreens incorporates by reference its challenges to Dr. Hilton's extensive qualifications and to the reliability of her methodology. Motion at 2. Plaintiffs incorporate by reference their Opposition to Motion to Exclude [Dr.] Hilton's Expert Report and Testimony Under Federal Rule of Evidence 702 (ECF No. 613) ("Plaintiffs' Opposition").

**II.     THE EVIDENCE ADDUCED TO DATE DEMONSTRATES THAT THE RELEVANT PBMS CAN IDENTIFY TPPS**

Walgreens argues that the Relevant PBMs cannot identify transactions associated with a third-party payer ("TPP") that paid for a given transaction. Motion at 2-4. Walgreens, however, asks the Court to ignore that the Relevant PBMs that adjudicated claims for the Fund Plaintiffs[2] all produced transactions that *those PBMs* identified as associated with the Fund Plaintiffs. The Relevant PBMs thus can and have produced data associated with the Fund Plaintiffs, and those productions supply facts and data that support Dr. Hilton's opinion that the Relevant PBMs can identify class members.

As an example for its claim that the transactional claims data cannot necessarily identify an ultimate payer, Walgreens points to "███████████████████████████ ███████████████████████" and claims that it is Dr. Hilton's *ipse dixit* alone that determined that those "███████████████████████████." Motion at 3. However, this ignores that *Express Scripts itself* – the entity that produced the transactional claims data – determined and represented that the data reflected "prescription drug purchases by beneficiaries of IUOE made at

---

[2]     A&A Services, LLC d/b/a SAV-RX Prescription Services; Caremark, LLC; Castia Rx (f/k/a Leehar Distributors Missouri, LLC); Express Scripts, Inc.; and MedTrak Services, LLC.

Walgreens Pharmacies before April 2009." Supplemental Declaration of Joseph P. Guglielmo in Support of Plaintiffs' Motion for Class Certification ("Supp. Guglielmo Decl."), Ex. 85. The facts and data thus provide ample support for Dr. Hilton's claim that the Relevant PBMs can identify transactions associated with a given TPP.

Walgreens' argument that it "would not be possible" for the Relevant PBMs to make similar determinations on a classwide basis (Motion at 3), contradicts Walgreens' own testimony. In the Declaration of Christopher Dymon, executed on Walgreens' behalf,[3] Mr. Dymon stated:



Declaration of Joseph P. Guglielmo in Support of Plaintiffs' Motion for Class Certification (ECF No. 556) ("Guglielmo Decl."), Ex. 58 (filed under seal at ECF No. 553, Ex. 46) ("Dymon Decl."), ¶6(e)(i). Mr. Dymon further acknowledged that "

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████ *Id*.

Walgreens disputes Dr. Hilton's claim that Mr. Smith's identification of unique health plans in the 2015 sample was inflated. Motion at 4. Walgreens does not dispute that Mr. Smith's methodology to identify "unique" plans, including by reference to the ██████████ field,

---

[3]     Mr. Dymon states in his Declaration: "██████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████.'' Dymon Decl., ¶2.

3

identifies ███████████████████████████████████████. *Id.* Instead, Walgreens speculates that if ██████████████████████████████████████, then Dr. Hilton would have mentioned that fact. *Id.* This argument is disingenuous. Walgreens knows full well that there are myriad ████████████████████████████████████████████ ████████████████████ will result in an inflated identification of plans. *See also, e.g.,*

Dymon Decl., ¶13(c). Dr. Hilton's testimony is thus relevant and properly criticizes Mr. Smith's identification of purportedly "unique" plans.

## III. TPPS ARE ABLE TO IDENTIFY THEIR PARENTS AND SUBSIDIARIES

Mr. Smith opined that there is no specific data field showing whether a TPP was a parent or subsidiary of a PBM. Declaration of Michael S. Leib in Support of Defendant Walgreen Co.'s Opposition to Plaintiffs' Motion for Class Certification (ECF No. 588), Ex. 1 (filed under seal as ECF No. 586, Ex. 1), ¶22. To rebut the inference that the class exclusions could not be implemented, Dr. Hilton opined that it would be "straightforward" to remove TPPs with a parent or subsidiary relationship with a PBM and that the Relevant PBMs could provide such information. Supp. Guglielmo Decl., Ex. 61 ("Hilton Rebuttal Report"), ¶12.

Walgreens now concedes that Relevant PBMs can identify their parents and subsidiaries. Motion at 5 ("That Relevant PBMs have information about their own parent and subsidiary relationships is not in dispute."). Walgreens instead modifies its argument to claim that the Relevant PBMs do not have information about whether TPPs had a parent or subsidiary relationship with *any other* PBM. *Id.* However, just as Walgreens and the Relevant PBMs can identify their parents and subsidiaries, as Mr. Smith and Walgreens concede they can, so too can TPPs. *See* Hilton Rebuttal Report, ¶12 n.16.

**IV.  DR. HILTON'S METHODOLOGY TO IDENTIFY ENTITIES EXCLUDED FROM THE CLASS DEFINITION RELIES UPON RELIABLE DATA FROM WALGREENS AND THE RELEVANT PBMS**

Walgreens goes to great lengths to mischaracterize Dr. Hilton's methodology for identifying which entities are encompassed by and excluded from the proposed class definition. Dr. Hilton's methodology is straightforward.  In the first instance, to identify transactions encompassed within the class definition, Dr. Hilton relies on Walgreens' data, which identifies transactions that ***Walgreens has determined*** are associated with a ███████████████████ ███████  *See* Hilton Rebuttal Report, ¶16 n.24 ("I restrict transactions to those where ██████ ███████████████████████████████████████████ ███████████████████████████████████"); *see also* Declaration of Michael S. Leib in Support of Walgreens' Motion to Strike or Exclude Lynette Hilton's Rebuttal Report and Any Testimony Regarding the Same Pursuant to Federal Rules of Evidence 702 and 403 and Federal Rule of Civil Procedure 26 (ECF No. 636-1), Ex. D ("Hilton Supp. Dep.") at 27:24-:28:2 & 29:2-18 ("I rely on the data, on what Walgreens has characterized these payers as, either commercial, union, Medicare Part D, state-funded, et cetera.").[4]

By leveraging the determinations that Walgreens has made, Dr. Hilton is able to exclude transactions that ***Walgreens has determined*** are associated with ███████████████ ██████████████████████████████████████████, among others. Dymon Decl., ¶18(h).

---

[4]  In addition to relying on Walgreens' data, Dr. Hilton's methodology also considers data provided by the Relevant PBMs and TPPs.  Hilton Rebuttal Report, ¶18 ("It is my understanding that this information will be requested from all of the Relevant PBMs and can be used to confirm the identity of Class members.");  Hilton Supp. Dep. at 36:15-24 ("I believe that these entities themselves would be able to self-identify and they know whether they're a – a state-funded entity, a federally funded entity or a political subdivision, much the way that a PBM would know  . . . if somebody was affiliated with a PBM . . . .").

Walgreens challenges Dr. Hilton's reliance on Walgreens' data by arguing that Walgreens' own data is unreliable. Motion at 7. For example, Walgreens claims that Mr. Smith has identified several entities in Walgreens' data associated with ████████████████████████████ ████████████████████████████. *Id.* Walgreens, however, testified that the data its expert now denigrates was gathered and curated by Walgreens' employees for the express purpose of using the data in the ordinary course of Walgreens' business.

The ████████████████████████████ fields that Dr. Hilton relies upon are part of Walgreens' Payer Map. Plaintiffs asked Walgreens to describe the process and sources of information Walgreens used to create ████████████, as well as how Walgreens uses ████████████ ████████████████. In response, Walgreens designated certain portions of the testimony of Megan Butterfield as its corporate testimony. Dymon Decl., ¶14. Ms. Butterfield testified that Walgreens specifically ████████████████████████████████████████

████████████████████████████████████████

Declaration of Carey Alexander in Support of Plaintiffs' Opposition to Defendant Walgreen Co's Motion to Strike or Exclude, filed concurrently herewith ("Alexander Decl."), Ex. A at 199:17-200:6. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████. *Id.* Ms. Butterfield testified that "████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████" *Id.* at 204:11-205:10. ████████████████████████████████████████

████████████████████████████████████. *Id.* at 203:5-

6

204:5.  In other words, ███████████████████████████████████████████████████

███████████.  *Id.* at 200:10-202:1.  Ms. Butterfield testified that ██████████████

███████████████████████████████████████.  *Id.* at 204:7-10.

Walgreens' testimony establishes that Walgreens' employees considered Walgreens' data

to be reliable.  Mr. Dymon confirmed that Walgreens' data is reliable "***to the best of Walgreens'***

***knowledge***."  For example, Walgreens testified that "████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████."  Dymon Decl., ¶18(h).  Walgreens' data

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████."  *Id.*

Walgreens questions the reliability of Dr. Hilton's methodology because it claims that the

███████████████████████ field is unreliable.  Motion at 6-7.  This, however, is Walgreens' own

*ipse dixit*.  Plaintiffs insisted that Walgreens provide in its testimony all the reasons Walgreens had

for doubting the reliability of the ████████████████████████████████.  In response,

Walgreens proffered a single reason: "████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████."

Dymon Decl., ¶18(h) n.11.  No other reasons were provided.

In correspondence, Walgreens' counsel represented that the ██████████████████████

███ was a field that "█████████████████████████████████."  Alexander Decl., Ex. B at

4. Walgreens' counsel went on to represent: "████████████████████████████████

████████████████████████████████████████████████████████████████." *Id.*

Dr. Hilton states that as part of her methodology that she would also consider data produced

by the Relevant PBMs to determine whether a given plan was a commercial or government entity.

Hilton Rebuttal Report, ¶18.  Walgreens cannot credibly challenge the use or reliability of such

data, which, according to Walgreens's Senior Director, Third Party Operations, would identify

"████████████" whether an entity "actually is a commercial or government entity."  Dymon Decl.,

¶18(h) n.11.

The best that can be said with respect to the ████████████████████████████

████████████████████████████████████████████████████████████████

██████████████.  As Mr. Dymon states, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████, it is reliable

enough for Dr. Hilton to use.

Finally, Walgreens speculates that complete historical data may not be available, and that,

on that basis, the Court should exclude Dr. Hilton's testimony.  Motion at 8-9.  Whether complete

data exists is not a basis to exclude Dr. Hilton's opinions.  The proper inquiry is whether Dr. Hilton

considered sufficient data in preparing her methodology.  Sufficient data refers to "the 'kinds of

facts or data on which experts in the field would reasonably rely.'"  *In re NorthShore Univ.*

*HealthSystem Antitrust Litig.*, No. 07 CV 04446, 2023 WL 2138971, at *5 (N.D. Ill. Feb. 20, 2023)

(Chang, J.). Dr. Hilton clearly considered historical data from both Walgreens and the Relevant

PBMs. That data provides a sufficient basis for Dr. Hilton to form her opinions.

## V. DR. HILTON'S METHODOLOGY IS ABLE TO RELIABLY DETERMINE WHETHER A CONSUMER PAID A COPAYMENT OR COINSURANCE AND WHETHER THE USUAL AND CUSTOMARY PRICE WAS THE BASIS OF ADJUDICATION

Walgreens distorts Dr. Hilton's methodology for identifying whether a consumer payment

was a copayment or coinsurance. Motion at 10-11. Dr. Hilton testified that in the first instance

her methodology is for "the [Relevant] PBMs … to give that information." Alexander Decl., Ex.

80 at 277:3-12. In Dr. Hilton's Rebuttal Report, she further testified that she believes this data

exists because she has "reviewed PBM data produced in other cases that provide information

regarding whether a copay or coinsurance was paid and the amount of the copay or coinsurance

paid." Hilton Rebuttal Report, ¶23.

Dr. Hilton points to the declarations submitted by PBMs in *In Re: Niaspan Antitrust*

*Litigation* to "further confirm" that such data are available. Walgreens claims that Dr. Hilton's

reading of the declarations submitted in *Niaspan* is "incorrect." Motion at 10. Referencing

Caremark's declaration, for example, Mr. Smith claims that Dr. Hilton "provided no information

on what information [the Plan co-pay structure] field may contain . . . ." *Id.* Walgreens argues

that this renders Dr. Hilton's testimony "speculative and irrelevant." *Id.* However, Caremark's

*Niaspan* declaration plainly states the opposite:

> The data maintained for our Clients includes, among other things, the total amount paid by the Client's individual member (i.e., the applicable co-pay, and other aspects that are dependent on the Client's plan design) as well as the total amount paid by the Client for each prescription it adjudicates. Generally, Client plan sponsors have their plan/group structure broken out by plan design, allowing the data to be sorted to exclude, for example, ***members who have a flat co-pay structure***.

Supp. Guglielmo Decl., Ex. 79, ¶9.

9

Thus, Dr. Hilton has an ample basis for her belief that the Relevant PBMs can produce information regarding whether a consumer payment was a copayment or coinsurance. Walgreens suggests that Plaintiffs should already have this data in-hand and speculates that perhaps this information is not available for all time periods. Motion at 10-11. Plaintiffs' subpoenas to the Relevant PBMs preserved their ability to pursue post-certification classwide discovery which would include this and other relevant fields. The fact that Dr. Hilton may not presently possess such data does not justify excluding Dr. Hilton's testimony. *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 386, n.25 (D.R.I. 2019) (denying *Daubert* motion and noting "it would be improper to deny class certification on this basis" when parties with "subpoenas in hand, are capable of securing, compiling, and analyzing the requisite data to identify class members and apply the class exclusions"); *Childress v. JPMorgan Chase & Co.*, No. 5:16-CV-298-BO, 2019 WL 2865848, at *3-*4 (E.D.N.C. July 2, 2019) ("Chase objects to Olsen's opinions because he does not identify specific data on which he will rely, but rather relies somewhat broadly on 'data available to Chase.' . . . Olsen has conducted similar analyses in other cases and, when permitted access to the relevant data, the Court persuaded that he can do so here.").

As an alternative to receiving information from the Relevant PBMs, Dr. Hilton developed a methodology that can determine whether a given TPP's beneficiaries' payments were associated with coinsurance by reference to the transactional data itself. Hilton Rebuttal Report, ¶24. Walgreens claims that Dr. Hilton somehow changed her methodology (Motion at 11), but Walgreens' claims stem from its own misunderstanding of Dr. Hilton's testimony. Dr. Hilton has been clear that her analysis was based on the data that she currently has from the PBMs. Supp. Guglielmo Decl., Ex. 80 at 277:1-12 ("So I only have transactions for Steamfitters at this point. . . . I used the methodology that I just described for the data that I have."); 271:23-24 ("[T]his is

10

the way that I did it with what – the data that I have currently.").  Because the data produced by

each Relevant PBM was associated with a single Fund Plaintiff, Dr. Hilton's analysis of the data

in-hand was necessarily limited to a given plan.

Similarly, with regard to whether the usual and customary price was used as a basis for

adjudicating claims, Walgreens again asks the Court to hold that it's impossible to know how a

PBM determined how much to charge a consumer or TPP for a given prescription drug.  Motion

at 12-13.  This again defies common sense and experience and provides no basis to exclude Dr.

Hilton's opinions.[5]

## VI. DR. HILTON'S TESTIMONY THAT WALGREENS MADE PSC PRICES AVAILABLE TO MEMBERS OF THE GENERAL PUBLIC WITHOUT CHARGING FEES AND DID NOT CONSIDER FEES WHEN DETERMINING PSC PRICES IS ACCURATE AND RELEVANT

Dr. Hilton previously set forth in her Rebuttal Report why PSC membership fees should

not be considered when determining PSC prices.[6]

Walgreens takes issue with Dr. Hilton's reference to Mr. Smith's analysis, which

determined that Walgreens sold PSC drugs at PSC prices to at least 24,069 Unique Account

Holders – none of whom paid a membership fee – and that Walgreens sold PSC drugs at PSC

prices to ███████████████████████████████████████████ without collecting

a membership fee.  Motion at 13-15.  Walgreens claims that Dr. Hilton "provides no reason for

referring to this, and thus, it is not proper rebuttal."  *Id.* at 13.  Dr. Hilton explains, however, that

her testimony rebuts the claim that "'any damages calculation must factor in PSC membership fees

in determining PSC prices.'"  Hilton Rebuttal Report, ¶54.  Further, the fact that Walgreens sold

---

[5] In further response, Plaintiffs incorporate Section II.C of Plaintiffs' Opposition by reference.

[6] There is no dispute that if the Court determines that membership fees need to be accounted for in determining PSC prices, it can be done in a formulaic way on a classwide basis.

made PSC prices available to members of the general public without charging a membership fee. Walgreens does not dispute that these facts, generated by its own expert, are accurate and Walgreens' desire to provide additional context provides no basis for excluding Dr. Hilton's testimony.

Walgreens next claims that it is "demonstrably false" that PSC prices were provided to the ██████████████████████████████████████████████████████. Motion at 14. The record, however, is clear. ████████████████████████████████████████████████████ ████████████████████████████████████████████████." Alexander Decl., Ex. C at 202:20-203:3. In determining the amount owed, Walgreens testified that it ██████████████ ███████████████████████████████████████████████████." *Id.* at 203:4-12. Walgreens does not and cannot dispute that in determining "████████████████████████ ████████████████████████████████████████. Similarly, ███████████████████ ████████████████████████████████████████████████████████████████ ███████████ Guglielmo Decl., Ex. 8 (filed under seal at ECF No. 553, Ex. 6) at 263:16-10. In determining "████████████████████████████████████████████████████████████ ████████████████████████ *Id.* at 261:18-263:20. Regardless, Rule 702 does not "'authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'" *Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316, at *12 (N.D. Ill. June 5, 2017) (collecting cases); *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 506 (7th Cir. 2003).

Finally, Dr. Hilton accurately states that if Mr. Smith's allocation of membership prices is accepted, it would "result in Class members paying more than the annual PSC membership fee." Hilton Rebuttal Report, ¶58. Walgreens claims that that the allocated fee "is not charged" to class

members (Motion at 15), but it is unclear how this is so and Walgreens does nothing to explain why the examples Dr. Hilton provides are inaccurate.

## VII. DR. HILTON PROVIDES A METHODOLOGY FOR DETERMINING UNJUST ENRICHMENT DAMAGES AND ANY ALLOCATION WOULD BE PREMATURE

In her Rebuttal Report, Dr. Hilton testifies that "overpayments and unjust enrichment are alternative methods of calculating damages (not additive)." Hilton Rebuttal Report, ¶63. Dr. Hilton further explains that her methodology identifies when "Walgreens was unjustly enriched by both a consumer and fund in a single transaction, not that they would be each separately be entitled to the entire amount that Walgreens was unjustly enriched." *Id.*, ¶64.

Walgreens claims that in order for a damages methodology to be valid, it must also allocate damages. Motion at 15. This, however, is not the law, and arguments regarding the allocation of damages, as distinct from a methodology to calculate damages, are premature. *Shanehchian v. Macy's, Inc.*, No. 1:07-CV-00828, 2011 WL 883659, at *7 n.4 (S.D. Ohio Mar. 10, 2011) ("Any damages resulting from this suit inure to the benefit of the Plans and would then be allocated among the Plans' participants using an appropriate formula. In any event, the Court is fully capable of structuring the damages allocation process in such a way as to account for individual differences among the class members."); *Cnty. of Monmouth, New Jersey v. Fla. Cancer Specialists, P.L.*, No. 2:18-CV-201-FTM-23MRM, 2019 WL 3242491, at *2 (M.D. Fla. June 5, 2019) ("Courts commonly resolve a motion to approve a plan of allocation in conjunction with final approval of a class action settlement after the fairness hearing.") (collecting cases); 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS §12:15 (6th ed.) ("[A] court or jury may determine liability and leave individual damage calculations to further proceedings.").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Walgreens'

Motion.

Dated: November 15, 2023        **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/Joseph P. Guglielmo*
Joseph P. Guglielmo (IL Bar #2759819)
Carey Alexander (IL Bar #5188461)
Amanda M. Rolon (*admitted pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-4478
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
calexander@scott-scott.com
arolon@scott-scott.com

Erin Green Comite (IL Bar #420630)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 S. Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 531-2632
Facsimile: (860) 537-4432
ecomite@scott-scott.com

David W. Mitchell (IL Bar #199706)
Arthur L. Shingler III (IL Bar # 181719)
**ROBBINS GELLER RUDMAN & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
davidm@rgrdlaw.com
ashingler@rgrdlaw.com

Mark J. Dearman (IL Bar #0982407)
Stuart A. Davidson (IL Bar #084824)
**ROBBINS GELLER RUDMAN & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com

*Interim Co-Lead Counsel*

Katrina Carroll (IL Bar #6291405)
**LYNCH CARPENTER LLP**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
Telephone: (312) 750-1265
katrina@lcllp.com

*Local Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically through the Court's Electronic Case Filing System, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

*s/Joseph P. Guglielmo*
Joseph P. Guglielmo

1