UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, AND STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) | No. 1:17-CV-02246 |
| Plaintiffs, | ) ) | Judge Edmond E. Chang |
| v. | ) ) | |
| WALGREEN CO., | ) ) | |
| Defendant. | ) ) | |

MEMORANDUM OPINION AND ORDER

Cynthia Russo, Lisa Bullard, and Ricardo Gonzales, along with the International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, the International Union of Operating Engineers Local 295-295c Welfare Fund, and the Steamfitters Fund Local 439 (collectively, "the Plaintiffs") filed this class action lawsuit against Walgreens. The Plaintiffs allege that Walgreens engaged in an improper pricing scheme—via Walgreens' Prescription Savings Club—that artificially inflated Walgreens' "usual and customary" prices and resulted in the Plaintiffs' overpayment of generic prescription drugs. *See generally* R. 477, Fourth Am. Compl.[1] Eventually,

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. The Court has jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy requirement is met:

the Plaintiffs and Walgreens entered into a class action Settlement Agreement in which Walgreens agreed to pay the Settlement Class $100 million and end its Prescription Savings Club. *See generally* R. 683-1, Guglielmo Decl. Exh. 1, Settlement Agreement. This Court granted preliminary approval of the Settlement Agreement in November 2024. *See generally* R. 689, Prelim. Approval Ord.

Now, the Plaintiffs move to invalidate certain requests to opt out of the Settlement Agreement submitted by various Blue Cross Blue Shield entities (for convenience's sake, the Blues) and Health Care Service Corporation (which goes by HCSC) on behalf of over 24,000 would-be Settlement Class Members. R. 723, Pls.' Mot. The Plaintiffs also move to overrule the insurance companies' objections to the opt-out procedure required by the preliminary approval Order. *Id.* For the reasons discussed in this Opinion, the Plaintiffs' motion is granted in full: the exclusion requests are denied.

## I. Background

Walgreens is a nationwide retail pharmacy with headquarters in Deerfield, Illinois. Fourth Am. Compl. ¶¶ 7, 41. The Plaintiffs are comprised of: (1) individuals that purchased the generic versions of prescription medications at Walgreens through insurance plans and (2) employee-benefit plans and non-profit trusts that

---

the Plaintiff class seeks damages for hundreds of thousands of class members and the parties' Settlement Agreement calls for payment of $100 million to satisfy those damages. Fourth Am. Compl. ¶ 45; R. 683-1, Guglielmo Decl. Exh. 1, Settlement Agreement at 14. Minimal diversity is also met because Walgreens is a citizen of Illinois, Fourth Am. Compl. ¶ 41, and at least one Plaintiff class member is a citizen of a different state. *See id.* ¶ 23.

provide healthcare benefits to individuals covered by certain collective-bargaining agreements. *Id.* ¶¶ 17, 20, 23, 26–27, 30–31, 34–35. The allegations in this case are based on Walgreens' "Prescription Savings Club," which allows customers that pay directly for prescriptions (that is, without using health insurance) to purchase generic prescription drugs at specified prices. *Id.* ¶¶ 4, 8–9, 11. According to the Plaintiffs, Walgreens charged them much more for the same prescription drugs than it charged the Prescription Savings Club members, effectively maintaining a dual-pricing scheme. *Id.* at 4, 6. The Plaintiffs alleged that this dual-pricing scheme allowed Walgreens to charge them a higher price than the "usual and customary" price, which is the price that a pharmacy charges the direct-paying public. *See id.* ¶¶ 5, 58. These alleged overpayments form the basis for the Plaintiffs' claims of significant financial damages spanning from 2007 to the present. *See id.* ¶ 13.

The Plaintiffs sought certification of a nationwide class under Civil Rule 23(a) and (b)(3). *Id.* ¶¶ 91–99. The parties reached a Settlement Agreement in October 2024; in November, the Court granted preliminary certification of the following Settlement Class:

> All individuals or entities in the United States and its territories who paid, in whole or in part, at any point in time from January 1, 2007 through [date of preliminary approval of the Settlement or December 31, 2024, whichever comes first] ("Settlement Class Period"), for one or more prescription drugs from Walgreens, where prescription insurance benefits were used in filling the prescription(s).

Prelim. Approval Ord. at 1, 3. But there is a carve-out from the class definition: it excludes "all individuals and entities … that have sued … Walgreens relating to its

3

determination of usual and customary prices in connection with the Prescription Savings Club." *Id.* at 3. In the preliminary-approval order, the Court directed the settlement administrator to implement a notice plan consisting of (1) direct email notice for potential Settlement Class Members containing summary notice; (2) supplemental paid-media notice via social media and digital advertising to targeted demographics; (3) postcard and email notice to third-party payor entities including health insurers and self-insured entities; and (4) press releases. *See* R. 684, Miller Decl. on Class Notice ¶¶ 10–20 (detailing the notice plan); Prelim. Approval Ord. ¶¶ 10–11 (approving the notice plan detailed in the Miller Declaration on Class Notice). The notice deadline passed in January 2025. Prelim. Approval Ord. ¶ 30.

The preliminary-approval order also set requirements for requests by class members to exclude themselves from the settlement. In particular, the order required "individual" requests, instructing that "request[s] for exclusion must be submitted by each Settlement Class Member on an *individual* basis," and that "group or class-wide exclusions shall not be permitted." *Id.* ¶ 14 (emphasis added). Settlement Class Members that wished to opt-out were directed to send written requests to the Settlement Administrator; these requests had to "be signed by the person authorized to do so." *Id.* ¶ 15. Among other things, the Order also required that requests include certain identifying information, such as the member's full name, telephone number, identification number, and information establishing class membership. *Id.* ¶ 15(a). Entities were specifically instructed to provide "a signature from the authorized representative of the entity." *Id.* ¶ 15(a)(ii). Finally, the Order advised that "any request for

4

exclusion by a purported authorized agent or representative of a Class Member must include proof of the representative's legal authority and authorization to act and request exclusion on behalf of each Class Member for which the representative requests exclusion." *Id.* ¶ 14. The deadline to submit exclusion requests was in March 2025. Prelim. Approval Ord. ¶ 30.

To understand the current dispute, it is important to know that the Settlement Class definition includes third-party payors, that is, commercial entities that utilize self-funded (rather than fully funded) health-insurance plans for their employees. R. 755, Insurers' Resp. at 4. Those commercial entities (referred to by the parties as "Administrative Services Only clients," or "ASO clients") contract with health-insurance companies; the insurers pay pharmacy claims on behalf of the ASO clients and then seek reimbursement later. *Id.*; *see also* R. 724, Pls.' Br. at 3.

The current dispute stems from exclusion requests sent by the Blues and HCSC (together, "the Insurers") in March 2025 seeking to opt out of the Settlement Class on behalf of their ASO clients. *See* Pls.' Br. at 3–4; Insurers' Resp. at 2 n.1–2 (listing the sub-entities comprising the Blues and HCSC). The exclusion requests assert that the Insurers, as third-party administrators, are authorized to opt out more than 24,000 ASO clients and would-be Settlement Class Members. Pl.'s Br. at 2; Insurers' Resp. at 4–5. The Insurers also assert that their standard contract language with each ASO client empowers the Insurers to "pursue recoveries on behalf of their ASO clients, including determining whether to opt-out or opt-in to a class action." Insurers' Resp. at 5–6; *see, e.g.*, R. 721-1, Miller Decl. Exh. 1 at 8 (PDF page number).

5

Also, the Insurers' exclusion requests iterate objections to the Settlement on behalf of their ASO clients, arguing that the opt-out procedures requiring the submission of certain information are unduly burdensome. Insurers' Resp. at 5; *see, e.g.*, Miller Decl. Exh. 1 at 4–5 (PDF page number).

The Plaintiffs now move to deny the exclusion requests and overrule the objections to the opt-out procedures submitted by the Insurers on behalf of their ASO clients. *See* Pls.' Mot.

## II. Analysis

## A. Exclusion Requests

The Plaintiffs and Walgreens argue that the Insurers' exclusion requests—sent on behalf of their ASO clients—should be denied because they fail to comply with the opt-out procedures outlined in the preliminary-approval order and they violate due process protections for absent class members. *See* Pls.' Br. at 9–13; R. 728, Def.'s Br. at 4–7. The Insurers, on the other hand, argue that they should not be held to the opt-out requirements because the requirements violate due process, and that the Insurers do have valid authority to effect *en masse* opt-outs on behalf of the ASO clients. Insurers' Resp. at 8–12.

Due process requires that absent class members receive notice and an opportunity to opt out of the class. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811–12 (1985); *see also Lemon v. Int'l Union of Operating Eng'rs, Loc. No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000). This is because absent class members that "do not opt out will be bound by the judgment in the class action," and thus unable to "litigate

6

their claims in a new suit." *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 820–21 (7th Cir. 2011). And "[j]ust as the requirements of notice and opportunity to opt out are designed to protect the due process rights of individual class members, courts have recognized that opting out is an individual right that must be exercised individually." *In re TikTok, Inc., Consumer Privacy Litig.*, 565 F. Supp. 3d 1076, 1092 (7th Cir. 2021) (cleaned up).[2] Thus, courts "routinely enforce[] the requirement that class members individually sign and return a paper opt-out form as vital to ensuring that the class member is individually consenting to opt out." *Id.* at 1093 (cleaned up) (collecting cases). In considering opt-out requests, courts have discretion to "turn away attempts by lawyers to opt out class members *en masse*." *In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 241 (3d Cir. 2002).

With this in mind, the preliminary-approval order instructed that "request[s] for exclusion must be submitted by each Settlement Class Member on an *individual* basis," and that "group or class-wide exclusions shall not be permitted." Prelim. Approval Ord. ¶ 14 (emphasis added). It also required that exclusion requests provide sufficient information to confirm the identity of each Settlement Class Member purporting to send it and a signature of the member. *Id.* ¶ 15(a)(ii). To the extent that an opt-out request is sent by an agent or representative of the Settlement Class Member, the Order required that the request include proof of the agent's legal authority to

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

request the exclusion on behalf of the Settlement Class Member. *Id.* ¶ 14. The Order warned that requests for exclusion that lacked any of the requirements "shall be invalid; the individual or entity filing such an invalid request shall be a Settlement Class Member and shall be bound by the Settlement, if the Settlement is approved." *Id.* ¶ 15(b). These requirements are typical in class-action settlements of this size. *See, e.g.*, *In re Deepwater Horizon,* 819 F.3d 190, 197 (5th Cir. 2016) (affirming the district court's requirement for exclusion requests to be signed by the class member to confirm the class member's consent in an MDL); *In re Centurylink Sales Pracs. & Secs. Litig.,* 2020 WL 3512807, at \*3–4 (D. Minn. June 29, 2020) (collecting cases).

It is clear that the exclusion requests submitted by the Insurers on behalf of their ASO clients do not comply with the preliminary-approval order. Despite the Order's clear bar on group-based exclusions, the Insurers submitted mass exclusion requests. *See, e.g.*, Miller Decl. Exh. 1 (requesting exclusion on behalf of over 1,000 entities). The requests were sent by employees of the particular *Insurer* entity—not employees of the ASO clients—and include declarations from employees of the Insurer affirming that they have authorization to submit claims or opt out on behalf of the ASO clients. *See id.* In addition to the total lack of signatures from the Settlement Class Members themselves, there is no evidence in any of the requests themselves that any of the ASO clients have specifically consented to opt out of this Settlement Class. *Id.* Each request merely quotes "standard ASO contract language" that the Insurers argue empowers them to make the decision to opt out of settlements, but none of the Insurers provided the actual governing contract for a single ASO client.

8

*See, e.g.*, R. 721-10, Miller Decl. Exh. 11 at 3–4 (PDF page number) (pasting the form contract language into the body of the opt-out letter).[3] So the Insurers' opt-out requests on behalf of over 24,000 Settlement Class Members are invalid under the preliminary-approval order.

The Insurers' only arguments for their noncompliance with the opt-out procedures are that the Insurers do have authorization to do so via the ASO contract language, and that the individualized procedures infringe on the ASO clients' due process rights by adding unnecessarily burdensome requirements. *See* Insurers' Resp. at 7–12. On the authority point, the Order required more than just a declaration affirming that the standard contract language with each of the 24,000 entities authorized the Insurers to submit requests on the clients' behalf. It required *proof* of legal authority, Prelim. Approval Ord. ¶ 14, in this case, that proof could have either come in the form of the actual signed contracts themselves or declarations from the ASO clients affirming their consent—but it did not. Courts overseeing large-scale class action settlements are often wary of "excessive informal opt outs that might pose problems of authenticity and ambiguity." *In re Deepwater Horizon,* 819 F.3d at 196 (cleaned up). To combat this concern, it is typical to require at least a reasonable indication of the class member's desire to opt out. *Id.* (collecting cases); *see also In re Centurylink,* 2020 WL 3512807, at *3 (explaining that courts may reject requests that bear only

---

[3]The Court notes that, had the Insurers' requests included even one contract for a particular client as a sample of the standard ASO contract language, it may have sufficed as proof of authorization for that specific client.

9

the signature of the class member's attorney, rather than the class member them-selves). The standard ASO contract language pasted into the Insurers' declarations does not reasonably indicate the ASO clients' desire to opt out. And it is called further into doubt by the fact that some of the ASO clients included in the mass opt-out re-quests have separately self-filed claims for recovery in this Settlement. *See* R. 721, Miller Decl. ¶ 6 (listing 21 entities that appear in the mass opt-out requests but that have self-filed claims for recovery); R. 758, Miller Suppl. Decl. ¶ 3 (listing 10 addi-tional entities).

On the due process point, the Insurers argue that the preliminary-approval order's requirements for opt out are too onerous and thus impede the ASO clients' right to opt out "in a reasonable manner." Insurers' Resp. at 7. Of course due process requires that class members be allowed to opt out if they express reasonable and clear indication of their desire to do so. *See id.* at 8 (arguing that there is no "strict formula" for opting out, and that any reasonable indication of the desire is sufficient) (quoting *McReynolds v. Richards-Cantave,* 588 F.3d 790, 800 (2d Cir. 2009)). But the case law cited by the Insurers only buttresses the disfavoring of group-based opt outs: when exercising the right to opt out, it must be reasonably clear that the *class member* does in fact desire to opt out. The operative question is not whether the *Insurers* desire to opt out on behalf of their ASO clients; it is whether the *ASO clients*—the Settlement Class Members—desire it. Again, there is no record evidence of that desire for any of

10

the ASO clients in the requests, so the Insurers have failed to meet the opt-out standard they ask this Court to adopt.[4]

The Insurers also argue that the Court's opt-out procedures would require the ASO clients to submit more than 24,000 individual declarations, infringing on the clients' due process rights by "render[ing] opting out virtually impossible." Insurers' Resp. at 9. They assert that "[i]t would have been administratively near-impossible … to work with each ASO client individually to review the opt-out process, compile individualized contracts, collect individual client-level authorization for more than 24,000 clients, and request claims-level data for each individual ASO client." *Id.* at 10. But this aggregate administrative burden is the result of the Insurers' purported undertaking to analyze settlement participation on behalf of over 24,000 entities. The notice plan was formulated with the goal of providing direct notice to potential Settlement Class Members; and the fact that several of the ASO clients received the notice and filed recovery claims shows their ability to complete an individualized analysis of whether to participate in the Settlement Class. *See* Miller Decl. on Class Notice ¶¶ 10–20 (detailing the multi-faceted notice plan); Miller Decl. ¶ 6; Miller Suppl. Decl. ¶ 3.[5] If the Insurers believe it is in the best interests of the ASO clients

_____

[4]There is also no indication of the ASO clients' desire for the Insurers to determine whether to opt out on their behalf, because there is no contractual evidence of this arrangement.

[5]The Insurers also imply that "the notice plan provided to the ASO clients was extraordinarily deficient." Insurers' Resp. at 13. But they fail to identify which specific aspect of the notice plan they believe to be deficient. And, in any event, there is no argument that the Insurers lacked notice. If it is the case that the Insurers are empowered to act on the ASO clients' behalf, then it was their responsibility to submit the opt-out requests in compliance

to opt out, they should have obtained signatures from them to do so. On top of that, if the Insurers felt that the opt-out period was too short for them to obtain each ASO clients' consent to the opt-out requests, then the Insurers could have asked the Court for an extension on the opt-out deadline—but they did not.

The Insurers ask the Court to accept the *en masse* opt-out requests to prevent the possibility of binding absent ASO clients to the Settlement Agreement and eliminating their right to pursue their own legal claims. Insurers' Resp. at 12. According to the Insurers, it would violate due process to require certain opt-*out* procedures when class members or parties are not required to follow any opt-*in* procedure. *Id.* But this approach would create the risk that over 24,000 entities would lose out on settlement proceeds to which they are legally entitled—with no indication from the clients that they would choose to forgo the recovery offered here. The Insurers have seemingly recognized this fact by filing purportedly "conditional, provisional claims" on behalf of the ASO clients.[6] *See* R. 721-11, Miller Decl. Exh. 13 (showing the claims

---

with the Order's procedure on an individual basis after ensuring that their clients had notice of the class action and consented to the opt out. The Insurers' argument that they would "have to go through 6,000 contracts per month, which is 200 contracts per day" in order to effectuate individualized opt-outs also ignores the fact that the Blues and HCSC are comprised of dozens of sub-entities, each presumably with their own administrative support for the group of ASO clients they serve. Insurers' Resp. at 10; *see also id.* at 2 n.1–2.

[6]The so-called provisional claims for settlement funds filed by the Insurers on behalf of their ASO clients are separate from the claims for settlement funds filed by the ASO clients themselves. Miller Decl. ¶ 6 (listing 21 entities that appear in the mass opt-out requests but that have self-filed claims for recovery); Miller Suppl. Decl. ¶ 3 (listing 10 additional entities). There is no indication that these 31 recovery requests were provisional. If the Court were to accept the *en masse* opt-out requests, then it would also need to determine the right course of action for these 31 entities that have shown a desire to recover but have been opted out by the Insurers.

12

filed by Crowell on behalf of the Insurers' ASO clients); Miller Decl. ¶ 8. Despite the Insurers' contention that these claims were filed only to "preserve their ASO clients' right to make a claim for a share of the Net Settlement Fund" in the event that the exclusion requests were denied, there is no indication that the claims were provisional aside from one email from a Crowell lawyer about the claim by Florida Blue. *See* Insurers' Resp. at 6 n.8; R. 756, Wulfekotte Decl. ¶ 8 (contending that the claims were expressly conditional and made only for the purpose of preserving the claim as needed); R. 758-4, Miller Suppl. Decl. Exh. D at 2 (PDF page number) (referencing a "conditional claim" submitted by Crowell on behalf of Florida Blue's ASO clients). And the fact that the Insurers have had to contact the settlement administrator several times to note that they "inadvertently included" certain ASO clients in their opt-out requests that "should not be opted out" of the Settlement further underscores the risk that the Court's acceptance of the *en masse* opt-out requests would result in class members being erroneously stripped of their right to recover in this case. *See* Miller Suppl. Decl. ¶¶ 4–5; R. 758-1, Miller Suppl. Decl. Exh. A; R. 758-2, Miller Suppl. Decl. Exh. B. So a rejection of the Insurers' *en masse* exclusion requests does not run afoul of due process. Instead, this is the way to secure due process.

It is worth noting that the Insurers also submitted exclusion requests on their own behalf. The Plaintiffs argue that these are also invalid, because the Insurers were never part of the Settlement Class. Pls.' Br. at 9. Indeed, the Settlement Class explicitly excludes "all … entities … that have sued, filed an arbitration demand, or participated in a settlement in a suit against Walgreens relating to its determination

13

of usual and customary prices in connection with the Prescription Savings Club." Prelim. Approval Ord. ¶ 3. The Insurers were listed in Walgreens' list of excluded entities. *See* R. 725, Guglielmo Decl. ¶ 4; R. 726-12, Miller Decl. Exh 12 (listing the Insurers as entities that have filed suit against Walgreens in connection to its usual and customary pricing). Because it is impossible to opt out of a class that one was never part of, the Insurers' opt-out requests on their own behalf are invalid (though also not needed to be excluded from the settlement).

### B. Insurers' Objections

The Insurers also object to the opt-out procedures on the grounds that they are "unwarranted and unduly burdensome." *See, e.g.*, Miller Decl. Exh. 1 at 1. The Plaintiffs and Walgreens respond that the Insurers lack standing to object to the settlement procedures because they are not class members. Pls.' Br. at 13–15; Def.'s Br. at 4. "The general rule, of course, is that a non-settling party does not have standing to object to a settlement between other parties." *Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 246 (7th Cir. 1992). The Insurers do not argue that they are in fact parties to the settlement in some way—instead, they argue that they have standing under the "plain legal prejudice" doctrine, which "allow[s] a non-settling defendant in a multiple defendant case who can show plain legal prejudice resulting from the settlement to object to a settlement to which it is not party." *Id.*; Insurers' Resp. at 14–15. According to the Insurers, they may object on behalf of their ASO clients because the settlement would interfere with their contractual right to act on behalf of the ASO clients. Insurers' Resp. at 15.

14

The Insurers bear the burden of establishing their standing. *Agretti*, 982 F.2d at 246. Courts have found plain legal prejudice where a settlement would interfere with a party's contractual rights, their ability to seek contribution or indemnification, or their ability to assert later claims or cross-claims. *Id.* (citing *Quad/Graphics, Inc. v. Fass,* 724 F.2d 1230, 1232 (7th Cir. 1983)). "[A] non-settling defendant may not merely claim an interest in the lawsuit but must show some cognizable prejudice to a legal relationship between it and the settling parties." *In re Asbestos Litig.,* 921 F.2d 1330, 1332 (3d Cir. 1990). But even if the Insurers *could* muster a showing that the settlement would somehow impact their legal rights, they are not a non-settling defendant in this case (they are not a party in this case at all). And because they are not members of the Settlement Class due to their pending litigation against Walgreens, there can be no finding that this settlement will impede their ability to assert their own claims against Walgreens.

To the extent that the Insurers attempt to argue that they have standing because they are objecting on behalf of their ASO clients, who are parties to the Settlement Agreement, that argument also fails. As explained earlier, they have not sustained their burden of proving that there exists any contractual right to object on the ASO clients' behalf—they have supplied no specific contract whatsoever. Any argument that they had a cognizable legal interest in opting out on behalf of their ASO clients also falls short: the opt-out procedures do not forbid opt outs on behalf of others—it forbids deficient, *en masse* opt outs on behalf of others in the absence of proof of authorization to do so.

15

In sum, the Insurers lack standing to object to the settlement, so the Court need not consider the merits of the objections.

### III. Conclusion

For the reasons discussed in this Opinion, the Plaintiffs' motion to invalidate the Insurers' exclusion requests, R. 723, is granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 7, 2025

16