IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CYNTHIA RUSSO, LISA BULLARD, RICHARDO GONZALES, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 38 HEALTH AND WELFARE FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 295-295C WELFARE FUND, and STEAMFITTERS FUND LOCAL 439, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> WALGREEN CO., <br><br> Defendant. | Civil Action No. 1:17-cv-02246 <br><br> <u>CLASS ACTION</u> <br><br> The Honorable Edmond E. Chang |

**BLUE CROSS AND BLUE SHIELD HEALTH PLANS AND
HEALTH CARE SERVICE CORPORATION'S
<u>REPLY IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION</u>**

The Court's August 7 Order, Dkt. No. 768 ("Order"), construed the class notice and opt-out procedures in this case to prohibit third-party administrator ("TPA") health plans from opting out their administrative services only ("ASO") clients *en masse*. Other courts have permitted such opt outs and ASO clients frequently rely on TPAs to opt them out of class actions. Yet the class notice never stated that TPAs would be unable to do so here.

Blue Cross and Blue Shield Health Plans and Health Care Service Corporation (the "Plans") have been in active litigation against Walgreens seeking to recover U&C-related overpayments on behalf of their ASO clients since March 18, 2020 and January 19, 2021,

1

respectively.[1] In HCSC's case against Walgreens, HCSC has served its expert opinions and analyses related to damages, which include damages to its ASO clients that ***exceed the entire settlement value*** in *Russo*. *See* Dkt. No. 756 ¶ 5. And that does not include damages claimed by the Blue Cross and Blue Shield plans in their case against Walgreens. Walgreens now seeks to have this Court—in a case where the Plans are not parties—effectively reduce the Plans' damages in other active litigation where they are parties. The Court should reject that effort.

The Plans' ASO clients may lose millions of dollars by being forced to accept the class settlement here rather than continuing to pursue their claims through the Plans in separate already pending actions the Plans are currently litigating against Walgreens. Notably, Walgreens and the class stand to gain those millions as a result. Yet seemingly no ASO clients opted themselves out of this class directly. This was all made possible by an opt-out procedure that Walgreens negotiated and drafted with Plaintiffs in this litigation.

No one disputes these facts. No one plausibly can. This is the manifest injustice the Order created through its interpretation of the scope of the opt-out procedure. That is the error the Plans' motion for reconsideration ("Motion," Dkt. No. 774) seeks to correct.

## I. The Parties Sidestep the Plans' Main Basis for Moving to Reconsider.

The main argument the Plans make in the Motion is that the Order construed the opt-out procedures in a way that rendered the class notice constitutionally invalid. Mot. at 3. That is because, if the opt-out procedures were how the Order interprets them to be, then the class notice

---

[1] Walgreens' claim that the Plans "failed to plead *any* predicate facts necessary to make out the ASO clients' claims in those other cases" (Dkt. No. 783 at 9) is plainly incorrect, as a review of the pleadings in those cases demonstrates. *See, e.g.,* Complaint ¶ 101, *HCSC v. Walgreen Co.*, No. 2021L000621 (Ill. Cir. Ct., Cook Cnty.), Dkt. 1 ("Walgreens' fraudulent conduct has prevented Plaintiff from obtaining more favorable prescription drug prices for members of plans it administers or insures.").

2

in this case "did not provide the best, most practicable indication to the class members of how to opt out," *id.* at 4, which is the standard class notice must meet. *See* Fed. R. Civ. P. 23(c)(2)(B).

The Parties do not argue that the class notice here was the best notice practicable. The Parties do not argue that it would have been impracticable to state that no TPA *en masse* opt outs would be permitted. The closest the Parties come to making that argument is when Walgreens argues that the Plans' proposed edit is "clumsier and more confusing." Dkt. No. 783 at 10. But the notice standard is not "least clumsy"—few would describe any class notice as svelte—and providing more detail hardly makes a notice confusing. Plaintiffs, for their part, only defend the notice by invoking the Order, which is a defense that assumes the conclusion: that Order is exactly what the Plans request reconsideration of here. Dkt. No. 784 at 7.

Instead of defending the notice's compliance with the governing standard, the Parties raise various ancillary issues. For example, the Parties dispute that this issue is appropriately raised on a motion for reconsideration. But the issue—that the class notice was not the best notice practicable—did not exist until the Order interpreted the opt-out procedures the way that it did. That is why the Plans did not challenge the notice in their opposition (Dkt. No. 755, "Opposition") to Plaintiffs' initial motion (Dkt. No. 724). The Parties mostly avoid that fact, instead cherry-picking phrases from the Opposition and the Motion to try to show overlap (Dkt. No. 783 at 4–5) or arguing about the appropriateness of the opt-out procedure rather than the class notice (Dkt. No. 784 at 5–6).

The question before the Court is whether the class notice was the best notice practicable, in light of how the Order interpreted the opt-out procedures. This was not a challenge that the Plans did raise or could have raised in their initial Opposition. Because the notice was not the most

3

practicable reflection of the opt-out limitations, as interpreted in the Order, the notice was impermissible.

II. **The Parties' Effort to Rebut the Plans' Description of Industry Standards Only Proves the Plans' Point.**

The Plans' Motion explains that ASO clients rely on TPAs like the Plans to opt them out of class actions on their behalf. In support of that, the Plans relied on cases describing the role of TPAs, a declaration from Plan counsel describing that role, and examples of mass opt outs for ASO clients. Mot. at 4–5.

In response, the Parties invoke the exceptions that prove the rule. Walgreens claims that the industry standard cannot be what the Plans claim it is because "nearly two dozen" (or "almost two dozen") of the Plans' ASO clients submitted claims on their own behalf. Dkt. No. 783 at 8. Plaintiffs make a similar argument. Dkt. No. 784 at 8 ("[A] number of the Blues [ASO] customers also individually filed claims . . . ."). To be clear, the Plans submitted opt out requests on behalf of more than 24,000 ASO clients. *See* Dkt. No. 724 at 3. Which means that fewer than one tenth of one percent of the Plans' ASO clients filed claims in this dispute. While 0.1% cannot establish an industry standard, 99.9% certainly can. And why would 99.9% of the Plans' ASO clients leave collective millions—more than the entire settlement amount in *Russo*, with some ASO groups sustaining damages in excess of a million dollars individually—on the table by relying on a mass opt-out if they received notice of the opt-out procedures and knew that the Plans could not submit mass opt-outs on their behalf? The answer is they wouldn't.

III. **Plaintiffs' Other Arguments Regarding Standing, Conflicts of Interest, and Timeliness Are Misplaced.**

Plaintiffs assert several arguments that Walgreens does not make. None of these have merit.

First, Plaintiffs contend that the Motion should be denied because the Court held that the Plans lack standing and the Plans do not contest that portion of the Order. Dkt. No. 784 at 3–4.

4

That holding, however, applied solely to the Plans' objections to the settlement and the opt-out procedures. Section II.B of Order, at 14–15. The Motion, however, addresses Section II.A of the Order, specifically the question of whether the exclusion requests should be granted—an issue that is independent of the standing holding. *See* Mot. at 8 (the Plans "merely ask that the Court honor their exclusion requests").

Second, Plaintiffs contend that the Plans' Counsel have a conflict of interest. Dkt. No. 784 at 9–12. Plaintiffs are wrong, and this is certainly not the place to hash that out. Setting aside the inappropriateness of alleging supposed ethical breaches to try to leverage an advantage in motion practice, Plaintiffs have already tried ringing this bell before to no avail (Dkt. No. 724 at 5 n.9). Ironically, Plaintiffs' counsel themselves stand to earn significantly more money in attorneys' fees (for literally the same work) under the position they are advancing.

Third, Plaintiffs contend that the Plans' Motion is untimely because it was not made within a "reasonable time" under Rule 60. Dkt. 784 at 12. Initially, a motion to reconsider an interlocutory order is not governed by Rule 60. *See* Fed. R. Civ. P. 60(b) advisory committee note to 1946 amendment ("[I]nterlocutory judgments [and orders] are not brought within the restrictions of [Rule 60(b)], but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires."). Further, Plaintiffs suggest with absolutely no support that the Court should—with no forenotice or predictability—adopt the local rules of the District Courts in New York and the District of Kansas. *See* Dkt. 784 at 12 n.7. Such a result would be arbitrary and unduly prejudicial.

Instead, the Plans note that the only reason these issues are still being litigated after the final approval hearing is because Plaintiffs waited three months after receiving the Plans' exclusion requests to move to invalidate them. This issue could have been litigated and resolved months ago

5

if Plaintiffs had chosen to bring their initial motion within a reasonable time. Further still, the Plans' Motion is timely even under this Circuit's 30-day deadline for Rule 54(b) motions. *See King v. Newbold*, 845 F.3d 866, 868 (7th Cir. 2017) ("[A]s a general rule it is an abuse of discretion for a district judge to grant a motion for a Rule 54(b) order when the motion is filed more than thirty days after the entry of the adjudication to which it relates.") (citation omitted); *see also Nucap Indus., Inc. v. Robert Bosch LLC*, No. 15 C 02207, 2020 WL 13645506, at *2 (N.D. Ill. Aug. 23, 2020) (holding that Rule 54(b) reconsideration motion was timely when filed 51 days after the decision) (Chang, J.). Here, the Order was entered on Thursday, August 7. Thirty days later was a Saturday. Consistent with Rule 6, the Plans filed their Motion on the next business day, Monday September 8.

## **CONCLUSION**

For the reasons stated above and in the Plans' opening Motion, the Court should reconsider the Order and grant the Plans' exclusion requests for their ASO clients.

Dated: September 24, 2025                    Respectfully submitted,

By: */s/ Jed Wulfekotte*
Jason P. Stiehl
Neil G. Nandi
**CROWELL & MORING LLP**
455 N. Cityfront Plaza Drive
Suite 3600
Chicago, IL 60611
Telephone: 312.840.3108
JStiehl@crowell.com
NNandi@crowell.com

Kent A. Gardiner*
Stephen J. McBrady*
Kelly H. Hibbert*
Jed Wulfekotte*
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: 202.624.2500
Facsimile: 202.628.5116
KGardiner@crowell.com
SMcBrady@crowell.com
KHibbert@crowell.com
JWulfekotte@crowell.com

*admitted pro hac vice*

*Counsel for Blues Plans and HCSC*