**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| Cynthia Russo, Lisa Bullard, Ricardo Gonzales, International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, International Union of Operating Engineers Local 295-295c Welfare Fund, and Steamfitters Fund Local 439, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | No. 1:17-CV-02246 |
| v. | Judge Edmond E. Chang |
| Walgreen Co., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Eight years ago, Cynthia Russo, Lisa Bullard, and Ricardo Gonzales, along with the International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund, the International Union of Operating Engineers Local 295-295c Welfare Fund, and the Steamfitters Fund Local 439 (collectively, "the Plaintiffs") filed this class-action lawsuit against Walgreens. R. 1, Compl.[1] The Plaintiffs alleged that Walgreens's use of a discount generic-drug program—called the Prescription Savings Club—fraudulently inflated the "usual and customary prices" reported to health

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

insurers and led to the Plaintiffs overpaying for generic drugs. *See generally* R. 477, Fourth Am. Compl.[2] The parties—after engaging in years-long discovery and undergoing mediation—finally arrived at a proposed settlement in June 2024. R. 764, Guglielmo Decl. ¶ 7. After a preliminary-approval hearing, the Court conditionally certified the class and approved the Settlement Agreement. R. 688, 11/18/2024 Minute Entry; R. 689, Prelim. Approval Ord. The Settlement Agreement is now before the Court for final approval. The Court held a fairness hearing on September 10, 2025. R. 779, 09/10/2025 Minute Entry. For the reasons discussed below, the motion for final approval of the settlement is granted and the motion for attorneys' fees and incentive award is granted as proposed. R. 700, Mot. Attys.' Fees.

## I. Background

Walgreens is a nationwide retail pharmacy with headquarters in Deerfield, Illinois. Fourth Am. Compl. ¶¶ 7, 41. The Plaintiffs are comprised of: (1) individuals that purchased the generic versions of prescription medications from Walgreens through insurance plans and (2) employee-benefit plans and non-profit trusts that provide healthcare benefits to individuals covered by certain collective-bargaining agreements. *Id.* ¶¶ 17, 20, 23, 26–27, 30–31, 34–35. The allegations in this case are based on Walgreens's "Prescription Savings Club," established in 2007, which allows

---

[2] The Court has jurisdiction over this matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount-in-controversy requirement is readily met: the Plaintiff class seeks damages for millions of class members and the Settlement Agreement calls for payment of $100 million to satisfy those damages. Fourth Am. Compl. ¶ 45; R. 763, Pls.' Final Approval Br. at 1–2. Minimal diversity is also met because Walgreens is a citizen of Illinois, Fourth Am. Compl. ¶ 41, and at least one Plaintiff class member is a citizen of a different state, *see id.* ¶ 23.

customers that pay directly for prescriptions (that is, without using health insurance) to purchase generic prescription drugs at specified prices if they pay a yearly membership fee. *Id.* ¶¶ 4, 8–9, 11; R. 477-1, Exh. A, PSC Medication List at 5. All pharmacy customers other than Medicare and Medicaid beneficiaries may participate in the Prescription Savings Club. Fourth Am. Compl. ¶ 10.

According to the Plaintiffs, Walgreens charged them much more for the same drugs than it charged the Prescription Savings Club members, effectively maintaining a dual-pricing scheme. Fourth Am. Compl. ¶¶ 4, 6. They further allege that this dual-pricing scheme allowed Walgreens to charge non-Club-members a higher price than the "usual and customary" price, which is the price that a pharmacy charges the direct-paying public. *See id.* ¶¶ 5, 58. Thus, the Plaintiffs contend that the Prescription Savings Club prices qualify as Walgreen's "usual and customary" prices, and that by reporting the higher, non-Club prices to insurers and third-party payors[3] to calculate copayment, coinsurance, and deductible amounts, Walgreens collected more money from them than it otherwise should have. *Id.* ¶ 12. These alleged overpayments form the basis for the Plaintiffs' claims of significant financial damages spanning from 2007 to the present. *See id.* ¶ 13. For example, Lisa Bullard alleges that she purchased 10 generic prescription drugs from Walgreens in New York and Massachusetts between 2014 and 2016 using Medicare and overpaid several dollars on

---

[3]The Plaintiffs define "third-party payors" as all private health-insurance companies, third-party administrators, or other health organizations and plans that either make benefit payments for members from their own funds, or administer health benefits on behalf of self-funded plans. Fourth Am. Compl. at 1 n.2.

each prescription, resulting in an alleged cumulative overpayment of $60.50. *Id.* ¶ 17. So the Plaintiffs filed this class action against Walgreens, alleging fraud, unjust enrichment, and violations of numerous state consumer-protection laws. *See id.* at 91–99, 113–407. The Plaintiffs sought injunctive and declaratory relief in addition to monetary damages. *Id.* at 100–01.

The parties engaged in extensive and, at times, disputed fact and expert discovery. *See, e.g.*, R. 142, 158, 205, 265, 327, 333, 339, 482; Guglielmo Decl. ¶ 4. Near the close of discovery, the parties retained a mediator to begin settlement negotiations. Guglielmo Decl. ¶ 6. The mediation process included written submissions, conferences with the mediator, and risk-based assessments. *Id.* ¶¶ 6–7. The parties eventually agreed to settle this case for a cash payment of $100 million, plus Walgreens's termination of the Prescription Savings Club. Pls.' Final Approval Br. at 1–2; R. 683-1, Exh. 1, Stipulation of Settlement ¶¶ 2.1–2.3.

Under the proposed Settlement Agreement, Settlement Class members who file valid claims will receive cash payments from the fund. Stipulation of Settlement ¶¶ 1.3, 1.10. The Settlement Agreement defines the Settlement Class as "[a]ll individuals or entities in the United States … who paid, in whole or in part, at any point in time during the Settlement Class Period, for one or more prescription drugs from Walgreens, where prescription insurance benefits were used in filling the prescription(s)." *Id.* ¶ 1.37. Excluded from the Settlement Class are any individuals or entities that have sued or settled in a suit against Walgreens related to its determination of "usual and customary" prices in connection to the Prescription Savings Club. *Id.* The

4

Settlement Class period runs from January 1, 2007, through the date of the Court's preliminary approval of the Settlement Agreement on November 18, 2024. *See id.* ¶ 1.36; Prelim. Approval Ord.

The parties propose splitting the $100 million settlement fund into two pools, allocating 80% of the net proceeds towards the entity claimants (including third-party payors) and 20% of the net proceeds to individual claimants. *See* Guglielmo Decl. ¶ 13. The parties arrived at the proposed allocation plan though expert analysis of the claims data to account for the disparity between damages to *entity* class members versus *individual* class members. *Id.* This allocation is meant to reflect an approximation of the proportional economic harm done to each sub-group within the class. *Id.* The proposed settlement also provided for a notice, opt-out, and claims process. *See* R. 684, Miller Decl. on Class Notice ¶¶ 10–20 (detailing the notice plan); Prelim. Approval Ord. ¶¶ 10–11 (approving the notice plan detailed in the Miller Declaration on Class Notice), 13 (establishing a deadline for claim submission), 14–15 (establishing the opt-out procedures).

The Plaintiffs also filed a motion for attorneys' fees, costs, and an incentive award. Mot. Attys.' Fees. The motion seeks an incentive payment of $5,000 to each individual class representative and $15,000 to each entity class representative. *Id.* at 1–2. It also seeks $30 million in Class Counsel attorneys' fees and reimbursement for $2,497,845.71 in out-of-pocket litigation costs. *Id.*; *see also* R. 767, Suppl. Guglielmo

& Shingler Decl. ¶ 14. The fees, costs, and incentive awards would be taken out of the settlement fund. *See* Stipulation of Settlement ¶¶ 1.2, 1.20.[4]

## II. Analysis

### A. Reconsideration Motion

Before reaching the merits of the Plaintiffs' motions for final approval and attorneys' fees, the Court must first decide the motions filed by the non-party Insurers.[5] First up is the Insurers' motion for reconsideration of the Court's order invalidating their requests to opt out *en masse* 24,000 commercial entities. *See* R. 772, Insurers' Recon. Mot.; R. 768, 08/07/2025 Order.

To understand the current dispute, it is important to emphasize that the Settlement Class definition includes third-party payors, some of which are commercial entities that use self-funded (rather than fully funded) health-insurance plans for their employees. R. 755, Insurers' Excl. Resp. at 4. Those entities (referred to by the parties as "Administrative Services Only clients," or "ASO clients") contract with health-insurance companies to administer their plans; the Insurers pay pharmacy claims on behalf of the ASO clients and then seek reimbursement later. *Id.* at 2, 4; *see also* R. 724, Pls.' Excl. Br. at 3. In March 2025, the Insurers sent exclusion

---

[4]In addition to fees, costs, and awards, Class Counsel also estimates that the cost of the settlement administration will total about $1.85 million, which would also come out of the settlement fund. Tr. of Fairness Hearing at 25:13–22; *see also* Stipulation of Settlement ¶ 5.2.

[5]This Opinion uses the shorthand "the Insurers" to describe a handful of Blue Cross and Blue Shield and Health Care Service Corporation entities. *See* R. 755, Insurers' Excl. Resp. at 2 n.1–2 (listing the sub-entities comprising the Blues and HCSC).

requests asserting that they, as third-party administrators, are authorized to opt out more than 24,000 ASO clients and would-be Settlement Class members. *See* Pls.' Excl. Br. at 2–4; Insurers' Excl. Resp. at 4–5. The Insurers argued that their standard contract language with each ASO client empowered the Insurers to "pursue recoveries on behalf of their ASO clients, including determining whether to opt-out or opt-in to a class action." Insurers' Excl. Resp. at 5–6; *see, e.g.*, R. 721-1, Miller Decl. Exh. 1 at 8 (PDF page number). The Plaintiffs moved to deny those exclusion requests, arguing that the Insurers had not complied with the opt-out procedures required by the preliminary-approval order, and the Court granted that motion. *See* R. 723, Pls.' Excl. Mot.; 08/07/2025 Order.

The Court's decision relied on the fact that the Insurers did not provide any actual evidence of contractual authorization to opt out on behalf of the ASO clients, so there was insufficient evidence to show that the ASO clients did in fact wish to opt out of this settlement. 08/07/2025 Order at 8–10; *see also* Prelim. Approval Ord. ¶ 14 (requiring "proof of the representative's legal authority and authorization to act and request exclusion on behalf of each Class Member"). The Insurers' exclusion requests were also submitted *en masse*—at times requesting exclusion on behalf of over 1,000 entities in a single submission—in violation of the Court-ordered procedures disallowing "group or class-wide exclusions," and requiring that each exclusion request "be submitted … on an individual basis." Prelim. Approval Ord. ¶ 14; *see also* Miller Decl. Exh. 1 at 3, 10–33 (requesting exclusion on behalf of over 1,000 entities). The Insurers now move for reconsideration, arguing that the denial order made manifest errors of

fact in granting the motion to deny the exclusion requests. *See* Insurers' Recon. Mot. But the Insurers' motion for reconsideration suffers from procedural, evidentiary, and merits-based defects, so it is denied.

To start, Federal Rule of Civil Procedure 54(b) states that a court may reconsider an interlocutory ruling "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Motions for reconsideration serve the narrow purpose of correcting manifest errors of law or fact or presenting newly discovered evidence. *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987). Thus, a motion to reconsider is proper when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (cleaned up).[6] But a motion for reconsideration "is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996).

### 1. Procedure

At the outset, the Plaintiffs and Walgreens argue that the motion for reconsideration is procedurally improper because it merely relitigates arguments that the

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

Court has already addressed and rejected. R. 784, Pls.' Recon. Resp. at 4–6, 8–9; R. 783, Walgreens's Recon. Resp. at 2–6. The Insurers respond that their "main argument" for the reconsideration motion is that the Court's interpretation of the opt-out procedures retroactively "rendered the class notice constitutionally invalid … because, if the opt-out procedures were how the Order interprets them to be, then the class notice in this case did 'did not provide the best, most practicable indication to the class members of how to opt out.'" R. 786, Insurers' Recon. Reply at 2–3 (quoting R. 774, Insurers' Recon. Br. at 4). Thus, according to the Insurers, this argument cannot be procedurally improper because it "did not exist until the Order interpreted the opt-out procedures the way that it did." *Id.* at 3. The Plaintiffs and Walgreens are right on this point: the motion is procedurally improper because it provides no new legal or factual points that were not already available during the briefing on the motion to invalidate the exclusion requests.

When a reconsideration motion merely repackages an already-made argument, the Court may reject the motion as procedurally improper if it is essentially rehashing a previously rejected argument. *See Caisse Nationale de Credit Agricole,* 90 F.3d at 1270 (explaining that reconsideration motions should not "rehash[] previously rejected arguments or argu[e] matters that could have been heard during the pendency of the previous motion"); *Bally Export Corp. v. Balicar, Ltd.,* 804 F.2d 398, 404 (7th Cir. 1986) ("[A] motion for reconsideration is an improper vehicle to introduce evidence previously available or tender new legal theories."). This principle applies equally where there was no particular need to bifurcate the issues into separate

9

phases. *See Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.,* 762 F.2d 557, 561 (7th Cir. 1985) (holding that, where "all of the evidence on which [the movant's] new arguments rest was available to it at the time it responded" to the underlying motion, the movant "was obligated to make these arguments at that time").

The crux of the Insurers' main argument is that the Court departed from industry standards that the ASO clients would have naturally read into the notice, so the notice was insufficient. Insurers' Recon. Br. at 3–6. But the Insurers already argued in their original brief that "when commercial entities delegate recovery rights to a third-party insurer via contract, courts honor those delegations and permit mass opt-outs." Insurers' Excl. Resp. at 11. Despite their invocation of a new phrase—"industry standards"—the Insurers' response to the exclusion motion did contend that it is (supposedly) standard practice for courts to honor third-party administrators' contractual arrangements in allowing them to opt out on behalf of ASO clients. *See id.* So the argument on reconsideration is either a gloss on the Insurers' previously presented argument, or one that could have been—and inexplicably was not—raised in the original brief.

To be sure, the Court does not mean to imply that a reconsideration motion is *never* procedurally proper. There are certainly proper reconsideration motions in which the court either misapprehended the arguments that were presented the first time around or new facts or new case law has come to light that could not have been presented earlier. *See Publishers Res., Inc.*, 762 F.2d at 561 (explaining that motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to

present newly discovered evidence" (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665–66 (N.D. Ill. 1982))); *Nucap Indus., Inc. v. Robert Bosch LLC*, 2020 WL 13645506, at *3–4 (N.D. Ill. Aug. 23, 2020) (granting reconsideration where the movant's original failure to flesh out an argument led to the Court's misunderstanding of a central issue in the claim). But neither situation applies here: the Insurers could have argued in their original response that an opposing interpretation of the opt-out procedures would render class notice ineffective, and to the extent that they *did* already argue this by asserting that the ASO clients would have expected the Court to honor the Insurers' opt-out authority, then they cannot rehash it now. So the reconsideration motion is procedurally improper, and for that reason alone, the Court could deny it. *See Rothwell Cotton Co.*, 827 F.2d at 251–52 (affirming the district court's denial of a motion to reconsider where the movant failed to satisfactorily explain why it could not have raised the argument earlier).

## 2. Timeliness

Next, the Plaintiffs argue that the motion for reconsideration is untimely because Civil Rule 60 requires that it be made "within a reasonable time" and it was not filed until 32 days after the issuance of the order invalidating the exclusion requests and two days before the final-approval hearing. Pls.' Recon. Resp. at 12–14 (citing Fed. R. Civ. P. 60(c)(1)). The Insurers respond that Civil Rule 54(b), rather than 60(c), supplies the governing standard, and that the motion is timely because it was filed on the next business day following the thirtieth day after the Court's order. Insurers' Recon. Reply at 5–6.

At the outset, the Court agrees with the Insurers that Civil Rule 54(b) sets the applicable standard because no final judgment has been entered in this case. The rule explicitly allows for reconsideration of interlocutory rulings "at any time *before* the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b) (emphasis added). In contrast, Civil Rules 59 and 60 govern post-judgment motions.

On timing, the text of Rule 54(b) itself does not provide a time deadline for the filing of reconsideration motions. The Insurers assert that motions for reconsideration under Civil Rule 54(b) may be made as late as 30 days after the issuance of the original decision. *See* Insurers' Recon. Reply at 6 (citing *King v. Newbold,* 845 F.3d 866, 868 (7th Cir. 2017)). But the case that the Insurers cite for that proposition addresses motions for entry of final judgment under the *first* sentence of Rule 54(b), not motions for reconsideration, which are governed by the *second* sentence of Rule 54(b). *See King,* 845 F.3d at 868 (explaining that Rule 54(b) "allows a district court to direct entry of a final judgment as to one or more, but fewer than all, claims or parties, but only if there is no just reason for delay" (cleaned up)). So the rule does not explicitly say that a movant can or should wait 30 days to move for reconsideration. But it is also true that the rule sets no express deadline.

Even in the absence of an explicit outer limit for the filing of a timely motion to reconsider under Rule 54(b), litigants must still exercise some regard for the timing of their motions for reconsideration, taking into account upcoming deadlines. *See Wine & Canvas Dev. LLC v. Weisser,* 2014 WL 5089122, at \*2 (N.D. Ill. Oct. 9, 2014).

12

Here, the Insurers' motion to reconsider was filed 32 days after the entry of the order granting the motion to invalidate their exclusion requests, *see* 08/07/2025 Order; Insurers' Recon. Mot., and just two days before the final-approval hearing, which had been scheduled since November 2024, *see* R. 688, 11/18/2024 Minute Entry. At no point between the issuance of the underlying order and the Insurers filing this reconsideration motion did they give any hint that the motion was in the works. They could have moved to continue the final-approval hearing in light of their plans to file the reconsideration motion, but they did not. There is no justification for the Insurers' surprise filing of their three-page motion and eight pages of analysis in the accompanying brief so close to the hearing.[7] Instead, they blame the Plaintiffs for "wait[ing] three months after receiving [their] exclusion requests to move to invalidate them," and argue that the motion was timely because it was very nearly filed 30 days after the Court's order. Insurers' Recon. Reply at 5–6. But the Insurers ignore the extremely close proximity of their filing to the final-approval hearing, and so under these circumstances, the motion for reconsideration was not timely.

### 3. Error of Law

Even setting aside the procedural impropriety and untimeliness of the reconsideration motion, the motion fails on the merits anyway. The Insurers primarily argue that the order contained a manifest error of law because it "construed the opt-out

---

[7]The Court notes that the Insurers' timing is especially hard to understand given the fact that the motion for reconsideration did not proffer any new evidence—such as a single executed ASO contract—nor do the Insurers attempt to argue that it did.

procedures in a way that rendered the class notice constitutionally invalid." Insurers'

Recon. Reply at 2–3. According to them, the preliminary-approval order did not ex-

plicitly mention how the Court would treat exclusion requests from third-party ad-

ministrators, so the clients opting out "naturally interpreted the class notice in the

context of industry norms allowing opt outs in exactly the manner that occurred

here." Insurers' Recon. Br. at 5. In support, the Insurers point to the fact that "fewer

than one tenth of one percent" of the 24,000 ASO clients they purport to represent

have self-filed claims to recover in this settlement. Insurers' Recon. Reply at 4; *see

also* R. 721, Miller Decl. ¶ 6 (listing 22 entities that appeared in the Insurers' opt-out

requests but that have self-filed claims for recovery); R. 758, Miller Suppl. Decl. ¶ 3

(listing 10 additional entities). This shows, they argue, that the other 99.9% of the

ASO clients banked on the Insurers submitting mass opt-out requests on their behalf.

Insurers' Recon. Reply at 4. But that argument does not cure the defects identified

by the order: it remains unproven that the Insurers actually have the authority to

opt out *any* of the 24,000 ASO clients that they are seeking to represent. 08/07/2025

Order at 8–11.

The exclusion-request opinion explained that, because absent class members

will be bound by the judgment in this case, they must receive notice and an oppor-

tunity to opt out of the class. 08/07/2025 Order at 6–7; *Phillips Petroleum Co. v.

Shutts*, 472 U.S. 797, 811–12 (1985); *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 820–

21 (7th Cir. 2011). For this reason, "courts have recognized that opting out is an in-

dividual right that must be exercised individually," requiring some proof that *each*

class member consented to the opt out. *In re TikTok, Inc., Consumer Privacy Litig.*, 565 F. Supp. 3d 1076, 1092–93 (N.D. Ill. 2021). The opinion further explained that, at the very least, it must be reasonably clear to the Court that each class member in the exclusion requests desires to opt out, and not just that the party purporting to represent them—here, the Insurers—desires it. 08/07/2025 Order at 10. On reconsideration, the Insurers do not provide any new evidence or reasoning to challenge the justifications for these requirements.

With this in mind, the opt-out procedures in this case required that exclusion requests be submitted by each class member "on an *individual* basis," and that opt-out requests sent by an agent or representative of a class member include proof of the agent's legal authority to do so. Prelim. Approval Ord. ¶ 14 (emphasis added). But the exclusion requests submitted by the Insurers did not comply with these requirements. They were submitted *en masse* by employees of the Insurer entity rather than the ASO entities. *See, e.g.*, Miller Decl. Exh. 1. What's more, the Insurers submitted no declaration or signature—or even the executed form contracts that they purport to have with each of the 24,000 ASO clients—as evidence that they would *ever* have the authority to opt-out on the clients' behalf. *See id.* Thus, in failing to "provide [a] declaration set[ting] forth the *specific* contract language and identif[ying] the ASO customer that signed the contracts with that language," the opt-out submissions fall short of the requirements that even the Insurers urge this Court to adopt. *See In re Generic Pharmaceuticals Pricing Antitrust Litig.*, No. 16-MD2724 (E.D. Pa. May 1, 2025), R. 3354, Approval of Prop. Notice Plan Order, at 4 (emphasis added); *see also*

15

Insurers' Excl. Resp. at 11 (citing *In re Generic*, No. 16-MD2724). The exclusion-request opinion identified these flaws as fatal to the opt-out requests, concluding that they would create the risk that over 24,000 entities would lose out on settlement proceeds (or at least the option to file a claim for proceeds)—to which they are legally entitled—with no indication from the clients that this is their choice. 08/07/2025 Order at 8–9, 12–13.

On reconsideration, the Insurers provide no record evidence or legal argument to overcome these flaws. In the 32 days between the issuance of the order denying the opt-out requests and the filing of the reconsideration motion, the Insurers apparently did not collect the missing contracts, nor did they collect declarations from the ASO clients to support their purported authorization. Instead, they now argue that the facts—*as they existed when they filed the original response brief*—supposedly give rise to a new consideration about the sufficiency of the class notice. *See* Insurers' Recon. Br. at 5–6. They take issue with the specific phrasing of the opt-out procedures in the preliminary-approval order, *see id.* (citing Prelim. Approval Ord. ¶ 14), criticizing the order's lack of specific instructions for third-party administrators. But the opt-out procedures and the prior order iterate one set of clearly stated requirements for *all* opt-out requests, explaining that "group or class-wide exclusions *shall not be permitted*," and that "*any* request for exclusion by a purported authorized agent or representative of a Class Member must include *proof* of the representative's legal authority and authorization to act. …" Prelim. Approval Ord. ¶ 14 (emphases added). The Insurers, then, were on notice of this so-called departure from industry standards before

16

they ever submitted opt-out requests. Thus, nothing about the order invalidating the requests added new or unexpected information to the opt-out procedures for third-party administrators specifically, and the Insurers could have—but did not—request clarity from the Court or the class administrator upon receiving notice and deciding to pursue opt-out requests.

### 4. Sufficiency of Notice

The Insurers go on to argue that in addition to insufficient opt-out instructions for third-party administrators, "these [class] notices likely did not even reach each of the approximately 24,000 ASO Clients." Insurers' Recon. Br. at 6. The parties respond that there is no evidence that the notice-distribution plan was deficient; on the contrary, there is evidence that the notice did reach at least some of the ASO clients because some clients went so far as to *file claims* for themselves. Walgreens's Recon. Resp. at 9; Pls.' Recon. Resp. at 6–8; *see also* Miller Decl. ¶ 6; Miller Suppl. Decl. ¶ 3. The Court agrees; there is no evidence to support a conclusion that the distribution of the notices was deficient.

As explained in the prior order, the distribution plan consisted of (1) direct email notice; (2) supplemental paid-media notice via social media and digital advertising to a targeted audience; (3) postcard and email notice to third-party payor entities including insurers; and (4) press releases. *See* 08/07/2025 Order at 4; Miller Decl. on Class Notice ¶¶ 10–20, 22–24, 29; Prelim. Approval Ord. ¶¶ 10–11. In their response brief to the Plaintiffs' motion to invalidate their exclusion requests, the Insurers implied that "the notice provided to the ASO clients was extraordinarily

17

deficient." Insurers' Excl. Resp. at 13. But they did not develop the argument further to identify which aspects of the plan were deficient, and so the Court did not delve into this topic substantively. *See* 08/07/2025 Order at 11 n.5.

The Insurers now repeat the contention, this time arguing (somewhat more fully) that "a webpage requires individuals to affirmatively seek out the settlement page … [a]nd publication and social media notice are always 'disfavored' because they contain 'an implicit admission that many members of the class will never know that their rights are before the courts.'" Insurers' Recon. Br. at 6 (internal quotation mark omitted) (citing and quoting *Kaufman v. Am. Express Travel Related Servs., Inc.*, 283 F.R.D. 404, 407 (N.D. Ill. 2012)). Aside from the fact that the Insurers failed to develop this argument at the outset—an argument that was available to them at the time of their original response brief—they also fail to provide evidence suggesting that the ASO clients did not receive notice. *See Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("A party may waive an argument by disputing a district court's ruling in … a one-sentence assertion that lacks citation to record evidence.").

The sole authority cited by the Insurers for the proposition that notice by publication is generally disfavored is distinguishable: there, the court was faced with "very low" response rates that had claimed "only slightly more than one percent" of the settlement fund. *Kaufman*, 283 F.R.D. at 406. That is not the case here, where the claims administrator has received over 17 million claims from individuals and 5,142 claims from third-party payor entities. R. 765, Miller Decl. on Claims ¶ 25. The

18

settlement administrator has confirmed that "[t]his is consistent with [the adminis-trator's] experience in serving as claims administrator for other pharmaceutical class action settlements." *Id.* So given this dearth of evidence for the Insurers' challenge to the notice plan, there is no concrete reason for the Court to conclude that the plan was deficient. Finally, as the exclusion-request opinion noted, the Insurers never ar-gue that *they* lacked notice. 08/07/2025 Order at 11 n.5. Thus, if it is the case that they may act on behalf of the ASO clients, then the notice was not the problem; in-stead, the Insurers' failure to follow the opt-out procedures was the flaw.

### 5. Substantial Prejudice

Lastly, the Insurers argue that the ASO clients will suffer substantial preju-dice if the Court does not allow them to be opted out of this settlement because the Insurers are already separately pursuing claims on their behalf. Insurers' Recon. Br. at 7–8. They contend that "[t]he ASO Clients stand to recover a significant amount through that litigation, far more than they would in the instant case." *Id.* at 7. The Insurers argued this in their response brief to the motion to invalidate the exclusion requests, asserting that they "are already pursuing litigation on behalf of their ASO clients, whose individualized damages likely will far exceed the entire settlement class" in this case. Insurers' Excl. Resp. at 2. That argument was unsuccessful then, just as it is now.

The prior order explained that the Settlement Class definition excludes "all … entities … that have sued, filed an arbitration demand, or participated in a settlement in a suit against Walgreens relating to its determination of usual and

19

customary prices in connection with the Prescription Savings Club." 08/07/2025 Order at 13–14 (citing Prelim. Approval Ord. ¶ 3). For that reason, the Insurers *themselves* were explicitly excluded from the class, so no release applies to them. *See* R. 725, Guglielmo Decl. on Exclusion Req. ¶ 4; R. 726-12, Miller Decl. Exh. 12. Conversely, the ASO clients were not excluded from the Settlement Class as entities that had sued Walgreens separately. *See* Miller Decl. Exh. 12. And the Insurers' submission of claims for the ASO clients to recover in this case further suggests that even the Insurers did not see them as parties to the other lawsuit—until, apparently, now. *See* R. 721-11, Miller Decl. Exh. 13 (attaching the Insurers' claims for the ASO entities); Guglielmo Decl. on Exclusion Req. ¶¶ 6–8 (explaining that counsel for the Insurers had been in contact with Class Counsel to confirm that the Insurers were excluded from this Settlement Class, but never sought confirmation on whether the ASO clients were excluded). A review of the operative complaints in the Insurers' own suits against Walgreens reveals no mention of the ASO clients, despite confirming that the Insurers had knowledge of this suit at the time of at least one of those filings. R. 790-1, Exh. 1, HCSC Cook Cnty. Compl.; R. 790-2, Exh. 2, BCBSM NDIL Compl.; *see also* BCBSM NDIL Compl. ¶ 48 (citing this case and stating that it involves "a putative nationwide class of third-party payors and insured consumers" and "share[s] a similar factual and legal nexus" to those cases).

But even if the Court were to accept the Insurers' contention that they are actually litigating those other cases on behalf of the ASO clients (and there is no proof that they are), a recovery in those cases is merely hypothetical at this point. There is

no information about a contingency agreement (or any other agreement) between the Insurers or ASO clients to confirm that they do actually plan to pay the ASO clients some amount of any potential recovery in those cases. What's more, because the Insurers provided no actual contracts with their clients, the Court cannot even refer to the individual contracts that the Insurers claim to have with the ASO clients to verify that they are empowered to litigate on their behalf and will share any winnings. So the Insurers' substantial-prejudice argument also suffers from a lack of record evidence, a failure that is compounded by their unsubstantiated merits-based arguments for reconsideration and their procedural and timing missteps. The motion to reconsider, R. 772, is denied.

### B. Intervention Motion

The Insurers have also filed a motion to intervene in this case, purporting to invoke Civil Rule 24. R. 780, Insurers' Intervention Mot. According to the Insurers, intervention is warranted as a matter of right because their interest in their ASO clients' recovery against Walgreens is at risk and not otherwise adequately represented by the parties. R. 782, Insurers' Intervention Br.

Under Rule 24(a)(2), a court must permit intervention on timely application by anyone (1) who "claims an interest relating to the property or transaction that is the subject of the action"; and (2) whose interest may be impaired or impeded by disposition of the action. Fed. R. Civ. P. 24(a)(2). Intervention is not permitted, however, if the "existing parties adequately represent that interest." *Id.* The Seventh Circuit has divided this rule into four elements: "(1) timely application; (2) an interest relating to

21

the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 797 (7th Cir. 2019) (cleaned up). A court may deny a motion to intervene if the movant fails to establish any one of these requirements. *Id.* More fundamentally, Rule 24(c) requires that a motion to intervene "state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c).

At the outset, the Plaintiffs and Walgreens both argue that the Insurers' failure to file a pleading alongside their motion to intervene warrants dismissal of the motion. R. 787, Pls.' Intervention Resp. at 6–7; R. 789, Walgreens's Intervention Resp. at 3–5. The Insurers reply that they are not seeking intervention for the purpose of asserting any claims or defenses, so they need not file a pleading. R. 790, Insurers' Intervention Reply at 2–7. Instead, the Insurers contend that they only want the right to appeal the Court's decision on their exclusion requests, and courts regularly permit similar interventions without pleadings in similar settings. *Id.* The Court agrees with the Insurers on this point.

It is true that Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Failure to identify a claim or defense makes it difficult for courts to discern whether a moving party has a "direct, significant, and legally protectable interest in the question at issue in the lawsuit." *Wis. Educ. Ass'n Council v. Walker*,

22

705 F.3d 640, 658 (7th Cir. 2013) (cleaned up). But a court may overlook this procedural deficiency if no prejudice would result. *Retired Chi. Police Ass'n v. City of Chicago,* 7 F.3d 584, 595 (7th Cir. 1993); *see also Shevlin v. Schewe,* 809 F.2d 447, 450 (7th Cir. 1987) ("We do not advocate a strict interpretation of the rule in all circumstances … but that does not mean that intervenors may totally ignore the rule ….").

In this case, the Insurers have made clear that they only seek to intervene for the purpose of pursuing the opt-out litigation, and not to assert any claims or defenses on the merits as between the parties. *See* Insurers' Intervention Br. at 5 ("The only action the Plans intend to take based on their intervention is appealing the Court's granting of Plaintiffs' motion to deny their exclusion requests and overrule their objections …."); R. 790, Insurers' Intervention Reply at 2 (explaining that the Insurers seek "to formalize their status solely to be able to appeal the resolution of Plaintiffs' motion to invalidate …."). Thus, strict adherence to Rule 24(c)'s requirement to attach a pleading is not necessary for the sake of considering the merits of the motion, and the Court will overlook the lack of pleading to address the substance of the arguments. That said, it is difficult for the Court to evaluate whether the Insurers have a "direct, significant, and legally protectable interest in the question at issue in the lawsuit," *Wis. Educ. Ass'n Council,* 705 F.3d at 658 (cleaned up), and it probably would have helped if the Insurers had attached a formal pleading. In any event, for the reasons explained next, the motion to intervene is denied.

### 1. Timeliness

Timeliness is a prerequisite for a motion to intervene. *See Lopez-Aguilar v. Marion Cnty. Sheriff's Dept.*, 924 F.3d 375, 388 (7th Cir. 2019). The Insurers filed their motion to intervene in September 2025. *See* Insurers' Intervention Mot. The Insurers assert that their motion is timely because their interest in this case only emerged in June 2025, when the Plaintiffs moved to invalidate their exclusion requests. Insurers' Intervention Br. at 5. And from June until September 2025, intervention was unnecessary because they were able to participate in the proceedings to the extent required through the briefing schedule. *Id.* They also argue that the parties will not be harmed by their timing in filing the motion because they do not intend to assert a claim at this stage. *Id.* In response, the parties argue that the Insurers knew of this case for several years but waited to act until now, and that the delay will prejudice them because disbursements to the class cannot be made until the judgment is final and non-appealable. *See* RPls.' Intervention Resp. at 8–10; Walgreens's Intervention Resp. at 5–8. The parties are right: given the circumstances, the motion to intervene was not timely filed.

The Seventh Circuit has explained that "timeliness [under Rule 24] is not limited to chronological considerations but is to be determined from all the circumstances." *Lopez-Aguilar*, 924 F.3d at 388 (cleaned up). Thus, the Court must consider four factors to determine whether the Insurers' motion was timely: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the

24

intervenor if the motion is denied; and (4) any other unusual circumstances." *Id.* (cleaned up). Thus, "[t]he test for timeliness is essentially one of reasonableness," requiring would-be intervenors to be "reasonably diligent" in acting promptly upon learning of suits that could impact their rights. *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995) (cleaned up).

At the very least, there can be no dispute that the Insurers had actual knowledge of this case in March 2025 when they sent the exclusion requests. *See* Miller Decl. ¶ 3 (noting that the class administrator received the requests in late March, and they were dated March 18, 2025). And the Plaintiffs filed their motion to invalidate the exclusion requests three months later, in June 2025. *See generally* Pls.' Excl. Mot. So the Insurers had been on notice that the Plaintiffs were objecting to the exclusions at least three months before the Insurers filed the motion to intervene. The unreasonableness of this delay is underscored by the fact that the motion to intervene was filed nine days *after* the final-approval hearing. *See generally* Insurers' Intervention Mot. (filed on September 19, 2025); 11/18/2024 Minute Entry (scheduling the final-approval hearing for September 10, 2025).

Their only excuse for the six-month delay in filing the motion is that they were able to participate to the full extent they desired until the Court denied their request for remote participation at the final-approval hearing, which they took as a "highlight[ing]" of their "limited rights in this case." Insurers' Intervention Br. at 5.[8] But

---

[8]The Court notes that its partial denial of the request for remote participation in the final-approval hearing was not meant as a proclamation on the Insurers' limited role in the

25

this argument only further proves the unreasonableness of the delay by confirming that the Insurers definitely had knowledge of the date of the final-approval hearing, and still did not choose to file their motion sooner or at least put the Court or parties on notice. Had the Court known—before the hearing—that the Insurers planned to file a motion to intervene, it would had impacted whether the hearing could go forward as planned and which additional processes the Court may have instituted ahead of it. So under these circumstances, the motion to intervene was not timely filed. *See Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003) ("A prospective intervenor must move promptly to intervene as soon as it knows or has reason to know that its interests might be adversely affected by the outcome of the litigation.").

## 2. Interest

Even if the intervention motion had been timely filed, the Insurers must show that they have an interest in the subject matter here that faces potential impairment by the disposition of this suit. *See Sec. Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1380 (7th Cir. 1995). The "interest" required by Rule 24(a)(2) must be "direct, significant, [and] legally protectable," amounting to "something more than a mere betting interest … but less than a property right." *Id.* at 1380–81 (cleaned up). Courts "focus on the issues to be resolved by the litigation and whether the potential

---

case. The Insurers were welcome to attend the proceeding in person, and the Court encouraged those raising substantive objections to do so to the extent possible. Still, some remote participation for *individual* objectors was allowed due to the significant traveling costs to out-of-state individuals.

intervenor has an interest in those issues," undergoing a fact-specific inquiry in each circumstance. *Reich*, 64 F.3d at 321–22.

The Insurers assert that they have an interest in this dispute because "[t]he proposed settlement would release the Plans' ASO clients' claims against Walgreens—which the Plans are contractually authorized to pursue on their clients' behalf, … despite the Plans currently litigating those same claims in the Plan Suits." Insurers' Intervention Br. at 5–6. They also argue that they have an interest in this suit's core underlying transactions because they paid for the prescriptions for the ASO clients as part of their administrative services. *Id.* at 6. But as the Court has already explained in the order invalidating the exclusion requests—and then again in the reconsideration analysis—the Insurers have yet to provide any concrete evidence that they have a right to pursue claims against Walgreens on behalf of the ASO clients. *See* 08/07/2025 Order at 15. So any argument that the Insurers' interest exists on behalf of the ASO clients is unconvincing. And the argument that they *themselves* have an interest because they paid for the prescriptions on behalf of the ASO clients also fails, because it is not clear how that interest could be impaired by this lawsuit: to repeat, the Insurers were excluded from the class definition and have already filed a separate lawsuit, which is not subject to a release as to the Insurers' claims for themselves. Far from being direct or significant, any interest the Insurers purport to have in this case is vague and unsubstantiated.

Even if the Insurers could articulate a sufficient interest for the purposes of Rule 24(a), they would also need to show that the interest was at risk of potential

impairment by the disposition of this lawsuit. "Impairment exists where the proposed intervenor's purported interest could be decreased in value by a decision in the underlying litigation." *F.T.C. v. Med Resorts Int'l, Inc.*, 199 F.R.D. 601, 606 (N.D. Ill. 2001). According to the Insurers, the proposed settlement would release the ASO clients' claims against Walgreens, which they are contractually authorized to pursue on their behalf and are currently litigating elsewhere. *See* Insurers' Intervention Reply at 9–11. But if it is the Insurers' interest at stake, then it is difficult to understand how it could possibly be impaired by this lawsuit, given that they are not part of the Settlement Class and their claims will remain intact. They are thus free to continue with their case regardless of what happens in this one. And if it is the ASO clients' interests at stake, then it is not clear that those clients even *have* a claim in the Insurers' other cases. As the Court explained earlier, reviews of those complaints reveal no mention of the ASO clients. *See generally* HCSC Cook Cnty. Compl.; BCBSM NDIL Compl. And the Insurers' submission of claims for recovery on behalf of the ASO clients in this case is evidence against the contention that they are plaintiffs elsewhere. Thus, the Insurers have failed to show that they have an interest in this litigation, or that the interest could potentially become impaired.

### 3. Adequate Representation

Finally, the Insurers fail to show that any potential interest could not be adequately represented by the parties in this case. *See Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774–75 (7th Cir. 2007); *Med Resorts Int'l*, 199 F.R.D. at 607. This showing, under Rule 24(a)(2), need not be absolute: it is enough to show that the current

representation of the Insurers' interest "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). But where there is no conflict of interest between the potential intervenor and the existing parties, "adequacy of representation is presumed." *Med Resorts Int'l*, 199 F.R.D. at 607. According to the Insurers, their interests are not adequately represented because the Plaintiffs are clearly adversarial—as evidenced by their motion to invalidate the exclusion requests—and neither party is going to appeal a settlement into which they voluntarily entered. Insurers' Intervention Br. at 6.

This argument fails for similar reasons as have already been discussed. To the extent that the Insurers are arguing that *their* interests are not adequately represented, that contention is undercut by their failure to clearly articulate any interest on their own behalf at all. If the Insurers claim to have an independent interest in opting out the ASO clients, there is no reason why the ASO clients—as members of the Settlement Class—are not adequately representing themselves. This must be the case if the ASO clients and the Insurers' interests are the same and the Insurers really are empowered to act on their behalf to pursue recoveries. And if the Insurers are claiming that the ASO clients have an interest in this litigation that the Insurers must intervene to protect on their behalf, then there can be no argument that the ASO clients—as class members in this suit—are inadequate representation for themselves. As members of the Settlement Class, the ASO clients have the same interests as the Plaintiffs. There has been no showing to rebut the presumption of adequate

representation, so the Insurers have thus failed to satisfy this requirement. The Insurers' motion for intervention as of right is denied.

### 4. Permissive Intervention

Even if intervention as of right is not available, courts may still exercise their discretion to allow permissive intervention under Rule 24(b). *See Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). Permissive intervention is appropriate only when the movant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Unlike intervention as of right, this analysis is a balancing test. *See Planned Parenthood of Wis., Inc.*, 942 F.3d at 803. The Insurers relegate this request to a footnote, arguing that they "have asserted claims in the [other lawsuits] that include the claims that would be released by the settlement in this case." Insurers' Intervention Br. at 4 n.5.

For the reasons already discussed in this Opinion, the Insurers' request for permissive intervention is denied. First, the Insurers have not developed this argument to explain how they meet the requirement of Rule 24(b)(1)(B).[9] Yes, the Insurers have similar claims to the ones brought here that they are litigating in another case, but that alone is not enough to persuade the Court that they should be allowed to intervene in this case. Second, as explained already, the motion to intervene is untimely. And third, the Insurers have not articulated an interest that is at risk of

---

[9]The Court notes, again, that the Insurers' choice to only raise this argument "in passing in a footnote" could be read as a waiver. *Long,* 585 F.3d at 349; *see also United States v. White,* 879 F.2d 1509, 1513 (7th Cir. 1989) ("[B]y failing to raise this issue other than by a passing reference in a footnote, [the appellant] has waived it.").

impairment or not already adequately represented. So the Insurers' motion to intervene, R. 780, is denied in full.

## C. Class Certification for Final Approval

Having addressed the Insurers' motions, the Court now turns to the Plaintiffs' motion for final approval of the Settlement Agreement. R. 762, Pls.' Final Approval Mot. The first step in evaluating the Settlement is to determine whether the class can be certified. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses *of a certified class* … may be settled, voluntarily dismissed, or compromised only with the court's approval." (emphasis added)). To be certified, the class must meet the requirements of Rule 23. *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). Under Rule 23(a), the class must meet the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Additionally, the class must satisfy at least one of the conditions of Rule 23(b). Fed. R. Civ. P. 23(b); *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). In this case, the relevant Rule 23(b) requirement is that "the questions of law or fact common to class members" must "predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court will evaluate each requirement in turn.

## 1. Ascertainability

Implicit in Rule 23(a) is the requirement that the proposed class must be definite enough to be ascertainable. *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).

Generally, this means that a class must be clearly defined by objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Classes defined by vague or subjective criteria, or classes defined only in terms of success on the merits (so-called "fail-safe classes"), fail the ascertainability requirement. *Id.* at 659–60. The class definition in this case, however, does not suffer from those shortcomings. The class defined in the Settlement Agreement is "[a]ll individuals or entities in the United States and its territories who paid, in whole or in part, at any point in time from January 1, 2007 through [November 18, 2024], for one or more prescription drugs from Walgreens, where prescription insurance benefits were used in filling the prescription(s)." Prelim. Approval Ord. ¶ 3. This class definition articulates an identifiable class of individuals using objective limiting criteria. The proposed class as defined by the preliminary-approval order satisfies the ascertainability requirement.

### 2. Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no bright-line test for numerosity, courts have long commented that a class of forty or more is enough to satisfy Rule 23(a)(1). *See, e.g.*, *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008); *Fauley v. Drug Depot, Inc.*, 323 F.R.D. 594, 599–600 (N.D. Ill. 2018). At last count, the class in this case had over 17 million individual claimants and 5,142 third-party payor claimants. Miller Decl. on Claims ¶ 25. That is (quite obviously)

32

more than enough to make joinder impracticable, so the numerosity requirement of Rule 23 is met.

### 3. Commonality

Rule 23(a)'s second requirement is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is satisfied if the class members' claims "depend upon a common contention." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The common contention "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Additionally, "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

All of the class claims in this case depend upon the common contention that Walgreens was overcharging insured customers in comparison to the Prescription Savings Club members by maintaining an impermissible dual-pricing scheme. *See, e.g.*, Fourth Am. Compl. ¶¶ 4–6. The common issue thus is whether Walgreens's use of the Prescription Savings Club improperly allowed it to charge its insured customers more than genuine usual and customary prices. *Id.* Central to this issue is the question of whether Walgreens's representations to consumers and third-party payors were false and misleading, which "is a common contention that is capable of class-wide resolution because the determination of its truth or falsity will resolve an

issue that is central to the validity of each one of the claims in one stroke." *Mullins*, 795 F.3d at 673 (cleaned up). Commonality is satisfied in this case.

### 4. Typicality

Next is the requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (cleaned up). In this case, each plaintiff's claim arises from the same event (paying for a prescription at Walgreens within the covered period using insurance) and the same legal theory (that the Prescription Savings Club prices were the usual and customary prices, so the insured customers were overcharged). The named Plaintiffs' claims arise from the same events, *see, e.g.*, Fourth Am. Compl. ¶¶ 17–24 (individual Plaintiffs), ¶¶ 26–37 (third-party payor Plaintiffs), and would not elicit any unique defenses, so their claims are typical of the rest of the class.

### 5. Adequacy

Last up of the Rule 23(a) requirements is the rule that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). When evaluating adequacy of representation, courts consider "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the absentee members." *Sec. of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc). As already

discussed, the named individual and entity Plaintiffs are adequate representatives, because their claims are very similar to the other claims in the class, without complicating factual issues that would lead to "antagonistic or conflicting claims." *Retired Chi. Police Ass'n*, 7 F.3d at 598 (cleaned up).

As for the adequacy of the Plaintiffs' co-lead Class Counsel, Scott+Scott Attorneys at Law LLP and Robbins Geller Rudman & Dowd LLP are experienced in large-scale consumer class actions, corporate fraud, and other complex civil litigation. *See* R. 86-1, Exh. A, Scott+Scott Firm Resume at 6–7 (PDF page numbers) (listing past representations in consumer class actions for overcharges and deceptive marketing); R. 86-1, Exh. B, Robbins Geller Firm Resume at 1–2 (same). Class Counsel has also invested a considerable amount of time and money into pursuing the class's recovery in this case: reviewing around 80,000 documents, participating in 36 depositions and multiple rounds of motion-to-dismiss briefing, and compiling expert reports for class certification. *See* Guglielmo Decl. ¶¶ 4–5; R. 91, 03/09/2018 Order; R. 421, 03/23/2021 Order. Counsel has also designated a separate counsel for the individual Settlement-Class members to ensure that the settlement fund is distributed equitably. Guglielmo Decl. ¶ 13. Thus, the representative parties in this case are adequate.

### 6. Predominance and Superiority

As a final hurdle before class certification, the Plaintiffs must show that they fit into at least one of the categories outlined in Rule 23(b). The 23(b) category that is most applicable here requires that "questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3) (emphasis added). The predominance requirement is similar to the commonality and typicality requirements, but "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997). Predominance is established if "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (cleaned up). The Court should take a pragmatic view of the evidence and issues in the case, and "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) (cleaned up).

In this case, the predominance requirement is satisfied by the common question of law regarding Walgreens's liability for allegedly overcharging insured customers through the use of a dual-pricing scheme. *See* Fourth Am. Compl. ¶¶ 4–6, 78–87, 113–131. Each of the 17 million individual class members' and over five thousand third-party payor entities' cases will hinge on that preliminary question, and the same evidence is likely to suffice for each member of the class to make their prima facie showing. *See Messner*, 669 F.3d at 815. This common legal question thus "represent[s] a significant aspect of [this] case and can be resolved for all members of [the] class in a single adjudication." *Id.* (cleaned up).

The question of whether Walgreen's Prescription Savings Club prices were improperly left out of the usual and customary pricing calculation will also likely

36

generate one answer applicable to all members of the class. Another district court concluded the same when it considered a similar legal theory in a lawsuit against CVS Pharmacy, writing that the issue of "whether [the pharmacy] fraudulently failed to include its [prescription club] prices in its U&C pricing [] will provide common answers." *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 540 F. Supp. 3d 182, 206 (D.R.I. 2021) (citing *Dukes,* 564 U.S. at 350); *see also Corcoran v. CVS Health Corp.*, 779 F. App'x 431, 433 (9th Cir. 2019) ("It is enough for plaintiffs to show that CVS failed to report the [prescription club] prices as U & C prices contrary to the [pharmacy benefits manager] contracts, and that, as a result, plaintiffs were charged higher copayments."). Thus, litigating the issue in a single class action is preferable to millions of individual lawsuits.

Of course, there may be individual variation in each claim: some class members likely overpaid more than others because their prescriptions were more costly or needed more frequent refills, and the insurance schemes introduce another fertile area for variation. But on the whole, all of the millions of claims tie back to the same common question, so this class satisfies the requirements of Rule 23(b).

In sum, the requirements of Rule 23 are met, so the Court certifies the class for settlement purposes.

### D. Settlement Approval

With the Settlement Class certified, the next step is evaluation of the Settlement Agreement itself. Rule 23(e) governs the evaluation of proposed class settlements. If the proposed settlement would bind class members (as the settlement in

37

this case does, *see* Prelim. Approval Ord. ¶ 29), then the Court may approve it "only after a hearing" and a finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court's approval is not a mere rubber stamp. Given the potential informational gap between class members and their attorneys, and given the potential differing incentives between those two groups, the Seventh Circuit requires district judges to carefully examine proposed settlements for fairness, going so far as to describe the judge as "a fiduciary of the class." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279–80 (7th Cir. 2002). In evaluating fairness, courts consider "the strength of plaintiffs' case compared to the amount of defendant's settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs. Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (cleaned up).

### 1. Strength of the Case and Value of the Settlement

This first factor is the most important to the Court's analysis of the settlement's fairness. *Synfuel*, 463 F.3d at 653. The Court begins by estimating the "net expected value of continued litigation to the class, since a settlement for less than that value would not be adequate." *Reynolds*, 288 F.3d at 284–85. Although a "high degree of precision cannot be expected," the parties must at least "present evidence that would enable" a fair "ballpark valuation." *Synfuel*, 463 F.3d at 653 (cleaned up). Still, the Seventh Circuit has noted that "evaluation of potential outcomes need not

38

always be quantified, particularly where there are other reliable indications that the settlement reasonably reflects the relative merits of the case." *Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 285 (7th Cir. 2017); *see also Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014).

The first step to assessing the settlement is to evaluate the estimated proposed payout for each class member. In this case, the gross settlement fund is $100 million, covering an estimated 87 million individual class members and 42,000 entity class members. Pls.' Final Approval Br. at 1–2, 4–5. Taking Class Counsel's request for $30 million in attorneys' fees and $2,497,845.71 in expenses at face value for now, as well as the estimated $1,850,000 in settlement administration costs, and the $60,000 total requested incentive awards, the class's net recovery from the fund is expected to be around $65,592,154.29.[10] *See* Mot. Attys.' Fees at 1–2; Suppl. Guglielmo & Shingler Decl. ¶ 14; R. 788, Tr. of Fairness Hearing at 25:13–22. Of the total number of estimated class members, 17,140,542 individuals and over 31,000 third-party payor entities have filed claims to recover from the fund.[11] Miller Decl. on Claims ¶ 25; Tr. of Fairness Hearing at 19:18–24.

---

[10]The precise calculation for the estimated net settlement fund is as follows: $100,000,000 - $30,000,000 - $2,497,845.71 - $1,850,000 - $60,000 = $65,592,154.29.

[11]The Court notes that Class Counsel expects the final number of individual class members receiving payouts will be lower, as the 17 million total individual claims had not yet been screened for fraud as of the date of the briefing and fairness hearing. *See* Tr. of Fairness Hearing at 20:6–12. The Court also notes that although the settlement administrator received only 5,142 claim forms for third-party payor entities, those claim forms cover approximately 31,000 third-party payor class members. *See id.* at 19:18–24; Miller Decl. on Claims ¶ 25.

The parties intend to split the settlement fund into two pools, allocating 80% of the funds to the entity class members and 20% to the individual class members.[12] R. 683-2, Exh. A, Prop. Allocation Plan ¶ 11; *see also* Pls.' Final Approval Br. at 11–12; Guglielmo Decl. ¶ 13. According to Class Counsel, this allocation is the result of expert analysis on the claims data from Walgreens and is intended to approximate the proportional harm that each pool of Plaintiffs suffered. *See* Guglielmo Decl. ¶ 13 ( "Expert analysis revealed that [third-party payor entities] shouldered a greater portion of the financial impact from the alleged overcharges, as they covered more of the prescription drug costs allegedly inflated beyond the 'usual and customary' prices charged by Walgreens."). The Plaintiffs' economic expert, Dr. Lynette Hilton, developed a methodology for approximating the value of alleged overpayments that the class has suffered by analyzing a subset of the Walgreens's claims data to isolate—in any given case—the extent to which the individual consumer and the entity insurer paid more than Prescription Club Members for specific drugs. R. 553-44, Exh. 55, Hilton Rep. at 9–12; *see also* R. 553-44, Hilton Rep. Exh. 3, Illustrative Examples. This distribution is an efficient and common-sense way to allocate the settlement fund to the class based on their relative economic harm, and courts regularly find that allocation plans "that reimburse[] class members based on the extent of their injuries" are "generally reasonable." *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1

---

[12]The Court addresses class members' objections to this proposed distribution in Section II.D.6 of this Opinion.

40

(N.D. Cal. June 18, 1994); *see also In re High-Tech Emp. Antitrust Litig.*, 2015 WL 5159441, at \*8 (N.D. Cal. Sep. 2, 2015) (collecting cases).

Thus, applying the 80/20 allocation to the net settlement fund, roughly $52,473,723.43 will be allocated to the entity claimants (the parties refer to this as "Pool 1"), and $13,118,430.86 will go to the individual claimants ("Pool 2"). *See* Prop. Allocation Plan ¶ 11 (delineating the separate settlement Pools). From there, the claimants will be paid on a *pro rata* basis from their respective Pools using the relative size of their claim amount. *See id.* ¶¶ 8 (explaining the valuation of the claims), 11 (explaining that the claimants' payout will be calculated by dividing their claim amount by the total amount of claims in that Pool, and then multiplied by the total amount of net funds in that Pool). Although it is not possible for the Court to fully calculate the amount that each claimant will receive from the proposed settlement without knowing the received claim amounts, the Court assumes for illustrative purposes that each individual and entity claimant has filed a claim that is roughly the same as the rest of their Pool, such that the Pool is split amongst its respective claimants equally. This would mean that each entity class member will receive an average payment of $1,692.70 from the fund, and each individual will receive about 77 cents.[13]

With this in mind, the Court must now "weigh the probabilities and possibilities of victory or defeat" for the class. *See Dorvit ex rel. Power Sols. Int'l, Inc. v.*

---

[13]The precise calculation for the estimated payment amounts is as follows: $52,473,723.43 / 31,000 = $1,692.70 per entity; $13,118,430.86 / 17,140,542 = $0.77 per individual.

*Winemasters*, 950 F.3d 984, 988 (7th Cir. 2020) (cleaned up). In some cases, the Court has the benefit of a statutory-damages provision, so it can know exactly what victory would look like for the class members. *See, e.g.*, *Leung v. XPO Logistics, Inc.*, 326 F.R.D. 185, 196–97 (N.D. Ill. 2018). But a statutory-damages provision does not exist in this case, so the Court must instead approximate the potential damages that a victory on the merits would have brought for the class, using the Plaintiffs' estimation of the total amount of class-wide damages.[14]

The Plaintiffs' expert, Dr. Hilton, estimates that the total amount of alleged overpayments for the class is around $750 million to $1 billion. *See* Tr. of Fairness Hearing at 21:9–15; *see also* Hilton Rep. at 9–12 (explaining her methodology for approximating class-wide overpayments). Thus, around $800 million of that total victory would likely be allocated to the entity Plaintiffs, and $200 million would go to the individual Plaintiffs.[15] Class Counsel also estimates there to be around 87 million individual potential class members and 42,000 entity potential class members. *See* Pls.' Final Approval Br. at 2; Miller Decl. on Claims ¶ 26. Once again assuming that the class members' claims would be roughly similar to one another within the Pools, entity class members would receive award payments of about $19,048 and individuals

---

[14]The Court notes that using the Plaintiffs' estimation of class-wide damages is the most conservative approach in this case, because this estimation is likely the absolute ceiling—rather than the floor—of the damages that the class may have actually won at trial.

[15]For the sake of conservative estimation, the Court does not take from the $1 billion figure any attorneys' fees or costs that would also need to come out of the total damages award.

would receive about $2.[16] Comparing these figures to the proposed settlement, not surprisingly the class will receive less money now than it might stand to gain if it were to continue through the litigation and win the case on the merits for the absolute highest amount of estimated damages.

But the difference between the settlement recovery and the estimated maximum damages does not necessarily render the settlement unfair. The *expected* value of continued litigation is likely less than $1 billion, and these damages of course would only be awarded if the Plaintiffs prevailed; otherwise, the Plaintiffs would receive nothing. The Court and parties ought not to discount the substantial risk to the class of Walgreens winning this case outright on the merits, especially in light of CVS Pharmacy's complete victory in a similar case after a jury trial. *See Washington v. CVS Pharmacy, Inc.*, 2022 WL 17430289, at *1–2 (9th Cir. Dec. 6, 2022) (affirming the district court's evidentiary decisions on jury instructions after a jury returned a verdict in favor of CVS in a failure-to-report discount drug prices as usual and customary). And the outcome of this case is far from clear, given that the Plaintiffs would need to defeat a probable motion for summary judgment, get certified as a class, and overcome Walgreens's affirmative defenses on cash payments and individual contracts. *See* R. 485, Walgreens Answer at 110–14. So after discounting the expected value of litigation to the class to account for the risk of failure, the settlement

---

[16]The precise calculation for the estimated award amounts is as follows: $800,000,000 / 42,000 = $19,047.62 per entity; $200,000,000 / 87,000,000= $2.30 per individual.

amount—while obviously low on a per-member basis, especially for individuals—is not unreasonable or unfair.[17]

Also, both sides benefit from avoiding the "time, expense, and uncertainty of litigation." *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016). Even if the class were to be certified for disputed-litigation purposes (as distinct from settlement purposes), survive summary judgment, and win at trial, they would also possibly face an appeal. That process could take years, and the Plaintiffs would not receive their distributions until the end (if ever). Thus, both sides are paying for the convenience of avoiding the risk and length of continued litigation, which is "the essence of a settlement." *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135 (7th Cir. 1979). The overall settlement amount is fair when considered in the full context of this case: the class forfeits their chance at a $1 billion recovery, but gains the certainty and finality of ending the litigation now for $100 million. This factor thus favors approval.

### 2. Complexity, Length, and Expense of Litigation

As discussed above, continued litigation is likely to be extensive and risky. The Plaintiffs would need to win certification outside of the settlement context, and then overcome (like by opposing a motion for summary judgment) Walgreens's affirmative

---

[17]The Court also notes that it would be unlikely for *any* individual customers to bring their own actions at all, given the small sum of estimated damages they would stand to gain (two dollars) and the amount of attorneys' fees they would likely incur. It is thus preferable that Walgreens pay $100 million on a class-wide basis to answer for these claims instead of having several millions of individual class members be priced out of the litigation on a one-off basis, which would result in Walgreens keeping its millions and continuing its Prescription Drug Program.

defenses that the Prescription Savings Club prices are not cash-based (and so they need not be reported as usual & customary) and that the prescription benefits managers did not require Prescription Savings Club reporting. *See* Pls.' Final Approval Br. at 10–11 (summarizing Walgreens's key defenses raised thus far in its opposition to class certification and motions to dismiss). After that, the class would still face the uncertainty and cost of trial (again, keeping in mind that CVS won a defense verdict in a jury trial on a similar theory, *see CVS Pharmacy, Inc.*, 2022 WL 17430289, at *1) and potential appeal. The Court reiterates its conclusion that both the class and Walgreens benefit from avoiding these risks and expenses through a definite and immediate settlement, so this factor favors approval.

### 3. Opposition to the Settlement

The relatively low number of objections from the class is another factor in favor of settlement approval. Here, in response to around 42,000 direct notices sent to potential entity class members, the settlement administrator received no entity objections and only one opt-out request. Miller Decl. on Claims ¶¶ 5, 20–24.[18] And on the individuals' side, of the 87 million notices that went out, over 17 million claims were filed and only three individual class members objected. *See id.* ¶¶ 8, 21–25. Also, only 79 exclusion requests were received from individuals, and of those, only 54 were deemed valid. *See id.* ¶ 20. "Such a low level of opposition supports the

---

[18]The Court does not count the Insurers' opt-out requests or objections, discussed earlier, because they are deemed to be invalid.

reasonableness of the settlement." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. 2015) (finding that 20 objections in response to 9 million notices evidenced the reasonableness of settlement).

Of the three individual class member objections, one is from an individual that has opted out of the class, so he is no longer a party. *See* R. 708, Bentley Obj.; Miller Decl. on Claims ¶ 24 (explaining that Steven Bentley confirmed over the phone that he wished to opt out); *In re Brand Name Prescription Drugs Antitrust Litig.*, 115 F.3d 456, 457 (7th Cir. 1997) ("Having opted out of the class action, [the opt-outs] were no longer members of the class and so in no sense were parties.").[19] The remaining two objections voice concerns about the amount of attorneys' fees, the deadlines for objections, Walgreens's recordkeeping, the difficulty in obtaining prescription records for the covered period, the claims-filing process, the remote-participation procedures for the fairness hearing, and the 80/20 allocation. *See* R. 703, Hodge Obj.; R. 709, Ries Obj.; R. 770, Hodge Suppl. Obj. These two objections are discussed in greater detail below, but for now, it is enough to note the extremely low level of opposition to the settlement.

---

[19]The Court notes that Bentley's opt-out request states that he is opting out on an individual basis, but that his company will not be opting out and will thus file an objection. Miller Decl. on Claims, Exh. J at 59 (PDF page number). Bentley later stated in writing that he "want[ed] to object in front of [the] judge," Miller Decl. on Claims, Exh. L at 69 (PDF page number). But the substance of the objection does not imply that it was made on behalf of Bentley's company. *See* Bentley Obj. at 1–2 (showing that Bentley signed the letter with his own name and used "I" statements in voicing his objection). And unlike the other two objectors, Bentley did not appear at the fairness hearing. Thus, the Court will not consider his objections, having deemed him no longer a part of the litigation.

### 4. Opinion of Competent Counsel

Class Counsel (not surprisingly) endorses the Settlement Agreement. Final Approval Br. at 14; *see also* Guglielmo Decl. ¶ 11. Although far from an objective observer—in fact, Class Counsel is the greatest single beneficiary of the Settlement Agreement—this still weighs in favor of approval. *See In re Capital One Telephone Consumer Protection Act Litig.*, 80 F. Supp. 3d 781, 792 (N.D. Ill. 2015). Class Counsel has experience litigating class actions—particularly consumer-fraud class actions— and has litigated this case for seven years, making it familiar with the factual and legal hurdles still to come. The Settlement Agreement is the result of several months of negotiations between counsel for both sides and a formal mediation session that was overseen by an experienced mediator. Guglielmo Decl. ¶¶ 6–7, 11.

### 5. State of the Proceedings and Amount of Discovery Completed

The last *Synfuel* factor considers the stage of the proceedings and the amount of discovery completed at the time of settlement. 463 F.3d at 653. This factor is crucial because it allows the Court to evaluate whether parties have enough information to reach a fair settlement. *See Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998). In this case, the parties completed extensive fact discovery, ensuring that they understood their relative legal positions before entering settlement negotiations. Guglielmo Decl. ¶¶ 3–5 (detailing that the parties completed fact discovery, briefed class certification, and engaged in Rule 702 motions practice). They had an enormous amount of information by the time they began the settlement

47

negotiations, which lasted several months and relied on the evidence uncovered from discovery. *See id.* ¶ 6–8. Thus, the case is at a stage in which the parties can value the litigation and arrive at a reasoned decision on settlement. This factor favors approval.

### 6. Objections to the Settlement

The circumstances of this case, discussed above, show that the Settlement Agreement is fair, reasonable, and adequate under Rule 23(e), and none of the objections undermine that conclusion. As previously mentioned, only two individual class members have objected to aspects of the settlement. One of these objections pertains exclusively to the proposed attorneys' fees, so the Court will discuss that in depth later. *See* Hodge Obj.; Hodge Suppl. Obj. Thus, only one class member—Mr. Kenneth Ries, on behalf of himself and the estates of his parents—objects to the settlement terms. Ries objects for several reasons: (1) the objection deadline should have been later; (2) Walgreens routinely destroys records that would have been beneficial to class members; (3) Class Counsel has not adequately considered how difficult it is for class members to obtain the requisite records for their claims; (4) the notice did not provide an email for objections; (5) Class Counsel and the Court should have an electronic process to request remote participation in the fairness hearing; (6) the 80/20 allocation lacks reason; and (7) the administrator's categorization of Ries and his late mother as "unknown claimants" increased the requirements for their claims and

constitutes disparate treatment. *See* Ries Obj. at 2–4 (PDF page numbers).[20] Of these objections, many have since been mooted by Ries's ability to file his objection and remotely participate in the fairness hearing, *see* Tr. of Fairness Hearing at 7–13, and Ries's timely filing of claims for recovery on behalf of himself and his parents' estates, *see* Miller Decl. on Claims ¶ 23 (confirming that Ries submitted claims for himself and his parents). As to Ries's objection against Walgreens's corporate recordkeeping practices: to the extent they are related to this litigation, the Court addressed this at the fairness hearing, explaining that the Court has no reason to doubt that there was a litigation hold in connection with this lawsuit and that it is unfortunately not uncommon—in a class of this size—for there to be some amount of degradation of custodianship leading to a loss of some historical prescription records. *See* Tr. of Fairness Hearing at 15:13–16:22; R. 761, Bosch Decl. ¶¶ 4–5 (stating that Walgreens has maintained litigation holds on patient records during the covered time period). This leaves, for now, Ries's objections to the 80/20 allocation and to the "unknown claimant" distinction.

The Court has already briefly explained its understanding of the 80/20 allocation's fairness and reasoning. *See supra* 40–41. To reiterate, the allocation comes after expert analysis of claims data—using the voluminous records that were gathered and reviewed during fact discovery—to approximate the proportional harm that each

---

[20]The Court notes that Ries also objects to the attorneys' fees and billing practices of Class Counsel. *See* Ries Obj. at 4 (PDF page number). The Court addresses those objections later, when it assesses attorneys' fees.

Plaintiff Pool has suffered. *See* Guglielmo Decl. ¶ 13. "Federal courts have held that an allocation plan that reimburses class members based on the extent of their injuries is generally reasonable." *Lucas v. Vee Pak, Inc.*, 2017 WL 6733688, at \*13 (N.D. Ill. Dec. 20, 2017) (collecting cases). Class Counsel also designated a separate attorney to act as counsel for the individual class members, who then reviewed and approved the allocation plan. *See* Guglielmo Decl. ¶ 13. The Court certainly understands Ries's inclination to demand proof that the 80/20 split is supported by the claims. But as discussed at the fairness hearing, the experts sampled transaction data for certain sub-periods within the covered period and estimated the overpayments on individual transactions. Tr. of Fairness Hearing at 20:13–24. This analysis revealed that the individual consumers had likely paid a little less than 20 percent of the overpayments in this case. *Id.* This figure aligns with Hilton's expert report submitted for class certification, which included examples illustrating her methodology for determining overpayment amounts and which Pool bore the cost for specific transactions. *See* Hilton Rep. Exh. 3, Illustrative Examples. With this in mind, and with the input of counsel for the individual consumers, the parties arrived at the 80/20 compromise. Tr. of Fairness Hearing. at 20:25–21:8. There being no reason to doubt that the 80/20 allocation is the result of reasoned analysis and adequate representation by Class Counsel and counsel for the individual consumers, Ries's objection is overruled.

Ries also objects to the distinction between known and unknown claimants, the latter category of which is required to provide more extensive proof alongside their claims. *See* Ries Obj. at 4 (PDF page number). Ries's written submission states

that both he and his late mother were designated as unknown claimants, but Class Counsel and the settlement administrator maintain that Ries himself was actually a known claimant. *See* Miller Decl. on Claims ¶ 23; Pls.' Final Approval Br. at 23. In any case, the distinction between known and unknown claimants pertains to whether the class members received direct notice (as known claimants did) and thus were already within the pool as potential class members. *See* Miller Decl. on Class Notice ¶ 12 (explaining that approximately 60 million email addresses—obtained from Walgreens's business records—were provided direct email notice). For these claimants, the process for screening the claims for fraud was understandably less arduous, because the Plaintiffs and settlement administrator already had reason to believe they would be part of the class. By contrast, the unknown claimants were required to submit some supporting documentation in the form of receipts or bank statements to verify their eligibility. Guglielmo Decl. ¶ 17. As explained at the fairness hearing, requiring supporting documentation for class-action claims is the unfortunate result of an increase in the filing of fraudulent claims for the growing number of class actions generally. *See* Tr. of Fairness Hearing at 16:13–22. Seeing as Ries was ultimately able to successfully submit claims for himself and his two parents (one of which was an unknown claimant), the Court ultimately does not have reason to believe that the process for unknown claimants was so burdensome as to prevent unknown claimants from submitting the form. *See* Miller Decl. on Claims ¶ 23. Ries's objection is thus overruled.

### E. Attorneys' Fees

Having found the settlement fair, reasonable, and adequate, the Court now moves to attorneys' fees. Rule 23(h) allows the Court to award "reasonable attorney's fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In determining a reasonable fee, the Court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988). When it comes to fees, there is a "built-in conflict of interest" between the class and their attorneys: the attorneys would naturally prefer to maximize their fees, but because fees come out of the same pot as the award to the class, the attorneys' interests are not aligned with their clients' interests. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). Meanwhile, class-action defendants care only about their overall payout, not how the payout is divided between the class and class counsel, so the defendant cannot be relied on to guard the interests of the class. *Id*. This means that the Court must carefully evaluate any award of attorneys' fees in order to prevent unfair self-dealing by class counsel.

Moving on to the nitty-gritty of fee awards, the Court has discretion to choose between two methods of calculating a reasonable fee: (1) the lodestar method, which calculates fees based on number of hours worked; and (2) the percentage-of-recovery method, which awards a percentage of the common fund as a fee. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565–66 (7th Cir. 1994). The ultimate goal is to "recreate the market" and approximate the fees that the lawyer and client would have

agreed to *ex ante* if negotiation with clients having a real stake had been feasible. *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011). The Court must consider factors such as actual fee contracts between plaintiffs and their attorneys, information from other cases, and data from class-counsel auctions. *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 719–20 (7th Cir. 2001) ("Synthroid I"). For the reasons explained below, the Court finds that the requested fees are reasonable and thus grants them to Class Counsel.

## 1. Reasonableness

In this case, Class Counsel requests fees of $30 million (30% of the gross settlement fund of $100 million), plus expenses of $2,497,845.71 (representing counsel's out-of-pocket costs for items such as copying, legal research, filing fees, and transportation). Mot. Attys.' Fees at 1; Suppl. Guglielmo & Shingler Decl. ¶ 14. As a starting point, the Seventh Circuit has held that "[t]he ratio that is relevant to assessing the reasonableness of the attorneys' fees that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman,* 768 F.3d at 630; *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 780–81 (7th Cir. 2014). Thus, the Court deducts costs that do not directly benefit the class—such as administration costs and incentive awards—from the gross settlement amount when determining the reasonableness of the requested fees. *Redman,* 768 F.3d at 630. Thus, the relevant denominator in this case is $98,090,000 (which is $100 million minus the estimated

administrative costs and incentive award), not $100 million.[21] This means that Class Counsel is requesting around 31% of the net settlement fund.[22]

Again, the Court has discretion to decide between awarding attorneys' fees using the percentage method or the lodestar method. *Florin*, 34 F.3d at 566. The choice is made slightly easier in this case, where the lodestar is $29,316,016.60, and thus falls relatively close to the requested fees amount of $30,000,000. Suppl. Guglielmo & Shingler Decl. ¶ 14. It is true that Class Counsel requests some $684,000 in excess of the lodestar calculation. Class Counsel argues that the Court should nevertheless award fees using the percentage method because contingency cases like this one commonly use percentage fees rather than billable rates. *See* R. 701, Pls.' Br. Attys.' Fees at 3. They also argue that the percentage method incentivizes counsel to obtain the largest settlement fund possible rather than delay resolution of the case in favor of billing more hours. *Id.*

Indeed, "the normal practice in consumer class actions" is to "negotiate[] a fee arrangement based on a percentage of the recovery," thus relieving the class of the burden of closely monitoring the billable hours of its counsel. *In re Capital One*, 80 F. Supp. 3d at 795; *see also Kolinek*, 311 F.R.D. at 501. Typical contingency agreements in this circuit may range from 33% to 40% of the recovery. *See, e.g.*, *Retsky Family*

---

[21]The precise calculation is as follows: $100,000,000 - $1,850,000 - $60,000 = $98,090,000.

[22]$30,000,000 / $98,090,000 = 0.30584. This percentage does not count attorneys' costs. *See Pearson*, 772 F.3d at 780–82 (distinguishing between attorneys' fees and costs, and not considering costs when determining whether the fees were a fair percentage to the class).

*Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at \*4 (N.D. Ill. Dec. 10, 2001) ("A customary contingency fee would range from 33 1/3% to 40% of the amount recovered."); *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (noting that "[t]he typical contingent fee is between 33 and 40 percent," though it might be smaller in large-recovery cases); *Kirchoff v. Flynn*, 786 F.2d 320, 323 (7th Cir. 1986) ("40% is the customary fee in tort litigation …."); *see also Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("[I]n personal-injury suits the usual range for contingent fees is between 33 and 50 percent …."). The proposed 31% fee award is also in line with the Seventh Circuit's suggestion in *Pearson* that "attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members …." 772 F.3d at 782.

The Court must also consider the circumstances of the case, in particular the fact that a contingency fee here would need to take into account the risk of absolute nonpayment. *See Silverman v. Motorola, Inc.*, 2012 WL 1597388, at \*1 (N.D. Ill. May 7, 2012) (quoting *Synthroid I*, 264 F.3d at 718). And as already discussed, the risk of nonpayment in this case was very high. *See CVS Pharmacy, Inc.*, 2022 WL 17430289, at \*1 (affirming defense verdict after jury trial for a similar case against a peer pharmacy). Class Counsel worked on this case for over seven years, having gone through all of the fact and expert discovery, briefed the motion for class certification, and overcome two partial motions to dismiss. Guglielmo Decl. ¶¶ 3–8. Thus, as enormous as the absolute number is, the Court holds that Class Counsel's request for 31% of the recovery is appropriate and reasonable, as evidenced by the very low number (just

two) objections from class members on this topic. The Court awards fees in the amount of $30 million and expenses of $2,497,845.71.

## 2. Objections to Fees

Mr. Donald Hodge and Mr. Kenneth Ries object to the amount of attorneys' fees requested by Class Counsel. *See* Hodge Obj.; Ries Obj.; Hodge Suppl. Obj. Both objectors primarily take issue with the percentage of the fee award in relation to the class's payout, as well as with a perceived ambiguity regarding whether Class Counsel's work on this case truly warrants such a high payment. *See* Hodge Obj. at 1; Ries Obj. at 4 (PDF page number). As the Court explained during the fairness hearing, it is not unreasonable for non-lawyers to be shocked by the billable rates of lawyers generally. Tr. of Fairness Hearing at 14:9–16. The Court's job, however, is not to criticize the going rates of members of the bar, but to approximate the market rate and roughly align the fee award to resemble it. *Taubenfeld*, 415 F.3d at 599. As the Court has already explained, the requested 31% of the net recovery for the class is not out of bounds with what is considered reasonable in this circuit, and is not altogether far off from the lodestar in this case. Also, Class Counsel's billable rates are not unusual for the market. And Class Counsel bore the enormous risk of devoting thousands of attorney hours into this case for potentially no money at all.

Hodge also argues that the fees should be reduced in a "mega-fund" case like this one, because "[a]s the settlement fund grows, the marginal effort required by attorneys to secure each additional dollar decreases." Hodge Obj. at 1. It is true that the Seventh Circuit has approved of this approach in a case involving a settlement

fund that was in the billions. *See In re Synthroid Mktg. Litig.*, 325 F.3d 974, 978–80 (7th Cir. 2003) ("Synthroid II"). Although this approach may be proper for some cases, it is not an absolute requirement in every mega-fund case. *See In re TikTok, Inc., Consumer Privacy Litig.*, 617 F. Supp. 3d 904, 940 (N.D. Ill. 2022); *In re Broiler Chicken Antitrust Litig.*, 2021 WL 5709250, at *3 (N.D. Ill. Dec. 1, 2021). The risk of Hodge's proposed approach in a case like this would be that Class Counsel feels less inclined to work as hard to get the fund from $80 million to $100 million, knowing that they only stand to gain a small percentage for that last $20 million. Taking into account the very realistic risk that the class would walk away with zero, it is proper to incentivize Class Counsel as much as possible to push the fund as far as they did. Hodge's and Ries's objections to the fee amount are thus overruled.

Finally, Ries also objects to the award of fees for law firms that were not appointed as Class Counsel but nonetheless involved in the lodestar and expense calculations. Ries Obj. at 4 (PDF page number); *see also* Suppl. Guglielmo & Shingler Decl. ¶ 14 (listing seven additional firms outside of the two firms appointed as Class Counsel). Again, it is reasonable to feel opposition to hundreds of thousands of dollars coming out of the settlement fund to compensate unfamiliar law firms for their work on this case. The missing distinction here is that although Scott+Scott and Robbins Geller comprise Class Counsel, the other additional law firms that incurred expenses are also counsel for class members. *See* R. 702, Guglielmo & Shingler Decl. ¶¶ 34–35. Some of these firms worked on behalf of the individual consumer class members to protect their interests in the allocation negotiations, *see* Guglielmo Decl. ¶ 13, and

57

others contributed more generally to the case itself by hiring experts, consultants, reporting services, and research, Guglielmo & Shingler Decl ¶ 43. Unsurprisingly, litigating this seven-year case on behalf of an estimated 87 million individual consumers and 42,000 entities required a huge amount of staffing power, and there is no reason to doubt that Class Counsel and Plaintiffs' counsel have diligently and truthfully reported their hours and expenses spent for the benefit of the class. Ries's objection is overruled.

### F. Incentive Award

Finally, the Plaintiffs request an incentive award of $5,000 for each of the three individual class representatives and $15,000 for each of the three third-party payor class representatives. Mot. Attys'. Fees at 1–2. "Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *see also Synthroid I*, 264 F.3d at 722 ("Incentive awards are justified when necessary to induce individuals to become named representatives."). In determining the need for an award, the Court can consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016.

To start, the requested incentive awards are modest in relation to the total settlement fund. The individual class representatives, collectively, request 0.015% of the total fund; the entity class representatives request 0.045% of the fund. In this

case, the named Plaintiffs retained the lawyers, instigated this case, sat for depositions, participated in the litigation for seven years through regular discussions about the status of the case, and assisted with the creation of the pleadings. *See, e.g.*, R. 702-10, Exh. 10, Russo Decl.; R. 702-11, Exh. 11, Bullard Decl.; R. 702-12, Exh. 12, Gonzales Decl.; R. 702-13, Exh. 13, Fox Decl.; R. 702-14, Exh. 14, Catalano Decl.; R. 702-15, Exh. 15, Bailey Decl. This is likely much more inconvenience than the average consumer would be willing to endure on an individual basis, with no incentive award. The named Plaintiffs' participation and instigation of this suit benefitted the class at large by allowing the case to be brought when it would not have otherwise been efficient to do so individually. Given these considerations, the requested awards are reasonable, so the individual named Plaintiffs are entitled to $5,000 each and the entity named Plaintiffs are entitled to $15,000 each.

### III. Conclusion

For the reasons explained above, the Insurers' motion for reconsideration, R. 772, and the Insurers' motion to intervene, R. 780, are denied. The Settlement Agreement is approved in its entirety, R. 762, creating a settlement fund in the total amount of $100 million. Also, the Plaintiffs' motion for attorneys' fees, R. 700, is granted in the amount of $30 million from the settlement fund, plus litigation expenses of $2,497,845.71.

The motion for a $5,000 incentive award for each individual class representative and $15,000 for each third-party payor representative is granted.

The parties shall file a status report on or before May 1, 2026, on the progress of effectuation of the settlement agreement.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: March 30, 2026